UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————— X
UNITED STATES OF AMERICA,

                    Plaintiff,

                                              Case No. (S-1) 16-CR-725 (JPO)

          Against

LEV PARNAS,


                    Defendant.

————————————————— X


**MEMORANDUM OF LAW IN SUPPORT OF PRE-TRIAL MOTIONS**

Joseph A. Bondy
Stephanie R. Schuman
Law Offices of Joseph A. Bondy
1776 Broadway
Suite 2000
New York, N.Y. 10019
josephbondy@mac.com
(212) 219-3572

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

**INTRODUCTION** ........................................................................................................1

**STATEMENT OF FACTS** ............................................................................................2

    A.  Personal History of Lev Parnas ...............................................................................2

    B.  Indictment and Arrest ..............................................................................................3

             i.      The July 25, 2018 Campaign Legal Center FEC Complaint Against Parnas, Fruman and Global Energy Producers............................................4

             ii.     The Government's Criminal Investigation...................................................4

             iii.    August 12, 2019 "Whistleblower Complaint" .............................................5

             iv.    The *Common Cause v. Trump FEC Complaint* .........................................9

             v.      The U.S. House of Representatives Permanent Select Committee on Intelligence Presidential Impeachment Inquiry, and Parnas's Congressional Demand Letter.......................................................................9

             vi.    Parnas Obtains Counsel, and Declines to Comply with the Congressional Demand Letter.................................................................12

             vii.   Protecting the President and his Personal Lawyer ....................................14

    C.  Arrest to Superseding Indictment..........................................................................16

             i.      Arrest .........................................................................................................16

             ii.     Change of Counsel .....................................................................................17

             iii.    Efforts at Compliance with Congressional Subpoena ..............................17

             iv.    Parnas asks Attorney General Barr to Recuse Himself .............................19

             v.      Attorney General Barr Disavows Ukrainian Sourced Evidence ...............21

             vi.    Attorney General Barr's Other Actions as the President's "Sword and Shield" ......................................................................................22

    D.  COVID-19 Pandemic .............................................................................................25

**LEGAL ARGUMENT** ...........................................................................................25

I.   THE INDICTMENT MUST BE DISMISSED, BECAUSE IT
     WAS OBTAINED IN VIOLATION OF THE DUE PROCESS
     CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED
     STATES CONSTITUTION. ALTERNATIVELY, DISCOVERY
     AND AN EVIDENTIARY HEARING SHOULD BE ORDERED............ 25

     A. Law of Selective Prosecution......................................................... 25

     B.  Law Applied to the Facts ............................................................. 27

II.  DISCOVERY AND AN EVIDENTIARY HEARING MUST ORDERED
     AND THE INDICTMENT THEN DISMISSED BECAUSE IT WAS
     OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH
     AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
     THE JURY SELECTION AND SERVICE ACT ........................................ 33

     A. The Applicable Law...................................................................... 33

         i.    Quorum ......................................................................... 33

         ii.   Original Presentment and Later "Streamlining" of Count One in the
               Superseding Indictment .................................................. 33

         iii.  Fair Cross-Section Requirement...................................... 34

     B.  Law Applied to the Facts ............................................................. 35

III. SEVERANCE OF COUNTS IS REQUIRED ............................................. 41

IV.  ALL *BRADY* AND *GIGLIO* MATERIALS MUST
     BE PRODUCED FORTHWITH................................................................. 42

     A. Applicable Law ............................................................................ 42

     B.  Law Applied to Facts ................................................................... 45

V.   JOINDER IN CO-DEFENDANTS' MOTIONS ......................................... 48

VI.  RESERVATION OF RIGHTS..................................................................... 48

CONCLUSION ....................................................................................................... 49

## **TABLE OF AUTHORITIES**

**Statutes**

28 U.S.C. § 1861(d) (2018).................................................................................34

28 U.S.C. § 1863(a) (2018).................................................................................39

28 U.S.C. §§ 1867(a) & (f) (2018) .................................................................34, 35

52 U.S.C. § 30109(a)(1) (2018)............................................................................4

52 U.S.C. § 30101 (2018)......................................................................................4

52 U.S.C. § 30102 (2018)......................................................................................4

52 U.S.C. § 30103 (2018)......................................................................................4

52 U.S.C. § 30104 (2018)......................................................................................4

52 U.S.C. § 30122 (2018)......................................................................................4

**Cases**

*Attorney General v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982) ...........................27, 28

*Brady v. Maryland*, 373 U.S. 83 (1963)............................................................... *passim*

*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2004) ...........................................................26

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................................... *passim*

*Grant v. Alldredge,* 498 F.2d 376 (2d Cir. 1974)……………………………………………44

*In re United States* (*U.S. v. Coppa*), 267 F.3d 132 (2d Cir. 2001) ......................................44

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................43, 44, 45

*Mendez v. Artuz*, No. 98 Civ. 2652 (LMM) (A), 2000 WL 722613, (S.D.N.Y. June 6, 2000) .........44

*Mendez v. Artuz*, No. 98 Civ. 2652, 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000)........................44

*Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) .........................................................44

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................43

*Synanon Church v. United States*, 579 F.Supp. 967 (D.D.C. 1984)...................................................27

*Tate v. Wood*, 963 F.2d 20 (2d Cir. 1992) ...................................................................................44

*Test v. United States*, 420 U.S. 28 (1975) ...................................................................................35

*United States v. Agurs*, 427 U.S. 97 (1976)..................................................................................43

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003).................................................................26

*United States v. Alden*, 776 F.2d 771 (8th Cir. 1985)..................................................................34

*United States v. Al Jibori*, 90 F.3d 22 (2d. Cir. 1996)..................................................................27

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................................25, 26

*United States v. Bass*, 536 U.S. 862 (2002)............................................................................27, 31

*United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974) ...............................................................27

*United States v. Chem. Found., Inc.*, 272 U.S. 1 (1926)................................................................25

*United States v. Ciambrone*, 601 F.2d 616 (2d Cir. 1979) ...........................................................33

*United States v. Fares*, 978 F.2d 52 (2d Cir. 1992) ......................................................................26

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002)......................................................................43, 44

*United States v. Gotti*, No. (S-8) 02-CR-743(RCC),
2004 WL 2274712 (S.D.N.Y. Oct. 7, 2004) ..................................................................................34

*United States v. Litwok*, 678 F.3d 208 (2d Cir. 2012) ..................................................................41

*United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005).........................................................42

*United States v. Moon*, 718 F.2d 1210 (2d Cir. 1983)..................................................................26

*United States v. Nejad*, 18-cr-00224 (AJN)
2020 WL 5549931, (S.D.N.Y, Sept. 16, 2020)..............................................................................42

*United States v. Parnas*, Docket No. 1:19-mj-00443 (E.D.V.A. 2019)..........................................17

*United States v. Parnas*, Docket No, 19-cr-725 (JPO) (S.D.N.Y. 2020)…………………………16

*United States v. Reyes*, 921 F.Supp. 189 (S.D.N.Y. 1996) ...........................................................33

*United States v. Rivas*, 377 F.3d 195 (2d. Cir. 2004) .................................................................44, 43

*United States v. Royal,* 100 F.3d 1019 (1st Cir. 1996)...................................................................34

*United States v.* Saipov, 17-cr-722 (VSB), 2020 WL 915808 (S.D.N.Y. 2020)...........................35

*United States v. Sanders*, 211 F.3d 711 (2d. Cir. 2000) ................................................................27

*United States v. Shvarts*, 90 F. Supp. 2d 219 (E.D.N.Y. 2000)......................................................44

*United States v. Triumph Capital Group*, 544 F.3d 149 (2d Cir. 2008)..........................................46

*United States v. Tubol*, 191 F.3d 88 (2d Cir. 1999).........................................................................41

*United States v. Washington*, 705 F.2d 489 (D.C. Cir. 1983)..........................................................28

*Wayte v. United States*, 470 U.S. 598 (1985) ...........................................................................25, 26

*Youngblood v. West Virginia*, 547 U.S. 867 (2006).........................................................................43

## Rules

Fed. R. Crim. P. 8(a).......................................................................................................................41

Fed. R. Evid. 608............................................................................................................................46

Fed. R. Evid. 609............................................................................................................................46

Justice Manual 9-5.002   Criminal Discovery ...............................................................................45

Justice Manual 9-11.2333   Exculpatory Evidence...............................................................33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————X
UNITED STATES OF AMERICA,

                  Plaintiff,

        Against

LEV PARNAS,

                  Defendant.

————————————————————X

Case No. (S-1) 16-CR-725 (JPO)

MEMORANDUM OF LAW
IN SUPPORT OF
PRE-TRIAL MOTIONS

## INTRODUCTION

During the most divisive and corrosive presidency in our nation's history, the United States Attorneys' Office for the Southern District of New York ("USAO SDNY") elected, first, to open an investigation into Mr. Parnas and co-defendants, given their national origin and his support for President Trump and other Republican Political Action Committees ("PAC") and legislative candidates, and then, as part of an intervention by Attorney General William P. Barr, to time Mr. Parnas's indictment and arrest to thwart him from being able to provide evidence to Congress during the Impeachment Inquiry of President Donald J. Trump.

Throughout the entirety of the next almost-year, during the unprecedented coronavirus pandemic, and as Attorney General Barr repeatedly intervened to protect the President's penal and political interests, drawing condemnation and calls for his recusal, resignation and impeachment, the USAO SDNY continued to present evidence to a grand jury, which ultimately

returned a seven count superseding indictment. The new indictment struck the original indictment's marquee allegation that Mr. Parnas had been involved in a foreign influence plot to remove then-U.S. Ambassador to Ukraine, Marie Yovanovich, and added a wire-fraud allegation.

This memorandum of law is submitted in support of Mr. Parnas's pre-trial motions to: (1) dismiss the indictment under the Due Process Clause to the Fifth Amendment on the grounds of selective prosecution; (2)  dismiss the indictment under the Fifth Amendment and Sixth Amendments and the Jury Selection and Service Act; (3) sever Counts One, Two and Three from Counts Four, Five and Six, and Count Seven from all other counts; (4) compel production of outstanding favorable and impeaching evidence forthwith, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and progeny; (5) join in co-defendants' motions to the extent that they are in furtherance of and not inconsistent with Mr. Parnas's defense; (6) reserve rights to file additional motions based upon any newly available evidence obtained or discovery produced and to supplement the existing motions to the extent required by such disclosures; and (7) grant Mr. Parnas any such other relief that the Court deems necessary and proper.

Mr. Parnas respectfully submits that his motions should be granted. Alternatively, Mr. Parnas has made legally sufficient showings for the Court to order production of the discovery requested herein and to schedule an evidentiary hearing.

## STATEMENT OF FACTS

### A.    Personal History of Lev Parnas

Lev Parnas is a 48-year old father of six. He was born in Odessa, Ukraine, and emigrated to the United States with his family in 1976. He has been a naturalized U.S. citizen for over forty years. Mr. Parnas was raised primarily in Brooklyn, New York, where he attended public middle

2

and high schools. He has also been a licensed securities broker and owned a brokerage firm. Mr. Parnas currently resides in South Florida, where he moved approximately 25 years ago. Since approximately 2003, Mr. Parnas has pursued a variety of business ventures, with limited success. Germane to this case, starting in approximately 2012, Mr. Parnas, along with his co-defendant David Correia, began a business venture named "Fraud Guarantee," which aspired unsuccessfully to produce an anti-fraud insurance vehicle for investors. In approximately 2016, Mr. Parnas began to become supportive of then-presidential candidate Donald J. Trump, and to make political pledges and donations to his campaign, the campaigns of other GOP candidates, and to so-called "Political Action Committees" or PACs. His efforts to become involved in the nascent legal cannabis industry during this time were not successful.

