THE LAW OFFICES OF

# JOSEPH A. BONDY

JOSEPH A. BONDY

STEPHANIE SCHUMAN
(OF COUNSEL)

1776 BROADWAY
SUITE 2000
NEW YORK NY 10019
TEL 212.219.3572
FAX 212.219.8456

JOSEPHBONDY@MAC.COM

January 20, 2020

(By Fax: (202) 307-6777 and Mail)
William P. Barr
Attorney General
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Re:     Request for Recusal, Lev Parnas

Dear Attorney General Barr,

We are counsel to Lev Parnas regarding the Federal Election Act charges for which he is under indictment in the Southern District of New York and the investigation of his alleged involvement in the subject matter of the Presidential impeachment. As explained below, due to the conflict of interest of your being involved in these matters as Attorney General, and in an effort to preserve the public trust in the rule of law, we request that you recuse yourself and allow the appointment of a special prosecutor from outside the Department of Justice to handle this case.

The public record is replete with requests for your recusal, the reasons for that request, and public outcry that you have not. Federal ethics guidelines bar federal employees from participating in matters in which their impartiality could be questioned, including matters in which they were personally involved or about which they have personal knowledge. 5 C.F.R. § 2635.502; Justice Manual § 1-4.020.

The July 25, 2019 transcript of President Trump's call with Ukrainian President Volodymyr Zelensky contains multiple references to you, alone and in conjunction with the President's attorney, Rudolf Giuliani, as being the point person for the Zelensky administration to work with in commencing an investigation into the President's chief political rival, Joe Biden. (Exhibit A).

In the August 12, 2019, whistleblower complaint, you were personally named as a participant in the President's abuse of the power of his office to solicit interference with the government of Ukraine in connection with the 2020 election, including pressuring Ukraine to investigate one of the President's political opponents, Joe Biden. (Exhibit B).

Page 1 of 3

On October 23, 2019, the New York City Bar Association called upon you to recuse yourself from all Department of Justice matters relating to the allegations that the President abused the power of his office to solicit political interference on his behalf by the government of Ukraine. (Exhibit C).

On October 24, 2019, the United States Senate Judiciary Committee Democrats urged you to recuse yourself from investigation into Trump-Ukrainian matters involving Lev Parnas, his current co-defendant Igor Fruman, and the President's personal attorney, Rudy Giuliani. (Exhibit D).

On January 9, 2020, The New York City Bar Association, having received no reply to its earlier call for recusal, asked Congress to investigate you for acting as a "political partisan…willing to use the levers of government to empower certain groups over others." (Exhibit E).

In recent days, evidence has been brought to light linking you further to your long-time colleagues Victoria Toensing and Joseph diGenova, as well as Mr. Guiliani, which undoubtedly creates at least the public appearance of a conflict of interest.

In addition to harmful perceptions, this conflict of interest appears to have caused actual harm to Mr. Parnas who, given delays in the production of discovery in his federal case, was rendered unable to comply with a duly-issued congressional subpoena in time for congressional investigators to make complete use of his materials or properly assess Mr. Parnas as a potential witness. Furthermore, prosecutors have, thus far, refused to meet with Mr. Parnas and to receive his information regarding the President, Mssrs. Giuliani, Toensing, diGenova and others—all of which would potentially benefit Mr. Parnas if he were ever to be convicted and sentenced in his criminal case.

The criteria informing whether an Attorney General should recuse him or herself from a matter and allow the appointment of a special prosecutor is whether a prosecution or investigation of a "matter" or of a person may raise a conflict of interest for the Department of Justice, or whether there exists, "other extraordinary circumstances," and when, in light of these conflicts or circumstances, the Attorney General finds it is in the "public interest" to appoint such counsel. 28 C.F.R. §§ 600.1-2 (1999).[1] If the Attorney General is recused from a matter, then the Acting Attorney General will appoint a special prosecutor when deemed warranted. Here, the issues involved concern the apparent conflict of interest in your being tasked with investigating the President, certain members of his administration, and your long-term colleagues and friends, and the appearance of such conduct as undermining the public's interest in due administration and trust in the rule of law.

The 1999 recusal regulations promulgated by Attorney General Reno also provide that, if appointed, an outside special counsel "shall be a lawyer with reputation for integrity and impartial decision-making, and with appropriate experience to ensure both that the investigation will be conducted ably, expeditiously and thoroughly and that investigative and prosecutorial decisions will be supported by

---

[1] See Justice Manual at § 3-1.140, United States Attorney Recusals ("When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of an actual or apparent conflict of interest, they must contact EOUSA's General Counsel's Office (GCO)…They must be recused by the designated Associate Deputy Attorney General.  The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a loss of impartiality. A United States Attorney who becomes aware of circumstances that might necessitate his or her recusal or that of the entire office should promptly notify GCO to discuss whether a recusal is required.  If recusal is appropriate, GCO will coordinate the recusal action, obtain necessary approvals for the recusal, and arrange for a transfer of responsibility to another office.").

an informed understanding of the criminal law and Department of Justice policies." (28 C.F.R. §§ 600.1-10; 64 Fed. Reg. 37,038–44 (July 9, 1999)).  In Mr. Parnas's case, it is in the public interest to remove this matter entirely from the Department of Justice, both to ensure that the matter is handled properly and that the public had confidence in the way in which it was handled.

Given the totality of the circumstances, we believe it is appropriate for you to recuse yourself from the ongoing investigation and pending prosecution of Mr. Parnas, and to allow the then-Acting Attorney General to appoint a special prosecutor from outside the Department of Justice, so as to avoid the appearance of a conflict of interest and to preserve the public trust in the rule of law.

Thank you for your consideration of this request.

Respectfully submitted,

Joseph A. Bondy
Stephanie R. Schuman
*Counsel to Lev Parnas*

c:      Hon. J. Paul Oetken
        AUSAs Nicolas Roos, Douglas Zolkind
        and Rebekah Donaleski
        All Defense Counsel

Exhibit A

~~SECRET//ORCON//NOFORN~~

# UNCLASSIFIED [PkgNumberShort]

Declassified by order of the President
September 24, 2019

~~EYES ONLY~~
~~DO NOT COPY~~

MEMORANDUM OF TELEPHONE CONVERSATION

SUBJECT:        ~~(C)~~ Telephone Conversation with President
                Zelenskyy of Ukraine

PARTICIPANTS:   President Zelenskyy of Ukraine

                Notetakers:  The White House Situation Room

DATE, TIME      July 25, 2019, 9:03 - 9:33 a.m. EDT
AND PLACE:      Residence


~~(S/NF)~~ The President: Congratulations on a great victory. We all
watched from the United States and you did a terrific job. The
way you came from behind, somebody who wasn't given much of a
chance, and you ended up winning easily. It's a fantastic
achievement. Congratulations.

~~(S/NF)~~ President Zelenskyy: You are absolutely right Mr.
President. We did win big and we worked hard for this. We worked
a lot but I would like to confess to you that I had an
opportunity to learn from you. We used quite a few of your
skills and knowledge and were able to use it as an example for
our elections and yes it is true that these were unique
elections. We were in a unique situation that we were able to

CAUTION: A Memorandum of a Telephone Conversation (TELCON) is not a verbatim transcript of a
discussion.  The text in this document records the notes and recollections of Situation Room Duty
Officers and NSC policy staff assigned to listen and memorialize the conversation in written form
as the conversation takes place.  A number of factors can affect the accuracy of the record,
including poor telecommunications connections and variations in accent and/or interpretation.
The word "inaudible" is used to indicate portions of a conversation that the notetaker was unable
to hear.

Classified By: 2354726
Derived From: NSC SCG
Declassify On: 20441231

# UNCLASSIFIED

SECRET//ORCON//NOFORN

2   UNCLASSIFIED

achieve a unique success. I'm able to tell you the following;
the first time, you called me to congratulate me when I won my
presidential election, and the second time you are now calling
me when my party won the parliamentary election. I think I
should run more often so you can call me more often and we can
talk over the phone more often.

(S/NF) The President: [laughter] That's a very good idea. I
think your country is very happy about that.

(S/NF) President Zelenskyy: Well yes, to tell you the truth, we
are trying to work hard because we wanted to drain the swamp
here in our country. We brought in many many new people. Not
the old politicians, not the typical politicians, because we want to
have a new format and a new type of government. You are a great
teacher for us and in that.

