UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────X

UNITED STATES OF AMERICA,

　　　　　　—v.—　　　　　　　　　　　　　　　(S-1) 19-Cr-725 (JPO)

LEV PARNAS,
IGOR FRUMAN and
ANDREY KUKUSHKIN,

　　　　　　　　　　Defendants.

────────────────────────────────────X

### REPLY MEMORANDUM IN SUPPORT
### OF LEV PARNAS'S PRE-TRIAL MOTIONS

### I.　　<u>Introduction</u>

　　　The Government falsely argues that Mr. Parnas's claim of selective prosecution is nothing more than a Twitter-fueled conspiracy theory, and that he was not singled out for investigation because of his national origin and political interests, nor indicted and arrested as a means to thwart the substantial risk of his providing evidence against the President in the first impeachment proceeding. Attempts to divert focus to the return of the superseding indictment, rather than the inception of its investigation and premature return of the original indictment and Parnas's arrest, are misplaced and misleading.  In fact, actual evidence, not mere hyperbole, supports Parnas's argument.

　　　In consenting to the production of certain grand jury records in furtherance of Parnas's fair cross-section challenge to its composition, the Government concedes for the first time that a partially remote grand jury proceeding was employed during its presentation on the superseding indictment, which—in addition to ripening problems related to grand juror privacy, secrecy, attention, and ability to observe—improperly bifurcated the quorum into White Plains and

Manhattan divisions by having seven grand jurors participate by videoconference from a location within the White Plains Courthouse. *See* Dkt. No. 163, at p. 66. The Government continues to wrongly oppose production of additional information that is reasonably related to Parnas's motion to dismiss, including whether there was a quorum of grand jurors from one presentation to the next, or whether potentially false and misleading evidence reached grand jurors and what, if any, curative instructions were given.

Next, although consenting to Mr. Parnas's motion for severance of the Fraud Guarantee wire fraud charged in Count Seven, the Government persists in opposing severance of Counts One, Two and Three from Counts Four, Five and Six, notwithstanding the substantial prejudice that will inure to all defendants in trying these counts jointly.

Finally, the Government persists in resisting the full and "prompt" production of favorable and impeaching evidence as required by *Brady v. Maryland*, 373 U.S. (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and progeny, and as contemplated by new Federal Rule of Criminal Procedure 5(f) and Order of this Court. *See* Dkt. No. 142.

The Government's arguments opposing Parnas's motions are without merit. Production of the materials requested should be Ordered, and an evidentiary hearing on Parnas's motions to dismiss scheduled.

## II.     <u>**Selective Prosecution**</u>

Contrary to the Government's claim, Mr. Parnas's motion to dismiss the indictment for selective prosecution is grounded in facts, not speculation. There is "clear evidence" that the decision to prosecute him not only "had a discriminatory effect" but was also "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718

F.2d 1210, 1229 (2d Cir. 1983). Accordingly, discovery should be compelled and an evidentiary hearing ordered.

### A.    Discriminatory Effect

It is clear that "'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant,'" and that Messrs. Parnas and Fruman were "'singled out'" for criminal prosecution. *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229) (alteration incorporated); *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same). This is true both within the confines of the conduct alleged, and in comparison to other alleged Federal Election Act violations that have neither become the subject of criminal charges nor an adverse judgment by the Federal Election Commission. An offender is deemed "similarly situated" when they have committed roughly the same offense, under roughly the same circumstances, but the law has not been enforced against them. *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir 2008); *see also United States v. Stone*, No. 19-0018 (ABJ), 2019 WL 2502929 at *22 (D.D.C. Aug. 1, 2019) ("[A] defendant must show that the crimes charged and those allegedly committed by the comparator are the same or similar and arose in similar circumstances"). Here, Messrs. Parnas and Fruman were singled out for criminal investigation from among all comparators because of the unique combination of their Soviet emigre backgrounds and political affiliations (pro-Trump; Trump donors).

