THE LAW OFFICES OF

# JOSEPH A. BONDY

Joseph A. Bondy

Stephanie R. Schuman
(Of Counsel)

1776 Broadway
Suite 2000
New York NY 10019
Tel 212.219.3572

josephbondy@mac.com

September 28, 2021

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, N.Y. 10007

    Re:    <u>United States v. Lev Parnas, et. al., 19-cr-725 (JPO)</u>

Dear Judge Oetken:

Lev Parnas responds to the Government's motions *in limine* as follows:

**I.**    **Co-Conspirator Declarations**

The Government has indicated that it intends to introduce out-of-court statements of the defendants and other purported co-conspirators at trial, pursuant to Federal Rule of Evidence 801(d)(2)(E).

Out-of-court statements made by a defendant's co-conspirator are admittedly not hearsay when they are offered against the defendant—*provided* the statements were made "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Prior to the admission of any such statements, the Government is required to prove by a preponderance of the evidence that the conspiracy charged existed, that both the particular defendant and the declarant were members of the conspiracy, and that the statement was in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

That Second Circuit allows co-conspirator declaration evidence to be admitted conditionally, subject to later admission of the additional evidence required to show that the conspiracy charged existed and that the particular defendant participated. *See United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993).

Nevertheless, the more prudent practice would be for the Government to simply introduce its direct evidence of the conspiracy alleged, and then to seek the introduction of any purported co-conspirator declarations unconditionally. Indeed, should the Government fail to carry its burden of connection with any conditionally admitted evidence, the defense will be constrained to request a mistrial, since any instruction to the jury to disregard the statements would likely be unable to cure any prejudice at that point.

The Government's current evidentiary basis for arguing that the charged conspiracy existed, based on the unsworn examples of co-conspirator declarations it sets forth in its motion, is not yet adequate to warrant the statements' admission and should be denied at this time. There is no reason the Government could not attempt to demonstrate the ultimate admissibility of these statements at a preliminary hearing, out of the presence of the jury.

Although Second Circuit precedent may allow the Government to have these statements introduced conditionally, the Government bears the risk of the statements being struck, a limiting instruction imposed, or even a mistrial declared if it ultimately fails to demonstrate that *all* the statements were made during and in furtherance of the conspiracy. We therefore respectfully submit that the Court should decline to admit any alleged co-conspirator declarations until it has either heard direct evidence of the conspiracy alleged as to each defendant and their participation therein, or conducted a preliminary hearing on the issue of conditional admission outside the presence of the jury.

Also, Fruman and Parnas's statements to Correia regarding the inclusion of certain items in a document are not "imperatives" as asserted by the Government. They are not similar in any way to the statements at issue in *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir 1999). The defendants in *Bellomo* were charged in a criminal racketeering case with being members of the Colombo Crime Family, and the commands at issue were directives involving "duty" and the commission of murder and extortion, which included non-verbal gestures. *Id.* at 587. As the Court found there, "statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *Bellomo* at 586, citing *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985). Here, the nature of the statements attributed to Mr. Parnas do not rise to the level of "imperative," and should not be admitted as such.

## II. Evidence of Acts that Occurred After the Completion of the Charged Conduct is Admissible

The dates alleged in the indictment are merely approximate, and not dispositive. Here, the Government seeks to exclude certain evidence that reflects the fruits of Mr. Parnas's and Mr. Fruman's work to develop their company into a potentially viable energy business during the period charged in the indictment, on the theory that it arose subsequent to the offense charged. However, much of the evidence the Government seeks to exclude shows that, from at least the time of the inception of GEP and the payment of the $325,000 donation that forms the basis for Count Four, Mr. Parnas and Mr. Fruman sought and developed connections to purchase Liquid Natural Gas (LNG) in the United States, for shipping overseas, delivery in Poland, and

transshipment via pipeline throughout Europe. Their decision where to donate a part of the *bona fide* capital investment in GEP that the money derived from Mr. Fruman's home equity loan represented was also grounded in how to meet the type of donors that could best further their nascent energy business interests. That the company made progress towards these goals is anchored in 2018, and the later evidence plainly bears on Mr. Parnas's intent and *mens rea.* As such, it is admissible.

