LAW OFFICES OF
GERALD B. LEFCOURT, P.C.
A PROFESSIONAL CORPORATION
1776 BROADWAY, SUITE 2000
NEW YORK, N.Y. 10019

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

SHERYL E. REICH
reich@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

October 3, 2021

VIA ECF

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, N.Y. 10007

*Re: United States v. Lev Parnas and Andrey Kukushkin*, 19-cr-725 (JPO)

Dear Judge Oetken:

On behalf of Defendants Lev Parnas and Andrey Kukushkin we write to supplement our September 21, 2021, letter requesting that the Court administer a written jury questionnaire in advance of *voir dire*. Our letter explained several reasons why a juror questionnaire would promote the interests of fairness and efficiency in this case: it will elicit more candid responses, minimize the risk of a juror contaminating the rest of the pool, and streamline the jury selection process. The Government informed us on October 1, 2021, that it objected to the request. We therefore provide the following additional explanation and authority supporting the use of the previously submitted juror questionnaire pursuant to Fed. R. Crim. P. 24(a)(2)(A).

There have been two prior criminal trials of defendants with highly publicized connections to former President Donald J. Trump: *United States v. Stone*, No. 19-CR-0018, (ABJ) (D.D.C.); *United States v. Manafort*, 1:18-CR-0083 (TSE) (E.D.V.A.). In both, as explained more fully below, the courts recognized the elevated risk of juror bias in a high profile, politically charged case and sought to mitigate that risk by employing a written juror questionnaire. The Court should do the same here in light of (1) the Defendants' ties to former

President Trump and Rudy Giuliani, which jurors will inevitably learn through the evidence if they have not already from the extensive pretrial publicity about the case; (2) the pretrial publicity about this case, which has been overwhelmingly negative and prejudicial towards the Defendants; and (3) interests of efficiency.

This case is being tried in a political climate that makes the use of a questionnaire essential. It is well-documented that political polarization in the United States is at extreme levels.[1] Members of opposite political affiliations are more likely to harbor distrust and animus towards each other. *Id*. The Court and the parties are faced with a daunting challenge of keeping this tribalism outside of the courtroom so that jurors decide the case based on the evidence alone. Probing jurors on their political leanings through a juror questionnaire is the most effective tool available to meet this challenge.

These same concerns resulted in a juror questionnaire in *Stone* and *Manafort*, which have in common with this case an overt connection to former President Trump and his circle of advisors. In *Stone*, Roger Stone (a conservative lobbyist and longtime friend of former President Trump) was charged with lying to Congress about his contacts with WikiLeaks during the 2016 presidential campaign. The Court *sua sponte* ordered the use of a 56 item questionnaire that "posed a number of questions specifically designed to probe potential bias," including, for example, (i) whether jurors listened to "political commentators on TV or talk radio" and, if so, which ones; (ii) whether jurors or a close friend or family member had ever run for or held political office; and (iii) whether jurors had worked or volunteered for any 2016 presidential campaign. *See* 2020 U.S. Dist. LEXIS 67359 (D.D.C. 2020) at *24; *see also* Dkt. 247, Questions 22, 24, and 32. Similarly, in *Manafort*, the court granted the Government's motion for a jury questionnaire in the trial of Paul Manafort, the former chairman of former President Trump's presidential campaign who was charged with tax evasion and bank fraud. *See* Dkt. 87, 122.

The Government's motion in *Manafort* identified a consideration that is critical to impaneling a fair jury in this case—namely, that "[w]ritten questionnaires are more private, and encourage honesty, particularly about sensitive issues involving bias and prejudice that are critical in this case." Dkt. 87 at 5. Although jurors' political activities and leanings may be a sensitive and personal topic, it is critical to reveal political biases during the jury selection process in a case that deals directly with those issues, like this one.

A jury questionnaire, which jurors complete in private, has been widely recognized as an effective tool in eliciting candid answers on such issues. *See, e.g., United States v. Kaziu*, 559 F. App'x 32, 38 (2d Cir. 2014) (questionnaire used to "probe any prospective jurors' potential biases, including possible resentment of [defendant's] anti-Semitic views"); *United States v. King*, 140 F.3d 76, 80, 84 (2d Cir. 1998) (affirming district court's use of juror questionnaire and individual voir dire to ensure juror candor during voir dire); Hon. G. Mize & P. Hannaford-Agor, *Building a Better Voir Dire Process*, The Judges' Journal, 47:1 at 1 (2008) ("Written questionnaires are especially useful when questions involve sensitive topics (for example,

---

[1] Boxell, *et al.*, *Cross-Country Trends in Affective Polarization*, 26669 National Bureau of Economic Research (August 2021), at 2.

substance abuse or criminal history) that prospective jurors would understandably feel uncomfortable disclosing orally in a room full of strangers."); Jurywork, National Jury Project, § 2.10[1][b] at 2-72.5 (Elissa Krauss & Beth Bonora eds., 2d ed. 1985 & supp. 1990); ("When prospective jurors are questioned in the presence of other venire people they tend to 'learn' the 'right' answers and become less candid.").

