LALTPAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,              New York, N.Y.
3
                v.                         19 CR 725 (JPO)
4
    LEV PARNAS and ANDREY KUKUSHKIN,
5
                Defendants.
6   ------------------------------x
                                           October 21, 2021
7                                          9:45 a.m.

8
    Before:
9
                        HON. J. PAUL OETKEN,
10
                                           U.S. District Judge
11                                             And a Jury

12                            APPEARANCES

13  DAMIAN WILLIAMS
         United States Attorney for the
14       Southern District of New York
    BY:  NICOLAS ROOS
15       ALINE FLODR
         HAGAN SCOTTEN
16       Assistant United States Attorneys

17  LAW OFFICES OF JOSEPH A. BONDY
         Attorneys for Defendant Parnas
18  BY:  JOSEPH BONDY

19  LEAF LEGAL, P.C.
         Attorneys for Defendant Parnas
20  BY:  STEPHANIE SCHUMAN

21  GERALD B. LEFCOURT, P.C.
         Attorneys for Defendant Kukushkin
22  BY:  GERALD LEFCOURT
         FAITH FRIEDMAN

23

24

25

LALTPAR1

```
 1                    (In open court, jury not present)
 2                    THE COURT:  Good morning, everyone.
 3              We're here today, and on the schedule is the closing
 4    arguments of the parties.  I have just handed out to all
 5    counsel a paper copy of the revised jury charge, and this
 6    reflects just slightly revised versions of the defense theories
 7    of the case that we received last night.  You'll see that we
 8    just tweaked a couple of things.  I don't think that we changed
 9    much.  For example, from Mr. Bondy's version from last night,
10    we changed knowingly and intentionally to knowingly and
11    willfully, and I think you will see that basically everything
12    is in there.
13              So any other issues with the jury charge that anyone
14    has?
15                    MS. FRIEDMAN:  No, your Honor.
16                    MR. BONDY:  No, your Honor.
17                    MS. FLODR:  No, your Honor.
18                    THE COURT:  Any other housekeeping matters before we
19    start?
20                    MS. FRIEDMAN:  I think there are.  I think Ms. Flodr
21    has them for all of us.
22                    THE COURT:  All right.
23                    MS. FLODR:  Your Honor, just so that the transcript is
24    clear, there were a couple of government exhibits that your
25    Honor received into evidence but were not marked in the
```

LALTPAR1

1    transcript as having been admitted.

2              So for the government, that includes Government

3    Exhibits 602 and 603.

4              THE COURT:  And those are per stipulation or those are

5    separate exhibits?

6              MS. FLODR:  Those were separate exhibits.

7              THE COURT:  602 and 603 are admitted.

8              (Government's Exhibits 602 and 603 received in

9    evidence)

10             MS. FLODR:  And then yesterday the defendant

11   Mr. Kukushkin offered and your Honor admitted A3, A4, A5, A6,

12   and A6A.

13             THE COURT:  Yes.

14             MS. FLODR:  And in addition, the government and the

15   defendant have agreed that a stipulation SD4 should be

16   admitted.

17             THE COURT:  All right.  So A3, A4, A5, A6, A6A and SD4

18   are admitted in evidence.

19             (Defendant's Exhibits A3, A4, A5, A6, A6A and SD4

20   received in evidence)

21             MS. FLODR:  Yes, your Honor, and one further one is

22   B5.

23             THE COURT:  B5 is admitted.

24             (Defendant's Exhibit B5 received in evidence)

25             THE COURT:  Is that it?

LALTPAR1

1          MS. FLODR:  I believe so, but if we could confirm with

2     Ms. Friedman.

3          MS. FRIEDMAN:  Yes, your Honor, I guess there's just

4     one question, do we need to address the exhibit that was marked

5     GX1 that was attached to the stipulation?

6          Your Honor, Defense Exhibit GX1 was annexed to

7     stipulation S11, and S11 was formally admitted by the

8     government as a government exhibit with that annexed.  They

9     also admitted the GX1 as a government exhibit, I believe 755.

10    It's Mr. Kukushkin's naturalization certificate.  As a result,

11    Defendant's Exhibit GX1 was never separately offered for a

12    third time and admitted.

13         We believe we addressed it clearly on the index, and

14    on the defense exhibit it's referred to as an attachment to

15    stipulation S11, but we wanted to make sure that was sufficient

16    for the Court and the record and that it was explained

17    properly.

18         It is in evidence, it's just stamped the as Defense

19    Exhibit G1, but it wasn't formally admitted as G1.

20         THE COURT:  All right.

21         MS. FLODR:  The only edit to that is it's stipulation

22    S12.

23         THE COURT:  So basically that's part of the

24    stipulation that GX1 is admitted.

25         MS. FLODR:  Yes, your Honor, G1.

LALTPAR1

1          THE COURT:  G1 is admitted, and I think we already

2     admitted stipulation S12.  To be clear, that is in as well.

3          MS. FRIEDMAN:  That's correct.

4          MS. FLODR:  That's correct.

5          THE COURT:  S12 and G1 are admitted.

6          (Defendant's Exhibits S12 and G1 received in evidence)

7          THE COURT:  Any other preliminary matters?

8          MS. FLODR:  No, your Honor.

9          THE COURT:  Mr. Bondy?

10          MR. BONDY:  No, thank you.

11          THE COURT:  Ms. Friedman?

12          MS. FRIEDMAN:  No, your Honor.

13          THE COURT:  For summations, who is giving the

14     government summation?

15          Mr. Scotten?

16          MR. SCOTTEN:  Yes, your Honor.

17          THE COURT:  Do you want to make a prediction to how

18     long?

19          MR. SCOTTEN:  It was an hour and 20 minutes when I did

20     it last night, but I will try to talk slower.

21          THE COURT:  All right.  And Mr. Bondy for Mr. Parnas?

22          MR. BONDY:  Yes, your Honor.

23          THE COURT:  Do you want to make a prediction to how

24     long?

25          MR. BONDY:  Less than an hour and 20 minutes.

LALTPAR1

1              THE COURT:  And who will it be for Mr. Kukushkin?

2              MR. LEFCOURT:  It will be me, your Honor, and I'm

3     guessing an hour.

4              THE COURT:  All right.  Thank you.

5              Are we ready for the jury?

6              MR. BONDY:  Yes, your Honor.

7              THE COURT:  We'll bring out the jury.

8              (Jury present)

9              THE COURT:  Good morning, ladies and gentlemen.  All

10    the jurors are here in the courtroom.  You've heard and seen

11    all the evidence in the case, all the evidence that's being

12    admitted, which will be what you focus on in your

13    deliberations, and all the exhibits will be available for you

14    in the jury room when you deliberate as the jury in this case.

15             There are two final aspects to the trial as I

16    mentioned last night, or yesterday morning, actually, one is

17    the summations of the parties.  As I mentioned before, the

18    arguments of the lawyers are not evidence, however, the lawyers

19    are welcome to, and indeed, it is their job to talk about the

20    evidence and reference it and argue to you about how you should

21    interpret and think about the evidence.

22             So we now have the summations of the parties.  After

23    the summations or closing arguments of the parties I will

24    explain the law to you in detail to be applied to the facts as

25    you find them.

1           We'll now have the closing on behalf of the

2    government.

3           Mr. Scotten.

4           MR. SCOTTEN:  Thank you, your Honor.

5           Good morning.  Nine days ago Ms. Flodr stood here and

6    explained what the evidence in this case would show.  Now

7    you've seen that evidence and you know what it shows:  It shows

8    that the defendants are guilty.

9           You saw the agreement between Parnas and Kukushkin to

10   wire money from Andrey Muraviev to cover the donations that

11   Parnas and his partner, Igor Fruman, would make.  You saw the

12   wires from Muraviev, who Parnas called big Andre, into New York

13   companies through bank accounts and loan agreements that never

14   mentioned Muraviev's name.  Then you saw how that money came

15   out on the other side, finding its way into American elections

16   where the defendants thought they had bought political

17   influence to further their business.

18          Today, my job is to walk through that evidence and

19   explain how it matches up with the law.

20          What you're looking at here is just an outline of what

21   I'm going to talk about.  You may remember at the beginning of

22   the case Judge Oetken said that the indictment has six counts.

23   You can think of them in two groups:  The first for the scheme

24   to bring Muraviev's money into U.S. elections, and the second

25   for the crimes Parnas committed without Kukushkin when he

1    donated other people's money and then lied to the FEC in his

2    affidavit.

3              I'll also talk briefly about some of the claims that

4    the defendants made last time they spoke to you.

5              Count One is where we started the case.  The

6    conspiracy to donate Andrey Muraviev's money to U.S. political

7    candidates, people like Wes Duncan, Adam Laxalt and Ron

8    DeSantis.  We'll spend most of our time here today because a

9    lot of what we go through here will also apply to the other

10   crimes.

11             This is part of what I expect Judge Oetken will tell

12   you about what a conspiracy is.  I'll let you read, but to be

13   clear, as the judge said, you will have all the judge's

14   instructions in chambers, so if I go too fast, don't worry

15   about it, you'll get them later.

16             I wanted to mention conspiracy first because people

17   think all kinds of things when they hear that word, but here,

18   all it means is an agreement to do something illegal.

19             Now in this closing I'm going to talk about the law a

20   bit, but if anything I say like the instruction I'm looking at

21   here, is different than what Judge Oetken says, it's what he

22   says that matters.

23             The next slide shows what are called the elements of a

24   crime.  The elements are just the parts of a crime.  If the

25   evidence proves each element beyond a reasonable doubt, then

LALTPAR1                    Summation – Mr. Scotten

1   the defendants are guilty of that crime.

2              And again, I will give you a second to look at these.

3   I will be talking about them for the next few minutes.

4              The first thing I'm going to talk about is an

5   agreement of two or more persons.  It's clear as day there is

6   an agreement here.  This is from Government Exhibit 25, a

7   WhatsApp chat that Kukushkin sent to Parnas, Muraviev and

8   Fruman earlier in the conspiracy.  He said:  An understanding

9   of the joint activities has been reached.

10             This is about two and a half months later when

11  Muraviev's second $500,000 transfer was coming due and Fruman

12  wrote this to Kukushkin, Parnas and Muraviev:  I am reminding

13  about our agreements.

14             This is about a month later than that, when Muraviev

15  reminded Parnas about their agreement dated at least back to

16  when they got together in Las Vegas:  Hi Lyova.  In Las Vegas

17  we agreed on the principles of our cooperation.

18             So it's clear that Parnas, Kukushkin, Muraviev and

19  Fruman had an agreement.

20             Next we need to talk about what the defendants agreed

21  to do.  As Judge Oetken will tell you, the defendants are

22  guilty if they agreed to do any of these three things:  Make at

23  least $25,000 in contributions from a foreign national, make a

24  contribution in someone else's name, or defraud the FEC.

25             In fact, you saw the defendants do all three, and I

1    will go through that evidence one object at a time.

2              So the first of the three illegal goals was to donate

3    at least $25,000 from someone who wasn't a U.S. citizen or

4    green card holder, meaning Andrey Muraviev.  You know that was

5    something that these defendants agreed to do because you saw it

6    in their own words.

7              This is from the summary chart reflecting WhatsApp

8    messages between Kukushkin and Fruman.  Kukushkin tells Fruman

9    that Andrey, that's Andrey Muraviev, will support with money.

10   So the first thing you can see is that this is an agreement

11   that Muraviev will give money.  You see this in June right from

12   the beginning.

13             And by the way, you may have noticed those little

14   yellow stickers on the bottom of the screen.  Those are exhibit

15   numbers.  If I mention something to you and you want to see

16   more of it when you get back there, the exhibit sticker tells

17   you the exhibit number, so you can ask for it.  So here, for

18   example the sticker says 1402, that's the number of the summary

19   chart that I spent a long time going through with Agent Casola.

20   If you want to see those charts that summarize the key evidence

21   in the case, you ask for Government Exhibit 1402.

22             Now this is less than three weeks after the last

23   message we saw on June 20.  You may remember this chat when

24   Fruman sent all those pictures of himself and Parnas meeting

25   with famous politicians.

1          And how does Kukushkin respond?  We need Andrey

2    because your guys are raking it in just for an appointment.

3          You know, in light of everything you saw in this case,

4    what that means.  The politicians hanging out with Fruman and

5    Parnas were raking it in for a meeting.  They're demanding

6    campaign contributions just to meet with them.  So we need big

7    Andre's money.

8          You also saw it here in July when they confirmed their

9    agreement.  I've highlighted the bottom and I will do that as

10   we go throughout this.  Andrey Muraviev is the financial

11   resource.  He is paying the bills.  They actually sent this

12   same message four times, but here it is in Government

13   Exhibit 28 where it went directly from Kukushkin to Parnas, and

14   everyone knew what that money was for.

15         This is a chat from October 1st, after the first

16   $500,000 was transferred, when they are fighting about who is

17   going to pay for Kukushkin's travel.  How does Kukushkin refer

18   to that money?  Existing donation funds.  You saw that again

19   and again and again.

20         Here they are a week later, Parnas, Kukushkin and

21   Fruman all on the same page talking about money to give to

22   politicians, like the men they expect will be governor and

23   attorney general.  After the 6th, nobody will need anything

24   else.  Why?  Because the 6th is Election Day.

25         If they are running a regular business that had

LALTPAR1                     Summation - Mr. Scotten

1    regular operations, they would need money all the time, but

2    they're not, because Muraviev's money is for contributions.

3    They only need it until November 6.  After that, campaign

4    contributions aren't necessary.

5            And by the way, it's clear why they are doing this, to

6    get the licenses they need for their cannabis business, because

7    they want help from politicians.

8            You saw this in late October about two weeks before

9    Election Day.  This chat is about the meeting with Daniel

10   Stewart.  He was that cannabis lawyer that came here and

11   testified before you.  Stewart told them that they missed

12   Nevada's licensing deadline.  What did Kukushkin want to do?

13   Change the rules.  They can't get licenses under the existing

14   laws, so they need new laws.

15           And who do they think can help them with that?

16   Kukushkin tells Parnas and Muraviev and Fruman:  We need the

17   governor's approval.  And you know who they think the next

18   governor will be:  Adam Laxalt.

19           Here he is taking pictures with the defendants at that

20   Las Vegas fund raiser.

21           Who else do the defendants think they need help from?

22   The attorney general.  You see that here in their chats.  And

23   you know who they think the attorney general is going to be,

24   Wes Duncan.

25           Here he is standing next to Kukushkin at that rally in

1    Elko.

2             Of course, Nevada isn't the only place they wanted

3    help from politicians.  You saw them mention a bunch of other

4    states, too.

5             Here is Kukushkin complaining that they have

6    contributed too much money not to have enough results.  He

7    mentions four states, Nevada, New York, Jersey and Florida.

8    And you saw when states like California mentioned elsewhere

9    during this case.

10            Even when they fought about how much money they needed

11   from big Andre, there was no dispute about what that money was

12   for.  Here's Kukushkin and Parnas talking on November 3rd, just

13   three days before the election.  Kukushkin tells Parnas the

14   money was wired to Global Energy, Parnas' and Fruman's

15   corporate name, to cover all donations whatsoever.  It is plain

16   as day that these defendants agreed to donate Muraviev's money

17   to U.S. political campaigns.

18            So the second illegal thing that the defendants agreed

19   to do was to make contributions in another person's name.  And

20   that's going to look a lot like what I just talked about,

21   because when they agreed to donate Muraviev's money, they

22   agreed to do it under other people's names.

23            Here is one of the charts you saw.  This is the

24   parties' stipulations as to donations that came in after June

25   when they agreed to support it.

1          Despite all of those donations and all of Andrey

2   Muraviev's money, you don't see Muraviev's name anywhere on

3   this chart.  You see Fruman, Parnas and GDP.

4          Again, this is what Kukushkin said.  He's writing to

5   Parnas:  You are the one issuing them the checks, not me or

6   Andrey.

7          But who was the money supposed to benefit?  Again,

8   here's Kukushkin and Parnas talking:  We were supposed to tell

9   him that the checks from Global are indeed the donations from

10  us.

11         Ladies and gentlemen, you could not have a clearer

12  picture of a straw donation right here.  He is saying:  You

13  were supposed to give him the check in your name, but they're

14  supposed to know it benefits us.  This is exactly what a straw

15  donation looks like.  The purpose is to make big Andre's

16  business look good, but the money is not coming in under his

17  name.  That's the second legal objective.

18         Here's the last:  Defrauding the FEC.  You learned

19  during in the case, if you hadn't known already, that the FEC

20  tracks campaign contributions and puts them on the internet.

21  So any voter can learn who is contributing to U.S. politicians.

22         Mike Hartsock, who works at the FEC, came and he

23  testified right there before you.  This is part of what he

24  said:  Without accurate information on the report we could

25  potentially miss identifying a violation of one of the federal

1    campaign laws.

2            And by the way, you will see at the bottom I have

3    given you the page in the transcript.  Like the exhibit cites,

4    if you want to see where that is, you can get the written

5    record or ask to have it read back.

6            Those reports matter because the FEC uses them to

7    enforce the law.  He also told you that the FEC uses them to

8    create a public website so anybody can see who is funding our

9    political campaigns.  And he told you that if you went on the

10   FEC's website and you looked for Andrey Muraviev, you wouldn't

11   find anything.

12           In fact, this is the search he ran.  Do you remember

13   he typed in Andrey Muraviev's name and printed out the result?

14           There are no results from Andrey Muraviev.

15           You know why that is.  Because all the donations, like

16   these two donations here to Congressman Pete Sessions, had the

17   wrong name, so the FEC never had a clue.  That's what it means

18   to defraud the FEC.  The FEC is supposed to tell us who is

19   donating to our politicians, but it can't if defendants like

20   Parnas and Kukushkin lie to it.

21           So that's the first element.  This element would be

22   complete if a defendant agreed with at least one person to do

23   at least one of these things.  But you saw that at least four

24   people, Kukushkin, Parnas, Muraviev and Fruman, agreed to do

25   all three.

1          Now I'm going to go to the second element, that the

2     defendants acted knowingly and willfully.  This is what I

3     expect the Court will tell you knowingly means.

4          Now I'm not going to spend any time on knowingly.

5     Each defendant obviously knew what he was doing.  They weren't

6     sleepwalking or hallucinating when they spent months planning

7     to funnel Muraviev's money in the 2018 elections.

8          So I will pay a little more attention to willfully.

9     This is what I expect the judge will tell you there:  An act is

10    done willfully if the defendant acted with knowledge that some

11    part of his course of conduct was unlawful and with the intent

12    to do something the law forbids, and again, not by mistake or

13    accident.

14         The defendants have to know they were breaking the law

15    in some sense, but I want to be clear about one other thing

16    Judge Oetken is going to tell you:  It is not, however,

17    necessary for the government to prove that the defendant was

18    aware of the specific provision of the law that he is charged

19    with violating.  Rather, it is sufficient for the defendant to

20    act knowing that his conduct is unlawful, even if he does not

21    know precisely which law or regulation makes it so.

22         If you think about it, that just makes sense.  You

23    can't get away with breaking the law just because you can't

24    name the law that you're breaking.  Otherwise, everybody could

25    get away with breaking the law.  That means, and what we're

LALTPAR1                    Summation - Mr. Scotten

1  going to focus on here, is how the defendants just knew

2  generally they were doing something illegal.  The defense

3  attorneys spent a lot time talking about willfulness, so I will

4  spend a little time, too.  In fact, I will give you five

5  reasons that you know the defendants acted willfully.

6         The first reason you know that the defendants acted

7  willfully is so simple you might not even have thought about

8  it.  Why isn't Andrey Muraviev listed on any of the donation

9  forms?

10         We just saw that the defendants agreed to donate his

11  money, and we know this was to benefit his business.  If they

12  thought this was legal, why not just put his name on the forms?

13         Instead, they put Igor Fruman's name and Lev Parnas'

14  name.  And these are just two of the many donation forms that

15  you saw, one for Duncan, I believe, and one for Fruman --

16  sorry, DeSantis.

17         But why would you go to all the trouble of lending the

18  money to Parnas and Fruman and then having them make the

19  contribution?  Why didn't Andrey Muraviev just call Congressman

20  Sessions and say:  Hi, I'm Andrey Muraviev, I'm a Russian

21  businessman, I would like to make donation to your campaign.

22         Isn't that what he would have done if he thought it

23  was legal?  Isn't that what any of them could have done?

24         The whole point of a contribution is so the politician

25  likes you.  It doesn't make sense to give money to a politician

in someone else's name.

I don't want that to get lost in a case about so much bad behavior.  We're going to talk about a lot of other stuff but when people lie, they do it for a reason.  It's unusual. Most people don't lie.  You have to think about what the reason is they're not just putting Muraviev's name here.

And you saw that again and again.  And when I say "that," you saw the reason.

Here, is what Wes Duncan testified to:  It's against the law to take a donation from a foreign national.

This is Adam Laxalt's testimony:  Not allowed to accept donations.

This is Caroline Boothe, same thing.

All of the folks on the receiving end here testified they knew they could not take donations from a foreign national.  If they knew the source was Muraviev, they wouldn't have taken the donation, which would have defeated the whole point of offering it.  That's why the defendants didn't put Muraviev's name on it, because it wouldn't serve any point. They had to hide it.

The second reason that you know the defendants acted willfully is that Parnas was told again and again that he couldn't donate someone else's money and he couldn't donate except from a citizen or legal permanent resident.

These are just some of the more than a dozen forms you

1   saw in this case where Parnas had to confirm that he wasn't

2   breaking the laws that he was breaking, right, as he was

3   filling out these forms.  Some of these went straight to

4   Parnas, like this one.  This is one of the first messages you

5   saw in this case when Wes Duncan started the long chain of

6   chats with Parnas.

7           What is on the bottom?  It's a link to Duncan's

8   website.  This website, the one where you could not donate

9   money unless you affirm that you weren't doing exactly what

10  Parnas was doing.

11          Here's another form just like that.  This is for the

12  $325,000 donation.  You see Parnas' initials there.

13          Now you know that Parnas actually ordered Deanna

14  Van Rensburg to initial for him, but you also know that they

15  talked about this in detail.

16          Here is what she said.

17          She talked to him specifically about initialing this

18  form.  And you saw that throughout her testimony.  What

19  Van Rensburg did is what Parnas told her to do.  And here it's

20  particularly clear that she talked to him about this because

21  the records also prove it.

22          On top, that's the email in which Parnas says to

23  Van Rensburg:  Let's talk about filling this form out.  On the

24  bottom, those are the phone records showing that the calls

25  Parnas was asking for.  Happened just as Van Rensburg

LALTPAR1                    Summation - Mr. Scotten

1    testified.

2          Plus, some of the stuff was even found in Parnas'

3    house.  This is what Special Agent Thomas testified about.  You

4    remember she was the agent that led the search of the house.

5    She found this form in his home.  It's Parnas' paperwork for

6    joining Trump's campaign finance committee.  He's on the

7    committee.  And this tells him in no uncertain terms that he

8    could not do what he did in this case.

9          And of course, you could not be warned more clearly

10   than this, also from the same form:  Contributions in the name

11   of another person.  No contributions are to be accepted from

12   someone that has received the funds from another person.  It

13   does not matter if the funds are advanced or being reimbursed.

14   This prohibition is strictly enforced by the Department of

15   Justice, and any person or entity is subject to severe criminal

16   liability if it is discovered these types of contributions have

17   been made.

18         Ladies and gentlemen, he's on the President of the

19   United States Finance Committee and seeing these warnings again

20   and again.  He's even being warned he will be prosecuted if he

21   didn't adhere to them.  In fact, Parnas knew this rule so well,

22   he told other people about it.

23         This is what Joe Ahearn admitted during

24   cross-examination.  Do you remember this part of the

25   examination?  He's talking about a fellow named Greenspun -- it

says Greenspan, it was actually Greenspun -- about the problems
of taking money from him.  Parnas is telling Ahearn that one of
the problems, as his testimony goes on, is it could be foreign
money.  Of course, that would make the donation illegal.

            But that fact, that Parnas knew this rule so well he
could teach others about it, doesn't just matter for Parnas.
Think about what it's going to tell you for Kukushkin.

            This is another part of what I expect Judge Oetken
will instruct you:  The fact that one person may be guilty of
an offense does not mean that his or her friends, relatives or
associations were also involved in the crime.  You may, of
course, consider those associations as part of the evidence in
this the case and draw whatever inferences are reasonable from
the fact of the associations, taken together with all of the
other evidence in this case.

            So that makes sense.  Two people can associate for all
kinds of reasons and it doesn't make them guilty of each
other's crimes, but it could help you figure things out, like:
Are they talking to each other about what they're doing
together?

            Parnas and Kukushkin chatted for months.  They flew on
private jets and they went to campaign rallies together.
Kukushkin arranged for Parnas to get $1 million for campaign
contributions.

            If Parnas could tell Joe Ahearn to avoid a foreign

1    donor, what do you think Kukushkin and Parnas talked about

2    given Kukushkin worked for a foreign donor?  You know exactly

3    what he told him.

4           This is very serious business.  Here is a chat from

5    Parnas talking about that Vegas meeting, which, by the way, was

6    six weeks after Parnas and Fruman got hit with that FEC

7    complaint for doing straw donations.  What do you think he's

8    telling Kukushkin and Muraviev about their plan to donate

9    Muraviev's money?  That it's perfectly legal?  That this is a

10   good idea?  That we should do it in Muraviev's name?  No, he is

11   telling them to be careful, it's serious business.  They're

12   breaking the law.  That's why they come up with this whole plan

13   to put it in in a way that you can't see it, because the whole

14   group knows what they're doing.

15          The third reason you know the defendants acted

16   willfully is that they read the news about their crimes while

17   they were committing those crimes.

18          Now you heard Kukushkin's attorney say in his opening

19   statement that Kukushkin is not a political person.  And that

20   may be true.  He may not read political news for fun like a lot

21   of people do.  But he followed the news that mattered to him,

22   that mattered to his work for Muraviev.

23          You saw this earlier in the case.  It's Kukushkin

24   sending Muraviev an article about legalizing American at the

25   federal level.  Kukushkin may not care about politics, but he's

1  following the news for this stuff because he's interested in

2  it.  He's interested in legalized marijuana.

3       The problem is you know what else he's interested in:

4  Illegal campaign contributions.

5       This is from August 4.  Kukushkin sends Muraviev the

6  link to an article.  What is the article about?  Well, it's an

7  article about political donators, couple donors in specific,

8  Lev Parnas and Igor Fruman, right here in the article Kukushkin

9  sent to Muraviev.  Why are they in the news?  Because of a

10 Federal Election Commission complaint alleging that GEP, that's

11 the company name they're using, might be an illegal campaign

12 finance conduit created to mask the actual sources of its

13 political contributions.

14      They're in the news for making straw donations.  That

15 is exactly what Kukushkin is planning to do with them, so of

16 course he knows it's a crime.  He saw that Parnas has already

17 been accused of doing this and he gave his boss a heads up.

18      That's the third way you know the defendants acted

19 willfully.  Parnas' crimes were so notorious, they made the

20 news, and Kukushkin shared that news with Muraviev.

21      And by the way, look at the rest of the article, too.

22 It tells Kukushkin that a spokesman for GEP denied the

23 allegations in the complaint.  He claimed that it was a real

24 company and that the donation represents a small fraction of

25 GEP's operating costs.

1           Now you know that's not true, but what matters here is

2    what Kukushkin read in terms of what has Kukushkin seen.

3           And think this about what this person doesn't say.  We

4    think it's okay to make foreign donations.  There's nothing

5    wrong with masking the true source of the funds.  We thought

6    what we were doing was fine.

7           GEP denied this allegation because everyone knows it's

8    a crime, and so Kukushkin knew that, too.

9           The fourth reason you know the defendants acted

10   willfully is the obvious bad purpose of their acts.

11          Here's another part of what I expect Judge Oetken will

12   tell you about the law.

13                  (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SCOTTEN:  Another way to define willfulness is

2     that a person acts willfully when he acts with a bad purpose to

3     disobey or disregard the law.

4          I'm going to start with something simple.  This is the

5     evidence that neither defendant ever voted.  Now, that's not a

6     crime, there is nothing wrong with that.  There are lots of

7     good people who, for whatever reason, never make time to vote,

8     but most of those people probably don't spend their time going

9     to campaign rallies and donating tens of thousands of dollars

10    to politicians, but that is exactly what Kukushkin and Parnas

11    did.

12         You see them here at the Elko rally, acting like they

13    are diehard partisans when, in fact, they couldn't care less

14    about politics.  And you saw plenty of other pictures of them

15    smiling with politicians they hoped to contribute to.

16         You know why they did it.  Again, Kukushkin's own

17    words will tell you.  "We do not pay for anyone's political

18    ambitions or lobbyists at all.  We get a license, they get a

19    bonus."  This is what he told Parnas and Fruman.  He doesn't

20    want anything to do with politics.  He's a businessman.  He

21    just wants to pay off politicians for licenses.

22         Now, as you saw throughout this case, the way the

23    defendants used their money here was through contributions that

24    at least looked legal from the outside.  But make no mistake,

25    the purpose behind this conspiracy was influence buying, and

1    it's going to get worse than that.  Every time Kukushkin texted

2    or spoke with Muraviev, every time Fruman forwarded one of

3    Muraviev's chats to Parnas or the others, this is what they

4    saw.  This is Muraviev's chosen image for himself, a picture of

5    someone mooning the Statue of Liberty, and Kukushkin is helping

6    this guy put a million dollars into U.S. elections?  There is

7    no way Kukushkin doesn't know he's doing something with a bad

8    purpose.

9            Muraviev and Kukushkin were close.  Here they are

10   celebrating together.  No Parnas, no Fruman, no Correia.  Think

11   about what happened after the Elko rally.  After Muraviev and

12   Kukushkin got the tables saying they were going to donate to

13   Wes Duncan, Muraviev asked Kukushkin for another picture.

14   Here's one of the pictures that Kukushkin sends.  It's Duncan

15   with the police chief.  Kukushkin had something to say about

16   that, too.  Kukushkin brags to his boss that they control the

17   whole state police, just in case, smiley face emoji.  It

18   couldn't be clearer that Kukushkin knew he was acting with a

19   bad purpose.

20           That brings us to the final reason you know the

21   defendants acted willfully.  The defendants tried to hide what

22   they did.  This is like the first reason I talked about not

23   donating Muraviev's money under Muraviev's name, but it goes

24   further.  The defendants didn't just avoid mentioning Muraviev,

25   they went out of their way to conceal his entire involvement

1    here.  They used lies and tricks to hide what they knew was a

2    crime.

3           I'm going to start with the obvious one.  We saw this

4    before, the Duncan website where they donated the $10,000 to a

5    man they thought could help them get new marijuana licenses in

6    Nevada.  When the defendants chose not to put Muraviev's name

7    on it, they still had to put something there, they to fill it

8    out, and they had to check that box.  They chose to lie.  They

9    put Igor Fruman's name there, even though they knew it wasn't

10   Muraviev.  They chose to check a box saying they weren't

11   donating foreign money, even though they knew they were.

12          Now, to be clear, Kukushkin's not checking these

13   boxes.  Parnas is ordering Van Rensburg to do that.  He's not

14   the one making the donations.  As he said, you — meaning

15   Parnas — are the one issuing the checks, not me and Andrey.

16   But he is the one who got Andrey's money to them, and at every

17   step of the way, he hid Muraviev's involvement.

18          These are the bylaws for SIG, Strategic Investment

19   Group, that's the company they formed to do the marijuana

20   business.  The documents are signed by Correia and Kukushkin.

21   You could read this all the way through and you will never see

22   Andrey Muraviev's name mentioned anywhere, even though you know

23   he's funding it and it's his business.

24          The same is true here.  This is a defense exhibit.

25   You see that sticker in the corner, it's blue, but all the

exhibits are the same, they're evidence.  These are the

registration papers for what they later name SIG.  Again, you

see Kukushkin, but no Muraviev, even though it's Muraviev's

company, not Kukushkin's.  You know that was a deliberate

choice.

You may remember this email.  Kukushkin is talking to

Correia and also a cannabis lawyer about how to set up their

company.  The company, they just call it NewCo here, but that's

what's going to become Strategic Investment Group.  Kukushkin

is thinking about how transparent to be with Muraviev's

involvement.  What is he worried about?  Muraviev's Russian

roots.

Now, Kukushkin knows there's a lawyer on this.  He

can't just come out and say, we need to hide Andrey Muraviev's

Russian citizenship because it's going to make our campaign

contributions illegal.  So he says something about political

paranoia, but you know that is just a cover.  Why?  Because

Muraviev was not hiding in places where it was legal for him to

be.

These are two forms of cannabis companies Brad Hirsch

set up for Muraviev and Kukushkin, companies that were not

involved in anything legal, not involved in these illegal

campaign contributions.  There was no secret about Muraviev's

involvement in them.  These defendants knew perfectly well how

to follow the law, and they did that when they were investing

1    in marijuana.

2          Here, you see Muraviev in an email circulated by

3    Kukushkin listed on the board of directors of a public company

4    in 2018, the same year as the crimes we're talking about.  Why?

5    Because this company isn't doing anything illegal, so Kukushkin

6    isn't worried about listing Muraviev.  There is nothing wrong

7    with being Russian and there is nothing wrong with selling

8    marijuana with a license.  You just can't donate to American

9    politicians to get that license.  So that's point 1.  They're

10   hiding Muraviev where his participation makes what they're

11   doing illegal, and only there.

12         And here's point 2.  Remember, it's not just illegal

13   to donate a foreign citizen's money.  It's illegal to donate

14   under anyone else's name, even if that person could legally

15   donate themselves.  This is part of what I expect Judge Oetken

16   will tell you about that, the law, no person shall make a

17   contribution in the name of another person.  This is what

18   Kukushkin knew from that article we looked at a minute ago, GEP

19   might be an illegal campaign finance conduit created to mask

20   the actual source of its political contributions.  So even if

21   Kukushkin thought that the problem with Muraviev being Russian

22   was just a political problem, not a legal problem, he still

23   broke the law by trying to hide that.  The law says you have to

24   be honest about his donating so that Americans can know who is

25   giving thousands of dollars in our elections.  When Kukushkin

LALCpar2                    Summation - Mr. Scotten

tried to hide that to him, he broke the law he knew everything

about.  And, of course, he didn't just keep Muraviev's name off

the corporate papers, he kept it off the money, too.

