UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――
UNITED STATES OF AMERICA

            -v-

LEV PARNAS and
ANDREY KUKUSHKIN,
                      Defendants.
―――――――――――――――――――――――――――――――

S3 19-CR-725 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Defendants Lev Parnas and Andrey Kukushkin, along with other individuals, were charged with federal election law violations for a scheme in which they conspired to disguise and use a foreign national's money for contributions to political candidates in U.S. elections (the "Foreign Donor Scheme"), in violation of the prohibition on political contributions from foreign nationals. *See* 52 U.S.C. § 30121. These contributions went to candidates in states where Defendants intended to seek licenses to operate a cannabis business. Parnas, along with another individual, was also charged with federal election law violations for conspiring to disguise and falsely report the source of donations to political action committees and campaigns (the "Straw Donor Scheme"), thereby evading federal contribution limits. *See* 52 U.S.C. § 30122. Following a jury trial in October 2021, Parnas and Kukushkin were convicted on all counts against them. Both Defendants have moved for judgment of acquittal or, in the alternative, for a new trial.

**I.      Background**

      The Court presumes familiarity with the background of this case and with the legal issues addressed in the Court's opinion resolving Defendants' pretrial motions. *See United States v. Parnas*, No. 19 Cr. 725, 2021 WL 2981567 (S.D.N.Y. July 14, 2021).

The trial against Defendants began on October 13, 2021. On October 22, 2021, the jury found Parnas guilty on all counts for his role in the Foreign Donor Scheme — Counts One (conspiracy to make contributions by a foreign national), Two (solicitation of a foreign national), Three (aiding and abetting the making of a contribution by a foreign national) — and on all counts for his role in the Straw Donor Scheme — Counts Four (conspiracy to make contributions in the name of another), Five (false statements), and Six (falsification of records). The jury also found Kukushkin guilty on all counts for his role in the Foreign Donor Scheme — Counts One and Three. (*See* Dkt. No. 249.) Kukushkin was not alleged to have participated in, or to have had any connection to, the Straw Donor Scheme. (*See* Dkt. No. 207.)

Parnas and Kukushkin have both moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. They move, in the alternative, for a new trial pursuant to Rule 33.

## II.     Motions for Judgment of Acquittal

A motion for judgment of acquittal under Rule 29 may be granted only if "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). When considering such a motion, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (internal quotation marks omitted). A defendant challenging a jury's guilty verdict "bears a heavy burden." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted).

Defendants argue that the evidence at trial was insufficient to support the jury's guilty verdict for several reasons. Each is addressed in turn.

### A.     Foreign Donor Scheme

Defendants contend that there was evidence of facts in the case that would have prevented a rational trier of fact from concluding that there was any kind of conspiracy with respect to the Foreign Donor Scheme. Kukushkin also challenges the sufficiency of the evidence that he had a meeting of the minds with his co-conspirators and that he joined the conspiracy willfully.

#### 1.     Existence of a Conspiracy

First, Parnas and Kukushkin point out that the political contributions in this case went to recipients who were staunch opponents of legalized cannabis. But this fact does not exculpate Defendants from participating in a conspiracy. The relevant statutes here, which criminalize donation of foreign money, straw donations, and defrauding the Federal Election Commission ("FEC"), do not also require that political donations actually influence the recipient or help the donor. *See* 52 U.S.C. §§ 30121, 30122, and 30109(d)(1)(A) & (D). At best, this argument provides circumstantial evidence that the schemes here might have been illogical and perhaps less likely to have occurred — an inference that the jury could, and did, reject in light of the ample evidence of a conspiracy. Indeed, the government introduced evidence that supported the inference that defendants believed, even if mistakenly, that their donations would help their cannabis business. For instance, after the Nevada cannabis license deadline passed, Kukushkin texted his co-conspirators that they could "change the rules" with the help of "the Governor" and "the Attorney General." (*See* GX 81.) And a chart of proposed donations to political candidates, which Kukushkin sent to Muraviev, was titled "Cannabis Schedule and Budget." (*See* GX 33, 45.) A reasonable jury could rely on this evidence to infer that the political contributions in this case were made as a part of an illegal conspiracy.

