THE LAW OFFICES OF

# JOSEPH A. BONDY

JOSEPH A. BONDY                                        1776 BROADWAY
                                                       SUITE 2000
STEPHANIE R. SCHUMAN                                    NEW YORK NY 10019
(OF COUNSEL)                                           TEL 212.219.3572

                                                       JOSEPHBONDY@MAC.COM

June 15, 2022

(**REDACTED**)
Hon. J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, N.Y. 10007

     Re: *United States v. Lev Parnas, (S-3) 19-cr-725 (JPO)*

Dear Judge Oetken,

     Lev Parnas is currently scheduled to be sentenced on June 29 2022, at 11:00 am. We respectfully submit that a sentence of time-served, followed by a period of supervised release to include community service and counseling would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## Personal History of Lev Parnas

     Lev Parnas was born on February 6, 1972, in Odessa, Ukraine, which was then a part of the Union of Soviet Socialist Republics (USSR). He has one older sister, Lyudmila, age 60, with whom he is very close. She resides in Florida, near Mr. Parnas. His mother, Zhanna, also resides nearby. Mr. Parnas's father, Aaron Parnas, passed away from a heart attack in 1983, at the age of 46. At the time, Mr. Parnas was approximately 11 years old.

     Mr. Parnas and his family fled the USSR as Jewish refugees in 1976, when Mr. Parnas was four. While the family was temporarily sheltering in Italy *en route* to relocating in Israel, Mr. Parnas and his sister won a U.S. green card lottery that enabled the family to emigrate to the United States instead. The family entered the country on January 20, 1977, first staying in the Detroit, MI area, as guests of a Jewish refugee relief organization.

     Mr. Parnas's father, who had been a businessman previously, took odd jobs to support his family, including working as an auto mechanic at a local repair shop. Approximately six months

after Mr. Parnas arrived in the U.S., while visiting the repair shop with his father, a customer reversed his vehicle and ran him over. Mr. Parnas was pinned beneath the vehicle and was being burned by the heat of the muffler. Somehow, his father managed to lift the tail of the car just enough for Mr. Parnas to be freed. In doing so, Mr. Parnas's father suffered a heart injury that required hospitalization, and from which he never fully recovered. Mr. Parnas sustained serious burns and crushed his leg requiring multiple surgeries and hospitalization for a period of several months.

After the tragic incident with the vehicle, Mr. Parnas's father was unable to resume employment. His father remained at home and Mr. Parnas's mother became the family's primary source of income, working in a beauty salon for long hours.

After moving briefly to Florida in search of better economic opportunity, Mr. Parnas and his family relocated to the Brighton Beach area of Brooklyn, New York, which had a vibrant Ukrainian and Jewish community. Mr. Parnas's older sister had married by this time and was residing with her then-husband.

Mr. Parnas's father died of heart disease while hospitalized at Coney Island Hospital. Then age 11, Mr. Parnas raced to the hospital with his family after receiving a dire call but did not get the opportunity to see his father alive. Mr. Parnas's life changed overnight. He began attempting to assume the role of "man" of the family, focusing on work over education. Mr. Parnas began to work at a video store in an attempt to help his mother and support their family. He ultimately became the manager of the store, while also working odd jobs, including selling newspapers by phone.

When Mr. Parnas was 15, he began to work as a sales agent at a real estate agency, lying about his age to do so. He worked selling and assisting in the sales of Brooklyn condominium apartments, located in buildings owned by the real estate developer Fred Trump, the father of former President Donald J. Trump. This early experience appeared to be highly impactful for Mr. Parnas.

After Mr. Parnas's stint as an underage real estate salesman came to an end, he began working in the limousine and then the import/export business. At approximately the age of 20, Mr. Parnas began to work as a licensed stockbroker. Thereafter, he went on to operate a securities trading company, Aaron Investments, located in Boca Raton, Florida. For the past approximately twenty years, Mr. Parnas has engaged in a variety of business endeavors, with limited success.

Beginning in approximately 2012, Mr. Parnas, along with David Correia, started a company named "Fraud Guarantee," which was intended to provide a type of investment insurance against fraud. Mr. Correia and Mr. Parnas misrepresented to investors how their funds were being used. Mr. Parnas has pled guilty, and accepts responsibility for his conduct

Starting in 2018, Mr. Parnas, along with his co-defendant Igor Fruman, and later, Andrey Kukushkin, engaged in the federal election law violations for which Mr. Parnas was ultimately indicted and convicted at trial.

Mr. Parnas was arrested on October 9, 2019 and spent nearly one year thereafter living under the strictest terms of 24-hour home confinement, with a GPS device attached to his body. On July 24, 2020, Mr. Parnas was granted a 7:00am to 7:00pm curfew after his wife had broken her ankle and he was needed to assume the daily responsibilities of caring for her and their young children, including transportation, cooking, cleaning, shopping, and management of all appointments and school activities. On August 4, 2021, Mr. Parnas's curfew was extended to 10:00pm. On April 29, 2022, Mr. Parnas's curfew component of release was lifted, enabling him to work late-night for DoorDash as a food delivery person.

Mr. Parnas has a total of seven children, from four relationships, ranging in ages from almost 30 to 7 months old. Photographs of Mr. Parnas and his family are attached at Exhibit A. Mr. Parnas is an extremely loving and devoted father—particularly so given his past almost three years of strict home confinement or confinement with curfew, his unfolding criminal case, and the seemingly endless COVID-19 crisis.

As to



In anticipation of sentencing, Mr. Parnas's immediate family and friends have written character letters on his behalf. They are appended in full at Exhibit C, Letters of Support, Family and Friends.

