UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

                                       :

UNITED STATES OF AMERICA

                                       :

        - v. -

                                       :    S1 19 Cr. 725 (JPO)

LEV PARNAS,

                                       :

                    Defendant.

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

# THE GOVERNMENT'S SENTENCING SUBMISSION

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Rebekah Donaleski
Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys
    *- Of Counsel -*

**<u>Table of Contents</u>**

I.   BACKGROUND ............................................................................................................ 1

    A.   The Foreign Donor Scheme .................................................................................. 2

    B.   The Straw Donor and False Statements Scheme ............................................... 3

    C.   The Fraud Guarantee Scheme .............................................................................. 4

    D.   The Probation Department's Guidelines Calculation is Correct ......................... 7

    E.   Parnas is Not Entitled to a Downward Departure Pursuant to Section 5K2.0 .................. 8

        1.   Relevant Facts ................................................................................................ 9

        2.   Applicable Law .............................................................................................. 12

        3.   Discussion ...................................................................................................... 13

II.   SECTION 3553(a) ANALYSIS .................................................................................. 14

    A.   The Nature and Circumstances of the Offense .................................................. 14

    B.   The History and Characteristics of the Defendant ............................................ 17

    C.   The Need to Afford Adequate Deterrence and Protect the Public ..................... 18

    D.   The Need to Avoid Unwarranted Sentencing Disparities .................................. 20

CONCLUSION .................................................................................................................... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of Lev Parnas scheduled for June 29, 2022 at 11:00 a.m.  Parnas stands convicted of seven offenses related to pumping foreign money into United States elections; making straw donations using other peoples' money; lying to the Federal Election Commission ("FEC"); and defrauding investors of more than two million dollars that Parnas used to fund his own lavish lifestyle.  The record before this Court shows that Parnas has—for years—lied and swindled and corrupted for his own benefit. Parnas put himself above this country, his investors, and the public.  His conduct was, in the words of the Probation Department, "appalling" and merits a significant sentence.  Parnas's requests for leniency, based in large part on his compliance with a Congressional subpoena, should be rejected. For the reasons set forth below, a sentence within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 78 to 97 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

## I.      BACKGROUND

The Court is familiar with the overwhelming evidence of Parnas's guilt after presiding over Parnas's October 2021 trial, plea proceeding, and the sentencing proceedings for Parnas's co-defendants, David Correia, Igor Fruman, and Andrey Kukushkin.  In short, Parnas played a pivotal role in three separate criminal schemes: a scheme to make political contributions funded by a foreign donor; a scheme to make straw donations and lie about those donations to the FEC; and the Fraud Guarantee scheme, whereby Parnas defrauded seven investors out of more than two million dollars.  The relevant facts with respect to each scheme are set forth below.

A.    **The Foreign Donor Scheme**

Parnas, along with his co-defendants Igor Fruman, Andrey Kukushkin, and Andrey Muraviev, conspired to make political contributions funded by Muraviev, a Russian national, in order to benefit their nascent cannabis business.  (Presentence Investigation Report ("PSR") ¶ 29). The conspiracy began in the summer of 2018, when after a series of meetings, Kukushkin told Parnas and Fruman that "[a]n understanding of the joint activities ha[d] been reached" and Muraviev would provide the "financial resources," and that Muraviev was "not pay[ing] for anyone's political ambitions," but wanted to secure cannabis "licenses." (*Id.* ¶ 30).  To fulfill their end of the bargain, Parnas and Fruman began to make thousands of dollars in political contributions that they intended would be reimbursed by Muraviev, including Parnas's $5,400 contribution to Congressman Pete Sessions (which was made using Fruman's credit card).  (*Id.* ¶ 31).

In September 2018, Parnas, Fruman, David Correia, Kukushkin and Muraviev met in Las Vegas, Nevada, during which Parnas, Fruman, and Kukushkin attended a campaign event for Adam Laxalt, a politician they believed could be helpful for their cannabis venture.  (PSR ¶¶ 31-32).  While in Las Vegas, the group refined the details of their illegal campaign finance scheme: Muraviev would wire $1 million to Fruman, which the group would use for political contributions. (*Id.* ¶ 32).  Parnas, Fruman, and Correia worked on a proposed schedule and budget for making political contributions related to the planned cannabis venture, which was ultimately transmitted to Muraviev and Kukushkin.  (*Id.* ¶¶ 33, 34).

