# 19MAG729 .'

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



In the Matter of a Warrant for All Content and Other
Information Associated with the Email Accounts

|and

Maintained at Premises

Controlled by Google, Inc., and

Maintained at Premises Controlled by Oath
Holdings, Inc., USAO Reference No.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

## Agent Affidavit in Support of Application for a Search Warrant
### for Stored Electronic Communications

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

eing duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence, including emails.

**B. The Provider, the Subject Accounts and the Subject Offenses**

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the following email accounts (collectively referred to as the "Subject Accounts") maintained by Google, Inc. ("Google"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and Oath Holdings Inc. Custodian of Records, formerly Yahoo! Holdings, Inc. ("Oath"), headquartered at 701 First Avenue, Sunnyvale, California 94089 (collectively, the "Providers").

| Account | Provider | Owner | Referred To As: |
|---|---|---|---|
| ████████████ | Google | Igor Fruman | I-Fruman GEP Account |
| | Google | Lev Parnas | L-Parnas GEP Account |
| ████████████████████████ | | | |
| | Google | David Correia | D-Correia GEP Account |
| | Google | Igor Fruman | I-Fruman Gmail Account |
| ████████████████████████ | | | |
| | Oath | Lev Parnas | L-Parnas Yahoo Account |
| | Oath | David Correia | D-Correia Yahoo Account |

The information to be searched is described in the following paragraphs and in Attachments A and B to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contains evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw

donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering) (together, the "Subject Offenses").

4.  This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C. Services and Records of the Provider

5.  I have learned the following about the Provider:

a.  The Providers offer email services to the public. In particular, Google permits subscribers to maintain email accounts under the domain name gmail.com. Google also allows a subscriber to maintain email accounts under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "globalenergyproducers.com," Google enables the subscriber to host any email address under this domain name on servers operated by Google. Oath permits subscribers to maintain email accounts under the domain name yahoo.com. A subscriber using the Providers' services can access his or her email account from any computer connected to the Internet.

b.  The Provider maintains the following records and information with respect to every subscriber account:

i.  *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form

3

in the account, is maintained on the Providers' servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time.

ii.     *Address book.* The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.    *Subscriber and billing information.* The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.     *Transactional information.* The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' website).

v.      *Search history.* Google and Oath also typically maintain records of any search history or web history associated with the subscriber's account.

vi.     *Chats and Instant Messages.* The Providers allows subscribers to engage in "chat" sessions in an instant messaging format with other users, the transcripts of which are

4

generally stored in a user's email content. Similarly, Google also allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

vii. *Customer correspondence.* The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

viii. *Associated Google content.* Google also provides subscriber's with additional serves, and maintains additional records, including the following:

1. *Google Payments.* Google allows for the storage of payment information associated with a Google account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

2. *Google Drive Content.* Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his Google account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

3. *Google Docs.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google

5

Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

4. *Google Calendar.* Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

5. *Location History.* Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

6. *Device Information.* Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

7. *Android Services.* Google also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet

6

computers. Google retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

8. *Cookie Data.* Google uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

ix. *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D. Jurisdiction and Authority to Issue Warrant**

6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7

7.   A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## II.  Probable Cause

9.   The FBI and United States Attorney's Office for the Southern District of New York are investigating political contributions made to campaigns and political action committees by Global Energy Producers LLC ("GEP") and Lev Parnas, but which in fact appear to have been funded by third parties, possibly through foreign sources, in violation of the Subject Offenses.  Specifically, the federal campaign finance laws prohibit persons from making contributions in the name of another person.  The Federal Election Commission ("FEC") has ruled that the so-called straw donor prohibition also applies to the creation and use of closely held corporation or corporate LLC for the purpose of concealing the true source of the funds.  The federal campaign finance laws also prohibit foreign nationals from directly or indirectly making political contributions.  Additionally, the federal wire fraud statute makes it a crime to defraud political campaigns by depriving them of information about the nature and source of a contribution—specifically, that it is a foreign contribution or a straw donation—necessary for campaigns to exercise their intangible right to control the use of their assets, including how to best allocate the money they raise, while exposing the campaigns to a risk of even greater economic loss, including FEC fines.  The federal money

laundering statute, as applied here, prohibits the transferring of funds from outside the United States to inside the United States for the purpose of promoting such a wire fraud.

10. Here, there is probable cause to believe that the contributions made by GEP and Parnas to federal and state political committees in connection with the 2018 midterm elections were, in fact, funded by money that was purportedly lent by          o Igor Fruman, a Ukrainian-born businessperson who claims to be involved in an import-export business, and then laundered through accounts to fund the political contributions. In particular, and as described below, it appears that GEP was set up by Fruman and Parnas for the purpose of making political contributions, it appears to have no real business operations, it was created in a manner to disguise its owners and source of funding, and it was funded by the purported loan by

and     and by what appear to be foreign wire transfers. Additionally, it appears that Parnas made contributions in his own name that were funded by the same third-party payments. Accordingly, there is probable cause to believe that Fruman, Parnas, and other individuals have committed the Subject Offenses.

11. As described below, there is also probable cause to believe that the Subject Accounts, which belong to Fruman, Parnas, and other individuals who appear to be affiliated with GEP, contain evidence, fruits, and instrumentalities of the Subject Offenses. Specifically, as set forth below, it appears that the Subject Accounts were used by Fruman, Parnas, and others to, among other things, communicate about GEP-related matters, communicate with individuals working for campaigns or political action committees, and coordinate financial transactions that appear to be related to the Subject Offenses. Therefore, there Subject Accounts are likely to contain the types of evidence of the Subject Offenses enumerated below.

