learned that on or about July 2, 2018, $11,000 of the funds wired into the GEP account – which originated from ███████████████ – were used to make a contribution to ██████████ PAC in Parnas's name.

e.  On or about June 12, 2018, Igor Fruman made another $50,000 contribution to ███████████ PAC, which was reported as given by "██████████ with the employer "█████ ████████.

f.  Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

i.  On or about September 18, 2018, a bank account held at JPMorgan Chase Bank in the name of ███████████████ to which ███████████ s the authorized signatory (the "██████████ Account") received a $500,000 wire transfer from an account held in the name of ███████████ Ltd. at ███████████ a Swiss bank. Based on my review of financial records and public sources, I have learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a Russian national, who appears from my review of emails to be in communication and/or business with Fruman and Parnas.

ii.  On or about September 19, 2018, approximately $494,415 of the funds in the ███████████ Account – most if not all of which came from ███████████ – were used to pay an American Express bill for a credit card in the name of ███████████

iii.  Based on my review of records from American Express, I have learned that the ███████████ credit card account was used to pay for a June 12, 2018 contribution to ███████████ PAC in the name of "███████████ referenced above, as well as a $15,000 contribution to the ███████████ Fund, and a $5,400 contribution to ███████████ for Congress, all of which were also made in Fruman's name.

21

The █████████████ Contribution

25. It appears that Fruman also made a contribution to the █████████ PAC using funds from a third party.

26. Based on my review of FEC records, financial records, emails obtained pursuant to the E-Mail Search Warrant, public sources, and my training and experience, I have learned the following:

a. On or about April 17, 2018, a finance director for the █████ National Committee e-mailed Parnas at the Parnas Yahoo E-mail Address to invite him to attend roundtable event at █████████ with President Trump on April 20, 2018. In order to attend the event, Parnas was required to make a minimum contribution of $100,000 to the █████████ The finance director subsequently e-mailed █████ at the █████ Google E-mail Address, copying Parnas, and noted that, "I believe Mr. Parnas was going to send his contribution information shortly, so we should be good to go for the event."

b. On or about April 27, 2018, Igor Fruman made a $100,000 donation to the █████ █████████ PAC in the name "█████████ The information reported to the FEC also stated that the occupation of "█████████ was employment with "█████████████." Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but who is named █████████ and works for █████████ █████████

c. Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

    i.  On or about May 16, 2018, and May 17, 2018, one day after receiving the transfer of funds that originated from ████████████████ $502,650 of those funds was wired from the ████████ Account to the ████████ Account.

    ii.  Between May 16, 2018, and May 23, 2018, approximately $262,041 was transferred from the ████████ Account and used to pay an American Express bill held in the name of ████████ for which Igor and ████ Fruman were authorized account-holders.

    iii.  That American Express bill included an April 27, 2018 contribution in the amount of $100,000 to the ████████, which was charged to the credit card assigned to Igor Fruman.  Although Fruman was the listed contributor in the ████████████ disclosure, none of the individuals who were actually responsible for the funds, including ████████ or the other individual responsible for the transfer of the funds, Parnas, were reported as the contributors in the disclosure.

27.  Based on all of the foregoing, it appears that as a result of the contributions to ████████ ████ PAC, ████████ PAC, and ████████ PAC, Parnas, Fruman, and their guests were invited to attend multiple ████████ PAC, ████████ PAC, and ████████ events.  For instance, based on email correspondence, it appears that on or about February 21, 2018, Parnas and Igor Fruman attended a private event at the library bar at ████████ on or about March 12, 2018, Parnas attended the aforementioned dinner in New York with Vice-President ████ on or about March 29, 2018, Parnas attended a dinner at ████████ on or about April 20, 2018, Parnas attended the aforementioned roundtable at ████████ with President Trump; on or about June 13, 2018, Parnas and an associate of his, ████████ attended a dinner with Vice-President ████ and Majority Leader ████; and on or about June 18 and

19, 2018, Parnas, Igor Fruman, their business partner David Correia, and ▇▇▇▇ attended a leadership summit at the Trump International Hotel in Washington, D.C. Based on my review of e-mails obtained pursuant to the E-mail Search Warrant, it appears that in addition to taking pictures with politicians, Parnas and Igor Fruman used these events as an opportunity to raise policy issues and requests with certain officials.

