UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of a Warrant for All Content and Other
Information Associated with the Email Accounts

████████████████████,

████████████████,

█, ██████████and
█████Iaintained at Premises
Controlled by Google, Inc., and
███████, and ██████████
Maintained at Premises Controlled by Oath
Holdings, Inc., USAO Reference No. ████████

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

---

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK )
                              ) ss.
COUNTY OF NEW YORK )

████████████, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence, including emails.

### B. The Provider, the Subject Accounts and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the following email accounts

(collectively referred to as the "Subject Accounts") maintained by Google, Inc. ("Google"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and Oath Holdings Inc. Custodian of Records, formerly Yahoo! Holdings, Inc. ("Oath"), headquartered at 701 First Avenue, Sunnyvale, California 94089 (collectively, the "Providers").

| Account | Provider | Owner | Referred To As: |
|---------|----------|-------|-----------------|
|  | Google | Igor Fruman | I-Fruman GEP Account |
|  | Google | Lev Parnas | L-Parnas GEP Account |
|  | Google | David Correia | D-Correia GEP Account |
|  | Google | Igor Fruman | I-Fruman Gmail Account |
|  | Oath | Lev Parnas | L-Parnas Yahoo Account |
|  | Oath | David Correia | D-Correia Yahoo Account |

The information to be searched is described in the following paragraphs and in Attachments A and B to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an

2

agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses").

4. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C. Services and Records of the Providers

5. I have learned the following about the Providers:

a. The Providers offer email services to the public. In particular, Google permits subscribers to maintain email accounts under the domain name gmail.com. Google also allows a subscriber to maintain email accounts under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "globalenergyproducers.com," Google enables the subscriber to host any email address under this domain name on servers operated by Google. Oath permits subscribers to maintain email accounts under the domain name yahoo.com. A subscriber using the Providers' services can access his or her email account from any computer connected to the Internet.

b. The Providers maintain the following records and information with respect to every subscriber account:

i. *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Providers' servers unless and until the subscriber deletes the

3

email. If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time.

ii. *Address book.* The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information.* The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

iv. *Transactional information.* The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' website).

v. *Search history.* The Providers also typically maintain records of any search history or web history associated with the subscriber's account.

vi. *Chats and Instant Messages.* The Providers allow subscribers to engage in "chat" sessions in an instant messaging format with other users, the transcripts of which are generally stored in a user's email content. Similarly, Google also allows users to engage in

4

enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

vii. *Customer correspondence.* The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

viii. *Associated Google content.* Google also provides subscribers with additional services, and maintains additional records, including the following:

1. *Google Payments.* Google allows for the storage of payment information associated with a Google account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

2. *Google Drive Content.* Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his Google account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

3. *Google Docs.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google

Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

4. *Google Calendar.* Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

5. *Location History.* Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

6. *Device Information.* Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

7. *Android Services.* Google also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet

computers. Google retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

       8. *Cookie Data.* Google uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

       ix. *Preserved and backup records.* The Providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Providers may also maintain backup copies of the foregoing categories of records pursuant to their own data retention policies.

**D. Jurisdiction and Authority to Issue Warrant**

    6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Providers from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

9. The FBI and the United States Attorney's Office for the Southern District of New York ("USAO") are investigating, among other things discussed herein, political contributions made to campaigns and political action committees ("PACs") by Lev Parnas, Igor Fruman, and Global Energy Producers LLP ("GEP"), in violation of federal law – including the federal campaign finance laws – and as part of the Subject Offenses. Specifically, the FBI and USAO are investigating whether contributions made by Parnas in 2016 and 2018 were illegal "straw donations," funded by third parties, made in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person. Additionally, the FBI and USAO are investigating whether Fruman illegally funded some of Parnas's contributions,[1]

---

[1] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a shell corporation created at or shortly before the time the contributions were made for the purpose of obscuring the true donor's identity. The Federal Election Commission ("FEC") has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

and whether he and Parnas paid for political contributions using funds from a foreign national, in violation of the campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions.

10. The FBI and USAO are also investigating whether Fruman and Parnas, at the direction of a foreign government or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine. The applicable statutes in the foreign agent registration act ("FARA") criminalize acting as an agent of a foreign principal and failing to register as such, as required by the statute. Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the Ambassador to the Ukraine and that they may have done so in coordination with foreign officials. Moreover, it appears that as part of that effort, Fruman and Parnas made contributions to a United States congressman in exchange for that congressman's successful effort to persuade the United States Secretary of State to remove the Ambassador, in what may be a violation of the federal honest services fraud statute and federal anti-bribery statutes, which prohibit the giving or offering of anything of value to a public official to influence an official act.[2]

11. On or about January 18, 2019, the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, approved search warrants (the "January 18 Warrant") for records in the Subject Accounts. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, FEC records, financial records, and public sources, it appears that the

---

[2] It appears, as noted above, that these contributions were funded by a foreign principal and routed through multiple bank accounts, in an apparent violation of the federal money laundering statute, which as applied here, prohibits the transferring of funds from outside the United States to inside the United States for the purpose of promoting such an honest services wire fraud, or in furtherance of a FARA violation.

Subject Accounts were used by Fruman, Parnas, and others to, among other things, communicate about GEP-related matters, communicate with individuals working for campaigns or political action committees, communicate with a congressman's staff in furtherance of their efforts to seek the removal of a U.S. Ambassador, and coordinate financial transactions that appear to be related to the Subject Offenses. Moreover, based on my review of the January 18 Warrant returns and public reporting since January 2019, it appears that Fruman, Parnas, and others have continued to engage in the Subject Offenses to the present day. This warrant therefore seeks content from the Subject Accounts for the time period of January 18, 2019 to the present, which, for the reasons discussed herein, there is probable cause to believe will contain evidence of the Subject Offenses.

## A. Probable Cause Regarding the Subject Offenses

Parnas's Contribution to the            Fund Using Third Party Funds

12. Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, I have learned, among other things, the following:

a. On or about October 3, 2016, David Correia, a business partner of Parnas, emailed
                        using the email address                              ) copying Parnas at the L-Parnas Yahoo Account): "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent                      "some information about our group                      .
. . and a few properties that        owns." Based on my review of this and other emails, it appears that        solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in                      Correia's signature line in that e-mail read: "David Correia, Principal,                      ."

