19MAG 7595

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of the United
States Of America for a Search Warrant for the
Contents of Nine-Email Accounts Located on
Two Devices Containing the Results of An
Email Search Warrant, USAO Reference No

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for a Search Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

being duly sworn, deposes and says:

**I. Introduction**

**A. Affiant**

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the
course of my experience and training in this position, I have participated in criminal investigations
into federal offenses involving public corruption and violations of the federal campaign finance
laws. I also have training and experience executing search warrants, including those involving
electronic evidence, including emails.

2.  I make this Affidavit in support of an application pursuant to Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search nine email accounts on the electronic devices
specified below (the "Subject Devices") for the items and information described in Attachment A.
This affidavit is based upon my personal knowledge; my review of documents and other evidence;
my conversations with other law enforcement personnel; and my training, experience and advice
received concerning the use of computers in criminal activity and the forensic analysis of
electronically stored information ("ESI"). Because this affidavit is being submitted for the limited
purpose of establishing probable cause, it does not include all the facts that I have learned during
the course of my investigation. Where the contents of documents and the actions, statements, and

2

conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## B. The Prior Warrant and Subject Devices

3. On January 18, 2019, the Honorable Sarah Netburn authorized a search warrant (the "January 18 Warrant") numbered 19 Mag. 729, directing Google, Inc. and Oath Holdings, Inc. (collectively, the "Providers") to provide content and other information for the email accounts in the chart below to search for evidence of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering) (together, the "January 18 Warrant Subject Offenses"). The Subject Devices are particularly described as the following two electronic devices in the possession of the FBI which, respectively, contain the results of the January 18 Warrant on eleven email accounts, as specifically described in the chart below:

| Account | Provider | Owner | Referred To As | Subject Device |
|---|---|---|---|---|
| ███████████████ | Google | Igor Fruman | I-Fruman GEP Account | 1 |
| ███████████████ | Google | Lev Parnas | L-Parnas GEP Account | 1 |
| ███████████████ | | | | |
| ███████████████ | | | | |
| ███████████████ | Google | David Correia | D-Correia GEP Account | 1 |
| ███████████████ | Google | Igor Fruman | I-Fruman Gmail Account | 1 |
| ███████████████ | | | | |

3

| | Oath | Lev Parnas | L-Parnas Yahoo Account | 2 |
|---|---|---|---|---|
| | Oath | David Correia | D-Correia Yahoo Account | 2 |

4. Google provided the content and information responsive to the January 18 Warrant electronically, which was downloaded by a paralegal specialist at the United States Attorney's Office for the Southern District of New York ("USAO") onto a hard drive, which is Subject Device-1. Oath provided the content and information responsive to the January 18 Warrant in the form of a compact disc, which is Subject Device-2. The contents of those Subject Devices have been loaded onto a shared database to which the prosecution team has access, and which is the principal system I have used to review the contents of the devices.[1]

## C. The Subject Offenses

5. In the course of reviewing the content contained on the Subject Devices for evidence of the January 18 Warrant Subject Offenses, I have discovered emails which, as set forth in greater detail below, establish probable cause to believe the following accounts on the Subject Devices contain evidence of additional offenses: the I-Fruman GEP Account, the L-Parnas GEP Account, the                      the D-Correia GEP Account, the I-Fruman Gmail Account; the                      the                      the L-Parnas Yahoo Account, and the D-Correia Yahoo Account (the "Selected Accounts"). I am therefore requesting authority

---

[1] A filter team comprised of Assistant United States Attorneys and FBI agents who are not a part of the prosecution team have used search terms to separate any potentially privileged documents out of the shared database to which the prosecution team has access.

4

to search the Selected Accounts on the Subject Devices for evidence, fruits, and/or instrumentalities of these additional offenses.

6.      In particular, I respectfully submit that there is probable cause to believe that the Selected Accounts on the Subject Devices also contain evidence, fruits, and/or instrumentalities of the commission of one or more of the following: 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses").

## II.  Probable Cause Regarding the Subject Offenses

7.      The FBI and the USAO are investigating, among other things discussed herein, political contributions made to campaigns and political action committees ("PACs") by Lev Parnas, Igor Fruman, and Global Energy Producers LLP ("GEP"), in violation of federal law – including the federal campaign finance laws – and as part of the Subject Offenses.  Specifically, the FBI and USAO are investigating whether contributions made by Parnas in 2016 and 2018 were illegal "straw donations," funded by third parties, made in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person. Additionally, the FBI and USAO are investigating whether Fruman illegally funded some of Parnas's contributions,[2] and whether he and Parnas paid for political contributions using funds

---

[2] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a shell corporation created at or shortly before the time the contributions were made for the purpose of obscuring the true donor's identity. The Federal Election Commission ("FEC") has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

from a foreign national, in violation of the campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions.

8.     The FBI and USAO are also investigating whether Fruman and Parnas, at the direction of a foreign government or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine.  The applicable statutes in the foreign agent registration act ("FARA") criminalize acting as an agent of a foreign principal and failing to register as such, as required by the statute.  Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General.  As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the Ambassador to the Ukraine and that they may have done so in coordination with foreign officials.  Moreover, it appears that as part of that effort, Fruman and Parnas made contributions to a United States congressman in exchange for that congressman's successful effort to persuade the United States Secretary of State to remove the Ambassador, in what may be a violation of the federal honest services fraud statute and federal anti-bribery statutes, which prohibit the giving or offering of anything of value to a public official to influence an official act.[3]

9.     As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, FEC records, financial records, and public sources, it appears that the Selected Accounts were used by Fruman, Parnas, and others to, among other things, communicate about GEP-related matters, communicate with individuals working for campaigns or political action

---

[3] It appears, as noted above, that these contributions were funded by a foreign principal and routed through multiple bank accounts, in an apparent violation of the federal money laundering statute, which as applied here, prohibits the transferring of funds from outside the United States to inside the United States for the purpose of promoting such an honest services wire fraud, or in furtherance of a FARA violation.

committees, communicate with a congressman's staff in furtherance of their efforts to seek the removal of a U.S. Ambassador, and coordinate financial transactions that appear to be related to the Subject Offenses. There is therefore is probable cause to believe that the Selected Accounts on the Subject Devices will contain evidence of the Subject Offenses.