During the approximately ten-month period leading up to Mr. Parnas's arrest, he had been participating on behalf of the Presidents interests, with the President's long-time personal attorney, Rudy Giuliani, the President's now-election attorneys Victoria Toensing and her husband Joseph DiGenova, and others, in an attempt to gather compromising evidence and foment a baseless anti-corruption investigation against now-President-Elect Joseph Biden and his son, Hunter Biden. Mr. Parnas, since nearly the time of his appearance in the Southern District on October 23, 2019, has sought to cooperate with Congress by providing evidence material to its impeachment inquiry into the President.

### B.    Indictment and Arrest

The USAO SDNY commenced its investigation of Mr. Parnas in or about January 2019, based largely upon the allegations raised in an earlier Federal Election Commission ("FEC") complaint against Messrs. Parnas and Fruman. Attorney General Barr was personally apprised of

the existence of the SDNY investigation into Mr. Parnas shortly after he assumed office, in February 2019.

### i. The July 25, 2018 Campaign Legal Center FEC Complaint Against Parnas, Fruman and Global Energy Producers

On July 25, 2018, Campaign Legal Center filed a complaint against Global Energy Producers, LLC ("GEP"), Igor Fruman and Lev Parnas.[2] Brought pursuant to 52 U.S.C. § 30109(a)(1), it alleged that the defendants has violated the Federal Election Campaign Act ("FECA"), 52 U.S.C. § § 30101& 30122 by making political contributions to America First Action ("AFA") in the name of another person    GEP.  *Id.* The complaint also alleged that GEP had violated 52 U.S.C. §  30122 by knowingly allowing its name to be used as the source of the donations, and may have violated 52 U.S.C. § § 30102 & 30103 and 30104 by failing to register GEP and file disclosure reports as a political committee. *Id.* at Para. 2.

The complaint sought civil penalties and injunctive relief, as well as any other remedies necessary to ensure future compliance with FECA. *Id.* at Para. 35. Mr. Parnas, along with Mr. Fruman, had retained counsel and were defending the FEC matter throughout the year, up until the time of their arrest.

### ii. The Government's Criminal Investigation

In or about January 2019, emanating from the allegations in the FEC complaint as well as recent information that Mr. Parnas, along with Mr. Giuliani, was beginning to make contact with Ukrainian former officials for the purposes of gathering information favorable to the

---

  *See* New York Times, "Inside  Barr's Effort to Undermine Prosecutors in N.Y.," https://www.nytimes.com/2020/06/25/nyregion/geoffrey-berman-william-barr-michael-cohen.html (June 25, 2020).
[2] *See* Compl. filed by the Campaign Legal Center (July 25, 2018) (online at https://campaignlegal.org/sites/default/files/2018-07/SIGNED%2007-25-18%20GEP%20LLC%20Straw%20Donor%20Complaint.pdf).

President's political interests, the Government commenced the instant investigation. Throughout the year, the Government interviewed dozens of witnesses, issued numerous subpoenas, and sought and was granted multiple warrants for the searches and seizures of various electronic communications and other materials. The fact that Mr. Parnas and Mr. Fruman were born in the former Soviet Republics of Ukraine and Belarus, respectively, and then became involved with Andre Kukushkin, another Ukrainian, in attempts to form a legal cannabis business funded by a Russian national were played up in charging documents, press conferences, and the media,[3] in the time immediately following the Report on the Investigation into Russian Interference in the 2016 Presidential Election by Special Prosecutor Robert Mueller, which although not exonerating the President also did not consider whether he committed a crime.

The Government's investigation was, apparently, still ongoing and far from its completion at the time of Mr. Parnas and his co-defendants' arrest on October 9, 2019. Indeed, it was not until over eleven months after the original indictment had been returned that the Government concluded its investigation, and the grand jury voted to return the new charges contained in the superseding indictment.

### iii.     The August 12, 2019 "Whistleblower Complaint"

Certain unanticipated events unfolded in Mr. Parnas's case, which created and accelerated what appears to have been an urgent interest in silencing Parnas from providing information adverse to President Trump.

---

[3]*See, e.g.*, Russian confirmed as source of funds in alleged Parnas, Fruman 'straw donor' scheme, https://www.sacbee.com/news/california/california-weed/article246311690.html (last visited Dec. 1, 2020); Pot lawsuit may provide clues to Russian funds in Parnas, Fruman straw donor scheme, https://www.mcclatchydc.com/news/politics-government/article236028683.html (last visited Dec. 1, 2020); Two Giuliani Associates Who Helped Him on Ukraine Charged With Campaign-Finance Violations, https://www.wsj.com/articles/two-foreign-born-men-who-helped-giuliani-on-ukraine-arrested-on-campaign-finance-charges-11570714188 (last visited Dec. 1, 2020).

During the summer of 2019, Mr. Parnas's activities with and on behalf of Mr. Giuliani began to be reported by the media.[4] Then, on August 12, 2019, a "whistleblower" sent a letter to Senator Richard Burr, Chairman of the U.S. Senate Select Committee on Intelligence, and Congressman Adam Schiff, Chairman of the U.S. House of Representatives Permanent Select Committee on Intelligence, alleging that:

> In the course of my official duties, I have received information from multiple U.S. Government officials that the President of the United States is using the power of his office to solicit interference from a foreign country in the 2020 U.S. election. This interference includes, among other things, pressuring a foreign country to investigate on of the President's main domestic political rivals. The President's personal lawyer, Mr. Rudolph Giuliani, is a central figure in this effort. Attorney General Barr appears to be involved as well.

*See* Exh. A, at 1, Letter from Whistleblower to Adam B. Schiff, House Permanent Select Committee on Intelligence, and Richard Burr, Senate Select Committee on Intelligence (Aug. 12, 2019) (online at https://intelligence.house.gov/uploadedfiles/20190812_-_whistleblower_complaint_unclass.pdf).

The Whistleblower asserted that, during a July 25, 2019 telephone call with Ukrainian President Volodymyr Zelensky, President Trump "sought to pressure the Ukrainian leader to take actions to help the President's 2020 reelection bid." *Id.* Particularly, "[a]ccording to the White House officials who had direct knowledge of the call, the President pressured Mr. Zelensky" to, among other things:

- Initiate or continue an investigation (footnote omitted) into the activities of former Vice President Joseph Biden and son, Hunter Biden;

---

[4] Two Unofficial US Operatives Reporting To Trump's Lawyer Privately Lobbied A Foreign Government In A Bid To Help The President Win In 2020, https://www.buzzfeednews.com/article/mikesallah/rudy-giuliani-ukraine-trump-parnas-fruman (last visited Nov. 28, 2020).

- assist in purportedly uncovering that allegations of Russian interference in the 2016 U.S. presidential election originated in Ukraine, with a specific request that the Ukrainian leader locate and turn over servers used by the Democratic National Committee (DNC) and examined by the U.S. cybersecurity firm crowd strike (footnote omitted), which initially reported that Russian hackers had penetrated the DNC's networks in 2016; and

- meet or speak with two people the President named explicitly as his personal envoys on these matters, Mr. Giuliani and Attorney General Barr, to whom the President referred multiple times in tandem.

*Id.* at p. 3.

The complaint also stated that, according to multiple U.S. officials, "on or about 2 August, Mr. Giuliani reportedly travelled to Madrid to meet with one of President Zelensky's advisers, Andriy Yermak," and that this meeting was "a direct follow-up" to President Trump's July 25 call with President Zelensky "about the 'cases' they had discussed." *Id.* at p. 4. It was alleged that, "Mr. Giuliani had reportedly privately reached out to a variety of other Zelensky advisers, including Chief of Staff Andriy Bohdan and Acting Chairman of the Security Services of Ukraine Ivan Bakanov." *Id.* In a footnote, the complaint asserted that, "In a report published by the Organized Crime and Corruption Reporting Project (OCCRP) on 22 July, two associates of Mr. Giuliani reportedly travelled to Kyiv in May 2019 and met with Mr. Bakanov and another close Zelenskyy adviser, Mr. Serhiy Shefir." *Id.* at n. 4.

The Whistleblower's complaint included allegations involving Mr. Giuliani and his contacts with then-Ukrainian Prosecutor General Yuriy Lutsenko:

- It was also publicly reported that Mr. Giuliani had met on at least two occasions with Mr. Lutsenko; once in New York in late January and again in Warsaw in mid-February. In addition, it was publicly reported that Mr. Giuliani had spoken in late 2018 to former Prosecutor General [Victor] Shokin, in a Skype call arranged by two associates of Mr. Giuliani.

7

- On 25 April in an interview with *Fox News*, the President called Mr. Lutsenko's claims "big" and "incredible" and stated the Attorney General "would want to see this."

*Id.* at p. 6. (footnote omitted).

The Whistleblower also refers to learning that Mr. Giuliani and his "associates" were attempting to "make contact" President-Elect Zelensky's team:

- Around the same time, I also learned from a U.S. official that "associates" of Mr. Giuliani were trying to make contact with the incoming Zelensky team.

*See id.* (footnote omitted).

The complaint also referenced a May 9, 2019 New York Times article, which reported "Mr. Giuliani planned to travel to Ukraine to press the Ukrainian government to pursue investigations that would help the President in his 2020 reelection bid." *Id.* Although on May 10, the President said in an interview with *Politico* that he was planning on speaking with Mr. Giuliani about the trip, the following day, Mr. Giuliani cancelled, claiming "Mr. Zelensky was 'surrounded by enemies of the [U.S.] President …and of the United States.'" *Id.*

The Whistleblower asserted that, by mid-May 2019, s/he had heard from a number of U.S. officials who were "deeply concerned by what they viewed as Mr. Giuliani's circumvention of national security decision-making processes to engage with Ukrainian officials and relay messages back and forth between Kyiv and the President." *Id.* at p. 7. During this same period, multiple U.S. Officials had told the Whistleblower that "the Ukrainian leadership was led to believe that a meeting or phone call between the President and President Zelensky would depend on whether Zelensky showed willingness to 'play ball' on the issues that had been publicly aired by Mr. Lutsenko and Mr. Giuliani." *Id.* at p. 7.  It was noted that, "I do not know who conveyed this message to Ukrainian leadership, or when." *Id.*

8

iv.    The *Common Cause v. Trump et. al* FEC Complaint

On September 23, 2019, Common Cause, a self-described non-partisan, grass-roots organization, working to "create open, honest, and accountable government that serves the public interest; promote[s] equal rights, opportunity, and representation for all; and empower[s] all people to make their voices heard in the political process,"[5] brought its own FEC complaint against President Trump and Mr. Parnas.[6] The complaint also named Rudy Giuliani, Victoria Toensing, and Igor Fruman as defendants, and alleged that they had violated the Federal Election Campaign Act ("FECA") by soliciting a contribution from a foreign national by meeting with Ukrainian officials and urging that they commence anti-corruption investigations for the purpose of influencing the presidential election of then-candidate and now President-Elect Joe Biden. *Id.* To date, with the exception of Messrs. Parnas and Fruman, none of the individuals named in this FEC complaint have been criminally charged.

v.    **The U.S. House of Representatives Permanent Select Committee on Intelligence Presidential Impeachment Inquiry, and Parnas's Congressional Demand Letter**

On September 24, 2019, House Speaker Nancy Pelosi initiated the Impeachment Inquiry against President Trump.[7] That same day, the President released a declassified, non-verbatim transcript of his July 25 call with President Zelensky.[8] The following day, the Whistleblower's