(S/NF) The President: Well it's very nice of you to say that. I
will say that we do a lot for Ukraine. We spend a lot of effort
and a lot of time. Much more than the European countries are
doing and they should be helping you more than they are. Germany
does almost nothing for you. All they do is talk and I think
it's something that you should really ask them about. When I was
speaking to Angela Merkel she talks Ukraine, but she doesn't do
anything. A lot of the European countries are the same way so I
think it's something you want to look at but the United States
has been very very good to Ukraine. I wouldn't say that it's
reciprocal necessarily because things are happening that are not
good but the United States has been very very good to Ukraine.

(S/NF) President Zelenskyy: Yes you are absolutely right. Not
only 100%, but actually 1000% and I can tell you the following;
I did talk to Angela Merkel and I did meet with her. I also met
and talked with Macron and I told them that they are not doing
quite as much as they need to be doing on the issues with the
sanctions. They are not enforcing the sanctions. They are not
working as much as they should work for Ukraine. It turns out
that even though logically, the European Union should be our
biggest partner but technically the United States is a much
bigger partner than the European Union and I'm very grateful to
you for that because the United States is doing quite a lot for
Ukraine. Much more than the European Union especially when we
are talking about sanctions against the Russian Federation. I
would also like to thank you for your great support in the area
of defense. We are ready to continue to cooperate for the next
steps specifically we are almost ready to buy more Javelins from
the United States for defense purposes.



SECRET//ORCON//NOFORN

~~SECRET//ORCON//NOFORN~~

3

UNCLASSIFIED

~~(S/NF)~~ The President: I would like you to do us a favor though because our country has been through a lot and Ukraine knows a lot about it. I would like you to find out what happened with this whole situation with Ukraine, they say Crowdstrike… I guess you have one of your wealthy people… The server, they say Ukraine has it. There are a lot of things that went on, the whole situation. I think you're surrounding yourself with some of the same people. I would like to have the Attorney General call you or your people and I would like you to get to the bottom of it. As you saw yesterday, that whole nonsense ended with a very poor performance by a man named Robert Mueller, an incompetent performance, but they say a lot of it started with Ukraine. Whatever you can do, it's very important that you do it if that's possible.

~~(S/NF)~~ President Zelenskyy: Yes it is very important for me and everything that you just mentioned earlier. For me as a President, it is very important and we are open for any future cooperation. We are ready to open a new page on cooperation in relations between the United States and Ukraine. For that purpose, I just recalled our ambassador from United States and he will be replaced by a very competent and very experienced ambassador who will work hard on making sure that our two nations are getting closer. I would also like and hope to see him having your trust and your confidence and have personal relations with you so we can cooperate even more so. I will personally tell you that one of my assistants spoke with Mr. Giuliani just recently and we are hoping very much that Mr. Giuliani will be able to travel to Ukraine and we will meet once he comes to Ukraine. I just wanted to assure you once again that you have nobody but friends around us. I will make sure that I surround myself with the best and most experienced people. I also wanted to tell you that we are friends. We are great friends and you Mr. President have friends in our country so we can continue our strategic partnership. I also plan to surround myself with great people and in addition to that investigation, I guarantee as the President of Ukraine that all the investigations will be done openly and candidly. That I can assure you.

~~(S/NF)~~ The President: Good because I heard you had a prosecutor who was very good and he was shut down and that's really unfair. A lot of people are talking about that, the way they shut your very good prosecutor down and you had some very bad people involved. Mr. Giuliani is a highly respected man. He was the mayor of New York City, a great mayor, and I would like him to



UNCLASSIFIED

~~SECRET//ORCON//NOFORN~~

SECRET//ORCON//NOFORN

UNCLASSIFIED

4

call you. I will ask him to call you along with the Attorney
General. Rudy very much knows what's happening and he is a very
capable guy. If you could speak to him that would be great. The
former ambassador from the United States, the woman, was bad
news and the people she was dealing with in the Ukraine were bad
news so I just want to let you know that. The other thing,
There's a lot of talk about Biden's son, that Biden stopped the
prosecution and a lot of people want to find out about that so
whatever you can do with the Attorney General would be great.
Biden went around bragging that he stopped the prosecution so if
you can look into it… It sounds horrible to me.

(S/NF) President Zelenskyy: I wanted to tell you about the
prosecutor. First of all I understand and I'm knowledgeable
about the situation. Since we have won the absolute majority in
our Parliament, the next prosecutor general will be 100% my
person, my candidate, who will be approved by the parliament and
will start as a new prosecutor in September. He or she will look
into the situation, specifically to the company that you
mentioned in this issue. The issue of the investigation of the
case is actually the issue of making sure to restore the honesty
so we will take care of that and will work on the investigation
of the case. On top of that, I would kindly ask you if you have
any additional information that you can provide to us, it would
be very helpful for the investigation to make sure that we
administer justice in our country with regard to the Ambassador
to the United States from Ukraine as far as I recall her name
was Ivanovich. It was great that you were the first one who told
me that she was a bad ambassador because I agree with you 100%.
Her attitude towards me was far from the best as she admired the
previous President and she was on his side. She would not accept
me as a new President well enough.

(S/NF) The President: Well, she's going to go through some
things. I will have Mr. Giuliani give you a call and I am also
going to have Attorney General Barr call and we will get to the
bottom of it. I'm sure you will figure it out. I heard the
prosecutor was treated very badly and he was a very fair
prosecutor so good luck with everything. Your economy is going
to get better and better I predict. You have a lot of assets.
It's a great country. I have many Ukrainian friends, their
incredible people.

(S/NF) President Zelenskyy: I would like to tell you that I also
have quite a few Ukrainian friends that live in the United
States. Actually last time I traveled to the United States, I
stayed in New York near Central Park and I stayed at the Trump

UNCLASSIFIED
SECRET//ORCON//NOFORN

~~SECRET//ORCON/NOFORN~~

5   **UNCLASSIFIED**

Tower. I will talk to them and I hope to see them again in the
future. I also wanted to thank you for your invitation to visit
the United States, specifically Washington DC. On the other
hand, I also want to ensure you that we will be very serious
about the case and will work on the investigation. As to the
economy, there is much potential for our two countries and one
of the issues that is very important for Ukraine is energy
independence. I believe we can be very successful and
cooperating on energy independence with United States. We are
already working on cooperation. We are buying American oil but I
am very hopeful for a future meeting. We will have more time and
more opportunities to discuss these opportunities and get to
know each other better. I would like to thank you very much for
your support

~~(S/NF)~~ The President: Good. Well, thank you very much and I
appreciate that. I will tell Rudy and Attorney General Barr to
call. Thank you. Whenever you would like to come to the White
House, feel free to call. Give us a date and we'll work that
out. I look forward to seeing you.

~~(S/NF)~~ President Zelenskyy: Thank you very much. I would be very
happy to come and would be happy to meet with you personally and
get to know you better. I am looking forward to our meeting and
I also would like to invite you to visit Ukraine and come to the
city of Kyiv which is a beautiful city. We have a beautiful
country which would welcome you. On the other hand, I believe
that on September 1 we will be in Poland and we can meet in
Poland hopefully. After that, it might be a very good idea for
you to travel to Ukraine. We can either take my plane and go to
Ukraine or we can take your plane, which is probably much better
than mine.

~~(S/NF)~~ The President: Okay, we can work that out. I look forward
to seeing you in Washington and maybe in Poland because I think
we are going to be there at that time.

~~(S/NF)~~ President Zelenskyy: Thank you very much Mr. President.

~~(S/NF)~~ The President: Congratulations on a fantastic job you've
done. The whole world was watching. I'm not sure it was so much
of an upset but congratulations.

~~(S/NF)~~ President Zelenskyy: Thank you Mr. President bye-bye.


-- End of Conversation --



Exhibit B

UNCLASSIFIED

August 12, 2019

The Honorable Richard Burr
Chairman
Select Committee on Intelligence
United States Senate

The Honorable Adam Schiff
Chairman
Permanent Select Committee on Intelligence
United States House of Representatives

Dear Chairman Burr and Chairman Schiff:

I am reporting an "urgent concern" in accordance with the procedures outlined in 50 U.S.C. §3033(k)(5)(A). This letter is UNCLASSIFIED when separated from the attachment.

In the course of my official duties, I have received information from multiple U.S. Government officials that the President of the United States is using the power of his office to solicit interference from a foreign country in the 2020 U.S. election. This interference includes, among other things, pressuring a foreign country to investigate one of the President's main domestic political rivals. The President's personal lawyer, Mr. Rudolph Giuliani, is a central figure in this effort. Attorney General Barr appears to be involved as well.