Thus, in relation to the conduct that led the Government to criminally charge Parnas in Counts One, Two and Three—making political contributions to, *inter alia*, the America First Super PAC on behalf of Parnas and Fruman's newly conceived and incorporated energy company, Global Energy Producers, with a bona fide capital contribution of funds received through Fruman's refinancing of his condominium by private loan, and a transfer of those funds

to Parnas's account for payment to the Super PAC—there are a number of individuals who were aware that Parnas and Fruman were making contributions exactly as they were done: with funds derived from a loan to Fruman, which he had sent to an account owned by Parnas, and which Parnas then paid on behalf of GEP, or with a credit card in the name of a third-party corporation but attributed to GEP.  Messrs. Parnas and Fruman have pled not guilty and asserted their innocence. Nonetheless, they were the only ones singled out for prosecution, and the only Soviet emigres from among this group of individuals. Parnas and Fruman were also the only comparators within the conduct charged who had little or no actual experience with the requirements of federal election and campaign finance laws, and yet they were still singled out while others with particularized knowledge of the law were not prosecuted.

By way of example, other participants in the conduct alleged against Parnas and Fruman in Count One include, but are not limited to Joseph Ahearn[1], Tommy Hicks, Jr., and Roy Bailey, who were employed by, or the leaders of, America First Super PAC at the time of the donations.[2]

Individuals alleged to have engaged in other violations of federal election law with Parnas and Fruman include President Trump, and Attorneys Rudy Giuliani, Victoria Toensing.[3] Again, notwithstanding claims of having extorted Ukrainian President-Elect Zelensky in an effort to influence the 2020 election, none of these other individuals have been criminally prosecuted.

_____

[1] *See, e.g.,* Exhibit A, text message between Ahearn and Parnas, referencing payment to America First by Parnas with proceeds from the closing of a loan by Fruman.

[2] *See, e.g.,* Trump is going to a social event hosted by pro-Trump super PAC America First Action (Apr. 30, 2018) https://www.cnbc.com/2018/04/30/trump-is-going-to-a-social-event-hosted-by-pro-trump-super-pac-america-first-action.html?__source=iosappshare%7Ccom.apple.UIKit.activity.Mail (last visited January 15, 2021); Parnas Says He Warned Top Ukraine Aide on Potential Cutoff of Funds (January 15, 2020) https://www.wsj.com/articles/house-impeachment-panels-release-documents-on-contacts-of-lev-parnas-11579141413?st=pb6aw0c8jdjz1vd&reflink=article_email_share (last visited January 15, 2021).

[3] *See* https://www.commoncause.org/wp-content/uploads/2019/09/Signed-Trump-DOJ-Complaint-9.23.19.pdf (last visited January 15, 2021).

Beyond participants in the same courses of conduct ascribed to Parnas and Fruman, the Federal Election laws are routinely not enforced against other similarly situated individuals of different national origins and political affiliations. A review of the FEC's enforcement summaries during the past decade is instructive. It would appear that there are scant or virtually no other matters involving an FEC complaint that was referred for, or became the subject of, a criminal prosecution. *See* https://www.fec.gov/resources/cms-content/documents/ status_of_enforcement_fiscal_year_2019_third_quarter_redacted.pdf. Criminal prosecution of election and campaign law violations are also comparatively rare. A LEXIS search reveals that, in the past ten years, there have been a total of only 15 written decisions involving alleged criminal violation of 15 U.S.C. 30122. As to 15 U.S.C. 30109, there have been only 19 written decisions involving alleged criminal violations. As to 18 U.S.C. 1001, although there have been 2,773 written decisions, it appears as though only 39 have involved alleged criminal violations of the federal election laws. Although there were 8,495 written decisions during this time involving a general conspiracy charge under 18 U.S.C. 371, only 30 have involved claims of criminal federal election violations. By way of comparison, there are over 54,000 written decisions during the same time frame involving controlled substance violations of 21 U.S.C. 841, over 34,000 involving controlled substance violations of 21 U.S.C. 846, 7,934 involving wire fraud offenses under 18 U.S.C. 1343, and 529 involving violations of the RICO statute, 18 U.S.C. 1963. The data available plainly reflects the rarity of bringing criminal claims of federal election law violations.

### B.    Discriminatory Purpose

It is apparent that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or

5

the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59 (internal quotation marks omitted; alteration incorporated). The evidence reflects that this decision was not a mere "awareness of consequences," *Wayte v. United States*, 470 U.S. 598, 610 (1985) (internal quotation marks omitted), but rather was selected "at least in part because of, not merely in spite of, its adverse effects." *Id*. (internal quotation marks omitted).