### III. Jury Nullification: The Court Cannot Instruct Against Jury Nullification, nor can Parnas Suggest it, However Juries Remain Free to Return Verdicts "In the Teeth of Both Law and Facts"

The Government has expressed a concern that, by being permitted to present limited background evidence regarding his history, upbringing and education, Mr. Parnas might somehow "nullify" the jury. Mr. Parnas has neither moved for leave to make such an argument nor sought an instruction allowing nullification, and we submit it would be improper for the Court to proactively instruct the jury or to police counsel against nullification.

Mr. Parnas does not intend to ask the jury not to follow the law, nor to reject it in favor of acquittal. Nonetheless, juries remain free to do so of their own accord. Given the sanctity of jury independence and the historical support for juries returning verdicts on both the facts and the law, this must not be altered.

It is well settled that juries have the right and power to decide on their own to "nullify" a jury. Although the Second Circuit has noted that, "it is not the proper role of courts to encourage nullification," *United States v. Polouizzi,* 564 F.3d 142, 162–63 (2d Cir. 2009), the power of a jury to nullify the verdict exists: "the power of juries to 'nullify' or exercise a power of lenity is just that – a power." *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997). This independent power exists even though, "it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent." *Id.*

More recently, in *United States v. Manzano*, 945 F.3d 616 (2018), a decision arising from the Government's successful mandamus petition reversing the district court granting a defendant leave to argue jury nullification, the Second Circuit noted that "supervisory power does not authorize a court to grant a defendant's request to argue that the jury should disregard the law." *Id.* at 628. The Court also noted, however, that "In so concluding, we have no occasion to pass on whether, or to what extent, a district court must *sua sponte* police a lawyer's arguments to the jury that sound in nullification. *Id.* at 628, fn. 6. Here, there has been no defense request that the jury disregard the law nor any nullification argument made by counsel, and we oppose any insinuation by the Government that the Court *sua sponte* police counsel's arguments to the jury.

Indeed, the Supreme Court has long-acknowledged juries' constitutional power to judge both law and fact. *See Horning v. District of Columbia*, 254 U.S. 135, 138 (1920) ("The judge cannot direct a verdict, it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts"), and so have several circuit courts. *See, e.g., United States v. Krzyske*, 836 F.2d 1013 (6th Cir. 1988) (trial judge's response to a jury that there was no such thing as valid jury nullification was incorrect but harmless error); *United States v. Dougherty*, 473 F.2d 1113

(D.C. Cir. 1972) (jury has the power to nullify, but the court may not instruct them of their power); *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) (jury may render a verdict at odds with evidence or the law); *United States v. Moylan*, 417 F.2d 1002, 1006 (4th Cir. 1969) (power of a jury to acquit in the face of the law and evidence is undisputed). Indeed, no court disputes whether juries have the constitutional authority to judge the law.

More recently, in the context of modern federal sentencing laws, it has been noted that juries stand as the last protection against "a spirit of oppression and tyranny on the part of rulers" and as a "great bulwark of [our] civil and political liberties." *United States v. Booker*, 543 U.S. 220, 239 (2005) (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000)). Indeed, when the government has abused the criminal process or imposed draconian punishment for a particular crime, this last bastion of protection against government oppression often "took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses." *Jones v. United States,* 526 U.S. 226, 245 (1999). Plainly stated, the Sixth Amendment does not prohibit a criminal jury from judging both the law and facts.