Courts in the Second Circuit are in accord with *Stone* and *Manafort* and have employed jury questionnaires in cases fraught with political issues. In the political corruption trial of New York Senator Joseph L. Bruno, a questionnaire was used to screen the jury pool and expedite jury selection. *United States v. Bruno*, 700 F. Supp. 2d 175, 178 (N.D.N.Y. 2010). The questionnaire contained fifty-five questions covering topics such as jurors' involvement in political campaigns, organizations, and unions, their political affiliations, and their personal views regarding public officials. *Id.* at 179. The court explained that "because the parties anticipated trial evidence relating to political matters, [the] questions were [] relevant to the parties' assessment of juror qualifications and the need for further questioning during formal *voir dire*." *Id.* A jury questionnaire was also used in the trial of former New York Senator Pedro Espada Jr. *United States v. Pedro Espada Jr.,* No.10 Cr. 985 (E.D.N.Y. 2010) (*see* Minute Entry for March 6, 2012 proceeding). In answering over fifty questions, potential jurors listed their membership in groups and organizations, the television shows they watched, the newspapers and magazines they read, and their main source for news. Jurors were also asked if they ever voted in an election in which the defendant was a candidate, and if they or any member of their family or close friends ever campaigned or volunteered for the defendant. *Id.*; Dkt. 61.

If questionnaires were necessary in *Bruno* and *Espada* to impanel an unbiased jury, the need for a questionnaire in this case is stronger. Given the increased political polarization in the eleven years since those cases, it is a virtual certainty that some venirepersons will prejudge the allegations against Messrs. Parnas and Kukushkin due to their affiliation with former President Trump and Rudy Giuliani. On the other side of the coin, strong supporters of President Biden may hold different biases, given the alleged connections between Mr. Parnas and alleged attempts to have Hunter Biden's business dealings in Ukraine investigated.

An additional reason the Court should employ a juror questionnaire is the extensive media attention garnered by this case. The Second Circuit has repeatedly recognized that a juror questionnaire is appropriate where, as here, there is a risk that pretrial publicity has tainted the venire. *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (noting that "extensive publicity surrounding this case" necessitated a juror questionnaire); *United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999) (approving of district court's use of selection process that included juror questionnaire about exposure to pretrial publicity); *United States v. King*, 140 F.3d at 82 (approving of trial judge's decision to require juror questionnaire and individual follow-up questioning "[i]n light of the widespread and largely negative publicity concerning [defendant] and the racial tensions heightened by some aspects of that publicity"); *United States v. Wilson*, 493 F. Supp. 2d 397, 400-01 (E.D.N.Y. 2006) (ordering juror questionnaire to protect defendant's "constitutional rights to a fair trial and an impartial jury").

A detailed analysis of the media coverage of this case is included as Exhibit A. A preliminary search of four widely circulated New York publications revealed that, since the indictment was returned on October 9, 2019, more than 400 articles have covered the Defendants and the allegations. Specifically, the *New York Daily News* published 135 articles, *The New York Times* published 124 articles, the *New York Post* has published 84 articles, and *The Wall Street Journal* has published 63 articles. These articles contain numerous inflammatory headlines that presume Defendants' guilt. For example:

- "It's a small swamp after all: Rudy, Trump and a seemingly corrupt cast of characters."[2]
- "Good morning, Kyiv! Giuliani pals Lev Parnas and Igor Fruman were actually fleeing to Ukraine: report."[3]
- "When Trump's Thugs Turn on Him."[4]
- "Recording Shows That The Swamp Has Not Been Drained"[5]
- "Video shows Rudy Giuliani hanging out with recently busted Soviet-born pals."[6]
- "Giuliani Associate Left Trail of Troubled Businesses Before Ukraine Probe Push,"[7]

A prejudicial effect on prospective jurors should be presumed given that the four most widely consumed papers in New York City have already passed sentence on the Defendants. But the evidence of prejudice is plain in the reader comments as well, which echo the headlines. These reader comments include:

- "Where did Giuliani find these guys, on the Ukrainian version of The Supranos? Just by appearance they look like mobsters that would kill their own mothers." – *BorisRoberts*[8]

---

[2] New York Daily News, https://www.nydailynews.com/opinion/ny-oped-the-rise-of-the-swamp-things-20191011-nw3ndyoyx5bbnisxwy5rr5vxza-story.html (October 11, 2019)

[3] New York Daily News, https://www.nydailynews.com/news/politics/ny-parnas-fruman-giuliani-ukraine-20191108-hilyl3qqurhodfvbomrlxxp65y-story.html (November 8, 2019)

[4] The New York Times, https://www.nytimes.com/2020/01/17/opinion/lev-parnas-maddow-interview.html (January 17, 2020)