          Here are the two loan agreements from Muraviev's

million dollars, each one for $500,000.  You may remember a bit

about that weird scheme.  The money started in the foreign bank

accounts of the foreign companies owned by Muraviev.  Then

there was a loan agreement and the money went not to Parnas,

not to Fruman, or even Global Energy, but to Fruman's brother's

company, which Deanna Van Rensburg thought sold baby food and

maybe also coffee.

          But what are these loans for?  For contributions.

This is the text Fruman sent about the first 500.  He's the one

telling them, put the purpose of payment down as a loan, list

this as a loan.  But what is it for?  Access to New York and

New Jersey, states where they are seeking to get cannabis

licenses.

          Here are the signatures on those loans, not signed by

Parnas or Muraviev.  Signed by Igor Fruman's brother, Steve,

and two people you never heard of.  Again, Andrey Muraviev is

nowhere on them.  If you were lending out a million dollars,

wouldn't you want your name on the paperwork so you could get

it back?  Not Big Andrey, he doesn't want his name anywhere

near this money.  Remember, even after they set up Strategic

Investment Group to do their cannabis business, he doesn't send

1    the money there.

2           This is from the summary charts.  Fruman had suggested

3    they should, he's telling the group, we've opened up the

4    company, let's wire the money to the new company we set up to

5    do our business together.  That only makes sense where you send

6    the money if you were trying to hide something.  Kukushkin

7    sends this to Parnas and Fruman, same thing.  It should go

8    straight to our new company, right?  His response, Fruman tells

9    Kukushkin he spoke to the other Andrey, which, of course, is

10   Big Andrey, and that he should use the old scheme to avoid

11   problems later.  You remember what the old scheme was, that was

12   how the first $500,000 got in, coming from those two foreign

13   companies into Steve Fruman's company and only then making its

14   way to the defendants, the way they got it.

15          How does Kukushkin respond to that?  Does he say, what

16   problems?  Does he say, why would we have problems later?

17   "Okay."  Just "okay."  He doesn't need an explanation for why

18   they need to avoid linking Muraviev to their company to avoid

19   problems later because everyone already knows, this company is

20   going to get its licenses by making big political

21   contributions — and those contributions are illegal if they can

22   be connected to Andrey Muraviev, which is why they can't just

23   do business in a straightforward way.

24          For example, Deanna Van Rensburg was the person

25   actually filling out all the forms on these donations and she

looked at Parnas's bank accounts and Fruman's bank accounts
every day, but she had no idea where this million dollars came
from.  This is what she said, neither Parnas nor Fruman ever
told her where the million dollars she was using came from.

You can see this confusion more from Kukushkin's side.
I'll pause for a second, let you take a quick look.  This is
part of a longer chat we saw when Van Rensburg reached out to
Kukushkin to try to get more money for a donation to Laxalt,
and you probably remember some of the more colorful parts about
people eating mushrooms and losing their minds, that's the same
chat.

But this is the interesting part, Fruman is telling
Kukushkin that Van Rensburg isn't involved in many situations,
she's not in the loop.  Kukushkin is confused.  He says, I
don't know your inner workings, that is he thinks Van Rensburg
is in on the secret that Global — that is GEP — is donating all
of Muraviev's money.  That also explains why Parnas wanted to
avoid writing about all this over text messages.  This is part
of the same argument a little later on, on October 30th, after
learning about the situation with Van Rensburg.  "I don't want
to discuss everything over text."

Now, you may remember the defense attorney suggesting
that sometimes people want to text or they don't want to text
and they want to talk, and that's completely true, but you saw
Parnas chatting with these guys all the time.  And here, Parnas

1    didn't even want to have a call either.

2           This, again, is from later in that same series of

3    chats about this.  Kukushkin tells his boss, Parnas is in

4    hiding.  He won't get on that conference call they were

5    planning.  Why?  Parnas isn't trying to have a phone call

6    rather than have a text exchange to work things out, he's

7    trying to avoid making a record of their crimes, which is

8    exactly what they were doing.

9           Here, again, is Kukushkin laying everything out.  We

10   were supposed to tell him that the checks from Global are

11   indeed the donations from us, as in, we're making straw

12   donations.

13          Now, Kukushkin is in an encrypted chat and the only

14   other people on it are the members of the conspiracy, so it

15   seems like he feels safe enough, but Parnas knows better.  He

16   knows that some day a jury — just like you — might see these

17   messages, and his frustration boils over.

18          What is crazy and stupid?  Not the business plan

19   they've been working on for months, but Kukushkin writing out

20   plain as day exactly what made that plan illegal, that Parnas

21   is supposed to make donations in someone else's name to benefit

22   that person, not himself.  That is far more than you need to

23   know that Parnas and Kukushkin acted willfully.

24          So that's the second element of these crimes, which

25   leaves the last one, what the law calls an overt act.  This is

LALCpar2                    Summation - Mr. Scotten

1    what I expect Judge Oetken will tell you that means.   The term

2    overt act means some type of outward action performed by one of

3    the members of the conspiracy that furthers the objective of

4    the conspiracy.  He'll tell you the act itself doesn't have to

5    be a crime, it could be something ordinary, but it has to

6    advance the crime.  The idea is the conspiracy has to be more

7    than just talk.  That makes this conspiracy particularly easy

8    to prove because you know the defendants put their plan in

9    action, you saw them do all kinds of things.

10            Here are just two examples.  The one on top is the

11   wire receipt for the first $500,000 transfer from Muraviev's

12   bank account to Fruman's brother's New York company and the one

13   on the bottom is about that big fundraiser for DeSantis on

14   October 3rd, the one they said will help them get a leg up in

15   doing business in Florida.

16            Now, you also saw donations to all kinds of candidates

17   and people going to meetings with politicians and so on.

18   Because the defendants put their plan in action, there are many

19   overt acts.

20            That is all three elements, the defendants are guilty

21   of Count One.

22            Now I'm going to go through the next crimes, but I'll

23   be able to go faster here because a lot of the same facts are

24   going to be relevant there.

25            The second count is solicitation of foreign donations.

LALCpar2                    Summation - Mr. Scotten

1    Only Parnas is charged in this count.  Solicitation just means
2    asking for something.  Here, it means that Parnas was asking
3    Muraviev to make contributions to U.S. elections.  This is what
4    I expect Judge Oetken will tell you.  It is not necessary for
5    the solicitation to actually succeed or that a contribution was
6    actually made.  Like the conspiracy, this count isn't about
7    actually making the donations.  We'll get to the money going
8    into candidates' pockets in Count Three.  Here the question is
9    just about asking Muraviev to contribute his money in U.S.
10   elections.
11          By the way, you may remember that most of the asking
12   was actually done by Fruman.  On the chats you saw, he's the
13   one who is hounding Muraviev and Parnas to send the money.
14   That does not get Parnas off the hook, because Parnas helped
15   him do it because he was urging him to do it, because in some
16   cases he ordered him to do it, he is also liable.  It's what
17   the law calls aiding and abetting, and this is part of what I
18   expect that Judge Oetken will tell you about aiding and
19   abetting.
20          To put it simply, the idea is, did Parnas help and did
21   he know what he was helping to do, did he know he was helping
22   with this crime.  You know that from everything I just talked
23   through in Count One.  We saw Parnas doing all this stuff.
24          So I'm just going to give you one more example here.
25          Actually, before I do that, I'm actually going to let

LALCpar2                    Summation - Mr. Scotten

1    you see the elements.  Now, you can see this looks a lot like

2    Count One, except that Kukushkin isn't here.  As I said,

3    Kukushkin is not charged in this count.  Parnas and Kukushkin

4    don't need to agree here.  It's just about what Parnas helped

5    people do.  Did he help ask for political contributions?  As I

6    said, I'm not going to go through all the evidence we just saw

7    in that, but just give you one more example.

8          You may remember this series of texts and emails.

9    Correia, who worked for Parnas, sends him something called a

10   cannabis schedule and budget, asks him to look at it.  Parnas

11   says it's good, send it to Igor Fruman.  Correia listens to

12   Parnas, he attaches the cannabis schedule and budget and sends

13   it to Fruman.  Parnas tells Fruman, this is good, send it to

14   them, Igor.  Fruman listens, perfect, I'm going to send it

15   right now, and then he does.  He sends the cannabis schedule

16   and budget to Kukushkin.  This is the document Fruman sent, a

17   list of campaign contributions and a funding schedule.  You

18   can't get any clearer than that.  Parnas helps write a document

19   telling Muraviev to send all this money for campaign

20   contributions and even providing a funding schedule, then he

21   tells Fruman to send it to Kukushkin and Muraviev, and Fruman

22   does what he says.

23         There is also that second even more specific list that

24   had the individual candidates' names, which we'll talk about

25   later.  But even just from this or all the evidence we talked

1    about in Count One, it is obvious that Parnas is helping to

2    solicit contributions from Muraviev.  So that's the first

3    element.

4            You also know that Parnas was asking for that money

5    from a foreign national.  This is what Madelyn Garcia, the

6    customs and border patrol agent told you.  Muraviev openly

7    walks around as a Russian citizen.  In fact, here is a picture

8    of Muraviev's passport.  This was found on Kukushkin's phone.

9            You also know that Parnas was well aware that Muraviev

10   was Russian.  In some way, we already talked about that on

11   Count One, it's the only reason they're not just donating

12   Muraviev's money under his own name, because the fact that he's

13   Russian is a problem.

14           But you also saw more direct proof of that here.

15   Parnas is chatting with Muraviev, in Russian, by the way, about

16   helping with something.  You know who Ilona is.  Agent Garcia

17   told you she was one of Muraviev's girlfriend's.  In the end,

18   Muraviev tells Parnas that she was rejected, but that Muraviev

19   and his son got it.  And what is it, what is the "it" that

20   Parnas was helping Muraviev with?  A nonimmigrant visa.

21   Obviously, you don't need a temporary visa to come here if

22   you're a U.S. citizen or a lawful permanent resident.  And

23   Andrey Muraviev, who lives in Moscow, speaks Russian with the

24   defendants, and needs Parnas's help with a visa for himself,

25   his son, and his girlfriend, he is Russian, which Parnas

LALCpar2                    Summation - Mr. Scotten

1   obviously knew because he's the one chatting with Big Andrey

2   about this.

3          So that's the second element.  Parnas knew the person

4   he was seeking donations from was a foreign national and not a

5   green card holder.

6          We can go through the remaining elements more quickly.

7          You saw many times that Parnas asked for a million

8   dollars to make contributions all for the 2018 elections.  So

9   you know that's well over $25,000.  And you know Parnas did

10  this willfully for all the reasons we discussed in Count One,

11  and some I didn't even get time to talk about.

12         Parnas got that FEC complaint, too, the one that

13  Kukushkin read about, Parnas actually got it.  He actually got

14  a complaint from the FEC about the crime he was committing

15  while he was committing with it with Muraviev and then he went

16  ahead and did it again.

17         Ladies and gentlemen, Parnas is guilty of Count Two.

18         The third count charges both defendants with actually

19  making the foreign contributions.  And like the last count,

20  this is an aiding and abetting count.  The foreign money

21  belongs to Muraviev, so he's the donor.  The question is to

22  what degree Parnas and Kukushkin helped him make those

23  donations.  And you know they did.  In fact, Muraviev himself

24  didn't do a lot.  He's sitting in Moscow throughout all of this

25  and it's Parnas and Kukushkin along with Fruman who are doing

1    all the work.

2                Let's look at the elements.

3                Now, as you can see, this looks a lot like the first

4    two counts, these aren't whole new areas.  The big difference

5    is actually going to be what the dollar amount is about.  In

6    Count One, the conspiracy, the question was just what the

7    defendants agree to do.  In Count Two, solicitation, the

8    question was, what did Parnas help ask for.  Here, the question

9    is, where did the money actually go, how much foreign money

10   actually ended up going to U.S. candidates.  For that reason,

11   we're going to have to follow the money a little bit.

12               These are the donations at issue.  I showed this once

13   already today, these are the donations from June on, a total of

14   $156,000 donated in the names of Fruman, Parnas, and GEP.  And

15   why from June on?  Because that is when Kukushkin first

16   communicated or at least when we had the first evidence that

17   Kukushkin communicated of Muraviev's commitment to supply the

18   money, June 2nd, 2018.

19               And it's clear what Muraviev is committing the money

20   for.  Again, this is the next chat exchange.  Three weeks

21   later — and I mentioned earlier this morning — Fruman has just

22   sent a bunch of pictures of him and Parnas hobnobbing with

23   politicians.  I have two of them here, but you know there is

24   actually about 20 pictures that he sent.

25               Kukushkin, who, as we said, doesn't really care about

1   politics, doesn't recognize anyone except Parnas and Fruman and

2   Donald Trump.  Fruman jokes, if you got me, Parnas, and

3   Kukushkin, you don't need anybody else.  And how does Kukushkin

4   respond?  We need Andrey, too, because — I talked about this

5   before — all your guys, the politicians are raking it in just

6   for appointments and they need Andrey Muraviev's money to give

7   to politicians.  So we know what Andrey Muraviev has agreed to

8   pay for.  Fruman says, that goes without saying — this is the

9   same exchange — because that's what it's all about.  Because

10  they said on June 2nd that Andrey would support this, and so

11  that date, June 2nd is when you know Muraviev has signed up to

12  fund these donations.

13          Now we're going to follow the payments from there.

14  This is going to be one of the charts who Kim Espinoza, who

15  testified a couple days ago, testified about.

16          Starting on the right, you see all the donations

17  Parnas and Fruman made in June and a little in early July after

18  Kukushkin told them Muraviev would support with money.  They

19  made those donations using the American Express cards you heard

20  so much about, under the name of this company, F.D. Import &

21  Export, and that's Steve Fruman's company.

22          They ran up quite a bill on that Amex.  There is a

23  $495,000 balance on the Amex by September.  $136,000 of that is

24  the donations we're talking about here, but there is lots of

25  other stuff on there, too.  Some of it may be part of this

LALCpar2                     Summation - Mr. Scotten

1    scheme, like their airline tickets and hotel rooms in Vegas

2    when they went out to that fundraiser, but some of it is just

3    pure personal luxuries, like a $4,000 golf outing.  Then,

4    suddenly, on September 19th, 2018, they pay the whole bill off.

5    How do they do that?  Because the day before they got a

6    $500,000 transfer from Andrey Muraviev.

7              Now, for these $136,000, it's easy to follow the

8    money.  The reason you can do that here is because before the

9    $500,000 come in, the account is basically empty.  You see that

10   down here.  Before that money shows up, there is only $1,600 in

11   the F.D. Import & Export account.  Another $33,000 came in the

12   same day.  That's still not nearly enough to pay for the

13   $136,000 in donations.  So you know those donations were paid

14   for by Andrey Muraviev's money, which, by the way, was exactly

15   the plan all along.

16             This is one of the screenshots of texts between Fruman

17   and Muraviev that Fruman then sends to the whole group.  He's

18   telling Kukushkin now what Fruman and Muraviev had already

19   talked about.  Fruman says, we handed out a lot.  We had no

20   doubt that the funds would come according to the set schedule,

21   as in, we handed out the donations you wanted us to make, now

22   pay us back as we agreed.  And to be clear, that is obviously

23   illegal.

24             This, again, is one of the rules that Parnas signed up

25   for when he joined Trump's finance committee.  It does not

1  matter if the funds are advanced or being reimbursed.  The news

2  even covered a similar crime a few months earlier.  This is

3  from that newspaper article Parnas saw talking about how

4  someone else admitted crimes for trying to get around FEC rules

5  by using a straw buyer for tickets to the 2016 inauguration —

6  same scheme — right down to getting reimbursed from a bank

7  account in Cyprus.  So of course it's illegal to go on a

8  donation spree knowing that Muraviev is going to pay your

9  credit bill, and that is exactly what you saw here.

10         We could stop following the money right there.  We've

11  already talked about $136,000, and this account is only about

12  $25,000, but still I want to talk a little bit about the last

13  two donations you saw in this case, both on November 1st, the

14  two donations to Laxalt and Duncan.

15         Here they are.  That's about 45 days after the credit

16  card bill is first paid off, and it's about 20 days after the

17  second $500,000 comes in.  Ms. Espinoza told you she could not

18  trace these funds from start to finish.  This is what she said,

19  based on your review of records, is it possible to say what

20  payment paid off the credit card balance containing these

21  donations.  It is not.

22         Now, you may remember why, unlike for the first

23  $136,000, by October and then also in November and also in

24  December, there is too much money going in and out of the F.D.

25  Import & Export bank account.  You saw that Strauss payment,

1    which was quite large, come in, you saw other expenses going

2    out, and they don't pay off the credit card bill at least

3    during 2018 all the way.

4         So the financial records can't tell you which money

5    went where, but unlike Ms. Espinoza, you saw all the WhatsApp

6    chats and emails and you heard from the witnesses, so you know

7    exactly what was going on with that money.

8         I went through a bunch of that already, so I'm just

9    going to do a couple more here.

10        This is from the beginning of the case.  Fruman sends

11   Kukushkin that voicemail that Wes Duncan left for Parnas,

12   remember we played that when Mr. Duncan was on the stand.

13   Duncan is reaching out to Parnas for a donation.  Parnas and

14   Fruman pass that request right to Kukushkin.

15        Then they go to the rally, they go to the Vice

16   President Pence fundraiser, they go to the dinner with Laxalt

17   and Duncan and so on, we looked at all that already.  Kukushkin

18   is impressed.  This is what he sends to his boss.  He brags to

19   Muraviev about their new friends who he says will help them

20   apply for licenses in Vegas — you know that's Duncan and Laxalt

21   — and, of course, he agrees to make contributions to the new

22   friends.

23        They had agreed to, as he puts it, a precise course of

24   action based on Igor's table.  They've agreed to spend Andrey

25   Muraviev's money in a certain way.  And you know exactly what

1    Igor's table was, this is part of it, it's that three-page

2    document that Parnas and Correia and Fruman made and then they

3    sent on to Muraviev and Kukushkin.

4            So Parnas and Kukushkin both agreed that some of their

5    money was committed — that's how the table puts it — to Laxalt

6    and Duncan.  Does that mean Kukushkin and Parnas also aided and

7    abetted the donation to Duncan and Laxalt?  Yes, of course it

8    does.  Kukushkin sent money with the purpose of getting it to

9    Duncan.  Duncan got that money because Parnas told Van Rensburg

10   to donate it to them using the same credit card and the account

11   that money Muraviev went into.  The fact that once it was

12   inside that account, it mixed around with a bunch of other

13   money doesn't change anything.

14           And here's what Ms. Espinoza could conclude.  Without

15   the million dollars from Intellect Capital and Nilder

16   combined — Muraviev's companies — would F.D. Import & Export

17   Chase account be able to pay for those two contributions and

18   the other debts for the period you looked at?  No, it would

19   not.  That is to say, there wasn't enough money in the account

20   to pay for everything, and you know that Muraviev's money came

21   in with the purpose of going back out to pay for folks like

22   Laxalt and Duncan.  That is how it gets added into the $156,000

23   that Parnas and Kukushkin smuggled into U.S. elections.

24           Now, before I go on, I do want to talk about one other

25   thing, the amount.  You saw that Parnas didn't give anywhere

LALCpar2                    Summation - Mr. Scotten

1    near the amount of money that he told Muraviev and Kukushkin he
2    was going to give.  And if you remember, he actually did the
3    same thing on the other side.  He told Duncan and Laxalt he was
4    going to give them a whole bunch of money, too, and had to
5    hound him and chase him, and in the end, he donated far less
6    than that.
7         Put simply, Parnas is ripping everybody off.  You saw
8    the same thing with the contributions on the front end, from
9    the first $500,000, just to take one example, it's another line
10   from that chart.  This one says they gave $250,000 total to Ron
11   DeSantis on October 3.  But you saw the reality, they only gave
12   $50,000 to DeSantis and they did it way back on June 22nd.
13        Now, that October 3rd date wasn't pulled out of thin
14   air, however.  It's the date Parnas did an event for DeSantis.
15   This is Parnas's chat to the group — Kukushkin, Muraviev,
16   Fruman — announcing the event on October 3rd, they're going to
17   do a fundraiser for DeSantis.  And Fruman also told the group,
18   that is part of this project.  This is from the summary chart,
19   it's on October 3rd, that day, Florida became ours forever.
20        You see, unlike Laxalt, Duncan, and Sessions, with
21   DeSantis, the group's candidate actually got elected, and how
22   did Parnas and Kukushkin react?  You remember these pictures
23   and this at the very end of the summary charts, DeSantis wins,
24   Parnas celebrates.  The group chats about how now they'll get
25   the license they want based on what, why do they think that?

The $50,000 of Muraviev's money that Kukushkin and Parnas
steered to friends of Ron DeSantis following the plan they all
agreed to.

          Now, did Parnas get the $250,000 the chart says?  No.
Did he lie about the date?  Yes, probably trying to get
Muraviev to send him even more money.  But what's clear is that
Parnas and Kukushkin secretly steered this $50,000 into a U.S.
election and that, too, therefore, is part of the $150,000 of
illegal donations you saw.

          So that's Count Three.  Muraviev donated directly and
indirectly by paying off the credit card used to fund these
donations and by giving a million dollars that made it possible
for Parnas and Fruman so that they could keep making these
donations.

          The donations totaled well over $25,000.  We saw the
right figure is $156,000.  We know that from following the
money and from what the defendant said about the money.  You
saw how Parnas and Kukushkin helped get money from Muraviev's
company to American politicians by everything from Kukushkin
arranging wire transfers to Parnas ordering Van Rensburg to
make donations.  So that is aiding and abetting, they helped.

          And did they do it willfully?  Did they know why they
were doing it?  Did they know they were doing it to further
this crime?  Yes, we just looked at an hour now worth of text
talking about what the exact purpose of all this was.  The

1    defendants are guilty on Counts One, Two, and Three, Two is

2    just for Parnas.  That's going to leave us only the counts for

3    Parnas alone.

4         Count Four is for the straw donations Parnas did with

5    Fruman's money, not Muraviev's.  These are the ones Kukushkin

6    is not involved in.  And here are the elements.

7         Now, if this looks familiar, it should be.  It's the

8    same elements of Count One.  It's the same charge.  It's

9    another conspiracy count.  We're just missing one of the

10   objects.  The foreign donor object isn't here because Fruman is

11   not a foreign donor.  The crime is that Parnas just conspired

12   with Fruman to donate Fruman's money in Parnas's name and to

13   defraud the FEC go by doing that.

14        There are two donations at issue here, there is one

15   for $11,000 to Protect the House and there is one for $325,000

16   to America First.  I'm going to talk a lot about that $325,000

17   donation in Counts Five and Six, so right now I'm just going to

18   do the $11,000 donation.

19        Here it is.  This is the email confirming it.  It's in

20   Parnas's name on June 29th to a group called Protect the House.

21   The next line is going to be the stipulation showing that

22   donation actually happened.  You see at the bottom I put a red

23   box around it.

24        There is also another donation on the same page I want

25   to show you.  It's a little higher in red.  This one in Igor

1  Fruman's name 17 days earlier for $50,000.  Why does that

2  matter?  It matters because it helps you understand why this

3  money had to be in Parnas's name.  If you remember, Protect the

4  House is one of those groups that takes in a bunch of money and

5  then splits it up amongst several candidates.  A donor gave to

6  Protect the House and then it split it up.

7          This is just part of the list of how Fruman's $50,000

8  donation got divided.

9          So, for example, by giving $50,000 to Protect the

10  House, Fruman gave $2,700 to Kevin McCarthy.  He was the

11  congressman you heard about.  That matters because, as you

12  heard several witness say, the most any candidate could accept

13  in 2018 was $2,700.  Igor Fruman can't legally give any more

14  money to McCarthy.  Any more donations under Fruman's name will

15  get flagged by the campaign and reject it.  But, here's another

16  $2,700 going to McCarthy under Parnas's name, also through

17  Protect the House, which would be fine if it was Parnas's

18  money, but you know that it's not.

19          This is what Deanna Van Rensburg told you.  Out of

20  those sources did — here she's talking about the money for the

21  $11,000 — were any of them Lev's money?  No, none of them were

22  Parnas's.  And the records prove it couldn't have been his.

23          We're to follow Ms. Espinoza's analysis again.

24          On top, in red, is the $3 million loan for mortgaging

25  Igor Fruman's condo.  That's the loan that Neil Ross testified

1    about.  $1.26 million is proceeds.  If you remember, Ross told

2    you the rest went to taxes and to pay off another loan, but the

3    money doesn't go into Fruman's account, it goes into Parnas's

4    account.  Parnas directed it there at the last minute, with

5    Fruman's agreement.  You can track it easily enough.  That's

6    because the account had less than $4,000 in it before Fruman's

7    mortgage money got there.  That means almost all the money in

8    Parnas's account is Fruman's.  So when $100,000 goes out of

9    that account, you know it's still the Fruman money, and you can

10   keep following it from there into the GEP account.

11            Again, here the reason you can be confident about the

12   money tracing is the GEP account is empty before that money

13   arrives.  So, again, you can follow the money all the way

14   through.  Balance was zero dollars before June 29th when the

15   Fruman mortgage money arrives.  So the only money here is

16   Fruman's, which is exactly what Van Rensburg testified.  Then

17   $11,000 goes out on June 29th — still has to be the Fruman

18   mortgage money — and where does it go?  To Protect the House in

19   Lev Parnas's name, even though you can tell, and

20   Ms. Van Rensburg knew at the time, that money all came from

21   Fruman.

22            Ladies and gentlemen, what you are looking at here is

23   a picture of a straw donation.  Those green lines you can see,

24   you can think of them like straws or conduits, as the FEC

25   sometimes calls them.  You can watch the money flow through

LALCpar2                    Summation - Mr. Scotten

1    them all the way through Fruman's mortgage until it ends up at

2    Protect the House, as Van Rensburg testified.

3              None of these contributions are made with Parnas's

4    money.  Again, she's looking at their bank accounts all the

5    time.  This is why a candidate like McCarthy could take it.  He

6    can't tell it's Fruman's money, so he just takes Parnas's

7    words, it comes in under Parnas's name.  You know his words are

8    false because you saw the records and you heard from the

9    witnesses.

10             Let's go back to the elements.

11             You know that Parnas and Fruman agreed, Neil Ross told

12   you about that, Deanna Van Rensburg told you about that, the

13   money would go into Parnas's account and then Deanna

14   Van Rensburg told you that Parnas and Fruman were partners in

15   all of this.

16             You know one of the things they agreed to do was

17   obstruct the FEC.  This is actually a direct example of that.

18   Twice the amount of money that's supposed to go to McCarthy

19   gets to him because they put it in under two different names,

20   even though it's all Fruman's money.

21             Now, you will notice here that there is no checkmark

22   next to that first block from "make political contributions in

23   the name of another," and that's because there is a $25,000

24   floor on that.  Again, you have to see $25,000 in money, and

25   the only donation we've talked about so far is $11,000, so

LALCpar2                    Summation - Mr. Scotten

1   we're going to have to come back to that after we do the 325.

2   But, as I expect Judge Oetken will tell you, Parnas is guilty

3   if he agreed to either one of these two things, since we

4   already saw the $11,000 to the FEC, we know that element is

5   satisfied.

6        We also know that he acted willfully and knowingly for

7   the same reasons we've already talked about, and we also know

8   there were overt acts.  We just got done talking about them.

9   Parnas ordering Van Rensburg to wire that $11,000 was an overt

10  act, so was transferring the money through all those accounts

11  so it would get from Igor Fruman's mortgage to Kevin McCarthy's

12  campaign under Lev Parnas's name.  Parnas and Fruman had agreed

13  to donate money under the wrong name, and that defrauded the

14  FEC.  Ladies and gentlemen, Parnas is guilty of Count Four.

15       The last two counts both concern Parnas's lies to the

16  FEC.  The counts aren't exactly the same, but they're about the

17  same facts and they look a lot alike, they're both about the

18  affidavit.  So for these two we're going to go through the

19  facts first then talk about the different elements a little

20  later.

21       It starts when Parnas told Deanna Van Rensburg to make

22  that $325,000 contribution to America First.  She told you

23  that, like all the other donations, she made it as Parnas

24  directed and she also told you where it came from.  This is the

25  loan we just talked about, the refinance of Igor Fruman's

1    condo.

2              We'll go through Ms. Espinoza's tracing again.

3              Like the $11,000, you start with the loan to Seafront

4    Properties, but Parnas said was for some investment in a

5    European oil project, not a political contribution.  There,

6    again, is the $1.26 million, it's supposed to go to Seafront,

7    the company that owned the condo, but then is switched to Aaron

8    Investments.

9              From there, Parnas had Van Rensburg send $325,000 to

10   America First.  This is her testimony.  It's the money from

11   Igor Fruman's mortgage into Aaron Investments.  That was also

12   confirmed by the financial records.  You'll notice that at no

13   point does this money pass through anything belonging to GEP.

14   GEP doesn't have a bank account, but there's no property, there

15   is nothing.  The only thing here that says GEP is the wire

16   reference, which is how Parnas had it described, because Parnas

17   told America First that's who the money came from, from him.

18   That's how it gets recorded as a donation.

19             Here's the donation form.  You can see it's donated in

20   the name of GEP and it is for $325,000.  Of course Parnas wants

21   credit for it.  He's listing himself as the point of contact,

22   the CEO, and the cofounder.

23             But then someone noticed that this money didn't come

24   from GEP, that it looked like a straw donation, and they filed

25   a complaint with the FEC.  This is the key part of that

1   complaint, that Parnas had made straw donations, that he made

2   donations under the name of another person.  You know that's

3   true, but what matters for these two counts is how Parnas

4   responded to the complaint.

5        Evan Preminger, who is that lawyer who notarized the

6   form, testified about it.  Here is his signature next to

7   Parnas's on the affidavit.  Preminger explained that he helped

8   Parnas put together a response for the complaint.  Part of that

9   was an affidavit from Parnas.  As Preminger explained, the

10  affidavit is a crucial part of the response because it lays out

11  Parnas's version of the facts for the FEC.  The lawyers put

12  together the affidavit based on what Parnas told them, then

13  Parnas read it and signed it, saying that he swore it was true.

14  But it's not true.  Parnas wasn't giving the FEC the facts,

15  because the facts would show his guilt.

16       Now, you'll see the affidavit actually has a lot of

17  falsehoods in it, but the indictment focuses on just two, and

18  so that's what I'm going to go through.

19       Here's the first.  Parnas swears under penalty of

20  perjury that the $325,000 donation was made with GEP funds for

21  GEP purposes.  As you just saw, that's literally impossible.

22  There were no GEP funds.  GEP didn't even have a bank account

23  when it made this donation.  This money went from Igor Fruman's

24  mortgage through Lev Parnas's bank account to America First.

25  At no point did those funds come from anything that looked like

1   GEP, at no point did they go through anything that looked like

2   GEP.  This is a false statement.

3            Now, I want to talk a bit about the defense opening on

4   this.  You may remember Mr. Bondy telling you that perhaps GEP

5   was a startup, that maybe it didn't have money or bank accounts

6   or assets and hadn't done anything yet, but there is nothing

7   wrong with starting off a company with money from someone's

8   mortgage.

9            Here's the problem with that, if that is what Parnas

10  believed, he could have put that in his affidavit.  Why doesn't

11  the affidavit say GEP is a startup, although it doesn't have

12  any assets, we think ha Igor Fruman's mortgage can count

13  because we plan to use that to start up our company and so, we

14  didn't do a straw donation.

15           If you think what you're doing is legal, you can be

16  honest about it, but that is not what the affidavit says.

17  Instead, here's what Parnas said, or part of it.  Since making

18  this donation, GEP has continued to pursue numerous

19  opportunities and expand our operations.  Collective cost of

20  these activities have exceeded $1 million and has been paid out

21  of our bonafide capital investment.  GEP has expanded its

22  operations and it spent another $1 million from its initial

23  capital investment?

24           To start, you know the numbers don't add up, because

25  if you add a million dollars to the $325,000, you're already

1    over the $1.26 million they're trying to call their initial

2    capital investment.  So Parnas is just making these numbers up.

3          But what's more important, there are no expanded

4    operations or activities.  You heard Deanna Van Rensburg

5    describe GEP.  They have no office.  Just her and a driver.

6    What do they spend a million dollars on?  As you heard, they

7    aren't even paying her salary.

8          And think about what Agent Thomas found when she

9    searched GEP's supposed headquarters, Parnas's house.  Based on

10   your observations, did it appear that an energy company was

11   being run out of that residence?  No.  A team of FBI agents

12   combed through the supposed corporate headquarters, but they

13   didn't find any indication of an energy company, not even a

14   home office energy company being run there.  Remember, they're

15   executing a search warrant, they're looking through documents,

16   they're seizing electronic devices.  If there is any kind of

17   energy company operating there, Agent Thomas would have known,

18   but there wasn't any such thing.

19         And this is what Ms. Espinoza saw in the bank records.

20   She didn't see any charges for energy beyond gassing up a car.

21   The bank records also don't give any indication that GEP is

22   involved in energy.

23         And again, let's look at what Parnas told the FEC in

24   his sworn affidavit.  Contrary to the assertions in the

25   complaint, GEP is a real business enterprise funded with

1    substantial bonafide capital investment.  Its major purpose is

2    energy trading, not political activity.

3            I want to focus on that last sentence.  Parnas says

4    GEP's major purpose is energy trading, not political activity.

5    You remember Deanna Van Rensburg's testimony.  Mr. Roos and

6    Mr. Bondy spent hours with her talking about political

7    contributions.  Even Mr. Bondy wanted to talk about what GEP

8    might have done, he just showed pictures of meetings.

9            Do you remember her testimony about energy trading?  I

10   won't blame you if you didn't.  If you blinked, you would have

11   missed it.  Did you ever see anything that led you to believe

12   that Global Energy Producers was doing energy trading?  No.

13           Now, remember Mr. Bondy tried to remind her of all

14   kinds of meetings and maybe you saw a memo, but this is Global

15   Energy Producers' full-time employee, she's the one who's doing

16   everything for them.  She's looking at their bank accounts and

17   she couldn't even remember it doing energy trading.  You cannot

18   square that with Parnas's affidavit.

19           If its major purpose is energy trading, would you

20   think that its only secretary, the FBI agent who searched its

21   headquarters, or the accountant who reviewed its financial

22   records would have seen some sign of that?  Not even one out of

23   three did.

24           This sworn claim by Parnas isn't just a lie, it's the

25   exact opposite of the truth.  The evidence you saw in this case

1    confirmed that the major purpose of GEP was political activity,

2    not energy trading, if it did any energy trading at all.