Second, Parnas and Kukushkin argue that the evidence did not support the existence of a conspiracy because of the timing of some donations and the fact that Muraviev's money could not be traced to all the donations. It is true that some of the political donations in this case were made before Muraviev transferred any money. The government, however, introduced evidence of an agreement among Kukushkin, Parnas, and other individuals that Muraviev's money would reimburse these earlier donations. Fruman texted Muraviev, in a message later forwarded to Parnas and Kukushkin, that he and Parnas "handed out a lot . . . . We had no doubt that the funds would come according to the set schedule." (*See* GX 58-A-84-T.) A text from Kukushkin stated that "we all have a clarity from day 1" on the "precise course of action" for the "[m]oney transferred by Andrey M" to be used "to support" the individuals in a chart of proposed donations. (*See* GX 83.) There was also the testimony of Kimberly Espinoza, a forensic accountant who traced over $136,000 of Muraviev's money to reimbursing political contributions. (*See* GX 1403.) Though Parnas and Kukushkin accurately note that Espinoza could not identify which funds paid off the credit card used to fund donations to Adam Laxalt and Wes Duncan (*see* Tr. 1015–17), the money Espinoza could trace was more than sufficient since the relevant threshold to sustain Defendants' convictions is $25,000. *See* 52 U.S.C. § 30109(d)(1)(A) & (D). Moreover, there were communications among the co-conspirators supporting the inference that Muraviev's money also reimbursed the Laxalt and Duncan donations. (*See, e.g.*, GX 58 (chat exchange noting that donations were "committed" but not yet "paid" to Laxalt and Duncan, among others).)

Viewing all the evidence in the light most favorable to the government, and deferring to the jury's assessment of witness credibility, the Court concludes that a rational jury could find that there was a conspiracy among Parnas, Kukushkin, and other individuals.

## 2. Meeting of the Minds

Kukushkin contends that the evidence at trial failed to show that he reached an agreement with Parnas and the other co-conspirators to funnel Muraviev's money to political candidates. Kukushkin instead asserts that the evidence, at best, showed fluid negotiations that never materialized into an agreement. This argument is directly undermined by evidence of Kukushkin's own words to his co-conspirators.

The government introduced several text messages that Kukushkin sent to his co-conspirators about their illicit agreement to donate Muraviev's money to political candidates:

- "Leva, the money where wired to Global Energy in order cover all the donations whatsoever" (GX 86);
- "please allocate 10% of the existing donation funds" (GX 54);
- "We were supposed to tell him that the check(s) from Global are indeed the donations from us" (GX 86);
- "I believe we all have a . . . precise course of action . . . . Money transferred by Andrey M to Global was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing" (GX 83).

Kukushkin maintains that the "donations" he spoke of in his text messages were for the benefit of Global Energy ("GEP"), but one of his messages states that the checks *from* GEP were "the donations from us." (GX 86.) And a separate message from Kukushkin lays out that the money "transferred by Andrey M to Global" was meant to support "specific people & states," not GEP. In addition to these text messages, Kukushkin forwarded a chart of proposed campaign contributions to Muraviev and asked Muraviev to transfer $500,000 to Parnas and Fruman. (*See* GX 45.)

Kukushkin's arguments against the weight of this evidence are availing. Kukushkin counters that his text messages were cherry picked, and that many of his text exchanges with his co-conspirators were about completely legal aspects of the group's ventures. To be sure, the evidence showed that Kukushkin and his co-conspirators also discussed lawful plans, which the government acknowledges. Yet Kukushkin and others discussing lawful plans does not exculpate Kukushkin of agreeing to unlawful plans too.

Kukushkin also argues that these text exchanges do not show a true meeting of the minds because other evidence showed that his co-conspirators were not sincerely invested in the cannabis venture and even diverted some of Muraviev's money for their personal use. This argument fails for two reasons. First, a conspiracy exists even when the conspirators have not "agreed on the details of their criminal enterprise," as long as they have agreed on "the offense" to be committed. *United States v. Rosenblatt*, 554 F.3d 36, 38–41 (2d Cir. 1977). As discussed, there was ample evidence of Kukushkin agreeing to the crime of using Muraviev's money for political donations, and that some of Muraviev's money was indeed used for this purpose. It is of no consequence that Kukushkin's co-conspirators, unbeknownst to him at the time, also used Muraviev's money for personal expenses. Second, Kukushkin also agreed to the conspiracy with Muraviev (*see, e.g.,* GX 45, 83), which would suffice to convict Kukushkin of conspiracy. *See United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992) ("A conspiracy involves an agreement by at least two parties to achieve a particular illegal end.").