Mr. Parnas's wife of twelve years, Svetlana Parnas, writes of the impact the present case has had upon their family, as well as Mr. Parnas's involvement as a father, and his efforts in furtherance of rehabilitation:

My name is Svetlana Parnas. Lev and I have been married for 12 years. We are proud parents to 6 children: Aaron, 23, ███ 19 ███ 15, ███ 9, ███ 3, and ███, 7 months. The blending of a family is never easy, but I can honestly say Lev and I have worked very hard to provide a loving home for our children.

The past few years since Lev's arrest have been of particular difficulty for us. Through all the trials and tribulations our family has fought to stay together and help each other navigate these uncertain waters. A marriage, like all relationships, is full of ups and downs, however I'm not sure anything can prepare you for the plethora of emotions I felt the night the FBI searched our home. As I bounced my newly 1 year old son on an exercise ball while praying my 6-year-old slept through the search of the master bedroom where he was fast asleep. At the time, Lev and I shared a room with our 1-year-old son, and of course his older brother loved to sneak in to cuddle most nights.

All the agents worked in a very respectful manner over the many hours they were at our home, and I am grateful they let me keep the awfully loud sound machine on so my son would stay asleep. Thankfully he was able to blissfully sleep through the whole ordeal as any child should be spared such an experience. My son ███ who was 17 at the time, was not as fortunate. For many months, afterwards he suffered from anxiety and fear following his father's arrest and the search of our home.

The entirety of the past 2 years and 7 months of my husband being on GPS monitoring, his arrest, his time in jail, and the pandemic that has kept most of the world on lockdown has had a profound impact on Lev, me, and our entire family. Lev is the nucleus of our family, he is the string that weaves through each one of our children and makes us, us. It is his recommitment to us that has been the most impactful change in our family dynamic over the past 2 years. With all his shortcomings, loving me and our children is not one of them.

I believe it has always been and remains my husband's goal to take care of his family. I hope he will be given the opportunity to continue being there for me and our kids.

Lev can always be counted on having an enormous heart. I have always known him to be a kind person full of life, one who believes in the power of positive energy, in pushing forth through any obstacle, to fight what he believes in, to be loyal, to help people, and always be a charitable man. He has donated and has been deeply involved in many charities both during our marriage, and in his life prior to that, and over the past couple of years through his home arrest. Helping others is a personal passion of Lev's and it's during his charitable work that he is most happy.

Since the start of the war in Ukraine, both of our birth countries, Lev has been working tirelessly to help in any way he can. Through his network he was able to assist those innocent people of Ukraine, whether it is with help relocating them or to help facilitate humanitarian aid to the regions that were underserved. This is the

heart of the man I married, as a result, his offenses come as a complete shock to me.

My husband has come to terms and accepted responsibility for his wrongdoings and has expressed his regret to me privately as well as publicly. Lev has a strong desire to fix his underlying personal issues. One of the ways he has been working on this commitment to better himself, for not only his benefit but also for that of our children and myself is seeking help from Gambler Anonymous meetings. Lev has been attending weekly meetings for 6 months and checks in with his sponsor regularly.

I have seen the personal growth these meetings have helped him achieve. I am confident with his tenacious and persistent attitude he will overcome his mistakes in an efficient and successful manner, and I believe that severe punishment will be detrimental to him and our entire family. I'm fully aware of the seriousness of his offenses, however, I humbly ask you to consider in your decision the impact of his absence on our family.

My husband is instrumental in the lives of all of our children, the youngest being most vulnerable. Knowing the pain, trauma, and poor outcome growing up without a father has had on my husband, I ask this court to consider any alternative sentence that keeps my children's father and my husband in their lives. Any sentence imposed will leave me a single mother of 3 small kids and it is hard to imagine how I will be able to cope with being the support system for Aaron, ██████████ ██████████ and ██████ without my rock.

I love my husband and will be praying for an outcome that keeps him out of prison. Thank you for your time and consideration.

*Id.*

Mr. Parnas's eldest son, Aaron, who is a recently-admitted attorney, writes that:

My name is Aaron Parnas, and I am the oldest son of Lev Parnas. I am writing to you today to ask for your consideration and leniency when sentencing my father later this month. My father's arrest and subsequent indictment was truly a low point for my entire family. Since October 9, 2019–the day of the arrest–my family has been placed under a tremendous amount of pressure, both internally and externally. Internally, my father's arrest thrust my family into extreme flux, requiring us to cope with the initial shock of the arrest, coupled with the secondary effects that came from it. These effects placed a major strain, both financially and emotionally, on my entire family, and especially on myself, my mother, and my younger siblings. Externally, my father's arrest placed my family into the public spotlight. Within hours after his arrest, we were labeled anything from Russian spies to oligarchs, and everything in between. My little siblings, two of which were under the age of ten at the time, were forced to deal with reporters jumping fences to get to our home,

peering eyes in public, and intrusive questions at school. The intense media spotlight has been very difficult for all of us and has come with a lot of negative backlash in our community in Florida.

Despite the extremely difficult conversations, internal, and external struggles, my family has remained steadfast in our support of my father through the entire process, and we continue to wholeheartedly support him to this day. Since his arrest, I have seen a significant transformation in my father, his relationships with family, and the way he lives his day-to-day life. First, my father has taken an active role in mending relationships with me and my siblings and has become a larger part of our lives. Because of this, my relationship with my father is getting better every single day, and I could say the same for his relationship with my younger siblings.