Muraviev funded the group's illegal donation scheme by transferring two separate wires of $500,000 each to an account Fruman controlled, pursuant to sham loan agreements.  (PSR ¶¶ 34-35).  The funds were used, among other things, to pay an American Express bill that included $136,500 in donations such as the donations to Protect the House, Joe Wilson, Friends of Ron

DeSantis, Pete Sessions, a Florida-based PAC, and the Trump Make America Great Again Committee.  (*Id.* ¶ 34).  While those donations were primarily made in Fruman's name, Parnas arranged the donations and promised donations to other candidates listed on the table that Parnas, Fruman and Correia had put together.  (*Id.* ¶ 37).

Parnas and his co-defendants went to considerable lengths to hide their criminal scheme. As noted above, the donations were made in Parnas's, Fruman's, or Global Energy Producers' names.  (PSR ¶ 38).  The money Muraviev wired was smuggled in as loans to Fruman's brother's company.  This was no accident, since Parnas and Fruman were well familiar with the campaign finance laws, having been the subject of an FEC complaint, discussed below.  Parnas also reminded his co-conspirators of the need for secrecy: Parnas told Fruman, Kukushkin, and Muraviev that they should avoid sending texts about the specifics of their agreement, telling them, "You are going to get everybody in trouble."  (*Id.*).

### B.    The Straw Donor and False Statements Scheme

Parnas and Fruman made straw donations to a number of federal candidates, joint fundraising committees, and independent expenditure committees that were made in Parnas's name or the name of Global Energy Producers in order to conceal the fact that the donations were funded by Fruman.  (PSR ¶ 39).  Parnas, Fruman, and Correia further concealed the straw donation conspiracy by lying to the FEC.  (*Id.*).

In the spring of 2018, Parnas and Fruman began attending a number of political fundraising events and making high-dollar contributions in order to gain access to and ingratiate themselves within political circles.  (*Id.* ¶ 40).  Parnas and Fruman did so in order to promote their personal financial interests and promote a newly-founded energy company (with no bank account, income, or assets) called Global Energy Producers ("GEP").  (*Id.*).  In order to enhance GEP's reputation

and make it appear that it was an established, successful business, Parnas and Fruman conspired to make a $325,000 donation to America First Action PAC, and a $15,000 contribution to 35th Inc. in the name of GEP using Fruman's funds.  (*Id.* ¶¶ 40-41).  Parnas and Fruman routed the funds through various accounts, including an account in the name of Parnas's shell corporation, in order to further conceal the fact that the money came from Fruman.  (*Id.*).

Parnas also made contributions in his name that were funded by Fruman in order to evade federal contribution limits and to make it appear as if Parnas were a contributor.  (PSR ¶ 42). Parnas, Correia, and Fruman then made false statements to the FEC about these donations.  In response to an FEC complaint regarding the source of funds for the $325,000 GEP donation, Parnas submitted a sworn statement that falsely averred that (i) the contribution was made with GEP funds for GEP purposes, when in actuality the contribution was made with funds from a private lending transaction by Fruman; and (ii) that GEP was a real business enterprise funded with substantial bona fide capital investment whose major purpose was energy trading and not political activity, when in actuality GEP had no existing business, was not funded with bona fide capital investment, and was not engaged in energy trading.  (*Id.* ¶ 44).  Additionally, Parnas falsely stated that his $2,700 contribution to Congressman Sessions was made with a business credit card which Parnas reimbursed, when in fact Parnas had not reimbursed Fruman or anyone else for that contribution.  (*Id.*).

### C.    The Fraud Guarantee Scheme

Between 2012 and 2019, Parnas and Correia defrauded seven different victims out of more than $2.3 million dollars.  Parnas kept the majority of that money—Correia pocketed only approximately $43,650—which Parnas used to fund a lifestyle that included luxury travel, high-end cars, and lavish personal expenses.

4

Beginning in late 2012, Correia and Parnas began raising money for Fraud Guarantee. (PSR ¶ 46). Parnas and Correia marketed Fraud Guarantee as a company that would "help reduce the risk of fraud as well as mitigate the damage caused by fraudulent acts . . . by building products that protect investors in the private equity marketplace." They claimed that Fraud Guarantee would "provide[] . . . investors peace of mind through comprehensive intelligence, and insurance against losses due to fraudulent behavior, or defaults due to fraud." In their pitches to investors, they repeatedly made several false material statements that funds would be used for Fraud Guarantee's purposes, that Correia and Parnas would not take a salary from investors' funds, and that Parnas had already invested millions in the company. (PSR ¶¶ 45-46).