9

## A. Probable Cause Regarding the Subject Offenses

12. As described herein, the investigation to date has revealed that donations made in the name of GEP and Parnas, including a $325,000 donation to the                 PAC by GEP and a $11,000 donation to the           PAC by Parnas, were, in fact, funded and orchestrated by third parties such as Fruman – possibly through foreign sources – in violation of the campaign finance laws. These funds were laundered through multiple bank accounts in the names of shell LLCs, apparently to disguise the true ownership and source of the funds. Moreover, it appears that these contributions were made to          congressional and gubernatorial candidates as well as political action committees with a stated purpose of electing candidates, after Fruman and Parnas met with President Donald J. Trump in March and May 2018.

13. Specifically, according to a public report published in Russian, of which I have reviewed a draft translation, on or about March 3, 2018, Fruman met with Trump at the resort in Palm Beach, Florida. According to Fruman, who is quoted in the article, "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in       was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the       victory in the mid-term elections to Congress in November 2018." The article includes a photograph of Fruman with President Trump, a photograph of Fruman in front of a "Trump-    Victory" poster, and a photograph of Fruman's identification, which says "Special Event with President Donald J. Trump :: The       Club :: PALM BEACH, FL :: 03.03.18." Based on my review of this article, as well as my review of President Trump's public schedule for March 3, 2018, which notes a "Trump Victory reception" in West Palm Beach, it appears that Fruman met with President Trump and discussed providing financial support to       campaigns in the 2018 midterm election.

10

14. While the aforementioned article described Fruman as a major       donor, from my review of FEC records, it does not appear that Fruman made contributions in his own name prior to 2018. Additionally, based on my review of FEC records, I have learned that in the months following the March 3, 2018, in the lead up to the 2018 midterm elections, Fruman made multiple low-dollar contributions to President Trump's reelection committee. Specifically, on or about April 5, 2018, May 5, 2018, June 5, 2018, and July 5, 2018, Fruman contributed $100 to the

Committee.

15. Fruman met with President Trump again in or around the first week of May 2018. Specifically, according to a public report published in Russian on or about May 15, 2018, of which I have reviewed a draft translation, approximately one week prior, "Fruman . . . participated in a closed meeting with Donald Trump . . . held in Washington, . . . attended by only eight people" including Parnas. According to Fruman, who was quoted in the article and described as a "channel of direct communication between the Jewish community of Kiev and the President of the United States," "the conversation was about preparations for the victory in the midterm elections to the US Congress in November 2018."

16. Based on my review of campaign finance records, I have learned that shortly after their meeting with President Trump, Fruman and Parnas made multiple contributions to candidates' campaigns and political action committees affiliated with      causes or candidates. Specifically, Fruman and Parnas caused a $325,000 contribution to be made to

PAC in the name of GEP, a $11,000 contribution to be made to

PAC in the name of Parnas, and multiple other contributions in the name of Fruman and Parnas to be made to the campaigns of      candidates and political action committees.

11

*The $325,000 Contribution to*

17. On or about May 17, 2018, shortly after Fruman and Parnas met with President Trump in Washington in May 2018, GEP made a $325,000 contribution to ▐ Inc. (" ▐ which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump- ▐ administration." This single contribution represented 6.5 percent of ▐ nearly $5 million in second quarter contributions received.

18. It appears that GEP was created shortly before its name was used to make the contribution to ▐ Specifically, based on my review of public records, I have learned that GEP was incorporated in Delaware on or about April 11, 2018, with ▐

▐ as its registered agent. Neither Fruman nor Parnas was originally registered as an agent of GEP, nor were either of them named in any filing in Delaware relating to the LLC. Both Fruman and Parnas have made extensive use of various corporate entities in Florida and New York, and for each of those entities, Fruman and Parnas have registered those companies in their own names. Accordingly, it appears that the decision to incorporate GEP in Delaware using the ▐

▐ was made in an attempt to obscure the ownership of the LLC. Additionally, the address listed on FEC reports for GEP is ▐ Florida, which according to public records is a single-family residence owned by an individual named ▐

▐ However, from my review of utility records, I have learned that in or around March 2018, Parnas began paying the utility bill for that property. Accordingly, it appears that Fruman and Parnas incorporated GEP and utilized an address for GEP in such a way so as to disguise their involvement with GEP.

12

19. Based on my review of financial records and public sources, I have learned the following about the source of the funds used to make the $325,000 contribution to 

a. On or about May 11 and May 14, 2018,     a Ukrainian-born individual living lawfully in the United States, and     an American attorney, wired a total of $3,000,000 ($2,500,000 from    , $500,000 from   ) into an attorney trust account operated by     who I have learned from his website and other public sources is an attorney based in Florida specializing in real estate transactions, including for foreign buyers. Based on my review of financial records, I have learned that    and    both have a history of receiving international wire transfers from Russia, although the specific source of the money that funded these transfers is presently unknown.[1]

b. On or about May 11 and May 14, 2018, the same days on which the wire transfers were made,    moved the $3,000,000 to a different attorney trust account also in his law firm's name.

c. On or about May 15 and May 16, 2018, substantially all of that money was transferred from    trust account in multiple transfers as follows: *First,*    account transferred $1,500,000 to    , which subsequently disbursed the funds to three other LLCs. *Second,*    account transferred $1,260,330 to    . *Third,*    account paid $47,735 to    and $13,215 to    as well as approximately $120,309 in real estate fees, that appear to be related to recording a mortgage, described below. Based on my training and experience, as well as the circular nature of these transactions—in which

---

[1] Grand jury subpoenas are pending for records associated with the bank accounts that made the transfers to the   attorney trust account.