D. Contributions to Representativ▇▇▇▇ ▇▇▇▇ and Request for Official Action

28. Based on my review of emails obtained pursuant to the E-mail Search Warrant, it appears that Parnas used his attendance at the April 20, 2018 roundtable at ▇▇▇▇ to meet Congressman▇▇▇▇ and then Parnas, Fruman, Correia and others used subsequent meetings and contributions to gain access to and build a close relationship with Congressman ▇▇▇▇ Those contributions were made by Igor Fruman and Parnas in June 2018. It also appears that at the request of Parnas and Igor Fruman, Congressman▇▇▇▇ wrote to U.S. Secretary of State ▇▇▇▇ in May 2018 to ask that the current U.S. Ambassador to the Ukraine be fired and replaced. Specifically, based on my review of public records, financial records, and my review of emails obtained pursuant to the E-mail Search Warrant, I have learned the following:

a. On April 22, 2018, ▇▇▇▇ emailed Congressman ▇▇▇▇ copying Lev Parnas, to identify herself the "Director of Operations of Global Energy Producers" and thanked Congressman ▇▇▇▇ on Parnas's behalf for "engaging conversation during the round table meeting," and requested a meeting between Parnas and Congressman ▇▇▇▇ or that week. It appears that ▇▇▇▇ ference to the "round table meeting" was to the April 20, 2018 roundtable at ▇▇▇▇ featuring President Trump, which Parnas attended as a result of Fruman's $100,000 donation to the ▇▇▇▇ PAC.

b. Parnas met with Congressman▇▇▇▇ n Washington, D.C. on May 9, 2018. Parnas brought ▇▇▇▇ who served as co-chairman of the finance committee of the 58th

24

Presidential Inaugural Committee, to the meeting. A subsequent meeting between Parnas and Congressman ███████ occurred on June 6, 2018. The next day, on June 7, 2018 ███████ e-mailed a member of Congressman ███████ staff to report that she had "just spoke to Lev about how we can help out by using our contacts for Congressman ███████

     c. On June 11, 2018, ███████ wrote ███████ Congressman ███████ communications director, to report that she had "an initial list of donors" and asked if it could be put "on one CC." Later that day, ███████ e-mailed ███████ from a Gmail address, which she described as her "offsite" address, to ask "how much do they think they will bring in." ███████ replied "$21k on the one credit card." ███████ replied, "the maximum an individual can donate is $2,700 and a PAC can give up to $5,000. I'm unsure if we can do that entire amount on one credit card but I can find out." ███████ wrote back that "it will be 8 people on that card."

     d. On June 12, 2018, ███████ asked ███████ for a meeting between Parnas and Congressman ███████ which was scheduled for June 14, 2018. When ███████ asked whether it was about "policy related matters or political," ███████ replied, "Lev said it would be about what you previous[ly] met about. He said you would know, hahaha." ███████ replied "I believe it was a political matter involving Eastern European relations."

     e. On June 15, 2018, the day after Parnas's meeting with Congressman ███████ ███████ emailed ███████ attaching a letter, and wrote "I think this is it. Please don't distribute, this is only for your records. Thanks for all of your help!" The letter, dated May 9, 2018 – i.e., the aforementioned day that Congressman ███████ met with Parnas and Fruman – was addressed from Congressman ███████ to Secretary of State ███████ In the letter, Congressman ███████ wrote to Secretary ███████ to "bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine," ███████

12.13.2017

Congressman ▆▆▆ reported that he had "received notice of concrete evidence from close companions that Ambassador ▆▆▆ has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of ▆▆▆ as U.S. Ambassador to the Ukraine immediately." Congressman ▆▆▆ asked that Secretary ▆▆▆ "consider terminating her ambassadorship and find a replacement as soon as possible." Less than an hour later, ▆▆▆ forwarded the email from ▆▆▆ to Parnas. Based on this email and my participation in the investigation, I believe that the "political matter involving Eastern European relations" ▆▆▆ referenced above as the purpose for the June 14, 2018 meeting between Parnas and Congressman ▆▆▆ was related to Parnas's and Fruman's May 9, 2018 request to Congressman ▆▆▆ to remove the current U.S. Ambassador to Ukraine.