10

b. On or about October 11, 2016,               emailed Parnas a link to a video about Trump, and on or about the same day, he sent Parnas (at the L-Parnas Yahoo Account) and Correia (at the               account) a registration link for a Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email,         wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow." Based on my review of public records, I know that funds contributed to the PAC were disbursed to the           for President, Inc. campaign committee (the "Trump Campaign") and the        National Committee.

c. On or about October 14, 2016, Correia (using the email address              , which appears to have backed up to the D-Correia Yahoo Account) emailed        that Parnas had said he and        had "connected and worked things out" and that Correia was "happy to have you as part of the team!" Correia's signature line read "David Correia, Founder/COO, Fraud Guarantee." In a subsequent email copying Parnas (at the L-Parnas Yahoo Account), Correia asked        to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day,        replied that he was "happy to be part of the team" and "looking forward for more ventures in the future."        rote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However,        did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between        nd Parnas or Correia.

d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of           LLC, on which Parnas was a signer,

11

received a wire transfer from ▮▮▮▮▮▮▮▮▮▮▮▮▮ n the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from ▮▮▮▮▮▮ the balance of the ▮▮▮▮▮▮▮▮ account was negative $801.82.

    e. On or about October 14, 2016, $100,000 was transferred from the ▮▮▮ ▮▮▮▮▮▮ LLC account at Bank of America to an account in Lev and ▮▮▮ arnas's names at Bank of America. On the same date, $25,000 was wired from the account in Parnas's name to an account in the name of ▮▮▮▮▮▮ which is the name of David Correia's wife.

    f. On or about October 24, 2016, Parnas contributed $50,000 to the ▮▮▮▮▮▮ PAC. On the same day, a $5,000 contribution was made in the name of ▮▮▮▮ b the ▮▮▮ ▮▮▮ PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by ▮▮▮▮▮

    13. Based on my review of public records, I have learned that ▮▮▮▮▮▮ who is a lawful permanent resident, contributed $15,000 to the ▮▮▮▮▮▮ PAC on October 14, 2016, which was paid as a $2,700 contribution to the Trump Campaign (the maximum) and a $12,300 contribution to the ▮▮▮▮ National Committee. On or about October 24, 2016, ▮▮▮▮▮▮ again contributed $15,000 to the ▮▮▮▮▮▮ PAC. Because of these contributions, ▮▮▮▮▮▮▮▮ was precluded by federal campaign finance law from making, in his own name, the full $55,000 in contributions to the ▮▮▮ PAC made by Parnas and Correia as described above.

    a. Based on my review of bank records for the ▮▮▮▮▮▮ Account, I have learned that, with the exception of the donations to the ▮▮▮▮▮▮ PAC, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the money transferred from ▮▮▮▮▮

12

on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, on hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the ▮▮▮▮▮▮▮▮ Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds ▮▮▮▮▮▮ were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ▮▮▮▮▮▮▮ ver asked for a return of his "investment" in Fraud Guarantee, even though ▮▮▮▮▮▮ did ask for a return of his investment in a separate company, ▮▮▮▮▮▮▮ (which investment actually appears to have been made using different funds), as set forth above.

   b. Based on the foregoing, it appears that the contributions to the ▮▮▮▮▮▮ PAC were solicited and funded by ▮▮▮▮▮▮ but were made in the names of Parnas and ▮▮▮▮▮▮ in violation of federal law. Specifically, ▮▮▮▮▮▮ solicited Correia's and Parnas's attendance at a ▮▮▮▮▮▮ Fund event. ▮▮▮▮▮ wired Parnas $300,000, but while ▮▮▮▮▮▮ had discussed an investment in Correia's business Fraud Guarantee, the money was wired to a different entity, ▮▮▮▮▮▮ and the only documented investment ▮▮▮▮▮▮ seems to have made was a $100,000 investment, using separate funds, in ▮▮▮▮▮ The funds ▮▮▮▮▮▮ sent to Parnas through ▮▮▮▮▮▮ by contrast, do not appear to have been used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as discussed above, Parnas used $100,000 of those funds to fund his and Correia's donations to the ▮▮▮▮▮▮ Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition, ▮▮▮▮▮▮ did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his ▮▮▮▮

13

investment, which indicates that ███████ did not actually believe that his $300,000 wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the ███████ Fund were made in violation of federal law and as part of the Subject Offenses.

### Contributions to PACs in 2018 Using Third Party Funds

14. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting ███████ candidates, with a principal focus on the 2018 midterm elections. Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. In order to attend these events, however, Parnas and his associates were required to, and did, make sizeable political contributions. In particular, Parnas and Igor Fruman made sizeable contributions to ███████ PAC, ███████ PAC, and ███████ PAC. The investigation has revealed that Parnas and Igor Fruman financed these contributions with funds from third parties, including what appears to be a foreign national, in apparent violation of the Subject Offenses. Several such examples are listed below.

### ███████ PAC Donation

15. According to a publicly available article published in a Russian-language newspaper, as translated into English, on or about March 3, 2018, Igor Fruman met with President Trump at the ███████ resort in Palm Beach, Florida. The article quotes Fruman, who is pictured with President Trump, as saying: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in ███████ was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the ███████ victory in the mid-term elections to Congress in November 2018." Based on a review of publicly available information,

14

financial records, and emails obtained pursuant to the January 18 Warrant, it appears that following that meeting, Igor Fruman began attending political fundraising events with Parnas.

16. On or about May 17, 2018, Parnas and Fruman made a $325,000 contribution to the PAC, which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump- administration." Parnas and Fruman made the contribution to the PAC using the name GEP – rather than their own names – in an apparent effort to obscure their identities and the true source of the funds, in violation of the Subject Offenses. As described below, based on my review of financial records and emails obtained pursuant to the January 18 Warrant, it appears that Igor Fruman and his brother, borrowed these funds from a third party as part of a private lending transaction, and then transferred some of the money to Parnas, who made the contribution in the name of GEP, which appears to have been a shell entity. Specifically, I have learned the following:

a. On or about April 25, 2018, Correia (using the D-Correia Yahoo Account) contacted a Miami-based commercial mortgage broker ("Broker-1") – on behalf of Parnas and Fruman – to inquire about obtaining a short-term loan.

b. In the days that followed, Broker-1 arranged for a $3 million commercial loan from a businessman, and an attorney, to LLC, which is owned and managed by Igor and . Based on a review of email correspondence, and Igor Fruman were involved in, and copied on (using the I-Fruman Gmail Account and the along with Parnas (using the L-Parnas GEP Account and the L-Parnas Yahoo Account), correspondence related to the loan from and On or about May 15, 2018, entered into a mortgage agreement with which documented the $3,000,000 transfer as a loan to