## A. Probable Cause Regarding the Subject Offenses

Parnas's Contribution to the        Fund Using Third Party Funds

10.     Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, I have learned, among other things, the following:

a.  On or about October 3, 2016, David Correia, a business partner of Parnas, emailed

(using the email address                    copying Parnas at the L-Parnas Yahoo Account): "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent        'some information about our group        . . . and a few properties that    owns." Based on my review of this and other emails, it appears that        solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in            Correia's signature line in that e-mail read: "David Correia, Principal,         ."

b.  On or about October 11, 2016,        emailed Parnas a link to a video about Trump, and on or about the same day, he sent Parnas (at the L-Parnas Yahoo Account) and Correia (at the            account) a registration link for a         Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email,        wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow." Based on my review of public records, I know that funds contributed to the

7

██████████ PAC were disbursed to the ██████████ for President, Inc. campaign committee (the "Trump Campaign") and the ██████ National Committee.

c. On or about October 14, 2016, Correia (using the email address ██████████, which appears to have backed up to the D-Correia Yahoo Account) emailed ██████████ that Parnas had said he and ██████████ had "connected and worked things out" and that Correia was "happy to have you as part of the team!" Correia's signature line read "David Correia, Founder/COO, Fraud Guarantee." In a subsequent email copying Parnas (at the L-Parnas Yahoo Account), Correia asked ██████████ to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, ██████████ replied that he was "happy to be part of the team" and "looking forward for more ventures in the future." ██████████ wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, ██████████ did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between ██████████ and Parnas or Correia.[4]

---

[4] Based on my review of the emails obtained pursuant to the January 18 Warrant and bank records, I have learned that on November 3, 2016, after ██████████ $300,000 wire to Parnas, Correia (using the email ██████████ and copying the L-Parnas Yahoo Account) forwarded a "subscription agreement" signed by ██████████ to ██████ at ██████████. The agreement contemplated ██████████ would make a $100,000 investment in the "██████ ██████████," and included wiring instructions for ██████ bank account. In that email, Correia confirmed that "His ██████████ wire was received today." Beginning in December 2017, ██████████ and another investor ("Investor-1") in the "██████ ██████████" began emailing the managing director of ██████████ to demand a refund of their investment. These emails were forwarded by Investor-1 to Correia, at using the email address ██████████, which appears to have automatically backed up to the D-Correia Yahoo Account, and the L-Parnas Yahoo Account. Based on my review of emails obtained pursuant to the January 18 Warrant and bank records, it does not appear that ██████████ investment in ██████████ was made through Parnas, and thus it appears that ██████████ wired the funds directly from his bank account. However, I am

d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of                                    , on which Parnas was a signer, received a wire transfer from                                    in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from                    the balance of the                        account was negative $801.82.

e. On or about October 14, 2016, $100,000 was transferred from the                     account at                        to an account in Lev and         Parnas's names at                  . On the same date, $25,000 was wired from the account in Parnas's name to an account in the name of                  , which is the name of David Correia's wife.

f. On or about October 24, 2016, Parnas contributed $50,000 to the PAC. On the same day, a $5,000 contribution was made in the name of                to the                PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by

11.     Based on my review of public records, I have learned that                who is a lawful permanent resident, contributed $15,000 to the                PAC on October 14, 2016, which was paid as a $2,700 contribution to the Trump Campaign (the maximum) and a $12,300 contribution to the                National Committee. On or about October 24, 2016, again contributed $15,000 to the                PAC.     Because of these contributions,

---

awaiting subpoena returns from                bank account, which will reflect how he funded the                investment.

9

was precluded by federal campaign finance law from making, in his own name, the

full $55,000 in contributions to the        PAC made by Parnas and Correia as described above.

12.    Based on my review of bank records for the                         Account, I have

learned that, with the exception of the donations to the                 PAC, between October 14,

2016, and December 5, 2016, Parnas spent nearly all of the money transferred from

on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal

account, discussed above, Parnas spent the remainder of the money on luxury personal items,

including a private jet rental company, on hotels and restaurants, luxury clothing stores, and cash

transfers to his personal accounts. By December 5, 2016, the balance in the

Account was less than $7,000. Thus, based on my review of the bank records, it does not appear

that any of the funds from                 were used for a business purpose. Moreover, based on

my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence

that            ever asked for a return of his "investment" in Fraud Guarantee, even though

did ask for a return of his investment in a separate company,

(which investment actually appears to have been made using different funds), as set forth above.

13.    Based on the foregoing, it appears that the contributions to the            PAC

were solicited and funded by            but were made in the names of Parnas and

in violation of federal law. Specifically,                 solicited Correia's and Parnas's

attendance at a            Fund event.            wired Parnas $300,000, but while

had discussed an investment in Correia's business Fraud Guarantee, the money was

wired to a different entity,            and the only investment            seems to

have made was a $100,000 investment, using separate funds, in            The funds

sent to Parnas through            by contrast, do not appear to have been

10

used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as discussed above, Parnas used $100,000 of those funds to fund his and Correia's donations to the

Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition,              did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his

investment, which indicates that              did not actually believe that his $300,000 wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the              Fund were made in violation of federal law and as part of the January 18 Warrant Subject Offenses.