---

[5] *See* What is Common Cause?, https://www.commoncause.org/about-us/ (last visited Nov. 29, 2020).
[6] *See* https://www.commoncause.org/wp-content/uploads/2019/09/Signed-Trump-DOJ-Complaint-9.23.19.pdf
[7] *See* Nancy Pelosi Announces Formal Impeachment Inquiry of Trump, https://www.google.com/search?q=nancy_pelosi_begins_impeachment_inquiry (last visited Dec. 1, 2020).
[8] *See* Call transcript between President Donald J. Trump, United States of America, and President Volodymyr Zelensky, Ukraine (July 25, 2019) (online at https://www.whitehouse.gov/wp-content/uploads/2019/09/Unclassified09.2019.pdf).

complaint   which the DOJ's criminal division had allegedly investigated and closed without a

finding of wrongdoing   was finally presented to Congress and thereafter released to the public.[9]

On September 30, 2019, the U.S. House of Representatives Permanent Select

Committee on Intelligence ("HPSCI") sent a letter to Mr. Parnas, demanding the production of

documentary evidence and deposition testimony. *See* Exh. B; Letter from Adam B. Schiff, House

Permanent Select Committee, Eliot L. Engel, House Committee on Foreign Affairs, and Elijah

E. Cummings, House Committee on Oversight and Reform, to Lev Parnas (Sept. 30, 2019).[10]

The items to be produced included "all documents and communications for the period of

January 20, 2017, through the present, regardless of form and as defined below, referring or

relating to":

> (1)  Paul Manafort, Hunter Biden, Mykola Zlochevsky, Burisma Holdings
> Ltd. ("Burisma"), or any employee or agent of Burisma;
>
> (2)  Efforts, including but not limited to those by you, Rudolph ("Rudy")
> Giuliani, IgorFruman, Vitaly Pruss, Semyon ("Sam") Kislin, Joseph
> diGenova, or Victoria Toensing, to induce, compel, petition, press, solicit,
> suggest, or otherwise pressure current or former Ukrainian government
> officials, politicians, or any persons or entities associated with or acting in
> any capacity as a representative, agent, or proxy for any such individuals,
> to investigate matters related to Burisma, or any U.S. persons or entities,
> including but not limited to Paul Manafort, Hunter Biden, Joseph Biden,
> the Democratic National Committee, or Hillary Clinton, as well as any
> responses by current or former Ukrainian government officials, politicians,
> or other persons of influence, or any persons or entities associated with or
> acting in any capacity as a representative, agent, or proxy for any such
> individuals, concerning the same;
>
> (3)  Serhiy Leshchenko, Igor Kolomoisky, or any persons or entities
> associated with or acting in any capacity as a representative, agent, or
> proxy for these individuals, including but not limited to efforts to induce,

---

[9] Pelosi on Barr's handling of whistleblower complaint: 'He's gone rogue',
https://abcnews.go.com/Politics/pelosi-barrs-handling-whistleblower-complaint-hes-
rogue/story?id=65910745 (last visited Nov. 28, 2020).

[0] Online at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/20190930%2
0-%20Parnas%20Letter%20and%20Doc%20Request%20Schedule.pdf).

compel, petition, press, solicit, suggest, or otherwise pressure current or former Ukrainian officials, politicians, or any persons or entities associated with or acting in any capacity as a representative, agent, or proxy for any such individuals, to investigate matters related to Leshchenko and Kolomoisky, and any documents, communications, or meetings with former Prosecutor General Yuri Lutsenko related to these matters;

( 4) The White House, President Donald Trump, Attorney General William Barr, Donald Trump Jr., Rudolph ("Rudy") Giuliani, former Ambassador Kurt Volker, State Department counselor T. Ulrich Brechbuhl, State Department Deputy Assistant Secretary George Kent, Assistant Secretary of State for European Affairs A. Wess Mitchell, or anyone in or associated with the Trump Administration;

(5)  Former Congressman Pete Sessions, including but not limited to a meeting in or about May 2018;

(6)  Former United States Ambassador to Ukraine Marie "Masha" Yovanovitch, including but not limited to the former Ambassador's recall or dismissal;

(7)  Petro Poroshenko, Volodymyr Zelensky, Nazar Kholodnitsky, Andriy Telizhenko, Andriy Yermak, Yuri Lutsenko, Serhiy Shefir, Ivan Bakanov, Ruslan Ryaboshapka, Andriy Bogdan, Kostiantyn Kulyk, Victor Shokin, Lena ("Olena") Zerkal, Andriy Favorov, Gennady Bogolyubov, or anyone who is or has been associated with Ukrainian law enforcement or anti-corruption organizations or entities, including but not limited to the office of the Prosecutor General, the Special Anti-Corruption Prosecutor's Office, or the National Anti-Corruption Bureau of Ukraine (NABU);

(8)  United States foreign assistance to Ukraine, including but not limited to the Ukraine Security Assistance Initiative and any efforts to withhold, delay, or release security assistance to Ukraine;

(9)  Monies, funds, gifts, contributions, donations, or offers of anything of value made directly or indirectly to U.S. political campaigns, candidates, parties, political action committees (PACs) and super PACs-including but not limited to America First Action, Inc.-by any foreign individuals or entities of any type (e.g., government, business, organization, etc.), individuals or entities on the Office of Foreign Assets Control's (OFAC) list of Specially Designated Nationals and Blocked Persons (SDNs) or Sectoral Sanctions Identifications List, or any persons or entities associated with or acting in any capacity as a representative, agent, or proxy for any such individuals or entities; and

11

(10) The source of any monies, funds, gifts, contributions, donations, or
offers of anything of value made by Global Energy Producers, LLC or
Aaron Investments I, LLC to America First Action, Inc., including but not
limited to a $325,000 donation in May 2018.

*Id.* at 1-2.

### vi.   Parnas Obtains Counsel, and Declines to Comply with the Congressional Demand Letter

Upon learning of the HPSCI demand letter, Mr. Parnas sought counsel. On the

recommendation of Rudy Giuliani, Mr. Parnas met with attorney John Dowd, who had

previously represented President Trump in connection with Special Prosecutor Robert Mueller's

investigation of former Trump Campaign Chair, Paul Manafort.[11] Mr. Dowd then sought a

waiver of any potential conflicts of interest from the President.[12] On October 2, 2019, the

President's impeachment counsel Jay Sekulow confirmed by e-mail that that the President

waived any potential conflict of interest in Dowd representing Mr. Parnas and Mr. [sic] Furman.

Mr. Parnas collected materials responsive to the demand letter, and reconvened with Dowd

several days thereafter in Washington DC.

On October 3, 2019, John Dowd sent HPSCI a letter advising that, among other things,

Mr. Parnas had "assisted Rudy Giuliani in connection with his representation of President

Trump," and certain of the items requested were "protected by the attorney-client, work product

and other privileges":

Be advised that Messrs. Parnas and Fruman assisted Mr. Giuliani in
connection with his representation of President Trump. Mr. Parnas and

---

*See* Dowd resigns as Trump's lawyer amid disagreements on strategy,
https://www.cnn.com/2018/03/22/politics/john-dowd-white-house/index.html (last visited
Nov. 28, 2020).

[2]The President has since claimed not to know Mr. Parnas or who he was, notwithstanding
Attorney Sekulow having provided the President's waiver of potential conflict to Attorney Dowd,
and the emergence of multiple photographs of Parnas together with the President. *See, e.g.,*
Donald Trump says he doesn't know Lev Parnas. Parnas says he has pictures with
Trump., https://www.usatoday.com/story/news/politics/2020/01/16/impeachment-donald-
trump-says-he-doesnt-know-lev-parnas/4487325002/ (last visited Nov. 29, 2020).

Mr. Fruman have also been represented by Mr. Giuliani in connection with their personal and business affairs. They also assisted Joseph DiGenova and Victoria Toensing in their law practice. Thus, certain information you seek in your September 30, 2019, letter is protected by the attorney-client, attorney work product and other privileges. Given the breadth and detail of your request for information, an appropriate privilege review cannot reasonably be conducted by  October 7, 2019, the date you have set to produce documents and communications. The amount of time required is difficult to determine, but we are happy to keep you advised of our progress and engage in a rolling production of non-privileged documents.

Your request for documents and communications is overly broad and unduly burdensome. The subject matter of your requests is well beyond the scope of your inquiry. This, in combination with requiring immediate responses, leads me to the inescapable conclusion that the Democratic Committee members' intent is to harass, intimidate and embarrass my clients.

The "Committees" and its Democratic members are well aware that my clients are entitled to retain counsel and counsel is entitled to an adequate period of time to get acquainted with the clients, review documents, consult with the clients and prepare the clients for any potential testimony and document production. Requesting production of documents within seven days and requiring testimony within fifteen days is unreasonable and not in keeping with your Committees' standard procedures.

Considering the important factual questions and legal issues attendant to the alleged whistleblower, your investigation, your authority and requests for information, your charter should be amended to exhibit some semblance of due process, fairness, justice and common decency.[13]

On October 6, 2019, Mr. Parnas met with attorney John Dowd and attorney Kevin

Downing in Washington DC. He provided the materials he believed responsive to the HPSCI

demand letter.

---

[3] *See* Exh. C Letter from John Dowd to Nicholas A. Mitchell, House Permanent Select Committee on Intelligence (Oct. 3, 2019).Online at https://twitter.com/kyledcheney/status/1181299742980132870?ref_src=twsrc%5Etfw%7Ctwc amp%5Etweetembed%7Ctwterm%5E1181311858684432384%7Ctwgr%5E%7Ctwcon%5Es3_ &ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fnews%2Fpolitics%2F2019%2F1 0%2F10%2Fcomic-sans-lawyer-john-dowd-uses-font-replying-impeachment-letter%2F3928008002%2F

13

### vii.   Protecting the President and his Personal Lawyer

On October 8, 2019, John Dowd sent an e-mail to the President's impeachment defense attorneys, Jay Sekulow and Jane Raskin, the President's personal attorney, Rudy Giuliani, Attorneys Victoria Toensing and her husband Joseph DiGenova, and Attorney John Sale, who, it is believed, was acting as Mr. Giuliani's criminal defense counsel during this time. [4] In his e-mail, Dowd assured that he would send a letter to HPSCI "eliminating any doubt" that Messrs. Parnas and Fruman would be appearing to answer questions, referred to the President as the "Boss," called Congressman Adam Schiff "Schifty," the Whistleblower a "fake," and the impeachment inquiry "Nancy's folly":



**From:** John Dowd
**Date:** October 8, 2019 at 7:06:25 AM EDT
**To:** Jay Sekulow                        com>, Victoria Toensing
                        com>, Rudy Giuliani
                                om>, Jane Raskin
                        com>, Joseph diGenova
<                        m>, Kevin Downing
<                        .com>, "Jon A. Sale"
                        >, "Martin R. Raskin"
                        , John Dowd                        .com>

**Subject: Query?**

We are sending a letter to the intel committee to eliminate any doubt that Igor and Lev will appear to answer questions because we are not prepared to do so.

We are tempted to take on a challenge to the legitimacy of the inquiry without all the bells and whistles. It would help to know if **the Boss/WH** is going to challenge. I hope. This is a huge opportunity to educate the public about **the stupidity of Nancy's folly** and **the fake WB**.

By the way McCollough has left the Compass Rose over pangs of conscience regarding the handoff to **Schifty**. ( not enough to serve the public interest)Turn the hounds loose!

---

[4] *See* Giuliani Taps Former Watergate Prosecutor Jon Sale in Impeachment Probe National Law Journal, https://www.law.com/nationallawjournal/2019/10/01/giuliani-taps-former-watergate-prosecutor-jon-sale-in-impeachment-probe/ (last visited Dec. 1, 2020).