- Over the past four months, more than half a dozen U.S. officials have informed me of various facts related to this effort. The information provided herein was relayed to me in the course of official interagency business. It is routine for U.S. officials with responsibility for a particular regional or functional portfolio to share such information with one another in order to inform policymaking and analysis.
- I was not a direct witness to most of the events described. However, I found my colleagues' accounts of these events to be credible because, in almost all cases, multiple officials recounted fact patterns that were consistent with one another. In addition, a variety of information consistent with these private accounts has been reported publicly.

I am deeply concerned that the actions described below constitute "a serious or flagrant problem, abuse, or violation of law or Executive Order" that "does not include differences of opinions concerning public policy matters," consistent with the definition of an "urgent concern" in 50 U.S.C. §3033(k)(5)(G). I am therefore fulfilling my duty to report this information, through proper legal channels, to the relevant authorities.

- I am also concerned that these actions pose risks to U.S. national security and undermine the U.S. Government's efforts to deter and counter foreign interference in U.S. elections.

1
UNCLASSIFIED

UNCLASSIFIED

To the best of my knowledge, the entirety of this statement is unclassified when separated from the classified enclosure. I have endeavored to apply the classification standards outlined in Executive Order (EO) 13526 and to separate out information that I know or have reason to believe is classified for national security purposes.[1]

- If a classification marking is applied retroactively, I believe it is incumbent upon the classifying authority to explain why such a marking was applied, and to which specific information it pertains.

## I.   The 25 July Presidential phone call

Early in the morning of 25 July, the President spoke by telephone with Ukrainian President Volodymyr Zelenskyy. I do not know which side initiated the call. This was the first publicly acknowledged call between the two leaders since a brief congratulatory call after Mr. Zelenskyy won the presidency on 21 April.

Multiple White House officials with direct knowledge of the call informed me that, after an initial exchange of pleasantries, the President used the remainder of the call to advance his personal interests. Namely, he sought to pressure the Ukrainian leader to take actions to help the President's 2020 reelection bid. According to the White House officials who had direct knowledge of the call, the President pressured Mr. Zelenskyy to, inter alia:

- initiate or continue an investigation[2] into the activities of former Vice President Joseph Biden and his son, Hunter Biden;
- assist in purportedly uncovering that allegations of Russian interference in the 2016 U.S. presidential election originated in Ukraine, with a specific request that the Ukrainian leader locate and turn over servers used by the Democratic National Committee (DNC) and examined by the U.S. cyber security firm Crowdstrike,[3] which initially reported that Russian hackers had penetrated the DNC's networks in 2016; and
- meet or speak with two people the President named explicitly as his personal envoys on these matters, Mr. Giuliani and Attorney General Barr, to whom the President referred multiple times in tandem.

---

[1] Apart from the information in the Enclosure, it is my belief that none of the information contained herein meets the definition of "classified information" outlined in EO 13526, Part 1, Section 1.1. There is ample open-source information about the efforts I describe below, including statements by the President and Mr. Giuliani. In addition, based on my personal observations, there is discretion with respect to the classification of private comments by or instructions from the President, including his communications with foreign leaders; information that is not related to U.S. foreign policy or national security—such as the information contained in this document, when separated from the Enclosure—is generally treated as unclassified. I also believe that applying a classification marking to this information would violate EO 13526, Part 1, Section 1.7, which states: "In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; [or] (2) prevent embarrassment to a person, organization, or agency."
[2] It is unclear whether such a Ukrainian investigation exists. See Footnote #7 for additional information.
[3] I do not know why the President associates these servers with Ukraine. (See, for example, his comments to *Fox News* on 20 July: "And Ukraine. Take a look at Ukraine. How come the FBI didn't take this server? Podesta told them to get out. He said, get out. So, how come the FBI didn't take the server from the DNC?")

UNCLASSIFIED

The President also praised Ukraine's Prosecutor General, Mr. Yuriy Lutsenko, and suggested that Mr. Zelenskyy might want to keep him in his position. (Note: Starting in March 2019, Mr. Lutsenko made a series of public allegations—many of which he later walked back—about the Biden family's activities in Ukraine, Ukrainian officials' purported involvement in the 2016 U.S. election, and the activities of the U.S. Embassy in Kyiv. See Part IV for additional context.)

The White House officials who told me this information were deeply disturbed by what had transpired in the phone call. They told me that there was already a "discussion ongoing" with White House lawyers about how to treat the call because of the likelihood, in the officials' retelling, that they had witnessed the President abuse his office for personal gain.

The Ukrainian side was the first to publicly acknowledge the phone call. On the evening of 25 July, a readout was posted on the website of the Ukrainian President that contained the following line (translation from original Russian-language readout):

- "Donald Trump expressed his conviction that the new Ukrainian government will be able to quickly improve Ukraine's image and complete the investigation of corruption cases that have held back cooperation between Ukraine and the United States."

Aside from the above-mentioned "cases" purportedly dealing with the Biden family and the 2016 U.S. election, I was told by White House officials that no other "cases" were discussed.

Based on my understanding, there were approximately a dozen White House officials who listened to the call—a mixture of policy officials and duty officers in the White House Situation Room, as is customary. The officials I spoke with told me that participation in the call had not been restricted in advance because everyone expected it would be a "routine" call with a foreign leader. I do not know whether anyone was physically present with the President during the call.

- In addition to White House personnel, I was told that a State Department official, Mr. T. Ulrich Brechbuhl, also listened in on the call.
- I was not the only non-White House official to receive a readout of the call. Based on my understanding, multiple State Department and Intelligence Community officials were also briefed on the contents of the call as outlined above.

II.   Efforts to restrict access to records related to the call

In the days following the phone call, I learned from multiple U.S. officials that senior White House officials had intervened to "lock down" all records of the phone call, especially the official word-for-word transcript of the call that was produced—as is customary—by the White House Situation Room. This set of actions underscored to me that White House officials understood the gravity of what had transpired in the call.

- White House officials told me that they were "directed" by White House lawyers to remove the electronic transcript from the computer system in which such transcripts are typically stored for coordination, finalization, and distribution to Cabinet-level officials.

3
UNCLASSIFIED

UNCLASSIFIED

- Instead, the transcript was loaded into a separate electronic system that is otherwise used to store and handle classified information of an especially sensitive nature. One White House official described this act as an abuse of this electronic system because the call did not contain anything remotely sensitive from a national security perspective.

I do not know whether similar measures were taken to restrict access to other records of the call, such as contemporaneous handwritten notes taken by those who listened in.

## III.  Ongoing concerns

On 26 July, a day after the call, U.S. Special Representative for Ukraine Negotiations Kurt Volker visited Kyiv and met with President Zelenskyy and a variety of Ukrainian political figures. Ambassador Volker was accompanied in his meetings by U.S. Ambassador to the European Union Gordon Sondland. Based on multiple readouts of these meetings recounted to me by various U.S. officials, Ambassadors Volker and Sondland reportedly provided advice to the Ukrainian leadership about how to "navigate" the demands that the President had made of Mr. Zelenskyy.

I also learned from multiple U.S. officials that, on or about 2 August, Mr. Giuliani reportedly traveled to Madrid to meet with one of President Zelenskyy's advisers, Andriy Yermak. The U.S. officials characterized this meeting, which was not reported publicly at the time, as a "direct follow-up" to the President's call with Mr. Zelenskyy about the "cases" they had discussed.

- Separately, multiple U.S. officials told me that Mr. Giuliani had reportedly privately reached out to a variety of other Zelenskyy advisers, including Chief of Staff Andriy Bohdan and Acting Chairman of the Security Service of Ukraine Ivan Bakanov.[4]
- I do not know whether those officials met or spoke with Mr. Giuliani, but I was told separately by multiple U.S. officials that Mr. Yermak and Mr. Bakanov intended to travel to Washington in mid-August.

On 9 August, the President told reporters: "I think [President Zelenskyy] is going to make a deal with President Putin, and he will be invited to the White House. And we look forward to seeing him. He's already been invited to the White House, and he wants to come. And I think he will. He's a very reasonable guy. He wants to see peace in Ukraine, and I think he will be coming very soon, actually."

## IV.  Circumstances leading up to the 25 July Presidential phone call

Beginning in late March 2019, a series of articles appeared in an online publication called *The Hill*. In these articles, several Ukrainian officials—most notably, Prosecutor General Yuriy Lutsenko—made a series of allegations against other Ukrainian officials and current and former U.S. officials. Mr. Lutsenko and his colleagues alleged, inter alia:

---

[4] In a report published by the Organized Crime and Corruption Reporting Project (OCCRP) on 22 July, two associates of Mr. Giuliani reportedly traveled to Kyiv in May 2019 and met with Mr. Bakanov and another close Zelenskyy adviser, Mr. Serhiy Shefir.