Here, there is a significant quantum of evidence the Government returned its original indictment against Mr. Parnas at the behest of then-Attorney General Barr "*because of*" his potential exercise of his constitutional rights to speak with Congress and comply with its demands for the production of evidence and testimony. Tellingly, the Government has failed to file a declaration or otherwise deny the influence of the Attorney General in its decision making regarding the contents and timing of the return of the original indictment, and the arrest of Parnas and Fruman.

## C.    Discovery

To obtain discovery in support of his claim, Mr. Parnas must first "must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see also Fares*, 978 F.2d at 59 (same). That is, Parnas must provide "some evidence tending to show the existence of the essential elements of the defense." *United States v. Berrios*, 501 F.2d 207, 1211 (2d Cir. 1974) (quoted in *Armstrong*, 517 U.S. at 468).

Even though the standard for granting discovery is "rigorous," and intended to act as a "significant barrier to the litigation of insubstantial claims," *Armstrong*, 517 U.S. at 464, the standard for granting discovery cannot be an unattainable bar. Indeed, the clearest evidence needed to rebut the presumption that the Government has "properly discharged their official duties" is sure to be closely protected and elusive. *Id.*

As set forth in detail in our opening memorandum, the chronology of events leading to Mr. Parnas's investigation, the timing of his indictment and arrest, and certain acts of former Attorney General William P. Barr in the months thereafter provide strong support and evidence of discriminatory purpose. Salient points along this continuum include, but are not limited to the following:

- During the course of the Government's investigation into Parnas and Fruman as Soviet-born Trump donors, it was learned that Parnas was engaged in efforts led by with the President's personal attorney, Rudy Giuliani, and others to collect evidence to smear then-candidate and now President-Elect Joseph R. Biden, Jr., and to attempt to persuade Ukrainian President-Elect Volodymyr Zelensky to announce baseless anti-corruption campaigns against Joe Biden and his son Hunter, in exchange for the United States continuing to provide Ukraine with military and humanitarian aid.

- These activities bubbled over in August 2019, with the unexpected filing of a Whistleblower Complaint[4] alleging that the President, along with his personal attorney Mr. Giuliani, and the assistance of unnamed others, including Mr. Parnas, had engaged in a plot to extort Ukraine into announcing investigations into Joe and Hunter Biden in exchange for aid.

- On September 24, 2019, the House commenced its impeachment inquiry into President Trump.[5]

---

[4] *See* Letter from Whistleblower to Adam B. Schiff, House Permanent Select Committee on Intelligence, and Richard Burr, Senate Select Committee on Intelligence (Aug. 12, 2019) (online at https://intelligence.house.gov/uploadedfiles/20190812_-_whistleblower_complaint_unclass.pdf).

[5] *See* Nancy Pelosi Announces Formal Impeachment Inquiry of Trump, https://www.google.com/search?q=nancy+pelosi+begins+impeachment+inquiry (last visited Dec. 1, 2020).

- On September 30, 2019, Messrs. Parnas and Fruman—as well as Mr. Giuliani—were issued demand letters by Congress, seeking their documentary evidence and deposition testimony in the impeachment inquiry.[6]

- By October 3, 2019, Mr. Parnas had been jockeyed, manipulated and cajoled into being represented by one of President Trump's former attorneys, John Dowd, with the President—who would later famously disavow knowing Parnas—agreeing through his counsel Jay Sekulow to waive any potential conflicts of interest in Dowd representing Parnas *and* Fruman. Dowd then launched a campaign, known and approved of by the President's attorneys Dowd, Sekulow, Giuliani and others, to refuse to comply with Parnas's Congressional demand letter.[7]

- On October 8, 2019, Dowd sent a second letter to the House Intelligence Committee, restating that Parnas would not be complying with its demand letter.[8]

- On October 9, 2019, Parnas and Fruman met with Giuliani in Washington DC, who withdrew his plans to travel with them to Vienna later that day. That evening, Parnas and Fruman were arrested on an indictment that had returned earlier that day, which scrupulously avoided charging the men with any Giuliani or Trump-related allegations, and came in the middle of an ongoing and yet-to be completed grand jury presentment.

- That same evening, Attorney General Barr met with Robert Murdoch, who owned Fox News, the news outlet that was going to air former Ukrainian Prosecutor General Victor

---

[6] Online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/20190930%20-%20Parnas%20Letter%20and%20Doc%20Request%20Schedule.pdf.