Furthermore, the stipulations proposed by Mr. Parnas that the Government objects to as somehow intended to promote nullification—his refugee status, suffering severe injuries as a four-year old, the early disability and death of his father, the need to work from an early age, leaving high school to obtain a General Equivalency Diploma, his naturalization as a United States Citizen, voting experience, and naïveté as a political donor—are all non-controversial parts of Mr. Parnas's background and upbringing, to be presented in a case in which specific knowledge of federal election laws is relevant. The proposed stipulations are all intended to allow Mr. Parnas's biographical sketch to be presented to his triers of fact as appropriate context to the case, to enable their understanding and discernment of his education, experience, knowledge and intent relative to that of the Government's witnesses. They are not intended to subvert the Court's instructions on the law or somehow nullify a verdict.

By attempting to suppress simple truths about Mr. Parnas, the Government demonstrates a distrust of juries that is both regrettable and unfounded.

### III. Parnas's Proffer Agreement is Enforceable: The Government Cannot Open the Door to Admission of the Proffer Statement, Only Mr. Parnas Can. Even then, Irrelevant, Confusing, and Unduly Prejudicial Subjects Must be Excluded

Mr. Parnas agrees that his proffer agreement is enforceable against both parties. Thus, the Government cannot introduce the statements contained in either the handwritten original proffer notes or the type-written FBI-302 report of the proffer unless and until Mr. Parnas makes an argument or introduces evidence that "opens the door." A defendant may do so volitionally, or by inadvertently making argument contrary to the statements.

Should the door open, Mr. Parnas's alleged proffer statements must still be evaluated individually and excluded if irrelevant, confusing, unduly prejudicial, or otherwise inadmissible. Any statements Parnas may have made that relate to acts outside the scope of the charged conduct are also properly subject to exclusion.

### IV. Mr. Parnas Should be Allowed to Cross-Examine Freely on all Relevant Matters Impacting Witness Credibility, Including Motives to Fabricate, Bias, and Competency

Mr. Parnas is entitled to impeach the Government's witnesses on matters questioning their credibility, including potential motives to fabricate, biases, and irrationally held beliefs. Mr. Parnas is also entitled to present his theory of defense to the jury under the Sixth Amendment to the U.S. Constitution.

It is unlikely that any of the Government's witnesses who are subject to impeachment will simply admit to lying, or being biased, or holding irrational beliefs. Instead, during the course of trial, Mr. Parnas intends and is entitled to cross-examine the Government's witnesses using evidence that suggests to his jury that the particular witness is mistaken, incomplete in their testimony, irrational, incompetent, or flat-out lying. Of course, any such evidence must be relevant and will be subject to exclusion if its probative value is outweighed by its prejudicial impact.

Criminal trials have become rare enough. They are not, however, silent movies. The witnesses will be asked relevant questions and required within the confines of the Sixth Amendment, the Rules of Evidence and the Court to answer them.

The Government has identified two witnesses as having particular vulnerabilities that they hope to protect from cross-examination on the evidence. We discuss each in turn.

#### A. Adam Laxalt

Adam Laxalt is the embodiment of the "Stop the Steal" movement in Nevada. He was endorsed by Donald Trump after filing multiple lawsuits contesting Joe Biden's narrow 2020 victory in Nevada. The State's former Attorney General, Laxalt is currently running for United States Senate in Nevada, and has already threatened election lawsuits—before there has been a campaign, and fourteen months before the election. *See, e.g.,* Nevada GOP Senate candidate threatens election lawsuits, https://www.salon.com/2021/09/21/nevada-senate-candidate-threatens--14-months-before-anybody-votes/ (last accessed September 28, 2021) ("Adam Laxalt, the "Nevada version of Rudy Giuliani," vows he'll sue to "tighten up the election" before anyone votes"). This belief is, frankly, untethered from reality, and is properly the subject of questioning.

The Government identifies a number of ▮▮▮▮ ▮▮▮▮▮▮ all of which we believe to be entirely proper, probative of credibility, and not unduly prejudicial. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To preclude cross-examination on the incidents identified by the Government would be improper and would prevent limit relevant evidence from reaching Mr. Parnas's jury.