[5] The New York Times, https://www.nytimes.com/2020/01/26/us/politics/trump-recording-donors.html (January 26, 2020)

[6] New York Post, https://nypost.com/2019/10/11/video-shows-rudy-giuliani-hanging-out-with-recently-busted-soviet-born-pals/ (October 11, 2019)

[7] The Wall Street Journal, https://www.wsj.com/articles/giuliani-associate-left-trail-of-troubled-businesses-before-ukraine-probe-push-11572527608 (October 31, 2019)

[8] *2 Giuliani Associates Arrested with One-Way Tickets at US. Airport*, The New York Times, https://www.nytimes.com/2019/10/10/us/politics/lev-parnas-igor-fruman-arrested-giuliani.html#commentsContainer (October 10, 2019).

- "Obviously these two criminals weren't planning on returning so lock them up and absolutely, positively NO BAIL." – *Ken Solin*[9]

- "Please choose adjectives that best describe trump's henchmen. These are nefarious crooks or scurrilous criminals. "Colorful", the adjective you use to describe these evil figures who have done so much harm, is an upbeat descriptor and puts a good light on what is an evil, criminal enterprise." – *Jon*[10]

- "And yet ... these corrupt fraudsters keep getting away with it. Trump routinely throws people under the bus, but they still line up to do his bidding." – *Andy*[11]

- "Parnas and Fruman have to be in jail for long period of time without any doubts. They don't represent face of other immigrants who work honestly for our country and are not involved in dirty political games. They were thieves in their native countries and continued to do the same in US." – *Maria*[12]

- "People like Giuliani, Parnas and trxmp don't have friends, they have tools and enemies. It's easy to rat on either one. You eat the dog or the dog eats you. There is no honor among thieves at this level." – *Steven*[13]

The level of negative pretrial publicity in this case is therefore an independent reason the Court should order the use of a juror questionnaire.

A third reason the Court should order the use of a juror questionnaire is that it will streamline the selection process and conserve judicial resources. Using a written questionnaire is more efficient than oral examination alone in highly-publicized cases. *United States v. Ashburn*, No. 13-CR-0303 (NGG), 2014 U.S. Dist. LEXIS 158657, at *57 (E.D.N.Y. Nov. 7, 2014) ("[T]he court finds that utilizing a questionnaire will conserve judicial resources by saving a substantial amount of time relative to a jury selection process in which the entire *voir dire* is conducted orally."). That is because where a potential juror's questionnaire responses reveal biases that "render[s] superfluous further oral inquiry about the juror's ability to follow legal instructions and to serve impartially," he or she can be removed for cause prior to oral *voir dire*, saving time and resources. *United States v. Quinones*, 511 F.3d 289, 302 (2d Cir. 2007). Further,

---

[9] *Id.*

[10] *All the President's Henchmen*, The New York Times, https://www.nytimes.com/2019/10/11/opinion/trump-giuliani-ukraine.html (October 11, 2019)

[11] *Id.*

[12] *Lev Parnas, Giuliani Associate, Opens Talks With Impeachment Investigators*, The New York Times, https://www.nytimes.com/2019/11/04/nyregion/lev-parnas-giuliani-associate.html#commentsContainer (November 4. 2019)

[13] *Lev Parnas, Key Player in Ukraine Affair, Completes Break With Trump and Giuliani*, The New York Times, https://www.nytimes.com/2020/01/15/us/politics/lev-parnas-ukraine-trump-giuliani.html (January 15, 2020)

administering a questionnaire decreases the time necessary to complete the jury selection process because it can be completed without the supervision of the court, and the parties can use the responses to pinpoint areas requiring follow-up inquiry. *See* Barbra Allen Babcock, *Voir Dire: Preserving "Its Wonderful Power",* 27 STAN. L. REV. 545, 563-64 & n.70 (1975) ("A sworn questionnaire . . . might gather from jurors answers to basic questions about themselves with face-to-face inquiry reduced to certain key issues on which the reactions of the individual and observation of her or his manner are important . . . A more extensive questionnaire would be more revealing and would concomitantly reduce the need for extended face-to-face questioning . . . Face-to-face questioning would then be reserved for the issues on which probing is necessary, such as prejudice against the litigant or bias arising from the facts of the particular case."); *see also* Hon. Barbara M.G. Lynn (N.D. Tex.), *From the Bench: A Case for Jury Questionnaires*, 33 LITIGATION MAGAZINE 3, at 4 (Summer 2007) (questionnaires provide "more information in a faster and more organized way than could be gathered in a reasonable amount of time by questioning in court. . . .").

For the foregoing reasons, we respectfully request that the Court employ the previously submitted jury questionnaire as part of the selection process in this case. We thank the Court for its consideration.

Respectfully submitted

/s/ Gerald B. Lefcourt
Gerald B. Lefcourt
Faith A. Friedman
*Attorneys for Andrey Kukushkin*

cc: All Counsel (By ECF)