3              Which brings us to one more.  This is the $2,700

4    donation to Pete Sessions we talked about earlier.  It's made

5    in Parnas's name, but it's using Fruman's money.  I want to

6    focus on the last part.  Parnas is telling, swearing, actually,

7    to the FEC that he reimbursed the Amex card used for the

8    Sessions donation.  Why is he saying that?  Because the

9    Sessions donation is in his name.  So if it's not his money,

10   it's another straw donation.  But you know that it wasn't

11   reimbursed.

12             Here's what Kim Espinoza testified.  She didn't see

13   any sign that Parnas reimbursed Fruman, no trace in the bank

14   records.

15             Deanna Van Rensburg also told you she didn't see that.

16   Remember, she's looking at the bank accounts day by day.  She's

17   going to know if there is a reimbursement.  She said she was

18   not aware of any reimbursement Parnas made for this specific

19   contribution.  Parnas didn't reimburse Fruman.  The records and

20   Van Rensburg's recollection show it clearly.  So that's another

21   lie.

22             Now that we talked about the lies, I'll go through the

23   elements in the last two counts.

24             These are the elements for Count Five, making false

25   statements.  We just talked about Parnas's lies in the

affidavit, those are the statements, so you know that element
is proven.

Now, the second element is something called
materiality.  This is what I expect Judge Oetken will tell you
about that.  As to the second element, a material statement or
representation is one that has a natural tendency to influence
or is capable of influencing a decision or a function of a
government agency, including the FEC.  However, proof that the
FEC actually relied on the statement is not required.

Would these lies be capable of influencing the FEC?
Of course they would.  Parnas is telling the FEC nothing wrong
happened here, that there were no straw donations because it
really was GEP's money, because GEP is a real business, and
that he paid off the credit card used for the Sessions
donation.  And what is he being investigated for?  Straw
donations.  He's telling them he didn't do exactly what they're
looking into.  That makes thee lies material.

You also know Parnas acted knowingly and willfully
here.  The affidavit told him that he was breaking the law if
he lied, and you remember Mr. Preminger told him that, too, and
then he went ahead and signed affidavit with these false
statements.

Is this matter within the jurisdiction of the
government?  Yes, it's obvious that the FEC is part of the
government and I expect that Judge Oetken will tell you that.

LALCpar2                    Summation - Mr. Scotten

1          Parnas is guilty of Count Five.

2          Now we'll just do the elements on Count Six.

3          Here, the count is for falsifying documents.  As you

4   can see, this is why it's so similar to the prior count.  The

5   falsified document is the affidavit.  So it's the same false

6   statements as before.

7          Parnas obviously acted knowingly.  He knew exactly

8   what he was doing when he lied about exactly the things he knew

9   the FEC was investigating and he intended to influence the

10  FEC's investigation of him.  The lies in the affidavit were

11  designed to make it look like there were no straw donations.

12  That's what the complaint was about.  Parnas is guilty of Count

13  Six.

14         And, by the way, the facts we just talked about also

15  complete the other object of Count Four, that straw donation

16  count against Parnas for using Fruman's money, it's going to go

17  back to those elements really quickly.

18         We already talked about the $11,000 Protect the House

19  donation, spent a little time on that.  That was enough to

20  convict because it defrauded the FEC.  The $325,000 donation

21  defrauded the FEC, too, but because it's way over $25,000, it

22  satisfies the other element, for making contributions in the

23  name of another person.

24         Ladies and gentlemen, Parnas and Kukushkin are guilty

25  of every charge against them.

LALCpar2                    Summation - Mr. Scotten

1          We have to talk very quickly about something called

2     venue.  It's going to be very short.  Judge Oetken is going to

3     instruct you about the law here, but what it comes down to is

4     there has to be some connection to the Southern District of New

5     York.  You heard about a bunch of things happening here, like

6     the money coming into that New York company, F.D. Import &

7     Export, or signing the loan in the New York restaurant.  And so

8     the parties have stipulated, they've agreed, the defendants

9     have agreed that this is the correct place to bring the case.

10    You can see the stipulation here.  You'll have it in evidence.

11    It's one of the last things we offered during our case.

12    Everyone agrees this is where the case can be brought.

13         So all I have to do now is talk very quickly about a

14    few points where we disagree.

15         Now, the burden of proof is on the prosecution and

16    only us, the defendants don't have to do anything, but when

17    they do make arguments or make claims, it is your job to see if

18    they hold water.  In this case, they offered evidence and they

19    made arguments, and so I'm just going to take a few minutes to

20    discuss.  I'm not going to go through everything.  If I had to

21    go through every time the defendants told you something and

22    then the evidence came out the opposite way, I would be here

23    for another hour and a half.  I'm just going to choose a couple

24    examples.

25         You may remember in his opening statement, Mr. Bondy

1   told you — and I'm quoting now — Mr. Preminger, the notary who

2   signs it, he'll tell you he never saw it.  And then Preminger

3   testified and it turned out to be the opposite.  This is part

4   of what Preminger said.  Did Parnas see the affidavit?  Yeah,

5   he showed up in the office with Fruman and Correia, he showed

6   his driver's license, and he signed it.  Stuff like that

7   happened all the time.

8           Mr. Lefcourt told you this whole story in his opening

9   statement about how Kukushkin reached out to Fruman in Ukraine,

10  looking for help with a business venture.  And then the whole

11  trial passed and you never heard about anything about what

12  Kukushkin did in Ukraine at all.

13          Mr. Bondy told you in his opening statement, Parnas

14  didn't work in fundraising.  Turns out that he's on the

15  president's finance committee, he offers to bundle for all

16  kinds of people, and his company, GEP doesn't seem to do

17  anything but fundraising.

18          The defense attorneys promised you the evidence would

19  show the facts, and the evidence showed the opposite of the

20  facts they claimed.  So if one of the defendants tells you that

21  there is a fact, demand evidence, demand an exhibit or a

22  transcript that they show you that says exactly what the

23  lawyers argue.

24          The same is true for their overall stories.  In their

25  opening statements, each defendant gave you a different version

1    of the facts.  Kukushkin told you how this case was about the

2    theft of $1 million, how Parnas and Fruman didn't think much of

3    Kukushkin and they stole from him.  Parnas told you that he

4    decided Kukushkin was a bad businessman and decided to walk

5    away from the cannabis venture.  There was an element of truth

6    there.

7              This is one of the documents that was offered

8    yesterday by the defense.  And I'll give you a minute to read

9    it if you want.  I apologize for the small type.

10             This is the email Mr. Lefcourt quoted in his opening,

11   and it does sound like they don't think Kukushkin or Muraviev

12   are good businessmen.  You see I highlighted part of that here.

13   Although, unlike what Mr. Lefcourt told you, it doesn't sound

14   like Correia — who, by the way, is the one who wrote this — is

15   planning to rip anyone off.  "I think Kukushkin is a really

16   good guy, but he needs a lot of help."  They don't think much

17   of him as a businessman, but this does not sound like some plot

18   to rip him off.  Who says that about somebody they're plotting

19   against?

20             But the more important point is it doesn't even matter

21   if they were.  The question in this case is not whether the

22   defendants committed crimes against each other, it's whether

23   they committed crimes against the United States.

24             So, sure, Parnas certainly spent Muraviev's money on

25   whatever he wanted.  Here's a credit card bill for that $4,000

1    golf outing I talked about.  And that also got paid off by

2    Muraviev's money.  It was lumped in with that $136,000 in

3    political contributions.

4            And the defendants did argue.  Here, again, is this

5    argument we talked about before where Kukushkin is complaining

6    that the million dollars he had already sent to Global was

7    supposed to be enough for the donations, but Parnas is

8    threatening to walk away.

9            Ladies and gentlemen, none of this is a defense.

10   Think about what they are fighting about.  Kukushkin is

11   complaining that he already sent Parnas a million dollars and

12   Parnas is still asking for more money.  If you remember, this

13   was to give more to Laxalt.  That is not a defense.

14           Kukushkin bargained for a million dollars worth of

15   crime.  Now, it's true, he only got about $150,000 worth of

16   crime, but that is still a whole lot of crime.  This is not a

17   defense, it's an admission.  He's telling you he went into

18   business with criminals and he didn't get all the crime he paid

19   for.  And Parnas, claiming he'll just walk away after taking a

20   million dollars from Andrey Muraviev?  Again, that helps you

21   know he's in a criminal conspiracy.  The whole reason he can

22   make this threat is because he knows they're breaking the law.

23   Parnas knows Muraviev and Kukushkin can't call the police and

24   say, Lev Parnas stole a million dollars of my money.  He can

25   have Muraviev's companies try to collect on that loan, and I

1    think you may see some evidence of that, but he can't just say

2    I wanted all my money to go to politicians and they only gave

3    $150,000.  That's an admission, too.

4            Ladies and gentlemen, these defense claims were a

5    distraction, an attempt to get you to look at the disagreements

6    between the defendants on things that don't matter rather than

7    the clear agreement to commit a crime.

8            And you saw that agreement.  There was an agreement to

9    bring Andrey Muraviev's wealth and corruption into American

10   politics, to make all kinds of donations through the names of

11   people other than the real donor so that the voters would never

12   know whose money was pouring into our elections.  But you did

13   find out.  You saw the evidence in this case.  You saw the

14   chats and the wires, the donations and the agreements, and they

15   showed, as Ms. Flodr said, secret foreign money infiltrating

16   American elections.

17           You know the defendants are responsible.  Hold them

18   accountable.  Return the only verdict consistent with the law,

19   the evidence, and your common sense — the defendants are

20   guilty.

21           Thank you, your Honor.

22           THE COURT:  Thank you, Mr. Scotten.

23           Ladies and gentlemen, you've now heard the closing

24   argument of the government and each of the defense counsel will

25   have an opportunity to present a closing argument.  Would you

LALCpar2                        Summation - Mr. Scotten

1    like to take a 10-minute break?

2            MR. BONDY:  I would, your Honor.

3            THE COURT:  I would, too.  We'll take a 10-minute

4    break, folks.  I'm going to ask you to leave your pads on your

5    chairs once again.  Please go back to take a break and we'll

6    resume in 10 minutes.

7            Court will be in recess for 10 minutes.

8            (Recess)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  We have the jury back in the courtroom.

3          Ladies and gentlemen, we'll now have the closing on

4     behalf of Mr. Parnas.

5          Mr. Bondy.

6          MR. BONDY:  Thank you, your Honor.

7          Good morning, ladies and gentlemen.  Thank you for

8     being here today and for all of the days that you've been here.

9          I want to let you know it's an extraordinary privilege

10    to be able to stand in front of you on behalf of Lev Parnas.

11    And today, in our closing argument, I'm going to walk you

12    through the evidence as we see it.  I want to respond to some

13    of the things Mr. Hagan said, and I want to start, as I did in

14    my opening, with a story.

15         I will say it's very challenging to put a person's

16    life into one speech.  It's very challenging to put a human

17    being into one argument, but we're going to try.

18         Now I'm reminded of the story of a Shaolin monk who

19    was living in China at the base of a mountaintop, and he would

20    look during the days at the top of the mountain and he would

21    say:  I wonder what it looks like at the top of the mountain.

22    I wonder what it looks like.

23         And travelers would come and travelers would go, and

24    he would ask the travelers:  What is it like up there?  What

25    did you see?  Tell me.  And they all said to him:  Well, we saw

1    this, and we saw that, and we saw the other.

2             And one day he decided that he would go and try to

3    take the walk up to the mountaintop himself.  And he stood on

4    the mountaintop.  And when he got there, he realized no one

5    else could explain to him what they saw, no one else could can

6    explain to him how they felt, no one else could replace his

7    judgment.

8             And I say this because it's the same with you here

9    today.  Your judgment is not my judgment, it's not

10   Mr. Scotten's judgment, it's not the Court's judgment, it is

11   your judgment from the vantage point of being yourselves on the

12   top of that mountain.

13            I can't tell you which way to go.  I can't tell you

14   what to do.  It's your journey, but we're going to let it

15   reign.

16            I want to talk to you about the evidence in this case.

17   I want you to remember that emotions aren't evidence,

18   assumptions aren't evidence, and theories aren't evidence.  An

19   opening statement is not evidence, a closing argument is not

20   evidence.  These are the statements of advocates.  These are

21   the statements of people who have points of view on each side.

22            We have done our best.  I don't have a bunch of

23   graphics.  I will speak to you with my mouth and my heart.  We

24   have done our best to try to do what we thought was important

25   to bring to you the defense, to show you the reasonable doubts

1    in this case that we told you we would try to show you from the

2    very beginning when I talked to you about walking through the

3    forest and turning the stones and turning the logs and seeing

4    what's on the other side.  Because you don't know a person, you

5    don't know a man or a woman until you know all of the sides.

6          Now it is also very tough, I will say it to you, I

7    never tried a case from inside of a bubble.  I have never tried

8    a case inside of a bubble while wearing a mask and big glasses

9    that fog all the time, and I fear I might not be able to convey

10   to you some of the essence that I think is important in

11   defending a person.

12          But these are questions here.  It's not a money

13   judgment case, a civil case, we're not seeking a money judgment

14   here, we're talking about a person's freedom, one human being's

15   freedom.  And the judge will tell that you punishment is not

16   your concern that, sympathy is not your concern, and we don't

17   want you to treat with Mr. Parnas with sympathy.  He doesn't

18   want your sympathy.  He wants a verdict based upon the facts

19   and the law, not sympathy.

20          He's lucky enough and we're lucky enough to be viewed

21   as equal parties to the government of the United States of

22   America in this courtroom.  And there are very few other places

23   in our country -- and use your common sense, because we want

24   you to take that which is in you and apply here.  Your common

25   sense isn't elsewhere, it's not outside of you, it always is in

LALTPAR3                    Summation - Mr. Bondy

1    you.  But there are very few places in our country today where

2    people really stand equal before the rule of law.  We might not

3    have the resources or the agents or the power that the

4    government has, we don't have a badge or some imprimatur of an

5    eagle, but we have equality in this room.

6            So in America, no matter how infrequent our trials

7    have become, no matter so rare we have these criminal trials

8    where people actually stand up and hold the government to their

9    burden, we have a core right to say that we're not guilty, to

10   demand that the evidence be shown, to bring it into a courtroom

11   and to confront our accusers, to be heard or not heard, and to

12   then have a verdict rendered based upon those truths.

13           Unfortunately, it takes a great degree of fortitude to

14   do sometimes.  It shouldn't take courage to exercise our

15   rights.  Sometimes it does.

16           I want to start out, I got a few things to say about

17   Mr. Hagan and his representations.  The Statute of Liberty, the

18   picture of the Statue of Liberty, and he interpreted it for

19   you.  There's a picture of a person mooning the Statue of

20   Liberty.  So what?  You have a right to speak, think, feel, do

21   what you want, as long as you're not hurting people.

22           But has the promise of liberty been fulfilled for

23   everyone here?  Is that not a reason for some people to want to

24   moon the Statue of Liberty?  Does that statue mean the same

25   thing for everyone?  Is it the symbol of hypocrisy for many of

LALTPAR3                    Summation - Mr. Bondy

1   us?  Is it like a statue of Jefferson or Washington or

2   Christopher Columbus?  You can love America and you can still

3   see the false promises.  But to stand up here and point out a

4   picture of the Statue of Liberty to you and tell you it means

5   some terrible thing.  When people speak out in America, it's a

6   good thing.

7          Mr. Parnas has sat here silently this whole time.  He

8   waited a long time to be here, far longer than nine days.  He

9   had his home raided.  You saw that.  He has had evidence seized

10  from every device he owns.  He has had people that he worked

11  for chased after by the government and questioned, people he

12  spoke to in Washington queried, people put under immunity

13  grants because they were afraid they might have done something

14  wrong who then come to court and tell you they didn't think

15  they did anything wrong at all.  But it's very hard to sit

16  there and listen to people say things about you and not be able

17  to speak up.

18          You will issue a verdict today or tomorrow or whenever

19  you may come to some point of unanimity, if ever.  But whatever

20  the verdict is, it's going to go well beyond these walls, it's

21  going to go well beyond the courtroom halls, it's going to go

22  out into the street and into the air and become a piece of our

23  history.

24          And the question is not going to be:  Did we get here

25  on time?  The question is going to be:  Does your verdict

LALTPAR3                    Summation - Mr. Bondy

1    bespeak justice?  Does it honor our law?  Does it protect a

2    person who is presumed innocent until such time, if ever, there

3    is proof beyond a reasonable doubt that they did something?

4              You are the very last defense for Mr. Parnas.

5              I'll sit down, and then your work will begin.  And it

6    is one of the greatest privileges and prides that a person in

7    the United States can have.  It's terrible to sit in judgment

8    over a person, but it's so precious at the same time.  Use your

9    power as you would like to have that power used in having a

10   loved one of yours judged.

11             Before I get into our evidence, I will say in America

12   sometimes we don't know the value of things until they're gone.

13   And may we never in our country lose the ability to be here and

14   have a trial.  May we never ever have the fear of having a

15   trial and standing there without just a fear of being judged

16   itself, penalized for being on trial.  It's scary enough.

17             In any event, we selected you to be Lev's jury.  We

18   knew you for ten minutes.  We asked you some demographic

19   questions.  I wrote about you on Post-its, I wrote about you on

20   Post-its.  We selected you because of things we thought we felt

21   about you and saw in you that would help us, that you would

22   understand.

23             What's the evidence in this the case?  What did you

24   see?  You saw that Lev Parnas is a guy who actually had some

25   good ideas.  He was well over his head, but he had some pretty

LALTPAR3                    Summation - Mr. Bondy

good ideas.  Cannabis, marijuana, prohibition, the war on
drugs.  His passion and interest in attempting to bring a
message of legalization right into the President's lair took a
lot of courage.  And it was a good idea.  It remains a good
idea and it will be a good idea until that fight is done.  He's
been doing it for a long time.

          Lev also had no experience or training with liquid
natural gas, but he knew at the time there was a Trump -- the
article Mr. Hagan talked about, The Daily Beast article that
the Court admitted merely for state of mind, and he wants to
tell you that it's for truth, but what you see in terms of
state of mind, there is a Trump-era policy that still exists to
attempt to get liquid natural gas from America to Europe as a
way to undermine Russia's ability to have a stranglehold over
liquid natural gas.  It was a policy.  He didn't know about
energy.  But if you think about it, what he did to try to
effect that goal was really kind of creative and powerful.  And
had it worked, it would have had significant implications for
our country, and certainly it would have benefited him.

          But again, he was in well over his head.  He had no
experience with pipelines.  He had no experience with tankers.
He has no knowledge about liquid natural gas.  But he could put
together a plan with Igor Fruman, a wealthy businessperson who
was willing to put up the bone fide capital investment, the
seed capital for a start-up business.

1        I don't know if anyone had a start-up business and you

2    want to look to an investor to get capital and you have

3    nothing, you don't have an office and you don't have a staff

4    and you don't have a contract.  I remember when I was looking

5    for my first client.  It's real hard.  It doesn't mean that

6    what you're doing is fake.

7        Now the cannabis stuff.  Legalization, advocacy,

8    activism.  That doesn't mean you know how to run a marijuana

9    business.  It doesn't mean that you understand the nuances of

10   it.  It doesn't mean that you understand what it might really

11   take to make something work.

12       And in Nevada, what did you have to look for?

13   Adequate size for a structure, a diversity in equity and

14   inclusion plan, sufficient financing to compete in a closed

15   market and to try to win an application against other

16   applicants that were in invariably going to have more resources

17   than you.

18       It's not just paying a bribe.  The government says pay

19   a bribe and now we're going to have a marijuana business.

20   That's nefarious.  That's not what the legal marijuana industry

21   is about in this country:  Some criminality, you pay a bribe

22   and you get a license.  It's far more complex than that.  It's

23   like any other normal business except those businesses still

24   can't take tax deductions.  They're still stigmatized by people

25   that are looking at federal marijuana laws and trying to

LALTPAR3                    Summation - Mr. Bondy

1    enforce them against state legal operators.

2            Now the evidence showed that you Nevada was just not a

3    good place for Lev Parnas and Mr. Kukushkin and Mr. Muraviev

4    and Mr. Fruman to try to have a cannabis license.  So that

5    venture was abandoned.

6            GEP.  This is all the evidence in the case:  The money

7    for Global Energy Producers came from a U.S. citizen taking out

8    a loan on their home, like you might take out a loan, and

9    deciding through their freedom of choice how they wanted to

10   spend it, what they wanted to do with it, as is their right.

11   It was a bone fide capital investment.  That's what the

12   evidence shows you.  If you have a doubt about that or a

13   question about that, and it's reasonable, you have to acquit.

14           Now it wasn't just this money, the $325,000 that was

15   paid to America First Action that constitutes the money that

16   went into Global Energy Producers at all.  You saw $100,000

17   flow from the Aaron Investment account to GEP.  You saw a

18   credit card bill that had many cost associated with GEP.  And

19   the money, it's very simple, flowed from his business partner's

20   lawyer, the lawyer who did this refi with special instructions

21   from Mr. Fruman into the Aaron Investment account that

22   Mr. Parnas and his wife happened to have that had peanuts in it

23   because they didn't have a lot of money.

24           But the money went in there, and immediately went to

25   America First Action.  There was an urgency about it.  That's

1  what Ms. Van Rensburg conceded to you.  There was an interest

2  in getting the money paid quickly over to America First Action

3  at a time when there just wasn't a Global Energy account.  If

4  there had been a Global Energy bank account in place, maybe we

5  wouldn't be here.

6        But what we had instead was a contribution form that

7  identified Global Energy Producers LLC as being the donor with

8  Lev Parnas' home address, the address that reflected the search

9  that supervisory Special Agent Thomas executed on his home.

10 His name and his title.  He was proud of being involved in GEP.

11 Mr. Fruman was proud of what they were trying to do.  There was

12 no effort to hide anything whatsoever.  There was no effort to

13 make a donation in the name of another person whatsoever.

14       We saw pictures of planes, we saw texts about jets, we

15 saw bills about travel and hotel costs and a sushi bill for

16 $450.  Are these businesses expenses?  And they reasonable?

17 What happens in your business?  Does anyone travel?  Does

18 anyone eat?  Does anyone pay staff?  Does anyone have expenses?

19       Now there was no willfulness.  There was no knowledge.

20 There was no violation of the federal election laws that way.

21       There are plenty of reasonable doubts on this GEP

22 count, which is Count Four.  And I will tell you why I started

23 there instead of Count One, because temporally, time-wise,

24 that's the first count.  GEP is the first count in the case,

25 remember this, and the first contact that Mr. Parnas has with

LALTPAR3                    Summation - Mr. Bondy

1    the strangler figs I told you about in the opening.  The

2    fundraisers will come and strangle you and suck whatever they

3    can out of you.  And you saw this repeatedly, whether you are a

4    candidate dunning someone for money or Mr. Ahearn asking for

5    donations, or Ms. Boothe, I don't know, maybe you could put it

6    on a credit card but it's better if it's on two.  All the

7    strangler figs.

8            Now in terms of this conspiracy to solicit money from

9    a foreign national, Andrey Muraviev, and make contributions,

10   it's just absurd.

11           Let's talk about some of these facts.  There's a loan

12   that's received on September 17 -- or 18, excuse me, of 2018,

13   and that loan pays off the FD Export credit card bill of

14   $495,000 pretty much the same day it goes into the account.

15   The FBI's own forensic accounting expert couldn't tell you if

16   it was an autosweep or not.  That bill contained expenditures

17   for donations that had been made by Mr. Parnas 86 days and 105

18   days earlier.

19           I asked Ms. Espinoza, and she told us, as a forensic

20   accountant for the FBI, that the transactions involving

21   Mr. Parnas had been June 6, June 25, three months before any of

22   this loan, the first $500,000 loan was made, well before there

23   was ever any real agreement of any sort to provide Mr. Fruman

24   funds for any reason, and well before -- Mr. Scotten knows

25   about it, it was in evidence, but he neglected to tell you --

LALTPAR3                    Summation - Mr. Bondy

the ten minute and 30 second phone call between Mr. Fruman and

Mr. Muraviev that they had without Mr. Parnas or Mr. Kukushkin

present in August of 2018.  That phone call came at a time that

was consistent with those two men, wealthy Mr. Fruman and

wealthy Mr. Muraviev, talking about a loan.

          Now what the judge will tell you about this first loan

and those first payments -- this is what I expect the judge is

going to tell you:  He will tell you that a promise of

reimbursement must have been a causal factor to the

intermediary's decision to make the contribution attributed to

him.  In consequence, it's a defense, right, a defense for us,

that the intermediary made up his mind to make the contribution

in question prior to the time that the true contributor made

his reimbursement promise, and so it is a defense to this

charge that Mr. Parnas made up his mind and that those

donations were paid before there was ever any kind of an

agreement with Mr. Muraviev, and the government knows it.

          Not only was there no agreement to solicit

contributions from a foreign national when these donations were

made, there's also a reasonable doubt that any of

Mr. Muraviev's October 16, 2018 loan money ever went towards

paying the $10,000 contributions to Adam Laxalt and Wes Duncan

that Igor Fruman made.

          Those were contributions made by Mr. Fruman on

November 1st of 2018, remember?  They were paid on an AmEx bill

LALTPAR3                    Summation - Mr. Bondy

1    on December 24, 2018.  And the government's own forensic

2    accountant, again, Madelyn Espinoza got on the witness stand

3    and told you that she was unable to tell you whether a penny of

4    the monies from Muraviev went to pay those donations.  She

5    couldn't tell you she had a doubt.  There is a gap.  If you've

6    got a doubt and it's reasonable, you must acquit.

7           Furthermore, I said this briefly before, but the

8    notion that there's a criminal plot to put a million dollars --

9    take a million bucks and plow it into political candidates that

10   are opposed to marijuana legalization -- I know, I have a great

11   idea, I will take money and give it to Adam Laxalt, he can help

12   me in my cannabis venture.  Wes Duncan will help me with my

13   cannabis venture.  These people look at marijuana as the

14   Devil's lettuce, and it would be foolish to give them money in

15   an attempt to help with anything.

16          Preferential treatment for a cannabis license when the

17   application window has already closed?  It defies reality.  It

18   belies ignorance of cannabis law and licensing and it

19   undermines what is a legitimate industry in the United States

20   of America that just doesn't operate that way.

21          Counts Five and Six, this affidavit, this FEC

22   affidavit.  There are elements here.  The judge will tell you

23   something has to be materially false before it can be false.

24   Remember, I had Michael Hartsock on the witness stand from the

25   FEC from the RAD was the Report Analysis Division, he had been

1    working there for decades.  And he told you this small piece of

2    testimony, I bring it up to you here again.

3            I said:  Are there thresholds for materiality at the

4    FEC?  Is there like a numerical figure that must be reached

5    before the FEC determines something to be material?

6            Yes.  They're internal thresholds.  They're private

7    thresholds.  They're concealed thresholds.

8            I said:  Would you tell us, something involving 2,700

9    bucks, like the Sessions' contribution in the FEC affidavit,

10   could you tell the jury, is that above or below a threshold of

11   materiality for the FEC?  And he couldn't tell us because it's

12   a privileged fact.  He invoked the law enforcement privilege.

13   So you don't know, they don't know, the Court doesn't know, we

14   don't know if $2,700 even meets a threshold of materiality.

15           That affidavit -- go take a look at that affidavit,

16   read the affidavit, and remember it's just an allegation.  Was

17   it provided by Mr. Preminger, the lawyer to Mr. Fruman and to

18   Mr. Parnas, in his office to sit and read and review and sign

19   under penalties of perjury?  There was no translator there.

20   This is how you know they're not reading this thing closely.

21   Where is the translator?  Ms. Boothe is not comfortable

22   speaking with Mr. Fruman in the English language.  You see him

23   in Cyrillic on group chats.  Where is the translator?  Where is

24   he?  You sit there and you look at people, and you're a lawyer,

25   have you ascertained that they know what you wrote?  Have you

ascertained that you got it right?  Have you ascertained that
the facts are correct?

Then you have a jurat, they call it, the fancy word,
an attestation at the end where I'm swearing under penalty of
perjury that something is true.  There was no swearing or
attestation, it was a signature that Mr. Preminger said he
thought was given applied, and he looked at Mr. Parnas'
driver's license to confirm he was who he said.

Well, ask yourself if the lawyer should have read it
to them, had an interpreter review the questions, ensure that
the signers knew exactly what was being said, that they had
read it any other time, that it had been sent to them.  Ask
yourself whether there's evidence that they weren't just
signing off on it blindly.  Do you have a doubt?  If it's
reasonable, you must acquit.

Now this $325,000 contribution, that's the primary
thrust of the affidavit.  I told you the $2,700 contribution
referred to in the affidavit you can't even say meets a
threshold of materiality, which is an element of the offense
and is required for you to find by proof beyond a reasonable
doubt before you could convict a man.  But that $325,000 set
forth in the affidavit -- and the evidence showed you and I
said it in my overview -- was accurately and correctly
represented to be a, quote, bone fide capital investment in a
start-up business.

1           The judge will instruct you that one of the things you

2   get to look at when you're ascertaining if a business is real

3   or not is bone fide capital investments.  The activities of

4   these people, were they going around and meeting people in the

5   energy realm?  Were they trying to enter into memoranda of

6   understanding?  Were they trying to parlay their political

7   donations to meet high-net worth people who were involved in

8   oil and natural gas?  That's a great idea, isn't it?  Is that

9   what they were trying do when they were traveling?  When

10  Mr. Fruman was in Poland, what was he trying to do?

11          Ms. Van Rensburg tells you that -- ultimately we

12  extracted it from her, and we'll talk about her testimony on

13  the direct versus the cross-examination shortly, but we

14  ultimately extracted from her that, yes, she thought they were

15  in the oil and gas business, as did Mr. Ahearn, who was

16  introducing at least two companies to Mr. Correia and to

17  Mr. Parnas.

18          That's what the evidence showed you.  And so this is

19  not some hidden payment through some shell company that is

20  designed to mislead.  Poppycock.

21          Now a theme here throughout is that Lev Parnas is a

22  guy that doesn't have any campaign finance experience or

23  education.  And think about the witnesses who came into this

24  courtroom and told you what they know.  Just kind of think

25  about it.  He never worked on a campaign, he has never worked

LALTPAR3                       Summation – Mr. Bondy

1    at a PAC ore a super PAC or a joint fund raising committee, let

2    alone doing fund raising like Joe Ahearn did or acting as a

3    staffer on a congressional campaign like Caroline Boothe did,

4    the chief of staff for Congressman Sessions.  Lev Parnas never

5    ran for office like Wes Duncan or Adam Laxalt.  He didn't go to

6    graduate school like Joe Ahearn or a law school like Mr. Duncan

7    on Mr. Laxalt or Daniel Stewart.  And it's unfair to try to

8    ascribe that level of knowledge to him.  It's like saying to

9    him he should know what the prosecutors know or I should know.

10   It's just false.

11          Ms. Van Rensburg told you and the evidence showed you,

12   you saw it, that the PACs and the joint fund raising committees

13   and the campaigns never raised a red flag and told you they

14   don't do any diligence whatever.  You get to click through,

15   like we all do so many times in our lives, without reading the

16   fine print, just like Wes Duncan when I asked him:  You're a

17   lawyer, do you read the fine print?  He said I try to read the

18   fine print, but I don't always do it.  We all do.

19          And these were the transactions made by another

20   person, Deanna Van Rensburg, who read the form and clicked the

21   box and ultimately conceded in her testimony that she may or

22   may not have spoken to Lev in advance.  She doesn't remember,

23   it's so long ago.

24          Funny, the direct examination was Mr. Parnas directed

25   this and Mr. Parnas directed that, and Mr. Parnas directed the

other, and then on cross, yes, I have spoken to the government,

we have gone over the questions, we've gone over the answers,

we went over the questions, we went over the answers.  Somehow,

I ask a question and she doesn't remember anything.

Use your common sense.  Infer from the facts:  Was she

coached?  Was she trained?  You need to meet with people a

bunch of times to go tell truth about something?  You need to

practice telling the truth?  You need a coach to tell the

truth?  Have you ever paid anyone in your life to coach you to

tell the truth?  You need to work on telling the truth to

somebody?  Come on.

Wes Duncan is one of those witnesses who was kind

enough to speak with the defense before taking the witness

stand.  We asked every one of these witnesses if they would

talk to us, and I will let you know the ones who did and the

ones who didn't.  He did.  He conceded, and you saw it, he

asked Lev Parnas for donations repeatedly.  Repeatedly.  You

watched the testimony, you saw the exchanges.  He asked a lot

of times, because that's what politicians do.  For better or

for worse, it's just what they do.

But he also told you that the attorney general's

office in Nevada, along with the Department of Taxation,

regulated these licenses, regulated the cannabis market, and

that there were a variety of license categories and it was very

common for an applicant to engage lawyers.  Right?

LALTPAR3                    Summation - Mr. Bondy

1           Duncan told you that Dan Stewart, who we heard from

2      also, was a talented lawyer, his partner, an ethical man, not a

3      crooked person, transcript 159 to 60.  And when Mr. Duncan and

4      Lev spoke in September or October in 2018 at dinner in Nevada,

5      there were no licenses open for retail stores in Nevada,

6      cannabis stores.

7           Now something important here to this whole theory of

8      we'll go plow money into a bribe to get a cannabis license, he

9      told you that Nevada removes the identifiers from the license

10     applications.  He told you that these applications are

11     evaluated anonymously and judged on the merits, and there is no

12     favoritism whatsoever.  Transcript 161 to 162.  I will give you

13     the numbers and maybe write them down.  I don't have the screen

14     kind of thing, but I have done my best to endeavor if there is

15     something that is of note to you, you could ask for readbacks

16     of testimony.  I will guide you when I can, but there was no

17     ability to game the system in Nevada.

18          That process had been set up for exactly this

19     purpose -- and the government should know this -- to protect

20     against corruption.  There wasn't a senator, there wasn't an

21     attorney general, there wasn't a governor who would have the

22     means to push an application through.  It wasn't possible to

23     bribe.  Their theory is just untenable.

24          Now Mr. Duncan told you there was nothing out of the

25     ordinary whatsoever about Mr. Parnas' cannabis questions at the

1   dinner.  He told you he also met Mr. Fruman.  He told you he

2   never got a donation from Lev Parnas.  He told you he got a

3   donation from Mr. Fruman.  Throughout this whole trial we heard

4   the politicians say or fundraisers say:  Isn't it great?  You

5   could get another person, max out the donation, bring some more

6   people to the party, get some friends, raise some money, bundle

7   these things.  Because that's what they care about.