Viewing all the evidence in the light most favorable to the government, the Court concludes that a rational jury could find there was a meeting of the minds between Kukushkin and his co-conspirators.

### 3. Willfulness

Kukushkin further argues that the evidence does not support that he willfully joined the conspiracy, as the relevant statute requires. *See* 52 U.S.C. § 30109(d)(1)(A).

At trial, the government produced direct evidence that Kukushkin knew the conspiracy he agreed to was illegal. Kukushkin forwarded an article to Muraviev that described using a "conduit" to "mask the actual sources of . . . political contributions" as illegal. (*See* GX 30-A-1.) This specific article even described the alleged users of the illegal conduit as Parnas and Fruman, and the conduit as GEP (*see id.*) — the same entity that Kukushkin later said he transferred Muraviev's money to "in order to cover all donations whatsoever." (*See* GX 86.) Kukushkin argues that there was no proof that he actually read this article, but a reasonable juror could infer that he would have read an article that he forwarded to someone. There was also circumstantial evidence that supported the inference that Kukushkin knew his conduct was unlawful. For instance, Kukushkin wrote an email about his concerns about including Muraviev in the paperwork for the same cannabis venture that he and his co-conspirators planned to funnel Muraviev's money through to make political donations. (*See* GX 137.)

Viewing all the evidence in the light most favorable to the government, the Court concludes that a rational jury could find that Kukushkin willfully joined the conspiracy.

### B. Straw Donor Scheme

#### 1. Count Four

Parnas argues that there was insufficient evidence for his conviction on Count Four — conspiring to donate Fruman's money in the name of another. For this argument, Parnas focuses solely on his $325,000 donation to the America First Action PAC ("AFA"), asserting that the donation came from GEP instead of Fruman.

7

The government presented evidence that the $325,000 that went to AFA came from Fruman's lenders, to Parnas's bank account, to AFA, without ever going to GEP. (*See* GX 1403; Tr. 621.) Parnas counters that he received the money — instead of GEP — before it went to AFA because GEP did not yet have a bank account. But it was certainly reasonable for the jury to decline to credit this alternative inference, especially since the jury convicted him of lying about this donation for Counts Five and Six.

Even if Parnas were right about the AFA donation being insufficient evidence to support a conviction under Count Four, there was sufficient evidence to convict Parnas under Count Four for a separate donation: Parnas's $11,000 donation to the Protect the House PAC using Fruman's money. (*See* GX 1403.) This donation circumvented contribution limits that Fruman had already exceeded when donating in his own name. Parnas does not address this entirely sufficient basis to sustain his conviction on Count Four.

Viewing all the evidence in the light most favorable to the government, the Court concludes that a rational jury could find that Parnas was guilty on Count Four.

      2.    **Counts Five and Six**

With respect to Counts Five and Six, Parnas argues that the government failed to present sufficient evidence that his lying about the source of his $2,700 donation to Congressman Pete Sessions was "material." In support of this contention, Parnas notes that the FEC witness who testified at trial never confirmed or denied whether $2,700 met the FEC's threshold for materiality, which would initiate an enforcement action. (*See* Tr. 498–99.) Parnas also asserts that there was insufficient evidence that his statements about GEP to the FEC were false.

At trial, the Court instructed the jury — without objection — that "a material statement or representation is one that has the natural tendency to influence or is capable of influencing a decision or function." (Tr. 1510.) Even if Parnas's $2,700 donation was not enough for the FEC

8

to initiate an enforcement action, it could have affected the FEC's decision to continue or expand its preexisting investigation into Parnas's $325,000 straw donation. Parnas's lie about the source of his $2,700 donation could have also affected the FEC's decision on how to sanction him for his earlier $325,000 straw donation. Ultimately, whether Parnas's lie about his $2,700 donation *actually* influenced the FEC is irrelevant; what matters is that it could have done so. *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (finding a statement made to a bank material where it could have affected an interest rate charged even if it did not affect the decision to lend); *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006) (explaining that a false statement can be material if it is "capable of distracting government investigators' attention" from broadening their investigation); *United States v. Sampson*, No. 13 Cr. 269, 2016 WL 756565, at *18 (E.D.N.Y. Feb. 26, 2016) (concluding that a statement was material because it could have influenced the scope of an FBI investigation that had already begun).