At the same time, I have seen a significant shift in my father's demeanor. When he was arrested, my father was extremely defiant thinking he could do no wrong. Prior to his arrest, I had never heard my father say the words "I'm sorry." Since then, my father cooperated successfully with the House of Representatives, despite not having to, and attempted to cooperate, on multiple occasions with the United States Attorney's Office. Internally, he has expressed remorse and responsibility for the actions that led to his sentencing. Externally, he has apologized to those who he has wronged, including the United States Government, and continues to accept responsibility for his actions.

His acceptance of responsibility has come in more ways than one. My father went out of his way to settle all outstanding debts owed in pending judgments, and repeatedly shares his intent to repay the victims charged in the Government's indictment. He has also begun attending Gamblers Anonymous classes and will, at the time of his sentencing, be in possession of a six-month completion chip. In the community, he has taken a lead role in assisting those in Ukraine to receive financial and other assistance because of the Russian invasion.

When evaluating what type of sentence to impose, I am confident that Your Honor will impose a sentence that is no greater than necessary to punish my father. I am not writing to say my father is without faults. He has accepted responsibility for serious offenses. But I am writing to say that a sentence of incarceration will not serve its intended purpose. There are two prevailing reasons an individual is sentenced to a term of incarceration: retribution and rehabilitation. Both of these reasons have already been satisfied. Over the past two and a half years, while my father was on house arrest for a majority of that time, he has taken active steps to change his life for the better.

He has accepted responsibility for his wrongdoings, and he has committed, both privately and publicly, to right his wrongs. There is nothing prison would teach my father that he has not already learned over the past two years. Instead, a term of incarceration will only undo all of the progress my family has made.

First, my family, especially my mother and my three youngest siblings (the youngest being only six months old) rely on my father both as a primary source of income and as someone who can assist around the house. A term of incarceration would not only punish my father, but would also punish my mother, forcing her to be a single mother of three young children with no stable income for an extended period of time. They need him at home right now more than ever.

Second, my father is, in a lot of ways, the glue that keeps our family together. My siblings and I need him at home more than ever to continue the substantial progress we have made together as a family over the past several years. We need him at home more than ever.

Finally, my father has taken active steps to help our community by providing a significant amount of support to those in Ukraine. Him and I have spoken on many occasions about the many ideas he has to continue supporting Ukraine if he was able to remain at home. The community needs him at home right now more than ever.

I love my father very much, and firmly believe that he has changed for the better since his arrest and indictment. I have seen this change first-hand. As his son, I will personally ensure that he continues to achieve even more progress once we are able to put the past two years behind us. Although punishment is necessary, a custodial sentence is not. Please allow my father to remain home so that he is able to continue to work on himself, his family, and his community both here and abroad.

*Id.*

Mr. Parnas's son ████ 19, writes about his memories of fishing and watching football with his father, and how he increasingly relies upon him for guidance as he enters adulthood:

…My Dad has always been here for me and my brothers and sisters. He taught me so many things and I am thankful for him.

I love my dad very much and I can't imagine having to be without him. Growing up I remember my favorite activity was to go fishing with my dad. We went on a lot of trips together and I have some of my best memories spending time with him. Sports was another thing my dad and I shared a love for and continue to this day. I am looking forward to watching this next Jets football season with him, he is a lifelong fan and made one out of me. The last few years were  really hard with everything that happened with my dad. I'm glad to say our relationship got stronger during this time. Recently, I have been relying more on my dad and his advice as I am navigating becoming an adult myself. I want your honor to consider an alternative sentence to ensure my dad can be here for me, my siblings, and my mom. Thank you for your time.

*Id.*

Mr. Parnas's teen daughter, ████ writes about her father's commitment to her, and her need for his presence in her life as a teen now more than ever:

> My father, Lev Parnas, is the most wonderful, caring dad in the world. He has taught me to treat everyone with kindness and treat others how I wanted to be treated. My dad has always been there for me through dance recitals, school, and any other events I had growing up. My dad has been my number one supporter since day one and today I am writing in support of him. I love waking up in the mornings to him cooking breakfast and us watching football with my brothers and spending time together. He always remembered to bring me flowers for every dance recital or competitions I had because he knew it was important for me. He would always show up when I needed him. I couldn't imagine a time where I couldn't rely on him for that. Even when I was little whenever I would be scared of the dark or have a bad dream my dad would always be there to protect me, he always told me "Don't be scared daddy is here." I hope me and my siblings always have him by our side. Please consider how much I love him and will miss him if he were to be away from me and my siblings for any period of time. I had a rough year of high school and if it wasn't for my dad, I don't know how I would have survived. Being a teen is hard most days and I need my dad by my side now more than ever.

*Id.*

Mr. Parnas's older and only sister, Lyudmila, writes poignantly about her family's emigration to the United States, and the struggles they endured not merely as the first generation to live on American soil, but also through having to endure the loss of their father at a young age. To Lyudmila, Mr. Parnas is a hero:

> My name is Lyudmila Piker. I am the older sister of Lev Parnas. Actually, I'm the only sister of Lev Parnas. My brother and I were born in a beautiful city of Ukraine call[ed] Odessa.

> Those times antisemitism against Jewish people was at its worse. Our parents, like a lot of Russian Jewish, were looking for the ways to escape from that regime and try to give us, the children, a better life. Coming to America was our dream come true. We are so grateful for Jewish organizations that embraced us, helped us with important things that were needed like food, living arrangements, language support.  I will never forget the day when we as a family celebrated our citizenship and the rights to be called "American Citizen".

> But unfortunately, soon after that our dearest father passed away from heart complications at age of 45 and left my mom, my grandmother, my brother, and me alone. As an older sister I tried to keep the family together. It was not easy. Lev was still a little boy who had no choice, but to grow up very fast. After [the] death of our father, he always felt responsible to take care of me, my mom and grandma. AND HE ALWAYS DID!