Parnas and Correia had a remarkably consistent pattern: they told investor after investor the same lies, used the investors' money largely for personal expenses—particularly Parnas's personal expenses—and then when the money ran out, they identified new investors. In 2013, Parnas and Correia induced three victims, Rodney Suggs, John Bostick and Tapan Daftari, to invest approximately $750,000 in Fraud Guarantee. (PSR ¶¶ 47-48). Over the next year, Parnas and Correia used only some of that money on legitimate business expenses, and appropriated the rest: more than $230,000 was withdrawn as cash; more than $130,000 was used to pay rent for Parnas's personal residence; more than $40,000 was transferred to accounts in the name of Parnas and his wife; and tens of thousands of dollars were spent on various personal expenditures, including more than $30,000 at luxury car leasing companies. (*Id.*). In 2014, Parnas and Correia induced Suggs, Bostick, and Daftari to invest another $205,000, but that money was used principally to pay for Parnas's rent and personal expenses, withdrawn in cash, or transferred to accounts held by Parnas's and Correia's family members. (*Id.* ¶ 49).

The following year, in 2015, Parnas and Correia identified a new victim, Hubert Weisslinger.  After promising Weisslinger that his money would only be used for legitimate business purposes and providing him with a demonstrably false "business plan," Weisslinger agreed to invest $300,000, which he transferred to Parnas's personal account.  Again, Parnas used the majority of that money for personal expenses, including transferring money to his wife and son, spending another $30,000 on luxury car leases, and withdrawing $76,000 in cash.  (PSR ¶ 50). In 2016, Parnas and Correia followed the same pattern with another victim, Alexander Rothman, who invested $200,000 and a vehicle (which he transferred to Parnas), based on the same material lies that Parnas and Correia told to the other victims.  (*Id.* ¶ 52).  And in late 2016, Parnas and Correia induced yet another victim, Theodore Vougioklakis, to invest $300,000 in Fraud Guarantee, more than half of which Parnas immediately transferred to his own personal account, to be used for personal expenses, cash withdrawals, and to fund political contributions.  (*Id.* ¶¶ 53-54).

Finally, in September and October 2018, Parnas and Correia defrauded their final victim, Charles Gucciardo, by lying to induce him to invest $500,000 in Fraud Guarantee, which Gucciardo did by wiring money, at Parnas and Correia's direction, to a consulting company hired by Fraud Guarantee.  (PSR ¶ 55).  In a victim impact statement, Gucciardo compellingly describes the personal and financial consequences he and his family have suffered as a result of Parnas's crimes.  (*See* Ex. A).

Over the course of the scheme, Parnas and Correia conspired to defraud at least seven victims out of a total of approximately $2,322,500.  (PSR ¶ 56).  Despite the length of the scheme and the amount of money invested by victims, Fraud Guarantee never became operational.  (*Id.* ¶ 46).

### D.       The Probation Department's Guidelines Calculation is Correct

On October 9, 2019, Parnas was arrested on the charges contained in indictment 19 Cr. 725.  (PSR ¶ 58).  On October 22, 2021, a jury found him guilty of all six counts charged in indictment S3 19 Cr. 725: (i) conspiring to defraud the United States and make straw donations, in violation of 18 U.S.C. § 371; 52 U.S.C. §30122 and 30109(d)(1)(A) and (D) (Count One); (ii) making false statements to the FEC, in violation of 18 U.S.C. § 1001(a)(2) and 2 (Count Two); (iii) making false statements in affidavits to the FEC with the intent to obstruct a matter within the FEC's jurisdiction, in violation of 18 U.S.C. § 1519 and 2 (Count Three); (iv) conspiring to defraud the United States and make donations funded by a foreign national, in violation of 18 U.S.C. 371; 52 U.S.C. § 30121, 30122, and 30109(d)(1)(A) and (D) (Count Four); (v) soliciting foreign national contributions, in violation of 52 U.S.C. § 30121 and 30109(d)(1)(A) and 18 U.S.C. § 2 (Count Five); and (vi) aiding and abetting the making of foreign national contributions, in violation of 52 U.S.C. § 30121 and 30109(d)(1)(A) and 18 U.S.C. § 2 (Count Six).  On March 25, 2022, Parnas pled guilty to the wire fraud count charged in indictment S1 19 Cr. 725, in violation of 18 U.S.C. § 1349 (Count Seven).  (PSR ¶ 17).