13

funds are transferred back to ███████████ through transfers involving multiple bank accounts in the names of LLCs—it appears that these individuals were laundering funds to disguise their true ownership or source.

d. From my review of public records, I have learned that on or about May 15, 2018, a day after ███████ completed their transfers t ███████████ entered into a mortgage agreement with ███████████ which according to public records is managed by Fruman and his brother ███████ According to the mortgage agreement, which purported to justify the $3,000,000 transfer, ███████ agreed to loan ███████ $3,000,000, which was to be secured by a condominium owned by ███████ (which is own by Fruman) in Bal Harbour, Florida. However, the mortgage agreement does not require installment payments, and it states that the proceeds from the loan will be used for a "business or commercial purpose." Based on my training, including my review of law enforcement guidance relating to money laundering through real estate transactions, I have learned that "red flags" of improper money movements related to real estate include purported loans with ambiguous stated purposes, loans with non-standard repayment terms, and loans whose proceeds are used in a manner inconsistent with their stated purpose, described below.

e. Based on my review of bank records for the account in the name of ███████ ███████████, I have learned that Parnas, and his wife ███████████ are the signatories on the account. The account opening documents for the ███████ Account indicate that the account was opened by Parnas in May 2017 as a "real estate company / personal investment company" for the purpose of: "send/receive funds to/from countries outside the U.S." On or about May 15, 2018, the ███████ Account, as described above, received a wire transfer from the ███████ attorney trust account in the amount of

14

$1,260,329.80. Prior to receiving that transfer, the [REDACTED] Account generally had a low balance and minimal account activity. For instance, in January 2018, the [REDACTED] Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79.

      f. On or about May 17, 2018, or two days after receiving that in-bound transfer, $325,000 of those funds was wired from the [REDACTED] Account to an account owned by [REDACTED] Based on my review of campaign finance records, I have learned that the payment was reported to the FEC by [REDACTED] as a contribution by GEP, despite the fact that the funds came from [REDACTED] and, in fact, never flowed through an account in the name of GEP. Additionally, none of the individuals actually responsible for the transfer of the funds—including [REDACTED] Fruman, and Parnas—were reported as the contributor in [REDACTED] disclosure.

      20. In addition to the foregoing, based on my review of public sources and records obtained by subpoena, I have learned that the individuals involved in this contribution have taken additional steps to disguise the nature, source, and individuals involved in the payments. Specifically:

      a. As noted above, the address for GEP appears to be a residential property owned by [REDACTED] Based on my review of bank account records, I have learned that since on or about March 7, 2018, four days after Fruman met with President Trump, monthly payments have been made to [REDACTED] from the [REDACTED] Account and another account in the name of [REDACTED], which is also under Parnas's control (the "[REDACTED] Account"). The purpose of these payments, it appears, is to rent [REDACTED] property or use the address. Notably, it appears that some of these payments were funded by [REDACTED] a lobbying firm that previously worked for President Trump's campaign. Specifically, on or about March 7, 2018, the [REDACTED]

15

Account, which had a low account balance, received a wire transfer in the amount of \$22,500 from

      , and on the same day, \$11,300 of the funds was wired to     Similarly, on or about September 21, 2018,     Account received \$22,500 from     and those funds appear to have been used to make a payment to Imber.

     b. On or about April 29 and May 24, 2018, an individual using the username

posted advertisements on a design website seeking a logo design for GEP, which the advertisement described as a "United States based company transacting in [liquid natural gas], oil and gas and solar energy" that was "founded by a group of business leaders, representing several complimentary industries."

     c. On July 25, 2018,     published an article regarding GEP's contribution to     which suggested that GEP is a shell entity without legitimate business. In response, on July 31, 2018, a "spokesperson" for GEP emailed     that "[t]he donation to     PAC was a 100% legal contribution made by American citizens" and that "[t]he amount donated to     PAC represents only a small fraction of the operating costs of GEP." The "spokesperson" also wrote that "[t]he implication that GEP is some sort of shell company, couldn't be further from the truth, as the company is committed to a longterm plan to export American [liquid natural gas] and is in the process of partnering with major industry leaders both domestically and internationally to achieve that end."

     d. Despite the foregoing representations about GEP's business, from my review of public records and financial documents, it does not appear that GEP is an operating energy business. Specifically, I have reviewed U.S. Department of Energy records, and it does not appear that GEP has a permit to engage in shipping of liquid natural gas. Instead, it appears that the incorporation of the company, the use of a rented home as GEP's address, the creation of a logo,

16

and the statement t            were all designed to lend the appearance of legitimacy to GEP while its principals were engaged in political activity.

21. Accordingly, it appears that the contribution made in the name of GEP to

was to conceal the true donors of the funds and, in fact, was funded by third parties other than Parnas, from whose account the funds came.

### The        *Contribution*

22. On or about June 29, 2018,           a political action committee with the stated purpose of working to keep        in control of Congress, reported receiving an $11,000 contribution from Parnas. It appears, however, that the money used to make the contribution did not come from Parnas, but instead came from the funds wired by

in May 2018.