f.  On June 25, 2018, Igor Fruman and Parnas each made $2,700 contributions in their own names to ▆▆▆. Based on my review of American Express and FEC records, I have learned that the American Express bill included two $2,700 contributions -- the maximum an individual could at the time contribute -- to ▆▆▆. Based on my review of FEC records, described above, I know that despite the fact that these contributions were paid for using different credit cards linked to the same credit card account, they were reported as separate contributions by Fruman and Parnas.

g.  Between June and November 2018, ▆▆▆ repeatedly e-mailed ▆▆▆ request additional meetings between Parnas, Fruman, and others with Congressman ▆▆▆ Specifically, on June 28, 2018, Correia, who is an associate and business partner of Parnas, had meetings set up with Congressman ▆▆▆ On July 12, 2018, Parnas appears to have again met with Congressman ▆▆▆ On September 5, 2018, Parnas and Rudolph Giuliani appear to have

had a meeting scheduled with Congressman ▮▮▮▮▮ Finally, Fruman, Correia, and Parnas had a meeting scheduled with Congressman ▮▮▮▮ on November 16, 2018.

　　h.　On or about May 15, 2019, according to public sources ▮▮▮▮▮▮▮▮ was prematurely recalled or removed from her position as U.S. Ambassador to Ukraine.

E.　False Statements to the FEC

29.　Based on my review of emails and discussions with other law enforcement officers who have reviewed emails, it does not appear that Parnas, Igor Fruman, or ▮▮▮▮ told the campaigns or PACs to which they were making contributions that the funds used to make the contributions came from third parties and overseas bank accounts. Based on my training and experience, as well as my review of emails, I believe that had the PACs and campaigns known that these were unlawful contributions, they would not have accepted the funds.

30.　Based on my review of records obtained pursuant to the E-Mail Search Warrant, I have learned that Parnas and Igor Fruman have submitted affidavits to the FEC in connection with a pending complaint made by a non-profit advocacy group. Based on my review of those affidavits, it appears that Parnas and Igor Fruman have made multiple false statements to the FEC in connection with that matter. For instance, their sworn affidavits falsely state that Parnas and Fruman "funded the [GEP] entities with over \$2.8 million in assets" and that the ▮▮▮▮▮▮ PAC contribution "was made with GEP funds for GEP purposes." In fact, as set forth above, the ▮▮▮▮▮▮ PAC contribution was made with funds from a third party that were moved through multiple bank accounts before being paid to ▮▮▮▮▮▮ PAC. Additionally, Parnas stated in his affidavit that his contribution to ▮▮▮▮▮▮ "was made with a business credit card . . . which [he] reimbursed." Based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Fruman, Parnas, and

27

▮▮▮▮▮▮▮▮▮▮▮ I have learned that the analyst found no evidence of reimbursement by Parnas

to Fruman or ▮▮▮▮▮▮▮▮▮ for the contribution to Congressman ▮▮▮▮▮

31.  Based on the foregoing, I respectfully submit that there is probable cause to believe

that Parnas, Igor Fruman, and ▮▮▮▮▮ are involved in the commission of the Subject Offenses

by using foreign funds obtained by third-parties to make contributions in their own names or in

the name of GEP.[2]

### F.  Probable Cause Regarding the Subject Accounts

32.  Based on the foregoing, the facts set forth below, and my training and experience,

there is probable cause to believe that the Subject Accounts will contain evidence and

instrumentalities of the Subject Offenses, including communications about and records of

movement of money and bank transactions, including the contributions described above;

communications regarding the origin of the money that funded those contributions;

communications regarding Parnas, Fruman, and ▮▮▮▮▮▮ relationships with third parties who

provided them with foreign funds; and evidence of a scheme to disguise the true source of the

contributions to candidates, campaigns, and political action committees.  In particular:

a.  *First*, as set forth above, there is probable cause to believe that Parnas, Igor