15

 secured by the Frumans' condominium in Bal Harbour, Florida, which is owned by

Parnas and Fruman's assistant, was also copied on

the email correspondence pertaining to the            loan, using the

Correia was copied throughout the email correspondence relating to the loan using the

D-Correia Yahoo Account and the D-Correia GEP Account.

c. On or about May 11 and May 14, 2018,                       wired a total of

$3,000,000 ($2,500,000 from           who wired the funds from overseas, and $500,000 from

into an attorney escrow account. On or about May 15 and May 16, 2018, substantially

all of that money was transferred from the attorney escrow account in multiple transfers, including

a $1,260,329.80 transfer to the           Account, on which Parnas is a signer. Prior to

receiving that transfer, the           Account generally had a low balance and minimal

account activity. For instance, in January 2018, the           Account had a beginning

balance of $0.84, and in February 2018 it had a beginning balance of $66.79.

d. On or about May 17, 2018, Parnas, with           assistance, made a

$325,000 contribution in the name of GEP to           PAC. According to a

contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO

and co-founder. No other individuals were listed on the contribution form. The contribution form

required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor,

will not be reimbursed by another, and if this contribution is made via credit card, it is being made

with a card for which the donor has a legal obligation to pay and will not be made on the card of

another."           sent a confirmation email to           PAC in connection

with this donation, using her           and copying Parnas and Fruman at the I-

Fruman GEP Account and L-Parnas GEP Account, respectively.

16

e. While the May 17 $325,000 donation was reported to the FEC as having come from GEP, in fact, the money – which, as noted above, was paid by Parnas using the Account – came from the money that ＿＿＿＿＿ oaned to ＿ and Igor Fruman, as described above. The report to the FEC did not indicate that the contribution was made by Parnas or the Frumans, and it did not indicate the true source of the funds.

f. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, I have learned that in or about July 2018, a reporter from the ＿＿＿＿＿ emailed the registered agent ("Agent-1") for GEP, to ask questions about "who is behind the company or the donation." Agent-1 forwarded the email to Parnas (at the L-Parnas GEP Account) and wrote: "This is what happens when you become visible. The buzzards descend." Parnas replied "[t]hat's why we need to stay under the radar and have the best lawyers." Parnas subsequently forwarded the email to Correia (at the D-Correia GEP Account), who responded, "[w]e are all in agreement with that."

17. GEP was created shortly before its name was used to make the contributions, and evidence suggests – consistent with Parnas's statement that he and his associates "need to stay under the radar" – that its name may have been used in order to obscure the true source of the funds. Specifically, based on a review of publicly available information and a review of emails obtained pursuant to the January 2018 Warrant, I have learned the following:

a. GEP was incorporated in Delaware on or about April 11, 2018, with ＿＿＿＿＿ as its registered agent. Neither Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any filing in Delaware relating to the LLC. Parnas has made extensive use of various corporate entities in Florida, and it appears for many of those

17

entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

      b. On July 25, 2018, ▓▓▓▓▓▓▓ published an article regarding GEP's contribution to ▓▓▓▓▓▓▓ which suggested that GEP is a shell entity without legitimate business. In response, on July 31, 2018, a "spokesperson" for GEP emailed ▓▓▓▓▓▓▓ that "[t]he donation to ▓▓▓▓▓▓▓ PAC was a 100% legal contribution made by American citizens" and that "[t]he amount donated to ▓▓▓▓▓▓▓ PAC represents only a small fraction of the operating costs of GEP." The "spokesperson" also wrote that "[t]he implication that GEP is some sort of shell company, couldn't be further from the truth, as the company is committed to a long-term plan to export American [liquid natural gas] and is in the process of partnering with major industry leaders both domestically and internationally to achieve that end." Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has a permit to engage in shipping of liquid natural gas.[3] Additionally, based on my review of emails sent and received by Parnas and Igor Fruman obtained pursuant to the January 18 Warrant, it appears that GEP was set up at or around the time that the foregoing contributions were made, and it does not appear from bank records that GEP is presently involved in the purchase or sale of oil or gas, or engaged in oil or gas transactions.

---

[3] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in August 2018, Correia (using the D-Correia GEP Account) exchanged drafts of an unsigned memorandum of understanding ("MOU") between GEP and ▓▓▓▓▓▓▓, which contemplated that the parties would "begin pursuing commercial trading opportunities for the sale of LNG from the USA into various Eastern European countries." However, based on my review of emails pursuant to the January 18 Warrant and my review of bank account records, it does not appear that GEP and ▓▓▓▓▓▓▓ actually engaged in business together.

18

██████ PAC Donation

18. It appears that Fruman also made a contribution to the ██████ PAC using funds from the ████████ loan, referenced above, using another person's name and identity. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a. On or about April 17, 2018, a finance director for the ████████ National Committee e-mailed Parnas at the Parnas Yahoo Account to invite him to attend roundtable event at ████ with President Trump on April 20, 2018. In order to attend the event, Parnas was required to make a minimum contribution of $100,000 to the ████████ The finance director subsequently e-mailed ████ at the ████████ copying Parnas, and noted that, "I believe Mr. Parnas was going to send his contribution information shortly, so we should be good to go for the event."

b. On or about April 27, 2018, Igor Fruman made a $100,000 donation to the ████ ████████ PAC in the name "████████ The information reported to the FEC also stated that the occupation of "████████" was employment with "████████." Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but, who is named ████████ and works for ████████ ████.

c. Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

i. On or about May 16, 2018, and May 17, 2018, one day after receiving the transfer of funds that originated from ████████ $502,650 of those funds was wired

19

from the ▮ Account (on which Parnas was a signer) to the ▮ Account.

    ii.    Between May 16, 2018, and May 23, 2018, approximately $262,041 was transferred from the ▮ Account and used to pay an American Express bill held in the name of ▮ for which Igor and ▮ were authorized signers.

    iii.    That American Express bill included an April 27, 2018 contribution in the amount of $100,000 to the ▮ which was charged to the credit card assigned to Igor Fruman. While "▮ was the listed contributor in the ▮ disclosure, neither Fruman or Parnas, who was the other individual responsible for the transfer of the funds, were reported as the contributors in the disclosure. Based on the foregoing, it appears that Parnas and Fruman made a straw donation to the ▮ in violation of federal law and in furtherance of the Subject Offenses.