### Contributions to PACs in 2018 Using Third Party Funds

14.     Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting              candidates, with a principal focus on the 2018 midterm elections. Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. In order to attend these events, however, Parnas and his associates were required to, and did, make sizeable political contributions. In particular, Parnas and Igor Fruman made sizeable contributions to              PAC,              PAC, and

PAC. The investigation has revealed that Parnas and Igor Fruman financed these contributions with funds from third parties, including foreign nationals, in apparent violation of the January 18 Warrant Subject Offenses. Several such examples are listed below.

### PAC Donation

15.     According to a publicly available article published in a Russian-language newspaper, as translated into English, on or about March 3, 2018, Igor Fruman met with President Trump at the              resort in Palm Beach, Florida. The article quotes Fruman, who is

11

pictured with President Trump, as saying: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in ▮▮▮▮▮ was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the ▮▮▮▮▮ victory in the mid-term elections to Congress in November 2018." Based on a review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, it appears that following that meeting, Igor Fruman began attending political fundraising events with Parnas.

16. On or about May 17, 2018, Parnas and Fruman made a \$325,000 contribution to the ▮▮▮▮▮ PAC, which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-▮ administration." Parnas and Fruman made the contribution to the PAC using the name GEP – rather than their own names – in an apparent effort to obscure their identities and the true source of the funds, in violation of the Subject Offenses. As described below, based on my review of financial records and emails obtained pursuant to the January 18 Warrant, it appears that Igor Fruman and his brother, ▮▮▮▮▮ borrowed these funds from a third party as part of a private lending transaction, and then transferred some of the money to Parnas, who made the contribution in the name of GEP, which appears to have been a shell entity. Specifically, I have learned the following:

a. On or about April 25, 2018, Correia (using the D-Correia Yahoo Account) contacted a Miami-based commercial mortgage broker ("Broker-1") – on behalf of Parnas and Fruman – to inquire about obtaining a short-term loan.

b. In the days that followed, Broker-1 arranged for a \$3 million commercial loan from ▮▮▮▮▮ a businessman, and ▮▮▮▮▮ an attorney, to ▮▮▮▮▮ which is owned and managed by Igor and ▮▮▮▮▮. Based on a review of email

12

correspondence, [ ] and Igor Fruman were involved in, and copied on (using the I-Fruman Gmail Account and the [ ] , along with Parnas (using the L-Parnas GEP Account and the L-Parnas Yahoo Account), correspondence related to the loan from [ ] and [ ]. On or about May 15, 2018, [ ] entered into a mortgage agreement with [ ] which documented the $3,000,000 transfer as a loan to [ ] secured by the Frumans' condominium in Bal Harbour, Florida, which is owned by [ ]. [ ] Parnas and Fruman's assistant, was also copied on the email correspondence pertaining to the [ ] loan, using the [ ]. [ ] Correia was copied throughout the email correspondence relating to the loan using the D-Correia Yahoo Account and the D-Correia GEP Account.

c. On or about May 11 and May 14, 2018, [ ] wired a total of $3,000,000 ($2,500,000 from [ ] who wired the funds from overseas, and $500,000 from [ ] into an attorney escrow account. On or about May 15 and May 16, 2018, substantially all of that money was transferred from the attorney escrow account in multiple transfers, including a $1,260,329.80 transfer to the [ ] Account, on which Parnas is a signer. Prior to receiving that transfer, the [ ] Account generally had a low balance and minimal account activity. For instance, in January 2018, the [ ] Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79.

d. On or about May 17, 2018, Parnas, with [ ] assistance, made a $325,000 contribution in the name of GEP to [ ] PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor,

13

will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."                  sent a confirmation email to                      PAC in connection with this donation, using her                            and copying Parnas and Fruman at the I-Fruman GEP Account and L-Parnas GEP Account, respectively.

e. While the May 17 $325,000 donation was reported to the FEC as having come from GEP, in fact, the money – which, as noted above, was paid by Parnas using the Account – came from the money that                      loaned to      and Igor Fruman, as described above. The report to the FEC did not indicate that the contribution was made by Parnas or the Frumans, and it did not indicate the true source of the funds.

f. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, I have learned that in or about July 2018, a reporter from the                      emailed the registered agent ("Agent-1") for GEP, to ask questions about "who is behind the company or the donation." Agent-1 forwarded the email to Parnas (at the L-Parnas GEP Account) and wrote: "This is what happens when you become visible. The buzzards descend." Parnas replied "[t]hat's why we need to stay under the radar and have the best lawyers." Parnas subsequently forwarded the email to Correia (at the D-Correia GEP Account), who responded, "[w]e are all in agreement with that."