John M Dowd[15]

Later that day, Dowd wrote to HPSCI, [6] as he had indicated he would in his e-mail:

> Kindly refer to my letter of October 3, 2019. This is an update.
> We continue to meet with Mr. Parnas and Mr. Fruman to gather the facts and documents related to the many subjects and persons detailed in your September 30 letter and to evaluate all of that information in light of the privileges we raised in our last letter. This effort will take some additional time. Accordingly, Messrs. Parnas and Fruman will not be available for depositions scheduled for October 10, 2019.

The following day, October 9, 2019, Mr. Parnas met with Mr. Giuliani at the BLT Steakhouse in the Trump Hotel, Washington DC. Mr. Parnas was scheduled to travel later that evening to Frankfurt, Germany, and then on to Vienna, Austria, to meet with the former Prosecutor General of Ukraine, Victor Shokin, to prepare him for an appearance on FOX News' Shawn Hannity Show to discuss Joe Biden. Although Mr. Giuliani, along with Victoria Toensing and Joseph DiGenova, had originally been scheduled to travel to Vienna with Parnas, Toensing and DiGenova had cancelled several days earlier, and Mr. Giuliani cancelled that day.

After finishing meeting with Mr. Giuliani, Mr. Parnas and Mr. Fruman took a car to Dulles International Airport, where they waited in the Lufthansa lounge for approximately two hours before beginning to board their flight.

Unbeknownst to Messrs. Parnas and Fruman, they had been indicted in the SDNY earlier that day.

---

[5] See Exh. D.

[6] Letter from John Dowd to Nicholas A. Mitchell, House Permanent Select Committee on Intelligence, (Oct. 8, 2019) (emphasis added). Online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-10-08%20Fruman%20Parnas%20Counsel%20Dowd%20to%20HPSCI_Redacted.pdf).

### C.    Arrest to Superseding Indictment

#### i.    Arrest

On the evening of October 9, 2019, as Mr. Parnas and Mr. Fruman were walking down the jetway, they were stopped and arrested. The indictment returned against them earlier that day [7] charged four counts against Mr. Parnas    conspiring to make contributions in connection with federal elections in the names of others and making false statements and falsifying records to obstruct an FEC inquiry into that conduct, and an entirely separate conspiracy to violate the Federal Election Act's prohibition on foreign donations and contributions in connection with federal and state elections, involving Mr. Parnas and his co-defendants' alleged attempts to solicit funds from a foreign national for the purpose of making campaign contributions intended to secure preferential treatment in the granting of state cannabis licenses.

Court One of the indictment charged Mr. Parnas, along with Mr. Fruman, with attempting to make political donations for the purpose of "enhancing their influence in political circles and gaining access to politicians," and "to advance their personal financial interests and the political interests of at least one Ukrainian government official with whom they were working." *Id.* at Para. 13.  It also alleged that Mr. Parnas, sought the assistance of "Congressman-l" in "causing the U.S. Government to remove or recall the then-U.S. Ambassador to Ukraine." and that "Parnas's efforts to remove the Ambassador were conducted, at least in part, at the request of one or more Ukrainian government officials." *Id.* at Para. 17. This bombshell headline allegation was featured in the USAO SDNY press release on the arrests, and reverberated throughout the world, rendering Mr. Parnas a near-pariah and serving as a

---

[7] *See United States v. Parnas*, et. al, 19-CR-725 (JPO) (S.D.N.Y. 2019).

factor to consider    along with the now-debunked Government assertion that Messrs. Parnas and Fruman were fleeing to Vienna on a one-way ticket    in granting a relatively high $1.0 million dollar bond to a United States Citizen first-time offender in a fraud case.

At approximately the same time, Attorney General Barr was meeting with Rupert Murdoch, then owner of FOX News. [8] Attorney General Barr had known in advance that Messrs. Parnas and Furman were going to be arrested, and made a "routine" visit to the SDNY the following morning. [9]  Later that day, Mr. Parnas was arraigned in the Eastern District of Virginia, where he remained detained in the Alexandria County Jail for nearly two weeks before being released on a $1.0 million bond. *United States v. Parnas*, 1:19-mj-00443 (E.D.V.A. 2019).

### ii.    Change of Counsel

During the course of his confinement, Mr. Parnas terminated his relationship with Attorney Dowd. On October 23, 2019, he made his initial appearance before this Court with the undersigned counsel and since-relieved co-counsel, Edward B. MacMahon, Jr.

### iii.    Efforts at Compliance with Congressional Subpoena

On November 1, 2020, the President's personal attorney, Rudy Giuliani, left a voicemail message with the undersigned counsel    half of which was inadvertent after Mr. Giuliani forgot to hang up his phone. In his message, the President's personal lawyer indicates that he was calling to see if it was possible to speak about or with Lev Parnas, with his counsel present. Mr.

---

[8] *See* Vanity Fair, "Trump's dutiful attorney general, met with Fox News mogul Rupert Murdoch on Wednesday night," https://www.vanityfair.com/news/2019/10/why-is-william-barr-meeting-with-rupert-murdoch (last visited Dec. 1, 2020).

[9] Two Giuliani associates involved in Ukraine probe arrested on campaign finance charges, https://www.latimes.com/politics/story/2019-10-10/donors-arrested-giuliani-ukraine-campaign-finance ("Atty. Gen. William Barr was briefed about this investigation in February and was informed Wednesday night that Parnas and Fruman were about to be arrested, according to a Justice Department official. Barr visited with prosecutors in the Manhattan office on Thursday, part of what aides said was a routine check-in visit.") (last visited Nov. 28, 2020).

Giuliani then proceeded to provide his cellular phone number before stating to his attorney, who apparently was also present, "That's the soon to be gotten rid of number." *See* Exh. E.

Mr. Giuliani's entreaty to speak with Mr. Parnas went unanswered, and it is unknown whether Mr. Giuliani actually altered or destroyed any evidence associated with his cellphone, nor why he might have felt a need to get "rid of" his number. Instead, new counsel informed HPSCI that Mr. Parnas wished to comply with their previously issued demand and subpoena.

On November 6, 2019, counsel confirmed to the USAO SDNY that Mr. Parnas wished to comply fully with Congress' demands in the impeachment inquiry, including its requests for the production of documents and testimony. Understanding that the DOJ Office of Legal Counsel ("OLC") had issued an opinion that an "indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions,"[20] and that "'under our constitutional plan as outlined in Article I, sec. 3, only the Congress by the formal process of impeachment, and not a court by any process should be accorded the power to interrupt the Presidency or oust an incumbent,"[2]  Mr. Parnas began to press for the release of evidence to Congress for use in the Impeachment Inquiry that had been seized from him during the time of his arrest and the contemporaneous execution of a search warrant of his home, which was being maintained under protective order.

The Court ordered modification of the protective order on several occasions, to allow information to be provided to HPSCI for use in its inquiry. To this end, Mr. Parnas provided several tranches of evidence. On December 18, 2019, the House of Representatives approved

---

[20]A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. O.L.C. 222 (2000) (OLC Op.) (online at
https://www.justice.gov/sites/default/files/olc/opinions/2000/10/31/op-olc-v024-p0222_0.pdf.
[2]  *Id.*

18

articles of impeachment on charges of abuse of power and obstruction of Congress. On January

14, 2020, HPSCI Chair Adam B. Schiff conveyed a flash drive of evidence to House Judiciary

Committee Chair Jerrold Nadler that included, "some of the records recently produced by Lev

Parnas, an associate of President Trump's personal attorney, Rudy Giuliani, that are pertinent to

the impeachment inquiry and some of which are described in more detail in the enclosure." *See*

Exh. F, Letter and Enclosures.[22]

On February 5, 2020, without having viewed a piece of evidence or heard a witness, the

Senate acquitted President Trump of all charges.

### iv.    Parnas Asks Attorney General Barr to Recuse Himself

On January 20, 2020, Mr. Parnas, through the undersigned counsel, sent Attorney

General Barr a letter-request for his recusal. *See* Exh. G.[23]  The request stated, in pertinent part,

that:

> …As explained below, due to the conflict of interest of your being
> involved in these matters as Attorney General, and in an effort to preserve
> the public trust in the rule of law, we request that you recuse yourself and
> allow the appointment of a special prosecutor from outside the
> Department of Justice to handle this case.
>
> The public record is replete with requests for your recusal, the reasons
> for that request, and public outcry that you have not. Federal ethics
> guidelines bar federal employees from participating in matters in which
> their impartiality could be questioned, including matters in which they
> were personally involved or about which they have personal knowledge. 5
> C.F.R. § 2635.502; Justice Manual§ 1-4.020.
>
> The July 25, 2019 transcript of President Trump's call with Ukrainian
> President Volodymyr Zelensky contains multiple references to you, alone
> and in conjunction with the President's attorney, Rudolf Giuliani, as being

---

[22] House Democrats release new documents from indicted Giuliani associate CBS News,
https://www.cbsnews.com/news/lev-parnas-house-democrats-release-new-ukraine-documents-from-indicted-giuliani-associate-today-2020-01-14/. (last visited Dec. 2, 2020).
[23] Letter from Joseph A. Bondy, attorney of Lev Parnas, to William P. Barr, Attorney General of
the United States (Jan. 20, 2020) (online at
https://twitter.com/josephabondy/status/1219412808938545153).

the point person for the Zelensky administration to work with in commencing an investigation into the President's chief political rival, Joe Biden. (Exhibit A).

In the August 12, 2019, whistleblower complaint, you were personally named as a participant in the President's abuse of the power of his office to solicit interference with the government of Ukraine in connection with the 2020 election, including pressuring Ukraine to investigate one of the President's political opponents, Joe Biden. (Exhibit B).

On October 23, 2019, the New York City Bar Association called upon you to recuse yourself from all Department of Justice matters relating to the allegations that the President abused the power of his office to solicit political interference on his behalf by the government of Ukraine. (Exhibit C).

On October 24, 2019, the United States Senate Judiciary Committee Democrats urged you to recuse yourself from investigation into Trump-Ukrainian matters involving Lev Parnas, his current codefendant Igor Fruman, and the President's personal attorney, Rudy Giuliani. (Exhibit D).

On January 9, 2020, The New York City Bar Association, having received no reply to its earlier call for recusal, asked Congress to investigate you for acting as a "political partisan ... willing to use the levers of government to empower certain groups over others." (Exhibit E).

In recent days, evidence has been brought to light linking you further to your long-time colleagues Victoria Toensing and Joseph di Genova, as well as Mr. Guiliani, which undoubtedly creates at least the public appearance of a conflict of interest.

In addition to harmful perceptions, this conflict of interest appears to have caused actual harm to Mr. Parnas who, given delays in the production of discovery in his federal case, was rendered unable to comply with a duly-issued congressional subpoena in time for congressional investigators to make complete use of his materials or properly assess Mr. Parnas as a potential witness. Furthermore, prosecutors have, thus far, refused to meet with Mr. Parnas and to receive his information regarding the President, Messrs. Giuliani, Toensing, diGenova and others-all of which would potentially benefit Mr. Parnas if he were ever to be convicted and sentenced in his criminal case.