- that they possessed evidence that Ukrainian officials—namely, Head of the National Anticorruption Bureau of Ukraine Artem Sytnyk and Member of Parliament Serhiy Leshchenko—had "interfered" in the 2016 U.S. presidential election, allegedly in collaboration with the DNC and the U.S. Embassy in Kyiv;[5]
- that the U.S. Embassy in Kyiv—specifically, U.S. Ambassador Marie Yovanovitch, who had criticized Mr. Lutsenko's organization for its poor record on fighting corruption— had allegedly obstructed Ukrainian law enforcement agencies' pursuit of corruption cases, including by providing a "do not prosecute" list, and had blocked Ukrainian prosecutors from traveling to the United States expressly to prevent them from delivering their "evidence" about the 2016 U.S. election;[6] and
- that former Vice President Biden had pressured former Ukrainian President Petro Poroshenko in 2016 to fire then Ukrainian Prosecutor General Viktor Shokin in order to quash a purported criminal probe into Burisma Holdings, a Ukrainian energy company on whose board the former Vice President's son, Hunter, sat.[7]

In several public comments,[8] Mr. Lutsenko also stated that he wished to communicate directly with Attorney General Barr on these matters.[9]

The allegations by Mr. Lutsenko came on the eve of the first round of Ukraine's presidential election on 31 March. By that time, Mr. Lutsenko's political patron, President Poroshenko, was trailing Mr. Zelenskyy in the polls and appeared likely to be defeated. Mr. Zelenskyy had made known his desire to replace Mr. Lutsenko as Prosecutor General. On 21 April, Mr. Poroshenko lost the runoff to Mr. Zelenskyy by a landslide. See Enclosure for additional information.

---

[5] Mr. Sytnyk and Mr. Leshchenko are two of Mr. Lutsenko's main domestic rivals. Mr. Lutsenko has no legal training and has been widely criticized in Ukraine for politicizing criminal probes and using his tenure as Prosecutor General to protect corrupt Ukrainian officials. He has publicly feuded with Mr. Sytnyk, who heads Ukraine's only competent anticorruption body, and with Mr. Leshchenko, a former investigative journalist who has repeatedly criticized Mr. Lutsenko's record. In December 2018, a Ukrainian court upheld a complaint by a Member of Parliament, Mr. Boryslav Rozenblat, who alleged that Mr. Sytnyk and Mr. Leshchenko had "interfered" in the 2016 U.S. election by publicizing a document detailing corrupt payments made by former Ukrainian President Viktor Yanukovych before his ouster in 2014. Mr. Rozenblat had originally filed the motion in late 2017 after attempting to flee Ukraine amid an investigation into his taking of a large bribe. On 16 July 2019, Mr. Leshchenko publicly stated that a Ukrainian court had overturned the lower court's decision.

[6] Mr. Lutsenko later told Ukrainian news outlet *The Babel* on 17 April that Ambassador Yovanovitch had never provided such a list, and that he was, in fact, the one who requested such a list.

[7] Mr. Lutsenko later told *Bloomberg* on 16 May that former Vice President Biden and his son were not subject to any current Ukrainian investigations, and that he had no evidence against them. Other senior Ukrainian officials also contested his original allegations; one former senior Ukrainian prosecutor told *Bloomberg* on 7 May that Mr. Shokin in fact was not investigating Burisma at the time of his removal in 2016.

[8] See, for example, Mr. Lutsenko's comments to *The Hill* on 1 and 7 April and his interview with *The Babel* on 17 April, in which he stated that he had spoken with Mr. Giuliani about arranging contact with Attorney General Barr.

[9] In May, Attorney General Barr announced that he was initiating a probe into the "origins" of the Russia investigation. According to the above-referenced OCCRP report (22 July), two associates of Mr. Giuliani claimed to be working with Ukrainian officials to uncover information that would become part of this inquiry. In an interview with *Fox News* on 8 August, Mr. Giuliani claimed that Mr. John Durham, whom Attorney General Barr designated to lead this probe, was "spending a lot of time in Europe" because he was "investigating Ukraine." I do not know the extent to which, if at all, Mr. Giuliani is directly coordinating his efforts on Ukraine with Attorney General Barr or Mr. Durham.

UNCLASSIFIED

- It was also publicly reported that Mr. Giuliani had met on at least two occasions with Mr. Lutsenko: once in New York in late January and again in Warsaw in mid-February. In addition, it was publicly reported that Mr. Giuliani had spoken in late 2018 to former Prosecutor General Shokin, in a Skype call arranged by two associates of Mr. Giuliani.[10]
- On 25 April in an interview with *Fox News*, the President called Mr. Lutsenko's claims "big" and "incredible" and stated that the Attorney General "would want to see this."

On or about 29 April, I learned from U.S. officials with direct knowledge of the situation that Ambassador Yovanovitch had been suddenly recalled to Washington by senior State Department officials for "consultations" and would most likely be removed from her position.

- Around the same time, I also learned from a U.S. official that "associates" of Mr. Giuliani were trying to make contact with the incoming Zelenskyy team.[11]
- On 6 May, the State Department announced that Ambassador Yovanovitch would be ending her assignment in Kyiv "as planned."
- However, several U.S. officials told me that, in fact, her tour was curtailed because of pressure stemming from Mr. Lutsenko's allegations. Mr. Giuliani subsequently stated in an interview with a Ukrainian journalist published on 14 May that Ambassador Yovanovitch was "removed...because she was part of the efforts against the President."

On 9 May, *The New York Times* reported that Mr. Giuliani planned to travel to Ukraine to press the Ukrainian government to pursue investigations that would help the President in his 2020 reelection bid.

- In his multitude of public statements leading up to and in the wake of the publication of this article, Mr. Giuliani confirmed that he was focused on encouraging Ukrainian authorities to pursue investigations into alleged Ukrainian interference in the 2016 U.S. election and alleged wrongdoing by the Biden family.[12]
- On the afternoon of 10 May, the President stated in an interview with *Politico* that he planned to speak with Mr. Giuliani about the trip.
- A few hours later, Mr. Giuliani publicly canceled his trip, claiming that Mr. Zelenskyy was "surrounded by enemies of the [U.S.] President...and of the United States."

On 11 May, Mr. Lutsenko met for two hours with President-elect Zelenskyy, according to a public account given several days later by Mr. Lutsenko. Mr. Lutsenko publicly stated that he had told Mr. Zelenskyy that he wished to remain as Prosecutor General.

---

[10] See, for example, the above-referenced articles in *Bloomberg* (16 May) and OCCRP (22 July).
[11] I do not know whether these associates of Mr. Giuliani were the same individuals named in the 22 July report by OCCRP, referenced above.
[12] See, for example, Mr. Giuliani's appearance on *Fox News* on 6 April and his tweets on 23 April and 10 May. In his interview with *The New York Times*, Mr. Giuliani stated that the President "basically knows what I'm doing, sure, as his lawyer." Mr. Giuliani also stated: "We're not meddling in an election, we're meddling in an investigation, which we have a right to do... There's nothing illegal about it... Somebody could say it's improper. And this isn't foreign policy – I'm asking them to do an investigation that they're doing already and that other people are telling them to stop. And I'm going to give them reasons why they shouldn't stop it because that information will be very, very helpful to my client, and may turn out to be helpful to my government."

6
UNCLASSIFIED

UNCLASSIFIED

Starting in mid-May, I heard from multiple U.S. officials that they were deeply concerned by what they viewed as Mr. Giuliani's circumvention of national security decisionmaking processes to engage with Ukrainian officials and relay messages back and forth between Kyiv and the President. These officials also told me:

- that State Department officials, including Ambassadors Volker and Sondland, had spoken with Mr. Giuliani in an attempt to "contain the damage" to U.S. national security; and
- that Ambassadors Volker and Sondland during this time period met with members of the new Ukrainian administration and, in addition to discussing policy matters, sought to help Ukrainian leaders understand and respond to the differing messages they were receiving from official U.S. channels on the one hand, and from Mr. Giuliani on the other.

During this same timeframe, multiple U.S. officials told me that the Ukrainian leadership was led to believe that a meeting or phone call between the President and President Zelenskyy would depend on whether Zelenskyy showed willingness to "play ball" on the issues that had been publicly aired by Mr. Lutsenko and Mr. Giuliani. (Note: This was the general understanding of the state of affairs as conveyed to me by U.S. officials from late May into early July. I do not know who delivered this message to the Ukrainian leadership, or when.) See Enclosure for additional information.