[7] *See* Dkt. No. 156, Exh. F

[8] Letter from John Dowd to Nicholas A. Mitchell, House Permanent Select Committee on Intelligence, (Oct. 8, 2019) (emphasis added). Online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-10-08%20Fruman%20Parnas%20Counsel%20Dowd%20to%20HPSCI_Redacted.pdf.

Shokin's interview with Shawn Hannity in the coming days, which had been arranged by Parnas, and which he had been traveling to meet Shokin and prepare for.[9]

• The following morning, Attorney General Barr visited the SDNY-USAO and discussed Parnas's case.[10]

Following Mr. Parnas's arrest, Attorney General Barr came under increasing criticism for his intervention in a number of politically charged federal criminal matters, in each instance being seen as protecting the penal and personal interests of President Trump. These real facts of Attorney General Barr's repeated willingness to intervene on his behalf—again, not hyperbole—include, but are not limited to:

• On February 11, 2020, immediately after the President tweeted complaining about the recommended sentence in the Roger Stone case, the Attorney General intervened to recommend a more lenient sentence, precipitating the resignation of the prosecution team, recommend a more lenient sentence, precipitating the resignation of the prosecution team, the signing of a letter by over 2,000 DOJ alumni calling for his resignation, and a House Judiciary Committee demand for his testimony regarding the Roger Stone case as well as

---

[9] *See* Vanity Fair, "Trump's dutiful attorney general, met with Fox News mogul Rupert Murdoch on Wednesday night," https://www.vanityfair.com/news/2019/10/why-is-william-barr-meeting-with-rupert-murdoch (last visited Dec. 1, 2020).

[10] *See* Two Giuliani associates involved in Ukraine probe arrested on campaign finance charges, https://www.latimes.com/politics/story/2019-10-10/donors-arrested-giuliani-ukraine-campaign-finance ("Atty. Gen. William Barr was briefed about this investigation in February and was informed Wednesday night that Parnas and Fruman were about to be arrested, according to a Justice Department official. Barr visited with prosecutors in the Manhattan office on Thursday, part of what aides said was a routine check-in visit") (last visited Nov. 28, 2020).

the recent creation of a DOJ backchannel for receipt of evidence obtained by Rudy
Giuliani in Ukraine that purported to show wrongdoing by Joe and Hunter Biden.[11]

- On February 14, 2020, Attorney General Barr assigned an outside prosecutor to review
  the Michael Flynn case, ultimately leading to DOJ's motion for dismissal—something
  which former EDNY judge John Gleeson has described as "highly irregular conduct to
  benefit a political ally of the president" and "clear evidence of gross abuse of prosecutorial
  power."[12]

- On June 1, 2020, Attorney General Barr ordered federal officers to push back anti-Trump
  protestors, using fire chemical deterrents and rubber bullets, in Lafayette Square,
  Washington DC.[13]

- On June 19, 2020, in an act that could well be related to the instant case, Attorney General
  Barr visited the SDNY to solicit the resignation of then-United States Attorney Geoffrey

---

[11] Roger Stone Sentencing Was Politicized, Prosecutor Plans to Testify, https://www.nytimes.com/2020/06/23/us/politics/roger-stone-sentencing-politicized.html (last visited Nov. 28, 2020); All 4 federal prosecutors quit Stone case after DOJ overrules prosecutors on sentencing request, https://www.cnn.com/2020/02/11/politics/roger-stone-sentencing-justice-department/index.html (last visited Nov. 28, 2020); More than 2,000 former prosecutors and other DOJ officials call on Attorney General Bill Barr to resign, https://www.cnn.com/2020/02/16/politics/prosecutors-doj-officials-barr-resign/index.html (last visited Nov. 28, 2020); Barr confirms DOJ is receiving Ukraine information from Rudy Giuliani, https://www.axios.com/bill-barr-justice-department-ukraine-giuliani-Bidens-275f0649-925e-4d73-a117-4c588a2c573c.html Bill (last visited Nov. 28, 2020).