    B.    <u>Felix Vulis</u>

The Government intends to call Felix Vulis to testify against Kukushkin and Parnas in the instant federal election fraud case, ████████████████████████████████████. Mr. Vulis is a witness whom ██████████████████████████████████████████████████████████ Mr. Parnas intends to question Mr. Vulis ██████████████████████ Cross-examination on these subjects is nonetheless proper, as it relates directly to questions of witness credibility and potential motives to fabricate or biases.

**V.    There was no Diversion of "Donation Funds," nor are the Acts Alleged "Intertwined with the Charged Conduct"**

The evidence at trial will reflect that the money transferred by Andrey Muraviev to Igor Fruman was a personal loan, which came in the wake of their waning interest in a Nevada cannabis venture. Mr. Parnas did not receive any transfer of funds from Muraviev.

The alleged "diversion" is no more than Fruman using the proceeds of his personal loan to pay outstanding personal and business bills, a portion of which involved purchases made by Parnas. Mr. Parnas utilized a credit card in his name on Mr. Fruman's FD Export American Express account to make purchases that were never dependent upon the receipt of a penny from Muraviev. The purchases were never dependent upon Muraviev's funds, and there was no "diversion" of "donation funds." The funds in question were not intended to be anything other than a loan, and are thus not properly construed as "intertwined with the charged conduct." Accordingly, evidence of Parnas's spending should not be admitted against him. Considerations of undue prejudice and confusion similarly support this conclusion.

**VI.    The Court Should Rule on the Scope of Each Defendant's Ability to Impeach the Other Pre-Trial**

Mr. Parnas agrees that the Court should determine the permissible scope, if any, of each defendant's ability to impeach the other prior to the commencement of trial. Apparently, counsel to Kukushkin seeks to cast Mr. Parnas as a con-artist, and to point to a variety of mostly uncharged acts to support this theory. We submit that it would be unduly prejudicial to attempt to introduce evidence related to the now-severed Fraud Guarantee allegations, and that much of the other evidence we believe Kukushkin's counsel will endeavor to produce against him will be irrelevant, misleading, of little to no probative value, and unduly prejudicial.

We respectfully request that counsel for Kukushkin identify pre-trial the evidence that he intends to use to impeach Mr. Parnas, and that the Court render a preliminary ruling excluding its use at trial.

**VII.   Mr. Parnas joins in and adopts the arguments of co-defendant Andrey Kukushkin, to the extent they are not in conflict with his own.**

Mr. Parnas joins in and adopts all arguments of co-defendant Kukushkin, to the extent that they are not in conflict with his own.

### Conclusion

For the reasons set forth herein, Mr. Parnas respectfully submits that: (1) the Government has thus-far failed to demonstrate the existence of the charged conspiracies and Parnas's participation therein, and should be required either to present direct evidence sufficient to show the existence of the charged conspiracy prior to introduction of any "conditional" evidence of co-conspirator statements at trial, or to present its "conditional evidence" at a preliminary hearing outside the presence of the jury; (2) although Parnas has never intended to argue for nullification, juries are empowered and free to return verdicts based upon the facts and the law if they wish, and their province should remain undisturbed; (3) Parnas's proffer statements are not admissible against him unless and until—if ever—he "opens the door" to their introduction; (4) Parnas should be allowed substantial latitude to fully cross-examine witnesses on matters affecting their credibility, including potential biases and motives to fabricate, subject to relevance and prejudice; (5) there were no "donation funds" to divert, only proceeds from a personal loan to Igor Fruman, and this so-called "diversion" evidence should be excluded; (6) Kukushkin's counsel should be required to identify the evidence it intends to use to impeach Mr. Parnas—whether through other witnesses or in the event Mr. Parnas elects to testify—prior to the start of trial so that the Court can properly rule on the admissibility and scope of any such evidence, along with appropriate limiting instructions.

Respectfully submitted,

_____/S/_____
Joseph A. Bondy
*Co-counsel to Lev Parnas*

cc: All Counsel