8           Now although Duncan, I said it before, was a lawyer

9   and tried to do better, he told you the truth, all of our

10  truths:  We click through boxes.  Read the fine print on your

11  shrink wrapped agreement for software.  Read the fine print.

12  Have fun.

13          Now when that donation was made to Wes Duncan on

14  November 1st -- as I said, remember, you couldn't have gotten a

15  cannabis license for a retail establishment, the window was

16  closed.  You couldn't have paid 10 grand and gotten a cannabis

17  license.  Wes Duncan is not going to take a bribe.  Do you get

18  the sense he's going to take a bribe?

19          So Daniel Stewart, he came to court.  He is a cannabis

20  lawyer.  Yes, he also heads his firm's election law practice.

21  The government didn't ask him any questions about the election

22  law.  I'm not sure why exactly.  He told you he's the head of

23  the committee at the firm.

24          But he told you some things.  He provided you stereo

25  on Wes Duncan.  You couldn't submit an application for a

1   cannabis license following the closing of the application

2   window.  It closed in September.  He met with Parnas and Fruman

3   and Duncan at that dinner.  They had a meal after the

4   application process had closed.

5           Mr. Stewart told you some of the realities of pursuing

6   cannabis licenses.  He said the application was often too

7   expensive and only a limited number of licenses were available.

8   He told you it costs hundreds of thousands of dollars simply to

9   prepare a license.  This is not like flipping pancakes or

10  making a hamburger.  It's not a barbecue.

11          Now he also told you that you had to show that you

12  could succeed.  There had to be some adequacy to the

13  application.  You're graded on a scale in Nevada.  It's a blind

14  application graded across a variety of categories.  And

15  thankfully in Nevada they have an emphasis on diversity and

16  equity and inclusion as a way, he told you, to repair the

17  victims of the war on drugs.

18          He also told you that in Nevada they have a 120-day

19  legislative session.  The legislators sit for 120 days.  It's

20  longer in New York and it's still too short, and it's like

21  every other year or every three years or something.  And when

22  they are in session, the lobbyists come out of the woodwork,

23  and they are paid to lobby on a lot of subjects, not just

24  cannabis.  And you see the evidence in this case about lawyers

25  and lobbyists.

```
 1              Mr. Stewart told you also, he confirmed it, the
 2     governor nor the attorney general review the licenses.  Like
 3     Adam Laxalt, if you give him some money, he wouldn't have
 4     anything to do.  He couldn't possibly do it.  And when he spoke
 5     to Mr. Kukushkin and he spoke to Mr. Parnas, there was nothing
 6     that raised an alarm for him, not one thing.
 7              I want to talk a little about Adam Laxalt, because
 8     Adam Laxalt came to court.  Use your common sense.  What it's
 9     like to have a person in a position of power, some politician
10     or role model, some law enforcement person, look down upon you
11     and think you're an odd character or a novice or a clownish
12     figure or someone who is low class because you wear a gold
13     chain or, God forbid, you sound like you're from Brooklyn or
14     you're just there to be in the picture.
15              I submit that each of us knows in a deeply personal
16     way, probably very distinct from the evidence in this case, but
17     nonetheless resonate what it's like to be scorned for being
18     different and how hurtful that is.  How much more when it hurts
19     when a person smiles in your face and laughs about you behind
20     your back, jokes about you behind your back, snickers at you
21     behind your back.  It's disgusting.  Don't be that person.
22              And with Adam Laxalt, of course, there's that extra
23     layer of pain, fig wrapping around him, right, asking you,
24     bludgeoning you, badgering you, chasing you, texting you for
25     money, money, money, money.  He told you, though, Adam Laxalt,
```

1    he wouldn't take a bribe.  Cannabis venture, not good for him.

2    That's not what he was about.  He would be the wrong guy to

3    approach.

4            He also told you that, contrary to Igor Fruman's text

5    to Mr. Kukushkin about going to meet the guy and got to give

6    him $250,000, that he never got $250,000.  Of course he would

7    have remembered him.

8            Do you recall the FBI's summary chart witness, Anthony

9    Casola, who told you that the United States Attorney's Office

10   decided which pages in this case to put into their summary

11   chart, and that they selected something like one and a half,

12   one-thousandths of one percent of the evidence to put into the

13   summary chart, and then to slice and dice them into these

14   little snippets and present to you on some silver platter as

15   though it's the whole story?

16           Well, what he tells you, he identifies things,

17   Mr. Kukushkin was going in circles with Leva, going in circles

18   with Leva, page 292 and 293, he tells you there's a reference

19   to a 10 minute and 30 second phone call between Mr. Muraviev

20   and Mr. Fruman.  Where is the recording?  I don't have the

21   recording.  Does anyone have a recording?  There's no

22   recording.  What did they talk about?  Do you know what they

23   talked about?

24           All the donations on the summary chart, Mr. Scotten

25   puts it into evidence earlier and he neglects the fact that I

LALTPAR3                    Summation - Mr. Bondy

cross-examined on what the asterisks meant, the ones he

neglected to ask about on direct examination.  Look at the

document, the word is projections.

        Of course, Special Agent Casola has no actual

knowledge about anything, including whether donations were

made.  I have no personal knowledge of that.  I have no

personal knowledge of that.  I didn't do anything in this case.

Well, he did participate in the raid of Steven Fruman's home,

right?  I believe he participated in the pizza party before.

        But there are no communications that involve

Mr. Parnas on September 14 of 2018 in the summary chart, and

there are the two loan agreements that he put in concerning FD

Import & Export.  He had no knowledge about any donation ever,

no evidence of a donation ever being made to any of the people

on that chart Andrew Cuomo, Kirsten Gillibrand, Letitia James,

whomever it is.

        Mr. Parnas also communicated to everyone on

November 3rd, you see it, that he wants to end the

relationship.  He wants to stop it because it's not what he

thought.  He's already been speaking to Kukushkin about two

payments that he pledged that weren't made.  He is tired and

he's out.

        Remember Customs and Boarder Protection Agent Madelyn

Garcia?  The prosecutors presented her to demonstrate that

Mr. Muraviev, guess what, identified himself to her at an

LALTPAR3                  Summation - Mr. Bondy

1    international border where she was standing in a uniform, and

2    upon her inquiry and inspection, pursuant to law, he identified

3    himself as a Russian and Romanian citizen.  Remember, she went

4    through his bag to find the Romanian passport.

5         Lev Parnas is not wearing a uniform.  He's not

6    standing at the border.  He's not going through your bag.  He

7    doesn't have access to the immigration database.  He's not

8    looking at the data of your entries and exits and how you're

9    getting there.

10        But she told you that Mr. Muraviev spoke English.  She

11   told you that she communicated with him without an interpreter.

12   She told you that, on its face without a records check, that

13   she could do what Mr. Parnas couldn't, you couldn't, none of us

14   could do.  Maybe the prosecutors could.  That it would be

15   unclear whether Mr. Muraviev would be a foreign national

16   because, thank God, she had encountered many U.S. citizen

17   travelers from other countries with thick accents, including

18   people who had been U.S. citizens living abroad for lengthy

19   period of time.

20        She also told you that she didn't know if Mr. Parnas

21   spoke with an accent.  She didn't know if Mr. Parnas, who you

22   saw came here and was naturalized in the Borough of Brooklyn as

23   a 14-year-old boy having left the USSR.  She didn't know if he

24   learned to read and write in Cyrillic.  It's different to speak

25   a language, it doesn't mean you write it.

LALTPAR3                    Summation - Mr. Bondy

1          Brad Hirsch, I'm not sure if you recall him, he was in
2     a light blue suit and he was the cannabis lawyer from
3     California.  He was lucky enough to have a cannabis practice
4     where the clients said yes.  It wasn't like Mr. Stewart where
5     the clients talk about it and they decide not to pursue the
6     application.  For Mr. Hirsch, all of his clients pursued the
7     application.  And he told you it's important.  He confirmed --
8     for reasons I didn't want to go into because we don't need to
9     malign or hurt a person -- that Mr. Kukushkin was not a person
10    with whom he could continue to have any cannabis business
11    relationships.  He wasn't a good business partner.  And it's
12    reasonable to infer from Attorney Hirsch's statements to you
13    that Mr. Parnas also recognized for his own reasons that
14    Mr. Kukushkin and the entire venture had shortcomings, and he
15    abandoned it.

16          Hirsch never met Lev.  He never spoke to Lev.  He
17    never saw Lev.  The first time he saw him was on trial here.
18    Importantly, because you do need lawyers in this field, he told
19    you that marijuana law is an ever-changing field.  The laws are
20    frequently changing locally, from city to city, from state to
21    state.  California has an open licensing system.  Nevada has a
22    closed licensing system.

23          Now I do want to focus on the August 6, 2018, ten
24    minute and 30 second phone call that Mr. Scotten neglected to
25    raise in his closing argument or address in his closing

LALTPAR3                    Summation - Mr. Bondy

1   argument or speak about at all in his closing argument because

2   it was FBI Agent Casola, in introducing the prosecutor's

3   summary charts, who conceded to you on cross-examination --

4   because of course he wasn't asked about it on direct -- use

5   your common sense, that there was a 10 minute and 30 second

6   unrecorded phone call between Mr. Fruman and Mr. Muraviev.  Ten

7   and one half minutes.  Look at the transcript, pages 394, line

8   21, through 395, line 6.  Take a look at Government

9   Exhibit 1295 where this appears.  You will see the fact in the

10  record.  You will see it in their evidence.  The timing of the

11  call is completely consistent with the timeframe in which Igor

12  Fruman would have been entering into his private loan agreement

13  with Mr. Muraviev as reflected in the September 16, $500,000

14  loan agreement and the second October 17 loan agreement.

15          Ask yourselves:  What did they talk about?  Was it the

16  terms of the loan?  Why was it a call without Mr. Parnas and

17  Mr. Kukushkin?  Why were they not on the call?  Were they

18  intentionally excluded from the call?  How could you say the

19  loan was not the subject matter of the call?  Can you say it

20  was not discussed?  Do you have a doubt?  And if it's a doubt

21  and it's reasonable, you must acquit.

22          Deanna Van Rensburg.  Do you remember her and how she

23  testified starting out?  That's Lev's former assistant, not

24  business partner, not a director and officer of the company,

25  his assistant.  And she testified under an immunity grant

because she felt she had done something wrong, or so she said,

and she had to get that immunity grant.  And nonetheless, she

was evasive.

Why do you have to be evasive when you're testifying

under an immunity grant?  Why do you have to meet and go over

the questions and answers repeatedly when you're testifying

truthfully under an immunity grant?  And remember what she said

to you on direct?  Lev directed this and he directed that.  Lev

directed everything.  Lev directed everything.  That was the

direct testimony of Ms. Van Rensburg.

And then on cross-examination, it was like I flew in

from another planet and can't be understood.  She didn't

remember anything.  She wouldn't concede remembering anything.

But she did tell you a very important fact, I'm not

sure if you recall it, but she told you that she would often

send Mr. Parnas emojis in response to articles he sent her.

Even though she never read the articles, it was her way of

acknowledging the receipt of the articles.  But she didn't read

them, didn't know the contents, probably like many of us do.

You have seen Mr. Parnas and his emojis and other witnesses and

their emojis.  Use your common sense.  A response of an emoji,

as Ms. Van Rensburg told you, one of the government's marquis

witnesses, does not mean that you read the thing you're

responding to.

She also told you that she may not have gone over that

1   contribution form with Lev in certain instances.  She could no

2   longer remember, it's been so long.  An importantly, she told

3   you that she had been owed money by Mr. Parnas, had put her out

4   and she was upset.  Her husband had no money.  She has two

5   small children, and of course she doesn't want to be in that

6   chair.  She would rather be immunized in that big plastic box

7   over there on the witness stand.

8           So the back and forth between us I thought was really

9   kind of interesting.  Because what is she here for?  To tell

10  the truth or adopt the sinister narrative of the government

11  that Lev directed this and Lev directed that, and somehow I

12  just don't remember anything when the defense lawyer

13  cross-examines you?

14          Like I said before, when in your life have you had to

15  practice telling the truth?  Did you ever meet with a room full

16  of people so you could go over the questions and answers to

17  practice telling the truth?  And if that's what you do, then

18  how do you forget the truth when the defense lawyer is asking

19  about it?  The truth doesn't change.  It just gets selectively

20  remembered sometimes.

21          I understand, though.  In fact, I would say that if we

22  were to walk a mile in Ms. Van Rensburg's shoes, you could

23  understand her position.  She has small kids, she testified on

24  a Friday.  She flew back home to be with them on the weekend

25  and she came back on a Monday.  She doesn't want to be apart

1    from them.  They're much more important to her than Lev Parnas.

2                 So in terms of what we did manage to extract from this

3    biased witness, I submit to you, who was evasive on our

4    examination, she told you that she had spoken at Lev Parnas'

5    direction with Caroline Boothe about the credit card donation,

6    $21,000 on a credit card, and Lev asked to go and do things the

7    right way.  That's transcript 691 to 692.

8                 She told you -- and we had to drag it out of her like

9    yanking it out of snail shell -- yes, there was urgency to the

10   America First donation, and Lev did not want to wait to open

11   the GEP bank accounts.  Transcript 693.

12                In terms of timing, this was right at the time when

13   Mr. Ahearn was talking to Parnas about the swanky events,

14   including the dinner on April 30, 2018, the private dinner

15   where he had the courage to go bring cannabis talking points to

16   Donald Trump.  Wow.  You don't get to the party unless you pay

17   the fee, right?  You don't get to those events unless you pay

18   the piper.  You don't get there unless Mr. Ahearn has your

19   pledge and your money.

20                Now Ms. Van Rensburg finally remembered that Lev

21   Parnas very much wanted to become politically involved and was

22   important to their gas and oil efforts with GEP.  Oh, yes, now

23   I do remember that.  Yes.  Transcript 694.

24                Seeing her statement refreshed -- I shouldn't say her

25   statement, but seeing what she had said put back on her

LALTPAR3                    Summation - Mr. Bondy

refreshed her memory that the refinancing of Mr. Fruman's home
was for $2.8 million.  The money went to the Mamo restaurant.
That was where part of that money went.  Then, according to
her, she thought one and a half million dollars went to GEP.
And she did concede again and again that her memory was so much
better two years ago.  Transcript 667 to 68.

        Then she finally recalled that she had told the FBI
that Mr. Fruman and Mr. Parnas and Mr. Correia were indeed in
contact with people in the oil and gas industry.  She conceded
there was a conversation with someone named Orban and
Mr. Correia about, quote, buying barrels, although she just
couldn't give it up that those were referring to barrels of
oil.  I invite to you transcript 669 to 75.

        She actually went to the bank with Svetlana Parnas so
that they could transfer the $325,000 donation immediately
after that money came in from the lawyer, the trust account of
the lawyer on the refi.  She went to the bank with Svetlana so
she could do this transaction.  In GEP's name?  Yes.  As
directed by Lev, according to her?  Yes.  Is that what the
contribution was for?  Yes, for GEP.

        (Continued on next page)

1

2          MR. BONDY:  Now, she thought and she admitted

3    erroneously, that Lev had some election law knowledge and that

4    she had relied upon him, and I asked her, some knowledge he, in

5    fact, didn't have?  You thought he had some knowledge that, in

6    fact, he didn't have?  Answer, yes.  Transcript 677.

7          Do you think she'd ever tell you if she just read the

8    box and clicked through it?

9          She also told you that when there was the FEC

10   complaint, they went and hired lawyers.  Mr. Fruman and

11   Mr. Parnas, they went out and they defended themselves.

12         Ultimately, she told you that she knew Global Energy

13   Producers was a startup company, it seemed viable to her.

14   There came a point that she was owed money, but she continued

15   to work at the viable startup she thought it was.  Pages 680 to

16   681.

17         She also conceded that Lev and Igor are citizens.

18   They were business partners in Global Energy.  The money from

19   the condo refi was the startup capital, even if it went through

20   the Aaron account, and they did not have a bank account for GEP

21   yet.  So it's hard to pull that money through GEP's account

22   when it doesn't yet exist.

23         Importantly, even though she's testifying under the

24   immunity grant, she's accepted immunity on the theory that

25   she's done something wrong.  She told you that she never

LALCpar4                     Summation - Mr. Bondy

1    thought she was doing anything wrong.   Trial transcript at 683.

2              She told you her memory had faded a lot.  She's got

3    gaps in her memory.  She doesn't remember what happened by her

4    own -- take that for what it's worth.  It creates a doubt about

5    what she's saying.  It makes what she's saying unreliable.  It

6    makes it subject to question.  She told you she reviewed her

7    own text messages to prepare, but she still seemed to remember

8    so little.

9              We asked about a Proton account that she'd be the

10   administrator for and she lost the logging credentials so that

11   Mr. Parnas could never get back his Proton emails.  What's with

12   that?  Why?  Where did they go?  Why did you lose it?  Pages

13   775 to 777.  The issue of Mr. Parnas not being an email guy

14   came up because he wasn't an email guy.

15             And then on direct, I had asked if she was Global

16   Energy Producers' director of operations.  And like a parrot,

17   like this parrot, at Lev's direction, at Lev's direction.

18   Well, when confronted, at page 777 and 778 of the record, she

19   conceded that she had asked Lev to be the director of

20   operations, she was the one asking.  It wasn't Lev directing,

21   it was her asking.  Completely the opposite of what she said

22   when Mr. Scotten was questioning her.

23             She told you she worked on a logo for Global Energy

24   Producers.  She told you she worked on the website for Global

25   Energy Producers.  She asked to be the manager of Steven

LALCpar4                    Summation - Mr. Bondy

1  Fruman's Amex so she could have easier access to the account

2  and be authorized to speak on their behalf.

3       She told you she was working on his biography and

4  including certain things in the biography.

5       She told you that there were certain things that she'd

6  have Lev sign and she'd fill out the rest.

7       She said just notary forms, but it's an example of a

8  practice, a general practice that she had.

9       Although she told you she didn't know anything about

10 the cannabis realm or what they were doing in cannabis, she

11 then concedes that she's joking about 4/20 in a text with Lev

12 and what it is to be like you're staying in a hotel and the

13 address is 420 Park Avenue.  If you don't know anything about

14 cannabis or what they're up to or the business or your interest

15 in it, why is it to be staying at the 420 hotel?  Why?

16      She showed you, 788 to 790, there is a list of Lev's

17 contacts that she sent this message to about raising money for

18 Ron DeSantis, raising money.  Because, again, that's what the

19 politicians want you to do, raid your contacts, send them all a

20 message, you know this great guy running for congress or the

21 governor or whatever it is, give them money.  I love the

22 candidate, he's a wonderful candidate, please give them money.

23 And it wins you grace with the politician and perhaps you have

24 your candidate ultimately win.

25      She had a very detailed role, one that she didn't

1   really discuss on the direct in refinancing.  She told you
2   she's dealing with Steven Fruman, she's dealing with Neil Ross,
3   she's dealing with Igor Fruman, she's dealing with his son,
4   Arthur Fruman, she's texting them back and forth.  It's pages
5   790 to 791.

6          Now, at page 796 to 97, towards the end of her
7   testimony, all of a sudden, she doesn't remember even checking
8   boxes without Lev.  I don't remember, it's three times, it was
9   so long ago, I don't recall a conversation I had with Joe
10   Ahearn.  Well, you know, all of a sudden you remember these
11   things that no one is directing you to say anymore.  And
12   notwithstanding her and her immunity grant, she couldn't come
13   up with a reason why she needed it.  Pages 836 to 840, Deanna
14   failed to remember these checkboxes.  She was inconsistent in
15   her testimony.

16          When I pressed her on why the money had to run through
17   the Aaron account into A1A so quickly, why not just wait until
18   GEP had a bank account.  Can't you just wait you a few days
19   until you have a bank account?  Why?  Her answer was, I think
20   it was a way for him to be taken seriously in politics.  798 to
21   800.  And, of course, he and Igor Fruman and GEP wanted full
22   credit for those donations.  They weren't hiding anything.
23   They had much to gain through their new network and through
24   these high net worth connections.  They weren't running, they
25   weren't obscuring, they weren't doing anything in some other

1    person's name.

2              At the end of the day, she wasn't really a credible

3    witness.  She gave us some doubts, they're reasonable, she

4    showed us some things about the government and being aided to

5    tell the truth.  And remember, if you have a doubt and it's

6    reasonable, you must acquit.

7              Caroline Boothe came to court.  Remember Caroline

8    Boothe?  She was the Chief of Staff for Congressperson Session,

9    then Congressperson Pete Sessions.  She had worked closely on

10   his reelection campaign doing fundraising, and she communicated

11   with Ms. Van Rensburg concerning these contributions.  She told

12   you her version of the interactions with Ms. Van Rensburg.  She

13   told you that she had taken a class in college on not law, but

14   on campaign finance, but that she was working on the job and

15   she learned about this stuff on the job by interacting with

16   other members of the Congressperson's staff and asking

17   questions.

18             Ironically, Pete Sessions was the most vocally opposed

19   person to cannabis reform in the entire House of

20   Representatives.  He was vehemently opposed to cannabis

21   legalization.  He was the stadium block to having any federal

22   legalization measure brought to a vote by our House of

23   Representatives.

24             Caroline Boothe told you that Harry Sergeant is a

25   wealthy businessperson and that he's involved in oil.  She knew

that.  She didn't think that GEP was a shell company based upon
her own observations.  That's page 873, lines 16 to 21.  She
said that Mr. Parnas was always kind to Ms. Boothe, a little
bit of an odd character, but always kind to Ms. Boothe.  She
didn't slur him and call him a bunch of names and look down on
him at the same time that you're reaching in his pocket like
Adam Laxalt did.

          She told you that Mr. Parnas asked questions
concerning donations.  That's 876.  She told you that she was
not aware of many of the questions that were being asked about
bundling these payments on one credit card, and she had to go
ask others, including a guy named Matt Garcia.  She just didn't
know.  Shy had no reason to believe anyone was breaking the
law.

          And she believed that Tommy Hicks and Roy Bailey and
Harry Sergeant were involved in gas companies.  That's page
891, lines 10 to 14, one of the scant few exhibits that we had
in evidence that we wanted to put in.  There is a picture with
Hicks and Bailey and Sergeant and Mr. Parnas seated at a table
giving the thumbs up, Mr. Fruman is there, Mr. Correia is
there.  Well, they're all involved in gas business, according
to Ms. Boothe, right?  What do you think they're talking about
at dinner?

          That contribution chart.  There is no evidence these
contributions were made.  I invite it.  Where is the evidence

1  that those contributions on the chart were actually made?

2  Where is the evidence that Mr. Parnas ever intended to or

3  agreed to make any contributions on the chart that Mr. Fruman

4  sent?

5          Again, there is this September 9th text that they

6  referred to in evidence from Mr. Fruman and Mr. Kukushkin about

7  what's important in expressing the clear intent to use the

8  first $500,000 to access to New York or New Jersey or the

9  second $500,000 to access the Nevada marijuana markets, but

10 there is absolutely no evidence that Mr. Fruman or Mr. Parnas

11 or anyone ever took a single step with the loan that Mr. Fruman

12 received from Mr. Muraviev to access New York or New Jersey or

13 Nevada, anywhere else.

14         Then there is this October 2nd, 2018 text, Mr. Fruman

15 to Mr. Kukushkin.  Remember this one?  We have to fork over a

16 check for 250 to him at the event.  Well, Mr. Fruman is talking

17 to Mr. Kukushkin about having to pay Adam Laxalt $250,000 at

18 some event.  Remember that one?  And that that's somehow,

19 according to the government, is evidence that this second wire

20 was also intended to cover contributions.  But remember, Adam

21 Laxalt said he never got that check from Mr. Fruman, he said he

22 would have remembered it, he said it was a lie if anyone said

23 it was true, and he told you again that he was completely

24 opposed to expanding cannabis legalization and never would have

25 aided their marijuana venture.

1    Now, Mr. Kukushkin texted Mr. Fruman on the 29th of

2   October that money was sent in accordance with the budget and

3   the meeting people and showing and believed to make sure what

4   Mr. Kukushkin believed about what Mr. Muraviev's money was

5   being used for, but it absolutely does not indicate what

6   Mr. Parnas or Mr. Fruman agreed to with Mr. Kukushkin.  There

7   was no agreement.

8    If you look at this, actual money flow in this case,

9   the actual money flow, you're going to see that the money from

10   Mr. Muraviev went into anything but future donations, anything

11   but.  Nor was his money spent on any donations that had been

12   agreed to before I show showed you this, right?  There was

13   nothing about any of that money being paid before these loans

14   occurred as part of some agreement, some promise, some belief

15   that there would be money coming from Mr. Muraviev, and the

16   Judge will instruct you, as I read to you previously, that is a

17   defense.

18    Importantly, that last October transfer — and we're

19   going to talk about the forensic accountant, Kimberly

20   Espinoza's testimony in a second — was not used to pay the

21   contributions that were made in November and paid in December

22   of 2018 to Adam Laxalt and Wes Duncan.  That money came from

23   other payors into the F.D. account, including but not limited

24   to the Strauss Coffee payor.  You saw those records.  She

25   talked to you about those records.  She prepared these

1   financial charts for us.  And forensic accountant Espinoza told

2   you that she looked through the bank records and the credit

3   card statements and the checks in the case, and in the end,

4   after looking at everything the government gave her to create

5   the charts, she, herself, had a doubt that any of the money

6   that was derived from those loans in September and October had

7   been used to pay off the Amex bill for the November 1st, 2018

8   contributions.  If you have a doubt and it's reasonable, you

9   must acquit.

10          She told you those contributions occurred 86 and 105

11  days previously when Mr. Parnas's June 6th and June 25th

12  contribution were 86 and 105 days before the first loan was

13  even made.

14          Now, when the contributions were made, there is no

15  evidence that Lev was going to pay a credit card bill with

16  funds from Intellect Capital loans or Nilder, whatever it is,

17  those two companies, to F.D. Export.  The loans were yet to be

18  negotiated and there couldn't be such an agreement.  The loans

19  were yet to be negotiated.  There couldn't be such an

20  agreement.

21          The government will point to some nebulous text of

22  6/2.  They'll say, oh, Mr. Kukushkin and Mr. Fruman talking, we

23  need Big Andrey.  That's not an agreement.  And furthermore,

24  that communication comes a month and a half before the

25  ten-and-a-half-minute phone call between Mr. Muraviev and

1    Mr. Fruman that the government absolutely has failed to

2    address.

3              At trial transcript 1066, she tells you, Ms. Espinoza,

4    I cannot say the source of the money to those two donations was

5    from the Nilder or the Intellect Capital loans.  Cannot say the

6    source of the money for those two donations.  She can't tell

7    you if that was the source of the money.  The FBI's forensic

8    accountant, the one that they call into this case to give

9    testimony can't even tell you.  That's a doubt, if ever there

10   was a doubt, and from a law enforcement witness, too.  Don't

11   you have a doubt?  Read the charts.  Reread her testimony.

12             Supervisory Special Agent Ellen Thomas confirmed

13   something to us that maybe we all knew, Mr. Parnas does not

14   have oil wells in his backyard.  He doesn't have a gas station

15   anywhere.  He doesn't have a pipeline running through the

16   front.

17             And would you ever have expected him to?  Would you?

18   Guess what?  His home looked like a home.  Mr. Parnas's home

19   looked like a home, not an office.  And the time he's been

20   traveling around the world, as you learned, traveling

21   everywhere, his home looked like a home, but it had a heck of a

22   lot of paper in it.  It had papers and there were phones and

23   there were computers and there was a safe there, too.  The FBI

24   found a safe.  Oh, my god, and then they called a locksmith who

25   cut it in half only to find nothing of evidentiary value.

1    But, of course, on the table, there was a document
2    that was propaganda from the Trump victory people urging
3    donations and raising funds, and, of course, stating yet
4    another different rule for donors, because all of these groups
5    have different donation rules.  A super PAC, a joint
6    fundraising committee, the victory campaign.  Well, did Lev
7    read it?  She didn't know.  Did he understand it?  She doesn't
8    know if he read it.  There is no evidence if he ever
9    contributed in violation of those terms to this Trump victory
10   group.
11       And furthermore, it was seized from his home after all
12   the events in this case had long transpired.  When was it
13   seized?  Not during this timeframe.  I submit to you it has
14   little or no probative value, and the government knows that.
15       Joe Ahearn, while he was the prosecution witness,
16   remember him, who they prepared to testify and offered immunity
17   to but then decided against calling as a witness?  He's one guy
18   that I called as a defense witness without ever having spoken
19   to him.  This is like on Star Trek, it's a blind probe, and
20   there is trouble with blind probes.
21       It was gritty, but we learned some important things.
22   Joe had worked on numerous political campaigns.  He was the
23   fundraising director of America First Action.  He had an
24   undergraduate degree from the University of Pennsylvania in
25   history; he had a graduate degree, a master's degree in

LALCpar4                        Summation - Mr. Bondy

1    government relations; he attended the legal programs on

2    campaign finance; and he had many years of experience in the

3    trenches, learning on the job.

4            He told you that a super PAC can accept different or

5    larger or even unlimited sums of money from certain entities,

6    millions and millions and millions of dollars a super PAC can

7    accept, and remember, that was the guy, the first fundraiser in

8    this case that Mr. Parnas had an interaction with, that guy.

9            He told you that Protect the House was something

10   different, it's a joint fundraising committee, and unlike a

11   super PAC, a contribution is limited to a finite amount which

12   could depend upon the year.

13           And he also told you that AFA had its very own

14   compliance group, right, called Bulldog.  He talked about

15   Bulldog.  And Bulldog vetted contributions.  And they did so

16   here, the contribution was accepted.  Their internal vetting

17   process and questions were never made known to Lev.  He didn't

18   even know.  This is a whole, like, they don't raise the red

19   flag thing, you just don't know?  But, ultimately, they took

20   the donation.

21           Now, Joe had told you that he met Lev at a Mar-a-Lago

22   presale event at some point prior to the 4/20 Mar-a-Lago event

23   with Pete Sessions.  It's great to have Pete Sessions at a 4/20

24   event at Mar-a-Lago, but that event was for individuals who

25   could either anchor an event with a larger contribution or

1   bring additional donors.  That's what he said under oath, 1126

2   to 1127.  Then he told you about meeting Lev Parnas the first

3   time at a Kevin McCarthy Protect the House event in about

4   February or so of 2018.  He couldn't tell you if that was

5   before the $325,000 pledge to America First, but $125,000

6   pledge had been made at that event to Protect the House.

7          At some point, Mr. Ahearn solicited and Mr. Parnas

8   made an $11,000 donation from the GEP account with bonafide

9   capital funds of GEP as a bonafide donation.  It allowed, and

10  Mr. Ahearn said this, that donation allowed Protect the House

11  to reach its goal of raising $12 million, right.  Mr. Parnas

12  got called upon, he put him over, 1129 to 1130.

13         Mr. Ahearn is also the witness who can confirm about

14  cannabis that he actually gave Mr. Parnas talking points to

15  bring to the president of the United States about marijuana

16  reform.  He told you he met Lev through a guy he worked for

17  named Steven Katz, a state assembly person in New York who had

18  some kind of CBD they call it, right, the nonpsychoactive, one

19  of the cannabinoids in cannabis, but Katz apparently had some

20  pet treat business with CBD in the pet treats that Lev was

21  interested in buying.  So he confirms to you that Mr. Parnas

22  had a longstanding real bonafide interest in cannabis.

23         He also confirms to you that he sent his boss, the

24  president of America First Action, Brian Walsh, a list of names

25  for a cannabis working group that included Lev Parnas.

1          Regarding levels of donors.  Your Honor, I know it's

2    1:00, I would like to finish if I could, but I leave it to the

3    Court's discretion.

4          THE COURT:  Are you all okay?  Can you put off lunch a

5    few more minutes?  Okay, you can go ahead.

6          MR. BONDY:  Thank you very much, ladies and gentlemen.

7          Joe told you that there was a designation for

8    contributors that would pledge over a million dollars.  He

9    doesn't recall if you call them specifically a VIP or not, but

10   he confirmed that, indeed, there was that pledge level, right,

11   and that those donors would have access like Lev did with that

12   4/30 event to special small dinners with the president.  And,

13   of course, when Lev attended that small event with the

14   president, Joe was concerned about giving Lev, as he put it,

15   quote, a couple of vague ways to ask about cannabis while

16   avoiding, quote, lobbying.

17         He also told you that it was his belief that Igor and

18   Lev were business partners, that GEP was an American company —

19   as it is — and the purpose of it was to provide natural gas to

20   eastern European countries.  Joe told you he knew Harry

21   Sergeant to be a Florida-based executive for an energy company,

22   right.  Another witness telling you Harry Sergeant, who

23   Mr. Parnas was tied to, was an executive at an energy company.

24   It's transcript page 1143.  He told you he didn't try to hide

25   his identity with Mr. Ahearn.  Mr. Ahearn told you it wasn't

1  often that he discussed the rules with the donors.  He doesn't

2  recall specific examples.  It depended upon the situations.

3  And, although he sent Lev forms a bunch of times, he never

4  would have reviewed them with him word for word.  Transcript,

5  1146.

6          He told you donors make mistakes.  He told you that

7  when a donor made a mistake, they didn't do anything because

8  there are safeguards in place with credit card companies, and,

9  if anything, the money is going to be refunded.  Transcript

10 1147 to 1148.

11         And when the FEC complaint came out, he told Lev what

12 he thought about the merits of the complaint, which, of course,

13 I did not get out of him.  I don't know what he thought about

14 the merits, but he told Lev about the merits.  And then,

15 although he didn't give an advice, he referred him to a lawyer.

16         He also made a couple of those introductions to gas

17 firms.  It's at page 1151 to 52 of the record, including a firm

18 that he believed was called Tellurian.  Again, he didn't advise

19 people about law or contribution limits.  He didn't do it.

20 That wasn't his job.  Page 1154.

21         His energy industry introductions, he told you he made

22 freely with no strings attached, there was no donation

23 required, there was no need to pay back, there was no need to

24 report back to him and tell him what had been done or anything.

25 He said, I don't know what happened because no one told me.

1    But he also conceded that there was no obligation of anything.

2    They were freely given connections.

3              Now, on cross examination of the witness that I called

4    who had been the government witness who had been immunized and

5    who had been prepared to testify for the government but not for

6    me, Mr. Roos stood up and asked if Mr. Parnas had dissuaded A1A

7    from accepting a donation from someone.  I think we saw it this

8    morning.  Joe Ahearn said the donation was not accepted because

9    Mr. Parnas warned Mr. Ahearn that this person was, quote,

10   connected to a foreign oligarch.  They put it up on the screen,

11   connected to a foreign oligarch, and then they clipped the

12   transcript.  Go read the next lines at 1165 to 1166, because

13   the government readily could have put in what they surely read.