Moreover, contrary to Parnas's assertions, there was sufficient evidence that he lied to the FEC about GEP. Parnas swore to the FEC that GEP had spent over a million dollars in operations, even though it had no budget or operations, and that GEP's "major purpose was energy trading," even though GEP did not engage in any energy trading. (*See* GX 148, 1403.) And all of this is to say nothing of Parnas's false statements about the source of his $325,000 donation (*see* GX 1403), another basis for his convictions under Counts Five and Six that he does not challenge.

Viewing all the evidence in the light most favorable to the government, the Court concludes that a rational jury could find that Parnas was guilty on Counts Five and Six.

### III. Motions for a New Trial

Defendants also move for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. That Rule provides: "Upon the defendant's motion, the court may vacate

9

any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).

### A.     Willfulness Instruction

For a defendant to be guilty of aiding and abetting the making of a contribution by a foreign national, he must act willfully. *See* 52 U.S.C. § 30109(d)(1)(A). Kukushkin argues that the Court erroneously instructed the jury on the definition of willfulness, meriting a new trial under Rule 33.

How the Court instructed the jury on willfulness was legally correct and consistent with controlling precedent. The Court gave the following instruction to the jury on the meaning of willfulness:

> An act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids, and again not by mistake or accident. In other words, a person acts "willfully" when he acts with a "bad purpose" to disobey or disregard the law. It is not, however, necessary for the government to prove that the defendant was aware of the specific provision of the law that he is charged with violating. Rather, it is sufficient for the defendant to act knowing that his conduct is unlawful, even if he does not know precisely which law or regulation makes it so.

(Tr. 1487.) "The Supreme Court has held that, '[a]s a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) (quoting *Bryan v. United States*, 524 U.S. 184, 191–92 (1998)). In *Bryan*, the

Supreme Court approved of a willfulness charge instructing that so long as a defendant "act[s] with the intent to do something that the law forbids," he need not be aware "of the specific law or rule that his conduct may be violating." *Bryan*, 524 U.S. at 190 (quoting jury instructions). "While *Bryan* made these pronouncements in the context of a federal firearms conviction, [the Second Circuit] has recognized that its definition of willfulness is generally applicable." *Kosinski*, 976 F.3d at 154 (approving of the standard willfulness instruction in an insider trading case).

Despite this precedent on the meaning of "willfulness," Kukushkin contends that the Federal Election Campaign Act ("FECA") is a technical statute, like federal criminal tax laws, so the Court should have instructed the jury that the defendants "knew of the existence and meaning of the statute that made their conduct unlawful." (Dkt. No. 287 at 32 (citing *Cheek v. United States*, 498 U.S. 192 (1991) and *Ratzlaf v. United States*, 510 U.S. 135 (1994)). But, as the Ninth Circuit observed, the statute here is "not a technical statute, nor does it present the same concern of inadvertently ensnaring uninformed individuals" like federal criminal tax laws can. *United States v. Singh*, 979 F.3d 697, 712 (9th Cir. 2020). FECA, instead, "simply prohibits foreign nationals from donating or contributing to candidates or political parties." *Id.* at 713. Given the clear bright line established by FECA, it is not surprising that other courts have given the standard willfulness instruction in FECA cases. *See, e.g.*, *Singh*, 979 F.3d at 712–13 (approving of similar instructions to those given here); *United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018) (applying the *Bryan* standard to FECA false campaign expenditure charge); *United States v. Danielczyk*, 917 F. Supp. 2d 573, 576 (E.D. Va. 2013) (applying the *Bryan* standard to a conduit contribution charge).

Kukushkin is also wrong to assert that the Court erred by not instructing the jury that willfulness includes becoming a member of the alleged conspiracy "with the intent of achieving *a violation of the federal laws*." (Dkt. No. 287 at 33 (emphasis in original).) There is no legal requirement that the Court restate what the unlawful objective is when it gives that instruction. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 145–46 (2d Cir. 1998) (rejecting the argument that the court should have instructed that government had to prove "specific knowledge and intent to," as alleged there, "bomb the World Trade Center"). And under *Bryan*, a defendant need not be aware "of the specific law or rule that his conduct may be violating." *Bryan*, 524 U.S. at 190.