At 15 years old, when boys were still playing around, Lev already worked as a real estate agent, selling luxury apartments in Brooklyn, NY, working with the people twice his age and learning from them, so he can be the Best of the Best. AND HE ALWAYS WAS!

When it came to his family - his family was always his first and the most important priority.

He is our glue that keeps our family together. His positive attitude, his smile helps us to get through difficult times in our life.

We are very-very close family. Our believe in God is very strong!

Our mom is unfortunately suffering from diabetics and severe arthritis. I had my share of heart surgeries. Having my family support makes me strong. We are so Blessed with our beautiful children. Lev has 6 amazing children that are their father's pride and joy. I have two girls and grandchild and we are all grateful to have each other.

As a family we always were involved in our community. Lev helped a lot of people financially. He was always a part of different charity groups. He put together great events to raise money for children with disabilities. And for the past 5 years up to now me and my brother continue volunteering for Jewish Community Centers of Boca Raton and West Palm Beach Region. We spend a lot of time with Holocaust Survivors and their families. A lot of Survivors are coming from ex USSR, so our knowledge of Russian language gives us an opportunity to meet their needs like taking them to doctors' appointments, take them shopping, help around the house, anything that can help those people enjoy the rest of their life with the most needed support.

On February 24th, 2022, when the whole world was in shock with what happened in Ukraine, I knew our life will never be the same. No words can describe how much I'm proud of my brother Lev Parnas for jumping in for using all his connections, for getting so many people involved, for making a difference for saving so many Ukrainian lives. HE IS MY HERO!

Your Honor, please take to consideration how much good Lev can do for many people! Please let him continue give the help [to] the ones that need it the most.

Please allow him to spend the precious time with the mother who needs her son and doesn't have too much time left.

Please allow him to raise his little children, they need their father greatly.

> Please allow him to be the husband, who financially take[s] care of his family.
>
> AND Please, YOUR HONOR, don't take from me my dearest brother, my best friend, my hero that makes me proud, makes his family proud, makes his Country proud!

*Id.*

Mr. Parnas's mother-in-law, Galina Melandovich, writes of his kindness, even throughout the difficult circumstances that the past nearly three years has brought upon his wife and family, and the pivotal role that he plays in his family's wellbeing:

> My name is Galina Melandovich, Lev Parnas is my friend and son in law. I have known him for many years and even lived with him and my daughter and their kids for a period of a year and I come to visit from California as much as I can.
>
> Lev is such an open heart, he is always available to help, he always hosts everyone, and all people come to him for help and advice. I think my son in law is in this position because of how open he is and how trusting and loyal his is. Even in his position he is continuing to help others including his family and friends and even complete strangers across the world in Ukraine. That is Lev, keeping people he loves close and always there to support them.
>
> He has always been the main breadwinner of the family from a young age. I don't know how the family can manage without him, especially his kids and my daughter. My hope is you consider this and keep him close to us. I believe my son in law to be a good man, husband, and best father deserving of a full life after already too many years lost. For the past few years my health has been very bad, and I don't know how I would support my daughter and grandkids if Lev was not there.

*Id.*

David Sugarman, who has been a friend of Mr. Parnas for over seventeen years, writes about Mr. Parnas's charity, empathy, and service:

> …I consider Lev to be one of my closest friends on the planet and a pillar of the Jewish community in Palm Beach and Miami. There are so many things that I want to say and share, but I will list what are the most important to me that I hope resonates with you.
>
> On the early morning [of] June 24, 2021, I met with Lev at the Surfside family reunification center two blocks away from the disaster of the Champlain Tower collapse here in Miami. We spent two full days with the children, husbands, wives etc. of the victims that lost their lives the day before. We handed out food,

prayed, talked, and most importantly hugged those very sad family members. One thing that stands out the most is when Lev walked over to a woman who was hysterically crying and screaming in the sand while the ocean water was walloping over her. Lev went over to her, lifted her, hugged her, and spoke with her for over an hour. He walked her over to the family center and we met her family. This was ███████████████████ I remember watching how Lev and the family cried, loved, laughed, and spoke for countless hours. That day Lev gave much needed love to hundreds of people that needed those hugs.

Lev has always been a man of love, faith, smiles, positivity and as you know at this point an incredible dad. I never have written a letter like this, so I am not certain how to close it other than to say this…Lev is the best. Really the best. I have watched and read parts of this case and my opinion on this matter is not what is being judged by you; what is however is the penalty and freedom of one of the most compassionate souls on this very angry and bitter world.

Id.

Of great significance, given his observational perch, Mr. Parnas's Gambling Anonymous (GA) sponsor, ███████ has written a letter on his behalf:

I first met Lev Parnas in December 2021 at a Twelve Step Meeting of Gamblers Anonymous, a program that I have been attending for 48 years. I was aware of his troubles from news reports, and was reluctant, at first, to befriend him. However, I have come to know him over these several months as a kind, giving, man who is very serious about making restitution and becoming a better human being.

He has become humble in his search to do the "right" thing, asking other members for guidance, and following the program's suggestions. And, I am in awe of his charitable pursuits, as he has been very active in helping the people of Ukraine through an organization called Global Empowerment Mission.

I hope that you will take Lev's positive attributes into consideration when deciding upon a sentence that would be appropriate. (He did not request that I write this; I asked him if there was any way I might help)

Id.

In addition to the letters of support from family and friends, Mr. Parnas has received certificates of commendation from the Mayors of Bucha and Fastiv, and the Chief of Police of Odessa, Ukraine, for his humanitarian aid efforts (Exhibit D).