Based on a base offense level of 28, and a criminal history category of I, the Probation Department calculates the defendant's applicable Guidelines range as 78 to 97 months' imprisonment.  (*See* PSR ¶ 151).  The Probation Department recommends a downward variance to 18 months' imprisonment, in order to avoid sentencing disparities with Parnas's co-defendants, and in light of Parnas's lack of criminal history and family circumstances.  (PSR at 40).

Parnas challenges the Probation Department's calculation, arguing that his total offense level should be 26 rather than 28 because the amount associated with the illegal campaign contribution conspiracy is not "anywhere near" $1 million, but does not specify the amount he

7

believes applies.  (Def. Br. 19).  Despite claiming that the evidence at trial supports his argument, Parnas does not include a single citation to any evidence or testimony at trial, nor could he: the trial record showed that Parnas agreed to make $1 million in illegal campaign contributions.  There is no reasonable dispute that Parnas and Fruman requested well over a million dollars from Muraviev for the purpose of making political contributions, or that they actually received a million dollars in response to those requests.  (*See, e.g.*, GX 1402 at 7-8 (initial $500,000 request); *id.* at 9-10 (receipt of first $500,00); *id.* at 13-16 (request for and receipt of second $500,000); *id.* at 21 (request for an additional $2,000,000)).  Although Parnas then stole a significant portion of that money for personal expenses, that is not a defense: as this Court already explained in sentencing Kukushkin, in a conspiracy, the question is what the defendants agreed to do, not what they eventually did.  (*See* Kukushkin Sentencing Tr. at 5).  The correct value of the illegal transactions to which Parnas agreed is thus $1 million, which results in a 14-level enhancement pursuant to U.S.S.G. §§ 2B1.1(b)(1)(H) and 2C1.8(b)(1).

E.      **Parnas Is Not Entitled to a Downward Departure Pursuant to Section 5K2.0**

Parnas seeks a downward departure based on his compliance with a congressional subpoena issued by the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), in response to which he produced "nearly 700 pages of evidence."  (Def. Br. 20-21).  However, Parnas's compliance with a duly issued subpoena falls far short of the sort of "extraordinary" conduct and cooperation that merits a downward departure.  Moreover, the record shows that Parnas undertook these actions not out of the goodness of his heart, but laser-focused on the sentencing benefit and personal benefits he could obtain.  He should not be rewarded as a result.

8

### 1.  Relevant Facts

As a backdrop for Parnas's downward departure motion, and presumably in an effort to explain why he was not able to cooperate with the Government, Parnas claims that "the information [he] wished to supply the Department of Justice in this case was information that it did not want to hear," and that the Government "kept Mr. Parnas at bay before finally hearing his proffer," and only then, the proffer was "principally used to thwart his trial testimony." (Def. Br. 16). Parnas's claim is specious and merits correction.

By way of background, on September 30, 2019 HPSCI sent demand letters to Parnas and Fruman requesting certain documents and a deposition in connection with an impeachment inquiry. (Parnas Pretrial Mot. 10). Parnas and Fruman signaled their intention not to comply, and following their arrest on the instant charges on October 9, 2019, HPSCI issued subpoenas to Parnas and Fruman. (*Id.* 10-17).

Within a week of Parnas's arrest, on October 16, 2019, Parnas's counsel contacted the Government to indicate that Parnas was "really upset" that then-President Trump was "claiming he didn't know [Parnas]," and that Parnas was interested in cooperating.[1] The Government then requested an attorney proffer—that is, a summary from Parnas's attorney of what Parnas would be able to testify to at trial—in order to evaluate Parnas's truthfulness and potential to provide

---

[1]     Parnas made similar statements to the media, explaining that his decision to cooperate following his arrest was motivated by hurt feelings. *See, e.g.*, https://www.washingtonpost.com/politics/once-this-is-over-well-be-kings-how-lev-parnas-worked-his-way-into-trumps-world--and-now-is-rattling-it/2020/01/18/68542ff4-3940-11ea-9541-9107303481a4_story.html ("In interviews, Parnas has said he felt abandoned and betrayed after his arrest, when Trump disavowed him and Giuliani failed to forcefully defend him."); https://www.thedailybeast.com/rudy-giuliani-associate-lev-parnas-convicted-in-illegal-foreign-influence-operation ("Parnas disavowed the Trump empire entirely just as the former president went through his first impeachment because he felt they abandoned him during his initial arrest. 'I felt like my family left me,' he told The Daily Beast last year.").

substantial assistance.  Parnas's counsel provided a number of attorney proffers beginning on October 28, 2019, but the information was not fully credible and in material respects was plainly contradicted by the evidence the Government had gathered to date, which caused the Government to have serious concerns about Parnas's credibility and candor.  The Government had extended discussions with Parnas's counsel in the weeks and months following Parnas's arrest during which the Government pointed counsel to evidence that contradicted the attorney proffers.