23. Based on my review of financial records and public sources, I have learned the following about the source of the funds used to make the $11,000 contribution to

a. As described above, on or about May 11 and May 14, 2018,

wired a combined $3,000,000 to    who subsequently wired $1,260,330 of that $3,000,000 to        Account on or about May 15, 2018. As noted above, the

Account was opened by Parnas and had a low account balance prior to receiving that transfer.

b. On or about May 22, 2018, a $100,000 transfer was made from the

Account to an account in the name of Global Energy Producers LLC (the "GEP Account"). Fruman and Parnas are the signatories on the GEP Account.

17

c. On or about July 2, 2018, the GEP Account was used to make a contribution in the amount of $11,000 to the                        The contribution was nonetheless reported as being made by Parnas.

24. Accordingly, it appears that while the contribution to                        was made in the name of Parnas, it was, in fact, funded by                        orchestrated by Fruman, and processed through a GEP account.

*The Payment to*

25. Based on my review of campaign finance records, I have learned that on or about June 29, 2018, Parnas contributed $2,700 to the campaign of U.S. Representative                        who was running for re-election in California and was then House Majority Leader, and $5,000 to the                        PAC, a political action committee registered by Vice President of the United States

26. Based on my review of financial records, I have learned that following those contributions, on or about October 17, 2018, a $25,000 payment was made from the GEP Account to                        which is a consulting firm operated by                        who is a                        political operative and is also a senior advisor for                        PAC. Based on my review of bank records, I have also learned tha                        receives monthly payments from                        for President, Inc.,                        PAC, and                        PAC, which is affiliated with Representative                        .

27. Based on my review of financial records it appears that the $25,000 payment to                        from the GEP Account was funded by the money transferred into the                        Account, as well as from additional large transfers that may be derived from foreign sources. Specifically, I have learned the following:

18

a. As described above, on May 15, 2018 ▮▮▮ wired $1,260,330 to the ▮▮▮

▮▮▮ Account using funds that had been transferred to ▮▮▮ by ▮▮▮

b. From May 16, 2018 to May 22, 2018, the funds in the ▮▮▮ Account were used to make a $100,000 transfer to the GEP Account; transfers totaling $502,650 to an account in the name of ▮▮▮ Corp. (the "▮▮▮ Account"); a $205,000 transfer to the ▮▮▮ Account; and a $50,000 transfer to an account in the name of Global Energy Developers (the "GED Account").

c. From my review of records for the ▮▮▮ Account and public sources, I have learned that ▮▮▮ Corp. purports to be an import-export business, and the signatories on the account are Fruman and his brother ▮▮▮ Based on the same, I have learned that the $502,650 transferred from the ▮▮▮ Account was used by the Frumans through the ▮▮▮ Account to fund approximately $262,041 in payments on an ▮▮▮ credit card,[2] a $50,000 transfer to Fruman and his wife, an $11,500 payment back to the ▮▮▮ Account, a payment of approximately $56,231 back to

---

[2] A grand jury subpoena for records for the ▮▮▮ account is currently pending. Based on my training and experience, I know that political contributions can be made on a credit card, and therefore it is possible that additional political contributions have been made on this credit card account. For instance, from my review of campaign finance records, I have learned that on or about May 25, 2018, Fruman contributed $2,700, the maximum allowed individual contribution, to the campaign of ▮▮▮, the ▮▮▮ candidate for United States Senate in Florida, who President Trump campaigned for extensively. On or about June 12, 2018, Fruman contributed $2,700 to the campaign of U.S. Representative ▮▮▮ who was running for re-election in South Carolina and is a supporter of President Trump. On or about June 25, 2018, Fruman and Parnas each contributed $2,700 to the campaign of U.S. Representative ▮▮▮ who was running for re-election in Texas and for who received support from President Trump. Additionally, according to Florida campaign finance records, on or about June 21, 2018, GEP contributed $50,000 to Friends of ▮▮▮ a Florida political action committee supporting gubernatorial candidate ▮▮▮ The source of these contributions has not been identified, and thus they may have been made using the ▮▮▮ account in question.

19

who, as noted above, is the attorney who had wired to the funds to Parnas, and approximately $49,000 in transfers to the GEP Account.

d. From my review of records for the           Account, I have learned that the account was opened on March 8, 2018 by Parnas and his wife           The account opening documents do not indicate the purpose of the account or what type of business LLC is, and the account had a low balance prior to receiving the wire transfer. On July 6, 2018, $90,000 of the funds wired from the           Account were wired to the GEP Account. On September 1, September 18, October 2, October 19, and November 13, 2018, a total of $59,000 was transferred back from the GEP Account to the           account. The account was also used to pay           $28,115.67.

e. From my review of records for the GED Account, I have learned that the account was opened in May 2018 by Parnas and Fruman. From August 2018 through October 2018, the GED Account was used to transfer approximately $9,250 to the GEP Account.

f. Additionally, on or about September 18, 2018, the           Account received a $500,000 wire transfer from a bank account in the name of           held at in Switzerland. The signatories on the account or the individuals affiliated with are not presently known. The wire memo stated that it was "payment as per the loan agreement." On or about September 18 and 19, 2018, approximately $494,415 from the Account were used to make an           payment, and $30,200 was transferred into the GEP Account.