Fruman, and ▮▮▮▮▮ are the users of the Subject Accounts.  Based on my review of telephone

subscriber records and emails, it appears that during the period covered by this application, Parnas,

Fruman, and ▮▮▮▮▮ ll used iPhones to communicate with each other.  Based on my training

and experience and my review of publicly-available information provided by Apple, described

---

[2] In the application for the E-Mail Search Warrant, the agent affidavit stated that it appeared
that e-mail communications with ▮▮▮▮▮▮▮ of ▮▮▮▮▮▮▮▮ ated to the solicitation
of contributions.  Based on my subsequent review of e-mails obtained pursuant to the E-Mail
Search Warrant, I have learned that Parnas and Igor Fruman were communicating with ▮▮▮▮▮▮
about public relations issues concerning contributions, not the making of contributions themselves.

12.13.2017

above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled.    Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas, Fruman, and ▮▮▮▮▮

        b.  *Second*, there is probable cause to believe that Parnas, Igor Fruman, and ▮▮▮▮▮ used iPhones to communicate with each other and with third parties in furtherance of the Subject Offenses.  From my review of telephone records, I have learned the following:

        i.  Igor Fruman used a telephone number registered to an iPhone to communicate with two phone numbers associated with Parnas, which are registered to iPhones. Specifically, Fruman and Parnas exchanged calls and text messages around the time of the contributions identified above.  For example, on or about June 15, 2018, the day that ▮▮▮▮▮ and Parnas received a copy of the letter to Secretary▮▮▮▮▮ from Congressman▮▮▮▮▮ Fruman and Parnas exchanged approximately twelve text messages.  Similarly, on or about June 25, 2018, which is the day Fruman and Parnas made contributions to Congressman▮▮▮▮▮ Parnas sent Fruman approximately three text messages.

        ii.  Parnas communicated by text message with ▮▮▮▮▮ at or around the time political contributions were made to the ▮▮▮▮▮ PAC and ▮▮▮▮▮.  For instance, Parnas sent a text message to ▮▮▮▮▮ on May 14, 2018, and on June 20, 2018, Parnas and ▮▮▮▮▮ exchanged text messages.  On June 14 and June 17, 2018, Parnas sent text messages to Congressman▮▮▮▮▮ Based on the timing of these text messages, it appears that they could be related to contributions.

        iii.  ▮▮▮▮▮ using a telephone number registered to an iPhone, was in near-daily contact with Parnas and frequent contact with Igor Fruman.  Based on my review of records,

it appears tha          regularly exchanged telephone calls and text messages with Parnas and Fruman, including at or around the time that contributions were made.

                  iv. Based on my review of information provided by Apple, I know that text messages, call records, and voicemails can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain text messages, call records, and voicemails relating to the Subject Offenses.

        c. *Third*, from my review of emails obtained pursuant to the E-Mail Search Warrant, I have learned the following:

                  i. Parnas, Igor Fruman, and        used e-mail to communicate with each other, campaigns, PACs, and others in furtherance of the Subject Offenses. As described above, the owners of the Subject Accounts regularly communicated by email regarding making contributions. As noted above, the email accounts associated with the Subject Accounts' subscriber information were used in furtherance of the scheme. Based on my review of information from Apple, I understand that iCloud backups can include e-mail accounts. Based on my review of information provided by Apple, I know that emails can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain emails relating to the Subject Offenses.

                  ii.        references making or receiving telephone calls relating to political contributions or meetings with political figures. Specifically, in multiple emails referred to calls to schedule meetings or to discuss the logistics of making contributions. As noted above, based on my review of information provided by Apple, I know that text messages, call records, and voicemails can be stored on the iCloud. Accordingly, there is probable cause to

believe that Subject Account-4 contain text messages, call records, and voicemails relating to the Subject Offenses.

      iii. ███████ has an email address associated with Subject Account-4 – ███████ – that she sends materials from concerning political contributions, including contribution forms, political meeting information, and photographs of meetings. Accordingly, there is probable cause to believe that Subject Account-4 contains emails, photographs, documents, and calendar entries relating to the Subject Offenses.