### ▮ PAC Donations

19. It appears that the contributions made by Parnas and Fruman to the ▮ PAC were funded with money from third parties, including Andrey Muraviev, a Russian national. In an apparent effort to obscure the true donor of the funds, Parnas and Fruman moved the funds through multiple accounts, and it appears that Fruman made the donations using the "▮" name.

20. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, and public sources, I have learned the following:

    a.    On or about March 19, 2018, Igor Fruman made a $50,000 contribution to ▮ PAC. According to FEC records, this contribution was reported in the name of "▮

20

████ Fruman received a confirmation email for this donation at the I-Fruman Gmail Account from ████ PAC.

    b. On or about June 29, 2018, Parnas made an $11,000 contribution to ████ PAC. Some of the funds used to make this ████ PAC contribution came from the funds loaned by ████ discussed above. In particular, on or about May 22, 2018, $100,000 of the funds that originated from ████ and were transferred into the ████ Account – as described above – were wired to a JPMorgan Chase bank account in the name of GEP. Based on the financial records associated with the GEP account, it appears that on or about July 2, 2018, $11,000 of the funds wired into the GEP account – which originated from the loan by ████ to the Frumans – were used to make a contribution to ████ PAC in Parnas's name.

    c. On or about June 12, 2018, Igor Fruman made another $50,000 contribution to ████ PAC, which was reported as given by "████" with the employer "████."

    d. Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

        i. On or about September 18, 2018, a bank account held at JPMorgan Chase Bank in the name of ████ to which ████ (Igor Fruman's brother) is the authorized signer (the "████ Account") received a $500,000 wire transfer from an account held in the name of ████ Ltd. at ████ a Swiss bank. Based on my review of financial records and public sources, I have learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a Russian national, who appears from my review of emails to be in communication and/or business with Fruman and Parnas (using the

21

I-Fruman Gmail Account and the L-Parnas Yahoo Account). In addition, based on a review of email correspondence, ████████ (using the ████████ is involved in directing the business operations and finances for ████████

     ii. On or about September 19, 2018, approximately $494,415 of the funds in the ████████ Account – most if not all of which came from ████████ were used to pay an American Express bill for a credit card in the name of ████████

     iii. Based on my review of records from American Express, I have learned that the ████████ credit card account was used to pay for a June 12, 2018 contribution to ████████ PAC in the name of "████████," referenced above, as well as a $15,000 contribution to the ████████ Fund, and a $5,400 contribution to ████████ for Congress, all of which were also made in Fruman's name.

21. Accordingly, for the reasons set forth in the foregoing paragraphs, there is probable cause to believe that the Frumans, Parnas, and others are involved in the commission of the Subject Offenses by making contributions to political committees, including ████████ and ████████ in the names of GEP, Parnas, and Fruman for purposes of concealing the true source of the funds, and that they utilized the Subject Accounts to do so. Specifically, there is probable cause to believe that the contributions to ████████ and other political committees to which Fruman, Parnas, or GEP donated were funded by third parties. With respect to the funds obtained from Muraviev and ████████ the amount of money transferred was far in excess of any stated business purpose, and that excess was used to fund political contributions. Moreover, based on the circuitous nature of the monetary transactions described above, there is probable cause to

22

believe that the Frumans, Parnas, and others are engaged in money laundering in furtherance of their activity, in violation of federal law and in furtherance of the Subject Offenses.



Contributions to Representative ▮▮▮▮ Request for Official Action, and Activities as Agents of a Foreign Principle

22. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that, during the April 20, 2018 roundtable at ▮▮▮ Parnas met then-Congressman ▮▮▮▮ f Texas, and that Parnas, Fruman, Correia and others then used subsequent meetings and contributions to gain access to and build a close relationship with Congressman ▮▮▮ Those contributions were made by Igor Fruman and Parnas in June 2018. It also appears that at the request of Parnas and Igor Fruman, Congressman ▮▮▮ wrote to U.S. Secretary of State ▮▮▮ n May 2018 to ask that the U.S. Ambassador to the Ukraine be fired and replaced. In March 2019, news outlets published former Congressman ▮▮▮ letter to Secretar▮ and in May 2019, the U.S. Ambassador to the Ukraine was recalled prior to the end of her term. Based on the timing of the contributions in relation to when Congressman ▮▮▮ sent the letter to Secretary ▮▮▮ and the emails discussed below, there is probable cause to believe that the letter was written in exchange for a commitment to make contributions to Congressman ▮▮▮ ampaign. Specifically, based' on a review of public records, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a. On April 22, 2018, ▮▮▮ as noted above, Parnas and Fruman's assistant) emailed Congressma▮ ▮sing the ▮▮▮ copying Parnas (at the L-Parnas GEP Account), to identify herself the "Director of Operations of Global Energy Producers" and thanked Congressman ▮▮▮ on Parnas's behalf for an "engaging conversation during the round table meeting," and requested a meeting between Parnas and Congressma▮ ▮or that

23

week. It appears that ▮▮▮▮▮ reference to the "round table meeting" was to the April 20, 2018 roundtable at ▮▮▮▮ featuring President Trump.

b. Parnas met with Congressman ▮▮▮▮ h Washington, D.C. on May 9, 2018. Based on my review of public reporting, I have learned that Parnas posted a photograph of himself (the individual on the far left) and Correia (the individual on the far right) meeting with Congressman ▮▮▮▮ (the individual on the right of the first photograph and middle of the second photograph) on May 9, 2018, to Parnas' public Facebook profile:



c. A subsequent meeting between Parnas and Congressman ▮▮▮▮ occurred on June 6, 2018. The next day, on June 7, 2018 ▮▮▮▮ (using th ▮▮▮▮ emailed a member of Congressma ▮▮▮▮ staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman ▮▮▮▮ " Based on my involvement in this investigation and my review of emails, it appears tha ▮▮▮▮ statement about "help[ing] out by using our contacts" was a reference to individuals contributing to Congressma ▮▮▮▮

d. On June 11, 2018, ████████████ (using the ████████████████ wrote to ████████████ Congressman████ communications director, to report that she had "an initial list of donors" and asked if it could be put "on one CC." When████ mailed ████████████ to ask "how much do they think they will bring in," ████ replied "$21k on the one credit card." ████ wrote back: "the maximum an individual can donate is $2,700 and a PAC can give up to $5,000. I'm unsure if we can do that entire amount on one credit card but I can find out." ████████████ replied that "it will be 8 people on that card." Based on my review of publicly available information, I am aware that at this time, Congressman████ was in the midst of a November 2018 reelection campaign.

e. On June 12, 2018, ████████████ (using the████████████ asked ████████████ for a meeting between Parnas and Congressman████ which was subsequently scheduled for June 14, 2018. When████ sked whether it was about "policy related matters or political," ████████████ replied, "Lev said it would be about what you previous[ly] met about. He said you would know, hahaha." ████ replied "I believe it was a political matter involving Eastern European relations." Based on this email and my involvement in this investigation, it appears that the "political matter involving Eastern European relations"████████████ referenced above as the purpose for the June 14, 2018 meeting between Parnas and Congressman ████████████ - scheduled as████ was communicating with the Congressman's office about up to $21,000 in donations for his reelection effort – was related to Parnas's May 9, 2018 request to Congressman████ to remove the current U.S. Ambassador to Ukraine.

f. On June 15, 2018, the day after Parnas's meeting with Congressman████ ████ emailed████ (at the████████████, attaching a letter, and wrote "I think this is it. Please don't distribute, this is only for your records. Thanks for all of your help!"