17. GEP was created shortly before its name was used to make the contributions, and evidence suggests – consistent with Parnas's statement that he and his associates "need to stay under the radar" – that its name may have been used in order to obscure the true source of the funds. Specifically, based on a review of publicly available information and a review of emails obtained pursuant to the January 2018 Warrant, I have learned the following:

14

a. GEP was incorporated in Delaware on or about April 11, 2018, with

as its registered agent. Neither Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any filing in Delaware relating to the LLC. Parnas has made extensive use of various corporate entities in Florida, and it appears for many of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On July 25, 2018,                          published an article regarding GEP's contribution to                          which suggested that GEP is a shell entity without legitimate business. In response, on July 31, 2018, a "spokesperson" for GEP emailed                          that "[t]he donation to                          PAC was a 100% legal contribution made by American citizens" and that "[t]he amount donated to                          PAC represents only a small fraction of the operating costs of GEP." The "spokesperson" also wrote that "[t]he implication that GEP is some sort of shell company, couldn't be further from the truth, as the company is committed to a long-term plan to export American [liquid natural gas] and is in the process of partnering with major industry leaders both domestically and internationally to achieve that end." Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has a permit to engage in shipping of liquid natural gas.[5] Additionally, based on my review of emails sent and received by Parnas and Igor Fruman obtained pursuant to the January 18 Warrant, it appears that GEP was set up at or around the time that the foregoing contributions were made, and it does not appear

---

[5] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in August 2018, Correia (using the D-Correia GEP Account) exchanged drafts of an unsigned memorandum of understanding ("MOU") between GEP and                          which contemplated that the parties would "begin pursuing commercial trading opportunities for the sale of LNG from the USA into various Eastern European countries." However, based on my review of emails pursuant to the January 18 Warrant and my review of bank account records, it does not appear that GEP and                          actually engaged in business together.

15

from bank records that GEP is presently involved in the purchase or sale of oil or gas, or engaged in oil or gas transactions.



PAC Donation

18.     It appears that Fruman also made a contribution to the                                    PAC using funds from the                             loan, referenced above, using another person's name and identity. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a.  On or about April 17, 2018, a finance director for the                              National Committee e-mailed Parnas at the Parnas Yahoo Account to invite him to attend roundtable event at                    with President Trump on April 20, 2018. In order to attend the event, Parnas was required to make a minimum contribution of $100,000 to the                                    The finance director subsequently e-mailed                    at the                             copying Parnas, and noted that, "I believe Mr. Parnas was going to send his contribution information shortly, so we should be good to go for the event."

b.  On or about April 27, 2018, Igor Fruman made a $100,000 donation to the

PAC in the name "                    ." The information reported to the FEC also stated that the occupation of                    " was employment with                             ." Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but who is named                    and works for

.

c.  Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

16



i. On or about May 16, 2018, and May 17, 2018, one day after receiving the transfer of funds that originated from [                    ] $502,650 of those funds was wired from the [                    ] Account (on which Parnas was a signer) to the [                    ] Account.

ii. Between May 16, 2018, and May 23, 2018, approximately $262,041 was transferred from the [                    ] Account and used to pay an [                    ] bill held in the name of [                    ] for which Igor and [                    ] Fruman were authorized signers.

iii. That [                    ] bill included an April 27, 2018 contribution in the amount of $100,000 to the [                    ] which was charged to the credit card assigned to Igor Fruman. While '[                    ] was the listed contributor in the [                    ] disclosure, neither Fruman or Parnas, who was the other individual responsible for the transfer of the funds, were reported as the contributors in the disclosure. Based on the foregoing, it appears that Parnas and Fruman made a straw donation to the [                    ] in violation of federal law and in furtherance of the January 18 Warrant Subject Offenses.

[                    ] PAC Donations

19. It appears that the contributions made by Parnas and Fruman to the [                    ] PAC were funded with money from third parties, including Andrey Muraviev, a Russian national. In an apparent effort to obscure the true donor of the funds, Parnas and Fruman moved the funds through multiple accounts, and it appears that Fruman made the donations using the [                    ] name.

20. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, and public sources, I have learned the following:

17

a. On or about March 19, 2018, Igor Fruman made a $50,000 contribution to

PAC. According to FEC records, this contribution was reported in the name of '

." Fruman received a confirmation email for this donation at the I-Fruman Gmail Account

from                    PAC.

b. On or about June 29, 2018, Parnas made an $11,000 contribution to

PAC. Some of the funds used to make this                    PAC contribution came from

the funds loaned by                    discussed above. In particular, on or about May 22,

2018, $100,000 of the funds that originated from                    and were transferred into

the                    Account – as described above – were wired to a                    bank

account in the name of GEP. Based on the financial records associated with the GEP account, it

appears that on or about July 2, 2018, $11,000 of the funds wired into the GEP account – which

originated from the loan by                    to the Frumans – were used to make a

contribution to                    PAC in Parnas's name.

c. On or about June 12, 2018, Igor Fruman made another $50,000 contribution to

                    PAC, which was reported as given by                    with the employer '

."

d. Based on my review of financial records, I have learned the following about the

source of funds that was used to make this contribution:

i. On or about September 18, 2018, a bank account held at

in the name of                    to which                    (Igor Fruman's brother) is the

authorized signer (the '                    Account") received a $500,000 wire transfer from an

account held in the name of                    Ltd. at                    a Swiss bank.

Based on my review of financial records and public sources, I have learned that a similarly-named

18

entity based in Russia is associated with Andrey Muraviev, a Russian national, who appears from my review of emails to be in communication and/or business with Fruman and Parnas (using the I-Fruman Gmail Account and the L-Parnas Yahoo Account). In addition, based on a review of email correspondence,                    (using                                             is involved in directing the business operations and finances for

    ii. On or about September 19, 2018, approximately $494,415 of the funds in the                    Account -- most if not all of which came from                    -- were used to pay an                    bill for a credit card in the name of

    iii. Based on my review of records from                    , I have learned that the                    credit card account was used to pay for a June 12, 2018 contribution to                    PAC in the name of                    referenced above, as well as a $15,000 contribution to the                    Fund, and a $5,400 contribution to                    for Congress, all of which were also made in Fruman's name.