The criteria informing whether an Attorney General should recuse him or herself from a matter and allow the appointment of a special prosecutor is whether a prosecution or investigation of a "matter " or of a person may raise a conflict of interest for the Department of Justice, or whether there exists,

"other extraordinary circumstances," and when, in light of these conflicts
or circumstances, the Attorney General finds it is in the "public interest" to
appoint such counsel. 28 C.F.R. §§ 600.1-2 (1999).1 If the Attorney
General is recused from a matter, then the Acting Attorney General will
appoint a special prosecutor when deemed warranted. Here, the issues
involved concern the apparent conflict of interest in your being tasked with
investigating the President, certain members of his administration, and
your longterm colleagues and friends, and the appearance of such conduct
as undermining the public's interest in due administration and trust in the
rule of law.

*id.* at 1-2.

Attorney General Barr never responded to Mr. Parnas's request for recusal.

### v.   Attorney General Barr Disavows Ukrainian Sourced Evidence

On February 10, 2020, United States Attorney General William P. Barr made several

public statements regarding the "providence" and "credibility" problems presented by

"information coming in about Ukraine," none of which could be received "at face value."[24] These

included:

- "The DOJ has the obligation to have an open door to anybody who wishes to
  provide us information that they think is relevant, but as I did say to Senator
  Graham, we have to be very careful with respect to any information coming
  from the Ukraine."[25]

- "There are a lot of agendas in the Ukraine, there are a lot of cross-currents and
  we can't take anything we receive from the Ukraine at face value"[26]

- "And for that reason we had established an intake process in the field so that any
  information coming in about Ukraine could be carefully scrutinized by the
  department and its intelligence community partners so that we could assess its
  providence and its credibility."[27]

---

[24] *See* ABC News Politics (@ABCPolitics), TWITTER (Feb. 10, 2020, 12:29pm),
https://twitter.com/ABCPolitics/status/1226921058051219464?ref_src=twsrc%5Etfw%7Ctwc
amp%5Etweetembed%7Ctwterm%5E1226921058051219464%7Ctwgr%5E%7Ctwcon%5Es1_
&ref_url=https%3A%2F%2Fabcnews.go.com%2FPolitics%2Fag-barr-doj-review-giuliani-
documents-info-ukraine%2Fstory%3Fid%3D68884719.
[25] *Id.*
[26] *Id.*
[27] *See id.*

(emphases added.)

### vi.  Attorney General Barr's Other Actions as the President's "Sword and Shield"[28]

In addition to intervening to attempt to ensure that Mr. Parnas was not in a position to provide damaging testimony against the President in the impeachment inquiry, Attorney General Barr engaged in a pattern of conduct since that creates a strong inference that his *modus operandi* is to intervene in pending DOJ matters in an effort to shield the President from potentially damaging penal and political consequences.

Thus, since the time of Mr. Parnas's arrest, Attorney General Barr has been criticized for his conduct in a variety of matters, including: (1) on February 11, 2020, immediately after the President tweeted complaining about the recommended sentence in the Roger Stone case, the Attorney General intervened to recommend a more lenient sentence,[29] precipitating the resignation of the prosecution team,[30] the signing of a letter by over 2,000 DOJ alumni calling for his resignation,[3]  and a House Judiciary Committee demand for his testimony regarding the Roger Stone case as well as the recent creation of a DOJ backchannel for receipt of evidence obtained by Rudy Giuliani in Ukraine that purported to show wrongdoing by Joe and Hunter

---

[28] *See* William Barr, Trump's Sword and Shield,
https://www.newyorker.com/magazine/2020/01/20/william-barr-trumps-sword-and-shield
(accessed November 30, 2020).
[29] Roger Stone Sentencing Was Politicized, Prosecutor Plans to Testify,
https://www.nytimes.com/2020/06/23/us/politics/roger-stone-sentencing-politicized.html (last visited Nov. 28, 2020).
[30] All 4 federal prosecutors quit Stone case after DOJ overrules prosecutors on sentencing request, https://www.cnn.com/2020/02/11/politics/roger-stone-sentencing-justice-department/index.html (last visited Nov. 28, 2020).
[3]  More than 2,000 former prosecutors and other DOJ officials call on Attorney General Bill Barr to resign, https://www.cnn.com/2020/02/16/politics/prosecutors-doj-officials-barr-resign/index.html (last visited Nov. 28, 2020).

Biden[32]; (2) on February 14, 2020, Attorney General Barr assigned an outside prosecutor to review the Michael Flynn case,[33] ultimately leading to DOJ's motion for dismissal[34] — something which former EDNY judge John Gleeson has described as "highly irregular conduct to benefit a political ally of the president" and "clear evidence of gross abuse of prosecutorial power"[35]; (3) on June 1, 2020, Attorney General Barr ordered federal officers to push back anti-Trump protestors, using fire chemical deterrents and rubber bullets, in Lafayette Square, Washington DC[36]; (4) on June 19, 2020, in an act that could well be related to the instant case, Attorney General Barr visited the SDNY to solicit the resignation of then-United States Attorney Geoffrey Berman.[37] Although USA Berman declined, DOJ published a press release indicating Berman's resignation.[38] When USA Berman denied that he was resigning, the following day, AG Barr sent a letter to Berman stating that the President had fired him[39]; (5) on June 24, 2020, the House

---

[32] Bill Barr confirms DOJ is receiving Ukraine information from Rudy Giuliani, https://www.axios.com/bill-barr-justice-department-ukraine-giuliani-Bidens-275f0649-925e-4d73-a117-4c588a2c573c.html (last visited Nov. 28, 2020).

[33] Barr Installs Outside Prosecutor to Review Case Against Michael Flynn, Ex-Trump Adviser, https://www.nytimes.com/2020/02/14/us/politics/michael-flynn-prosecutors-barr.html (last visited Nov. 28, 2020).

[34] *See* READ: DOJ motion to dismiss Flynn case, https://thehill.com/regulation/496649-read-doj-motion-to-dismiss-flynn-case (last visited Dec. 2, 2020).

[35] Retired Judge Says Flynn's Guilty Plea Must Stand, https://www.courthousenews.com/retired-judge-says-flynns-guilty-plea-must-stand/ (last visited Nov. 28, 2020).

[36] Barr personally ordered law enforcement to push back Lafayette Square protesters, https://thehill.com/homenews/administration/500736-barr-personally-ordered-law-enforcement-to-push-back-lafayette-square (last visited Nov. 28, 2020).

[37] Berman says Barr 'repeatedly urged' him to resign as top SDNY prosecutor, https://www.marketwatch.com/story/berman-says-barr-repeatedly-urged-him-to-resign-as-top-sdny-prosecutor-2020-07-09 (last visited Nov. 28, 2020).

[38] Dep't of Justice, Attorney General William P. Barr On The Nomination Of Jay Clayton To Serve As U.S. Attorney For The Southern District Of New York. (June 19, 2020) (online at https://www.justice.gov/opa/pr/attorney-general-william-p-barr-nomination-jay-clayton-serve-us-attorney-southern-district).

[39] Letter from William P. Barr, Attorney General of the United States, to Geoffrey Berman, former United States Attorney for the Southern District of New York, (June 20, 2020) (online at

Judiciary Committee called for AG Barr's impeachment[40]; (6) on July 28, 2020, AG Barr announced plans to release Special Prosecutor John Durham's findings on the investigation into the origins of the Russia Investigation just prior to the election[4] ; (7) on September 8, 2020, AG Barr sought to have the DOJ intervene in a defamation lawsuit filed against the President by Jean Carroll[42]; (8) on September 11, 2020, a top aide of Special Prosecutor Durham resigned over concerns of political pressure on Durham in his investigation[43]; and (9) on September 16, 2020, AG Barr was reported to have pushed for sedition charges to be filed against protesters and prosecution of the Seattle Mayor, in connection with protests related to police shootings of unarmed citizens,[44] and also to have endorsed the personal intervention of the Attorney General in certain criminal prosecutions.[45] These instances are merely a representative sample of AG Barr's willingness to intervene in favor of President Trump's personal and political agenda.

---

https://context-cdn.washingtonpost.com/notes/prod/default/documents/febfd776-1bc3-4e20-9a88-0e944ba99e3c/note/97ee92d4-dea5-42f0-9f25-8240522ebff1.#page).

[40] Nadler says House 'may very well' pursue impeachment of Attorney General William Barr, https://www.cnn.com/2020/06/24/politics/attorney-general-william-barr-testify-congress/index.html (last visited Nov. 28, 2020).

[4] Barr won't rule out pre-election release of Durham report POLITICO, https://www.politico.com/news/2020/07/28/barr-pre-election-release-durham-report-385244 (last visited Dec. 2, 2020).

[42] White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says The New York Times, https://www.nytimes.com/2020/09/09/us/politics/trump-e-jean-carroll-lawsuit.html (last visited Dec. 2, 2020).

[43] Prosecutor resigns from U.S. attorney's investigation into origins of Trump-Russia probe The Washington Post, https://www.washingtonpost.com/national-security/nora-dannehy-john-durham-trump-russia/2020/09/11/8bf49890-f466-11ea-b796-2dd09962649c_story.html (last visited Dec. 2, 2020).

[44] Barr Told Prosecutors to Consider Sedition Charges for Protest Violence The New York Times, https://www.nytimes.com/2020/09/16/us/politics/william-barr-sedition.html (last visited Dec. 2, 2020).

[45] Injustice: Tracking Bill Barr's Misconduct as Attorney General Project On Government Oversight, https://www.pogo.org/analysis/2020/09/injustice-tracking-bill-barrs-misconduct-as-attorney-general/ (last visited Dec. 2, 2020).

**D.     The COVID-19 Pandemic**

As of November 30, 2020, there are a total of 63,189,103 global confirmed COVID-19 cases, 1,466,762 global deaths, 13,536,216 U.S. confirmed cases, and 267,987 U.S. deaths. The number of coronavirus cases and deaths, and the overall positivity rates are skyrocketing out of control. Although several vaccines have been recently identified, they will not be widely available, it is believed, until at earliest the third quarter of 2021.

<div align="center">

**LEGAL ARGUMENT**

</div>

**I.     THE INDICTMENT MUST BE DISMISSED, BECAUSE IT WAS OBTAINED IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION. ALTERNATIVELY, DISCOVERY AND AN EVIDENTIARY HEARING SHOULD BE ORDERED**

**A.     Law of Selective Prosecution**

In this case, there is reasonable basis to conclude    not merely hyperbolic allegations    that the prosecution of Mr. Parnas has been discriminatory in both purpose and effect.

Admittedly, a defendant challenging the Government's decision to prosecute him bears a heavy burden. *United States v. Armstrong*, 517 U.S. 456, 463  64 (1996). Federal prosecutors retain "broad discretion to enforce the Nation's criminal laws." *Id.* at 464 (internal quotation marks omitted). Accordingly, "'[t]he presumption of regularity supports 'their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14  15 (1926); *see also, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985).

<div align="center">

25

</div>

To establish a claim of selective prosecution, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but was also (2) "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

With respect to the first requirement — discriminatory effect — a defendant must establish that "'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant'" and that the defendant has been "'singled out.'" *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229) (alteration incorporated); *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same).

With respect to the second requirement — discriminatory purpose — a defendant must establish that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, **or the desire to prevent his exercise of constitutional rights**." *Fares*, 978 F.2d at 59 (emphasis added) (internal quotation marks omitted; alteration incorporated). This means more than that the Government acted with an "awareness of consequences." *Wayte*, 470 U.S. at 610 (internal quotation marks omitted). Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* (internal quotation marks omitted). Where a defendant "has not shown that the Government prosecuted him because of" his protected status or conduct, his claim fails. *Id.* (emphasis in the original).