Shortly after President Zelenskyy's inauguration, it was publicly reported that Mr. Giuliani met with two other Ukrainian officials: Ukraine's Special Anticorruption Prosecutor, Mr. Nazar Kholodnytskyy, and a former Ukrainian diplomat named Andriy Telizhenko. Both Mr. Kholodnytskyy and Mr. Telizhenko are allies of Mr. Lutsenko and made similar allegations in the above-mentioned series of articles in *The Hill*.

On 13 June, the President told *ABC*'s George Stephanopoulos that he would accept damaging information on his political rivals from a foreign government.

On 21 June, Mr. Giuliani tweeted: "New Pres of Ukraine still silent on investigation of Ukrainian interference in 2016 and alleged Biden bribery of Poroshenko. Time for leadership and investigate both if you want to purge how Ukraine was abused by Hillary and Clinton people."

In mid-July, I learned of a sudden change of policy with respect to U.S. assistance for Ukraine. See Enclosure for additional information.


ENCLOSURE:        Classified appendix

TOP SECRET/

August 12, 2019

## (U) CLASSIFIED APPENDIX

(U) Supplementary classified information is provided as follows:

### (U) Additional information related to Section II

(TS/████) According to multiple White House officials I spoke with, the transcript of the President's call with President Zelenskyy was placed into a computer system managed directly by the National Security Council (NSC) Directorate for Intelligence Programs. This is a standalone computer system reserved for codeword-level intelligence information, such as covert action. According to information I received from White House officials, some officials voiced concerns internally that this would be an abuse of the system and was not consistent with the responsibilities of the Directorate for Intelligence Programs. According to White House officials I spoke with, this was "not the first time" under this Administration that a Presidential transcript was placed into this codeword-level system solely for the purpose of protecting politically sensitive—rather than national security sensitive—information.

### (U) Additional information related to Section IV



(S/████) I would like to expand upon two issues mentioned in Section IV that might have a connection with the overall effort to pressure the Ukrainian leadership. As I do not know definitively whether the below-mentioned decisions are connected to the broader efforts I describe, I have chosen to include them in the classified annex. If they indeed represent genuine policy deliberations and decisions formulated to advance U.S. foreign policy and national security, one might be able to make a reasonable case that the facts are classified.

- (S/████) I learned from U.S. officials that, on or around 14 May, the President instructed Vice President Pence to cancel his planned travel to Ukraine to attend President



1

TOP SECRET/

TOP SECRET/ ███████████

Zelenskyy's inauguration on 20 May; Secretary of Energy Rick Perry led the delegation instead. According to these officials, it was also "made clear" to them that the President did not want to meet with Mr. Zelenskyy until he saw how Zelenskyy "chose to act" in office. I do not know how this guidance was communicated, or by whom. I also do not know whether this action was connected with the broader understanding, described in the unclassified letter, that a meeting or phone call between the President and President Zelenskyy would depend on whether Zelenskyy showed willingness to "play ball" on the issues that had been publicly aired by Mr. Lutsenko and Mr. Giuliani.

- **(S/**███**)** On 18 July, an Office of Management and Budget (OMB) official informed Departments and Agencies that the President "earlier that month" had issued instructions to suspend all U.S. security assistance to Ukraine. Neither OMB nor the NSC staff knew why this instruction had been issued. During interagency meetings on 23 July and 26 July, OMB officials again stated explicitly that the instruction to suspend this assistance had come directly from the President, but they still were unaware of a policy rationale. As of early August, I heard from U.S. officials that some Ukrainian officials were aware that U.S. aid might be in jeopardy, but I do not know how or when they learned of it.

TOP SECRET/ ███████████

Exhibit C

**MEDIA CONTACTS**

**Eric Friedman**
Director of
Communications
212-382-6754
**Email**

**Eli Cohen**
Communications
Associate
212-382-6656
**Email**

Subscribe

# Attorney General Barr Should Recuse Himself from Department of Justice Review of Ukraine Matter

October 23, 2019

### Statement of the New York City Bar Association
### October 23, 2019

#### Attorney General Barr Should Recuse Himself from Department of Justice Review of Ukraine Matter

## Summary

The United States Department of Justice (DOJ) has a unique role in safeguarding the rule of law under the Constitution. By failing to recuse himself from DOJ's review of the Ukraine Matter, Attorney General William P. Barr has undermined that role. To help remedy that failure, the New York City Bar Association urges that Mr. Barr recuse himself from any ongoing or future review by DOJ of Ukraine-related issues in which Mr. Barr is allegedly involved. If he fails to do so, he should resign or, failing that, be subject to sanctions, including possible removal, by Congress.

## The Office of the Attorney General

Since our democracy's inception in 1789, its foundation has been the rule of law. Our leaders are selected and exercise their powers under law, beginning with our Constitution. Although our courts have primary responsibility for interpreting and applying our laws, both the Congress and the Executive - including the President - are subject to, and

accountable under, the Constitution and the laws enacted thereunder.  Because respect for law is central to our nation's governance, the Attorney General of the United States bears a special responsibility to see that our laws are justly administered for the benefit of the American people. The Attorney General is, and must be seen as, the representative of the nation in advising the President and other federal officers and must demonstrate an unquestioned commitment to compliance with law by all who exercise the powers of government.

The modern DOJ was established by Congress in the Judiciary Act of 1870.  Even before that, however, the office of the Attorney General was seen as having a uniquely important role in our federal system.  As Attorney General Cushing observed in an 1854 opinion, the Attorney General is not simply "a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation."[1]   For the same reason that the Attorney General's obligations are not owed solely to "the Government as his client," they are not owed to the President in his individual capacity.

As noted by William Barr at the time of his nomination as Attorney General in 1991, the Attorney General "holds in trust the fair and impartial administration of justice.  It is the attorney general's responsibility to enforce the law evenhandedly and with integrity.  The attorney general must ensure that the administration of justice, the enforcement of the law is above and away from politics.  Nothing could be more destructive of our system of government, of the rule of law or the Department of Justice as an institution than any toleration of political interference with the enforcement of the law."[2]

Mr. Barr repeated these words at the time of his 2019 nomination for his current position as Attorney General and added that "the American people have to know that there are places in the government where the rule of law, not

Attorney General Barr Should Recuse Himself from Department of Justice Review of the Ukraine Matter | New York City Bar

are places in the government where the rule of law, not politics, holds sway and where they will be treated fairly based solely on the facts and the evenhanded application of the law.  The Department of Justice must be that place."[3]

## Mr. Barr's Performance

Despite this commitment to the role of the Attorney General, Mr. Barr's actions in office have failed in precisely the role that he described with eloquence when nominated.  That failure has jeopardized the confidence that the public can reasonably have in the DOJ as the place "where the rule of law, not politics, holds sway."  His actions during his brief tenure in office have demonstrated to us that, contrary to the responsibilities of his office, he appears to view his primary obligation as loyalty to the President individually rather than to the nation.  In serving the President, he has been willing to take or countenance actions that are contrary to the professional standards of the DOJ, his oath of office and his own obligations as an attorney.

Our concern has been brought to a head by Mr. Barr's failure to recuse himself from the DOJ's review—itself of uncertain propriety—of the ongoing "whistleblower" complaint with respect to the President's efforts during his July 25, 2019 telephone call to request the Republic of Ukraine to investigate Mr. Trump's allegations of Ukrainian interference in the 2016 U.S. elections and former Vice-President Biden and his son (the "Ukraine Matter").  As White House records made clear[4], the President told his Ukrainian counterpart, Volodymyr Zelensky, that Mr. Barr "would be in touch with him" to follow up on the President's requests. The whistleblower found this telephone call to be of "urgent concern" because of the President's apparent intermingling of U.S. foreign policy interests with his personal political interests in apparent violation of U.S. law.[5]

Our focus here is not on the legality of the President's actions or even on the merits of the whistleblower's complaint, which the Intelligence Community's Inspector

complaint, which the Intelligence Community's Inspector General found to be "credible." Nor do we take a position at this time on whether DOJ's review of this action was justified.

We do, however, believe it was, and is, incumbent on the Attorney General to recuse himself from any participation, direct or indirect, in DOJ's review of the whistleblower complaint. Regardless of whether Mr. Barr was in fact aware of or part of the President's plans, either before, at the time of, or after the July 25, 2019 telephone call, it is clear that Mr. Barr was obligated to recuse himself from any involvement in DOJ's review of either the whistleblower complaint or the substance of the President's actions once the President offered Mr. Barr's services to President Zelensky.

Federal regulations (28 CFR 45.2) for DOJ prosecutors require recusal whenever a lawyer "has a personal or political relationship with any person . . . substantially included in the conduct that is the subject of the investigation." The DOJ Manual for U.S. Attorneys requires (section 3-2.170, 2.220) recusal of U.S. Attorneys and Assistant U.S. Attorneys where "a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality." Executive Branch ethics rules also provide (5 C.F.R. 2635.502) that recusal is appropriate if "a reasonable person with knowledge of the relevant facts would be likely to question the employee's impartiality in the matter."