[12] Barr Installs Outside Prosecutor to Review Case Against Michael Flynn, Ex-Trump Adviser, https://www.nytimes.com/2020/02/14/us/politics/michael-flynn-prosecutors-barr.html (last visited Nov. 28, 2020); READ: DOJ motion to dismiss Flynn case, https://thehill.com/regulation/496649-read-doj-motion-to-dismiss-flynn-case (last visited Dec. 2, 2020); Retired Judge Says Flynn's Guilty Plea Must Stand, https://www.courthousenews.com/retired-judge-says-flynns-guilty-plea-must-stand/ (last visited Nov. 28, 2020);

[13] Barr personally ordered law enforcement to push back Lafayette Square protesters, https://thehill.com/homenews/administration/500736-barr-personally-ordered-law-enforcement-to-push-back-lafayette-square (last visited Nov. 28, 2020).

Berman.[14] Although USA Berman declined, DOJ published a press release indicating Berman's resignation.[15] When USA Berman denied that he was resigning, the following day, AG Barr send a letter to Berman stating that the President had fired him.[16]

- On June 24, 2020, the House Judiciary Committee called for AG Barr's impeachment.[17]

- On July 28, 2020, AG Barr announced plans to release Special Prosecutor John Durham's findings on the investigation into the origins of the Russia Investigation just prior to the election.[18]

- On September 8, 2020, AG Barr sought to have the DOJ intervene in a defamation lawsuit filed against the President by Jean Carroll.[19]

---

[14] Berman says Barr 'repeatedly urged' him to resign as top SDNY prosecutor, https://www.marketwatch.com/story/berman-says-barr-repeatedly-urged-him-to-resign-as-top-sdny-prosecutor-2020-07-09 (last visited Nov. 28, 2020).

[15] Dep't of Justice, Attorney General William P. Barr On The Nomination Of Jay Clayton To Serve As U.S. Attorney For The Southern District Of New York. (June 19, 2020) (online at https://www.justice.gov/opa/pr/attorney-general-william-p-barr-nomination-jay-clayton-serve-us-attorney-southern-district).

[16] Letter from William P. Barr, Attorney General of the United States, to Geoffrey Berman, former United States Attorney for the Southern District of New York, (June 20, 2020) (online at https://context-cdn.washingtonpost.com/notes/prod/default/documents/febfd776-1bc3-4e20-9a88-0e944ba99e3c/note/97ee92d4-dea5-42f0-9f25-8240522ebff1.#page).

[17] Nadler says House 'may very well' pursue impeachment of Attorney General William Barr, https://www.cnn.com/2020/06/24/politics/attorney-general-william-barr-testify-congress/index.html (last visited Nov. 28, 2020).

[18] Barr won't rule out pre-election release of Durham report POLITICO, https://www.politico.com/news/2020/07/28/barr-pre-election-release-durham-report-385244 (last visited Dec. 2, 2020).

[19] White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says The New York Times, https://www.nytimes.com/2020/09/09/us/politics/trump-e-jean-carroll-lawsuit.html (last visited Dec. 2, 2020).

- On September 11, 2020, a top aide of Special Prosecutor Durham resigned over concerns of political pressure on Durham in his investigation.[20]

- On September 16, 2020, AG Barr was reported to have pushed for sedition charges to be filed against protesters and prosecution of the Seattle Mayor, in connection with protests related to police shootings of unarmed citizens, and also to have endorsed the personal intervention of the Attorney General in certain criminal prosecutions.[21]

- On November 10, 2020, The head of DOJ's election crimes unit resigned in the wake of AG Barr authorizing election inquiries.[22]

Nor is Mr. Parnas's request novel or new. Indeed, on July 19, 2019, the U.S. House of Representatives' Committee on Oversight and Reform demanded that the SDNY-USAO produce information related to whether Attorney General Barr or other Justice Department leaders influenced decision-making in the SDNY prosecution of Michael Cohen[23], noting therein that:

> The Committee is also writing to you directly because Attorney General
> Barr failed to relay information to Congress and the American people in
> an independent, neutral and factual way regarding prosecutors' findings

---

[20] Prosecutor resigns from U.S. attorney's investigation into origins of Trump-Russia probe The Washington Post, https://www.washingtonpost.com/national-security/nora-dannehy-john-durham-trump-russia/2020/09/11/8bf49890-f466-11ea-b796-2dd09962649c_story.html (last visited Dec. 2, 2020).

[21] Barr Told Prosecutors to Consider Sedition Charges for Protest Violence, The New York Times, https://www.nytimes.com/2020/09/16/us/politics/william-barr-sedition.html (last visited Dec. 2, 2020).