14   When Mr. Ahearn was asked if Lev Parnas thought that the money

15   was probably foreign funds, talk about speculation.  What's

16   that, thought that the money was probably foreign funds?

17   Mr. Ahearn answered, I don't remember.  He doesn't know.

18             The other thing that Mr. Roos also did not ask

19   Mr. Ahearn was when did these conversations occur, was it after

20   November 1st of 2018, was it after any of the payments in this

21   case, was it long after any of the allegations in this case,

22   was it immediately before Mr. Parnas's arrest — we don't know

23   the timeframe whatsoever.

24             Now, when I sit down, counsel for Mr. Kukushkin will

25   stand up, and I'm sure on some level attempt to portray

1   Mr. Parnas as a con artist and a thief with whom his client had

2   no agreement, no meeting of the minds, that's what he'll say.

3   We agree there was no meeting of the minds and there was no

4   mutually understood agreement between the two, but not because

5   Mr. Parnas was some kind of con artist — an offense which, by

6   the way, is not a part of this case whatsoever.  Rather,

7   Mr. Parnas never intended to make illegal donations with money

8   from Mr. Muraviev, and the evidence showed you repeatedly, he

9   did not, never, not once.  They haven't proven it.  Just go ask

10  FBI forensic accounting analyst Kim Espinoza.  Remember, she

11  told you she had a doubt.

12          Now, they may tell you ifs and buts, but if they were

13  fruits and nuts, we'd all have a very merry holiday.  Put

14  another way, their dog don't hunt.

15          Because the prosecution bears the burden of proving a

16  human being beyond a reasonable doubt in this country, they

17  will have an opportunity when I sit down to deliver a rebuttal

18  summation to get the last word.  If the evidence is so

19  overwhelming in this case like they'd like you to think it is,

20  they don't need to get up, but if they do, as they speak, I'd

21  ask, be our advocates.  What would we say?  I can't respond to

22  him anymore.

23          On a higher level, as you go back and you deliberate,

24  the judge is going to give you instructions, and I would ask

25  that you try to be our voice, apply our defense to the

LALCpar4                    Summation - Mr. Bondy

1    evidence.  You'll see there are doubts.  Your job as jurors is

2    not to draw every sinister implication from the facts and say,

3    aha, we got you, you're bad, you're guilty.  That violates your

4    oath as a juror.  Find the doubt.

5          Proof beyond a reasonable doubt is the standard that's

6    got to be met before you find a person guilty in America.  And

7    the Judge will tell you what it means.  He'll instruct in

8    detail, but in short, it means proof of such a convincing

9    character, you would rely upon in making an important decision,

10   a very important decision in your own lives, a decision like,

11   is this the right person for me to be with forever, do I need a

12   second medical opinion, would this be a right place for my

13   elderly parents, should I relocate across the country to take

14   the job.  And when you look at it, you'll see there is no proof

15   of willfulness or knowledge to commit the offense as charged.

16         Again, there is no evidence that any money from a

17   foreign national was earmarked to pay the donations at the time

18   that they were made by Mr. Parnas in June.  There is

19   insufficient evidence that the two Fruman contributions made on

20   November 1st, 2018 were ultimately paid with funds from a

21   foreign national.  There is no material false statement in this

22   affidavit.  It was not read and it was not reviewed as it

23   should have been, and there is no intention to make a false

24   filing.

25         Well, who has been there to defend you when you needed

1    it?  Who have you defended when they needed you, a parent or a

2    child or a spouse or yourself.  I know too well that sometimes

3    people treat with you with a stigma or some kind of ostrichism

4    when you're the person accused.  Same thing if you defend

5    people.  Same thing, potentially, if you acquit people, find

6    them not guilty, particularly so in cases like this.  But we

7    know that you will rise above it and you're not going to let

8    anyone else's judgment get in the way of your work or the real

9    evidence in this case.

10        With that, I'm about to sit down, and as soon as I do,

11    I know I'm going to remember something I should have said to

12    you that I didn't say to you.  I really only have one more

13    thing in this case to give you, ladies and gentlemen, and

14    that's Lev.  He's a part of us.  He's a part of our connected

15    community.  We are all connected to each other.  We are all

16    interrelated to each other.  I couldn't think of a better time

17    to say that than today, his day of judgment.  To him, it's

18    awesome and it's full of dread.

19        And so here I am at the end of our argument, and I'm

20    now going to give you Lev, my client.  I'm going to sit down

21    and I'm going to ask of you, just please treat him fairly, take

22    care of him.  Thank you.

23        THE COURT:  Thank you, Mr. Bondy.  Is it okay if we

24    take a break for lunch at this point?  Folks, it's about 1:15,

25    and we'll start after lunch, a little after 2:00.  If you could

1    finish lunch in about 50 minutes, if possible, we'll try to

2    start about 2:05 or so, and then we'll resume with the closing

3    argument on behalf of Mr. Kukushkin, and then, finally, the

4    rebuttal closing argument by the government and then I will

5    instruct you on the law to apply in your deliberations.

6              I just want to remind you this last break and any

7    other break before I instruct the jury, you're still not

8    deliberating, so you should still not be discussing the case.

9    You will, after I instruct you on the law, finally have your

10   opportunity to discuss your case and deliberate.

11             So, we're going to break for lunch.  Have a good

12   lunch.  We'll be in recess for about 50 minutes.  Thanks,

13   everyone.

14             (Jury not present)

15             Who's doing the rebuttal?  Mr. Roos.  Anything to

16   discuss?

17             MR. LEFCOURT:  Your Honor, may I stay in the courtroom

18   over lunch?  I'd like to set up.

19             THE COURT:  Sure.

20             MR. LEFCOURT:  Thank you.

21             THE COURT:  Have a good lunch, everyone.  We'll be in

22   recess.

23             (Luncheon recess)

24

25

LALTPAR5                    Summation – Mr. Lefcourt

                           AFTERNOON SESSION

                              (2:10 p.m.)

            (Jury present)

            THE COURT:  Good afternoon, ladies and gentlemen.  All
the jurors are present and we'll proceed with the closing
argument on behalf of counsel for Mr. Kukushkin.

            Mr. Lefcourt.

            MR. LEFCOURT:  Good afternoon, ladies and gentlemen.

            Andrey Kukushkin is not guilty.  There's no evidence
that he intended to do anything illegal.

            Who is Andrey Kukushkin?  He is educated out of the
country, came to the U.S. in '93, naturalized six years later
in September of 1999.

            He's not registered to vote.  He never voted in a U.S.
election.  He never contributed to any political cause.  He has
no training or education in campaign finance laws.

            You've heard a lot about Andrey Muraviev.  We know he
was a Russian businessman and Andrey Kukushkin worked for him.
I'm going to give you an overview of a timeline here in this
case.

            Things at the bottom of the timeline is what
Mr. Kukushkin didn't know, things at the top is what he did.
So from February to July, Parnas and Fruman pursued their gas
company, liquid natural gas.  They made contributions and they
charge it to an AmEx card in June.  Unknown to Mr. Kukushkin.

1    In June, Mr. Kukushkin begins seeking investment in
2    Oasis.  The government didn't mention that.
3    In July, he has his first contact with Parnas.  He
4    didn't even know him in June when all those contributions were
5    made.
6    In July is the first discussion of an agreement to do
7    a cannabis business, a joint venture to get cannabis licenses.
8    In August, Kukushkin was pitching, still pitching
9    Oasis to David Correia.  Also in August, Parnas, Fruman and
10   Correia feign interest in Oasis, eyeing Muraviev's money.
11   In August, the Parnas and Fruman credit card debt has
12   rolled up to $495,000 on a card, unknown to Mr. Kukushkin.
13   In September, they have their first meeting in Las
14   Vegas.
15   In September, Kukushkin is left out of loan
16   discussions between Fruman and Muraviev.
17   Also in September, September 18, Muraviev loans Fruman
18   $500,000.
19   September 19, the very next day, Muraviev's money is
20   used to pay a three-month old credit card bill.  The credit
21   card was no longer working.  You'll hear about that.
22   In October, Fruman and Parnas and Correia create a
23   phony contribution list to tell Kukushkin and Muraviev how they
24   spent the first $500,000.
25   Also in October, Kukushkin is left out of the second

1    loan discussion between Muraviev and Fruman.

2              The loan of the second 500,000 comes in October, none

3    of it is used for any contributions.

4              November, November 1st, there are two $10,000

5    contributions.  It's not paid for with Muraviev's money.

6              In April 2019, Intellect Capital seeks confirmation of

7    the loan obligation.

8              And in 2020, Intellect Capital and Nilder Investments

9    sought repayment of the two loans.

10             That's an overview of everything.  But in 2018,

11   Mr. Kukushkin was trying to raise money for Oasis, you remember

12   the real estate firm with cannabis implications for

13   cultivation.

14             Here's a sample of the communications that Kukushkin

15   had with Fruman:  P.S., it would be help us a lot if Leva -- I

16   assume that's Lev -- and you would invest a minimal amount of

17   money in the friends and family round Oasis fund and I could

18   establish advisory board seats before we launch.

19             The government never mentioned Oasis, but that's been

20   going on since June.

21             Deanna Van Rensburg told you how Kukushkin paid for

22   Correia's travel to come out to look at the operation in

23   California.  And you remember Kukushkin sent a picture of an

24   Oasis Fund credit card and he says attached find corporate card

25   to be used for travel and lodging needs for David's trip.  It

was never mentioned by the government.  And that's what's going on since June.

Now Fruman pretended to be interested in Oasis because there's Muraviev down the road.  Kukushkin, at the time of the June contributions, hadn't even met Mr. Parnas.

This is the first meeting, it's by text, July 7, 2018. They're talking about football, thumbs up Parnas, and Kukushkin wants David's phone number.  Obviously, once he gets in touch with David, it comes to him coming out and looking at the Oasis operation.

So before Kukushkin ever meets Parnas, there's all these contributions, contributions that have nothing to do with the cannabis or joint venture about getting licenses, it always has to do with Global Energy Producers.

These are some of the receipts.  Every one of them you look at, Global Energy Producers, they were promoting this energy company with contributions, thinking if you made enough contributions you would be introduced to the right people.  One after another, it's all before Global Energy Producers.  It has nothing to do with Oasis, Muraviev, or Kukushkin.

And even in November 1st, 2000, two contributions of $10,000, Global Energy Producers, they're going to Republican candidates, who, by the way, are opposed to cannabis.  It's about Global Energy Producers.

So the campaign finance rules, we have been talking

1    about them a lot.  Why?  Because the government claims that

2    Kukushkin knew the campaign rules out of nowhere with no

3    evidence.  These rules are very complicated.  You heard from an

4    FEC official that his training was significant, was months,

5    daily.  He didn't know about campaign finance laws before he

6    started training, and still there are times when he has to seek

7    help.

8         Here's his testimony, Michael Hartsock.  Could you

9    tell us about that program?  Certainly.  It was about a two- to

10   three-month training program where we learned how to review

11   reports, what to look for, and of course, we are were trained

12   on the internal policies of the Federal Election Commission.

13   It was Monday through Friday.

14        And what about Adam Laxalt?  Here's somebody who was

15   the Attorney General of Nevada, the highest legal officer in

16   the state.  He is asked a question:  Would you agree that a

17   corporation that has foreign shareholders can still make a

18   $10,000 contribution to your campaign?  I'm not sure about

19   that.

20        I think it's an honest answer.  The rules are

21   complicated.

22        And you can have thousands of foreign shareholders

23   that are part of that company and the company still makes a

24   contribution to your campaign, no problem, right?

25        Honestly, I never addressed the issue, but I'm just

LALTPAR5                    Summation - Mr. Lefcourt

1   not sure.

2           The rules are complicated, and unless somebody tells

3   you the rules or explains them to you, or you read about them,

4   you don't know.

5           So because nobody ever waved a form in front of

6   Mr. Kukushkin, because he never made a contribution in his

7   life, he wouldn't have read a form.  Nobody explained a form.

8   There's no evidence of any of that.

9           This is a stipulation with the government:  There's no

10  record of Andrey Kukushkin having ever made a political

11  contribution or donation.  And by the way, Hartsock told you

12  it's easy using their computers to find out who made

13  contributions and to who.

14          And secondly, Andrey Kukushkin is not registered to

15  vote and there's no record of him having ever voted.  Also

16  something that could be established very easily.  So here's

17  somebody who is foreign to the process, and he's also from a

18  foreign country, and he's dealing a lot with a Russian

19  businessman.

20          So from February to June there's all these

21  contributions being made by Parnas and Fruman on behalf of

22  Global Energy, and in May and June, Kukushkin trying to get

23  investors into Oasis Fund and even into July and August.

24          So here's David Correia talking to Fruman.  Had a very

25  good phone call with Gerry Greenspoon.  Andrey -- and this

1    Greenspoon Marder are some of the top cannabis corporate

2    attorneys today on the West Coast -- everything went well.  We

3    scheduled a meeting in San Diego on Friday with them for a

4    face-to-face meeting to begin the process of the company

5    retaining Greenspoon Marder for legal services.  Andrey is

6    flying me out to be at the meeting and then to go up to San

7    Francisco with him Friday/Saturday for other meetings and to

8    see some of their operations.  Good things moving forward, and

9    now rather quickly.

10          That's what Kukushkin was doing, getting involved with

11   Greenspoon Marder, cannabis attorneys, in July and August,

12   still trying to raise money.

13          Now here's a conversation with Mr. Fruman,

14   Mr. Kukushkin in the top box it talking about Oasis teaser,

15   which is some promotional materials, then he says:  My size of

16   the relevant projects.  I am closing the investors' round.  I

17   left a seat for you on the board of detectors.  Fruman plays

18   along, but don't forget, they're in desperate need of money.

19          Fruman and Parnas send pictures about how connected

20   they are, how important they are, all to drive up the interest

21   in a joint venture, but most of all, to get money.

22          And here's an outline of the joint venture by

23   Mr. Kukushkin.  He says photos won't do on the left-hand side.

24   We'll create a managing LLC company, 50/50.  This is for a

25   joint venture to get licenses in the cannabis arena.  Parnas

1    and Fruman are holding themselves out as connected and experts.

2    And on the right side, the goals is to quickly take control of

3    a network of licenses for stores in California with real estate

4    to buy or lease long term.  And at the bottom, Andryuka's money

5    will be paid back first.  That's his idea of the joint venture.

6           Then later he's talking to David Correia about his

7    priorities, because Correia requests a list for the joint

8    venture of what your priorities are.  Correia:  I hope you had

9    a good rest of the weekend.  I'm back in Florida and available

10   this afternoon to discuss further the structure we spoke of on

11   Saturday.  I do need the comprehensive synopsis of all current

12   needs for the operation, as we mentioned.

13          By the way, none of this is mentioned by the

14   government in their opening.  None of it.  Because that's what

15   Kukushkin and Muraviev were focused on.  There's nothing to do

16   with June contributions when they didn't know they were going

17   on.

18          Correia is back at Kukushkin.  I had on my list today

19   review the proposal you were sending over.  And Kukushkin says

20   he wouldn't call it a proposal, rather a list of priorities for

21   the existing project and overall plan to join forces and open

22   new retail locations together.

23          This is an email, August 2nd, from Kukushkin to

24   Correia.  It's Defense Exhibit B1.  You should read what is on

25   Kukushkin's mind.  Let's look at some of it.  I strongly

LALTPAR5                    Summation - Mr. Lefcourt

1    suggest we use the equity opportunity ad hoc and engage our

2    lawyers to prepare application.  Then he says corporate

3    cannabis lawyer needed ASAP.  Cannabis attorney needed to apply

4    for business operating licenses.  In this email he quietly lays

5    out his need for legal advice, to do the right thing, to get

6    applications.

7              Then at the bottom with tax attorney.  That's what he

8    cares about, getting licenses the right way.

9              Correia sees an opportunity to go after the big bucks.

10   From Correia, he's going to retain GM, that's Greenspoon

11   Marder, for everything in California and Nevada.  Perfect

12   marriage.  I think we're in a great spot with them for

13   partnership and some other ideas I ran by Lev for big Andre,

14   too.  I'll let them discuss with you.  It's always been about

15   big Andre.

16             So here we are again back with Kukushkin and Fruman,

17   Kukushkin wants to know how you like the teaser for Russian

18   investors.  Laughs.  Fruman says great.  Fruman says we will

19   discuss.  Kukushkin is trying to raise money, then Fruman says

20   calls Saphira.  That's Saphira Galoob, who is a cannabis

21   lobbyist.

22             So how did they look at Kukushkin?  They looked at him

23   as unsophisticated, inexperienced, a rube, somebody they could

24   get over on.  And they were going after Muraviev, they wanted

25   to get Kukushkin out of the way.

1        This is the real conspiracy in this case.  Here's

2   Correia to Parnas:  Great opportunity with these guys since big

3   Andre is funding.  However, it is obvious I'm going to have to

4   spend more time on this than originally planned.  These guys

5   are not smart businessmen and the one issue I'm dealing with,

6   which began last night, is literally retarded.  I think Andrey

7   Kukushkin is a really good guy but needs a lot of hand holding

8   on some very easy issues.  This creates a great opportunity for

9   us because they need this help, but I'm not sure how to find

10  enough time along with everything else, et cetera.

11       This is what this case is about:  Get that money.  Why

12  would you want to be in a joint venture with someone who you

13  think is retarded, who is not a good businessman?  You

14  wouldn't.

15       In September, before the money -- the first loan

16  comes, Parnas and Fruman are desperate for money.  This is some

17  texts between them.

18          Igor:  Did the money arrive?

19          Steven:  Not yet.  Hopefully soon.

20          Steven:  Still didn't come.

21          Igor:  They need that money.

22       And what did Deanna Van Rensburg say about this

23  financial situation at that time for Fruman and Parnas?

24       At some point you were concerned that you couldn't pay

25  for your children's school, correct?

LALTPAR5                         Summation - Mr. Lefcourt

1              Yes, correct.

2              And you were concerned that you would have to move

3    back in with your parents?

4              Yes, correct.

5              There was a great deal of desperation about money at

6    that time, correct?

7              Yes, sir.

8              Would you constantly be asking Mr. Fruman and Parnas

9    will we get money today?

10             Yes, sir.

11             And you were texting them:  Will we get money today

12   regularly?

13             Yes, sir, I did.

14             And that two out of three accounts were negative, do

15   you remember saying that?

16             Yes, sir.

17             They were overdrawn in two accounts.  So would it be

18   fair to say everybody was desperate for money around there?

19   Yes.

20             That's the situation.  Desperate.

21             So Fruman calls Muraviev directly, ignoring Kukushkin,

22   always don't need him.  And Fruman convinces Muraviev to lend

23   $500,000.  There's a written agreement, legal agreement between

24   them, no evidence that there is any involvement whatsoever of

25   Kukushkin in that.

1          Their prayers are answered.  Look how they react when
2    the $500,000 loan comes in.  Finally.  Mr. Fruman with all of
3    his emojis, David Correia:  Excellent.  Lev Parnas:  Their
4    prayers are answered.  Correia:  Great work, great teamwork.
5    Indeed, great teamwork.
6          When the money comes in, Kukushkin finds out there's
7    money being transferred.  What does he say about it?  Do you
8    already know from where 500,000 be given to them, Sasha?  I
9    think it's necessary to transfer Greenspoon Marder to the trust
10   account.  He wants the lawyer's trust account to take care of
11   the money with clear directions.  It's not going to Global
12   Energy Group, it's going to their joint venture, but he doesn't
13   know.
14         So on September 18, the money is transferred, the very
15   next day the first loan money, $494,415.21.  That's on the
16   American Express card.  The card is no longer operable, you
17   heard Van Rensburg, they freeze the card.  This is months of
18   charges, including a lot of the June contributions that they
19   made, for Global Energy Producers.
20         These are some of the expenses on that card in various
21   things, luxury goods, clothing, jewelry, they are Global Energy
22   contributions, and expenses in June are on the card.  So the
23   500,000 was transferred for cannabis purposes but they
24   immediately took it and used it for personal things, to pay an
25   overdue bill, credit card.

1           Within a few weeks after September 18, transfer of the

2      $500,000 loan, they need more money and they're desperate

3      again.  This is what has gone on September 26 through

4      October 1st.

5           Van Rensburg:  Will we be getting money into this

6      account before the end of the week?

7           Fruman:  Yes.

8           Van Rensburg:  Hello?  Will we be getting money in

9      today?

10          Van Rensburg:  We are negative in two out of three

11     accounts.

12          Van Rensburg:  I hope you had a lovely weekend.  Will

13     we be getting money in today definitely?  Sorry could keep

14     pestering you about this.

15          MR. SCOTTEN:  Your Honor, objection.

16          THE COURT:  Hold on.

17          MR. SCOTTEN:  Actually, I think that was not in

18     evidence.  I think counsel just put something up that is

19     literally not in evidence.

20          MR. LEFCOURT:  I can't hear.

21          MR. SCOTTEN:  That is not in evidence.  I don't know

22     what that is.  I have been trying not to object but I think

23     we're literally not in evidence.

24          THE COURT:  Which exhibit did it refer to?

25          MR. LEFCOURT:  Defense Exhibit CR3.

1          May I continue, your Honor?  We could have a charge, a

2    limiting instruction if necessary.

3          THE COURT:  Okay, go ahead.

4          MR. LEFCOURT:  So what did they do with the first

5    $500,000 loan?  They spent it all on paying off their

6    experiences that they were desperate to deal with.  Nothing was

7    spent on the cannabis joint venture, nothing about licenses.

8          And Kukushkin and Muraviev want to know what happened

9    to the first 500.  Muraviev said we haven't spent the first 500

10   in accordance with the plan.  Let's move step by step.  He

11   doesn't know what they spent it on.  And Kukushkin says we need

12   to reserve a budget for company development to open the shops

13   and find the real estate.  This is very expensive part and it

14   cannot be ignored.  But this, most importantly at the bottom,

15   it would be good for us to see the results after the first 500

16   in order to keep sowing more.

17         What did you do with the first 500?  Parnas and Fruman

18   are desperate for money at that time and they are now being

19   questioned:  What did you do with the 500,000 for the benefit

20   of the joint venture?  They come up with a totally phony,

21   made-up, three-page document claiming that they used the money

22   for these contributions. Here's New Jersey, the highlighted,

23   they made a contribution on October 1 to Frank LoBiondo for

24   $50,000.  It's a total lie.  Never happened.  The government

25   has agreed that there were no donations during this period.

1           The bottom one, Peter Kilmartin, October 1st, 50,000.

2    Lie.  Never happened.  They came up with this to explain what

3    they did with the first 500 and it's all lies.

4           New York, Kirsten Gillibrand, 35,000, lie.

5           Keith Wofford, 30,000, lie.

6           Andrew Cuomo, Governor of New York on October 5,

7    $125,000.  It's a total lie, it never happened.  It's done to

8    try to get more money out of him and explain what they did with

9    the first 500,000.

10          And it goes on.  Florida, more lies on September 23rd,

11   Brian Mast, 15,000, never happened.  Rick Scott, 9/25, 100,000,

12   total lies.

13          Nevada, same thing.  Lies.

14          California, Kevin McCarthy, 125,000 on September 26.

15   It never happened.  It's a total lie.

16          This whole document, every word on it, is fabricated.

17   Fabricated, the government agrees, none of these contributions

18   were made on those dates.  Fabricated for one reason:  To get

19   money.  Lies.

20          Texas, Pete Sessions, 150,000.  No, no, never

21   happened.  Lies.

22          America First, didn't happen.

23          And you could see the stipulation with the government,

24   these were the contributions that were made.  Nothing in

25   September and October, it was all lies.

1          What about the second loan?  Kukushkin is trying to
2    get money for the cannabis business.  And the second loan, he
3    says it should probably go to our new company.  It doesn't.
4          Where does the second loan go?  $100,000 and the
5    second 500 goes directly to Fruman for personal stuff.
6          Global Energy Producers, a company Kukushkin and
7    Muraviev are totally not associated with, have nothing to do
8    with, they give $263,000.
9          They pay another American Express card bill, which by
10   the way, is full of the same old, their lives, how they're
11   living on somebody else's money, golfing, spas, restaurants,
12   private jets.  No contributions on this credit card, on this
13   money, on the credit card that they paid for 79,000.  And FD
14   Import and export gets 33,000, and then there's some East Coast
15   distributors, nothing goes to any contributions.
16         So the testimony of Kimberly Espinoza, after reviewing
17   all of those records:  You came to the conclusion that the
18   money was from the Strauss Coffee, correct?
19         Initially, yes, that's correct.
20         What's that about?  She's trying to figure out how the
21   two $10,000 on November 1st to Nevada politicians, whether it
22   was paid with that money, and she came to the conclusion it was
23   from money that came from Strauss Coffee.
24         And so question:  I have one final question for you,
25   Ms. Espinoza.  As you sit here today, you are unable to say

1  definitely what the source of the funds to pay the Laxalt and

2  Duncan contributions were, is that correct?

3          That's correct.

4          That's important because they claim that that money

5  was paid for the contribution, but she couldn't say that.

6          And when Kukushkin asked for travel, if you remember,

7  to go to Miami, they have already received all this money.

8  They of course refuse, maybe they don't have it, it goes in and

9  out so quick.

10         Fruman asks for another $2 million from Muraviev.

11  That's the end for them.  Muraviev is not going any further.

12  And obviously, it's turning into something else.

13         Kukushkin had no role in the money spent, the money

14  loaned.  It all is outside of him.  And Fruman and Parnas never

15  pay back the one million dollars.

16         So there's a conspiracy to do what?  What Kukushkin

17  and Muraviev wanted was a joint venture with the cannabis

18  business to get licenses across the country, to buy companies

19  with licenses, to get their licenses.  And what do we have?

20  Just ripped off.  There was no agreement to commit a crime.

21  Any agreement was for the cannabis business.  And obviously,

22  one party was totally pretending, pretending to be interested

23  in the cannabis business, pretending to be a partner when they

24  thought that the people they were dealing with weren't good

25  businessmen, were retarded.  It's all about a rip off.

1    Despite thousands and thousands of texts and emails

2    and whatever, all the pages, is there one conversation

3    involving Kukushkin with foreign nationals or about foreign

4    donations or about straw donations?  There's no conversation

5    about that.  It was not in his mind.

6    The goal was licenses, not contributions.  Even

7    Muraviev.  We were supposed to go to work on obtaining licenses

8    at these states.  And then he says:  Yesterday Igor told me

9    that two more million need to be allocated for other states.

10   It was not in our agreement.

11   Kukushkin:  You perfectly know that the ball is in

12   your court to continue with planned licensing.

13   There's no criminal agreement to make donations.  The

14   only reason donations were discussed was because of the phony

15   three-page document where they claim that's what they did with

16   the 500,000.

17   There's an actual legal loan agreement.  It's in

18   evidence.  And this is what the government and the defense

19   agreed about the outstanding loans:

20   In April, 2019, Intellect Capital (Cyprus) Limited

21   sought to confirm that FD Import & Export Corporation owed

22   Intellect Capital (Cyprus) Limited repayment of 500,000 with

23   interest.

24   And then the second bullet:  In March of 2020,

25   Intellect Capital (Cyprus) Limited and Nilder Investments

LALTPAR5                    Summation – Mr. Lefcourt

 1   Limited sought repayment of the one million dollars transferred

 2   to FD Import & Export Corporation bank account on September 17,

 3   2018 and October 12, 2018, respectively.

 4           They wanted their loans back, repaid.  It had nothing

 5   to do with a conspiracy to donate illegally.

 6           Andrey Kukushkin had no criminal intent whatsoever.

 7   He was trying to do the cannabis business.  He has no political

 8   experience.  He never made any donations.  No evidence he saw

 9   or read one of those forms which has information on it that one

10   could learn something.  No evidence he knew anything about

11   campaign finance rules, including foreign nationals or straw

12   donations.  There's no evidence he even know the contributions

13   were being made at the time they were made.

14           Again, he didn't meet Parnas until after June.  No

15   knowledge of this stuff.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1        MR. LEFCOURT:  And no evidence that he knew Muraviev's

2    money was used for his overdue June credit card bill that had

3    the contribution charges.  He thought the money was for

4    cannabis.  He wanted the money sent to an attorney's trust

5    account.

6            Now Parnas and Fruman represented themselves as

7    associated with the president, the president's lawyer, and all

8    these important people, and just like Van Rensburg, it looked

9    good on the surface, even though it was all baloney.

10           So let's talk about Russian Roots.

11           At the time of the formation of the joint venture

12   company, there was a discussion as to whether it should be a

13   C-corporation or an LLC.  Two different types of entities.  And

14   that's what's being discussed in this so called Russian Roots

15   email.

16           Mr. Kukushkin says, Moscow — which is where he was —

17   is beyond beautiful in September, whilst I'm catching up with

18   colleagues and investors.  Stephen did make a good argument

19   about personal liability protection under C-corporation

20   formation, which wasn't necessarily the case in certain states

21   under LLC, the other type.  I'm just confirming my

22   understanding, unless I missed some other purpose for it.

23   Please advise.  I believe what's left was for Igor, Lev to

24   establish who was going to be shareholders of the NewCo and

25   could we all use LLCs as our proxy in it.  Then he says I'm

LALCpar6                        Summation - Mr. Lefcourt

1    just trying to establish a core structure and how transparent

2    should Andrey be exposed for the benefits of NewCo

3    transparency.  His Russian roots and current political paranoia

4    about it.

5            So, on this email, the top, is John Sinadinos.  John

6    Sinadinos is his attorney, and you know that from Brad Hirsch's

7    testimony, who said he formed these entities for Kukushkin and

8    Muraviev, and that he was given those to take over the

9    representation of those entities by John Sinadinos's lawyer.

10   So he has this on the email.  This doesn't relate to anything

11   wrong or nefarious.  This relates to the political paranoia

12   that was going on at the time in September of 2018.

13           And we have a stipulation with the government about

14   that.  The investigation conducted by Special Counsel Robert

15   Mueller into Russian meddling in the 2016 election began in

16   2017 and continued through March 2019.  The investigation

17   garnered extensive media attention and, at times, daily

18   reporting.  It's easy to understand if you're a Russian when

19   press is bombarding every day about how Russians were meddling

20   and Russians were doing this.  Of course it's a concern.

21           The government argues some nefarious point about this?

22   It's what a normal businessperson would do to think about.

23   It's hard enough to get licenses.  A wealthy Russian

24   businessman being associated.  The goal was licenses.  Had

25   nothing to do with contributions.  This is about normal

1    concerns, political paranoia, nothing to do with donations.

2               And the same with Muraviev.  There is no -- he didn't

3    know anything about any of this.  He's a Russian businessman,

4    not even on that Russian Roots email.  No evidence he saw or

5    read the Daily Beast article, which talked about Trump's mega

6    donors.  The article never mentioned the word foreign, never

7    mentioned the word straw donor.  If he read it, if Kukushkin

8    read it, which there is no evidence of, there would be evidence

9    if it was something they were concerned about, they would text

10   about it, we would see the text.  It has no relevance.  It's

11   just something raised out of fulcrum.

12              And his board seat in some public marijuana company.

13   When was he made a board member?  What was his role?  I mean,

14   what does this have to do with this case?

15              Again, Parnas and Fruman appeared to be legit, they

16   had sent all these pictures.

17              So what is Kukushkin's knowledge?  You know parts of

18   it.  What's in his head?  Licenses.  That's what's in his head.

19   His cannabis business, trying to grow it.

20              What else?  He had no knowledge of what Parnas and

21   Fruman were up to, taking money for one purpose and using it

22   for some other purpose.

23              He had no knowledge that contributions were made in

24   June.  The contributions he was told about was that phoney

25   three-page statement in order to get more money, a list of

LALCpar6                    Summation - Mr. Lefcourt

1    contributions that were false and never made.  Again, nothing

2    about campaign finance rules, no evidence that he ever

3    discussed them, no one he knew knew anything about it.  That's

4    the state of what his knowledge is.

5              There is not a doubt, there is overwhelming doubts.

6    You just think about all these issues.  It's Kukushkin, who

7    repeatedly asked for lawyers, wanting lawyers on emails,

8    wanting money sent to lawyers.  Reasonable doubt.

9              Kukushkin had thought the money for the cannabis

10   business.  Reasonable doubt.  Didn't know it was being used for

11   anything else.

12             Was this a big fraud?  Was there ever a meeting in the

13   minds?  Reasonable doubt.

14             Nothing about the campaign finance rules, not a single

15   statement.  Reasonable doubt.

16             Parnas and Fruman, very politically connected, it

17   looked good on the surface, it looked good that there could be

18   a joint venture to help get licenses across the country.

19   Reasonable doubt.  On and on.

20             Each and every one of you has taken a solemn oath to

21   do this work in the right way.  This is not about guesswork,

22   it's not about speculation, it's not about, oh, I think it's

23   probably true.  No, it's proof beyond a reasonable doubt, and

24   there just isn't any.  The evidence is totally insufficient.

25   Reasonable doubt.  It's like saying not proven.  That's what

1    this case is, not proven.

2         Thank you.

3         THE COURT:  Thank you, Mr. Lefcourt.  Do you want to

4    take a break or do you want to --

5         MR. SCOTTEN:  I think given the nonevidence issues, a

6    slight break might be in order, your Honor.

7         THE COURT:  Why don't we take a five-minute break,

8    folks.  Please leave your notepads on your chairs and we'll

9    resume with the final closing argument when you come back.

10   We'll be in recess for five minutes.

11        (Jury not present)

12        THE COURT:  You may be seated.  So I think it's

13   correct that DXCR3 is not in evidence; is that right?

14        MS. FRIEDMAN:  You are correct, your Honor.  What

15   happened was Mr. Lefcourt cross examined Ms. Van Rensburg with

16   it, she said every single thing that was in there, and as a

17   result, he actually never offered it.  But it's almost word for

18   word consistent with the testimony that she provided in this

19   case and therefore there is absolutely no prejudice.  I mean,

20   it's literally exactly consistent with her testimony.  And I

21   believe that's the testimony that Mr. Lefcourt presented to the

22   jury, question by question, during the Power Point

23   presentation.

24        THE COURT:  Was it actually quoting testimony?  It was

25   actually lifted apiece of the exhibit incorrectly, right.

1            MS. FRIEDMAN:  Exactly.  The quotes from the testimony

2     were also included in the presentation.  I can give your Honor

3     a page number from the testimony.  It's exactly the same

4     testimony.