Kukushkin finally argues that the Court erred by not giving the jury a "good faith" instruction along with its willfulness instruction. The Second Circuit "has long adhered to the view held by a majority of the circuits that a district court is not required to give a separate 'good faith defense' instruction provided it properly instructs the jury on the government's burden to prove the elements of knowledge and intent, because, in so doing, it necessarily captures the essence of a good faith defense." *United States v. Al Morshed*, 69 F. App'x 13, 16 (2d Cir. 2003) (collecting cases); *see also United States v. McGinn*, 787 F.3d 116, 126 (2d Cir. 2015) (holding that even in a tax case, no good faith instruction was required because the "standard jury instruction on the willfulness element of tax evasion generally encompasses a good faith defense"). Here, the Court did just that: it instructed the jury that to find that Defendants acted willfully, they must have acted "with the intent to do something the law forbids" and "with a bad purpose to disobey or disregard the law," and "not by mistake or accident." (Tr. 1487.) Thus, to have found that Defendants acted willfully, the jury had to conclude beyond a reasonable doubt that they intentionally did something that the law forbids, the opposite of good faith.

12

### B.     Evidentiary Rulings

Kukushkin challenges some of the Court's evidentiary rulings and argues that these erroneous evidentiary rulings warrant a new trial.

"[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions." *United States v. Soto*, No. 12 Cr. 556, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014), *aff'd sub nom. United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015). Even when a trial court errs in its evidentiary rulings, "a new trial is not warranted if the court is satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's finding that th[e] defendant is guilty beyond a reasonable doubt." *Sanchez*, 969 F.2d at 1414.

None of Kukushkin's arguments establish that the Court erred in the evidentiary rulings he challenges. Nor does he establish that in the absence of the challenged evidentiary rulings there would have been insufficient evidence to support the jury finding defendants guilty beyond a reasonable doubt. The Court now turns to the specific evidentiary rulings that Kukushkin challenges.

### 1.     GX 137 — the "Russian Roots" Email

Kukushkin maintains that an exchange of emails about the formation of a corporation named "NewCo" to conduct the defendants' planned cannabis venture should not have been admitted. In particular, Kukushkin challenges the admission of the "Russian roots" email in that exchange, an email in which he states he is "trying to establish . . . how transparent should Andrey [Muraviev] be exposed or the benefits of NewCo Transparency, his Russian roots, and current political paranoia about it." (GX 137.) The Court already considered — and rejected — Kukushkin's reasons for why this email should not have been admitted in a sealed opinion before

trial. Yet Kukushkin again asserts that the email was inadmissible because it was a privileged attorney-client communication and it lacked probative value.

It remains this Court's conclusion that the Russian Roots email was about a business decision, not legal advice. Kukushkin sent an email addressed to Correia, not one the attorneys earlier involved in the exchange, and the email concerned how to structure a cannabis business. And pursuant to the Court's prior opinion, to the extent that the attorney-client privilege may have attached to the email, it had been waived. One of the members in this email exchange was a non-lawyer with no involvement in the cannabis venture. Also, as the Court explained in its prior opinion, the crime-fraud exception provides yet another basis for admitting this email: the email was in furtherance of the Foreign Donor Scheme because it discussed concealing Muraviev's identity. The email also has probative value because it is relevant to the question of Defendants' intent and the means used to advance the conspiracy's goals. That the email may have an alternative and innocent explanation, as Kukushkin maintains, goes to the weight of the evidence, not its admissibility.

Even if admission of the email was in error, which the Court does not conclude, it does not warrant a new trial. This email was mentioned just once during the government's summation (*see* Tr. 1320–22), and the government pointed to extensive independent evidence in arguing that Defendants acted willfully. (*See* Tr. 1310–25 (discussing GX 48-A-5, 48-A-26, 58, 66, 82, 83, 84, 86, 141, 167, 801, 802, and DX B-5, and Van Rensburg's testimony, in addition to GX 137).) The Court therefore denies Kukushkin's request for a new trial based on the admission of the Russian Roots email.

### 2. Government's Summary Charts

Kukushkin repeats arguments made in his motions in limine and at trial that the Court should have excluded two of the government's summary charts because they did not "fairly

represent competent evidence already before the jury." (Dkt. No. 287 at 41.) One of these charts summarized communications among Defendants in the case (GX 1402), and the other summarized financial evidence in the case (GX 1403).