Since the outbreak of war in Ukraine, Mr. Parnas has been using his language skills and resources to connect individuals and provide humanitarian aid. As a part of these efforts, Mr.

Parnas has assisted in relocating over 30,000 Ukrainian refugee families, helped to set up soup kitchens for citizens, and provided food to Ukrainian soldiers. This work currently occupies a significant amount of his time.

Michael Capponi, founder of the non-profit organization Global Empowerment Mission, has written a character letter, which further details Mr. Parnas's participation and the scope of these efforts:

> My name is Michael Capponi and I'm the founder and president of Global Empowerment Mission (GEM), a platinum-rated 501c3 that operates in the US and over 40 countries.

> GEM has been on the ground in Ukraine and Poland since the second day of the war. Before that, we supported the Bronx fire victims in January 2022 as well as the Mayfield, Kentucky tornado survivors in December 2021. I have personally gone deep inside hellish situations to provide aid in over 300 major disasters in the last decades.

> In my early 20s, ████████████████████████ of New York City during the 1996 blizzard. Since 1998, I ████████████ ████████████████. The moments spent on my knees begging for mercy were enough to shift me toward a completely different path. By 1999, I was helping refugees from the Kosovo War.

> I begin the letter with these examples to show you that I wholeheartedly understand what it means to learn from our mistakes and turn them into life's greatest lessons and gifts. The transmutation of the negative to the positive has been my life's journey. The global organization I founded would not exist today had it not been for my harsh lessons in life.

> It is for this very reason that I consciously chose to befriend Lev after his indictment, against all outside advice.

> As a true humanitarian, I devote my time to trying to support and assist people who have gone astray like I had. I have spent countless hours, sometimes even 5-hour phone calls at night from Poland speaking to Lev, explaining to him the laws of the universe, the importance of God's scales and balance systems, the penalties of spiritual judgements and the gifts that can arise for those who fully repent and seek a new path.

> I have repeatedly told Lev to only speak the truth to you and nothing else. What was done is done; it was Lev's biggest mistake in life and may also turn out to be his greatest gift in life, as was my stint in the streets of NY. I am a person who believes in penalties for wrong action. I also believe that penalties can be lifted upon one's true understanding and repentance of their mistakes.

In the hundreds of hours I have spent speaking to Lev, I can guarantee you that there is zero chance he would ever take that road again. Lev fully understands his mistakes. Lev wants nothing now but to be able to humbly serve others and raise his children. I have watched him with his children and how much he cares about them and how much they need him in his life. I personally see no benefit in a prison sentence for his soul. His soul understands and only wants to start his new path.

One of these paths is supporting the people of his country of birth. Lev has been instrumental in guiding our foundation inside Ukraine. With his help, we have been able to relocate over 32,000 refugees to 48 countries and send 208 full size containers of aid to Ukraine.

As I write this letter, I'm also packing for my next two months in Kyiv where I'm now temporarily based. We have also started repairing key buildings like clinics in Bucha. Many of the doors that were opened for our foundation to be able to be effective, were opened by Lev. I have probably spoken to Lev five times per week since the war began. He is devoted to his causes; he volunteers in the U.S. with packing relief supplies and so much more.

I know that if you find it in your heart not to send him to prison, that the world and his children will benefit much more. All he wants to do at this point in his life is to do good and please God. He understands that he fell deep into the world of power and manipulation and this had stolen his soul. He was misguided by dark powers within that had attempted the rob our country from its Constitution. This was his fault, but we all know who the true criminals are in this case.

Please consider my words in your sentencing. I would not write this if it wasn't the truth, the whole truth and nothing but the truth.

*See* Exhibit E, Letter of Michael Capponi.







Finally, The Aleph Institute—a not-for-profit organization that provides support and rehabilitation to individuals involved with the criminal justice system—has met with Mr. Parnas and is providing him with spiritual counseling and opportunities to engage in community service. It has written a proposal for a sentencing alternative to prison (Exhibit G, Alternative Sentencing Proposal, The Aleph Institute), which includes a plan of rigorous community service, spiritual counseling, psychotherapy, and continued participation in Gamblers Anonymous.

**<u>Factual and Procedural History</u>**

The Court's familiarity with the record is presumed.

Over thirty-two months ago, on October 9, 2019, Mr. Parnas and his co-defendant, Igor Fruman, were arrested as they attempted to board a flight at Dulles International Airport. They were arraigned in the Eastern District of Virginia on various Federal Election Campaign Act violations the following day. Although Mr. Fruman was released, Mr. Parnas was detained for 12 days before being placed under strict terms of home detention, including constant GPS monitoring. Nine months later, Mr. Parnas's condition of home confinement was modified to allow a curfew from 7:00am to 7:00pm. On August 4, 2021, the curfew was extended to 10:00pm. On April 29, 2022—less than two months ago—Mr. Parnas's home curfew component

of his GPS monitoring was finally removed. Throughout the entirety of pre-trial supervision, Mr. Parnas has been compliant with all terms of his release.

Immediately upon Mr. Parnas's appearance in the Southern District of New York, he had expressed an interest in attempting to provide substantial assistance to the Government. Days later, by November 4, 2019, Mr. Parnas informed the United States House of Representatives Permanent Select Committee on Intelligence (HPSCI) that he intended to cooperate and supply materials sought by subpoena in the First Impeachment Inquiry of then-President Donald J. Trump. Notably, Mr. Fruman had also been subpoenaed by HPSCI, but steadfastly refused to comply.