Moreover, in an effort to encourage Parnas to be truthful, on November 6, 2019, the Government took the extraordinary step of meeting with Parnas and his counsel for a reverse proffer to explain, among other things, the evidence the Government had gathered against Parnas; what the cooperation process entailed; and that Parnas would have to be truthful and accept responsibility for his own crimes.  At the close of that meeting, the Government informed Parnas that public spectacles, leaks, and social media postings could undermine his credibility and diminish his value as a potential cooperating witness.  The Government also explained to Parnas how certain information he had provided through his attorney proffers had been contradicted by the evidence and was materially false.  After that meeting, Parnas's counsel wrote the Government to report that he could not "accept responsibility for criminal activity for which he is not guilty," which based on discussions with counsel, the Government understood to be a reference to, among other things, the campaign finance and false statements offenses of which Parnas now stands convicted.

Thereafter, Parnas produced materials to HPSCI in response to its subpoena over the following weeks.  The Government facilitated this by producing discovery to Parnas on an expedited basis, so that he could access materials which had been seized pursuant to search warrants, and agreed to modifications to the protective order to permit Parnas to produce those

materials to HPSCI.  During that time, Parnas engaged in a high-profile media blitz that appeared to be aimed at securing immunity for Parnas from Congress, which—given the broad implications of *Kastigar v. United States*, 406 U.S. 441 (1972)—could have jeopardized the instant prosecution.[2]  Nonetheless, the Government did not object to Parnas's various requests for media interviews, or even when he wanted to travel to witness Congressional proceedings, despite knowing that he would not be allowed in the Capitol building because of his ankle bracelet.[3]  Later, Parnas made clear in repeated and highly public media interviews that he hoped to receive a sentencing benefit in exchange for complying with the HPSCI subpoena.[4]  Parnas did not testify in the impeachment proceedings, and was not deposed.  Instead, Parnas points to statements describing the fact that Parnas provided materials in response to the HPSCI subpoena, which the Government does not dispute.  (*See, e.g.*, Def. Br. 20-21).

---

[2]     *See, e.g.*,   https://www.theguardian.com/us-news/2019/dec/06/giuliani-associate-lev-parnas-talks-potential-plea-deal ("Parnas's counsel issued a statement saying that Parnas needed to be 'granted a level of immunity, such that his statements in the impeachment inquiry cannot be used against him in his federal prosecution.'"); https://www.motherjones.com/politics/2020/02/lev-parnas-wants-to-be-a-resistance-hero/ ("Bondy says he has a plan. He told Mother Jones in November that he hoped lawmakers would grant Parnas immunity for statements he makes in potential congressional testimony. 'I'd like to be able to arrive at some sort of understanding that is good for the republic,' Bondy said.").

[3]     https://www.washingtonpost.com/lifestyle/style/lev-parnas-barred-from-impeachment-trial-makes-himself-its-star-anyway/2020/01/29/2cb47062-42d2-11ea-aa6a-083d01b3ed18_story.html.

[4]      https://www.politico.com/news/magazine/2020/01/24/joseph-bondy-lev-parnas-attorney-104004 ("I don't need a 5k letter from the government to go to the court and say, 'Lev has tried to cooperate with the congressional inquiry,' Bondy said, referring to the letter a prosecutor gives to a court to indicate that a defendant has cooperated."); https://www.cnn.com/2020/01/20/politics/joseph-bondy-lev-parnas-attorney/index.html ("'The risks are enormous and the only way that this works is by him being truthful and wanting to be helpful,' says Bondy. His objective is that 'I am able to say to my judge at the end of this day, no matter what happens, he tried very hard and what he did that was so helpful transcends him.'").

As this Court is aware from pretrial litigation, the Government met with Parnas for a proffer on March 5, 2020. During that proffer, Parnas was not fully credible or forthcoming. He minimized, blamed others for the criminal conduct he has pled to and been convicted of, made statements that were inconsistent with the evidence, and the Government was ultimately unable to corroborate significant portions of what Parnas said. Due to his lack of credibility, candor, and unwillingness to accept responsibility, the Government did not meet with Parnas again for another proffer session and did not proceed with cooperation.