g. On or about October 1, 2018, a $100,000 check from           a Russian-born American businessman who is the chief executive of

a private natural resource company based in the United Kingdom, was deposited into

20

the GEP Account. The memo line on the check indicates that it is for a "loan to Igor [Fruman] &
Lev [Parnas] (two months)."

      h.  On or about October 16, 2018, the                    Account received a
\$500,000 wire transfer from a bank account in the name of              held at
          , which is a bank headquarter in the nation of Georgia. The signers on the account
or the individuals affiliated with                  are not presently known. The wire
memo stated that it was "payment as per the loan agreement." On or about October 16, 2018,
approximately \$263,000 was transferred to the GEP Account, \$100,000 was transferred to a bank
account held personally by Fruman, and approximately \$79,054 was used to make an
      payment. Additionally, as noted above, it appears that all of these payments from third
parties are described as "loans," which appears to be an attempt to disguise the true purpose of
transferring the funds.

      i.  As noted above, on or about October 17, 2018, the day after the
transfer, a \$25,000 payment was made from the GEP Account to

28. Based on my training and experience, the fact that Fruman and Parnas made a payment
to         while also making payments to political action committees or campaigns
with which      is affiliated, suggests that      may have coordinated or solicited the
contributions on behalf of those political action committees or campaigns. Additionally, the
movement between accounts and layering of funds traceable to the wire into the
Account, as well as foreign accounts, is indicative of money laundering and a purpose to disguise
the source of the funds.

29. Accordingly, for the reasons set forth in the foregoing paragraphs, there is probable
cause to believe that Fruman, Parnas, and others are involved in the commission of the Subject

21

Offenses by making contributions to political committees, including ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ in the name of GEP and Parnas for purposes of concealing the true source of the funds. Specifically, there is probable cause to believe that the contributions to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ and other political committees to which Fruman, Parnas, or GEP donated were funded by third parties including ▮▮▮▮▮▮▮▮ nd foreign sources. Moreover, based on the circuitous nature of the monetary transactions described above, and the fact that the funds come from third parties (some of whom are overseas), there is probable cause to believe that Fruman, Parnas, and others are engaged in money laundering in furtherance of their activity through GEP.

## B. Probable Cause Regarding the Subject Accounts

30. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including documents relating to the creation and operation of GEP, communications among individuals affiliated with GEP, communications with third parties about political contributions, communications about and records of movement of money and bank transactions relating to GEP and other entities operated by Fruman and Parnas, and evidence of a scheme to disguise the true source of political contributions to candidates, campaigns, and political action committees.

31. On or about November 14, 2018, the Honorable Barbara Moses, United States Magistrate Judge, signed orders directing the Providers to disclose header information reflecting the names and usernames of senders and recipients of emails, and the time/date stamps of such emails associated with the I-Fruman GEP Account, the L-Parnas GEP Account, the I-Fruman Gmail Account, the ▮▮▮▮▮▮▮▮ and the L-Parnas Yahoo Account. Based on my

22

review of the information produced pursuant to those orders, I have learned the following about the Subject Accounts:

a. *First*, there is probable cause to believe that the Subject Accounts will contain communications amongst individuals affiliated with GEP about political contributions based on evidence of account activity at and around the time of those contributions. In particular, with respect to the Subject Accounts with the domain globalenergyproducers.com – specifically the I-Fruman GEP Account, the L-Parnas GEP Account, the

and the D-Correia Account (hereafter the "GEP

Subject Accounts"):

i. The GEP Subject Accounts were created in or about April 2018, at or around the time of GEP's incorporation. As described above, it appears that GEP is not an operating business, but is instead a shell entity utilized by Fruman and Parnas to make political contributions.

ii. Based on my review of account information provided by Google, as well as my review of financial records, it appears tha

and David Correia work for Fruman and/or Parnas on behalf of GEP. Indeed, from the header information, it appears that all of the individuals with GEP email accounts communicated with each other extensively at or around the time political contributions were made.

iii. For instance, on May 11 and May 14, 2018, which are the days funds were wired from                    the L-Parnas GEP Account and exchanged multiple emails. Moreover, on May 17, 2018, the day that GEP made the contribution to                    th          the I-Fruman GEP Account, the D-Correia GEP Account, and the L-Parnas GEP Account exchanged emails with each other. The following day,

23

was used to communicate with the ████████████████ and L-

Parnas GEP Account.

    iv.  Additionally, throughout the remainder of the month of May 2018, and extending into June and July 2018, which is the same time period multiple contributions were made by GEP, Parnas, or Fruman to political committees, there was extensive communication among the I-Fruman GEP Account, the L-Parnas GEP Account, the ████████████████ the

████████████████████████████████ and the D-Correia GEP Account.

    v.  Accordingly, based on the domain name attached to each of the GEP Subject Accounts, the dates of their creation, and their email activity at or around key transaction dates, there is reason to believe that the GEP Subject Accounts will contain communications amongst individuals affiliated with GEP about political contributions.

    b.  Similarly, with respect to the Subject Accounts with the domain @gmail.com or @yahoo.com (the "Non-GEP Accounts"), it appears that the foregoing subject individuals affiliated with GEP interchangeably used their Non-GEP Accounts and their GEP Accounts to send and receive emails related to GEP, thus making it likely their Non-GEP Accounts similarly contain relevant emails.

    i.  For instance ████████████████ who appears to be an assistant to Lev Parnas and/or Fruman, regularly emailed Parnas at the L-Parnas GEP Account and the L-Parnas Yahoo Account, and Fruman on the I-Fruman GEP Account and the I-Fruman Gmail Account on or around the dates in May 2018, described above, in which key transactions relating to political contributions or political contributions themselves were made. ████████████████ ent those emails from the ████████████ Account as well as the ████████████ Account.