      iv. Based on my review of records from WhatsApp, I know that the telephone numbers used by Parnas, Fruman (which is also registered to Subject Account-3), and ███████ (which is also registered to Subject Account-4) are registered with WhatsApp accounts. Additionally, from my review of emails, I have learned that ███████ used WhatsApp to communicate with Parnas some of the time. For instance, on or about August 1, 2018, ███████ told a third party that Parnas was out of the country and that she had "been reaching him by way of WhatsApp." Based on my training and experience, I know that individuals use WhatsApp to communicate with other individuals overseas, and as described above, the sources of the funds used to make the contributions are or have been outside the United States. Additionally, based on my training and experience, I know that individuals involved in criminal activity use WhatsApp to communicate with their co-conspirators over encrypted channels to evade detection by law enforcement. Based on my review of information provided by Apple, I know that WhatsApp and other encrypted messaging application messages can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain encrypted messages, including WhatsApp messages.

31

v.    The Parnas Yahoo email address received emails from Apple indicating that he used devices, including an iPhone X and a MacBook Air, to log into Subject Account-1. Additionally, on multiple occasions, receipts were sent from Apple to the Parnas Yahoo email account for purchases of additional storage for Subject Account-1, which appears to indicate that Parnas is backing up information to Subject Account-1.

d.    *Fourth*, based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others about unlawful campaign finance donations, often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

12.13.2017

33. <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received between September 1, 2016, which is approximately two months before Parnas first gave a contribution to then-candidate Trump, and the present, as it appears from my review of emails that Parnas, Igor Fruman, and ███████ are still engaged in political activity and are contemplating making additional contributions.

## G. Evidence, Fruits and Instrumentalities

34. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence, including but not limited to communications, relating to contributions made or facilitated by Parnas, Igor Fruman, and/or ███████ on behalf of and/or funded by third parties to political candidates, campaigns, committees or other similar entities.

b. Evidence relating to the sources of the funds used to make contributions in the name of Parnas, Fruman, or GEP.

c. Evidence of Parnas or Fruman's relationship and/or business dealings with ███████ Muraviev, or ███████

d. Evidence of Parnas, Igor Fruman, or ███████ ommunications with campaigns, candidates, or PACs.

e. Evidence of Parnas or Igor Fruman attending events sponsored or hosted by, or for the benefit of, ███████ PAC, ███████ PAC, ███████ PAC, ███████ PAC, and/or ███████ for Congress.



f.  Evidence relating to contributions to the ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, and/or ▮▮▮▮▮ for Congress.

g.  Evidence relating to any request by Parnas or Fruman to ▮▮▮▮▮ that he take any official action, including but not limited to recommendations relating to the ambassador to Ukraine.

h.  Evidence sufficient to establish the ownership of GEP or any related entities, and the extent to which GEP is engaged in the actual operation of an energy business.

i.  Evidence sufficient to establish the ownership of bank accounts in the name of ▮ ▮▮▮▮▮ and/or ▮▮▮▮▮

j.  Evidence of intent to make unlawful political contributions to violate the campaign finance laws.

k.  Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on donations or contributions by foreign nationals.

l.  Passwords or other information related to online or encrypted messaging.

## IV.   Review of the Information Obtained Pursuant to the Warrant

35.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 10 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and

34

12.13.2017

instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

36. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all records within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## V.   Request for Non-Disclosure and Sealing Order

37. While there has been public reporting about some of the contributions made by GEP, the existence of a criminal investigation, as well as the scope and focus of this criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation and/or to the scope and focus of the investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption offenses, I know that individuals who participate in campaign

12.13.2017

finance offenses may communicate about known government investigations and tailor their stories to be consistent, and tamper with or hide potential evidence. Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering and/or obstruction of justice. In addition, the investigation relates to financial transactions involving foreign bank accounts, and premature disclosure of the focus of this investigation could lead to efforts to hide or conceal foreign funds or transactions. Lastly, if the subjects of this investigation were alerted to the existence of a criminal investigation, it may prompt them to delete electronic records, including in e-mail accounts or other electronic media not presently known to the government. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

38. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## VI.   Conclusion

39. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

12.13.2017

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.

Sworn to before me this
16th day of May, 2019

HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

12.13.2017