25



The letter, dated May 9, 2018 – i.e., the same day that Congressman ▮▮▮▮ met with Parnas – was addressed from Congressman ▮▮▮▮ to Secretary of State ▮▮▮▮.[4] In the letter, Congressman ▮▮▮▮ wrote to Secretary ▮▮▮▮ to "bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine," ▮▮▮▮ ▮▮▮▮.[5] Congressman ▮▮▮▮ reported that he had "received notice of concrete evidence from close companions that Ambassador ▮▮▮▮ has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. ▮▮▮▮ as U.S. Ambassador to the Ukraine immediately." Congressman ▮▮▮▮ asked that Secretary ▮▮▮▮ "consider terminating her ambassadorship and find a replacement as soon as possible." Less than an hour later ▮▮▮▮ forwarded the email from ▮▮▮▮ to Parnas (at the L-Parnas GEP Account).

g. On June 25, 2018, Igor Fruman and Parnas each made $2,700 contributions in their own names to ▮▮▮▮ for Congress. Based on a review of American Express and FEC records, it appears that the American-Express bill included two $2,700 contributions – the maximum an individual could at the time contribute – to ▮▮▮▮ for Congress. According to the FEC records, described above, despite the fact that these contributions were paid for using

---

[4] Based on my review of publicly available information, I have learned that between 2012 to 2018, Congressman ▮▮▮▮ was the Chairman of the House Rules Committee. Based on my review of public sources, I have learned that in relation to another matter, ▮▮▮▮ previously stated that as Chairman of the House Rules Committee, Congressman ▮▮▮▮ frequently works to ensure other countries are respecting democratic norms. However, it does not appear that Congressman ▮▮▮▮ had any leadership positions relevant to foreign policy or diplomacy with respect to Ukraine. Similarly, based on public reporting, it does not appear that Congressman ▮▮▮▮ had a close relationship with Secretary of State ▮▮▮▮ beyond simply serving in the House of Representatives at the same time, between approximately 2011 and 2017.

[5] Based on my review of publicly available information, I have learned that ▮▮▮▮ was sworn in as U.S. Ambassador to the Ukraine in August 2016. She previously served as the U.S. Ambassador to Armenia and Kyrgyzstan.

different credit cards linked to the same credit card account, they were reported as separate contributions by Fruman and Parnas.

      h. Between June and November 2018,             repeatedly emailed       to request additional meetings between Parnas, Fruman, and others with Congressman       On June 28, 2018, Correia, who is an associate and business partner of Parnas, had meetings set up with Congressman       On July 12, 2018, Parnas appears to have again met with Congressman      On September 5, 2018, Parnas and Rudolph Giuliani had a meeting scheduled with Congressman      Finally, Fruman, Correia, and Parnas had a meeting scheduled with Congressman     on November 16, 2018.

      i. On or about May 6, 2019, according to public sources         was prematurely recalled or removed from her position as U.S. Ambassador to Ukraine.

      23. Based on my review of publicly available reporting, I have learned, among other things, the following with respect to Ambassador      removal as U.S. Ambassador to Ukraine:

      a. According to a March 6, 2019 article in      , on or about March 5, 2019, Ambassador      gave a public speech in Ukraine in which she called for the Ukrainian anticorruption prosecutor,      to be fired and voiced frustration that      (the then-president) had not done enough to root out corruption.

      b. In a video interview published on March 20, 2019 by      Ukrainian Prosecutor-General      old      that      had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017.[6]      also announced that Ukrainian authorities would launch a criminal

---

[6] Based on my review of an April 18, 2019 article appearing on a Ukrainian news website,      later walked back his claim about the "do not prosecute list," and claimed instead that

investigation into whether Ukrainians sought to interfere in the U.S. election in 2016 to benefit ▇▇▇▇▇▇▇▇ claimed that the National Anti-Corruption Bureau may have been involved in efforts to influence the 2016 U.S. presidential election because it published information about secret payments from former ▇▇▇▇▇▇ party to ▇▇▇▇▇ allegedly in order to hurt the Trump campaign. According to ▇▇▇ in response to that interview, the State Department issued a statement saying that it no longer supported ▇▇▇ office in its anti-corruption mission, and considered his allegation about the "do-not-prosecute" list to be "an outright fabrication." However, ▇▇▇▇ reported that ▇▇▇▇ was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman ▇▇▇ wrote a "private letter asking Secretary of State ▇▇▇▇ to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." ▇▇▇ also included a copy of the letter:

---

he had asked ▇▇▇▇ for a "do not prosecute" list at their first in-person meeting in January 2017, but that she had refused.

28



c. In a March 23, 2019 segment on the [redacted] n [redacted],
revealed that former-Congressman [redacted] sent Secretary of State [redacted] "an urgent letter" in
May 2018, asking that Ambassador [redacted] be removed from her position, and published a
copy of that letter. During that segment, commentator [redacted] nnounced: "have learned
this evening that the President has ordered her dismissal from her post. . . as a result of her activities
there which were complained of by Congressman [redacted] She is known and reported by people
there to have bad-mouthed the President of the United States Donald Trump, to have told
Ukrainians not to listen to him or pay attention to his policies. . . and finally his activities have
caught up with her."[7]

---

[7] Based on my review of public reporting, I have not found evidence that Ambassador
[redacted] publicly criticized President Trump.