21. Accordingly, for the reasons set forth in the foregoing paragraphs, there is probable cause to believe that the Frumans, Parnas, and others are involved in the commission of the Subject Offenses by making contributions to political committees, including                    and                    in the names of GEP, Parnas, and Fruman for purposes of concealing the true source of the funds, and that they utilized the Selected Accounts to do so. Specifically, there is probable cause to believe that the contributions to                    and other political committees to which Fruman, Parnas, or GEP donated were funded by third parties. With respect to the funds obtained from Muraviev and                    the amount of money transferred was far in excess of any stated business purpose, and that excess was used to fund political contributions. Moreover, based on the circuitous nature of the monetary transactions described above, there is probable cause to

19

believe that the Frumans, Parnas, and others are engaged in money laundering in furtherance of their activity, in violation of federal law and in furtherance of the January 18 Warrant Subject Offenses.

Contributions to Representative                Request for Official Action, and Activities as
                                    Agents of a Foreign Principle

22.    Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that, during the April 20, 2018 roundtable at                Parnas met then-Congressman

of Texas, and that Parnas, Fruman, Correia and others then used subsequent meetings and contributions to gain access to and build a close relationship with Congressman

Those contributions were made by Igor Fruman and Parnas in June 2018. It also appears that at the request of Parnas and Igor Fruman, Congressman                wrote to U.S. Secretary of State

in May 2018 to ask that the U.S. Ambassador to the Ukraine be fired and replaced.    In March 2019, news outlets published former Congressman                letter to Secretary                and in May 2019, the U.S. Ambassador to the Ukraine was recalled prior to the end of her term. Based on the timing of the contributions in relation to when Congressman

sent the letter to Secretary                and the emails discussed below, there is probable cause to believe that the letter was written in exchange for a commitment to make contributions to Congressman                campaign.  Specifically, based on a review of public records, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a.    On April 22, 2018,                (as noted above, Parnas and Fruman's assistant) emailed Congressman                (using                , copying Parnas (at the L-Parnas GEP Account), to identify herself the "Director of Operations of Global Energy Producers" and thanked Congressman                on Parnas's behalf for an "engaging conversation during the round table meeting," and requested a meeting between Parnas and Congressman                for that

20

week. It appears that                    reference to the "round table meeting" was to the April 20, 2018 roundtable at                    featuring President Trump.

b. Parnas met with Congressman             in Washington, D.C. on May 9, 2018. Based on my review of public reporting, I have learned that Parnas posted a photograph of himself (the individual on the far left) and Correia (the individual on the far right) meeting with Congressman            (the individual on the right of the first photograph and middle of the second photograph) on May 9, 2018, to Parnas' public Facebook profile:



Lev Parnas is with David Correia at ♥ United States Capitol. May 9 at 9:41pm · Washington · 👥

Hard at work !!

c. A subsequent meeting between Parnas and Congressman            occurred on June 6, 2018. The next day, on June 7, 2018,            (using
emailed a member of Congressman            staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman            ." Based on my involvement in this investigation and my review of emails, it appears that
statement about "help[ing] out by using our contacts" was a reference to individuals contributing to Congressman

21

d. On June 11, 2018, ▮▮▮▮▮ (using the ▮▮▮▮▮▮▮▮▮ wrote to ▮▮▮▮▮▮▮ Congressman ▮▮▮▮▮ communications director, to report that she had "an initial list of donors" and asked if it could be put "on one CC." When ▮▮▮ emailed ▮▮▮▮ to ask "how much do they think they will bring in," ▮▮▮▮▮ replied "$21k on the one credit card." ▮▮▮ wrote back: "the maximum an individual can donate is $2,700 and a PAC can give up to $5,000. I'm unsure if we can do that entire amount on one credit card but I can find out." ▮▮▮▮▮ replied that "it will be 8 people on that card." Based on my review of publicly available information, I am aware that at this time, Congressman ▮▮▮▮▮ was in the midst of a November 2018 reelection campaign.

e. On June 12, 2018, ▮▮▮▮▮ (using the ▮▮▮▮▮▮▮▮▮ asked ▮▮▮▮▮ for a meeting between Parnas and Congressman ▮▮▮▮▮ which was subsequently scheduled for June 14, 2018. When ▮▮▮ asked whether it was about "policy related matters or political," ▮▮▮▮▮ replied, "Lev said it would be about what you previous[ly] met about. He said you would know, hahaha." ▮▮▮ replied "I believe it was a political matter involving Eastern European relations." Based on this email and my involvement in this investigation, it appears that the "political matter involving Eastern European relations" ▮▮▮ and ▮▮▮▮▮ referenced above as the purpose for the June 14, 2018 meeting between Parnas and Congressman ▮▮▮▮▮ – scheduled as ▮▮▮▮▮ was communicating with the Congressman's office about up to $21,000 in donations for his reelection effort – was related to Parnas's May 9, 2018 request to Congressman ▮▮▮▮▮ to remove the current U.S. Ambassador to Ukraine.

f. On June 15, 2018, the day after Parnas's meeting with Congressman ▮▮▮▮▮ ▮▮▮▮ emailed ▮▮▮▮▮ (at the ▮▮▮▮▮▮▮▮▮, attaching a letter, and wrote "I think this is it. Please don't distribute, this is only for your records. Thanks for all of your help!"