To obtain discovery on a claim of selective prosecution, Mr. Parnas "must provide 'some evidence tending to show the existence of the essential elements of the defense,'" *United States v.*

*Sanders*, 211 F.3d 711, 717 (2d. Cir. 2000) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d

Cir. 1974), "and that the documents in the government's possession would indeed be probative of

these elements." *Berrios*, 501 F.2d at 1211  12. That is, Mr. Parnas first "must show some evidence

of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863

(2002) (per curiam); *see also Fares*, 978 F.2d at 59 (same). "Mere assertions and generalized proffers

on information and belief are insufficient" to meet this burden. *Id.*

    A movant must offer "at least a colorable claim" that (1) he or she was singled out for

prosecution from among others similarly situated, and (2) that his or her prosecution was

improperly motivated. *See United States v. Al Jibori*, 90 F.3d 22, 25 (2d. Cir. 1996); *United States v.

Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983); *Attorney General v. Irish People, Inc.*, 684 F.2d 928,

932 (D.C. Cir. 1982); *Synanon Church v. United States*, 579 F.Supp. 967, 977 (D. D.C. 1984). The

"colorable claim" standard is met with the proffer of "some evidence tending to show the

existence of the essential elements of the [claim]." *See United States v. Armstrong*, 517 U.S. at 468;

*Attorney General v. Irish People, Inc.*, 684 F.2d at 932 (colorable showing must be made for both

prongs of test).

###     B.    Law Applied to the Facts

    Mr. Parnas respectfully submits that he has more than met this standard, and that his

indictment should be dismissed. Alternatively, he submits that ordering production of the items

requested *infra* and scheduling an evidentiary hearing is appropriate.

    First, as to "discriminatory intent," Millions of Americans already believe that Attorney

General Barr may have interfered in some aspect of Mr. Parnas's investigation and prosecution,

based on the public record.[46] This widely held belief undermines public confidence in the due administration of justice. Mr. Parnas's due process rights, the integrity of the due administration of justice and the USAO SDNY, and the public interest in holding government accountable to the law all require that the evidentiary record be revealed, and any constitutional deficiencies be identified and corrected.

Mr. Parnas's long-standing assertion that Attorney General Barr ordered the timing of his indictment and arrest as a means to protect the President and thwart his potential testimony in the impeachment inquiry has been substantially strengthened since the time of Parnas's unanswered January 20, 2020 request for AG Barr's recusal. Since then the Attorney General has abused the power of his position to further the political interests of the President repeatedly. As set forth above, examples include intervening to recommend a more lenient sentence for Roger Stone,[47] which led to the resignation of the prosecution team[48] and signing of a letter by

---

[46] *See, e.g.,* Lev Parnas is afraid of Bill Barr: he should be, https://www.salon.com/2020/01/26/lev-parnas-is-afraid-of-bill-barr-he-should-be_partner/ (last visited Nov. 28, 2020). Seth Abramson (@SethAbramson), Twitter (June 25, 2020, 9:22 PM), https://twitter.com/SethAbramson/status/1276324822788775936; Kerry Eleveld (@Kerryeleveld) Twitter (Jan. 20, 2020, 5:07 PM), https://twitter.com/kerryeleveld/status/1219380960283676672; Lev Parnas ran to Maddow over fear Justice Department officials would bury Bill Barr allegations: ex-prosecutor, https://www.rawstory.com/2020/01/lev-parnas-ran-to-maddow-over-fear-justice-department-officials-would-bury-bill-barr-allegations-ex-prosecutor/ (last visited Dec. 1, 2020); Glenn Kirschner (@glennkirschner2) Twitter (Jan. 18, 2020) https://twitter.com/glennkirschner2/status/1218638658225483778; Jon Cooper (@joncoopertweets) Twitter (Jan. 26, 2020) https://twitter.com/joncoopertweets/status/1221474721516150784.
[47] Roger Stone Sentencing Was Politicized, Prosecutor Plans to Testify, https://www.nytimes.com/2020/06/23/us/politics/roger-stone-sentencing-politicized.html (last visited Nov. 28, 2020).
[48] All 4 federal prosecutors quit Stone case after DOJ overrules prosecutors on sentencing request, https://www.cnn.com/2020/02/11/politics/roger-stone-sentencing-justice-department/index.html (last visited Nov. 28, 2020).

more than 2,000 DOJ alumni calling for his resignation,[49] and a Congressional demand for his

testimony regarding the Stone case and the DOJ's recently created backchannel for receipt of

evidence obtained by Rudy Giuliani in Ukraine that was believed to be adverse to Joe and

Hunter Biden[50], assigning an outside prosecutor to review the Michael Flynn case,[5]  ultimately

leading to DOJ's motion for dismissal[52]   "highly irregular conduct to benefit a political ally of

the president" and "clear evidence of gross abuse of prosecutorial power."[53] More recently, AG

Barr has ordered federal officers to push disperse anti-Trump protestors using chemical

deterrents and rubber bullets in Lafayette Square, Washington DC,[54] visited the SDNY to solicit

the resignation of then-United States Attorney Geoffrey Berman,[55] falsely stated USA Berman

had resigned,[56] and then, after USA Berman's denial, sent him a letter stating that the President

---

[49] More than 2,000 former prosecutors and other DOJ officials call on Attorney General Bill
Barr to resign, https://www.cnn.com/2020/02/16/politics/prosecutors-doj-officials-barr-
resign/index.html (last visited Nov. 28, 2020).
[50] Bill Barr confirms DOJ is receiving Ukraine information from Rudy Giuliani,
https://www.axios.com/bill-barr-justice-department-ukraine-giuliani-Bidens-275f0649-925e-
4d73-a117-4c588a2c573c.html (last visited Nov. 28, 2020).
[5]  Barr Installs Outside Prosecutor to Review Case Against Michael Flynn, Ex-Trump Adviser,
https://www.nytimes.com/2020/02/14/us/politics/michael-flynn-prosecutors-barr.html (last
visited Nov. 28, 2020).
[52] *See* READ: DOJ motion to dismiss Flynn case, https://thehill.com/regulation/496649-read-
doj-motion-to-dismiss-flynn-case (last visited Dec. 2, 2020).
[53] Retired Judge Says Flynn's Guilty Plea Must Stand,
https://www.courthousenews.com/retired-judge-says-flynns-guilty-plea-must-stand/ (last visited
Nov. 28, 2020).
[54] Barr personally ordered law enforcement to push back Lafayette Square protesters,
https://thehill.com/homenews/administration/500736-barr-personally-ordered-law-
enforcement-to-push-back-lafayette-square (last visited Nov. 28, 2020).
[55] Berman says Barr 'repeatedly urged' him to resign as top SDNY prosecutor,
https://www.marketwatch.com/story/berman-says-barr-repeatedly-urged-him-to-resign-as-top-
sdny-prosecutor-2020-07-09 (last visited Nov. 28, 2020).
[56] Dep't of Justice, Attorney General William P. Barr On The Nomination Of Jay Clayton To
Serve As U.S. Attorney For The Southern District Of New York. (June 19, 2020) (online at
https://www.justice.gov/opa/pr/attorney-general-william-p-barr-nomination-jay-clayton-serve-
us-attorney-southern-district).

had fired him.[57] Thereafter, on June 24, 2020, the House Judiciary Committee called for AG

Barr's impeachment,[58] AG Barr announced plans to release Special Prosecutor John Durham's

findings on the investigation into the origins of the Russia Investigation just prior to the

election,[59] sought to have the DOJ intervene in a defamation lawsuit filed against the President

by Jean Carroll,[60] reportedly pushed for sedition charges to be filed against protesters and for the

prosecution of the Seattle Mayor in connection with protests related to police shootings of

unarmed citizens,[6]  and endorsed his personal intervention in certain criminal prosecutions.[62]

This non-exhaustive list is indicative of AG Barr's willingness to intervene in favor of President

Trump's personal and political agenda.

     As to "discriminatory effect," Mr. Parnas was singled out for criminal investigation and

prosecution on Federal Election Act violations that were already the subject of a pending FEC

complaint, due in part to what appears to be Mr. Parnas's national origin and his protected

political beliefs, and thereafter his interest in exercising his constitutional right to comply with a

---

[57] Letter from William P. Barr, Attorney General of the United States, to Geoffrey Berman, former United States Attorney for the Southern District of New York, (June 20, 2020) (online at https://context-cdn.washingtonpost.com/notes/prod/default/documents/febfd776-1bc3-4e20-9a88-0e944ba99e3c/note/97ee92d4-dea5-42f0-9f25-8240522ebff1.#page).

[58] Nadler says House 'may very well' pursue impeachment of Attorney General William Barr, https://www.cnn.com/2020/06/24/politics/attorney-general-william-barr-testify-congress/index.html (last visited Nov. 28, 2020).

[59] Barr won't rule out pre-election release of Durham report POLITICO, https://www.politico.com/news/2020/07/28/barr-pre-election-release-durham-report-385244 (last visited Dec. 2, 2020).

[60] White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says The New York Times, https://www.nytimes.com/2020/09/09/us/politics/trump-e-jean-carroll-lawsuit.html (last visited Dec. 2, 2020).

[6]  Barr Told Prosecutors to Consider Sedition Charges for Protest Violence The New York Times, https://www.nytimes.com/2020/09/16/us/politics/william-barr-sedition.html (last visited Dec. 2, 2020).

[62] Injustice: Tracking Bill Barr's Misconduct as Attorney General Project On Government Oversight, https://www.pogo.org/analysis/2020/09/injustice-tracking-bill-barrs-misconduct-as-attorney-general/ (last visited Dec. 2, 2020).

Congressional demand. Other similarly situated people including any and all other individuals involved the conduct attributed to Mr. Parnas were not criminally prosecuted. Among these are the America First Action PAC, which received the donations from Messrs. Parnas and Fruman, and several GOP candidates who also received campaign donations.

Since there is "some evidence of both discriminatory effect and discriminatory intent," *United States v. Bass*, 536 U.S. 862 at 863 (2002) (per curiam), and not "mere assertions and generalized proffers on information and belief," *id.*, Mr. Parnas respectfully requests that the Court order the production of the following discovery items, and schedule an evidentiary hearing:

1.      Whether there was any involvement or influence of the Attorney General in any decisions in this case;

2.      Any information, whether documentary or otherwise, regarding the decision not to prosecute (a) America First Action PAC and (b) Protect the House PAC for their alleged receipt of improper campaign donations and alleged failure to report the source of these funds; not to prosecute (c) ▓▓▓▓▓▓▓▓▓▓, (d) ▓▓▓▓▓▓▓▓▓▓ or (e) ▓▓▓▓▓▓▓▓▓▓ for their alleged providing of money to defendants Fruman and Parnas that was later used to make political contributions; not to prosecute (f) ▓▓▓▓▓▓▓▓ for the alleged improper funding of Mr. Parnas's rental property; not to prosecute (g) US Representative Kevin McCarthy, (h) Vice President Mike Pence, and (i) the Great America PAC for their alleged improper receipt of campaign donations.

3.      All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Mr. Parnas was investigated, arrested and/or charged in this case;

31

4.      All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why individuals and entities including but not limited to, America First Super PAC, ███████████, Rudy Giuliani, President Donald J. Trump, Victoria Toensing, Joseph DiGenova, and John Solomon, were not arrested or charged with Mssrs. Parnas and Igor Fruman;

5.      A list of all SDNY indictments within the past 5 years that charge Federal Election Act violations;

6.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the timing of the decision to indict and arrest Messrs. Parnas and Fruman;

7.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and the Department of Justice regarding the decision not to arrest or charge any other individuals; and

8.      All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the USAO-SDNY and/or the Department of Justice, Attorney General William P. Barr, and the White House, President Trump, or anyone on his behalf (*e.g.*, his personal counsel), regarding Mr. Parnas.