Mr. Barr also was specifically mentioned by the President as a participant in the activity under investigation. Moreover, he appears to have participated in the DOJ review of the whistleblower's complaint and its decision not to forward that complaint to Congress. That he failed to recuse himself from that review, and still has not yet (to our knowledge) recused himself from any ongoing DOJ review of other aspects of the Ukraine Matter, is a serious violation of his obligation to protect the DOJ from reasonable questions as to its impartiality in the investigation of the Ukraine Matter. [6]

Attorney General Barr Should Recuse Himself from Department of Justice Review of Ukraine Matter | New York City Bar Association     1/20/20, 1:47 PM

Case 1:19-cr-00725-JPO   Document 156-7   Filed 12/22/20   Page 25 of 38

Recusal by the Attorney General is by no means rare. There have been at least 16 such recusals since 1989, including two previous recusals by Mr. Barr himself (one in 1993 during his first term as Attorney General and one in 2019 in connection with the Jeffrey Epstein review) and the 2017 recusal by Attorney General Sessions because of his potential role as a witness to Russian interference in the 2016 election. In addition, six other Attorneys General recused themselves during this period.[7] The whistleblower complaint against the President and others (potentially involving Mr. Barr either as a witness or, conceivably, an accomplice) clearly rose to the levels that required recusal in these earlier investigations and should have led Mr. Barr to similar action in this instance.

**Conclusion**

A nation founded on a commitment to the rule of law cannot have an Attorney General who by his actions appears to undermine the bedrock principle on which our nation relies —that all federal officials, including the President, are subject to the rule of law. Mr. Barr's failure to recuse himself from any involvement in the DOJ's review of the whistleblower complaint and its disclosure to Congress undermined that principle. In order to limit the impact of his earlier failure to recuse, we call upon Mr. Barr to immediately recuse himself from all further DOJ investigations of Ukraine-related issues in which he is or was allegedly involved, including any continuing or future investigations into alleged Ukrainian involvement in the 2016 election, allegations relating to Mr. Biden or his family members or the President's efforts to pursue those allegations in connection with U.S. assistance to Ukraine or to other nations.

We hope that Mr. Barr will act promptly to remedy, at least in part, his prior failure to recuse himself from the Ukraine Matter. If, however, he chooses not to do so, we believe he must resign his position as Attorney General. If he fails

1/20/20, 1:47 PM

either to recuse himself or to resign, Mr. Barr should be subject to appropriate Congressional sanctions, including possible removal from office, in order to restore the Office of the Attorney General and the DOJ to their historic roles as defender of the law on behalf of the American people.

October 23, 2019

Roger Juan Maldonado
President
New York City Bar Association

Stephen L. Kass
Chair, Task Force on the Rule of Law
New York City Bar Association

---

[1]  Department of Justice as an Independent Establishment, The, 29 Rec. Ass'n B. City N.Y. 486, 490 (1974).

[2]  Confirmation Hearing of William P. Barr, 15. Hrg. 102-505, Pt. 2 (Nov. 12 & 13, 1991), *available at* civilrightsdocs.info/pdf/ag-vacancy/1991-AG-Nomination-Hearing-Transcript.pdf  (All websites last visited October 21, 2019.)

[3]  Reproduced in *The* Washington *Post*, January 14, 2019.

[4]  The White House summary of the July 25 phone call is available                                                                   here: https://www.washingtonpost.com/context/official-readout-president-trump-s-july-25-phone-call-with-ukraine-s-volodymyr-zelensky/4b228f51-17e7-45bc-b16c-3b2643f3fbe0/.

[5]  The whistleblower's complaint included the following at page 1: "In the course of my official duties, I have received information from multiple U.S. Government officials that the President of the United States is using the power of his office to solicit interference from a foreign country in the 2020 election.  This interference includes, among other things, pressuring a foreign country to investigate one of the President's main political rivals.  The President's personal

Attorney General Barr Should Recuse Himself from Department of Justice Review of Ukraine Matter | Media Listing | NYC Bar

Case 1:19-cr-00725-JPO   Document 156-7   Filed 12/22/20   Page 27 of 38

1/20/20, 1:47 PM

lawyer, Mr. Rudolph Giuliani, is a central figure in this effort. Attorney General Barr appears to be involved as well." The whistleblower complaint is available here: https://intelligence.house.gov/uploadedfiles/20190812_-_whistleblower_complaint_unclass.pdf.

[6]  By identifying this one issue relating to his recusal, we do not mean to endorse Mr. Barr's decisions on other matters.

[7]  These examples of prior recusal by the Attorney General include the following:  Richard Thornburgh (drug use by public officials); Janet Reno (tax evasion by a former subordinate and FBI conduct at Waco); John Ashcroft (campaign finance by Ashcroft political opponent, Enron misconduct, and disclosure of Valerie Plame's CIA identity); Alberto Gonzales (Valerie Plame investigation, simultaneous termination of nine U.S. Attorneys); Michael Mukasey (Madoff investigation); Eric Holder (UBS investigation, Roger Clemens investigation, ATT and T-Mobile merger, and FBI press leak).  Congressional Research Service, *A Brief History of Attorney General Recusal* (Mar. 8, 2017), https://fas.org/sgp/crs/misc/recusal.pdf.

Issue(s): Governmental Affairs | International Affairs

Committee(s): Rule of Law, Task Force on the

Subject Area(s): Rule of Law | Recusal

Exhibit D

# United States Senate

WASHINGTON, DC 20510

October 24, 2019

The Honorable William P. Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Dear Attorney General Barr:

We urge you to recuse yourself from investigations into the Trump Ukraine matters, including any investigations involving Rudy Giuliani, Lev Parnas, or Igor Fruman, as well as investigations into the origins of the Russia investigation.

Federal ethics guidelines prohibit federal employees from participating in any matter in which their impartiality could be questioned, including matters in which they were personally involved or about which they have personal knowledge. [5 C.F.R. § 2635.502; Justice Manual § 1-4.020]. Previous Attorneys General have sought the counsel of the relevant senior career Department officials to determine whether they should recuse themselves from matters where their impartiality might reasonably be questioned.

The White House's memorandum of President Trump's July 25 phone call with Ukraine President Zelensky suggests that you may have personal knowledge or involvement in President Trump's requests that Ukraine pursue investigations to serve the President's personal political interests. During that phone call, President Trump referenced you by name or title at least five times, including mentioning you in tandem with Rudy Giuliani three times. [Call Summary at 3-5].

This raises legitimate questions about your knowledge of the activities of Mr. Giuliani and others, as well as the actions that you have taken and your discussions with the President and White House about these investigations. For example, after receiving the preliminary Justice Department Inspector General report on the Russia investigation's origins last month, you reportedly traveled to Italy to conduct your own fact-finding along with U.S. Attorney John Durham. [Washington Post, Oct. 10, 2019]. You did so after President Trump told President Zelensky that he would "like to have the Attorney General call" to discuss an

1

investigation meant to discredit Special Counsel Mueller's findings regarding Russian election interference.

Impartial enforcement of the law is essential to give the American public confidence in the Justice Department's work.  Your personal connection to these matters creates the appearance of a conflict of interest and gives rise to questions about whether the Department is being used to advance the President's personal interests.

Accordingly, we request that you recuse yourself and identify the appropriate official who will be responsible for these matters. We also request that you confirm whether you consulted Department ethics officials regarding recusal and provide copies of any ethics guidance that Justice Department officials have provided in connection with these matters.