[22] Justice Department's election crimes chief resigns after Barr allows prosecutors to investigate voter fraud claims, https://www.nbcnews.com/politics/2020-election/doj-s-election-crimes-chief-resigns-after-barr-directs-prosecutors-n1247220 (last visited January 15, 2021).

[23] *See* Letter from Congressman Elijah Cummings, U.S. House of Representatives Committee on Oversight and Reform, to Deputy United States Attorney SDNY Audrey Strauss (July 19, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-19.COR%20to%20Strauss-SDNY%20re%20Hush%20Money%20Investigation.pdf (last visited January 15, 2021).

related to President Trump when he fundamentally mischaracterized the findings of the report issued by Special Counsel Mueller.[24]

As a result of this and other incidents, the Committee has expanded its investigation to include examining the Department's process in the decisions in this case and whether they were influenced by politics, Department policy, or Department leadership in any way.

Here, Parnas has produced evidence that "similarly situated [others] could have been prosecuted but were not." *United States v. Armstrong*, 517 U.S. at 469. Accordingly, he has met his burden as to the first prong of the "colorable claim" test required to grant him discovery.

As to evidence of improper motivation, "[a] plaintiff alleging discrimination is not required to produce direct evidence of intent; indeed, direct evidence of motive or intent is rarely available," *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11 (D.D.C. 1997), and, "[a]s in any equal protection claim, evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent may be used to show bias or discriminatory motive." *Id.*, citing *King v. Palmer*, 778 F.2d 878, 881 (D.C.Cir. 1985) (party asserting intentional discrimination need not produce direct evidence of discriminatory intent but may demonstrate it through indirect evidence) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).

Indeed, in *United States v. Washington*, 705 F.2d at 494, the court "permitted discovery in a selective prosecution case based on inferences where no direct evidence of intent was available." *See Branch Ministries*, 970 F.Supp at 17 (noting that, in *Washington*, the "trial court permitted discovery after the defendant introduced evidence suggesting a link between foreign policy and the Israeli Government's [settlement policies]"). *See also United States v. Hastings*, Cr. No. 95-37,

---

[24] *See, e.g,* Letter from Special Counsel Robert S. Mueller, III to Attorney General William P. Barr, Department of Justice (Mar. 27 2019) (noting that Attorney General Barr "did not fully capture the context, nature and substance of this Office's worked conclusions," that he caused "public confusion about the critical aspects of the results fo our investigation," and that he threatened "to undermine a central purpose for which the Department appointed the Special Counsel: to assure full public confidence in the outcome of the investigations").

Memorandum at 12 (W.D.N.C. May 9, 1996) (tax investigator's explicit discussion of a defendant's political affiliations and status gave rise to proper inference that the defendant's political beliefs had played an impermissible role in the decision to prosecute).

Also, the relative rarity of an official act—such as a criminal prosecution of federal election laws—can support a finding of discriminatory intent, even if it may not be sufficient alone to make such a finding. *Branch Ministries at 17; see also United States v. Al Jibori,* 90 F.3d 22, 23, 26 & n.1 (2d Cir. 1996) (the fact that it was unusual for the INS to prosecute under the statute in question focused the inquiry and increased the need for discovery). In *Branch Ministries,* the court also noted that the fact that the IRS had a range of less severe options—just like the FEC and DOJ did in Parnas's case—including warnings, monetary penalties and suspensions, yet elected to pursue the most draconian course, was "probative, although not dispositive evidence of possible discriminatory intent." *Id.* at 17.

Here, Parnas has identified facts and evidence that his referral for criminal prosecution on Federal Election Act charges was at the very least unusual, and the remedy imposed for these alleged violations comparatively severe. The original FEC complaint identifies he and Fruman as being of Ukrainian and Belarusian origin, and the central complaint was the manner and means of their donations to America First. Without discovery of the materials requested in Parnas's opening memorandum, he will be unfairly prevented from fully presenting the evidence in support of his claim of selective prosecution. Because Parnas has made a colorable showing that his national origin and political affiliations/beliefs may have played a role in the Government's decision to prosecute him criminally, Ordering discovery—including the number of FEC investigations that become the subject of a criminal proceeding, how many involve Soviet emigres, how many involved Republican as opposed to Democratic or other party-affiliated

defendants, and any other evidence of improper or discriminatory influence by the Attorney General or members of the Justice Department—is justified.