5            MR. LEFCOURT:  I believe what happened, your Honor, is

6     I had the exhibit in front of me and I asked her those very

7     questions and she gave it all to me and I didn't move the

8     exhibit in, but it's identical to what the transcript is.

9            MR. SCOTTEN:  That is not even kind of the rules.

10    Among other things, that witness's credibility was attacked.

11    The government would love to say, oh, we're just going to put

12    in a bunch of exhibits because we can get a witness to testify

13    to the same thing, right, an exhibit, a text, something

14    contemporaneous has far greater force.

15            I should also note, also in the defense closing not in

16    evidence, Government Exhibit 136.  Also, in its closing, not in

17    evidence, was a statement as to who Saphira Galoob was.  There

18    was no dispute on that, it's just they kept trying to get it

19    in, they kept asking questions, nobody knew, so it's not in

20    evidence.

21            MS. FRIEDMAN:  I'm sorry, your Honor -- Russian Roots

22    email --

23            THE COURT:  Sorry?

24            MS. FLODR:  The government didn't offer the Russian

25    Roots email?  They talked about it in their --

1          MR. SCOTTEN:  No, we offered 137, which was actually

2     the more complete version.

3          THE COURT:  So 136 is a subset of 137?

4          MR. SCOTTEN:  Correct.

5          MS. FRIEDMAN:  Yes.

6          MR. SCOTTEN:  Well, look, we're not going to get any

7     remedy because we're the government.  It's just how it is.  And

8     I'll note throughout his closing, as forecast, Mr. Lefcourt

9     argued this is how it is -- I counted four times, this is how

10    it is.  This is what's happening with exhibits that the Court

11    admitted solely for effect on the listener.  I'm not actually

12    sure what point to make, other than Mr. Roos needs a little

13    more time to prepare, but this was exactly the abuse that was

14    forecast.

15         I am reminded of another cranky AUSA who once told a

16    defense attorney, look at the floor, do you see the carpet,

17    that means you're in federal court.  This shouldn't happen

18    here.  That was not an appropriate presentation.  I guess we'll

19    just take five more minutes and hope the jury doesn't get

20    confused about it.

21         THE COURT:  You're not asking me to say anything at

22    this point?

23         MR. SCOTTEN:  I mean, we'll think about it, your

24    Honor, real quickly, but I don't want to call more attention to

25    it.  We'll just point out that he was making stuff up.

1        THE COURT:  Okay.

2        MR. LEFCOURT:  What exactly did I make up?

3        THE COURT:  I'm not going to get into it now --

4        MR. SCOTTEN:  Actually, that is a good point.  One

5   thing we do want to think about is, again, as everyone said

6   would not happen, we just saw an attempted advice of counsel

7   defense.  You can't say, look, he is trying to do the right

8   thing, look at all the lawyers he's reaching out to.  That's an

9   advice of counsel defense.  So we might think briefly of an

10  instruction on that.  The Court said -- and it was the first

11  time I saw a court be this generous, well, you can talk about

12  lawyers in the background.  He went beyond that and said, look,

13  he's trying to do the right thing, look at these lawyers he's

14  reaching out to with no effort, no effort to make out the

15  elements of an advice of counsel defense and no disclosure of

16  whatever attorney-client advice he supposedly relied on, which

17  is a necessary component of an advice of counsel defense.

18       THE COURT:  Well, I mean, I did allow the fact that

19  lawyers are on communications as to the extent it could be

20  probative of someone not doing something they felt was criminal

21  because they presumably wouldn't have lawyers around, not for

22  advice of counsel, and it's a subtle distinction, but I don't

23  think he crossed that line.  So I'm not going to do anything

24  with the advice of counsel.  But Mr. Roos will be able to

25  respond to the other points.

LALCpar6                    Summation - Mr. Roos

1          MS. FRIEDMAN:  Your Honor, with respect to the
2     exhibit, it's transcript pages 808, lines 14 to 23, and 809,
3     line 1 through 4.
4          THE COURT:  All right.  Thank you.  I'll be back in a
5     couple minutes.
6          (Recess)
7          THE COURT:  Shall we bring in the jury?
8          MR. SCOTTEN:  Yes, your Honor.
9          MR. BONDY:  Yes.
10          THE COURT:  The jury will be brought back into the
11     courtroom.
12          (Jury present)
13          THE COURT:  Please be seated.  Good afternoon, ladies
14     and gentlemen.  We'll now have the rebuttal closing argument of
15     the government.  Mr. Roos.
16          MR. ROOS:  Thank you, your Honor.  Good afternoon,
17     everyone.  I'm the last lawyer you're going to hear from today,
18     or ever in this trial.
19          The defense spoke for maybe three hours and you've
20     heard a lot of arguments.  They spoke with passion, they spoke
21     with outrage sometimes, they had some beautiful slides,
22     beautiful timelines, none of which is actually evidence, but
23     they showed it to you and they're a committed advocate to their
24     client.
25          I want to make something clear, just because someone

1   speaks loudly, just because someone has a nice slide deck, a

2   timeline, that doesn't mean that's evidence.  Those are

3   arguments.  What you're going to focus on when you go back into

4   the jury room, that's evidence.  That's what matters, that's

5   what the truth will be based on, and so evaluate the evidence.

6           Also, think critically about the lawyer arguments,

7   think about what they said, think about what they didn't say.

8   The defense, they have no burden to put on any sort of

9   arguments at this trial, but when they do make arguments, you

10  should test those arguments, you should evaluate them.  Do they

11  stack up to the evidence.

12          Here, you're going to see two things.  They're not

13  consistent with the evidence, and there is also a lot of

14  evidence out there that they just didn't talk about.  So let's

15  go through it, let's get into it, let's start doing some work.

16          There are two questions, it's interesting, both

17  defense attorneys raised a question in the middle of their

18  summations maybe two-thirds of the way through, and I want to

19  talk about them.

20          One of the defense attorneys said, is there a

21  conversation about a foreign donation, and the other one said,

22  it has nothing to do with foreign nations, is there any

23  evidence of that.  And so, maybe that's really the question.

24  That, of course, is the conspiracy question, is this about an

25  illegal agreement to make donations.  And I don't have a

1    timeline, but I do have one slide, it's not very fancy, but

2    Ms. Drescher, could we have it.

3            So here it is.  This is the evidence, folks, about

4    what this was all about, was about making donations.  This is

5    the evidence that's enough to convict these two men, these two

6    defendants for conspiracy to commit the violations alleged in

7    Count One of the indictment.

8            Because, what are they talking about here?  One

9    million to fund our future enterprises, they're talking about

10   500 for donations in these states.  One million to Lev and

11   Igor's company to cover all the contributions as planned, to

12   cover all the donations whatsoever.  These are indeed four

13   donations from us.  The money transferred by Andrey to Global

14   Energy was to support the very specific people and states per

15   Igor's table.

16           This is the evidence.  Let's talk about the arguments.

17           Start your deliberations with Count One, not because

18   it's first, but because it's something you can render a guilty

19   verdict quickly and move on, because the defense arguments you

20   heard, they're not responsive to Count One.  Count One requires

21   you to find that there was agreement to make foreign donations.

22   That's it.  An agreement.

23           MR. LEFCOURT:  Objection.  That's not it.

24           THE COURT:  I'll explain in detail what all the

25   elements are.

1    MR. ROOS:  And you should listen to Judge Oetken's

2    instructions.  But Count One requires you to find there was an

3    agreement that they all joined and they took some act, and the

4    agreement here, as you can see on this slide, was to make

5    donations.  And there is tons of evidence of that.  Mr. Scotten

6    walked you through it.  I'm not going to go through it again.

7    But there is ample evidence that says that this was about

8    making donations.

9           And they're pretty literal about it.  It's not nuance.

10   It's fairly explicit and it's all in the messages they

11   exchanged.  So keep that in mind.  It doesn't matter whether or

12   not the contributions were reimbursed, it doesn't matter

13   whether or not the money was actually traceable to the November

14   1's, it doesn't matter if it was another Oasis business going

15   on.  What matters is whether there was an agreement, whether

16   Andrey Kukushkin and Andrey Muraviev said we're going to give

17   money to fund a bunch of donations --

18          MR. LEFCOURT:  He can't leave out the rest.  It's just

19   improper.

20          THE COURT:  Again, arguments of the lawyers are not

21   evidence and they are not my legal instructions.  They can

22   summarize my legal instructions, but I will give in detail the

23   legal instructions.

24          MR. LEFCOURT:  He can't give incorrect legal

25   instructions.

 1              MR. ROOS:  I'm not talking about the legal

 2     instructions.  You should follow Judge Oetken's instruction of

 3     the law.  I'm talking about the facts here, and the facts are

 4     that there was an agreement between these individuals to make

 5     these donations with foreign money.

 6              So, now let's talk about some of the defense

 7     arguments.

 8              Now, if Mr. Lefcourt is to be believed, his client,

 9     Andrey Kukushkin, must be a really unlucky guy.  Poor Andrey

10     Kukushkin, apparently just wanted to start a business called

11     Oasis that none of us had really heard anything about until the

12     closing arguments, and when he said in June, Andrey will

13     support in dollars, he actually meant the opposite, apparently,

14     and there must have been some sort of understanding.  And when

15     he said there will be a bunch of joint activities, he actually

16     meant something else and he was just pretending.

17              Of course, when they all went to Las Vegas in

18     September, Andrey Muraviev and Andrey Kukushkin and Lev Parnas,

19     well, that was just a total coincidence.  And of course when

20     they happened to do these loan agreements, well, those had

21     nothing to do with anything and those were private agreements

22     to fund something totally different and those totally unrelated

23     loan agreements corresponded with some of these conversations.

24     Those, of course, apparently had nothing do with donations.

25     And then, when those donations were made to the very specific

1  people on some of these charts, that, of course, also had

2  nothing to do with anything.

3          Folks, these are some of the premises you need to

4  believe, you need to understand in order to buy the defense

5  argument.  And it doesn't really stack up.  It's not a total

6  coincidence, it's not a series of unfortunate, unlucky events

7  here.  You should not accept this story.  It's not what

8  happened.

9          Here's a few questions to think about.  If the emails

10 and the text messages were actually about a different business

11 run by Kukushkin, why are there so many messages saying Andrey

12 Muraviev is paying.  Wouldn't it be the other way around where

13 they would want Fruman and Parnas to be paying?  If Andrey

14 Kukushkin wasn't conspiring to donate Muraviev's money, why is

15 he in so many text messages talking about donations, giving

16 people Igor's table, funding all their planned endeavors.  If

17 the $1 million that's sent over with these loan agreements was

18 actually for personal expenses, why is Kukushkin involved?  Why

19 was he talking to Fruman saying things like let's use the old

20 scheme to wire the money.  Why was he commenting that they were

21 doing too many contributions, that their contributions were too

22 high, why was he demanding 10 percent of the donation money to

23 be used for travel expenses?  The reason donations and

24 contributions keep coming up and everything is because that's

25 what the scheme was about.  That's what was going on here.

1          So while you heard a discussion about Oasis, it's not

2    really something for you to decide.  It's a distraction.  It's

3    a different story that defense counsel wants to advance to you

4    for the first time.  But the core evidence is that they were

5    making contributions, that they had an agreement to have the

6    money cover donations, and that's sort of what's most important

7    in this case, that's the essential fact here for the agreement,

8    is what the purpose of the money was, not whether the donations

9    were ultimately made, not whether there was an agreement to

10   reimburse, but what was behind the agreement.

11         So, I wanted to say one other thing about some of the

12   defense arguments here.  There is a little bit of an

13   inconsistency, also, which is something you should keep in mind

14   when you're evaluating these.

15         So Mr. Lefcourt told you that Muraviev made a private

16   loan, it didn't have anything to do with political donations,

17   but he also told you that Muraviev and Kukushkin were victims

18   of a fraud.  So think about that.  How can you swear those two

19   things?  How can it be both the money, the million dollars

20   that's wired wasn't intended for donations, and yet these

21   people were also defrauded when some of the money was used for

22   some other donations?  That doesn't make sense.

23         There is also a conflict between some of the arguments

24   made by defense counsel.  Parnas says the money was something

25   for totally personal reasons.  Kukushkin says it's for Oasis,

1    right.  Their stories are not the same.  Again, the conflict

2    there tells you something.  These inconsistencies emerge when

3    it's not the true story and it's not consistent with the

4    evidence.

5         Now, folks, there has been a lot of talk about

6    campaign finance laws, right.  You've heard questions from

7    defense counsel about all sorts of things.  Can foreign

8    shareholders donate money, what about minors, and that was

9    deliberate.  Defense counsel has focused a lot of their

10   arguments on just how complicated the campaign finance laws

11   are.  And you remember this shtick with every witness they go

12   through, don't you need so much training, isn't it so

13   difficult, how can you ever figure any of this out.  If you ask

14   some of these witnesses like Mr. Hartsock, he'll say, yes, it's

15   complex.  Some of these things are difficult, they're complex,

16   I needed training.  But listen, this is Mr. Hartsock's job.

17        Let me give you an example.  Say you go to a

18   university, you find a math professor and you say, is math

19   complex?  The guy is going to be like, yeah, I teach college

20   math, math is really complex.  But here's another thing, you

21   say to him, what's two plus two, and he'd say, oh, well that's

22   four.  And everyone can figure that out, two plus two is four.

23   It doesn't require you to be a math professor.

24        The point here is there is some very basic rules.  Use

25   your own money, can't be money from a foreign donor, it's on

1    every form, we heard testimony from various fundraisers and

2    witnesses that this was sort of obvious and well known.  We

3    heard testimony that Lev Parnas spoke to Joseph Ahearn about

4    how somebody else was potentially a foreign donor.  It's so

5    obvious to everyone that, many times, it's just sort of

6    understood, and that's because these are relatively simple

7    rules.  There are more complex rules, certainly, but that's not

8    what's at issue in this case.  When you think about these

9    arguments, think about what the actual evidence shows.

10            So I want to make a few points about that.  There is

11   overwhelming evidence that Lev Parnas knows the rules.  He's on

12   the president, the President of the United States' fundraising

13   committee.  He got an email talking to him about how he was on

14   the committee, and they got the document that was in his house

15   that lays out the rules.  It says all these things are a

16   violation, there is an affirmation on there that he has to

17   sign.  He's getting all these forms, there is like 15 of these

18   forms in evidence that talk about, this is what you need to do

19   in order to donate, you have to click the box or you have to

20   affirm or you have to initial.  And you heard testimony about

21   how he did all that, he got these documents, you saw the

22   emails, the text messages where they're being sent to him where

23   he gets the website, where he gets the form.  So there is ample

24   evidence.

25            There is also evidence that Lev Parnas was exchanging

1    news articles about how various people were being arrested or

2    indicted about the very similar campaign finance violations.

3    There is really no question about this.  And he's talking to

4    Andrey Kukushkin.  They are communicating about the donations.

5    Andrey Kukushkin has the very article, this Daily Beast article

6    about the complaint against Lev Parnas.  He sends it to Andrey

7    Muraviev.  And he says in that very article, it describes the

8    rules, right, it describes the violation that Lev Parnas has

9    been hit with.

10          And I want to correct something Mr. Lefcourt said.

11   Mr. Lefcourt said there is no evidence that Andrey Muraviev

12   ever saw that.  That's absolutely not true.  The very text

13   messages is Andrey Kukushkin texting Andrey Muraviev the Daily

14   Beast article that says, Lev Parnas's company has been hit with

15   an FEC complainant and here are the rules, and it's the same

16   rules that he has violated that he is guilty of violating here,

17   so they knew.

18          How else do you know?  Well, sometimes, you're going

19   to hear this from Judge Oetken, actions speak louder than

20   words.  So let's look at some of the actions here.

21          If no one knew, why weren't the donations just in

22   Andrey Muraviev's name?  If no one knew, why did they have

23   these sort of weird, circuitous loan agreements where the money

24   goes through foreign bank accounts and Igor Fruman says to

25   Andrey Kukushkin, let's use the old scheme.  If no one knew,

1    why is Andrey Muraviev sort of kept behind the veil, not on the

2    corporate paperwork, not invited to the donor events.  He's on

3    Lev Parnas's invite for a family celebration, but he's not on

4    the donor lists for the very donor events that Lev Parnas is

5    hosting.  The reason is because these guys know the rules.

6    They know what's going on.  They're not total rubes like

7    defense counsel would have you believe.  And you know that both

8    because they are sent the documents, they are sent the rules,

9    they have the knowledge, and from their own actions, we can see

10   what they're doing.

11             I want to make one other correction while we're on the

12   subject.  Mr. Bondy made a comment about Joseph Ahearn and he

13   said go through the Emmanuel Greenspan testimony.  This is the

14   part where Lev Parnas said to Joseph Ahearn, hey, this guy,

15   don't touch him because I think he's linked to an oligarch, and

16   also, his money is probably foreign funds.  And Mr. Bondy said

17   that the transcript says, I don't remember.  Take a look at the

18   transcript.  That's actually not what it says.  It says, I

19   don't remember specifically, but that sounds right.  Ms. Parnas

20   was warning Joseph Ahearn that this was a donor he shouldn't

21   touch.  And we know from Joseph Ahearn's actions that he did

22   not touch him then because Parnas gave the warning, Parnas knew

23   the rules.

24             By the way, on the subject of knowledge, there is also

25   this argument that, somehow, Lev Parnas didn't know this guy

1   was Russian.  I want to make a very brief point about this for

2   two reasons.  First of all, there is overwhelming reasons that

3   he did.  He spent time with him in Las Vegas, he's around him,

4   he chatted with him in Russian.  He asked Muraviev and

5   Kukushkin in one of the text messages, when you are you coming

6   back to the United States.  He helped one of Muraviev's

7   girlfriends get a visa.  Remember when we saw this when

8   Madeline Garcia was on the stand, he's texting, oh, let me see

9   if I can help your girlfriend get the visa, and at the same

10  time, Muraviev says, my son and I got one.  It's not an issue

11  that should hold you up.

12        But I mention it for another reason, and that's

13  because defense counsel have advanced these various different

14  arguments, so many different arguments they didn't know he was

15  Russian, they didn't know this, they don't know that, you don't

16  know if he was using a translation app or not.  Many of these

17  arguments have no basis in evidence, and the reason they're

18  being made to you is to distract you, to make your

19  deliberations more difficult.

20        I want to tell you something about those deliberations

21  right now.  Many of the counts should be very easy.  Count One

22  is the conspiracy count, I've already said something about

23  that.  It doesn't require for you to find that the funds trace

24  up.  It doesn't require that you find that the money was

25  actually reimbursed for the June donations.  It just requires

that there be an agreement that they willfully joined and that
there was a step in that direction, that is wiring the money.

There are other points, there are other counts
similarly where the evidence is crystal clear.  Count two,
Parnas is charged with soliciting, that is asking for the
million dollars.  You'll notice Mr. Bondy spent very little
time talking about that, and that's because the evidence is
very clear.  It doesn't matter if a donation was made.  It's
whether he asked Andrey Muraviev for a million dollars, and you
know that to be true.

Let's skip over Count Three for a second.

Count Four, what does the evidence show?  There is no
question that it was Igor Fruman's loan money, right.  It's
just whether Global Energy is real, you know, what was going
on, but they never disclosed, hey, this is Igor Fruman's loan
money.

Another thing on Count Four, and this is very
important, Mr. Bondy never said anything about that $11,000
donation.  There is no dispute apparently in the case that that
money was not Lev Parnas's and that it was given in Lev
Parnas's name.  Same thing for the $2,700 to Pete Sessions.
Seemingly no dispute that that was Igor Fruman's money donated
in Lev Parnas's name.

So keep that in mind as you're evaluating the
arguments.  Many distractions, many things are just omitted

1    because they're unhelpful to the defense case.

2              I said I was going to come back to Count Three.

3              Count Three is making a donation or aiding and

4    abetting a donation by a foreign national.  On this, there had

5    been a few arguments about what you can trace.  Is there really

6    $25,000?  So let me say something about the two sets of money.

7              Let's start with the money that is donated before the

8    first wire.  So Kukushkin is in Miami in late May, he sees

9    Fruman and Parnas.  On his way out of town, he thanks them for

10   their hospitality.  A few days later, he makes them a promise,

11   Andrey will fund with dollars.  And from that point forward,

12   Fruman and Parnas make a lot of donations.  And they did that

13   because they have an agreement.  Maybe not even an agreement at

14   this point, they have a promise, and that's what really

15   matters, right, they have a promise of reimbursement.

16             And let's take a look at that promise.  Ms. Drescher,

17   could we look at Government Exhibit 58-A-84-T.  And look at the

18   middle chat, folks.  We need to clearly understand what our

19   status is today.  We handed out a lot, we did a lot, and we

20   took on even more responsibilities to do before November 6.  We

21   had no doubt that the funds would come according to the set

22   schedule.

23             So, they had always planned that some money was going

24   to be laid out, right.  As soon as they met in June, they then

25   start making these bunches of donations.  They make them to

1   important people in this venture, to DeSantis, who later

2   becomes a very important person in their plan to get licenses

3   in Florida.  We can take this down.  And so it's no surprise

4   when the bill becomes due, right.  And this is important

5   because those donations from June and July, they're about

6   $136,000.  So that's enough to find the $25,000 threshold.

7           But there is also the later contributions.  Before I

8   get there, I want to say something.  Mr. Lefcourt kept telling

9   you, these guys never met until August, right.

10          MR. BONDY:  July.

11          MR. ROOS:  July.  Here's the deal, not true.  Here's

12  how you know.  There is a text message that says — and

13  Mr. Scotten talked about it — where Andrey Kukushkin says to

14  Igor Fruman, the only people I recognize are you, Donald —

15  Trump — and Lev.  And what does that tell you?  That means they

16  met before.  They met when he was in Miami in June.

17          Here it is.  And so you know, you know there is an

18  earlier meeting.  You know there is a promise at this point to

19  make donations.  We know it because Igor Fruman says it not

20  once, but twice.  He sends that text message, that WhatsApp to

21  the whole group, he repeats it.  So there is a commitment to

22  refund these past donations.

23          What did Kim Espinoza show you?  She showed you once

24  the money came in, it immediately went to pay that credit card

25  bill.  And sure, it's got a lot of other stuff on there, no one

1    is disputing that, but it has $136,000 in donations which is

2    consistent with the promise and agreement that was made

3    earlier.

4         Let me say something else with the later

5    contributions.  Kim Espinoza very candidly said to you, I can't

6    trace a linear line, one to two, between the second $500,000

7    wire and Adam Laxalt and Wes Duncan.  But the finances are not

8    the only evidence in this case.  There is also the text

9    messages, and we saw the messages that said the intention here

10   for the second wire is to fund people, like in Nevada.

11   Mr. Scotten walked you through all of that.  Kim Espinoza never

12   saw those messages.  So just because she can't trace the money

13   from A to B, that doesn't mean it wasn't the benefit of the

14   defendants' work.  It doesn't mean it didn't go to their

15   efforts to make donations.

16        Let me give you like a straightforward example of

17   this.  It's your birthday, someone gives you a $50 bill and a

18   card and says, take yourself out to a nice meal.  You slip the

19   $50 bill into your wallet because you're in the middle of doing

20   jury service on a trial and you don't have time to go out to

21   dinner.  It's with the rest of your cash, it gets mixed in.

22   Two weeks later, jury service is over and you go out to dinner.

23   You charge it on your credit card and you send your friend a

24   photo from the dinner thanking them for the present.  No one

25   would say, well, hey, your friend, they didn't pay for that

1   dinner because you used the credit card, right.  We all know

2   that in our everyday lives, money is what we call -- what the

3   forensic accountant called fungible.  Just because there is not

4   a one-to-one tracing, that doesn't mean that's not the intent.

5   When you look for the intent, look to the messages.  You don't

6   need a forensic accountant to tell you what the intent is.  The

7   messages and your own common sense will tell you that.

8          I'm getting close to the end, folks.  I want to talk

9   about a few other sort of dribs and drabs, things here and

10  there.

11         So one, Mr. Bondy made a lot out of this August phone

12  call.  What do we make of this?  It was a Government Exhibit.

13  It's one in a series of phone calls.  Now Mr. Bondy said this

14  is some sort of turning point because this is when this private

15  loan is apparently hatched.  Now, there is no evidence of that,

16  and it's also inconsistent with all the other messages out

17  there with all the other evidence about how they were planning

18  to make donations.  Every single message, it was the first five

19  hundred, second five hundred, four donations.  Don't have to

20  speculate.  You'll have the texts, they'll be available to you,

21  they'll go right back with you when you begin to deliberate.

22         You also heard from both defense counsel sort of a

23  question, why would they be donating to the people they were

24  donating to if this was about cannabis?  There is really two

25  reasons that we can see from the evidence.  One is you support

1    the guys who you think are going to win.  People pick winners.

2    So if you're in Nevada or you're in Florida, you think the two

3    republican candidates were going to win, and they were 50

4    percent right, you want to get behind the person who you think

5    is going to win.  And we saw that evidence in Florida where

6    they, after hosting an event for Ron DeSantis, Ron DeSantis

7    said we own Florida now.  And when the election happens, all of

8    them are on a text chain and they're texting and saying,

9    congratulations.  Andrey Muraviev texts a very happy face.  And

10   the reason they're all so excited is because they think they

11   picked someone help them get their license.  You don't have to

12   speculate about that.  Do you know why?  Because Andrey

13   Kukushkin, in that exact text change, says, when can we get a

14   license.  So they're picking winners.  That's what's going on

15   here.

16        Second, there is the question about, what about Pete

17   Sessions, because this guy hates marijuana, apparently.  And,

18   look, Pete Sessions was a Congressman, he's not handing out

19   licenses, why is he important?  Well, in the same testimony

20   that defense counsel referenced about Caroline Boothe, you

21   heard that he has the ability to block a bill.  They're not

22   looking for him to sponsor anything, they're just looking for

23   some of this legislation, legislation that, by the way,

24   Kukushkin and Muraviev were texting about.  They just wanted to

25   be able to go forward.  They just wanted some movement.  Bottom

1    line is, it's not that they're looking for any of these people

2    to give them a license.  They're, just to use their words,

3    looking to change the rules.  That's why they target people

4    they do.  Winners and rule changers.

5           Just a few other points, really two.  One, you heard a

6    comment by Mr. Bondy about the FEC's materiality rules, and

7    this is just a distraction, folks.  Judge Oetken is going to

8    instruct you on what materiality means and you're going to hear

9    in those instructions, I expect, that the FEC's view or whether

10   it relies on someone is not a question of materiality.  It's

11   whether -- Judge Oetken will give you the instructions on

12   materiality.

13          You also heard from Mr. Bondy a lot of attacks on

14   Deanna Van Rensburg and you heard from Mr. Lefcourt a lot of

15   attacks on David Correia.  Apparently Van Rensburg is a liar

16   and Correia is a fraudster.  This, too, is a way of basically

17   of turning the focus on two other individuals.

18          Let's start with Van Rensburg.  She got dragged into

19   this.  She was here for two days.  The reason she was here is

20   because she was Lev Parnas's assistant.  The reason she was

21   immunized is because she was helping Lev Parnas commit these

22   crimes, maybe unwittingly, but she was helping him fill out the

23   donation forms to process the money.

24          And so you heard her, she forgot some things.  She

25   also forgot, by the way, some questions that we asked.  The

LALCpar6                    Summation - Mr. Roos

1    proof there is that, what is her interest to lie?  Just think

2    about that.  And even setting aside her testimony, sort of,

3    what does that do for attacking her from the defense

4    standpoint?  You still have all the call records that

5    Ms. Drescher walked you through, you saw all the emails where

6    Parnas says do this, do that, and you saw all the text messages

7    where she's confirming or following his instructions.  She was

8    here to tell you she did what Lev Parnas said, but you already

9    knew that because you already have all the texts and the emails

10   and the documents.

11          All right.  Almost at the end.

12          You heard a lot from the defense counsel about

13   reasonable doubt.  Judge Oetken will tell you what that means,

14   listen to him, not the defense attorneys.  And keep this in

15   mind, there is nothing mystical, there is nothing magical about

16   the term beyond a reasonable doubt.  It's the very same burden

17   that is applied in every criminal case every single day in

18   every courtroom in the country.  It's been the same burden

19   since this country was founded.  Every day, juries return

20   verdicts.

21          I'm about to sit down.  Lawyers have been talking for

22   a while.  I've been talking for a little while.  You've seen a

23   lot of evidence, you've seen Power Points, you've seen chats,

24   you've seen bank records.

25          Before I sit down, I want to go back to where this

1    case started a little over a week ago.  I want to ask you to do

2    three things:  Pay attention to the evidence, and you've been

3    doing that; follow Judge Oetken's instructions on the law; and

4    use your common sense.  If you do that and you use your common

5    sense, you'll see through all the distractions, through all the

6    noise, through all the alternative theories of what the

7    evidence is about, the defendants, Lev Parnas and Andrey

8    Kukushkin, agreed to put $1 million of a Russian tycoon's money

9    into U.S. elections.  And they weren't motivated by politics,

10   it wasn't a civic duty, it wasn't because they cared about

11   voting or getting out to vote or making farmers great again,

12   they didn't care about the state of Nevada or Florida or

13   cannabis social justice.  They cared about licenses and money

14   and donating Andrey Muraviev's money for a plan they had to use

15   donations to curry favor and get licensed in states using

16   money, a million dollars to get licenses using donations,

17   millions of dollars potentially in profit, and they broke the

18   law.

19           Mr. Bondy, in his opening and closing, used the story

20   about walking through the woods and seeing something beautiful

21   under a log.  I'm sure you all remember that.  You'll also know

22   from your common sense and your experience that sometimes, when

23   you kick over a log, it's rotten, and the truth here when you

24   look underneath the surface of what's going on is this wasn't a

25   private loan agreement, it wasn't just a business oasis

1    operation trying to get funding, it wasn't just people trying

2    to pay their bills.  There was a criminal agreement.  They

3    wanted to make donations.  They wanted to use Andrey Muraviev's

4    money.  Lev Parnas separately was making plenty of donations

5    using Igor Fruman's money and making them in his own name.  And

6    now it's time to hold them accountable for their actions.  Now

7    is the time to find the defendants guilty.

8              THE COURT:  Thank you, Mr. Roos.

9              Ladies and gentlemen, you've now heard all the

10   evidence, seen all the evidence, and heard the arguments of the

11   parties.  The final step before you deliberate is my reading of

12   the instructions to you, and it's going to take a little bit of

13   time, so I just want to check on time.  It's 4 o'clock, we

14   would have to go a little beyond 4:30.  Does anyone actually

15   need to leave at 4:30?  Can you go to a little beyond that,

16   4:45?

17             Now, I'm not used to this, but I'm actually going to

18   go into the witness box so that I can take off my mask while I

19   read the instructions to you.

20             Members of the jury, can you hear me in the back?

21   Okay.  You've now heard all the evidence in the case, as well

22   as the final arguments of the parties.  We have reached the

23   point when you're about to undertake your final function as

24   jurors.  You paid careful attention to the evidence and I'm

25   confident that you will act together with fairness and

LALCpar6                        Charge

1    impartially to reach a just verdict in this case.

2            My duty at this point is to instruct you on the law.

3    There are three parts to these instructions.  First, I'm going

4    to give you some general instructions about your role and about

5    how you are to decide the facts of the case.  These

6    instructions really would apply to just about any trial;

7    second, I'll give you some specific instructions about the

8    legal rules applicable to this particular case; and third, I'll

9    give you some final instructions about procedure.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  It is your duty to accept these

2     instructions of law and to apply them to the facts as you

3     determine them.  With respect to legal matters, you must take

4     the law as I give it to you.  If any attorney or witness has

5     stated a legal principle different from any that I state to you

6     in my instructions, it is my instructions that you must follow.

7     You must not substitute your own notions or opinions of what

8     the law is or ought to be.

9          Listening to these instructions may not be easy.  It

10    is important, however, that you listen carefully and

11    concentrate.  I ask you for patient cooperation and attention.

12    You'll notice that I'm reading these instructions from a

13    prepared text.  It would be more lively, no doubt, if I just

14    improvised.  But it's important that I not do that.  The law is

15    made up of words, and those words are very carefully chosen.

16    So, it's critical that I use exactly the right words.

17         You'll have copies of what I'm reading in the jury

18    room to consult, so don't worry if you miss a word or two.  But

19    for now, listen carefully and try to concentrate on what I'm

20    saying.  Remember, you are to consider these instructions

21    together as a whole; you are not to isolate or give undue

22    weight to any single instruction.

23         As members of the jury, you are the sole and exclusive

24    judges of the facts.  You pass on the evidence.  You determine

25    the credibility of the witnesses.  You resolve such conflicts

as there may be in the testimony.  You draw whatever reasonable

inferences you decide to draw from the facts as you have

determined them, and you determine the weight of the evidence.

        Do not conclude from any of my questions or any of my

rulings on objections or anything else that I have done during

this trial that I have any view as to the credibility of the

witnesses or how you should decide the case.  Any opinion I

might have regarding the facts is of absolutely no consequence.

It is your sworn duty, and you have taken the oath as jurors,

to determine the facts.

        Just as I have my duties as a judge and you have your

duties as jurors, it has been the duty of each attorney in this

case to object when the other side offered testimony or other

evidence that the attorney believed is not properly admissible.

It has been my job to rule on those objections.  Therefore, why

an objection was made or how I ruled on it is not your

business.  You should draw no inference from the bare fact that

an attorney objects to any evidence.  Nor should you draw any

inference from the fact that I might have sustained or

overruled an objection.

        From time to time, the lawyers and I had conferences

outside of your hearing.  These conferences involved procedural

and other matters, and none of the events relating to these

conferences should enter into your deliberations at all.

        To be clear, the personalities and the conduct of

counsel in the courtroom are not in any way at issue.  If you

formed reactions of any kind to any of the lawyers in the case,

favorable or unfavorable, whether you approved or disapproved

of their behavior as advocates, those reactions should not

enter into your deliberations.

        In reaching your verdict, you must remember that all

parties stand equal before a jury in the courts of the United

States.  The fact that the government is a party and the

prosecution is brought in the name of the United States does

not entitle the government or its witnesses to any greater

consideration than that accorded to any other party.  By the

same token, you must give it no less deference.  The government

and the defendants stand on equal footing before you.  It would

be improper for you to consider, in reaching your decision as

to whether the government sustained its burden of proof, any

personal feelings you may have about the defendants' race,

religion, national origin, gender, sexual orientation, or age.