The Court's admission of both charts under Rule 1006 was proper. The use of such summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records" has been "regularly affirmed" by the Second Circuit. *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003). Kukushkin does not contend that anything included in the charts was false; he instead asserts that the charts were misleading because they took evidence out of context to support the government's narrative. But this was well within the government's right to do. *See United States v. Ho*, 984 F.3d 191, 209–10 (2d Cir. 2020) (rejecting defense argument that timeline charts should be precluded because it presented a "narrative supporting the prosecution's theory of the case" and holding that such charts are useful to the jury and permitted by Rule 1006). Moreover, Kukushkin was also entitled to make — and indeed did make — arguments to the jury with respect to the inferences that could be drawn from and the weight that should be given to these charts. (*See* Tr. 1411, 1415-17, 1424-26, 1430.)

Kukushkin also takes issue with the Court instructing jurors that "some of the exhibits that were admitted into evidence were in the form of charts and summaries. You should consider them as you would any other evidence." (Tr. 1470.) But these summary charts were admitted into evidence, as opposed to demonstrative charts that are not admitted into evidence and cannot themselves be considered evidence. The Court also explained to the jury the purpose of a summary chart during the trial, stating the following:

> [A] chart that was not a preexisting document that existed at the time of these events but is something that the prosecution team, as explained by Agent Casola, put together taking parts of different exhibits to create essentially a timeline bringing them together . . . That's what a summary chart is, to allow a party to put things together in a chart to make things clear sort of in one place but they're not the actual exhibits, they refer to the exhibits.

15

(Tr. 287–88.) The Court accordingly denies Kukushkin's request for a new trial based on the admission of summary charts.

### 3. Severing Trials of Kukushkin and Parnas

Kukushkin reasserts that he should have been tried separately from Parnas, a request that the Court has twice denied.

Each of Kukushkin's reasons for why his trial should have been severed from Parnas's is without merit. Kukushkin argues that severance would have been appropriate "because of the significant disparity in the amount and magnitude of proof" concerning willfulness. (Dkt. No. 287 at 42–43.) As discussed earlier, the government provided direct and circumstantial evidence as to Kukushkin's willful intent specifically. In any event, evidence of Parnas's willfulness would have still been admissible in a separate trial of just Kukushkin. *See Salameh*, 152 F.3d at 111 ("Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant.") Kukushkin also points to his antagonistic defense — that Parnas intended to defraud him and was never sincerely interested in a cannabis venture — as a reason that warranted separate trials. Even if there was no meeting of the minds between Parnas and Kukushkin, as this Court explained earlier, there was sufficient evidence of a meeting of the minds between Kukushkin and Muraviev to support Kukushkin's convictions. Moreover, as the Court laid out in an earlier opinion rejecting this request, "the 'defense' proffered by Kukushkin is not the type of antagonistic defense that would warrant a separate trial . . . . 'The mere fact that co-defendants seek to place the blame on each other is not the sort of antagonism that requires a severance.'" *United States v. Parnas*, No. 19 Cr. 725, 2021 WL 2981567, at *3 (S.D.N.Y. July 14, 2021) (quoting *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990)). Nor did the joint trial prevent Kukushkin from making his antagonistic defense. (See Tr. 1417–21.)

Kukushkin points out that he was unable to present evidence of Parnas's alleged involvement in a wire fraud scheme, since those charges were severed from the trial, but Kukushkin presents no arguments about why this evidence would have been admissible under Federal Rule of Evidence 608(b) and Rule 403 if he was tried separately.

The Court concludes that it properly held a joint trial of Kukushkin and Parnas.

### C.     Government Summation

Defendants contend that a new trial is warranted because of allegedly improper remarks in the government's summation.

"[A] defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (citing *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted)). "It is well established that the government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *Coplan*, 703 F.3d at 87 (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)); *see also United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence."). Even if a defendant can meet the heavy burden of demonstrating that a prosecutor's remarks were improper, an "improper summation will only warrant a new trial when the challenged statements are shown to have caused substantial prejudice to the defendant; rarely will an improper summation meet the requisite level of prejudice." *United States v. Daugerdas*, 837 F.3d 212, 227 (2d Cir. 2016) (internal quotation marks omitted). In evaluating whether substantial prejudice has occurred, the court "considers the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Elias*, 285 F.3d 183, 190

(2d Cir. 2002).  When a defendant does not object to the summation at trial, a new trial is warranted only where the remarks amounted to "flagrant abuse" by the prosecutor.  *See United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998).