Two of Mr. Parnas's co-defendants, David Correia and Igor Fruman, were ultimately offered plea agreements to select counts of the indictment and entered guilty pleas. Mr. Parnas, who was not offered such a plea, proceeded to trial along with another co-defendant, Andrey Kukushkin, which ended in conviction on October 22, 2021. Mr. Parnas filed post-verdict motions for a judgment of acquittal and for a new trial, which were denied.

Thereafter, he entered a plea to the single remaining count against him--which had been previously severed—"the Fraud Guarantee" wire fraud conspiracy.

All of Mr. Parnas's co-defendants have been sentenced by the Court to 366 days' imprisonment. Mr. Fruman, who surrendered to the custody of the Bureau of Prisons on March 14, 2022, has already been released to "residential reentry management." *See* https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results.

Most recently, by letter dated June 2, 2022, the Federal Election Commission wrote a letter to Mr. Parnas (Exhibit H),  advising that it had considered a July 31, 2018 complaint—which had formed the basis of the Global Energy Producers (GEP) federal election and campaign violations charged against Mr. Parnas and for which he was convicted at his trial—and also a June 21, 2019 supplemental complaint against him, but that there were "insufficient votes to find reason to believe that [Parnas] knowingly and willfully violated 52 U.S.C. 30122," and also that "the Commission was equally divided on whether to dismiss the allegation as a matter of prosecutorial discretion." For those reasons, "the Commission closed its file in this matter." *Id.*

### **Good Faith Efforts at Cooperation**

Apparently, the information Mr. Parnas wished to supply the Department of Justice in this case was information that it did not want to hear. Prosecutors kept Mr. Parnas at bay for months before finally hearing his proffer. When they did, it was principally used to thwart his potential trial testimony, rather than to consider his attempt to provide substantial assistance in good faith.

Mr. Parnas's cooperation with Congress was timely and material. His media statements were intended to place information and evidence that was important to our national interest into the public domain—frequently at great risk to himself. And yet, from nearly the moment Mr. Parnas committed to cooperating with Congress and producing videos, photographs, documents,

text messages, proton mail messages and other information, the value of this evidence was of undeniable significance.

On January 14, 2020, HPSCI Chairman Adam B. Schiff wrote a letter to the Chair of the House Judiciary Committee, Jerrold Nadler, transmitting certain evidence that Mr. Parnas had produced:

> Pursuant to Section 3 of H. Res. 660, following consultation with the Ranking Minority Member, I am transmitting to the House Committee on the Judiciary two flash drives containing additional records and other materials related to the impeachment inquiry. This evidence was produced to the House Permanent Select Committee on Intelligence pursuant to duly authorized subpoenas and shared with the Committee on Oversight and Reform and the Committee on Foreign Affairs.

> One flash drive is in a sealed envelope marked—"sensitive"—this flash drive contains call records with sensitive personal information that should be protected from *public disclosure, The other flash drive includes some of the records recently produced by Lev Parnas, an associate of President Trump's personal attorney, Rudy Giuliani, that are pertinent to the impeachment inquiry and some of which are described in more detail in the enclosure. Despite unprecedented obstruction by the President, the Committee continues to receive and review potentially relevant evidence and will make supplemental transmittals under H. Res. 660, as appropriate.*

> Thank you for your prompt attention to this matter,

*See* https://intelligence.house.gov/uploadedfiles/20200114_-_hpsci_transmittal_letter_to_hjc_-_new_evidence.pdf (Emphasis added).

As Speaker of the U.S. House of Representatives, Nancy Pelosi, stated at a press conference the following day, January 15, 2020:

> <u>Speaker Pelosi.</u> And just yesterday, the House committee, two of our chairmen here, Chairman, Chairman Nadler of Judiciary, Chairman Schiff of Intelligence, Chairman Eliot Engel of Foreign Affairs and Chairwoman Maloney of Government Reform, *they released new evidence pursuant to a House subpoena. Lev Parnas, you know who that is, an associate of Rudy Giuliani, that further proves the President was the central player in the scheme to pressure Ukraine for his own benefit in the 2020 election.*

> This is about the Constitution of the United States. And it's important for the President to know and Putin to know, that the American voter, voters in America should decide who our president is, not Vladimir Putin and Russia.

*See* Transcript of House Speakers' Announcement, January 15, 2020, https://www.speaker.gov/newsroom/11520-0 (Emphasis added).

At that same press event, House Judiciary Committee Chairman Jerrold Nadler also cited the importance of the materials that the Committee had received from Mr. Parnas:

> Chairman Nadler. Let me add to that. There is an overwhelming case beyond any reasonable doubt that the President betrayed the country by using – by withholding federal funds appropriated by Congress, breaking the law in doing so, in order to extort a foreign government into intervening to embarrass – to try to embarrass a potential political opponent of his. There is an overwhelming evidence of that.
>
> We couldn't wait because some people said well, let the election take care of it. He's trying to cheat in that election. So, it is essential that we bring this impeachment to stop the President from trying to rig – not from trying, he tried – from rigging the next election, from conspiring with a foreign government as the Russian government attempted to rig our last election.
>
> *The evidence is overwhelming. The latest evidence with Parnas and Giuliani makes it even more so.* It made sense to wait a while, as even more evidence piled up, but we have to proceed, because the election – the integrity of the election is at stake.

*Id.* (Emphasis added).