## 2.    Applicable Law

Section 5K2.0 permits courts to depart from the applicable Guideline range if "there exists an aggravating or mitigating circumstance," § 5K2.0(a)(1)(A), or if it is an "exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2)(B). Departures are also warranted in "exceptional cases[s], even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of … that which ordinarily is involved in that kind of offense." § 5K2.0(a)(3). As relevant here, under § 5H1.11, "Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."

Courts within this Circuit have considered departures under § 5K2.0 in connection with defendants' cooperation with Congress or other investigative bodies. *See, e.g.*, *United States v. Stoffberg*, 782 F. Supp. 17, 20 (E.D.N.Y. 1992) (granting a § 5K2.0 departure where the defendant extensively cooperated with Congress). However, the extent of cooperation matters when

determining whether a departure is warranted.  *See, e.g.*, *United States v. Chabot*, 70 F.3d 259, 260 (2d Cir. 1995) (per curiam) ("[A] court should exercise its discretion to depart only under extraordinary circumstances.").  As the Second Circuit has explained with respect to § 5K2.0, "in order to justify a downward departure, [a] defendant's conduct must be so extraordinary that it falls outside the heartland of cases covered by the guidelines."  *United States v. Korman*, 343 F.3d 628, 631 (2d Cir. 2003) (cleaned up).  *Korman* is instructive: in that case, the Second Circuit found that a district court had erred in granting a downward departure based on a defendant's voluntary testimony before a state grand jury.  Because "the fact of providing grand jury testimony in a state prosecution does not remove a case from the heartland of Sentencing Guideline cases" and indeed "[t]he duty to testify has long been recognized as a basic obligation that every citizen owes his Government," a downward departure was not warranted based on a "prior good deed, which is a discouraged basis for departure under U.S.S.G. § 5H1.11."  343 F.3d at 631-632 (citing *United States v. Calandra,* 414 U.S. 338, 345 (1974) (testifying in court is an ordinary civic duty)).

### 3.    Discussion

Parnas's compliance with the HPSCI subpoena does not justify a downward departure.  His decision to produce documents in response to a duly issued subpoena is akin to a civic deed that is "ordinarily not relevant in determining whether a sentence should be outside the applicable guideline range."  § 5H1.11.

The extent of Parnas's so-called cooperation with HPSCI was limited to compliance with its subpoena.  Parnas indisputably did not testify, did not voluntarily produce documents, did not meet with Congressional investigators, and was not deposed.  His conduct falls far short of the assistance deemed deserving of a downward departure in *Stoffberg*, 782 F. Supp. at 20, the case on which Parnas relies (Def. Br. 20).  There, the defendant agreed to be deposed by Congress,

agreed to testify voluntarily, and provided information relevant to the Iran hostage crisis, as set forth in a sentencing letter from the Chief Counsel of a House Committee. Parnas has not submitted any letters from HPSCI on his behalf, and has pointed only to public statements describing the fact that Parnas produced documents in response to the HPSCI subpoena. (*See, e.g.*, Def. Br. 20-21).

Instead, Parnas's fulfillment of his civic duty to comply with legal process is more akin to the defendant in *Korman*, who testified voluntarily before a state grand jury but still was not deserving of a downward departure since "[t]he duty to testify has long been recognized as a basic obligation that every citizen owes his Government." 343 F.3d at 631. If the duty to testify is a "basic obligation that every citizen owes his Government," then compliance with a duly issued subpoena is as well. *Id.*

## II. SECTION 3553(a) ANALYSIS

The factors enumerated in 18 U.S.C. § 3553(a) strongly support a Guidelines sentence in this case.

### A. The Nature and Circumstances of the Offense

The evidence at trial and before the Court overwhelmingly establishes that Parnas engaged in a veritable crime spree for seven years. He told investor after investor that he would not use their money for himself, then spent hundreds of thousands of dollars on lavish personal expenses. He lived off his lies for years. Parnas used his victims' money to make political contributions, and then used Fruman's money to continue making political contributions. Parnas did so to benefit himself: to buy himself access to power and the appearance of power at the expense of others. And when Parnas met Muraviev, he did the same thing, using Muraviev's money to benefit his and his co-defendant's business. Parnas hid his crimes from his victims and the public through subterfuge,

14

lies, and the use of shell corporations.  If not for his arrest, it is plain that Parnas would have continued defrauding and lying to those around him.  Parnas's crimes are serious, and call for a Guidelines sentence.  *See United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 46 ("Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath.").