24

ii. Similarly, Parnas used the L-Parnas Yahoo Account to communicate with Igor Fruman at the I-Fruman Gmail Account

and David Correia at the D-Correia Yahoo Account. Using the L-Parnas GEP Account and L-Parnas Yahoo Account, Lev Parnas also communicated with                 at the
                Account who, as noted above, is a signer on the                 Account.

iii.                 also used the                 in May 2018 to communicate with Igor Fruman at the I-Fruman GEP Account and the I-Fruman Gmail Account,

                                                                                                              and
David Correia at the D-Correia GEP Account and D-Correia Yahoo Account.

iv. Based on the fact that each of the foregoing Google and Yahoo Subject Accounts belong to individuals affiliated with GEP, were used to send or receive multiple emails with GEP Subject Accounts, and sent or received emails from those accounts during time periods particularly relevant to the scheme described above, it appears that the foregoing Subject Accounts will contain communications amongst individuals affiliated with GEP about political contributions.

c. Indeed, based on my training and experience, I have learned that when an individual has multiple email accounts either hosted by the same provider or accessed through the same electronic device, they must often select which account to send an email from. As a result, email users often use their accounts interchangeably, or accidentally send emails from an account because they failed to switch sending accounts. Accordingly, for this additional reason, there is reason to believe that the Google and Yahoo Accounts of Igor Fruman, Lev Parnas,

                and David Correia are likely to contain communications relating to GEP, even if they intended for these accounts to only be used for personal communications.

25

d. *Second*, there is probable cause to believe that the Subject Accounts will contain communications between the owners of the Subject Accounts, all of whom appear to be affiliated with GEP, and individuals affiliated with politicians, political campaigns, or political action committees. In particular, from my review of header information, I have learned the following:

i. It appears that the ▊▊▊▊▊▊▊▊▊▊▊▊ L-Parnas GEP Account, D-Correia GEP Account, and D-Correia Yahoo Account were used to email with employees at ▊▊▊▊▊▊▊▊▊▊ at ▊▊▊▊▊▊, which is where Igor Fruman met with President Trump. Specifically, on or about April 20, 2018, the ▊▊▊▊▊▊▊▊▊▊▊▊ was used to email ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ Based on my review of public sources, it appears that the email address ▊▊▊▊▊▊▊▊▊▊▊▊ belongs to ▊▊▊▊ the managing director at ▊▊▊▊▊▊. Based on my review of public sources, it appears that the email address ▊▊▊▊▊▊▊▊ belongs to ▊▊▊▊▊▊ a ▊▊▊▊▊ employee who, according to public reports, has assisted President Trump with scheduling and logistics for his travel. The L-Parnas GEP Account, D-Correia GEP Account, and the D-Correia Yahoo Account were copied on the email chain. Accordingly, based on the timing of these communications and the parties involved, there is reason to believe that the ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ L-Parnas GEP Account, D-Correia GEP Account, and D-Correia Yahoo Account will contain communications with ▊▊▊▊▊▊ employees about Fruman's past or future meeting with President Trump, including about the manner in which or reason why the contributions were made.

ii. It appears that some of the Subject Accounts, specified below, were also used to email with individuals affiliated with ▊▊▊▊▊▊▊▊ PAC, to which GEP made a contribution, and ▊▊▊▊▊▊▊▊ PAC, to which Parnas made a contribution. Specifically:

26



1. On or about April 25, 2018, prior to the GEP contribution to ▮▮▮▮▮ PAC, an email was sent from the accoun▮ ▮▮▮▮▮ to Lev Parnas at the L-Parnas Yahoo Account and to Igor Fruman at the I-Fruman Gmail Account. It appears that the email addresses ▮▮▮▮▮ belongs to ▮▮▮▮▮ the director of development at ▮▮▮▮▮ PAC. ▮ Parnas, and Fruman exchanged multiple emails that day, the following day, and on April 28, 2018.

2. On May 24, 2018, shortly after GEP's contribution to ▮▮▮▮▮ PAC, the ▮▮▮▮▮ copying the L-Parnas GEP Account, was used to contact ▮ ▮▮▮▮▮ t appears that the email address ▮▮▮▮▮ belongs to ▮▮▮▮▮ an assistant at ▮▮▮▮▮ a consulting firm founded by Rudolph Giuliani. As discussed below, it appears that members of the ▮▮▮▮▮ re involved in ▮▮▮▮▮ PAC.