29

d. Based on my review of public reporting, I have learned that on or about May 6, 2019, the State Department confirmed that Ambassador ███████ would leave her post ahead of schedule on May 20, 2019.

e. According to an article in ███████, on or about May 9, 2019, Rudolph Giuliani – who, as noted above, attended at least one meeting between Parnas, Fruman, and Congressman ███████ confirmed that he had been meeting with ███████ the Ukrainian Prosecutor-General who had criticized Ambassador ███████ Giuliani told *Newsweek* that he last met with ███████ six weeks prior: "I have met with him. I interviewed him for two days in New York. I met with him once in Poland…and I may have met with him one other time in America, I don't remember, I may have just gotten a coffee with him sometime when he was here." According to an article dated May 9, 2019 in the ███████ Giuliani also announced that he would travel to Ukraine to meet with Ukranian President-elect ███████ push him to press ahead with two investigations he hoped would benefit President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) ███████ involvement in a gas company owned by a Ukrainian oligarch. According to the ███████ Giuliani was to be accompanied by Lev Parnas. The article also reported that Parnas had previously traveled to Ukraine as a representative of Giuliani seeking information about both of the above topics.

f. According to a May 15, 2019 article in a Ukrainian news website, Giuliani announced that his trip to the Ukraine was cancelled: "I was going to visit Ukraine on Monday-Wednesday, but I canceled the trip as I found out that the President-elect is surrounded by the people who treated the U.S. President unfairly. It is about the events of 2016. One of them was

30

caught on having been cooperating and helping the election campaign of Trump's opponent

████████ And these people are among his key advisors."

  g. Based on my review of Giuliani's public Twitter page, I have learned that on May 19, 2019, Giuliani tweeted that Parnas and Fruman were his "clients."

  h. According to an article published on July 22, 2019 in ████████, Parnas and Fruman, while "reporting" to Giuliani, lobbied the Ukrainian government in a bid to assist President Trump's reelection campaign. The article described Parnas and Fruman's "aggressive campaign" in the United States to successfully push for the removal of Ambassador ████████ Parnas and ████ were interviewed for the article. Parnas said that he and Fruman were not "acting at the behest of anyone." ████ claimed that "he raised the issue of ████ in the meeting – not Parnas or Fruman," and that he "sought their input."[8] ████ admitted to speaking with Fruman and Parnas about Ukraine, saying: "They are ████ They have a strong interest in America not backing away from Ukraine."

  i. According to a July 22, 2019 article published by the ████████

████████, Parnas said that he and Fruman were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us – either I bury it or I pass it along. I felt it was my duty to pass it along." According to the article, which quoted heavily from an interview with Parnas, in late 2018, Parnas and Fruman organized a call between Giuliani and ████████ the former Prosecutor-General in Ukraine. Parnas and Fruman also attended a meeting in France between Giuliani and ████ the head

---

[8] Former-Congressman ████ claim that he brought up Ambassador ████ rather than Parnas, is contradicted by the fact that Parnas, rather than ████ requested the May 9, 2018 meeting, as well as the text of the letter, in which ████ wrote that he *"received notice* from close companions" regarding Ambassador ████ alleged activities in Ukraine (emphasis added).

31

of Ukraine's Special Anti-Corruption Prosecutor's Office. Parnas said that he and Fruman connected Giuliani with███████ and tha███████ met Giuliani in New York in January and in Poland in February. Of the meetings, Parnas said that "███████ brought documentation, verification. It opened Giuliani's eyes."

24. Based on the foregoing, there is probable cause to believe that Parnas and Fruman donated to Congressman███████ with the intention that those donations be made in exchange for official action, namely, a request to the Secretary of State to remove the Ambassador to the Ukraine, in violation of federal law and in furtherance of the Subject Offenses. Specifically, Parnas appears to have asked Congressman███████ to write a letter, reflecting information███████ "received" from "close companions" – i.e., Parnas – to Secretary of State███████ seeking the removal of Ambassador███████ This action appears to have been outside the purview of Congressman███████ committee and caucus positions, and appears to have been done at Parnas's request.

25. The timing of Parnas's and Fruman's donations to Congressman███████ also indicate that Congressman███████ wrote the letter with the understanding that Parnas and Fruman would make a substantial donation to his campaign. Specifically, several weeks after the May 9, 2019 meeting, Parnas's assistant emailed with Congressman███████ staff to coordinate a $21,000 donation on one credit card. After being advised that such a donation exceeded the maximum individual donation, Parnas and Fruman then donated $2,700 each, the maximum amount, in June 2018. Only a week before that donation was made███████ sought a copy of Congressman███████ letter and forwarded it to Parnas. In addition, based on public reporting, it appears that members of the Ukrainian Government met with Giuliani, Parnas, and Fruman in early 2019, and then led what appears to have been a coordinated effort to remove Ambassado███████

32

which relied in large part on the publication of Congressman          etter. Finally, Parnas and Fruman used money from a Cyprus-based bank account that appears to be associated with Muraviev, a Russian national, to pay for the donations they made to Congressman

26. For the same reasons, there is further reason to believe that Parnas and Fruman's efforts to lobby for the removal of Ambassador          was done in coordination with Ukranian officials, including          who was at the time the          etter became public critical of          and who Parnas has acknowledged meeting and subsequently connected to Giuliani. While Parnas has characterized his discussions with Congressman          egarding the Ambassador as "passing information along," it appears likely that that information originated from Ukranian sources. In particular, Parnas and Fruman appear to have close relationships with Ukrainian government officials, including          and arranged for meetings and telephone calls between Giuliani and          in early 2019. At least some of these meetings and telephone calls occurred, based on public reporting, prior to          making allegations of impropriety against Ambassador          in March 2019, which, in conjunction with the          etter being made public, ultimately led to her removal. I am aware, from my review of publicly available information, that Fruman and Parnas have not registered with the Department of Justice as foreign agents, and their conduct may therefore have violated federal law regarding foreign agent registration, as described above.

27. Accordingly, there is probable cause to believe that Parnas, Fruman,          nd others engaged in this activity in violation of federal law and in furtherance of the Subject Offenses, and used the Subject Accounts to do so. As such, there is probable cause to believe that

33

evidence of the Subject Offenses, which appear to have continued to the present day, will be found on the Subject Accounts.

## False Statements to the FEC

28. Based on my review of emails obtained pursuant to the January 18 Warrant, it does not appear that Parnas, Igor Fruman, or                    told the campaigns or PACs to which they and/or GEP were making contributions that the funds used to make the contributions came from third parties and overseas bank accounts. Had the PACs and campaigns known that these were unlawful contributions, they likely would not have accepted the funds.

29. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas and Igor Fruman have submitted affidavits to the FEC in connection with a pending complaint made by a non-profit advocacy group. Based on a review of those affidavits, it appears that Parnas and Igor Fruman made multiple false statements to the FEC in connection with that matter. For instance, their sworn affidavits falsely state that Parnas and Fruman "funded the [GEP] entities with over $2.8 million in assets" and that the                    PAC contribution "was made with GEP funds for GEP purposes." In fact, as set forth above, the PAC contribution was made with funds from a third party that were moved through multiple bank accounts before being paid to                    PAC. Additionally, Parnas stated in his affidavit that his contribution to                    for Congress "was made with a business credit card ... which [he] reimbursed." Based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Fruman, Parnas, and                    the

34

analyst found no evidence of reimbursement by Parnas to Fruman or ▨ for the contributions to Congressman Sessions.

## B. Probable Cause Regarding the Subject Accounts

30. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about political contributions, communications about and records of movement of money and bank transactions relating to GEP and other entities operated by Fruman and Parnas, evidence of a scheme to disguise the true source of political contributions to candidates, campaigns, and political action committees, and communications related to Parnas's and Fruman's efforts to remove the U.S. Ambassador to the Ukraine, which may have been at the direction of a foreign government or individual. In particular:

a. As set forth above, there is probable cause to believe that Parnas, ▨ Fruman ▨ Correia, and ▨ are the users of the Subject Accounts, and that they have used the Subject Accounts to communicate with each other and in furtherance of the Subject Offenses. For instance, as set forth above, the emails obtained pursuant to the January 18 Warrant showed that Parnas, ▨ Fruman ▨ Correia, and ▨ used the Subject Accounts to correspond with each other and third parties, including campaigns, PACs, and politicians regarding donations. The Subject Accounts were also used to correspond regarding funding and the sources of funding that were used to make political donations, as described above. Finally, the Subject Accounts were used to communicate with Congressman ▨ office regarding donations to and meetings with Congressman ▨ s well as the May 9, 2018 letter from Congressman ▨ o Secretary ▨ Accordingly, there is probable cause to believe that evidence of the Subject

___
[9] While, as set forth herein, the Target Subjects sometimes used different of the Subject Accounts for different purposes, I believe their regular use of e-mail in connection with the Subject

35

Offenses will continue to be found on the Subject Accounts. Based on my review of emails obtained pursuant to the January 18 Warrant, I am aware that Parnas, Fruman, Correia and ▮ used their personal and business email accounts interchangeably, and with respect to Correia in particular, used his personal account to store other emails sent from different addresses, such as fraudguarantee.com.

b. Moreover, as set forth above, there is probable cause to believe that Parnas, the Frumans, Correia, an▮ ▮ave continued to engage in the Subject Offenses and that evidence of the Subject Offenses will continue to be found on the Subject Accounts. As noted above, the Subject Accounts were used to correspond regarding and in furtherance of the Subject Offenses continually, which indicates that there will continue to be evidence of the Subject Offenses past the date of the execution of the January 18 Warrant. Moreover, based on public reporting, Fruman and Parnas appear to have continued to lobby for the removal of Ambassador ▮ in violation of the Subject Offenses, as described above.

c. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in or about October 2018, Correia, Fruman, and Parnas (using the Correia Yahoo Account, the Fruman Gmail Account, and the Parnas Yahoo Account, respectively) communicated regarding their plan for political donations in the future, which strongly indicates that they intended to continue to engage in the Subject Offenses on an ongoing basis and that evidence of the Subject Offenses will continue to be found on the Subject Accounts. Based on my review of FEC data, I am not aware that Parnas, Fruman, GEP, or Correia have made political donations since January 2019, however, it is possible that those donations have not been reported yet, or that the donations

Offenses generally provides probable cause to search each of the Subject Accounts for evidence of each of the Subject Offenses.

36

have been made in the names of straw donors that I am not aware of. Based on my review of emails pursuant to the January 18 Warrant, I am aware that ▊▊▊▊ uses the ▊▊▊▊

▊▊▊▊ o correspond regarding ▊▊▊▊ business. Because that business received the overseas funding to make donations to Congressman ▊▊▊ there is probable cause to believe that evidence of the Subject Offenses will be found on the ▊▊▊▊

including any communications about the source or purpose of the foreign funding. As set forth above, Parnas' and Fruman's donations, and promises of donations, appear to have led to Congressman ▊▊▊▊ authoring the May 9, 2018 letter that ultimately appears to have contributed to the removal of Ambassador ▊▊▊▊ n May 2019.

> d. In addition, based on my training and experience, email accounts like the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses, often contain records of that activity, including emails, chats, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), payment records, contact information of co-conspirators and/or witnesses, notes about calls and meetings, calendar entries relating to calls and meetings, and internet search history relating to unlawful conduct. Additionally, email accounts like the Subject Accounts often contain IP and location information, which can result in the creation of records of physical locations of meetings and calls. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, or other aspects of the schemes.

37

31. <u>Temporal Limitation</u>. From January 18, 2019 (the date of the prior January 18 Warrant) to the present.

## C. Evidence, Fruits and Instrumentalities

32. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachments A and B to the proposed warrants.

33. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

b. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d. Evidence relating to the funding of bank accounts held in the name of GEP.

e. Evidence relating to political contributions made by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

f. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman, ███████ Correia, or Parnas, or on which those individuals are listed as a signatory.

h. Evidence of other bank accounts or entities related to GEP, Parnas, or Fruman, including emails reflecting registration of other accounts potentially containing relevant evidence.

i. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

j. Evidence relating to communications with ███████████ or Andrey Muraviev.

k. Evidence relating to contributions to ████████ PAC, ███████ PAC, ██████████ PAC, the ██████████ Fund, ██████ for Congress, ████ for Congress, or the ████████ Fund.

l. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

m. Evidence related to any false statements made or caused to be made to the FEC.

n. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

o. Evidence relating to the May 9, 2018 letter from Congressman ███████, Secretary of State ███████ ncluding correspondence attaching or concerning the letter.

p. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including █████████

███████████████████

q. Communications regarding

r. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, Parnas, or Fruman.

s. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

t. Passwords or other information needed to access user's online accounts.

## III.    Review of the Information Obtained Pursuant to the Warrant

34. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachments A and B to the proposed warrants.

35. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword

40

searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

IV.     **Request for Non-Disclosure and Sealing Order**

36. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption and campaign finance offenses, I know that individuals who participate in such offenses communicate about known government investigations and sometimes tailor their stories to be consistent, and/or tamper with or hide potential evidence. In addition, the subjects of this investigation include dual citizens, who would have the ability and incentive to flee and evade prosecution. Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering, flight and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of

41

the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

37. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V. Conclusion

38. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Sworn to before me this
14th day of August, 2019

HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

19MAG 7593

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts



USAO Reference No.

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:     Google, Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent                    of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe the email accounts



maintained at premises

controlled by Google, Inc., contains evidence, fruits, and instrumentalities of crime, all as specified

in Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the

Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records

specified in Section II of Attachment A hereto, for subsequent review by law enforcement

personnel as authorized in Section III of Attachment A. The Government is required to serve a

copy of this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence, flight from prosecution, and/or tampering with potential witnesses, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

$\underline{8-14-19}$
Date Issued

$\underline{\quad \searrow 27 \ P.m}$
Time Issued

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

2

## Email Search Attachment A

### I.  Subject Accounts and Execution of Warrant

This warrant is directed Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the following email accounts (the "Subject Accounts"):



A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.  Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a. *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each

email, the date and time at which each email was sent, and the size and length of each email) for items sent, received, or created between January 18, 2019, and the present, inclusive;

b. *Address book information.* All address book, contact list, or similar information associated with the Subject Accounts.

c. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d. *Transactional records.* All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

f. *Search and Web History.* All search history and/or web browser history associated with the Subject Accounts.

g. *Google Payments.* All Google Payments records associated with the Subject Accounts.

h. *Google Drive Content.* All Google Drive records associated with the Subject Accounts, including all documents and other records stored on the Google Drive accounts.

i. *Google Docs.* All Google Docs records associated with the Subject Accounts, including all documents created or stored in Google Docs.

j. *Google Calendar.* All calendar entries and records associated with the Subject Accounts.

k. *Chats and Instant Messages.* All instant messages, chats, or other content or records related to Google Chat or Google Hangouts associated with the Subject Accounts.

l. *Location History.* All location records associated with the Subject Accounts.

m. *Information Regarding Linked Accounts, Including Accounts Linked by Cookie.* Any information identifying accounts that are associated or connected to the Subject Accounts, including specifically by Cookie, email account, phone number, Google Account ID, Android ID, or other account or device identifier.

n. *Device Information.* Any information identifying the device or devices used to access the Subject Accounts, including a device serial number, a GUID or Global Unique Identifier, a phone number, serial numbers, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access the Subject Accounts;

o. *Android Services.* All records relating to Android services associated with the Subject Accounts.

p. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III.    Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses"), including the following:

    a.  Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

    b.  Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

    c.  Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

    d.  Evidence relating to the funding of bank accounts held in the name of GEP.

    e.  Evidence relating to political contributions made by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

    f.  Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman, ▮▮▮▮▮ Correia, or Parnas, or on which those individuals are listed as a signatory.

h. Evidence of other bank accounts or entities related to GEP, Parnas, or Fruman, including emails reflecting registration of other accounts potentially containing relevant evidence.

i. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

j. Evidence relating to communications with ▮▮▮▮▮▮▮▮ or Andrey Muraviev.

k. Evidence relating to contributions to ▮▮▮▮ PAC, ▮▮▮▮ PAC, ▮▮▮▮ PAC, the ▮▮▮▮ Fund, ▮▮▮▮ for Congress, ▮▮▮▮ for Congress, or the ▮▮▮▮ Fund.

l. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

m. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

n. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

o. Evidence relating to the May 9, 2018 letter from Congressman ▮▮▮▮ to Secretary of State ▮▮▮▮ including correspondence attaching or concerning the letter.

5

p.   Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including ███████████████

███████████████████████████

q.   Communications regarding ███████████████

r.   Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, Parnas, or Fruman.

s.   Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

t.   Passwords or other information needed to access user's online accounts.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts
████████ and
████████, Maintained at
Premises Controlled by Oath Holdings,
Inc., USAO Reference No. ████████

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO: Oath Holdings, Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent ████████ of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe the email accounts

████████, and ████████, maintained at premises controlled by Oath

Holdings, Inc., contains evidence, fruits, and instrumentalities of crime, all as specified in

Attachment B hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agency, within 30 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachment B hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachment B. The Government is required to serve a copy of this

Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order

may be served via electronic transmission or any other means through which the Provider is

capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence, flight from prosecution, and/or tampering with potential witnesses, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_8 -/ 4/ -/ 9_
Date Issued

_3: 2 7 P M_
Time Issued

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

2

## Email Search Attachment B

### I.    Subject Accounts and Execution of Warrant

This warrant is directed Oath Holdings, Inc. (the "Provider"), headquartered at 701 First Avenue, Sunnyvale, California 94089, and applies to all content and other information within the Provider's possession, custody, or control associated with the following email accounts (the "Subject Accounts"):

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.    Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a. *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email) for items sent, received, or created between January 18, 2019, and the present, inclusive;

b. *Address book information.* All address book, contact list, or similar information associated with the Subject Accounts.

c. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d. *Transactional records.* All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

f. *Search and Web History.* All search history and/or web browser history associated with the Subject Accounts.

g. *Chats and Instant Messages.* All instant messages, chats, or other content or records associated with the Subject Accounts.

h. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III.    Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statements in a matter within the

2

jurisdiction of the executive branch), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses"), including the following:

a. Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

b. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d. Evidence relating to the funding of bank accounts held in the name of GEP.

e. Evidence relating to political contributions made by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

f. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman ███████████ orreia, or Parnas, or on which those individuals are listed as a signatory.

3

h. Evidence of other bank accounts or entities related to GEP, Parnas, or Fruman, including emails reflecting registration of other accounts potentially containing relevant evidence.

i. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

j. Evidence relating to communications with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or Andrey Muraviev.

k. Evidence relating to contributions to ▮▮▮▮▮▮▮▮ PAC, ▮▮▮▮▮▮▮▮ PAC, ▮▮▮▮▮▮▮▮ PAC, the ▮▮▮▮▮▮▮▮ Fund, ▮▮▮▮▮▮ for Congress, ▮▮▮▮▮▮ for Congress, or the ▮▮▮▮▮▮ Fund.

l. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

m. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

n. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

o. Evidence relating to the May 9, 2018 letter from Congressman ▮▮▮▮▮▮▮▮ to Secretary of State ▮▮▮▮▮▮▮▮▮▮▮▮ including correspondence attaching or concerning the letter.

4

p. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including

q. Communications regarding

r. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, Parnas, or Fruman.

s. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

t. Passwords or other information needed to access user's online accounts.