22



The letter, dated May 9, 2018 – i.e., the same day that Congressman [redacted] met with Parnas –
was addressed from Congressman [redacted] to Secretary of State [redacted] [6] In the letter,
Congressman [redacted] wrote to Secretary [redacted] to "bring to your attention an interaction that I
recently had with individuals regarding the current U.S. Ambassador to Ukraine," [redacted]
[redacted] [7] Congressman [redacted] reported that he had "received notice of concrete evidence
from close companions that Ambassador [redacted] has spoken privately and repeatedly about
her disdain for the current Administration in a way that might call for the expulsion of Ms.
[redacted] as U.S. Ambassador to the Ukraine immediately." Congressman [redacted] asked that
Secretary [redacted] "consider terminating her ambassadorship and find a replacement as soon as
possible." Less than an hour later, [redacted] forwarded the email from [redacted] to Parnas (at
the L-Parnas GEP Account).

g. On June 25, 2018, Igor Fruman and Parnas each made $2,700 contributions in their
own names to [redacted] for Congress. Based on a review of [redacted] and FEC
records, it appears that the [redacted] bill included two $2,700 contributions – the
maximum an individual could at the time contribute – to [redacted] for Congress. According
to the FEC records, described above, despite the fact that these contributions were paid for using

---

[6] Based on my review of publicly available information, I have learned that between 2012 to
2018, Congressman [redacted] was the Chairman of the House Rules Committee. Based on my
review of public sources, I have learned that in relation to another matter, [redacted] previously stated
that as Chairman of the House Rules Committee, Congressman [redacted] frequently works to
ensure other countries are respecting democratic norms. However, it does not appear that
Congressman [redacted] had any leadership positions relevant to foreign policy or diplomacy with
respect to Ukraine. Similarly, based on public reporting, it does not appear that Congressman
[redacted] had a close relationship with Secretary of State [redacted] beyond simply serving
in the House of Representatives at the same time, between approximately 2011 and 2017.

[7] Based on my review of publicly available information, I have learned that [redacted]
was sworn in as U.S. Ambassador to the Ukraine in August 2016. She previously served as the
U.S. Ambassador to Armenia and Kyrgyzstan.

23

different credit cards linked to the same credit card account, they were reported as separate contributions by Fruman and Parnas.

h. Between June and November 2018,                     repeatedly emailed      to request additional meetings between Parnas, Fruman, and others with Congressmar          On June 28, 2018, Correia, who is an associate and business partner of Parnas, had meetings set up with Congressman          On July 12, 2018, Parnas appears to have again met with Congressman          On September 5, 2018, Parnas and Rudolph Giuliani had a meeting scheduled with Congressman          Finally, Fruman, Correia, and Parnas had a meeting scheduled with Congressmar          on November 16, 2018.

i. On or about May 6, 2019, according to public sources,                              was prematurely recalled or removed from her position as U.S. Ambassador to Ukraine.

23.    Based on my review of publicly available reporting, I have learned, among other things, the following with respect to Ambassador          removal as U.S. Ambassador to Ukraine:

a. According to a March 6, 2019 article in                          , on or about March 5, 2019, Ambassador          gave a public speech in Ukraine in which she called for the Ukrainian anticorruption prosecutor,                          to be fired and voiced frustration that                     the then-president) had not done enough to root out corruption.

b. In a video interview published on March 20, 2019 by          Ukrainian Prosecutor-General          told                     that          had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about

24

January 2017.[8]         also announced that Ukrainian authorities would launch a criminal investigation into whether Ukrainians sought to interfere in the U.S. election in 2016 to benefit

claimed that the National Anti-Corruption Bureau may have been involved in efforts to influence the 2016 U.S. presidential election because it published information about secret payments from former President         party to         allegedly in order to hurt the Trump campaign. According to         in response to that interview, the State Department issued a statement saying that it no longer supported         office in its anti-corruption mission, and considered his allegation about the "do-not-prosecute" list to be "an outright fabrication." However,         reported that         was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman         wrote a "private letter asking Secretary of State         to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump."         also included a copy of the letter:

---

[8] Based on my review of an April 18, 2019 article appearing on a Ukrainian news website,         later walked back his claim about the "do not prosecute list," and claimed instead that he had asked         for a "do not prosecute" list at their first in-person meeting in January 2017, but that she had refused.



c. In a March 23, 2019 segment on the [                ] on [        ;    ]

revealed that former-Congressman [      ] sent Secretary of State [      ] "an urgent letter" in

May 2018, asking that Ambassador [        ] be removed from her position, and published a

copy of that letter. During that segment, commentator [          ] announced: "have learned

this evening that the President has ordered her dismissal from her post. . . as a result of her activities

there which were complained of by Congressman [      ]. She is known and reported by people

there to have bad-mouthed the President of the United States Donald Trump, to have told

Ukrainians not to listen to him or pay attention to his policies. . . and finally his activities have

caught up with her."[9]

---

[9] Based on my review of public reporting, I have not found evidence that Ambassador [        ] publicly criticized President Trump.

d. Based on my review of public reporting, I have learned that on or about May 6, 2019, the State Department confirmed that Ambassador ▇▇▇▇ would leave her post ahead of schedule on May 20, 2019.

e. According to an article in ▇▇▇▇, on or about May 9, 2019, Rudolph Giuliani – who, as noted above, attended at least one meeting between Parnas, Fruman, and Congressman ▇▇▇▇ – confirmed that he had been meeting with ▇▇▇▇ the Ukrainian Prosecutor-General who had criticized Ambassador ▇▇▇▇ Giuliani told ▇▇▇▇ that he last met with ▇▇▇▇ six weeks prior: "I have met with him. I interviewed him for two days in New York. I met with him once in Poland...and I may have met with him one other time in America, I don't remember, I may have just gotten a coffee with him sometime when he was here." According to an article dated May 9, 2019 in the ▇▇▇▇ Giuliani also announced that he would travel to Ukraine to meet with Ukranian President-elect ▇▇▇▇ to push him to press ahead with two investigations he hoped would benefit President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) ▇▇▇▇ involvement in a gas company owned by a Ukrainian oligarch. According to the ▇▇▇▇ Giuliani was to be accompanied by Lev Parnas. The article also reported that Parnas had previously traveled to Ukraine as a representative of Giuliani seeking information about both of the above topics.