8.      All documents reflecting any communication regarding Mr. Parnas between the USAO-SDNY and/or the Department of Justice and the White House, President Trump, or anyone on his behalf (e.g., his personal counsel).

Given the Attorney General's record since the inception of this case, the materials requested are important to examining the decisions to prosecute Mr. Parnas in this case, including the timing of the return of his indictment and arrest, and whether they were influenced by politics, or the Attorney General's interest in shielding the President in any way.  These are

32

questions of constitutional significance to Mr. Parnas and national importance to us all, and it is time for any such materials to be disclosed.

## II. DISCOVERY AND AN EVIDENTIARY HEARING MUST ORDERED AND THE INDICTMENT THEN DISMISSED BECAUSE IT WAS OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE JURY SELECTION AND SERVICE ACT

### A. The Applicable Law

#### i. Quorum

In *United States v. Reyes*, 921 F.Supp. 189 (S.D.N.Y. 1996), the court ordered the government to produce grand jury attendance and voting records, where the defendant produced documents obtained from the Jury Administrator proving that ten members of the grand jury that returned a third superseding indictment were in fact not members of the grand jury when it voted for the original, first and second superseding indictments. Finding a valid question of potential government misconduct in failing to present all evidence upon which its earlier indictments were based, the court ordered the government to produce all grand jury attendance and voting records.

#### ii. Original Presentment and Later "Streamlining" of Count One in the Superseding Indictment

Just as it is unfair to obtain an indictment based upon false evidence, *United States v. Ciambrone*, 601 F.2d 616, 622 23 (2d Cir. 1979), so too is it unfair to mislead a grand jury through multiple omissions into thinking it is receiving evidence from reliable sources.

Prosecutors owe a high duty of good faith to the court, the grand jury, and the defendant to screen out unreliable witnesses. Justice Department policy thus requires prosecutors to disclose "substantial evidence that directly negates the guilt of a subject of the investigation" to the grand jury before seeking an indictment. *See* JM 9 11.233.

###       iii.       Fair Cross-Section Requirement

In challenging the composition of the grand jury in this case, Mr. Parnas requests

production of all records and papers used in connection with the constitution of the Master and

Qualified Jury Wheels in the United States District Court for the Southern District of New York,

pursuant to the Fifth and Sixth Amendments to the United States Constitution and the Jury

Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1867(a) and (f). Section 1867(f) of Title 28 of the

United States Code states that "the parties shall …be allowed to inspect, reproduce, and copy …

records or papers [used by the commission or clerk in connection with the jury selection process]

at all reasonable times during the preparation and pendency of …a motion under subsection (a)."

*See also Test v. United States*, 420 U.S. 28, 30 (1975) (right to inspect records is supported "not only

by the plain text of the statute, but also by the statute's overall purpose in insuring grand and

petit juries selected at random from a fair cross section on the community"), quoting 28 U.S.C. §

1861(d).

To invoke the right to inspect under 28 U.S.C. § 1867(f) and "[t]o avail himself of [the]

right of access to otherwise unpublic jury selection records, a litigant needs only allege that he [or

she] is preparing a motion challenging the jury selection procedures." *United States v. Alden*, 776

F.2d 771, 773 (8th Cir. 1985) (internal citations omitted). The Defendants are not required to

make any showing with respect to probabilities of success of such a motion. *See, e.g., United States v.

Royal*, 100 F.3d 1019, 1025 (1st Cir. 1996); *see also United States v. Gotti*, No. (S-8) 02-CR-

743(RCC), 2004 WL 2274712, at *5 (S.D.N.Y. Oct. 7, 2004) (granting motion for discovery even

absent any showing that information would reveal a violation).

**B.      Law Applied to the Facts**

Here, the Defendants' superseding indictment was filed on September 17, 2020.  Despite having asked the Government on November 24, 2020, and again in writing on November 27, 2020, to confirm the location and circumstances of the grand jurors who returned the indictment, the Government was not able to do so. The Defendants thus have no assurances that they were indicted by a quorum of grand jurors sitting in Manhattan, notwithstanding the COVID-19 crisis, and indeed are aware of a number of contemporaneous challenges to the jury selection process in the SDNY on fair cross-section grounds.  The unusual circumstances of the time the indictment was returned   the Southern District Courthouse had been largely closed and many  members of the public were avoiding public appearances, self-isolating, in quarantine or otherwise under a stay-at-home order   may have compromised Mr. Parnas' right to a grand jury selected from a fair cross section of the community.   Accordingly, Mr. Parnas respectfully requests access to the records and papers used in connection with the constitution of the Master and Qualified Jury Wheels in the United States District Court for the Southern District of New York, pursuant to the Fifth and Sixth Amendments to the United States Constitution and the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1867(a) and (f).

Mr. Parnas does not seek any personal identifying information for the individuals whose records are maintained by the jury clerk's office.  As such, the full set of records should be provided in the manner requested below. *See United States v. Saipov*, 17-cr-722 (VSB), 2020 WL 915808, at *3 (S.D.N.Y. Feb. 26, 2020) (granting similar request in full).

In an effort to resolve their questions regarding the grand jury quorum, procedure for protecting against the use of certain misleading information, and the selection and composition of the grand jury, the defendants first conferred with the Government by phone, and thereafter, per its

request, Mr. Parnas submitted a letter on behalf of all the defendants, requesting discovery on these subjects. *See* Exh. H.

Particularly, the defendants request that the Court order the Government to produce information related to the grand jury quorum, the "streamlining" of Count One of the original Indictment into its present form, and the fair-cross section requirements of the Sixth Amendment. To the extent that the USAO SDNY is already in possession of any of the materials requested below, and to expedite this process and conserve judicial resources, we request voluntary production of these materials. The requested materials are necessary to properly challenge the jury selection procedures used in this district.

As to the quorum, the defendants respectfully request that the Court order the Government to produce the following items:

1.      Confirmation that there was continuity in the grand jurors between the initial and second presentments;

2.      Confirmation that at least 12 of the jurors who were present on September 18, 2020 (the date the first superseding indictment was returned) were also members of the grand jury on or before October 9, 2019 (the day the original indictment was returned);

3.      If there were grand jurors who were present for the return of the first superseding indictment but not the original indictment, an explanation of what steps the Government took to present these jurors with all testimony and evidence upon which the previous indictment was based;

4.      Confirmation as to whether the grand jury testimony upon which the first indictment had been returned was read to these jurors, or instead, the Government simply read the prior indictment.

5.      Confirmation whether or not all of the evidence supporting the original charges was made available to the new jurors;

6.      If any arguably attorney-client privileged communications were presented to the grand jury that returned the superseding indictment, the basis for the Government's assertion that this information was not privileged.

With respect to the "streamlining" of Count One of the original indictment to excise all reference in the superseding indictment to the alleged Ukrainian foreign influence plot to remove the former U.S. Ambassador to Ukraine, the defendants request that the Court order the Government to disclose the following items:

1.      Identify whether any information or testimony of the kind described by Attorney General Barr as having the "providence" and "credibility" problems presented by "information coming in about Ukraine," none of which could be received "at face value,"[63] was presented to the grand jury that returned the original indictment;

2.      If any such information or testimony was originally presented, please identify whether any of this evidence was withdrawn or not presented during the subsequent presentment the led to the first superseding indictment;

3.      If any such information or testimony was originally presented, then subsequently withdrawn or not presented, whether grand jurors received any instructions or warnings related to the potential credibility problems posed by this evidence    including credibility problems related to any agents responsible for the gathering of this evidence;

---

[63] *See* ABC News Politics (@ABCPolitics), TWITTER (Feb. 10, 2020, 12:29pm), https://twitter.com/ABCPolitics/status/1226921058051219464?ref_src=twsrc%5Etfw%7Ctwc amp%5Etweetembed%7Ctwterm%5E1226921058051219464%7Ctwgr%5E%7Ctwcon%5Es1_ &ref_url=https%3A%2F%2Fabcnews.go.com%2FPolitics%2Fag-barr-doj-review-giuliani-documents-info-ukraine%2Fstory%3Fid%3D68884719.

4.      Any such information or testimony that was originally presented, then subsequently withdrawn or not presented;

5.      If any such information or testimony was originally presented, then subsequently withdrawn or not presented, confirmation of whether any of this information was relied upon in obtaining any of the search warrants in this case and, if so, which ones.

6.      If any such information or testimony was presented in seeking the first indictment but later withdrawn or not presented, how many grand jurors who heard the presentment of this evidence in the original were present at the time of the return of the superseding indictment.

Finally, as to the defendants' assertion that they have been denied their constitutional rights to a grand jury that consists of a "fair cross section" of the community, we request production of the following information:

1.      Which jury division was chosen for the grand jury in this case.

2.      The specific location where the grand jury sat.

3.      Whether or not any aspect of the grand jury presentment was conducted remotely, and, if so, whether grand jurors ever appeared remotely.

4.      A description of any changes from the previous procedures or from the Jury Plan for the grand jury or creation of the grand jury because of the Covid-19 pandemic.

5.      Any order of the Court that affects the previous procedures or the Jury Plan for the grand jury or creation of the grand jury because of the Covid-19 pandemic.

6.      To the extent known, describe work done, contact information, and communications with any vendors in the creation of the Master and Qualified Jury Wheels used to summon grand jurors in this case.

7.      The Jury Plan for the Southern District of New York currently in effect and, if different in any respect, at the time grand jurors were summoned in this case.

38

8.      A description of the reason(s) for the choice of jury division for the grand jury in this case.

9.      Any "AO-12 form" or "JS-12 form" created which relates to the District and Divisional Master Jury Wheels and Qualified Jury Wheels that were used to summon the grand jurors who returned the indictment in this case as required by 28 U.S.C. § 1863(a).

10.      Any other statistical or demographic analyses produced to ensure the quality and compliance of the Master Jury Wheels and Qualified Jury Wheels that were used to summon grand jurors in this case with the Jury Plan, Jury Selection and Service Act and constitutional requirements.

11.      The date when the Master Jury Wheel that was used to summon grand jurors in this case was refilled as described in the Jury Plan Section III B.

12.      The record of the steps, numbers, and calculations as described in the Jury Plan Section II A.

13.      The general notice explaining the process by which names are periodically and randomly drawn as described in the Jury Plan Section III D.

14.      The calculation of the division of jurors from Westchester, Putnam, and Rockland Counties to reasonably reflect the relative number of registered voters as described in the Jury Plan Section IV B.

15.      The procedures implemented related to prospective jurors who do not respond to a juror qualification form or have their juror qualification form returned from the Postal Service as undeliverable as described in the Jury Plan Section III E.

16.      The date when grand jurors were summoned in this case.

17.     The number of persons summoned from the Qualified Jury Wheel to be considered as grand jurors in this case.

18.     The District, Manhattan Division, and White Plains Division Master Jury Wheel data as described in the Jury Plan Sections III A, III B and III C in electronic and accessible form that includes Juror Number, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County and Jury Division.

19.     The District, Manhattan Division, and White Plains Division Qualified Jury Wheel data as described in the Jury Plan Section III D in electronic and accessible form that includes Juror Number, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County and Jury Division.

20.     Status Codes for potential jurors who were selected from the Master Jury Wheel for qualification who either had their qualification form returned by the postal service, did not respond or were disqualified or exempted from jury service as described in the Jury Plan. The data should be in electronic and accessible form that includes Juror Number, whether the form was returned undeliverable, whether the form was not returned, Reason for Disqualification, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County, and Jury Division.