Sincerely,

DIANNE FEINSTEIN
Ranking Member

PATRICK LEAHY
United States Senator

RICHARD J. DURBIN
United States Senator

SHELDON WHITEHOUSE
United States Senator

AMY KLOBUCHAR
United States Senator

CHRISTOPHER A. COONS
United States Senator

RICHARD BLUMENTHAL
United States Senator

MAZIE K. HIRONO
United States Senator

CORY A. BOOKER
United States Senator

KAMALA D. HARRIS
United States Senator

cc:    The Honorable Lindsey O. Graham
        Chairman, Senate Committee on the Judiciary

Exhibit E



**NEW YORK CITY BAR**

ROGER JUAN MALDONADO
**PRESIDENT**
Phone: (212) 382-6700
rmaldonado@nycbar.org

STEPHEN L. KASS
**CHAIR**
TASK FORCE ON THE RULE OF LAW

*Sent via Facsimile & Regular Mail*

January 8, 2020

Hon. Nancy Pelosi
Speaker
U.S. House of Representatives
H-232, The Capitol
Washington, DC 20515

Hon. Kevin McCarthy
Minority Leader
U.S. House of Representatives
H-204, The Capitol
Washington, DC 20515

Hon. Mitch McConnell
Majority Leader
U.S. Senate
S-230, The Capitol
Washington, DC 20515

Hon. Charles Schumer
Minority Leader
U.S. Senate
S-221, The Capitol
Washington, DC 20515

Dear Speaker Pelosi, Minority Leader McCarthy, Majority Leader McConnell, and Minority Leader Schumer:

We write on behalf of the New York City Bar Association (the "City Bar") to urge Congress to commence formal inquiries into a pattern of conduct by Attorney General William P. Barr that threatens public confidence in the fair and impartial administration of justice. We make this request based upon our belief, as similarly recognized by Mr. Barr during his Senate confirmation hearings, that the Attorney General occupies a unique position with special obligations as the nation's top law enforcement officer. We also make this request in keeping with the City Bar's mission to embrace advancement of the rule of law and the fair administration of justice, especially by those who are entrusted with important public responsibilities.[1]

---

[1] In October 2019, the City Bar called on Mr. Barr to recuse himself from all Department of Justice matters relating to allegations that President Donald J. Trump abused the power of his office to solicit political interference on his behalf by the government of Ukraine. Mr. Barr was personally named in the whistleblower complaint first raising those allegations and is reported to have been involved personally in some of the matters subject to review. To date, Mr. Barr has failed to recuse himself. *See* New York City Bar Association, *Attorney General Barr Should Recuse Himself from Department of Justice Review of Ukraine Matter*, Oct. 23, 2019, https://www.nycbar.org/media-listing/media/detail/attorney-general-barr-should-recuse-himself-from-department-of-justice-review-of-ukraine-

As further described below, Mr. Barr's recent actions and statements position the Attorney General and, by extension, the United States Department of Justice (DOJ) as political partisans willing to use the levers of government to empower certain groups over others. These statements are the latest examples of a broader pattern of conduct that is inconsistent with the role of the Attorney General in our legal and constitutional system and with the norms and standards that govern the fair administration of justice. We urge Congress to exercise its constitutional authority to investigate this troubling pattern of conduct, in order to assess Mr. Barr's actions as Attorney General and to consider any legislative and oversight responses and remedies that may be necessary.

The duties to act impartially, to avoid even the appearance of partiality and impropriety, and to avoid manifesting bias, prejudice, or partisanship in the exercise of official responsibilities are bedrock obligations for government lawyers. In the context of pending investigations, government lawyers also are obliged to be circumspect in their public statements and to avoid prejudging the outcomes of those investigations.

Mr. Barr has disregarded these fundamental obligations in several extended public statements during the past few months:

- On October 11, 2019, in an invitation-only speech at the University of Notre Dame, Mr. Barr launched a partisan attack against "so called 'progressives'" for supposedly waging a "campaign to destroy the traditional moral order." He charged that "secularists" and "their allies among progressives" were "marshal[ing] all the force of mass communication, popular culture, the entertainment industry, and academia in an unremitting assault on religion and traditional values," with the ultimate goal of achieving the "organized destruction" of religion. In his speech, which is now published on the DOJ website, Mr. Barr stated that "the Founding generation . . . believed that the Judeo-Christian moral system corresponds to the true nature of man" and that "Judeo-Christian moral standards are the ultimate utilitarian rules for human conduct." According to the Attorney General, "they are like God's instruction manual for the best running of man and society." Expressing his view that "Judeo-Christian values . . . have made this country great"—while simultaneously rejecting the moral basis of secularism and, by implication, other religions (and atheism) as "an inversion of Christian morality," Mr. Barr vowed to place the Department of Justice "at the forefront" of efforts to resist "forces of secularization."[2]

---

matter (hereinafter New York City Bar Association, *Barr Should Recuse Himself*, Oct. 23, 2019). (All links cited in this letter were last checked on January 7, 2020).

[2] William P. Barr, Attorney General of the United States, *Remarks to de Nicola Center for Ethics and Culture, University of Notre Dame School of Law*, Oct. 11, 2019, https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-law-school-and-de-nicola-center-ethics (as prepared for delivery); *see* Michael Sean Winters, *Notre Dame Had a Right to Host Barr—But His Talk Was Ridiculously Stupid*, NAT'L CATHOLIC REPORTER, Oct. 18, 2019, https://www.ncronline.org/news/opinion/distinctly-catholic/notre-dame-had-right-host-barr-his-talk-was-ridiculously-stupid.

- On November 15, 2019, in a speech at the Federalist Society's National Lawyers Convention, Mr. Barr again vilified "progressives" and "the Left" (characterizing as "the other side" those who "oppose this President") in highly partisan terms. Attacking "so-called progressives" for supposedly "treating politics as their religion," and for allegedly attempting, by "any means necessary," to "use the coercive power of the State to remake man and society in their image," Mr. Barr charged that opponents of the Trump presidency's policies have been "engaged in the systematic shredding of norms and the undermining of the rule of law." By contrast, Mr. Barr proclaimed, conservatives "tend to have more scruple over their political tactics" and are more genuinely committed to the rule of law.[3]  The Attorney General referred to something he called a "progressive holy war," characterized, he says, by the use of "any means necessary to gain momentary advantage."

- On December 3, 2019 — drawing from earlier remarks at a Fraternal Order of Police gathering in New Orleans in which he lambasted District Attorneys from "large cities" who "style themselves as 'social justice' reformers, who spend their time undercutting the police, letting criminals off the hook, and refusing to enforce the law," and "an increasingly vocal minority" that "regularly attacks the police and advances a narrative that it is the police that are the bad guys" and "automatically start[s] screaming for the officers' scalps, regardless of the facts" following "a confrontation involving the use of force by police"[4] — Mr. Barr warned at a DOJ awards ceremony that "the American people have to . . . start showing, more than they do, the respect and support that law enforcement deserves," and "if communities don't give that support and respect, they might find themselves without the police protection they need."[5]  Although Mr. Barr did not specify which District Attorneys he had in mind, he did say that "[t]hese anti-law enforcement DAs have tended to emerge in jurisdictions where the election is largely determined by the primary" and cited to "large cities" as the culprit jurisdictions which, in his view, were headed towards "[m]ore crime; more victims" as a result.[6]  In similar fashion, Mr. Barr did not specify which "communities" were at risk of seeing

[3]  William P. Barr, Attorney General of the United States, *19th Annual Barbara K. Olson Memorial Lecture, National Lawyers Convention, Federalist Society*, Nov. 15, 2019, https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-19th-annual-barbara-k-olson-memorial-lecture (as prepared for delivery); *see* Ruth Marcus, *The Most Alarming Part of Barr's Speech Was Its Angrily Partisan Tone*, WASH. POST, Nov. 18, 2019, https://www.washingtonpost.com/opinions/william-barrs-language-is-that-of-an-ideological-warrior-not-an-attorney-general/2019/11/18/27f26c64-0a42-11ea-bd9d-c628fd48b3a0_story.html.

[4] William P. Barr, Attorney General of the United States, *Attorney General William P. Barr Delivers Remarks at the Grand Lodge Fraternal Order of Police's 64th National Biennial Conference*, August 12, 2019, https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-grand-lodge-fraternal-order-polices-64th (as prepared for delivery) (hereinafter "FOP Speech").

[5]  William P. Barr, Attorney General of the United States, *Third Annual Attorney General's Award for Distinguished Service in Policing*, Dec. 3, 2019, https://www.justice.gov/opa/video/third-annual-attorney-general-s-award-distinguished-service-policing.

[6]  In response to the FOP Speech, 67 prosecutors issued a statement calling Barr's speech "deeply concerning" and cautioning "It is not the time for a return to fear-driven narratives that find no foundation in fact."  *Statement in Response to Attorney General Barr's Remarks to The Fraternal Order of Police*, August 16, 2019, https://fairandjustprosecution.org/wp-content/uploads/2019/08/Barr-Remarks-Sign-On-Statement.pdf.