### III.   Discovery and a Hearing on Parnas' Motion to Dismiss for Grand Jury Violations is Proper

The Government has, for the first time, disclosed that it presented evidence to seven grand jurors via remote videoconferencing at the SDNY's White Plains Courthouse in the course of obtaining the superseding indictment. *See* Dkt. No. 163 at p. 66. Accordingly, Parnas requests production of all facts relating to the protocols used to ensure grand juror secrecy, to protect against technological malfunction, to enable jurors appearing by wifi to see, hear and observe the witnesses, receive evidence and exhibits, and to deliberate with secrecy.

The Government has also failed to answer the question of whether there was a continuous quorum of the same grand jurors present for the return of the superseding indictment as were present at the time of the return of the original indictment. Accordingly, *in camera* inspection of the attendance and voting records of the grand jury that returned the superseding indictment, and comparison to the voting and attendance records of the grand jurors who returned the first indictment, is requested. Should the Court's inspection of the records not reveal that at least a quorum of the same grand jurors voted as to each indictment, it is respectfully submitted that inspection of the grand jury proceedings "in order to determine whether the evidence supporting the charges contained in the original [] indictment was in any way presented to the new jurors who voted for the [] superseding indictment" will be required. *See United States v. Reyes*, 921 F. Supp. 189, 191 (S.D.N.Y. 1996).

Although the Government has agreed to the production of some records relating to the Defendants' fair-cross section challenge to the grand jury's composition, it opposes production of the other materials requested on the grounds of grand jury secrecy, as well as dismissal on fair-

cross section grounds. Mr. Parnas respectfully submits that the materials requested are all necessary to show that grounds may exist to dismiss the indictment, and their disclosure is authorized under Fed. R. Crim. P. 6(e)(3)(E)(ii).

Mr. Parnas also requests leave to file supplemental or additional arguments in light of the discovery produced, including information pertaining to the videoconferencing of grand jurors, and as to any gaps in production that may still remain.

## IV.     Severance of Counts One, Two and Three from Counts Four, Five and Six is Necessary

For the reasons set forth by Parnas, Kukushkin and Fruman in their opening memoranda, granting severance of Counts One, Two and Three from Counts Four, Five and Six is warranted. Each group represents a separate "bucket" of entirely independent criminal allegations, and a joint trial of these Counts will unduly prejudice the defendants.

Although not having originally moved for severance from his co-defendants, Mr. Parnas does not oppose the requests of Messrs. Kukushkin and Fruman to sever their trials from his own, for the reasons set forth in their respective opening memoranda. And, just as Fruman argues Parnas's purported media persona will somehow prejudice him, there remains another side to this equation: Parnas being paired with Fruman—who has been uncooperative with Congress[25], not made a clean public break with Rudy Giuliani, President Trump or any of their other

---

[25] *See* Lawyers for indicted Giuliani associates spar over records sent to Congress, https://www.politico.com/news/2020/01/28/parnas-fruman-giuliani-congress-108032 (last visited Jan. 15, 2021).

associates[26], and shown a proclivity to unilaterally invoke joint privileges against Parnas as a shield[27]—may well cause *Parnas* significant prejudice. Either consideration warrants severance.

### V.      Immediate Production of all Favorable (*Brady*) and Impeachment (*Giglio*) Evidence is Required

Production of evidence that is exculpatory or favorable to a defendant is constitutionally required under *Brady v. Maryland*, 373 U.S. 83 (1963), while production of impeachment evidence is constitutionally required under *Giglio v. United States*, 405 U.S. 50 (1972). *Brady* materials must be disclosed promptly upon becoming known to the Government, and *Giglio* materials are generally required to be disclosed sufficiently in advance of trial for a defendant to make "effective use" of them.

On November 2, 2020, the Court issued an Order regarding the Government's disclosure obligations under new Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), which stated unequivocally:

> The Government must disclose to the defense ***all*** information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government. *Id.* at 87. This obligation applies regardless of whether the information would itself constitute admissible evidence. The Government ***shall*** disclose such information to the defense ***promptly after its existence becomes known*** to the Government so that the defense may make effective use of the information in the preparation of its case.

(Emphasis added) (Dkt. No. 142).