All persons are entitled to the same presumption of innocence

and the government has the same burden of proof with respect to

all persons.  Similarly, it would be improper for you to

consider any personal feelings you have about the race,

religion, national origin, gender, sexual orientation, or age

of any other witness or anyone else involved in this case.  The

defendants are entitled to a trial free from prejudice, and our

judicial system cannot work unless you reach your verdict

LALTPAR7                    Charge

1   through a fair and impartial consideration of the evidence.

2             Now I will instruct you on the presumption of

3   innocence.  The law presumes the defendants to be innocent of

4   all charges against them.  In this case, the defendants before

5   you have pleaded not guilty.  In so doing, they have denied the

6   charges in the indictment.  Thus, the government has the burden

7   of proving the defendants' guilt beyond a reasonable doubt.

8   This burden never shifts to the defendants.  In other words,

9   the defendants do not have to prove their innocence.  They are

10  presumed to be innocent of the charges contained in the

11  indictment.  The defendants thus began the trial here with a

12  clean slate.  The presumption of innocence was in their favor

13  when the trial began, continued in their favor throughout the

14  entire trial, remains with them even as I speak to you now, and

15  persists in their favor during the course of your deliberations

16  in the jury room.

17            This presumption of innocence is removed if and only

18  if, as members of the jury, you are unanimously convinced that

19  the prosecution has sustained its burden of proving the

20  defendants guilty beyond a reasonable doubt.

21            Now, the question naturally arises: what, exactly, is

22  a reasonable doubt?  The words almost define themselves.  A

23  reasonable doubt is a doubt that a reasonable person has after

24  carefully weighing all the evidence.  It is a doubt founded in

25  reason and arising out of the evidence in the case or the lack

LALTPAR7                    Charge

1    of evidence.  Reasonable doubt is a doubt that appeals to your

2    reason, your judgment, your experience, your common sense.

3    Proof beyond a reasonable doubt must, therefore, be proof of

4    such a convincing character that a reasonable person would not

5    hesitate to rely and act upon it in the most important of his

6    or her own affairs.

7         I must emphasize that beyond a reasonable doubt does

8    not mean beyond all possible doubt.  It is practically

9    impossible for a person to be absolutely and completely

10   convinced of any disputed fact that, by its very nature, cannot

11   be proved with mathematical certainty.  In the criminal law,

12   guilt must be established beyond a reasonable doubt, not all

13   possible doubt.

14        Further, the government is not required to prove each

15   element of the offense by any particular number of witnesses.

16   The testimony of a single witness may be enough to convince you

17   beyond a reasonable doubt of the existence of the elements of

18   the charged offense–if you believe that the witness has

19   testified truthfully and accurately related what he has told

20   you.

21        That all said, if, after a fair and impartial

22   consideration of all the evidence, or the lack of evidence, you

23   have an abiding belief of the defendants' guilt beyond a

24   reasonable doubt -- a belief that you would be willing to act

25   upon without hesitation in important matters in the personal

affairs of your own life -- then it is your sworn duty to

convict the defendants.

On the other hand, if after a fair and impartial

consideration of all the evidence, and the lack of evidence,

you are not satisfied of the guilt of the defendants with

respect to the charges in the indictment; if you do not have an

abiding conviction of the defendants' guilt; in sum, if you

have such a doubt as would cause you, as prudent persons, to

hesitate before acting in matters of importance to

yourselves-then you have a reasonable doubt, and in that

circumstance it is your sworn duty to return a verdict of not

guilty.

In reaching that determination, your oath as jurors

commands that you are not to be swayed by sympathy or

prejudice.  You are to be guided solely by the evidence in this

case and you are to apply the law as I instruct you.  As you

sift through the evidence, you must ask yourselves whether the

prosecution has proven the defendants' guilt.  Once you let

fear or prejudice, or bias or sympathy, interfere with your

thinking, there is a risk that you will not arrive at a true

and just verdict.  Thus, if you have a reasonable doubt as to

the defendants' guilt, then you must render a verdict of not

guilty.  But if you should find that the prosecution has met

its burden of proving the defendants' guilt beyond a reasonable

doubt, then you should not hesitate because of sympathy, or for

LALTPAR7                          Charge

1   any other reason, to render a verdict of guilty.

2           The question of possible punishment of the defendants

3   is of no concern to the jury and should not enter into or

4   influence your deliberations.  The duty of imposing sentence in

5   the event of a conviction rests exclusively upon the Court.

6   Your function is to weigh the evidence or the lack of evidence

7   in the case and to determine whether or not the defendants are

8   guilty beyond a reasonable doubt, solely upon the basis of such

9   evidence.  Under your oath as jurors, you cannot allow any

10   consideration of the punishment that may be imposed upon the

11   defendants, if they are convicted, to influence your verdict.

12           Similarly, it would be improper for you to allow any

13   feelings you might have about the nature of the crimes charged

14   to interfere with your decision-making process.  Your verdict

15   must be based exclusively upon the evidence or the lack of

16   evidence in the case.

17           Now, I have repeatedly referred to the evidence in

18   this case.  This raises an important question: what is

19   evidence?  I instruct you that evidence consists of the sworn

20   testimony of the witnesses, the exhibits received in evidence,

21   and the stipulations of the parties.  In determining the facts,

22   you must rely upon your own recollection of the evidence.

23           What, then, is not evidence?  I instruct you that the

24   following does not count as evidence:

25           First, testimony that I have stricken or excluded is

not evidence.  You may not use it in rendering your verdict.

If certain testimony was received for a limited purpose, you

must follow the limiting instructions I have given, and use the

evidence only for the limited purpose I indicated.

Second, any exhibit that was not received into

evidence is not evidence.  Thus, exhibits marked for

identification but not admitted are not evidence, nor are

materials that were used only to refresh a witness's

recollection.

Third, among the exhibits received in evidence there

may have been some documents and recordings that are redacted.

Redacted means that part of the document or recording was taken

out.  You are to concern yourself only with the item admitted

into evidence. You should not consider any possible reason why

the other part has been redacted.

Fourth, arguments by the lawyers are not evidence.

The reason is simple: advocates are not witnesses.  The opening

and closing arguments of both sides explain how each side wants

you to analyze the evidence, which consists of the testimony of

witnesses, the documents and other exhibits that were entered

into evidence, and the stipulations of the parties.  What the

lawyers have said to you is intended to help you understand the

evidence, or the lack of evidence, as you deliberate to reach

your verdict.  However, if your recollection of the facts

differs from the lawyers' opening statements, questions to

1   witnesses, or summations, it is your recollection that

2   controls, not theirs.  For the same reasons, you are not to

3   consider a lawyer's or a party's questions as evidence.  Only

4   the witnesses' answers are to be considered evidence, not the

5   questions.

6           Finally, any statements that I may have made do not

7   constitute evidence.  It is for you alone to decide the weight,

8   if any, to be given to the testimony you have heard and the

9   exhibits you have seen.

10          I will now discuss at slightly greater length some

11  important matters related to evidence.

12          There are two types of evidence that you may properly

13  consider in reaching your verdict.

14          One type of evidence is direct evidence.  Direct

15  evidence is testimony by a witness about something he knows by

16  virtue of his own senses, something he has seen, felt, touched,

17  or heard.  For example, if a witness testified that when he

18  left his house this morning, it was raining, that would be

19  direct evidence about the weather.

20          The second type of evidence is circumstantial

21  evidence.  Circumstantial evidence is evidence that tends to

22  prove a disputed fact indirectly, by proof of other facts.

23  There is a simple example of circumstantial evidence that is

24  often used in this courthouse.

25          Assume that when you came into the courthouse this

morning the sun was shining and it was a nice day outdoors.

Assume that the courtroom shades were drawn and that you could

not look outside.  Assume further that as you were sitting

here, someone walked in with an umbrella that was dripping wet

and then, a few moments later, somebody else walked in with a

raincoat that was dripping wet.

Now, because you could not look outside the courtroom

and you could not see whether it was raining, you would have no

direct evidence of that fact.  But, on the combination of facts

that I have asked you to assume, it would be reasonable and

logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You

infer on the basis of your reason, experience, and common sense

from one fact that's established the existence or the

nonexistence of some other fact.

As you can see, the matter of drawing inferences from

facts in evidence is not a matter of guesswork or speculation.

An inference is a logical, factual conclusion that you might

reasonably draw from other facts that have been proven.

Many material facts, such as someone's state of mind, are

rarely easily proven by direct evidence.  Usually such facts

are established by circumstantial evidence and the reasonable

inferences that you draw.  Circumstantial evidence may be given

as much weight as direct evidence.  The law makes no

distinction between direct and circumstantial evidence, but

LALTPAR7                         Charge

1    simply requires that, before convicting a defendant, the jury

2    must be satisfied that the government has proven the

3    defendant's guilt beyond a reasonable doubt, based on all of

4    the evidence in the case.

5          There are times when different inferences may be drawn

6    from the evidence.  The government asks you to draw one set of

7    inferences.  The defendants ask you to draw another.  It is for

8    you, and for you alone, to decide what inferences you will

9    draw.

10         You have heard evidence in the form of stipulations.

11   A stipulation of testimony is an agreement between the parties

12   that, if called, a witness would have given certain testimony.

13   You must accept as true the fact that the witness would have

14   given the testimony.  However, it is for you to decide what

15   effect that testimony should be given.

16         You also heard evidence in the form of stipulations

17   that contain facts that were agreed to be true.  In such cases,

18   you must accept those facts as true.  However, it is for you to

19   decide what weight, if any, to give to those facts.

20         The government has introduced evidence with text in

21   the Russian language. The parties have agreed that the

22   translations of those materials are accurate, and the

23   translations have been admitted into evidence. For materials in

24   Russian with an English translation, I instruct you that it is

25   the English translation of the materials reflected in the

exhibit that is the evidence.  If you speak Russian, you may

not substitute your own translation for that which has been

agreed upon by the parties.

        Now, some of the exhibits that were admitted into

evidence were in the form of charts and summaries.  You should

consider them as you would any other evidence.

        As I have already explained, you should draw no

inference or conclusion for or against any party by reason of

lawyers making objections or my rulings on such objections.

By the same token, nothing I say is evidence.  If I commented

on the evidence at any time, do not accept my statements in

place of your recollection or your interpretation.  It is your

recollection and interpretation that govern.

        Further, do not concern yourself with what was said at

side-bar conferences or during my discussions with counsel.

Those discussions related to rulings of law.

        At times I may have admonished a witness or directed a

witness to be responsive to questions or to keep his or her

voice up.  At times I asked a question myself.  Any questions

that I asked, or instructions that I gave, were intended only

to clarify the presentation of evidence and to bring out

something that I thought might be unclear.  You should draw no

inference or conclusion of any kind, favorable or unfavorable,

with respect to any witness or any party in the case, by reason

of any comment, question, or instruction of mine.  Nor should

1    you infer that I have any views as to the credibility of any

2    witness, as to the weight of the evidence, or as to how you

3    should decide any issue that is before you.  That is entirely

4    your role.

5          You have had the opportunity to observe the witnesses.

6    It will now be your job to decide how believable each witness

7    was in his or her testimony.  You are the sole judges of the

8    credibility of each witness and of the importance of his or her

9    testimony.

10         To that end, I am going to give you a few general

11   instructions on how you may determine whether witnesses are

12   credible and reliable, whether witnesses told the truth at this

13   trial, and whether they knew what they were talking about.  It

14   is really just a matter of using your common sense, your good

15   judgment, and your experience.

16         First, consider how well the witness was able to

17   observe or hear what he or she testified about.  The witness

18   may be honest, but mistaken.  How did the witness's testimony

19   impress you?  Did the witness appear to be testifying honestly

20   and/or candidly?  Were the witness's answers direct or were

21   they evasive?  Consider the witness's intelligence, demeanor,

22   manner of testifying, and the strength and accuracy of the

23   witness's recollection.  Consider whether any outside factors

24   might have affected a witness's ability to perceive events.

25   Consider the substance of the testimony.  How does the

witness's testimony compare with other proof in the case?  Is
it corroborated or is it contradicted by other evidence?  If
there is a conflict, does any version appear reliable, and if
so, which version seems more reliable?

You may consider whether a witness had any possible
bias or relationship with a party or any possible interest in
the outcome of the case.  Such a bias or relationship does not
necessarily make the witness unworthy of belief, but it can.
These are simply factors that you may consider.

In passing upon the credibility of a witness, you may
also take into account any inconsistencies or contradictions as
to material matters in his or her testimony.

In summary, you should carefully scrutinize all of the
testimony of each witness, the circumstances under which each
witness testified, the impression the witness made when
testifying, the relationship of the witness to the controversy
and the parties, the witness's bias or impartiality, the
reasonableness of the witness's statement, the strength or
weakness of the witness's recollection viewed in the light of
all the other testimony, and any other matter in evidence that
may help you decide the truth and the importance of each
witness's testimony.

If you find that a witness has testified falsely as to
any material fact or if you find that a witness has been
previously untruthful when testifying under oath or otherwise,

LALTPAR7                         Charge

you may reject that witness's testimony in its entirety or you

may accept only those parts that you believe to be truthful or

that are corroborated by other independent evidence in the

case.

It is for you, the jury, and you alone–not the

lawyers, not the witnesses, and not me as the judge–to decide

the credibility of witnesses who testified and the weight that

their testimony deserves.  The ultimate question for you to

decide in passing upon credibility is: Did the witness tell the

truth before you?

The defendants did not testify in this case. Under our

Constitution, a defendant has no obligation to testify or to

present any evidence, because it is the Government's burden to

prove the defendants guilty beyond a reasonable doubt.  That

burden remains with the government throughout the entire trial

and never shifts to the defendant.  A defendant is never

required to prove that he or she is innocent.

You may not attach any significance to the fact that

the defendants did not testify. No adverse inference against

the defendants may be drawn because they did not take the

witness stand.  You may not consider this against the

defendants in any way in your deliberations in the jury room.

You have heard the testimony of law enforcement

officers and other government employees.  The fact that a

witness may be employed by the federal government or a state or

1    city government as a law enforcement agent or employee does not

2    mean that his or her testimony is deserving of more or less

3    consideration or greater or lesser weight than that of an

4    ordinary witness.  It is your decision, after reviewing all the

5    evidence, whether to accept the testimony of the law

6    enforcement or government employee witness and to give to that

7    testimony the weight you find it deserves.

8           You have heard the testimony of witnesses who have

9    testified under a grant of immunity from this Court, called

10   formal immunity. The testimony of such a witness may not be

11   used against such witnesses in any criminal case except in a

12   prosecution for perjury, giving a false statement, or otherwise

13   failing to comply with the immunity order of this Court. You

14   are instructed that the government is entitled to call as a

15   witness a person who has been granted immunity by order of this

16   Court. You should examine the testimony of such a witness to

17   determine whether or not it is colored in any way to further

18   the witness' own interests. If you believe the testimony to be

19   true, you may give it any weight you believe it deserves, and

20   you may convict the defendants on the basis of such witness'

21   testimony alone if you find that the testimony proves the

22   defendants guilty beyond a reasonable doubt.

23          In deciding whether to believe a witness, you should

24   specifically note any evidence of hostility or affection that

25   the witnesses may have towards one of the parties.  Likewise,

LALTPAR7                    Charge

you should consider evidence of any other interest or motive

that the witness may have in cooperating with a particular

party.  You should also take into account any evidence of any

benefit that a witness may receive from the outcome of the

case.

It is your duty to consider whether the witness has

permitted any such bias or interest to color his or her

testimony.  In short, if you find that a witness is biased, you

should view his or her testimony with caution, weigh it with

care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested

in the outcome of the case does not mean he or she has not told

the truth.  It is for you to decide from your observations and

by applying your common sense and experience and all the other

considerations mentioned whether the possible interest of any

witness has intentionally or otherwise colored or distorted his

or her testimony.  You are not required to disbelieve an

interested witness; you may accept as much of his or her

testimony as you deem reliable and reject as much as you deem

unworthy of acceptance.

During the trial, you heard the names of several other

individuals mentioned in connection with this case.  Some of

those other individuals have been mentioned in connection with

what the government alleges was illegal activity.

I instruct you that you may not draw any inference,

favorable or unfavorable, towards the government or the

defendants from the fact that any other person is not on trial

here.  Further, you may not speculate as to the reasons why

those other people are not on trial, or what became of them in

the legal system.  Those matters are wholly outside your

concern and have no bearing on your duties as jurors in this

case.

    You have heard evidence during the trial that

witnesses have discussed the facts of the case and their

testimony with the lawyers before the witnesses appeared in

court.

    Although you may consider that fact when you are

evaluating a witness's credibility, I should tell you that

there is nothing unusual or improper about a witness meeting

with lawyers before testifying so that the witness can be aware

of the subjects he or she will be questioned about, focus on

those subjects and have the opportunity to review relevant

exhibits before being questioned about them.  Such consultation

helps conserve your time and the Court's time. In fact, it

would be unusual for a lawyer to call a witness without such

consultation.

    Again, the weight you give to the fact or the nature

of the witness's preparation for his or her testimony and what

inferences you draw from such preparation are matters

completely within your discretion.

1      There are several people whose names you have heard

2   during the course of the trial but who did not appear here to

3   testify.  I instruct you that each party had an equal

4   opportunity, or lack of opportunity, to call any of these

5   witnesses.  Therefore, you should not draw any inferences or

6   reach any conclusions as to what they would have testified to

7   had they been called.

8      You should, however, remember my instruction that the

9   law does not impose on a defendant in a criminal case the

10   burden or duty of calling any witness or producing any

11   evidence.  The burden remains with the government to prove the

12   guilt of the defendants beyond a reasonable doubt.

13      You have heard reference, in the arguments and

14   cross-examination of defense counsel in this case, to the fact

15   that certain investigative techniques were or were not used by

16   the government.  There is no legal requirement, however, that

17   the government prove its case through any particular means.

18   While you are to carefully consider the evidence adduced by the

19   government, you are not to speculate as to why they used the

20   techniques they did or why they did not use other techniques.

21   The government is not on trial.  Law enforcement techniques are

22   not your concern.  However, you are free to consider a lack of

23   evidence in your determination of whether the government proved

24   the charged crimes beyond a reasonable doubt.  Your concern is

25   to determine whether, on the evidence or lack of evidence, the

1    government has proven the defendant's guilt beyond a reasonable

2    doubt.

3            You have heard testimony about evidence seized in

4    certain searches.  Evidence obtained from these searches was

5    properly admitted in this case and may properly be considered

6    by you.  Whether you approve or disapprove of how it was

7    obtained should not enter into your deliberations because I now

8    instruct you that the Government's use of this evidence is

9    entirely lawful.

10           Defendants Lev Parnas and Andrey Kukushkin are on

11   trial together.  In reaching a verdict, however, you must bear

12   in mind that innocence or guilt is individual.  Your verdict

13   must be determined separately with respect to each defendant,

14   solely on the evidence, or lack of evidence, presented against

15   him, without regard to the guilt or innocence of anyone else.

16   In this regard, you must be careful not to find any defendant

17   guilty merely by reason of relationship or association with

18   other persons.  The fact that one person may be guilty of an

19   offense does not mean that his or her friends, relatives, or

20   associates were also involved in the crime.  You may, of

21   course, consider those associations as part of the evidence in

22   the case, and may draw whatever inferences are reasonable from

23   the fact of the associations taken together with all of the

24   other evidence in the case.  But you may not draw the inference

25   of guilt merely because of such associations.  In short, for

1    each defendant, the question of guilt or innocence as to each

2    count of the indictment must be individually considered and

3    individually answered, and you may not find any defendant

4    guilty unless the evidence proves his guilt beyond a reasonable

5    doubt.

6           Now I am going to turn to the substantive

7    instructions.

8           Let us first turn to the charges against the

9    defendants as contained in the indictment.  The indictment is

10   not evidence.  It is an accusation, a statement of the charges

11   made against the defendants.  It gives the defendants notice of

12   the charges against them.  It informs the Court and the public

13   of the nature of the accusation.

14          A defendant begins trial with an absolutely clean

15   slate and without any evidence against him.  Remember that the

16   charges in the indictment are merely accusations.  What matters

17   is the evidence or lack of evidence that you heard and saw in

18   the trial.

19          The indictment in this case consists of six counts, or

20   charges.  I will, at times, refer to each count by the number

21   assigned to it in the indictment.  You should know that there

22   is no significance to the order of these numbers or the

23   specific number of counts charged.

24          Each count is a separate offense or crime.  Each count

25   must therefore be considered separately by you, as to each

LALTPAR7                        Charge

defendant named in that count, and you must return a separate

verdict of guilty or not guilty on each count, as to each

defendant named in that count.  Whether you find a defendant

guilty or not guilty as to one count should not affect your

verdict as to any other count charged.

       The indictment contains six counts or charges.

       Count One of the indictment charges that defendants

Lev Parnas and Andrey Kukushkin participated in a conspiracy to

make political contributions paid for by a foreign national in

the names of persons other than the true source of the funds,

and to defraud the Federal Election Commission, or FEC.

       Count Two charges that Mr. Parnas solicited, and aided

and abetted the solicitation of, a foreign national to make

political contributions.

       Count Three charges that Mr. Parnas and Mr. Kukushkin

aided and abetted the making of political contributions by a

foreign national.

       Count Four charges that Mr. Parnas participated in a

conspiracy to make political contributions in the names of

persons other than the true source of the funds, and to defraud

the FEC.

       Count Five charges that Mr. Parnas made false

statements to the FEC in an affidavit.

       Count Six charges that Mr. Parnas made false entries

in an affidavit in order to obstruct a matter before the FEC.

LALTPAR7                        Charge

1

2              In a moment, I will instruct you on each of these

3      charges in more detail.  At the outset, however, let me

4      instruct you that you must consider each individual charge

5      separately, and each defendant separately, and evaluate each on

6      the proof or lack of proof that relates to that charge with

7      respect to each defendant.

8              Count One charges the defendants with participating in

9      a conspiracy to make political contributions paid for by a

10     foreign national, in the names of persons other than the true

11     source of the funds, and/or to defraud the FEC.  Count One

12     reads, in relevant part:

13             From in or about June 2018 through at least in or

14     about April 2019, in the Southern District of New York and

15     elsewhere, Lev Parnas and Andrey Kukushkin, the defendants, and

16     others known and unknown, knowingly conspired with each other

17     and with others known and unknown to:

18             a. Knowingly and willfully make contributions and

19     donations of money, or express or implied promises to make

20     contributions or donations, directly and indirectly, by a

21     foreign national in connection with federal and State

22     elections, aggregating to $25,000 and more in a calendar year,

23     in violation of Title 52, United States Code, Sections 30121

24     and 30109(d)(1)(A).

25             b.  Knowingly and willfully make contributions to

LALTPAR7                          Charge

candidates for State and federal office, joint fundraising

committees, and independent expenditure committees in the names

of other persons, aggregating to $25,000 and more in a calendar

year, in violation of Title 52, United States Code, Sections

30122 and 30109(d)(1)(A) & (D).

            c.  Knowingly defraud the United States by impairing,

obstructing, and defeating the lawful functions of a department

or agency of the United States; to wit, the function of the

Federal Election Commission, FEC, to administer federal law

concerning source and amount restrictions in federal and State

elections, including the prohibitions applicable to foreign

nationals and straw donors.

            The relevant statute covering this charge is Section

371 of Title 18 of the United States Code.  That section states

that it shall be unlawful for two or more persons to conspire

either to commit any offense against the United States, or to

defraud the United States, or any agency thereof in any manner

or for any purpose, and for one or more of such persons to do

any act to effect the object of the conspiracy.

            So, what is a conspiracy?  A conspiracy is a kind of

criminal partnership.  It is an agreement of two or more

persons to join together to accomplish some unlawful purpose.

The essence of the crime of conspiracy is an agreement or

understanding between two or more persons to violate other

laws.  What we call a meeting of minds is required.  If one of

LALTPAR7                        Charge

two persons merely pretends to agree, the other party, whatever

he may believe, is in fact not conspiring with anyone.

          The crime of conspiracy to violate a federal law is an

independent offense.  It is separate and distinct from the

crime that is the objective of the conspiracy.  Indeed, you may

find the defendants guilty of the crime of conspiracy even if

you find that they never actually committed the substantive

crime that was the objective of the conspiracy.  In other

words, for Count One, you need not find that illegal political

contributions were actually made to find that someone is guilty

of a conspiracy to make political contributions that were

illegal.

          In order to find the defendants guilty of the

conspiracy charged in Count One, you must find that the

government has proven beyond a reasonable doubt each of the

following three elements of the crime:

          First, that two or more persons entered the unlawful

agreement charged in Count One of the indictment;

          Second, that the defendant you are considering

knowingly and willfully became a member of that alleged

conspiracy; and

          Third, that one of the members of the conspiracy

knowingly committed at least one overt act in furtherance of

the conspiracy.

          I will discuss each in turn.

1             Now let us consider the first element of the

2    conspiracy charge.  The first element which the government must

3    prove beyond a reasonable doubt to establish the offense of

4    conspiracy is that two or more persons entered into the

5    unlawful agreement charged in Count One of the indictment.

6    That Count alleges that defendants Lev Parnas and Andrey

7    Kukushkin conspired with others to (i) make political

8    contributions directly or indirectly by a foreign national,

9    (ii) make political contributions in the name of a person other

10   than the true donor, and (iii) defraud the FEC.

11            In order for the government to satisfy this element,

12   you need not find that the alleged members of the conspiracy

13   met together and entered into a formal contract.  Similarly,

14   you need not find that the alleged conspirators stated in words

15   or writing what the scheme was, its object or purpose or every

16   precise detail of the scheme or the means by which its object

17   or purpose was to be accomplished.  From its very nature, a

18   conspiracy is almost always characterized by secrecy, which

19   makes detection difficult.  Conspirators do not usually reduce

20   their agreements to writing.  They do not typically publicly

21   broadcast their plans.  What the government must prove is that

22   there was a mutual understanding, either spoken or unspoken,

23   between two or more persons to cooperate with each other to

24   accomplish an unlawful act.  Express language or specific words

25   are not required to indicate agreement to or membership in a

LALTPAR7                    Charge

conspiracy.

        You may, of course, find that the existence of an
agreement to disobey or disregard the law, as charged in Count
One of the indictment, has been established by direct proof.
However, since conspiracy is, by its very nature, characterized
by secrecy, you may also infer its existence from the
circumstances of this case and the conduct of the parties
involved.  In a very real sense then, in the context of
conspiracy cases, actions often speak louder than words.   In
this regard, you may, in determining whether an unlawful
agreement existed here, consider the actions and statements of
all of those you find to be participants as proof that a common
design existed on the part of the persons charged to act
together to accomplish an unlawful purpose.

        In short, as far as the first element of the
conspiracy is concerned, the government must prove beyond a
reasonable doubt that at least two alleged conspirators came to
a mutual understanding, either spoken or unspoken, to violate
the law in the manner charged in the indictment.

        The "objects" of a conspiracy are the illegal goal or
goals the co-conspirators agree or hope to achieve.  In Count
One, the indictment provides that there were three objects or
goals of the alleged conspiracy:  One, to make political
contributions by a foreign national; two, to make political
contributions in the name of a person other than the true

LALTPAR7                      Charge

1    source of the funds; three, to defraud the FEC.

2           You should keep in mind that you need not find that

3    the conspirators agreed to accomplish each one of these things.

4    An agreement to accomplish any one of these objects is

5    sufficient. Although the finding of one unlawful objective is

6    sufficient to satisfy the illegal purpose element, you must

7    unanimously agree on which object, if any, was the specific

8    object or objects of the alleged conspiracy.

9           The first object of the conspiracy charged in Count

10   One is the object of making a political contribution by a

11   foreign national, in violation of section 30121 of Title 52 of

12   the United States Code.  That statute states that:  It shall be

13   unlawful for a foreign national, directly or indirectly, to

14   make a contribution or donation of money or other thing of

15   value, or to make an express or implied promise to make a

16   contribution or donation, in connection with a federal, state,

17   or local election.

18          In order to find that the defendants conspired to

19   violate that law, you must find that the government proved

20   beyond a reasonable doubt that the defendants participated in a

21   conspiracy to cause (1) a foreign national, (2) to make,

22   directly or indirectly, one or more contributions or donations

23   of money, or an express or implied promise to make one or more

24   contributions or donations, in connection with a federal,

25   state, or local election, (3) with the aggregate amount of such

contributions or donations being $25,000 or more in a calendar

year, and (4) that they did so knowingly and willfully.

The term "foreign national" means an individual who is

not a citizen of the United States and who is not lawfully

admitted for permanent residence, that is, a green card holder.

"Contribution" includes any deposit of money, gift,

loan, or advance made by any person for the purpose of

influencing any election for Federal office.

The term "donation" is defined the same as

"contribution," but does not require the payment to be made in

connection with a federal election, and may be made instead in

connection with a state or local election.  The amount of

contributions or donations together must be equal to or exceed

$25,000 in the calendar year you are considering, 2018, but you

need not determine the precise amount of the contributions or

donations involved.

The "calendar year" for 2018 is January 1, 2018, to

December 31, 2018.

An act is done knowingly if the defendant is aware of

the act and does not act through ignorance, mistake, or

accident.  You may consider evidence of the defendant's words,

acts, or omissions, along with all other evidence, in deciding

whether the defendant acted knowingly.  An act is done

willfully if the defendant acted with knowledge that some part

of his course of conduct was unlawful and with the intent to do

1   something the law forbids, and again not by mistake or

2   accident.  In other words, a person acts "willfully" when he

3   acts with a "bad purpose" to disobey or disregard the law.  It

4   is not, however, necessary for the government to prove that the

5   defendant was aware of the specific provision of the law that

6   he is charged with violating.  Rather, it is sufficient for the

7   defendant to act knowing that his conduct is unlawful, even if

8   he does not know precisely which law or regulation makes it so.

9        The second object of the conspiracy charged in Count

10  One is the object of making a political contribution in the

11  name of another person, in violation of section 30122 of Title

12  52 of the United States Code.  That statute states in the

13  relevant part that, "no person shall make a contribution in the

14  name of another person."

15       In order to find that the defendants conspired to

16  violate that law, you must find that the government proved

17  beyond a reasonable doubt that the defendants participated in a

18  conspiracy to (1) make one or more contributions, (2) in the

19  name(s) of one or more persons other than the true source of

20  the funds, (3) with the aggregate amount of such contributions

21  being $25,000 or more in a calendar year, and (4) that they did

22  so knowingly and willfully.

23       The phrase "making a contribution in the name of

24  another" means making a disguised contribution through an

25  intermediary, or conduit, by giving that person the funds for

the contribution.  This is sometimes referred to as a "straw

donation."  It includes both payments to an intermediary of

funds to make a contribution, and reimbursement of funds to an

intermediary for making a contribution at the payor's request.

It does not matter when the payment or reimbursement

to the intermediary for the contribution occurs, as long as the

payment or promise of reimbursement was a causal factor in the

intermediary's decision to make the contribution attributed to

him or her.  In other words, the promise of reimbursement must

have been a causal factor to the intermediary's decision to

make the contribution attributed to him.  In consequence, it is

a defense that the intermediary made up his or her mind to make

the contribution in question prior to the time that the true

contributor made his reimbursement promise.

I have already instructed you on the requirement that

the aggregate amount of the contributions was equal to or

exceeded $25,000 and the meaning of "contribution".  I have

also instructed you on the meaning of "knowing" and

"willfully," and you should refer to my prior instructions.

The third object of the conspiracy charged in Count

One is the object of defrauding the United States, and

specifically the Federal Election Commission or FEC.

A conspiracy to defraud the United States means that

the defendants and their alleged co-conspirators are accused of

conspiring to impede, impair, obstruct, or defeat by fraudulent

LALTPAR7                         Charge

1    or dishonest means the lawful regulatory and enforcement

2    functions of an agency of the United States.

3              I instruct you that the FEC is an agency of the United

4    States government.

5              A conspiracy to defraud the United States need not

6    necessarily involve cheating the government out of money or

7    property.  The statute also includes conspiracies to interfere

8    with or obstruct any lawful government function by fraud,

9    deceit, or any dishonest means.  Dishonestly obstructing the

10   lawful function of a government agency must be a purpose of the

11   conspiracy, not merely a foreseeable consequence of it.

12   However, defrauding the FEC need not be the defendant's sole or

13   even primary purpose so long as it is a purpose of the scheme.

14   The intent to defraud the FEC may be incidental to another

15   primary motivation or purpose but it still must be an intent.

16   All that is required is that an object of the conspiracy was to

17   interfere with or obstruct one of the FEC's lawful government

18   functions by deceit, craft, or trickery or by means that are

19   dishonest.

20             The statute also does not require proof that the

21   defendants intended to directly commit the fraud themselves.

22   Proof that the defendant intended to use a third party as a

23   go-between may be sufficient.  But the government must prove

24   that the United States or one of its agencies or departments

25   was the ultimate target of the conspiracy that the defendants

LALTPAR7                    Charge

intended to defraud.

Not all conduct that impedes the lawful functions of a government agency is illegal. To be unlawful, such conduct must entail fraud, deceit, or other dishonest means. A conspiracy to impede the functions of a government agency by fraudulent or dishonest means may include such things as altering documents after they have been demanded by the government agency, creating false documents, destroying records, making false statements, attempting to induce others to make false statements, or engaging in any other fraudulent or deceptive conduct that would have the effect of impairing the ability of the government agency to determine important aspects of a transaction. By citing these examples, I certainly do not mean to suggest that these are the only actions that could impede the FEC by fraudulent or dishonest means, nor do I express any view as to whether conduct similar to these examples took place here.

If you find that the government has proven beyond a reasonable doubt that the conspiracy charged in Count One of the indictment existed, then you must consider the second element of the crime.

The second element the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendants knowingly, willfully and voluntarily became members of the alleged conspiracy with the intent of achieving

1    its unlawful objective.  I have already instructed you on the

2    definitions of knowingly and willfully, and you should apply

3    those definitions here.

4          In deciding whether the defendant was in fact a member

5    of the conspiracy, you must consider whether the defendant

6    knowingly and willfully joined the conspiracy intending to

7    advance or achieve its goals.  Did he participate in the

8    conspiracy with knowledge of its unlawful purpose and with the

9    specific intention of furthering its objective?  Direct proof

10   of state of mind is not always available.  Indeed, science has

11   not yet devised a manner of looking into a person's mind and

12   knowing what that person is thinking.  It would be a rare case

13   where it could be shown that a person wrote or stated that, as

14   of a given time in the past, he committed an act with a certain

15   state of mind.  Such direct proof is not required.  Rather, you

16   may look to the evidence of certain acts alleged to have taken

17   place by or with the defendant, or in his presence.