The Court now turns to the arguments the government made in its summation that Kukushkin argues were improper, none of which the Court concludes warrant a new trial.

### 1. Evidence of Kukushkin's Willfulness

Kukushkin asserts that the government improperly: (1) used Muraviev's profile picture to "inflame the jury"; (2) presented pictures of Kukushkin at rallies for former President Donald Trump; and (3) described that Kukushkin was engaged "in a bribery scheme aimed at paying off politicians for cannabis licenses." (Dkt. No. 287 at 47–48.)  Since Kukushkin did not object to any of these statements during the government's summation, these remarks he challenges not only must have not only been improper, but must have amounted to a flagrant abuse.

None of the summation remarks that Kukushkin takes issue with were improper.  As Kukushkin acknowledges, Muraviev's profile photo on WhatsApp is a painting of what appears to be someone mooning the Statue of Liberty.  The government highlighted this photo in summation to advance its position that Kukushkin acted with a bad purpose since Kukushkin was in constant contact with Muraviev and likely saw this photo.  Kukushkin responds that the picture is not meant to be a commentary on the United States and is in fact a painting by a respected Leningrad artist.  Regardless of the painting's actual meaning, the government was well within bounds to offer its own interpretation of the painting's significance.  *See United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993) (holding that the government has a right to present its own theory of the case and "has broad latitude in the inferences it may reasonably suggest to the jury during summation.") (internal citation and quotation marks omitted).  It was similarly proper for the government to focus on Kukushkin's presence at political rallies.

Central to Kukushkin's defense at trial was that he was apolitical, had no knowledge or involvement in political contributions, and was never registered to vote. (*See, e.g.*, Tr. 1413–17.) It was reasonable then, and far from flagrant abuse, for the government to use Kukushkin's presence at political rallies as evidence of his involvement in the conspiracy. That Kukushkin's presence at these rallies could lend itself to a different inference does not undermine or outweigh its relevance.

Kukushkin also objects to the government's argument that he and his co-conspirators were making illegal contributions to secure influence with politicians to aid their cannabis venture. Kukushkin argues that these remarks unfairly described a bribery scheme, a distinct scheme and crime than the one he was charged with. But evidence of Kukushkin's own words support the inference that the government asked the jury to make about *why* he was engaged in the Foreign Donor Scheme: "We do not pay for anyone's political ambitions or lobbyists at all. We get a license, they get a bonus." (GX 24.) The government's argument that Kukushkin and his co-conspirators were funneling Muraviev's money to political candidates to get cannabis licenses was thus a fair and reasonable interpretation of the evidence.

### 2. The Russian Roots Email

Kukushkin asserts that the government's use of the Russian Roots email in summation unfairly prejudiced him. The government used the Russian Roots email to highlight that Muraviev openly appeared in paperwork for legal cannabis ventures in the United States but did not appear in the paperwork for the joint cannabis venture that the co-conspirators intended to support through illegal campaign contributions. (*See* Tr. 1320-1322; GX 137, 801 & 802.) In the Russian Roots email, it is Kukushkin who suggests omitting Muraviev's name from the paperwork for the latter venture. Again, though Kukushkin posits that the email lends itself to an innocent inference, it was not unfairly prejudicial — nor flagrant abuse — for the government to

19

offer its own interpretation. *See United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (noting that evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence").

### D.  Weight of the Evidence

Finally, Defendants seek a new trial on the ground that the weight of the evidence does not support their convictions. To obtain a new trial on the basis that the jury's verdict was against the weight of the evidence, a defendant has the burden of establishing that a manifest injustice would result from allowing the guilty verdict to stand. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013). As with a Rule 29 motion, the Court must defer to the jury's assessment of the credibility of witnesses and the weight of the evidence. *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982).

For the reasons addressed in connection with Defendants' motions for judgment of acquittal under Rule 29, the evidence was sufficient for the jury to find Defendants guilty on all counts against them. Accordingly, Defendants' motions for a new trial are denied.

## IV.  Conclusion

For the foregoing reasons, Defendants' motions for judgment of acquittal under Rule 29 and for a new trial under Rule 33 are denied.

The Clerk of Court is directed to close the motions at Docket Numbers 283 and 286.

SO ORDERED.

Dated: March 7, 2022
       New York, New York

_____
J. PAUL OETKEN
United States District Judge