Then, HPSCI Chairman Schiff interjected to further underscore the importance of the materials that Mr. Parnas had provided:

> Chairman Schiff. Madam Speaker, can I just add – if I could just add really quickly onto this, and I thank the Chairman Jeffries. *I just want to underscore the importance of documents, because we spent a lot of time talking about John Bolton and other witnesses. Witnesses may tell the truth and witnesses may not tell the truth. Documents don't generally lie. And in the documents that we submitted to the Judiciary Committee just last night, you see the importance of documents.*
>
> *Because included among the Parnas documents we obtained is a letter from Giuliani trying to set up a meeting with the President of Ukraine Zelensky to discuss a particular matter. Of course, we know that matter is the investigations that the President wanted Ukraine to undertake of his political opponent. There have been – there's been speculation from time to time; maybe the President or his allies will throw Mr. Giuliani under the bus.*
>
> *That letter makes clear that Giuliani, in his own words, is acting at the behest and with the knowledge and consent of the President. There is no fobbing this off on others. The President was the architect of this scheme. These documents*

*are important. We have only obtained a very small sample of the universe of documents that the President is withholding.*

*Id.* (Emphasis added).

The documentary and other evidence Lev Parnas provided to Congress was material to the first impeachment proceeding of then-President Donald J. Trump. Although much of it had been seized from Mr. Parnas by the Government, absent his decision to request that the Court authorize the release of this material, neither Congress nor the American public would have known of its existence.

### Sentencing Guidelines Calculations

Mr. Parnas's advisory Guidelines calculations result in a Total Offense Level of 26, and a Criminal History Category "I". The advisory Guidelines range is 63 to 78 months.

The discrepancy between the PSR's Total Offense Level of 28 and advisory Guidelines range of 78 to 97 months and the defense calculations arises from the loss amount associated with the Federal Election Campaign Act Counts, which is *not* $1.0 million dollars. There was no agreement—at least not by Mr. Parnas—anywhere near that amount. That fact was borne out again and again by the evidence adduced at trial.

Regardless of the advisory Guidelines calculation ultimately arrived at by the Court, we respectfully submit that a downward variance to a sentence of time-served—roughly twelve days—would be sufficient to achieve every valid purpose of punishment under the law.

### A Sentence of Time-Served is Sufficient but no Greater than Necessary

**1.      Sentencing Framework**

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court may not presume the reasonableness of a within-Guidelines sentence, albeit the Second Circuit has concededly recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (Quotations omitted)).

## 2.    Downward Departures under 5K2.0

In *United States v. Stoffberg*, 782 F. Supp. 19 (E.D.N.Y. 1992) (Weinstein, J.), the district court held the defendant's cooperation with a Congressional Committee to be a permissible basis to downwardly depart without the need for a government 5K1.1 motion, since "the courts have sentencing authority to reward cooperation of a defendant with an agency other than the prosecution when the United States Attorney has not requested a downward departure." *Id.* at 19.

Here, Mr. Parnas has provided nearly 700 pages of evidence to an agency other than the prosecution—the House Intelligence Committee—that it relied upon in the First Impeachment of then-President Donald J. Trump. *See* MARKUP OF: H. RES. 755, ARTICLES OF IMPEACHMENT AGAINST PRESIDENT DONALD J. TRUMP VOLUME II, https://www.govinfo.gov/content/pkg/CHRG-116hhrg39402/pdf/CHRG-116hhrg39402.pdf. The Court plainly has the sentencing authority to reward this cooperation, without the need for a government request for downward departure.

As set forth in detail above, on January 14, 2020, HPSCI Chairman Adam Schiff transmitted this evidence from Mr. Parnas to the Chair of the House Judiciary Committee, Congressman Jerrold Nadler, for inclusion in the record, because he believed it was "pertinent to the impeachment inquiry."

And, the next day, January 15, 2020, Speaker of the House Nancy Pelosi, HPSCI Chairman Adam Schiff and House Judiciary Committee Chair Jerrold Nadler held a joint press conference, at which they repeatedly stressed the importance of the documentary evidence that Mr. Parnas had released.

More recently, in his book, *Midnight in Washington*, Congressman Schiff again refers to Mr. Parnas's cooperation with Congress:

> Lev Parnas, now an indicted associate of Rudy Giuliani, also *expressed a willingness to testify, and he provided a trove of documents to us*, including significant correspondence with Giuliani.

S*ee* Schiff, Adam, *Midnight in Washington*, 346, Random House, 1st ed. 2021 (Emphasis added).

Even if not considered under Guidelines Section 5K2.0, Mr. Parnas's efforts at cooperating with Congress, including providing material evidence in the First Impeachment of Donald J. Trump, may properly be considered as a basis for downward variance under 18 U.S.C. 3553(a).

### 3.    Consideration of the Title 18 U.S.C. 3553(a) Factors

In this case, a sentence below the stipulated Guidelines Range to time-served would be sufficient to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

It goes without saying that the crimes for which Mr. Parnas was convicted were serious. He participated in a wire fraud conspiracy involving over $2 million in investor assets over a period of seven years. Mr. Parnas was also convicted after a jury trial of various campaign finance violations.

There are, however, compelling countervailing factors that weigh in favor of a below-Guidelines sentence.

In terms of the "history and characteristics of the defendant," immediately upon his appearance in this district, in October 2019, Mr. Parnas sought to cooperate with the Government. Albeit the Government steadfastly rebuffed Mr. Parnas's efforts at providing "substantial assistance," Mr. Parnas was allowed by the Court to provide evidence to Congress for its use in the First Impeachment Inquiry of then-President Donald Trump. This cooperation with Congress was material to the impeachment of the former president and was of sufficient

public and historical importance to have been introduced into the Congressional record of the proceedings.

Also since the time of his arrest, Mr. Parnas has actively engaged in meaningful efforts at rehabilitation. The evidence of Mr. Parnas's rehabilitation counsels strongly in favor of a non-incarcerative sentence.