Parnas's crimes harmed the public: Parnas used other peoples' money to fund campaign contributions.  He lied to the public about the true source of those funds, and lied to the FEC about the contributions to ensure that no one—not the public, not a regulator—could determine who was really paying for Parnas's contributions.  As the Probation Department aptly puts it: Parnas's conduct "must not be tolerated, as it could have potentially been an embarkment of corruption and having a foreign national shape our government policies."  (PSR at 40).  Parnas's lies to the FEC, when coupled with his lack of acceptance of responsibility for his campaign finance offenses, underscore the gravity of his conduct and the need for a significant sentence.

Parnas's crimes also directly harmed specific victims: people who lost hundreds of thousands of dollars, who were charmed and conned by Parnas.  Parnas lied in order to get them to part with their hard-earned money, and then lived a high-flying life at their expense.  As Charles Gucciardo writes, Parnas has shown himself to be a "conniving self-centered con artist who does not care one iota about the consequences of his actions so long as he believes that he might stand to benefit from his schemes."  (Ex. A at 1).  Gucciardo describes Parnas as the "ring-leader in this group of conmen" whose ability to "con people into believing that he has connections, clout and ability to construct deals between important people is apparent on so many levels."  (*Id.*).  In this respect, it is clear that Parnas's crimes were interrelated: Parnas used other peoples' money to buy

access to power and celebrity and to give the appearance of personal wealth, which in turn allowed

him to continue to dupe investors into believing he was a successful businessman who would not,

for instance, use their investment to pay for his high-end car lease, but would instead spend the

money on legitimate business expenses.

Parnas's silence in his sentencing submission on the real financial toll his actions have

taken on his victims is glaring. The only mention of the victims is in Parnas's son's letter, which

reports that Parnas "repeatedly shares his intent to repay the victims charged in the Government's

indictment." (Def. Br. 6). But Parnas's actions speak more loudly. Since his arrest in this case,

Parnas has cashed in on his notoriety to the tune of $120,000, which he was paid by a documentary

company for a "documentary surrounding his life and legal battles." (PSR ¶ 143). But instead of

using that money to begin to repay his victims the more than $2 million he stole from them, Parnas

used it "on his living expenses, including pre-paying his home rent for the year." (*Id.*). As to his

living expenses, Parnas pays $5,000 per month to rent a "four-bedroom, four-and-one-half

bathroom home located in [a] well-established, high-income neighborhood." (*Id.* ¶ 112). Time

will tell if Parnas has any intention of repaying his victims, but Parnas's actions to date provide no

comfort that he will.

The length and extent of Parnas's crimes also weigh in favor of a substantial sentence.

Parnas's crimes did not result from a momentary lapse of judgment; they were undertaken over a

seven-year period and encompassed almost every facet of Parnas's life. He defrauded people he

led to believe were his friends; he lied and stole with impunity. Nor are Parnas's famous friends

and compatriots to blame for his actions. Parnas's statement to the Probation Department that he

"expressed disappointment in 'trusting' some of his political affiliates, noting that these

relationships contributed to his legal issues" shows how little Parnas has accepted responsibility

for his own criminal conduct, and the harm he caused to his victims and the public as a result. (PSR ¶ 112). Put simply, Parnas was engaged in a wire fraud scheme long before he traveled the world with rich and famous people. Parnas's lack of true remorse or meaningful acceptance of responsibility speaks volumes, and shows the need for a substantial punishment to reflect the seriousness of his crimes.

### B. The History and Characteristics of the Defendant

Parnas seeks a remarkably lenient sentence of time served—less than ten percent of the sentences his less culpable co-defendants received—on the basis of his family characteristics, personal health issues, efforts at rehabilitation, and attempted cooperation. None of Parnas's proffered bases for leniency are compelling, and certainly do not distinguish him from any other defendant who appears before this Court.

First, Parnas leans heavily on his family circumstances in support of his request for a time-served sentence. As with any defendant, the toll that Parnas's crimes will take on his family is an unfortunate reality. But Parnas's family circumstances are by no means extraordinary, and certainly do not distinguish him in any respect from the average offender, or even any of his co-defendants in this case, each of whom had small children and family members they supported. For that reason, courts will not typically consider a defendant's claim of family hardship at sentencing absent truly "extraordinary" circumstances. *See United States v. Nivar*, 2003 WL 21488061, at *4 (S.D.N.Y. June 26, 2003) (collecting cases); *cf.* U.S.S.G. § 5H1.6 ("family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted").

Second, Parnas's efforts at rehabilitation post-arrest do not merit leniency. Parnas claims that he has changed as a result of his arrest, and points to the fact that he has sought help for a claimed gambling addiction and volunteered. (Def. Br. 21-24). This is simply more evasion: there

is no reason to believe that Parnas's multifarious crimes were caused by a gambling addiction, rather than the narcissism for which he continues to show no remorse.