3. On June 5, 2018, the ▮▮▮▮▮ GEP Account was again used to contact ▮ his time copying the I-Fruman GEP Account, the D-Correia GEP Account, and the L-Parnas GEP Account. The contact with individuals affiliated with ▮▮▮▮▮ PAC continued through June 2018. For instance, during that time period, ▮ contacted Igor Fruman at the I-Fruman GEP Account and I-Fruman Gmail Account, ▮▮▮▮▮ ▮▮▮▮▮ nd Lev Parnas at the L-Parnas GEP Account. Then, on June 22, 2018, shortly before Igor Fruman and Lev Parnas made a number of contributions, Correia, using the D-Correia GEP Account, exchanged emails with ▮▮▮▮▮ ▮▮▮▮▮ copying ▮ Igor Fruman at the I-Fruman GEP Account and Lev Parnas at the L-Parnas GEP Account. It appears that the email address ▮▮▮▮▮ belongs to ▮▮▮▮▮ he chairman of ▮▮▮▮▮ PAC, and the email addresses

███████████████████████████████████████████████ the national finance

chairman of ███████████████ PAC, who also served as President Trump's ███████████

████████ co-chairman and managing director of ████████████████

               4. On July 26, 2018, the day after the ████████ ran an article about

GEP, the ██████████████████ was used to contact ███████████████████

copying Igor Fruman at the I-Fruman GEP Account, Lev Parnas at the L-Parnas GEP Account, and

Correia at the D-Correia GEP Account. Moreover, in August and September 2018, the ████████████

█████████████ L-Parnas GEP Account, and D-Correia GEP Account, and I-Fruman GEP Account

were used to communicate with ████████████████████████ nd the email account

████████████████. Based on my review of public sources, it appears that the email

address ████████████████ .com belongs to Rudolph Giuliani, the former Mayor of New York

City, an attorney and advisor to President Trump, and the chairman of ████████████ PAC, to

which, as noted above, Parnas made a donation.

               5. Accordingly, based on the timing of these communications, their

proximity to contributions and/or a new story about a contribution, and the individuals copied on

the email, it appears that the communications relate to GEP's contribution to ████████████████

PAC and/or Parnas's contribution to ████████████ PAC.

               iii. It appears that some of the Subject Accounts were used to email with

staffers for ████████ candidates for the U.S. House of Representatives at times relevant to the

Subject Offenses. Specifically, on or about April 18, 2018, the ████████████████████ was

used    to    email ████████████████████████████████████████████ d

████████████████ Based on my review of public sources, it appears that the email address

████████████████ belongs to ████████████ the chief of staff to Representative

28



of Wisconsin, the email address █████ belongs to █████ who was then the chief of staff to Representative █████ of Virginia, and the email address █████ belongs to Representative █████ of Washington. On each of those emails █████ the L-Parnas GEP Account and the D-Correia GEP Account. According, there is reason to believe that the █████ GEP Account, L-Parnas GEP Account, and D-Correia GEP Account will contain communications with congressional staffers about matters relating to GEP and/or political contributions.

    iv. It appears, in particular, that some of the Subject Accounts were used to email with Representative █████ who Parnas and Fruman contributed to, and some of his staff. Specifically:

    1. On or about April 22, 2018, the █████ was also used to email █████ copying the L-Parnas GEP Account. Based on my review of public sources, it appears that the email address █████ belongs to Representative █████

    2. On or about April 23 and April 24, 2018, the █████ GEP Account and L-Parnas GEP Account were used to with email █████ and █████ Based on my review of public sources, it appears that the email address █████ belongs to █████ the former chief of staff to Representative █████ and the email address █████ belongs to █████ an executive assistant and scheduler for Representative █████

    3. On or about July 13, 2018, the █████ GEP Account was used to contact █████ Based on my review of public sources, it appears that the email address █████ belongs to █████ the former

29

communications director and now chief of staff to Representative                The emails copied the
I-Fruman GEP Account, the D-Correia GEP Account, and the L-Parnas GEP Account.

        4. Accordingly, there is reason to believe that the

                , L-Parnas GEP Account, and D-Correia GEP Account will contain communications with
Representative            and his staff about political contributions.

        v. It also appears that some of the Subject Accounts were used to email with
Florida gubernatorial candidate                and some of his staff. Specifically, on May 10,
2018, the L-Parnas GEP Account exchanged emails with                    which appears to
belong to          , copying two email addresses that appear to belong to staff members of the
          campaign. As noted above, on June 21, 2018, GEP contributed $50,000 to Friends of
          a political action committee. Beginning shortly after that contribution, and
continuing through October 2018, the L-Parnas GEP Account, I-Fruman GEP Account, D-Correia
GEP Account, and              Account exchanged emails accounts which appear to belong
t          and his campaign staff. According, there is reason to believe that the L-Parnas GEP
Account, I-Fruman GEP Account, D-Correia GEP Account, an                        ill
contain communications wit          d his staff about political contributions.

        vi. It appears that some of the Subject Accounts were used to email with
          political operatives who were involved in fundraising for state and federal races during
the 2018 election. For instance:

        1. During the relevant time period in which contributions were made,
the L-Parnas GEP Account, I-Fruman GEP Account, and                    ere used to
email with the email accounts                        Based on my review
of public sources, it appears that the email address              elongs to          a

30

political operative who in 2018 served as an advisor to super PACs supporting ▮

candidates for government and U.S. Senate, and the email address ▮ belong

to ▮, who is president of ▮ which is a political

fundraising consulting firm.

      2. Similarly, the L-Parnas Yahoo Account, L-Parnas GEP Account, I-

Fruman Gmail Account, I-Fruman GEP Account, D-Correia Yahoo Account, and ▮

▮ were used to email with the email accounts ▮

▮ Based on my review of

public sources, it appears that ▮ belongs to ▮ the executive

director of the ▮ ), which has a mission of electing

▮ to the office of state Attorney General ▮ belongs to

▮ the finance director of ▮, and ▮ belongs

to ▮ the deputy finance director of ▮.

      3. Moreover, the L-Parnas GEP Account, I-Fruman GEP Account, and

D-Correia GEP Account were used to email with ▮ which appears to be

the email address fo ▮, who, as noted above, is a ▮ political operative

and a senior advisor for ▮ PAC, to which, Parnas made a donation.

      4. Based on the foregoing, and the timing of the communications, there

is reason to believe that these communications with fundraising consultants and political

operatives relate to political contributions.

      vii.  It appears that some of the Subject Accounts were used to email with ▮

▮ the president of ▮ who as noted above worked on the Trump Campaign

and later made payments to the ▮ Account and ▮ account, which were

31



used to pay        Specifically, on or about April 22, 2018, the           was used to email        , copying the L-Parnas GEP Account. Based on my review of public sources, it appears that the email address        belongs to        Based on the timing of this communication, there is probable cause to believe that it related to        payment to the        Account.

        viii.  In sum, it appears that the L-Parnas GEP Account, I-Fruman GEP Account, D-Correia GEP Account, L-Parnas Yahoo Account, I-Fruman Gmail Account, and D-Correia Yahoo Account were used for communications with individuals affiliated with politicians, political campaigns, or political action committees, and there is probable cause to believe, based on the timing of those communications and the individuals copied on them, that they relate to political contributions.

        e.  *Third,* there is probable cause to believe that the Subject Accounts will contain communications from banks relating to transactions involving GEP. Specifically, it appears that during the period in which the financial transactions and political contributions described above were occurring, Igor Fruman using the I-Fruman GEP Account and I-Fruman Gmail Account, using the        Lev Parnas using the L-Parnas GEP Account, and        sent and received emails from        where the GEP Account and        Account are held, and/or        which as discussed above may have been used to make contributions.

32. Based on my review of business records obtained pursuant to subpoena, I have learned that Lev Parnas used the L-Parnas Yahoo Account to register bank and other accounts that were used to set up GEP. For instance, in opening the        Account, Parnas used the L-

Parnas Yahoo Account. Similarly, in setting up utilities in his name for

in Boca Raton, Florida—the address that is affiliated with GEP—Parnas used the L-Parnas Yahoo Account. Based on my training and experience, and as described above, banks, utility companies, and other businesses routinely contact customers at the primary email contacts they provide at account opening. Accordingly, there is probable cause to believe that the L-Parnas Yahoo Account will contain records relating to the opening and use of these accounts.

33.     As described above, on or about April 29 and May 24, 2018, an individual using the username          posted advertisements on a design website seeking a logo design for GEP. It appears that the logo was sought to, among other things, make it appear as though GEP is a real business. Based on my review of records provided by that design website, I have learned that the username          is registered to th                    ccordingly, there is probable cause to believe that the                    will contain records relating to the creation of GEP, including communications relating to its logo.

34.     As described above, on or about July 31, 2018, a "spokesperson" for GEP emailed          about the legitimacy of GEP's political contributions. Based on the foregoing, it appears likely that one of the accounts with the GEP email domain will contain communications characterizing the nature of GEP's business, or the lack of business.

35. Based on my training and experience, email accounts like the Subject Accounts, which have been used to communicate with others about unlawful contribution schemes and money laundering, often contain records of that activity, including emails, chats, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), payment records, contact information of co-conspirators and/or witnesses, notes about calls and meetings, calendar entries relating to calls and meetings, and internet search history relating to

33

unlawful conduct. Additionally, email accounts like the Subject Accounts often contain IP and location information, which can result in the creation of records of physical locations of meetings and calls. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes.

36. Temporal Limitation. For the L-Parnas Yahoo Account and the I-Fruman Gmail Account, this application is limited to all content created, sent, or received between January 1, 2016, and the present, inclusive. For these two accounts, records from January 1, 2016, are necessary to establish Igor Fruman's and Lev Parnas's history of making contributions, including in the 2016 election cycle, and their relationship to President Trump. For the rest of the Subject Accounts, this application is limited to all content created, sent, or received between January 1, 2018 (which is shortly before when GEP, Parnas, and Fruman began making contributions), and the present, inclusive.

## C. Evidence, Fruits and Instrumentalities

37. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachments A and B to the proposed warrants.

38. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence relating to the creation, incorporation, or operation of GEP, or shell corporations used to make political contributions.

34

b. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d. Evidence relating to the funding of bank accounts held in the name of GEP.

e. Evidence relating to political contributions made by Igor Fruman, Lev Parnas, their family members, GEP, and its affiliates, employees, or representatives.

f. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Lev Parnas, their family members, GEP, and its affiliates, employees, or representatives.

g. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman or Lev Parnas, or on which Igor Fruman or Lev Parnas is a signatory.

h. Evidence relating to mortgages or loans to which

i. Evidence of other bank accounts or entities related to GEP, including emails reflecting registration of other accounts potentially containing relevant evidence.

j. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

k. Evidence relating to communications with individuals who work at

l. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

35

m. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

n. Passwords or other information needed to access user's online accounts.

## III. Review of the Information Obtained Pursuant to the Warrant

39. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachments A and B to the proposed warrants.

40. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as

searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Request for Non-Disclosure and Sealing Order

41. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption offenses, I know that individuals who participate in campaign finance offenses communicate about known government investigations and frequently tailor their stories to be consistent, and tamper with or hide potential evidence. Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

42. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose

those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V.    Conclusion

43. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.



Sworn to before me this
18th day of January, 2019

HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

38