f. According to a May 15, 2019 article in a Ukrainian news website, Giuliani announced that his trip to the Ukraine was cancelled: "I was going to visit Ukraine on Monday-Wednesday, but I canceled the trip as I found out that the President-elect is surrounded by the people who treated the U.S. President unfairly. It is about the events of 2016. One of them was

27



caught on having been cooperating and helping the election campaign of Trump's opponent

And these people are among his key advisors."

g. Based on my review of Giuliani's public Twitter page, I have learned that on May 19, 2019, Giuliani tweeted that Parnas and Fruman were his "clients.".

h. According to an article published on July 22, 2019 in                    , Parnas and Fruman, while "reporting" to Giuliani, lobbied the Ukrainian government in a bid to assist President Trump's reelection campaign. The article described Parnas and Fruman's "aggressive campaign" in the United States to successfully push for the removal of Ambassador

Parnas and          were interviewed for the article. Parnas said that he and Fruman were not "acting at the behest of anyone."          claimed that "he raised the issue of          in the meeting – not Parnas or Fruman," and that he "sought their input."[10]          admitted to speaking with Fruman and Parnas about Ukraine, saying: "They are          They have a strong interest in America not backing away from Ukraine."

i. According to a July 22, 2019 article published by the

, Parnas said that he and Fruman were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us – either I bury it or I pass it along. I felt it was my duty to pass it along." According to the article, which quoted heavily from an interview with Parnas, in late 2018, Parnas and Fruman organized a call between Giuliani and          the former Prosecutor-General in Ukraine. Parnas and Fruman also attended a meeting in France between Giuliani and          he head

---

[10] Former-Congressman          claim that he brought up Ambassador          rather than Parnas, is contradicted by the text of the letter, in which Congressman          wrote that he *"received notice* from close companions" regarding Ambassador          alleged activities in Ukraine (emphasis added).

28

of Ukraine's Special Anti-Corruption Prosecutor's Office. Parnas said that he and Fruman connected Giuliani with ████ and that ████ met Giuliani in New York in January and in Poland in February. Of the meetings, Parnas said that ████ brought documentation, verification. It opened Giuliani's eyes."

24.     Based on the foregoing, there is probable cause to believe that Parnas and Fruman donated to Congressman ████ with the intention that those donations be made in exchange for official action, namely, a request to the Secretary of State to remove the Ambassador to the Ukraine, in violation of federal law and in furtherance of the Subject Offenses. Specifically, Parnas appears to have asked Congressman ████ to write a letter, reflecting information ████ "received" from "close companions" – *i.e.*, Parnas – to Secretary of State ████ seeking the removal of Ambassador ████ This action appears to have been outside the purview of Congressman ████ committee and caucus positions, and appears to have been done at Parnas's request.

25.     The timing of Parnas's and Fruman's donations to Congressman ████ also indicate that Congressman ████ wrote the letter with the understanding that Parnas and Fruman would make a substantial donation to his campaign. Specifically, several weeks after the May 9, 2019 meeting, Parnas's assistant emailed with Congressman ████ staff to coordinate a $21,000 donation on one credit card. After being advised that such a donation exceeded the maximum individual donation, Parnas and Fruman then donated $2,700 each, the maximum amount, in June 2018. Only a week before that donation was made, ████ sought a copy of Congressman ████ letter and forwarded it to Parnas. In addition, based on public reporting, it appears that members of the Ukrainian Government met with Giuliani, Parnas, and Fruman in early 2019, and then led what appears to have been a coordinated effort to remove

29

Ambassador          which relied in large part on the publication of Congressman

letter. Finally, Parnas and Fruman used money from a Cyprus-based bank account that appears to
be associated with Muraviev, a Russian national, to pay for the donations they made to
Congressman

26.     For the same reasons, there is further reason to believe the efforts by Parnas and
Fruman – and Correia and          who attended and facilitated those meetings with
Congressman          – to lobby for the removal of Ambassador          was done in
coordination with Ukranian officials, including          who was at the time the          letter
became public critical of          and who Parnas has acknowledged meeting and
subsequently connected to Giuliani.    While Parnas has characterized his discussions with
Congressman          regarding the Ambassador as "passing information along," it appears likely
that that information originated from Ukranian sources. In particular, Parnas and Fruman appear
to have close relationships with Ukrainian government officials, including          and arranged
for meetings and telephone calls between Giuliani and          in early 2019. At least some of
these meetings and telephone calls occurred, based on public reporting, prior to          making
allegations of impropriety against Ambassador          in March 2019, which, in conjunction
with the          letter being made public, ultimately led to her removal. I am aware, from my
review of publicly available information, that Fruman, Parnas, and Correia have not registered
with the Department of Justice as foreign agents, and their conduct may therefore have violated
federal law regarding foreign agent registration, as described above.

27.     Accordingly, there is probable cause to believe that Parnas, Fruman, Correia,
and others engaged in this activity in violation of federal law and in furtherance of the
Subject Offenses, and used the Selected Accounts to do so. Based on my review of emails obtained

30

pursuant to the January 18 Warrant, I am aware that Parnas, Fruman, Correia and

used their personal and business email accounts interchangeably, and with respect to Correia in

particular, used his personal account to store other emails sent from different addresses, such as

. Thus, there is probable cause to believe that evidence of the Subject Offenses

will be found on all of the Selected Accounts, even though the above-referenced communications

with Congressman          staff – which were discovered during my review pursuant to only the

January 18 Warrant Subject Offenses, and not related to any searches that may lead to additional

evidence of the Subject Offenses – occurred over Parnas's and          GEP email

addresses.

28.    In addition, the donations to Congressman          vere funded by Muraviev's

transfer to a bank account held in the name of          to which          gor

Fruman's brother, is the authorized signatory. Based on my review of emails pursuant to the

January 18 Warrant, I am aware that          uses the          to

correspond regarding          business. Because that business received the overseas

funding to make donations to Congressman          there is probable cause to believe that

evidence of the Subject Offenses will be found on the          including any

communications about the source or purpose of the foreign funding. As set forth above, Parnas'

and Fruman's donations, and promises of donations, appear to have led to Congressman

authoring the May 9, 2018 letter that ultimately appears to have contributed to the removal of

Ambassador          in May 2019.

29.    As such, there is probable cause to believe that evidence of the Subject Offenses

will be found on the Selected Accounts on the Subject Devices.

31

### False Statements to the FEC

30.     Based on my review of emails obtained pursuant to the January 18 Warrant, it does not appear that Parnas, Igor Fruman, or                    told the campaigns or PACs to which they and/or GEP were making contributions that the funds used to make the contributions came from third parties and overseas bank accounts. Had the PACs and campaigns known that these were unlawful contributions, they likely would not have accepted the funds.

31.     Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas and Igor Fruman have submitted affidavits to the FEC in connection with a pending complaint made by a non-profit advocacy group. Based on a review of those affidavits, it appears that Parnas and Igor Fruman made multiple false statements to the FEC in connection with that matter. For instance, their sworn affidavits falsely state that Parnas and Fruman "funded the [GEP] entities with over $2.8 million in assets" and that the                              PAC contribution "was made with GEP funds for GEP purposes." In fact, as set forth above, the

PAC contribution was made with funds from a third party that were moved through multiple bank accounts before being paid to                    PAC. Additionally, Parnas stated in his affidavit that his contribution to                for Congress "was made with a business credit card . . . which [he] reimbursed." Based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Fruman, Parnas, and

the analyst found no evidence of reimbursement by Parnas to Fruman or

for the contributions to Congressman

32.     Therefore, there is probable cause to believe that a search of the Selected Accounts on the Subject Devices will reveal evidence, fruit and instrumentalities of the Subject Offenses, including the following:

32

g.  Evidence related to any false statements made or caused to be made to the Federal Election Commission.

h.  Evidence relating to the May 9, 2018 letter from Congressman        to Secretary of State        including correspondence attaching or concerning the letter.

i.  Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including

j.  Communications regarding

k.  Evidence, including travel records, related to meetings with foreign government officials, representatives of foreign corporations, or foreign individuals, involving Rudolph Giuliani, Lev Parnas, Igor Fruman,        and David Correia.

l.  Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

## III.  Procedures for Searching ESI

### A.  Review of ESI

33.  Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) will review the ESI contained on the Subject Devices for information responsive to the warrant.

34.  In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails contained on the Subject Devices. This method is

33

analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

IV. **Conclusion and Ancillary Provisions**

35.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

36.    The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption and campaign finance offenses, I know that individuals who participate in such offenses communicate about known government investigations and sometimes tailor their stories to be consistent, and/or tamper with or hide potential evidence. In addition, the subjects of this investigation include dual citizens, who would have the ability and incentive to flee and evade prosecution. Accordingly, premature disclosure of the scope of this

34

investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering, flight and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

37.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Sworn to before me on
14th day of August, 2019

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

35

## Attachment A

### I. Devices to be Searched

The devices to be searched (the "Subject Devices") are described as the electronic devices listed below which contain emails and other content information obtained pursuant to a search warrant issued on January 18, 2019 by the Honorable Sarah Netburn, numbered 19 Mag. 729.

| Account | Provider | Owner | Referred To As | Subject Device |
|---------|----------|-------|----------------|----------------|
| █████████████████ | Google | Igor Fruman | I-Fruman GEP Account | 1 |
| █████████████████ | Google | Lev Parnas | L-Parnas GEP Account | 1 |
| ████████████████████████████████████████████████ | | | | |
| ████████████████████████████████████████████████ | | | | |
| ████████████████████████████████████████████████ | | | | |
| █████████████████ | Google | David Correia | D-Correia GEP Account | 1 |
| █████████████████ | Google | Igor Fruman | I-Fruman Gmail Account | 1 |
| ████████████████████████████████████████████████ | | | | |
| ████████████████████████████████████████████████ | | | | |
| █████████████████ | Oath | Lev Parnas | L-Parnas Yahoo Account | 2 |
| █████████████████ | Oath | David Correia | D-Correia Yahoo Account | 2 |

This warrant applies only to the following accounts on the Subject Devices: the I-Fruman GEP Account, the L-Parnas GEP Account, the ███████████████ the D-Correia GEP Account, the I-Fruman Gmail Account; the █████████████ the L-Parnas Yahoo Account, and the D-Correia Yahoo Account (the "Selected Accounts").

**II. Review of ESI on the Selected Accounts on the Subject Devices**

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) are authorized to review the ESI contained on the Selected Accounts on the Subject Devices for evidence, fruits, and instrumentalities of one or more violations of 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses"), as listed below:

   a. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

   b. Evidence relating to the May 9, 2018 letter from Congressman             to Secretary of State             including correspondence attaching or concerning the letter.

   c. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including

   d. Communications regarding

   e. Evidence, including travel records, related to meetings with foreign government officials, representatives of foreign corporations, or foreign individuals, involving Rudolph Giuliani, Lev Parnas, Igor Fruman,             and David Correia.

   f. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.