21.     The Juror Number only (and not Name or Address) for persons selected as potential grand jurors in this case.

22.     The source of data in electronic form for the Master Jury Wheel used to summon grand jurors in this case as described in the Jury Plan Sections I (4) and III A (voter registration list). The data should include, as available, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County, and Jury Division but not any personal information or information that could be used to identify any individual such as Name or Address.

40

23.     The juror qualification and summons forms for persons summoned to potentially become grand jurors in this case.

24.     The disposition of each summoned potential grand juror in this case as to excusal, deferment, disqualification or selection as described in the Jury Plan.

Mr. Parnas also seeks leave to supplement his motion to dismiss once he had had an opportunity to inspect the grand jury records that are the subject of the above request.  Once these materials are obtained, the defendants will analyze the records with the assistance of an expert to determine whether the grand jury plan procedures violated their right to a grand jury "selected at random from a fair cross-section of the community."  28 U.S.C § 1861; see also 28 U.S.C. §§ 1863(b)(3), 1866(f).

## III.     SEVERANCE OF COUNTS IS REQUIRED

The superseding indictment charges three "buckets" of criminal activity, which Mr. Parnas argues are each improperly joined with the others. Counts One, Two and Three comprise the so-called "straw donor counts," Counts Four, Five and Six the "foreign donor counts," and Count Seven the "Fraud Guarantee" wire fraud count. Mr. Parnas argues that these offenses are improperly joined under Fed. R. Crim. P. 8(a), because they are not based upon the same acts or transactions, nor part of a common scheme or plan, nor of a similar character.  There is an insufficient logical connection between the groups of counts, and different evidence is required to prove each group. *See, e.g., United States v. Litwok*, 678 F.3d 208, 216  17 (2d Cir. 2012) (improper joinder of fraud and tax counts where the fraud and unreported income were not connected); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (finding two robbery counts to have been improperly joined where each involved "distinctly different methods" and "distinctly different victims"). Furthermore, introduction of evidence relevant as to some counts

41

would improperly taint the jurors' consideration of the others. Particularly, introduction of evidence pertaining to the Fraud Guarantee wire fraud charged in Count Seven would be unfairly and irremediably prejudicial to Mr. Parnas's defense of both the straw donor and foreign donor counts.

For these reasons, Mr. Parnas requests a severance of Counts One, Two and Three from Counts Four, Five and Six, and severance of Count Seven from all other counts. Mr. Parnas does not seek any severance from his codefendants other than that necessitated by the requested severance of offenses.

## IV.   ALL *BRADY* AND *GIGLIO* MATERIALS SHOULD BE PRODUCED FORTHWITH

The Government should be ordered to produce immediately all material that is favorable or exculpatory under *Brady v. Maryland,* or impeaching under *Giglio v. United States*, which is currently in its possession, and to continue to produce all *Brady* and *Giglio* material immediately upon discovery should any such additional evidence become known. *See generally, United States v. Nejad*, 18-cr-00224 (AJN) 2020 WL 5549931, at 2  3* (S.D.N.Y, Sept. 16, 2020).

### A.   Applicable Law

The Government has a duty to disclose all material evidence favorable to a criminal defendant. *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (*citing Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *see also Giglio v. United States*, 405 U.S. 150, 154  55 (1972) (*Brady* includes material that can be used to impeach prosecution witnesses). When the government violates this duty and obtains a conviction, it deprives the defendant of his or her liberty without due process of law. *See, e.g., United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). at 199.

*Brady* material need not be admissible to require production, if it "could lead to admissible evidence" or "would be an effective tool in disciplining witnesses during cross-examination by

refreshment of recollection or otherwise." *See, e.g., United States v. Gil*, 297 F.3d 93, 104 (2d Cir.2002).  Indeed, in *United States v. Rivas*, the Second Circuit granted a new trial where the suppressed *Brady* evidence was inculpatory as well as exculpatory, because its exculpatory character harmonized with the theory of the defense case. 377 F.3d at 199  200."

"A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). Evidence is deemed withheld under *Brady* even when it is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Evidence is favorable if it is either exculpatory or impeaching. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 281  82 (1999). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood*, 547 U.S. at 870 (internal quotation marks omitted). However, a "`showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,'" *id.* (quoting *Kyles*, 514 U.S. at 434), but only a "`showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,'" *Youngblood*, 547 U.S. at 870 (quoting *Kyles*, 514 U.S. at 435). The assessment of materiality is made in light of the entire record. *United States v. Agurs*, 427 U.S. 97 (1976).

The Due Process clause of the United States Constitution requires the Government to disclose favorable evidence to a defendant where it is material *either* to guilt or to punishment. *See Brady*, 373 U.S. at 87. Even if this evidence is only in the possession of investigating officers and not in the direct possession of the prosecutors, it must be produced. *See Kyles* at 419. Favorable evidence includes both evidence that tends to exculpate the accused, see id., as well as evidence that is useful to impeach the credibility of a government witness. *See Giglio* 405 U.S. at 154. As the

Second Circuit made clear nearly twenty years ago, *Brady* and *Giglio* material must be provided by the Government "in time for its effective use at trial." *In re United States* (*U.S. v. Coppa*), 267 F.3d 132, 146 (2d Cir. 2001).

Prosecutors are required to turn over exculpatory and impeachment evidence whether or not requested by the defense. *Brady v. Maryland*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. [150,] 154  55 (1972); *Tate v. Wood*, 963 F.2d 20, 25 (2d Cir.1992). This includes not only evidence that goes towards negating a defendant's guilt but also any information that if disclosed would affect the outcome of the case.

Moreover, merely because the government may consider any of this evidence not credible does not mean that it is not *Brady*. It is not for the government to determine whether *Brady* evidence is credible or not. It must be disclosed for the defense to investigate regardless of whether the government considers it credible. *See Mendez v. Artuz*, No. 98 Civ. 2652 (LMM) (A), 2000 WL 722613, at *14 (S.D.N.Y. June 6, 2000), report and recommendation adopted by *Mendez v. Artuz*, No. 98-CIV-.265, 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000), *aff'd by Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) ("If the evidence is favorable to the accused, * * * then it must be disclosed, even if the prosecution believes the evidence is not thoroughly reliable."). The law requires the government to timely provide *Brady* information to enable the defense to fully explore and exploit this information. *Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir. 1974); *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001); *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002); *United States v. Shvarts*, 90 F. Supp. 2d 219 (E.D.N.Y. 2000) (Glasser, J.).

Prosecutors are to take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439. Furthermore, Justice Department

policy encourages prosecutors to disclose these types of evidence even when its admissibility is a close question. *See, e.g.,* Justice Manual 9-5.002 Criminal Discovery.

For these reasons, and given the difficulties of preparing a defense against multiple witnesses during a pandemic, Mr. Parnas respectfully requests that the Government be required to produce all *Brady* and *Giglio* materials immediately, so that the defense can make meaningfully use of them in advance of trial.

### B.      Law Applied to Facts

Mr. Parnas notes that the Government has produced limited materials to the defendants under the rubric of *Brady*. We believe these productions to be incomplete, for many of the reasons set forth by counsel to co-defendant Kukushkin, and therefore request that the Court order the Government to produce the following *Brady* and *Giglio* evidence, to the extent it is in their possession, forthwith:

#### General *Brady* Requests

1.      Any information that is inconsistent with any element of any crime charged or that establishes a recognized affirmative defense, regardless of whether the Government believes such information will make the difference between conviction and acquittal of the defendant for a charged crime;

2.      Any information that either casts a substantial doubt upon the accuracy of any evidence including but not limited to witness testimony the Government intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence, regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime, and regardless of whether the information subject to disclosure would itself constitute admissible evidence.

3.      All items of information that, although when viewed in isolation may not reasonably be seen as meeting the standards for *Brady* disclosure, but which may in conjunction with other items have such an effect.

### *Giglio* Requests

1.      Prior inconsistent statements, including inconsistent attorney proffers. *See United States v. Triumph Capital Group*, 544 F.3d 149 (2d Cir. 2008) (Convictions reversed due to suppression of "material exculpatory and impeaching evidence.");

2.      Statements or reports reflecting witness statement variations;

3.      Benefits, rewards or emoluments provided to witnesses including, *but not limited to*: (a) dropped or reduced charges; (b) immunity; (c) expectations of downward departures or motions for reduction of sentence; (d) assistance in a state or local criminal proceeding; (e) considerations regarding forfeiture of assets; (f) stays of deportation or other immigration status considerations; (g) S-Visas; (h) monetary benefits; (i) conjugal arrangements; (j) non-prosecution agreements; (k) meals during proffers; (l) letters to other law enforcement officials (*e.g.* state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf; (m) relocation assistance; (n) consideration or benefits to culpable or at risk third-parties;

4.      Conditions that could affect the witness's bias such as: (a) animosity toward defendant; (b) animosity toward a group of which the defendant is a member or with which the defendant is affiliated; (c) relationship with any victim; (d) known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor); (e) prior acts under Fed.R.Evid. 608; (f) prior convictions under Fed.R.Evid. 609; (g) known substance abuse or mental health issues; and (h) other issues that could affect the witness's ability to perceive and recall events.

5.      All variances in a witness's statements, even if they are within the same interview, or made during preparation to testify in a grand jury or at a trial;

6.      All law enforcement agent or prosecutors 'notes that are materially different from the final memorandum or report of the subject matter contained in the notes.

### Specific *Brady/Giglio* requests

1.      All evidence related to the criminal histories of government witnesses, whether foreign or domestic, including but not limited to rap sheets, conviction records, plea agreements, and cooperation agreements.

2.      Any promises, inducements, payments, emoluments, rewards or threats made to witnesses to gain evidence, information, or cooperation in the investigation or prosecution;

3.      All potential impeachment information, including information that either casts a substantial doubt upon the accuracy of any evidence    including witness testimony    the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information may include but is not strictly limited to: (a) specific instances of conduct of a witness for the purpose of attacking the witness' credibility or character for truthfulness; (b) evidence in the form of opinion or reputation as to a witness' character for truthfulness; (c) prior inconsistent statements; and (d) information that may be used to suggest that a witness is biased;

4.      Any statements, oral, electronic, written, recorded or otherwise, made by individuals interviewed by the Government, which reflect a belief that their participation with Mr. Parnas in any aspect of the offenses alleged in the indictment was not illegal;

5. Any information related to the decisions not to prosecute other individuals or entities with the Federal Election Act violations charged in the indictment, including but not limited to America First Action, and others;

6. Any information reflecting the intervention of Attorney General William P. Barr in the decisionmaking process relating to the investigation, charging, indictment, or prosecution of Mr. Parnas.

The items requested above are essential to preparing Mr. Parnas's trial defense, and to facilitate their meaningful use and application, disclosure of these items if required forthwith if possessed, and promptly upon receipt of any such additional materials.

## V.   JOINDER IN THE MOTIONS OF CO-DEFENDANTS

To the extent that they are not in conflict, Mr. Parnas joins in the motions of his co-defendants, particularly those of Mr. Fruman as they relate to the Government's having used attorney-client privileged materials in search warrant affidavits thus requiring suppression of all improperly obtained fruits, and compelling production of still-outstanding evidence, including a witness and exhibit list.

## VI.   RESERVATION OF RIGHTS

Mr. Parnas reserves the right to bring additional motions, based upon additional facts or evidence that may become available or known to the defense.

48

**CONCLUSION**

For the reasons set forth herein, it is respectfully requested that the Court grant Mr.

Parnas's pre-trial motions in entirety, along with any other relief that is necessary and proper.

Dated: New York, New York
        December 10, 2020

Respectfully submitted,

*Joseph A. Bondy*

Joseph A. Bondy
Stephanie R. Schuman
*Counsel to Lev Parnas*

49