3

decreased police protection because they lack respect for law enforcement, but his comment was understood by some observers, not unreasonably, as being directed toward members of communities of color protesting excessive use of force by police.[7]

- On December 10, 2019, in a television interview soon after DOJ's Inspector General released a report finding no improper political motivation in the FBI's commencement of a counterintelligence investigation into alleged ties between the Trump-Pence campaign and Russian officials in 2016, Mr. Barr publicly rejected the Inspector General's findings, asserting instead that a separate ongoing investigation into the FBI's actions that he personally had directed would likely reach a different conclusion. Although that second investigation (which is being supervised by a different DOJ official) is not yet complete, Mr. Barr nevertheless openly discussed his opinions about the likely outcome of that investigation. In a separate statement the previous day, Mr. Barr asserted that the FBI's factual predicate was "insufficient to justify" its investigation and that the FBI may have acted in "bad faith" in commencing that investigation.[8]

These comments follow and are reminiscent of Mr. Barr's earlier mischaracterizations of the Mueller Report, prior to his release of a redacted version of it, in which Mr. Barr claimed the special counsel had found insufficient evidence of any obstruction of justice by President Trump—

---

[7] In a television interview with Pete Williams of NBC News on December 10, 2019, Mr. Barr denied that he had suggested that people should not criticize police officers and said he was referring to the high rates of job vacancies in police agencies throughout the country. *See Full Interview: Barr Criticizes Inspector General Report on the Russia Investigation*, NBC NEWS, Dec. 10, 2019, https://www.nbcnews.com/video/full-interview-barr-criticizes-inspector-general-report-on-the-russia-investigation-74851909911. There has been extensive reporting over many years on police shortages and the innovative recruitment efforts being made by police departments, but the causes of the hiring challenges are myriad and complex. According to experts in the field, contributing factors include relatively low starting pay; a changing workforce with expectations and objectives that differ from past generations; a weakening pipeline from family members and the military; continuing challenges associated with recruitment of non-traditional candidates, including women and people of color; disqualifying past behaviors by applicants; the stress of increasingly being called upon to deal with the social ills of homelessness, substance abuse and mental illness; news stories highlighting the challenges of serving as a police officer; and misaligned job expectations. *See, e.g.,* Laurie Mack, *Shortage Of Officers Fuels Police Recruiting Crisis,* Dec. NPR NEWS, Dec. 11, 2018, https://www.npr.org/2018/12/11/675505052/shortage-of-officers-fuels-police-recruiting-crisis; Timothy Roufa, *Why Police Departments Are Facing Recruitment Problems,* THE BALANCE CAREERS/CRIMINOLOGY CAREERS, Nov. 5, 2018, https://www.thebalancecareers.com/why-police-departments-are-facing-recruitment-problems-974771; Sid Smith, MPA, Chief of Police (former), *A Crisis Facing Law Enforcement: Recruiting in the 21st Century*, POLICE CHIEF MAGAZINE, June 2016, https://www.policechiefmagazine.org/a-crisis-facing-law-enforcement-recruiting-in-the-21st-century/; Ben Langham, Lieutenant, Kenai, Alaska, Police Department, *Millennials and Improving Recruitment in Law Enforcement,* POLICE CHIEF MAGAZINE, May 24, 2017, https://www.policechiefmagazine.org/millennials-and-improving-recruitment/; Lt. Ryan Harmon, *A New Approach In Recruiting & Retaining Qualified Officers At The Bella Vista [Arkansas] Police Department,* March 2011, https://www.cji.edu/wp-content/uploads/2019/04/new-approach-in-recruiting-retaining-qualified-officers.pdf; POLICE EXECUTIVE RESEARCH FORUM, *The Workforce Crisis, And What Police Agencies Are Doing About It,* September 2019, https://www.policeforum.org/assets/WorkforceCrisis.pdf.

[8] *Full Interview: Barr Criticizes Inspector General Report, supra* note 7; Mikhaila Fogel, *Notable Statements on Inspector General's Report,* LAWFARE, Dec. 9, 2019, https://www.lawfareblog.com/notable-statements-inspector-generals-report; William Webster, *The Rule of Law Still Matters,* NY Times, Dec. 17, 2019, at A27, https://www.nytimes.com/2019/12/16/opinion/FBI-Trump-russia-investigation.html.

4

a material mischaracterization of the Mueller Report and a proposition rejected by more than 1,000 former federal prosecutors based on the facts set forth in the Mueller Report.[9]

These public statements by Mr. Barr also contravene the norms applicable to his office and warrant further investigation by Congress as part of an inquiry into Mr. Barr's conduct as Attorney General more generally. They may even implicate ethical considerations, insofar as prosecutors must generally avoid public comments on ongoing investigations and must not manifest any bias or prejudice based on race, religion, sexual orientation or partisan political considerations in exercising their prosecutorial discretion.[10] Although we do not in this letter take any position on whether or not Mr. Barr has violated any Rules of Professional Conduct, at least one leading legal ethics authority has suggested that government lawyers have special obligations to be factually accurate in their public statements, and should be bound by the Rules of Professional Conduct, even if they do not represent clients in the traditional sense.[11] Indeed, Mr. Barr's conduct appears to run afoul of the "very special obligations" that he himself professed to recognize during his 1991 and 2019 Senate confirmation hearings.[12] During the 1991 hearing, Mr. Barr recognized that the Attorney General "holds in trust the fair and impartial administration of justice" and bears responsibility "to enforce the law evenhandedly and with integrity." He also noted that the Attorney General "must ensure that the administration of justice . . . is above and away from politics," and that "[n]othing could be more destructive of our system of government, of the rule of law, or the Department of Justice as an institution, than any toleration of political interference with the enforcement of the law." In 2019, Mr. Barr further explained that the Department of Justice must be a "place[] in the government where the rule of law—not politics—holds sway, and where they [the American people] will be treated fairly based solely on the facts and an even-handed application of the law."[13]

Mr. Barr's recent actions and statements are in sharp and diametric contrast to the principles he cited in his confirmation hearings. In addition, they reinforce a broader pattern of conduct during his tenure in which he has created, at a minimum, an appearance of partiality in

[9] *Statement by Former Federal Prosecutors*, May 6, 2019, https://medium.com/@dojalumni/statement-by-former-federal-prosecutors-8ab7691c2aa1. Mr. Mueller expressed a similar point of view in a letter to the Attorney General, in which he stated that "The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this Office's work and conclusions." *Letter from Special Counsel Robert S. Muller, III to The Honorable William P. Barr*, March 27, 2019, https://int.nyt.com/data/documenthelper/796-mueller-letter-to-barr/02499959cbfa313e36d4/optimized/full.pdf.

[10] CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION §§ 3-1.3, 3-1.4, 3-1.6 & 3-1.10 (Am. Bar Ass'n, 4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition.

[11] *See* Ellen Yaroshefsky, Regulation of Lawyers in Government Beyond the Client Representation Role, 33 NOTRE DAME J.L. ETHICS & PUB. POL'Y 151 (2019), https://am.aals.org/wp-content/uploads/sites/4/2018/12/AM19SYaroshefskyRegulationofLawyers.pdf.

[12] New York City Bar Association, *Barr Should Recuse Himself*, Oct. 23, 2019, *supra* note 1; see also *infra* note 13.

[13] Confirmation Hearing of William P. Barr, 15. Hrg. 102-505, Pt. 2 (Nov. 12 & 13, 1991), at 16, http://civilrightsdocs.info/pdf/ag-vacancy/1991-AG-Nomination-Hearing-Transcript.pdf. Written Testimony of William P. Barr, Hearing on the Nomination of the Hon. William Pelham Barr to Be Attorney General of the United States, Committee on the Judiciary, U.S. Senate, Jan. 15, 2019, at 1, https://www.judiciary.senate.gov/download/barr-testimony.

how he understands and carries out his role as Attorney General.  In a troubling number of instances, Mr. Barr has spoken and acted in a manner communicating an impression that he views himself as serving as the Attorney General not for the entire nation, but more narrowly for certain segments of society—whether defined in terms of religion, ideology (his own "side," to borrow the language of Mr. Barr's Federalist Society speech) or party affiliation.

For the reasons stated above, we have significant concerns about the propriety of Mr. Barr's recent actions and statements.  We urge Congress to exercise its constitutional obligations by expeditiously commencing formal inquiries into Mr. Barr's conduct.

Respectfully,

Roger Juan Maldonado
President
New York City Bar Association

Stephen L. Kass
Chair, Task Force on the Rule of Law
New York City Bar Association

cc:     Hon. William P. Barr
        Attorney General of the United States
        U.S. Department of Justice
        (*Sent via Express and Regular Mail*)

        Hon. Jerrold Nadler
        Chair, Committee on the Judiciary
        U.S. House of Representatives

        Hon. Doug Collins
        Ranking Member, Committee on the Judiciary
        U.S. House of Representatives

        Hon. Lindsey Graham
        Chair, Committee on the Judiciary
        U.S. Senate

        Hon. Dianne Feinstein
        Ranking Member, Committee on the Judiciary
        U.S. Senate

6