The Court's Order does not provide for the Government to produce anything less than "all information," nor delay production of any *Brady* material, and instead mandates prompt

---

[26] *See* Lev Parnas is talking. So where is Igor?, https://www.washingtonpost.com/world/national-security/lev-is-talking-so-where-is-igor/2020/01/21/7e0d586c-0c9e-11ea-a49f-9066f51640f6_story.html (last visited Jan 15, 2021).

[27] *See* Fruman Demands Parnas Take Back Docs From Congress, https://talkingpointsmemo.com/muckraker/fruman-demands-parnas-take-back-docs-from-congress (last visited Jan. 16, 2021).

production "after its existence becomes known." *Id.* Defendants ask that this Order be enforced against the Government, and that it be compelled to produce all *Brady* evidence of which it is currently aware and to file a declaration that it has done so forthwith.

Here, the COVID-19 pandemic presents an unprecedented and extraordinary set of circumstances, and immediate production of not only favorable *Brady* evidence but also impeachment evidence under *Giglio* is required to ensure the protection of Mr. Parnas's constitutional rights, including the right to properly investigate, competently confront and cross-examine witnesses, and to present a defense derived from this evidence. Indeed, as the Supreme Court has explained, *Giglio* material is but one form of *Brady* material. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that if disclosed and used effectively, it may make the difference between conviction and acquittal"). *Giglio* should thus be treated as the *Brady* evidence that it is, and produced at the same time—promptly after its existence becomes known.

Albeit the Government claims that it has provided defense counsel with sufficient summaries of its *Brady* evidence, this is not the case. Their scant letter-disclosures do not summarize *Brady* evidence witness-by-witness, and in many instances do not identify the witnesses whose evidence the Government purports to be summarizing. Production of the actual evidence, not anemic, watered-down and inadmissible summary, is thus requested.

There is also no threat to witnesses or the Government's case presented by early disclosure of their impeachment evidence. All the defendants and their counsel have received multiple rounds of discovery under protective order, which identifies nearly every single one of the Government's trial witnesses. Early production of the materials requested by all Defendants

would protect their constitutional rights to a fair trial, further the interests of justice, streamline the trial process, ensure the ability for effective use of the materials by defense counsel, and do absolutely no harm.  This is particularly true given the quantum of such evidence, geographical distribution of the Government's witnesses, the raging Coronavirus pandemic and the difficulties that it presents in conducting an appropriate investigation and in preparing the defense.

In weighing the equities, the scale plainly tips in favor of immediate production of *Brady* and *Giglio* evidence and protection of the defendants' fair trial rights over the Government's interest in sequestering the evidence until its own, unilateral, determination of a date sufficiently in advance of trial for the defense to make "effective use of the information."

### VI.    <u>Conclusion</u>

Since the return of the original indictment and Mr. Parnas's arrest on October 9, 2019, President Trump has been impeached twice. Former Attorney General Barr has been the subject of multiple demands for recusal, resignation, and impeachment for the apparent use of his office to protect the personal interests of President Trump. The limits to which Mr. Trump's supporters will go to protect him from criticism, scrutiny, investigation, impeachment, removal, and prosecution have been repeatedly shown to have absolutely no bounds. Mr. Parnas points to sufficient objective evidence of discriminatory purpose and effect to make it reasonable, equitable and proper for the Court to Order the Government to produce all discovery that supports Mr. Parnas's claims of selective prosecution—along with any other items that the Court may deem necessary and proper—and an evidentiary hearing, to ensure that his case was not brought and sustained for reasons forbidden by the Constitution.

Given the fundamental Constitutional significance of a fairly selected grand jury, and the Government's having conceded Coronavirus-induced anomalies in presentation of its evidence in

support of the superseding indictment, Ordering production of all discovery requested, along with any other materials the Court deems necessary and proper, and scheduling of an evidentiary hearing on this issue is appropriate.

To protect Mr. Parnas from the undue spillover prejudice of a joint trial on two separate "buckets" of otherwise unrelated sets of allegations, severance of Counts One, Two and Three from Four, Five and Six is required. Parnas reserves his right to bring additional motions as required by newly disclosed or available evidence, and joins in his co-defendants' motions to the extent not in conflict with his own.

Respectfully submitted,

_____/S/_____
Joseph A. Bondy
Stephanie R. Schuman
*Counsel to Lev Parnas*

c:      All Counsel (By ECF)