18         Of course, mere association with a conspirator or mere

19   presence at a place where a conspiracy is going on does not

20   make someone a member of the conspiracy.  Nor is knowledge

21   without participation sufficient.  What is necessary is that

22   the defendant participated with knowledge of the unlawful

23   objectives of the conspiracy and with intent to aid in the

24   accomplishment of one of those objectives.

25         If you find that the conspiracy existed and that the

defendant participated knowingly and intentionally in it, the
extent and duration of the defendant's participation has no
bearing on whether or not he is guilty.  A defendant need not
have joined the conspiracy at the outset.  If a defendant
joined the conspiracy at any time in its progress, he will be
held responsible for all that was done before he joined and all
that was done during the conspiracy's existence while he was a
member.  Moreover, each member of the conspiracy may perform
separate and distinct acts.  Some conspirators play major
roles, while others play minor roles in the scheme.  The fact
that a defendant's participation in a conspiracy was more
limited than that of a co-conspirator should not affect your
verdict.  An equal role is not what the law requires.  In fact,
even a single act may be sufficient to draw a defendant within
the scope of a conspiracy.

          It is not necessary that a defendant be fully informed
as to all the details of the conspiracy to justify an inference
of knowledge on his part.  To have guilty knowledge, a
defendant need not have known the full extent of the conspiracy
or all of its activities or all of its participants.  It is not
even necessary that the defendant know every member of the
conspiracy.  In fact, a defendant may know only one member of
the conspiracy and still be a co-conspirator.  Nor is it
necessary that a defendant receive any monetary benefit from
participating in the conspiracy or have a financial stake in

the outcome, so long as he in fact participated in the

conspiracy in the manner I have explained.

Ultimately, the question is this:  Has the government

proven beyond a reasonable doubt that the defendant joined the

conspiracy charged and knowingly and intentionally participated

in it with the awareness of its unlawful purpose and as

something he wished to bring about?

Turning to the third and final element of the

conspiracy charge, the government must prove beyond a

reasonable doubt that one of the members of the alleged

conspiracy or agreement knowingly and willfully performed at

least one overt act in furtherance of the objectives of the

conspiracy and that this overt act was performed during the

existence or life of the conspiracy and was done somehow to

further the goals of the conspiracy or agreement.

The term "overt act" means some type of outward action

performed by one of the members of the conspiracy that further

the objectives of the conspiracy.  An overt act may itself be a

lawful act; however, the act must be a step in achieving the

conspiratorial objectives.

The indictment alleges that the following acts were

committed in the Southern District of New York and elsewhere:

On or about September 18, 2018, a foreign national

Russian citizen and businessman who, at all relevant times, was

not a citizen or lawful permanent resident of the United

States, Andrey Muraviev, wired $500,000 from a foreign bank

account, through the Southern District of New York, to a bank

account under the control of Igor Fruman, who was a

co-conspirator of Parnas and Kukushkin, among others, for

purposes of making political contributions and donations.

On or about October 16, 2018, Andrey Muraviev wired

$500,000 from a foreign bank account, through the Southern

District of New York, to a bank account under the control of

Igor Fruman, for purposes of making political contributions and

donations.

On or about November 1, 2018, Parnas and Fruman used

funds wired by Andrey Muraviev to make maximum donations to two

political candidates for State office in Nevada.

In order for the government to satisfy this element,

it is not required that all of the overt acts alleged in the

indictment or even any of the overt acts contained in the

indictment be proven.  Although you must find unanimously that

some overt act in furtherance of the conspiracy has been

proved, you do not have to be unanimous as to which act.

Similarly, you need not find that the defendants committed the

overt act.  It is sufficient for the government to show that

one of the alleged conspirators knowingly committed an overt

act in furtherance of the conspiracy, since such an act

becomes, in the eyes of the law, the act of all the members of

the conspiracy.

LALTPAR7                          Charge

You are further instructed that the overt act need not have been committed at precisely the time alleged in the indictment.  It is sufficient if you are convinced beyond a reasonable doubt that it occurred at or about the time and place stated.

You should bear in mind that the overt act standing alone may be an innocent lawful act.  Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting a conspiratorial scheme.  You are therefore instructed that the overt act does not have to be an act which in and of itself is criminal or constitutes an objective of the conspiracy.

Count Two charges defendant Lev Parnas with solicitation of, and the aiding and abetting the solicitation of, one or more political contributions or donations by a foreign national.

Count Two reads in relevant part:

From in or about June 2018 through at least in or about April 2019, in the Southern District of New York and elsewhere, Lev Parnas, the defendant, knowingly and willfully solicited, and aided and abetted the solicitation of, a foreign national, directly and indirectly, to make contributions and donations of money, and made express and implied promises to make contributions and donations, in connection with federal and State elections, aggregating $25,000 and more in a calendar

1  year.

2         The relevant statutes covering this charge are Section

3  30121(b) of Title 52 of the United States Code and Section 2 of

4  Title 18 of the United States Code.  Section 30121(b) states

5  that it shall be unlawful for a person to solicit a

6  contribution or donation from a foreign national.  Section 2 of

7  Title 18 makes it a crime to aid, abet, counsel, command,

8  induce or procure such a crime.

9         In order to find defendant Lev Parnas guilty of

10 solicitation of one or more political contributions or

11 donations by a foreign national charged in Count Two, you must

12 find that the government has proven beyond a reasonable doubt

13 each of the following elements of the crime:

14        First, that the defendant solicited, and/or aided and

15 abetted the solicitation of, one or more political

16 contributions or donations of money;

17        Second, from a foreign national;

18        Third, the aggregate amount of such political

19 contributions or donations was $25,000 or more in a calendar

20 year; and

21        Fourth, the defendant did so knowingly and willfully.

22        To "solicit" or "solicitation" means to ask, request,

23 or recommend, explicitly or implicitly, that another person

24 make a contribution, donation, transfer of funds, or otherwise

25 provide anything of value.  A solicitation is an oral or

written communication that, construed as reasonably understood

in the context in which it is made, contains a clear message

asking, requesting, or recommending that another person make a

contribution, donation, transfer of funds, or otherwise provide

anything of value.  A solicitation may be made directly or

indirectly.  The mere solicitation or requesting of a

contribution is just as much a violation of the statute as the

actual making or receipt of a contribution.  It is not

necessary for the solicitation to actually succeed, or that a

contribution was actually made.

When you consider whether a defendant aided, abetted,

counseled, commanded, or induced the crime alleged in Count

Two, it is not necessary for the government to show that the

defendant himself actually committed the crime with which he is

charged in order for you to find the defendant guilty.  Rather,

a defendant must have willfully and knowingly associated

himself in some way with the crime, and willfully and knowingly

sought by some act to help make the crime succeed.

The mere presence of a defendant where a crime is

being committed, even coupled with knowledge by the defendant

that a crime is being committed, or the mere acquiescence by a

defendant in the criminal conduct of others, even with guilty

knowledge, is not sufficient to establish aiding and abetting.

An aider or abettor must have some interest in the criminal

venture.

LALTPAR7                         Charge

In determining whether the defendant aided or abetted the solicitation of one or more contributions or donations by a foreign national, ask yourself these questions:  Did he participate in the crime charged as something he wished to bring about?  Did he knowingly and willfully associate himself with the criminal venture?  Did he seek by his actions to make the criminal venture succeed?  If the defendant did these things, then he aided and abetted the solicitation of one or more contributions or donations by a foreign national as charged in Count Two, and is guilty of that offense.  If, on the other hand, your answer to any of these questions is "no," then the defendant is not an aider and abettor, and is not guilty as an aider and abettor of that offense.

(Continued on next page)

LALCpar8                    Charge

1          THE COURT:  As I have already told you, contributions
2     and donations include, together, any deposit of money, gift,
3     loan, or advance made by any person for the purpose of
4     influencing any election for a federal, state, or local office.
5          As I mentioned already, the term foreign national
6     means an individual who is not a citizen of the United States
7     and who is not lawfully admitted for permanent residence.
8          To find that the government has proven the third
9     element, you must find that the total amount of contributions
10    and donations solicited from the foreign national in the
11    calendar year 2018 were equal to or exceeded $25,000.
12         Finally, I've already instructed you on the meaning of
13    knowing and willfully, and you should apply those instructions
14    here.
15         Count Three charges the defendants, Lev Parnas and
16    Andrey Kukushkin, with aiding and abetting or making of one or
17    more political contributions or donations by a foreign
18    national.
19         Count Three reads, in relevant part, from in or about
20    June 2018 through at least in or about April 2019, in the
21    Southern District of New York and elsewhere, Lev Parnas and
22    Andrey Kukushkin, the defendants, knowingly and willfully aided
23    and abetted the making of a contribution, the making of
24    contributions and donations of money, and the making of express
25    and implied promises to making contributions and donations,

LALCpar8                    Charge

directly and indirectly, by a foreign national in connection

with federal and state elections, aggregating $25,000 and more

in a calendar year.

        The relevant statutes covering this charge are Section

30121(a) of Title 52, and Section 2 of Title 18.  Section

30121(a) states that it shall be unlawful for a foreign

national, directly or indirectly, to make a contribution or

donation of money or other thing of value or to make an express

or implied promise to make a contribution or donation in

connection with a federal, state, or local election.  Section 2

of Title 18 makes it a crime to aid, abet, counsel, command,

induce, or procure such a crime.

        In order to find defendant Lev Parnas and defendant

Andrey Kukushkin guilty of aiding and abetting of the making of

one or more contributions or donations by a foreign national as

charged in Count Three, you must find that the government has

proven beyond a reasonable doubt each of the following elements

of this crime.  First, that a foreign national, directly or

indirectly, made one or more contributions and donations --

contributions or donations; second, the aggregate amount of

such contributions or donations was $25,000 or more in a

calendar year; third, that the defendant aided, abetted,

counseled, commanded, or induced the foreign national in making

or to make one or more contributions or donations; fourth, the

defendant did so knowingly and willfully and with the intent to

LALCpar8                    Charge

1   facilitate the crime of making contributions or donations by a

2   foreign national or to help it succeed.

3          I previously defined and explained the terms foreign

4   national, contributions, donations, calendar year, and the

5   $25,000 aggregate amount requirement, and I instruct you to

6   refer back to my prior instructions.  I've also previously

7   defined and explained what it means for a defendant to aid,

8   abet, counsel, command, or induce a crime and what it means for

9   a defendant to act knowingly and willfully.  I again instruct

10  you to refer back to my prior instructions.

11         Count Four charges defendant Lev Parnas with

12  participating in a conspiracy with other individuals to make

13  political contributions in the names of persons other than the

14  true source of the funds, and/or to defraud the FEC.

15         Count Four reads, in relevant part, from in or about

16  March 2018 through at least in or about November of 2018, in

17  the Southern District of New York and elsewhere, Lev Parnas,

18  the defendant, knowingly conspired with others, known and

19  unknown, to knowingly and willfully make contributions to

20  candidates for federal office, joint fundraising committees,

21  and independent expenditure committees in the names of other

22  persons aggregating to $25,000 and more in a calendar year in

23  violation of title 52 U.S. Code, sections 30122 and 30109, and

24  to knowingly defraud the United States by impairing,

25  obstructing, and defeating the lawful functions of a department

LALCpar8                        Charge

1    or agency of the United States, to wit, the FEC's function to

2    administer federal law concerning source and amount

3    restrictions in federal elections, including the prohibitions

4    applicable to straw donors.  The relevant statute covering this

5    charge is section 371 of Title 18 of the United States Code.

6            As I told you previously, that section states that it

7    shall be unlawful for two more persons to conspire, either to

8    commit any offense against the United States or to defraud the

9    United States or any agency thereof in any manner or for any

10   purpose, and for one or more of such persons to do any act to

11   effect the object of the conspiracy.

12           I've already instructed you on the elements of

13   conspiracy in connection with Count One, and you may refer to

14   those instructions about conspiracies.

15           To summarize, in order to find defendant Lev Parnas

16   guilty of the conspiracy charged in Count Four, you must find

17   that the government has proven beyond a reasonable doubt each

18   of the following three elements of the crime; first, that two

19   or more persons entered the unlawful agreement charged in Count

20   Four; second, that the defendant knowingly and willfully became

21   a member of the alleged conspiracy; third, that one of the

22   members of the conspiracy knowingly committed at least one

23   overt act in furtherance of the conspiracy.

24           As I told you previously, the object of a conspiracy

25   is its illegal goal.  In Count Four, there are two objects or

goals alleged.  One, to make political contributions in the

name of a person other than the true source of the funds; two,

to defraud the FEC.

        The first object of the conspiracy charged in Count

Four is the object of making a political contribution in the

name of another person.  As I previously told you in connection

with Count One, in order to find that the defendant conspired

to violate that law, you must find that the government proved

beyond a reasonable doubt the defendant participated in a

conspiracy to, one, make one or more contributions; two, in the

name or names of one or more persons other than the true source

of the funds; three, with the aggregate amount of such

contributions being $25,000 or more in a calendar year; and

four, that he did so knowingly.

        I previously instructed you about the meaning of

contribution and I direct you to refer to those instructions

here.

        As I previously explained, the phrase making a

contribution in the name of another means making a disguised

contribution through an intermediary or conduit by giving that

person the funds for the contribution.  You should refer to my

full instructions about this phrase here.

        In Count Four, the indictment alleges that three

contributions were illegal, conduit, or straw contributions.

One of those contributions is alleged to have been made in the

LALCpar8                    Charge

name of an LLC, Global Energy Producers.  For the two

contributions alleged to have been made in Parnas's name, you

should apply the instructions I previously gave you in

connection with Count One.

I will now say a few words about the application of

the conduit contribution prohibition to LLCs.  That statute

states, in relevant part, that no person shall make a

contribution in the name of another person.  Person means not

only an individual, but also a partnership, corporation, or

another organization, and therefore the law applies to closely

held corporations and corporate LLCs.

A contribution made in the name of a closely held

corporation or corporate LLC but paid for by another person is

an illegal conduit contribution where funds were intentionally

funneled through the entity for the purpose of obscuring the

source of the funds or evading the legal requirement that

contributions be reported accurately to the FEC.

You may consider circumstances such as whether the

corporate entity did not have income from assets, investment

earnings, business revenues or bonafide capital investments, or

was created and operated for the sole purpose of making

political contributions.  Based on such circumstantial

evidence, you may conclude that the corporate entity is merely

a conduit and not the true source of the funds.

The second object of the conspiracy charged in Count

LALCpar8                    Charge

Four is the object of defrauding the United States, and

specifically the FEC in violation of Section 371 of Title 18.

        As I instructed you previously in connection with

Count One, a conspiracy to defraud the United States means if

the defendant and his alleged coconspirators are accused of

conspiring to impede, impair, obstruct, or defeat by fraudulent

or dishonest means, the lawful, regulatory, and enforcement

functions of an agency of the United States.

        You should consult my prior instructions relating to a

conspiracy to defraud the United States.  Those instructions

apply equally to Count Four.

        If you find that the government has proven beyond a

reasonable doubt that the conspiracy charged in Count Four of

the indictment existed, then you must consider the second

element of this crime.  The second element, the government must

prove beyond a reasonable doubt to establish the offense of

conspiracy is that the defendant knowingly, willfully, and

voluntarily became a member of the alleged conspiracy.  I've

already instructed you on the meaning of knowingly, willfully,

and voluntarily becoming a member of a conspiracy as part of my

instructions on Count One.

        Turning to the third element of the conspiracy charge,

the government must prove beyond a reasonable doubt that one of

the members of the alleged conspiracy or agreement knowingly

and willfully performed at least one overt act in furtherance

1    of the objectives of the conspiracy and that this overt act was

2    performed during the existence or life of the conspiracy and

3    was done somehow to further the goals of the conspiracy or

4    agreement.  As I've instructed you, the term overt act means

5    some type of outward objective action performed by one of the

6    members of the conspiracy that further the objectives of a

7    conspiracy.

8            The indictment alleges that the following overt acts,

9    each of which is one of the contributions alleged to have been

10   made illegally, were committed in the Southern District of New

11   York and elsewhere.

12           In or about May 2018, Igor Fruman and others, known

13   and unknown, obtained a private loan, the proceeds of which

14   were used to fund a $325,000 contribution made by Parnas to a

15   joint fundraising committee, America First Action PAC.  Parnas

16   caused the contribution to America First Action PAC to be

17   falsely reported in the name of Global Energy Producers.

18           In our about June 2018, Parnas made an $11,000

19   contribution to a joint fundraising committee, Protect the

20   House, using funds that belonged to Fruman and another

21   individual.

22           In or about June 2018, Parnas used a business credit

23   card registered to a credit card account belonging to Fruman

24   and another individual in order to make a maximum $2,700

25   contribution to the reelection campaign of then sitting U.S.

Congressman Pete Sessions.

As I told you previously, in order for the government
to satisfy this element, it is not required that all of the
overt acts alleged in the indictment or even any of the overt
acts contained in the indictment be proven.  However, you must
unanimously agree that some overt act was committed, although
you do not have to agree on which act.

Count Five charges defendant Lev Parnas with making
false statements to the FEC in an affidavit.  Count Five reads,
in relevant part, in or about October 2018, in the Southern
District of New York and elsewhere, Lev Parnas, the defendant,
willfully and knowingly did make materially false, fictitious
and fraudulent statements and representations in a matter
within the jurisdiction of the executive branch of the
Government of the United States, to wit, Parnas made materially
false statements in an affidavit submitted to the FEC that,
quote, a $325,000 contribution to America First Action PAC was
made with Global Energy Producers' funds for Global Energy
Producers' purposes, and that Global Energy Producers is a real
business enterprise funded with substantial bonafide capital
investment, its major purpose is energy trading, not political
activity, and, quote, and that a contribution made by Parnas on
or about June 25th, 2018 to Congressman Pete Sessions' campaign
for reelection, quote, was made with a business credit card
which Parnas reimbursed, end quote.

1   The relevant statute governing this charge is section

2   1001(a)(2) of Title 18 of the U.S. Code.  That section states

3   that, quote, who ever in any matter within the jurisdiction of

4   the executive, legislative, or judicial branch of the

5   government of the United States knowingly and willfully makes

6   any materially false, fictitious, or fraudulent statement or

7   representation, end quote, shall be guilty of a crime.

8   In order to find defendant Lev Parnas guilty of making

9   false statements to the FEC as charged in Count Five, you must

10  find the government has proven each of the following elements

11  beyond a reasonable doubt.  First, that the defendant made a

12  statement that was false, fictitious, or fraudulent; second

13  that the statement was material; third that the defendant acted

14  knowingly and willfully; and fourth, that the statement

15  pertained to a matter within the jurisdiction of the executive,

16  legislative, or judicial branch of the United States

17  Government.

18  Now I will give you more detailed instructions on some

19  of these terms.

20  As to the first element, the government need not prove

21  that the defendant physically made or otherwise personally

22  prepared the statement in question.  It is sufficient if the

23  defendant caused the statement charged in the indictment to

24  have been made.  A statement is false or fictitious if it was

25  untrue when it was made, and the defendant knew it was untrue

at the time.  A statement is fraudulent if it was untrue when

it was made, the defendant knew it was untrue at the time, and

the defendant intended to deceive.

The indictment alleges that Parnas made two false

statements in his FEC affidavit.  First, that the $325,000

contribution to the America First Action PAC was made with

Global Energy Producers' funds and that the company was a real

business with substantial bonafide capital investment; and

second, that the contribution made by Parnas to Congressman

Pete Sessions was made with a business credit card, which was

reimbursed by Parnas.  It is not necessary for the government

to prove that both statements constituted a materially false

statement.  The government satisfies its burden if it proves

beyond a reasonable doubt that one of the factual statements

specified in Count Five was such a statement.  However, you may

not find the defendant guilty on Count Five unless you all

agree unanimously as to which of the specified statements

constituted a material false statement or that both did.

As to the second element, a material statement or

representation is one that has the natural tendency to

influence or is capable of influencing a decision or a function

of a government agency, including the FEC.  However, proof that

the FEC actually relied on the statement is not required.  An

act is done knowingly and willfully if one acts knowingly and

intentionally with the intent to do something the law forbids,

1    that is to say with bad purpose to either disobey or disregard

2    the law.  A matter is within the jurisdiction of the executive

3    branch of the United States Government if, for example, the FEC

4    has the power to exercise authority in that matter.

5            Count Six charges defendant, Lev Parnas, with

6    falsification of records.  It reads, in or about October 2018,

7    in the Southern District of New York and elsewhere, Lev Parnas,

8    the defendant, willfully and knowingly did falsify and make a

9    false entry in a record and document with the intent to impede,

10   obstruct, or influence the investigation or proper

11   administration within a matter within the jurisdiction of any

12   department or agency of the United States and in relation to

13   and in contemplation of any such matter, to wit, Parnas made

14   materially false statements in an affidavit submitted to the

15   FEC, including that, quote, a $325,000 contribution to America

16   First Action PAC was made with Global Energy Producers' funds

17   for Global Energy Producers' purposes, and that Global Energy

18   Producers is a real business enterprise funded with substantial

19   bonafide capital purpose.  Its major purpose is energy trading

20   and not political activity, end quote, and that a contribution

21   made by Parnas on or about June 25th, 2018 to Congressman Pete

22   Sessions's campaign for reelection, quote, was made with a

23   business credit card, which Parnas reimbursed, end quote, with

24   the intent to impede, obstruct, or influence the investigation

25   and proper administration of a matter within the jurisdiction

1    of the FEC.

2           The relevant statute covering this charge is Section

3    1519 of Title 18.  That section states that, quote, whoever

4    knowingly alters, destroys, mutilates, conceals, covers up,

5    falsifies or makes a false entry in any record, document, or

6    tangible object with the intent to impede, obstruct, or

7    influence the investigation or proper administration of any

8    matter within the jurisdiction of any department or agency of

9    the United States or in relation to or contemplation of any

10   such matter or case shall be guilty of a crime.

11          In order to find defendant, Lev Parnas, guilty of

12   falsification of records as charged in Count Six, you must find

13   that the government has proven beyond a reasonable doubt each

14   of the following elements of the crime.  First, that the

15   defendant falsified or made a false entry in a record or

16   document; second, that the defendant acted knowingly; third,

17   that the defendant acted with the intent to impede, obstruct,

18   or influence a matter within the jurisdiction of or in relation

19   to or in contemplation of a department or agency of the United

20   States.

21          Now I will give you more detailed instructions on some

22   of those terms.

23          The first element that the government must prove is

24   that the defendant falsified a record, here an affidavit

25   submitted to the FEC.  Falsifying a record means knowingly

included within the record any untrue statement of fact or

knowingly omitting from the record any fact that is necessary

to make the facts that are included not misleading.  Falsify,

therefore, does not only mean tampering with the preexisting

record, but can include the creation of a new record.

The indictment alleges that Parnas made two false

entries in his FEC affidavit.  First, that the $325,000

contribution to America First Action PAC was made with Global

Energy Producers' funds and that the company was a real

business with substantial bonafide capital investment; and

second, that the contribution made by Parnas to Congressman

Sessions was made with a business credit card which was

reimbursed by Parnas.

It is not necessary for the government to prove that

both statements in the affidavit constituted false entries.

The government satisfies its burden if it proves beyond a

reasonable doubt that one of the alleged false entries

specified in Count Six was a false entry.  However, you may not

find the defendant guilty on Count Six unless you all agree,

unanimously, as to which of the false entries was false or that

both were false.

As for the second element, a person acts knowingly if

he acts intentionally and voluntarily and not because of

ignorance or mistake, accident, or carelessness.  Whether the

defendant acted knowingly may be proven by the defendant's

LALCpar8                          Charge

conduct and by all of the facts and circumstances surrounding
the matter.

          The third element the government must prove beyond a
reasonable doubt is if the defendant acted with the intent to
impede, obstruct, or influence a matter within the jurisdiction
of or in relation to or in contemplation of a department or
agency of the U.S. Government, here the FEC.

          The government is not required to prove the defendant
knew his conduct would obstruct the federal matter or that a
federal investigation would take place, or that he knew of the
limits of federal jurisdiction.  However, the government is
required to prove that the defendant intended to impede,
obstruct, or influence -- sorry.  However, the government is
required to prove that the matter that the defendant intended
to impede, obstruct, or influence did, in fact, concern a
matter within the jurisdiction of an agency of the United
States.

          In addition to all the elements that I've described
for you, you must separately decide whether an act in
furtherance of each alleged crime occurred within the Southern
District of New York.  The Southern District of New York
includes Manhattan, the Bronx, and Westchester.  This
requirement is called venue.  The parties have stipulated that
this element has been met.

          Mr. Parnas and Kukushkin have several theories of

LALCpar8                    Charge

defense that may be helpful to you as you examine the evidence.
It is important to keep in mind that despite these explanations
of the defendants' respective views of the government's
evidence, the burden always remains on the government to prove
each and every charge.  The defendants do not need to prove
anything.

        By explaining their defenses, the defendants are in no
way assuming that burden.  As I said, these types of
instructions are simply meant to provide you with the
defendants' viewpoint.

        Mr. Parnas asserts he did not knowingly and willfully
violate the federal election and campaign laws that have been
charged against him.  He asserts that he did not participate in
the charged conspiracy to make contributions by a foreign
national, nor the solicitation of a contribution or making of a
contribution by a foreign national.  Mr. Parnas further asserts
that he did not conspire to make contributions in the name of
another, nor did the government prove beyond a reasonable doubt
that he made materially false statements to the FEC or
falsified an official record.

        Mr. Kukushkin denies the government's allegations and
maintains that at the time Mr. Parnas, Mr. Fruman, and GEP made
contributions, there was no agreement among them to make
contributions by a foreign national or straw donor, or to
defraud the FEC.

1        Mr. Kukushkin further maintains that he was unaware

2   that Mr. Parnas, Mr. Fruman, and GEP were making the political

3   contributions and donations at the time they were made.

4        Mr. Kukushkin also maintains that even if he had

5   believed that Mr. Parnas and Mr. Fruman intended to make

6   contributions by a foreign national or a straw donor or to

7   defraud the FEC, he did not knowingly or willfully enter into

8   any agreement with them to make such contributions or to

9   defraud the FEC since he had no knowledge of the unlawful

10  nature of any such agreement.

11       Mr. Kukushkin further maintains that even if he had

12  believed Mr. Parnas and Mr. Fruman intended to make

13  contributions by a foreign national or a straw donor, that they

14  were only pretending, unless there was no agreement with them.

15       Finally, Mr. Kukushkin maintains that none of the

16  contributions made by Mr. Parnas, Mr. Fruman, and GEP between

17  June 2018 and November 1st, 2018, including the Laxalt and

18  Duncan contributions, were by a foreign national.

19       Now, that completes my substantive instructions.  Your

20  function will now be to weigh the evidence in this case and to

21  determine the guilt or lack of guilt of the defendants with

22  respect to the charges in the indictment.  I apologize that

23  I've kept you this late, but we're just about done.

24       You must base your verdict solely on the evidence and

25  instructions on the law, and you are obliged on your oath as

LALCpar8                    Charge

1    jurors to follow the law as I instruct you, whether you agree

2    or disagree with the particular law in question.

3            Your verdict must be unanimous.  That means each and

4    every one of you must agree upon your verdict.  Each juror is

5    entitled to his or her opinion, but you are required to

6    exchange views with your fellow jurors.  That is the essence of

7    jury deliberation.

8            It is your duty to consult with one another and to

9    deliberate with a view to reaching agreement.  If you start

10   with one point of view, but after reasoning with other jurors

11   it appears that your own judgment is open to question, then, of

12   course, you should not hesitate in yielding your original point

13   of view if you are convinced that the opposite point of view is

14   the one that truly satisfies your judgment and conscience.

15           You are not to surrender a view of the case that you

16   conscientiously believe merely because you are outnumbered or

17   because other jurors appear firmly committed to their views.

18   You should vote with the others only if you are convinced on

19   the evidence, the facts, and the law, that it is the correct

20   way to decide the case.

21           In sum, you, the jury, must deliberate as a body, but

22   each of you as an individual juror must discuss and weigh your

23   opinions dispassionately and adopt that conclusion, which, in

24   your good conscience, appears in accordance with the truth.  No

25   juror should surrender his or her conscientious beliefs solely

1   for the purpose of returning a unanimous verdict.

2           I instruct you that you are not to discuss the case

3   unless all jurors are present.  Four or five or ten jurors or

4   eleven jurors together are only a gathering of individuals.

5   Only when all jurors are present do you constitute a jury and

6   only then may you deliberate.

7           Remember at all times, you are not partisans, you are

8   judges, judges of the facts.  Your sole interest is impartially

9   to assess the evidence to determine whether the government has

10  met its burden of proving guilt beyond a reasonable doubt as to

11  each of the charges and each of the defendants.

12          If you are divided, do not report how the vote stands.

13  Simply state that you are divided.  If you have reached a

14  verdict, do not report what it is until you are asked to do so

15  in open court.  Simply inform me through a note that you've

16  reached a verdict.

17          You are about to go into the jury room and begin your

18  deliberations.  I realize you may be going home shortly, but in

19  the morning, you'll come back to begin your deliberations.

20          The exhibits that were received in evidence will be

21  provided to you in the jury room.  In addition to paper copies

22  of many exhibits, you'll be provided with a laptop that

23  contains the exhibits that could not be presented in hardcopy.

24  I actually think all the exhibits will be on a laptop as

25  opposed to hardcopy, but you'll all be able to view them on a

LALCpar8                    Charge

1    screen.  You'll be given an exhibit list that will explain

2    which exhibits can be accessed on the laptop.

3         If you want any of the testimony to review, you may

4    request that.  It's not always easy to locate exactly what you

5    might want, but please be as specific as possible and I can

6    provide you copies of any testimony.

7         If you want any further explanation of the law as I've

8    explained it, you may also request that.  Your request for

9    testimony, and, in fact, any communication with the Court,

10   should be made in writing, signed by the foreperson, and given

11   to the marshal or deputy clerk which will then be given to me.

12   In any event, do not tell me or anyone else how the jury stands

13   on any issue or whether there is a unanimous verdict.

14        If you took notes during the trial, those notes are

15   only an aid to recollection, they're not evidence, nor are they

16   a substitute for your recollection of the evidence.  Your notes

17   are not entitled to any greater weight than your actual

18   recollection or the impression of each juror as to what the

19   evidence actually is.  I emphasize that if you took notes, you

20   should not show your notes to other jurors during your

21   deliberations.  They're only for yourself.  If you did not take

22   notes during the trial, you should not be influenced by the

23   notes of another juror and instead should rely on your own

24   recollection of the evidence.  And the fact that a particular

25   juror has taken notes does not entitle that juror's views to

LALCpar8                          Charge

1     any greater weight.

2              I've prepared a verdict form for you to use in

3     recording your decision.  Please use that form to report your

4     verdict.  Your verdict form does not represent evidence or

5     instructions on the law.

6              As you start deliberations, you must choose a

7     foreperson, which you can either do this evening before you

8     leave or first thing in the morning.  The foreperson does not

9     have any more power or authority than any other juror, and his

10    or her vote or opinion does not count for any more than any

11    other juror's.  The foreperson is simply the spokesperson to

12    the Court.  He or she will send out any notes, and when the

13    jury has reached a verdict, he or she will notify the marshal

14    that the jury has reached a verdict and you'll come to open

15    court to give the verdict.

16             After you've reached the unanimous verdict, your

17    foreperson will fill in the form, the verdict form, sign and

18    date it, and advise the marshal outside your door that you're

19    ready to return to the courtroom.

20             I stress that each one of you must be in agreement

21    with the verdict that is announced in court.  Once your verdict

22    is announced in open court and officially recorded, it cannot

23    ordinarily be revoked.

24             I remind you that you took an oath to render judgment

25    impartially and fairly without prejudice or sympathy solely

LALCpar8                    Charge

upon the evidence in the case and the applicable law.  I'm sure
that if you follow your oath, listen to the views of your
fellow jurors, and apply your common sense, you will reach a
fair verdict here.  Remember that your verdict must be rendered
without fear, without favor, and without prejudice or sympathy.

Do any of the lawyers need to speak about anything at
sidebar?

MR. BONDY:  No, your Honor.

MR. ROOS:  No.

THE COURT:  This concludes my instructions to you.

Before you retire to the jury room, I must inform you
that the law provides for a jury of twelve people.  Therefore,
two people, jurors 13 and 14 in the back row are alternates.
You will be allowed to leave the courthouse during
deliberations.  So I'm going to ask you to leave first, but I
want to say that I'm not yet excusing you as jurors in the
case.  In the event that one of the non-alternate jurors can no
longer deliberate, you will be recalled.  So you're not yet
released, but you are going to leave and I'm not going to need
you to come back tomorrow unless we'll contact you and tell you
that you need to come back.

I'm releasing you for now, but again, I'm not
completely excusing you.  You've been very attentive and very
patient.  I'm sorry that the two alternates will not be allowed
to deliberate, most likely, unless you're called back.

LALCpar8                          Charge

1          I'm going to ask the alternates as you leave not to

2     discuss the case for the next few days.  We'll contact you when

3     it's over and you'll know then you can discuss the case.

4     Again, we might have to call you back since you've heard all

5     the evidence if there is an issue that comes up with one of the

6     other jurors.

7          That completes my instructions.  Since it's the end of

8     the day, I'm going to ask you to come back to start at 9:30.

9     Before you start deliberating, I'll bring you out and tell you

10    when you start.  So as soon as you're all here, we'll come back

11    to court and you can begin your deliberations.  Thanks,

12    everyone.

13         And, again, you're not deliberating tonight.  You can

14    actually take your pads back to the jury room now and in the

15    morning you'll be able to begin deliberating, but not until all

16    of you are present.

17         Again, no research on the case, no deliberations with

18    anyone else about the case, no discussion of the case, and you

19    will begin your deliberations I assume tomorrow after you've

20    picked a foreperson.  When you do pick a foreperson, send out a

21    note just saying so and so, juror number X is the foreperson.

22         Thanks, everyone.  Have a goodnight.

23         (Adjourned to October 22, 2021 at 9:30 a.m.)

24                              * * *

25

LALCpar8                    Charge

                        GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  602 and 603   . . . . . . . . . . . . . . . .1295

                        DEFENDANT EXHIBITS

Exhibit No.                                    Received

A3, A4, A5, A6, A6A and SD4   . . . . . . . .1295

B5    . . . . . . . . . . . . . . . . . .1295

S12 and G1    . . . . . . . . . . . . . .1297