Mr. Parnas's family and friends all write about his efforts at personal growth and rehabilitation during the two years and eight months since his arrest. He has grown closer with his wife and children, participated with counseling with his wife, sought to tell the truth about his circumstances, and identified his gambling problem and taken steps towards its remission.

Mr. Parnas's ███████████████████████████████████████ along with what will invariably be the harsh and highly infectious nature of any incarceration during the COVID crisis, also weighs strongly in favor of finding that a non-incarcerative term is sufficient to achieve the purposes of punishment.

Additionally, since the time of his conviction in October, 2021, Mr. Parnas and his wife have had a daughter. She is now almost 8 months old.

Under 3553(a)(2), the Court must also consider the need for a sentence to afford adequate deterrence, protect the public from further crimes of the defendant, and provide needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Here, imposing a sentence of time-served would satisfy all these considerations.

Mr. Parnas has been convicted of multiple felony offenses and will have a significant order of restitution imposed against him as punishment. The collateral consequences of Mr. Parnas's conviction and monetary penalty will continue to impact him and his family for many years to come. A time-served sentence, given these additional collateral consequences, would reflect the gravity of his offenses while promoting respect for the law and providing just punishment. Such a sentence would provide adequate general deterrence, and Mr. Parnas's additional efforts while on release, including raising his family, seeking employment at Door Dash, participating in Gamblers Anonymous, and engaging in significant acts of community service demonstrate that he has been individually deterred from every engaging in any form of criminal activity again.

Given Mr. Parnas's exemplary efforts at rehabilitation, and his lack of any violation during thirty-two months of pre-trial supervision, there also remains no need for any additional period of incarceration to protect the public from further crimes. Mr. Parnas's remorse, public humiliation, shame, and hard work to turn his life around all weigh in favor of a non-jail sentence. Mr. Parnas has been publicly prosecuted, severed all ties with his co-defendants, attempted to cooperate with the Government, provided cooperation to Congress, had another

child, and is now 50 years old. His circumstances make it highly unlikely that he will ever reoffend.

Also, while on pre-trial release, Mr. Parnas has managed to provide himself with medical care, and there is no need to imprison him to provide him with medical care, let alone "in the most effective manner" as set forth in 3553(a)(2).

Indeed, Mr. Parnas will receive more effective medical treatment if he is not incarcerated, and he would also avoid the risk that contracting COVID represents to him in a prison environment.



As this Court noted in *United States v. Rodriguez*, 2022 WL 158685, "Several courts have found that these conditions constitute extraordinary and compelling reasons for a sentence reduction. *See, e.g., United States v. Rodriguez*, 492 F. Supp. 3d 306, 310–11 (S.D.N.Y. 2020); *United States v. Anderson*, No. 16 Crim. 824, 2020 WL 2849483, at *2 (S.D.N.Y. June 2, 2020)." *Id.* at *3. And, as the Court has also noted, Mr. Parnas's particular medical circumstances and the vulnerability to severe COVID-19 symptoms that they create renders a prison sentence itself "more harsh and more punitive," *Id.* at *4, than previously.

Turning to consideration of the kinds of sentences available and the sentencing range, per 3553(a)(3) and (4), the advisory Guidelines range is 78 to 97 months of imprisonment as calculated by the PSR. The advisory range, as calculated by the Defense, is 63 to 78 months. There is no mandatory minimum sentence. The Court is free to downwardly vary to time served, to be followed by supervised release with special conditions

The Court must also seek to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and also consider the need to provide restitution to any victims of the offense. 18 U.S. 3553(a)(6) and (7). Here, Mr. Parnas's co-defendants Igor Fruman and David Correia were offered plea bargains that relied upon prosecutorial discretion not to seek guilty pleas to all of the counts in which they were originally charged and plainly involved. Mr. Parnas was not extended such an opportunity. Instead, he proceeded to trial with co-defendant Andrey Kukushkin—against whom the evidence of conspiring to make illegal foreign donor campaign contributions was far greater. All of these co-defendants have received the same sentence of 366 days.

Yet, Mr. Parnas was the only one of his co-defendants to have cooperated with Congress. He was the only one with the inner resolve and courage to speak to the public about matters of national significance, even when he was under indictment and facing prosecution. And Mr. Parnas was the only defendant to provide evidence that was material to Congress' First Impeachment of Donald Trump. He has already served over nine months under strict, 24-hour home confinement, and another 18 months under some other form of a curfew. A sentence to time-served and no further confinement has been well-earned on a number of grounds, notwithstanding that Mr. Parnas exercised his right to a jury trial and such an outcome would be a lesser sentence than any of his co-defendants received.

As to restitution, imposing a time-served sentence would allow Mr. Parnas to continue working while pursuing literary and other projects when they are still ripe, so as to commence payment of any restitution ordered—even though incrementally—almost immediately.

Taken together, all of the 3553(a) factors coalesce to support a below-Guidelines sentence to time-served, notwithstanding the overall nature and gravity of the Federal Election Campaign Act and wire fraud violations for which Mr. Parnas stands convicted.

## <u>Conclusion</u>

For the reasons set forth herein, we respectfully submit that a sentence of time-served would be sufficient and no greater than necessary to satisfy all the objectives of sentencing.

Respectfully submitted,

*Joseph A. Bondy*

_____
Joseph A. Bondy
Stephanie R. Schuman
*Counsel to Lev Parnas*

cc:    AUSAs Nicolas Roos, Aline Flodr
       and Hagan Scotten
       USPO Specialist Paul Hay