Third, Parnas argues that his efforts to cooperate merit leniency. If Parnas had fully and truthfully cooperated, the Government would agree that he deserved leniency. But that is not what happened. Parnas refused to accept responsibility for the crimes he now stands convicted of; he minimized and lied to the Government; and he irreparably damaged his own credibility by embarking on a self-aggrandizing publicity tour that led to his own financial gain instead of signaling a serious intention to cooperate. Parnas blames the Government for his failure as a potential cooperator, but he has no one to blame but himself. He tried to cooperate in the way he wanted to: in the media, not in court. And while Parnas honored his civic duty to comply with a legally issued subpoena, the record shows that he did so in order to stand before this Court and ask for leniency. His efforts to "cooperate" were little more than continued efforts to gain power and influence for himself, using the currency of his criminal arrest and conviction. He has already monetized his notoriety. He should not also receive a sentencing benefit for it. His victims deserve better.

Finally, Parnas points to his health issues in support of his request for leniency. However, the Bureau of Prisons is well able to address the health conditions that Parnas complains of, which are hardly extraordinary or unusual enough to merit any leniency.

###    C.    The Need to Afford Adequate Deterrence and Protect the Public

A Guidelines sentence is necessary to specifically deter Parnas; to deter others from committing crimes like Parnas did; and to protect the public.

As noted above, nothing about Parnas's crimes or the conduct since his arrest shows that he has truly changed. His crimes of conviction have a unifying theme: Parnas lied and swindled

18

in order to buy influence and power. His conduct since his arrest is of a similar vein. Parnas sought fame and notoriety as a result of his arrest. He tried to cooperate not because it was the right thing to do, but because he was "hurt" that his former associates did not stand by him. When Parnas learned that he had to be truthful and accept responsibility to cooperate as a witness in court, he decided to try his hand at making his criminal case go away by seeking immunity from Congress; when that failed, he decided to do everything possible (short of truthfulness) to seek a sentencing benefit from the Court. Because Parnas has not meaningfully accepted responsibility for his conduct, the need to deter his future crimes, or protect the public from them, is significant. *See* 18 U.S.C. §§ 3553(a)(2)(B) and 3553(a)(2)(C).

General deterrence is particularly important in cases such as this one. As this Court saw, white collar crimes like this are extremely difficult to detect. "Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012); *see also, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)). General deterrence is particularly important here given the high-profile nature of Parnas's crimes: he corrupted the electoral system; lied with impunity to the FEC; and defrauded seven investors out of more than $2 million over a seven-year period. A substantially-

below Guidelines sentence—and particularly a sentence of time served—sends the message that serious crimes like Parnas's merit only a proverbial slap on the wrist.  That is not justice.

### D.     The Need to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence is necessary to avoid unwarranted sentencing disparities.  Parnas argues that he is similarly situated to his co-defendants, each of whom received a sentence of 366 days' imprisonment.  (Def. Br. 23-24).  He is wrong.

To begin with, Parnas was convicted of seven offenses related to three separate criminal schemes.  Correia was convicted of two offenses arising from two schemes; Kukushkin was convicted of two offenses arising from one scheme, while Fruman was convicted of one offense arising from one scheme.  That means that the extent of Parnas's crimes of conviction are orders of magnitude greater than his co-defendants.  Moreover, Parnas committed these crimes over a seven-year period , whereas the conduct of his co-defendants was generally far more limited in duration.  Their crimes were also more limited in subject matter.  Correia and Kukushkin, for example, had little in common, except that they both began committing felonies by virtue of their relationship with Parnas.  Fruman and Kukushkin were not involved with Fraud Guarantee. Correia had a menial role in the campaign finance scheme, and derived a tiny profit of the ill-gotten gains that Parnas did from the Fraud Guarantee scheme.  In short, Parnas may not be a career criminal as the law defines that term, but for the last decade, he has led a career of crime. He deserves far more punishment than his co-defendants.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully submits that a sentence within the applicable Guidelines Range of 78 to 97 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.  The Court should impose restitution with respect to Count Seven in the amount of $2,322,500, and the Government will submit a proposed order in advance of sentencing.  The Court should also impose forfeiture in connection with sentencing for Count Seven.  The Government will submit a proposed forfeiture order within sixty days of sentencing.

Dated:  New York, New York
         June 22, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:      /s/_____
Rebekah Donaleski
Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys