**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. __19-8415-WM__

**IN RE: Sealed Search Warrant.**

_____/

FILED BY _____ D.C.

OCT 0 9 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## MOTION TO SEAL

NOW COMES the United States of America, by and through its undersigned attorney, and respectfully requests that the Motion to Seal, Application and Affidavit for a Search Warrant, Search and Seizure Warrant, Criminal Coversheet and Order be SEALED, with the exception of the warrant and return that will be left at the premise to be searched, until further order of the Court, excepting the United States Attorney's Office and Federal Bureaus of Investigation which may obtain copies of the search warrant or other sealed documents for the purpose of furthering the ongoing investigation.

The United States makes this request because if persons involved in the crimes listed in the application learned of details regarding this investigation, those persons could decide to flee, to harm witnesses to their crimes, destroy evidence, or take other steps to impede the investigation. Should further information be required, the United States is prepared to respond.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____ 09/03/19

Anthony W. Lacosta
Assistant United States Attorney
Court No. A5500698
500 S. Australian Avenue
West Palm Beach, FL 33401
Ph: (561) 209-1015
Email: Anthony.Lacosta@usdoj.gov

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.  19-8415-WM**

IN RE:

Search Warrant

_____ /

| FILED BY _____ D.C. |
| OCT 0 9 2019 |
| ANGELA E. NOBLE |
| CLERK U.S. DIST. CT. |
| S.D. OF FLA. – W.P.B. |

## ORDER

The United States of America, having applied to this Court for an Order sealing the Motion to Seal, Application and Affidavit for a Search Warrant, Search and Seizure Warrant, Criminal Coversheet and Order (with the exception of the warrant and inventory provided for service), and the Court finding good cause, that is, the perpetrators may flee, evidence may be destroyed, the integrity of the ongoing investigation might be compromised, and the safety of witnesses could be placed at risk:

IT IS HEREBY ORDERED that the search warrant, search warrant application, affidavit, the government's motion and this Order shall be sealed until further order of this Court, excepting the U.S. Attorney's Office who may obtain copies of the search warrant or other sealed documents for the purpose of furthering the ongoing investigation.

DONE AND ORDERED in West Palm Beach, Florida, this 9th of October, 2019.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date _10/16/2019_

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-8415-WM

IN RE:

Search Warrant

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? Yes ____ No_X_

2.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? Yes ____ No_X_

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____

Anthony W. Lacosta
Assistant United States Attorney
Court No. A5500698
500 S. Australian Avenue
West Palm Beach, FL 33401
Ph: (561) 209-1015
Email: Anthony.Lacosta@usdoj.gov

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY _____ D.C.

OCT 09 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The Premises located under ▮▮▮▮▮▮
▮▮▮, Sunny Isles Beach (as further described in Attachment A)

) ) ) ) )

Case No. 19-8415-WM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

the Premises located under ▮▮▮▮▮▮▮▮▮▮, Sunny Isles Beach (as further described in Attachment A)

located in the     Southern     District of     Florida    , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

  ☑ evidence of a crime;

  ☐ contraband, fruits of crime, or other items illegally possessed;

  ☑ property designed for use, intended for use, or used in committing a crime;

  ☐ a person to be arrested or a person who is unlawfully restrained.

Certified to be a true and correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk
Date 10/10/2019

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 30122; 52 U.S.C. § 30121; 18 U.S.C. §§ 371, 1001; 1519;1956(a)(2) | unlawful straw donations; unlawful contributions by a foreign national; conspiracy to commit the aforementioned crimes; willfully causing a false statement to be made to the FEC; fabrication of documents; money laundering |

The application is based on these facts:

     See Attached Affidavit.

  ☑ Continued on the attached sheet.

  ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me and signed in my presence.

Date:    10/09/2019

_____
*Judge's signature*

City and state:    West Palm Beach, Florida

William Matthewman, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

In the Matter of the Application of the United
States of America for a Search and Seizure
Warrant for the Premises Known and Described
as the Residence located under
        Sunny Isles Beach, Florida (as
further described in Attachment A).

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF FLORIDA) ss.:

being duly sworn, deposes and says:

# I. Introduction

## A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachments A and B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and

1

2017.08.02

conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## B. The Subject Premises

3.      The Subject Premises are particularly described as a condominium bearing number

located in the                                                        ., Sunny Isles Beach, Florida.

Based on my review of financial records and public sources, I believe that the Subject Premises is

occupied by Igor Fruman. The exterior of the                                    in which the Subject

Premises is located, is pictured below:



## C. The Subject Offenses and Relevant Individuals

4.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), and

2

18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), and 18 U.S.C. § 1519 (fabrication of documents) (together, the "Subject Offenses").

5.      On October 9, 2019, a grand jury sitting in the United States Attorney's Office for the Southern District of New York returned an indictment charging (i) Lev Parnas and Igor Fruman with conspiring to make unlawful straw donations, making and willfully causing false statements to be made to the FEC, and fabricating documents to impede, obstruct, and influence the proper administration of a matter within the FEC's jurisdiction, in violation of 52 U.S.C. §§ 30122 and 18 U.S.C. §§ 371, 1001, 2, and 1519; and charging Lev Parnas, Igor Fruman, David Correia and Andrey Kukushkin with conspiring to make unlawful foreign contributions in violation of 52 U.S.C. § 30121 and 18 U.S.C. § 371. A copy of the indictment is attached hereto.

6.      The relevant individuals for purposes of this search warrant are as follows:

a.      Lev Parnas, who is charged in the indictment, is a U.S. citizen who was born in Ukraine. Under the campaign finance laws, he may make political contributions in compliance with, among other things, the contribution limits and source restrictions imposed by law.

b.      Igor Fruman, who is charged in the indictment, is a U.S. citizen who was born in Belarus. Under the campaign finance laws, he may make political contributions in compliance with, among other things, the contribution limits and source restrictions imposed by law.

c.      David Correia, who is charged in the indictment, is a U.S. citizen who was born in the United States. Under the campaign finance laws, he may make political contributions in compliance with, among other things, the contribution limits and source restrictions imposed by law.

d.      Andrey Kukushkin, who is charged in the indictment, is a U.S. citizen who was born in Ukraine. Under the campaign finance laws, he may make political contributions in

2017.08.02

compliance with, among other things, the contribution limits and source restrictions imposed by law.

e.   Andrey Muraviev is a Russian national who lives outside the United States. He is prohibited from directly or indirectly making political contributions.

f.   ▮▮▮▮▮▮▮ is the brother and business partner of Igor Fruman.

g.   ▮▮▮▮▮▮▮ is the personal assistant to Parnas and Igor Fruman.

## II.  Prior Search Warrant Applications

7.   On or about January 18, 2019, the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, David Correia, and ▮▮▮▮▮▮▮, among others.

8.   On or about May 16, 2019, USAO-SDNY and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for Apple iCloud accounts belonging to Igor Fruman, Lev Parnas, and ▮▮▮▮▮▮▮

## III.  Probable Cause

### A.  Probable Cause Regarding the Subjects' Commission of the Subject Offenses

9.   The FBI and the USAO-SDNY are investigating, among other things discussed herein, schemes involving Lev Parnas, Igor Fruman, David Correia, Andrey Kukushkin, ▮▮▮▮▮▮▮ Andrey Muraviev, and others to make political contributions to candidates and political action committees ("PACs") in order to gain access to politicians and influence policy, in violation of certain of the Subject Offenses. First, there is probable cause to believe that Parnas made illegal "straw donations," funded by third parties, in violation of the federal campaign finance laws, which

4

2017.08.02

prohibit persons from making contributions in the name of another person, and caused false forms to be submitted to the FEC. *See* 18 U.S.C. § 1001 and 2, 52 U.S.C. § 30122. Some of those contributions were made in the name of Global Energy Producers LLC ("GEP"), a purported liquefied natural gas ("LNG") import-export business that had been incorporated by Igor Fruman and Parnas around the time the contributions were made.[1] The rest of the contributions were made in the names of Igor Fruman and Parnas, although, as discussed below, Igor Fruman paid for Parnas's contributions. Second, in 2018, it appears that Parnas, Igor Fruman, Correia, Muraviev, and Kukushkin conspired to attempt to acquire cannabis licenses in multiple states by, among other things, donating to politicians in those states. Members of the group hired lobbyists, Correia identified the specific contributions the group should make in order to obtain licenses, and Muraviev – a Russian national with no legal status in the United States – wired $1 million from overseas to the United States, some of which was used to make contributions to politicians in Nevada and elsewhere, in violation of the federal campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions and the money laundering laws, *see* 18 U.S.C. § 1956; 52 U.S.C. § 30121.

10. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, materials obtained pursuant to the May 16 Warrant, FEC records, financial records, and public sources, it appears that the Subject Premises – and electronic devices located in the Subject Premises – were used by Igor Fruman to, among other things, communicate regarding the

---

[1] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a corporation created at or shortly before the time the contributions were made for the principal purpose of obscuring the true donor's identity. The FEC has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

illegal campaign finance donation schemes, create documents and store financial and incorporation records related to GEP matters, and make campaign contributions.

Straw Donations to the ▉▉▉▉▉ Fund in 2016

11.     Based on my review of public sources and financial records, I have learned that Parnas is a businessman and entrepreneur who lives in south Florida. According to a sworn affidavit that Parnas filed with the FEC, discussed below, he has worked in a number of industries including as a real estate broker, stockbroker, and most recently as the founder of Fraud Guarantee, which "provides risk management tools for investors to prevent losses from fraudulent activities." Based on my review of communications obtained pursuant to the January 18 Warrant and the May 2016 Warrant and records from financial institutions, I have learned that, from time to time, including in 2016 and 2018, Parnas has struggled financially. Parnas's business partner in Fraud Guarantee is Correia, who, based on my review of the same materials, also appears to have experienced financial troubles.

12.     Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, there is probable cause to believe that Parnas and Correia made unlawful straw donations to the ▉▉▉▉▉ Fund in 2016 at the suggestion of ▉ ▉▉▉▉▉ a businessman who had previously contributed to the ▉▉▉▉▉ Fund, using funds provided by ▉▉▉▉▉ Specifically, I have learned, among other things, the following:

        a.     On or about October 3, 2016, Correia emailed ▉▉▉▉▉ copying Parnas: "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent ▉ "some information about our group ▉▉▉▉▉ . . . and a few properties that ▉ owns."

6

Based on my review of this and other emails, it appears that ▇▇▇▇▇▇ solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in ▇▇▇▇▇▇, a private equity group with which Parnas and Correia were affiliated.

   b. On or about October 11, 2016, ▇▇▇▇▇▇ sent Parnas and Correia a registration link for a ▇▇▇▇▇▇ Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email, ▇▇▇▇▇▇ wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow."

   c. On or about October 14, 2016, Correia emailed ▇▇▇▇▇▇ that Parnas had said he and ▇▇▇▇▇▇ had "connected and worked things out" and that Correia was "happy to have you as part of the team!" In a subsequent email copying Parnas, Correia asked ▇▇▇▇▇▇ to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, ▇▇▇▇▇▇ replied that he was "happy to be part of the team" and "looking forward for more ventures in the future." ▇▇▇▇▇▇ wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, ▇▇▇▇▇▇ did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between ▇▇▇▇▇▇ and Parnas or Correia.

   d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of ▇▇▇▇▇▇, on which Parnas was a signer, received a wire transfer from ▇▇▇▇▇▇ in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to

7

receiving the wire transfer from                    the balance of the                        account
was negative $801.82.

e.   On or about October 14, 2016, $100,000 was transferred from a bank account in
the name of                        at Bank of America (the "                    Account") to
an account in Lev and        Parnas's names at Bank of America. On the same date, $25,000
was wired from the account in Parnas's name to an account in the name of            , which is
the name of David Correia's wife.

f.   On or about October 24, 2016, Parnas contributed $50,000 to the
Fund. On the same day, a $5,000 contribution was made in the name of            to the
         PAC. Based on my review of financial records, it appears that both of the contributions
were funded with money from the $300,000 payment by

13.   Based on my review of public records, I have learned that                who is a
lawful permanent resident, contributed $15,000 to the                Fund on October 14, 2016,
and another $15,000 on or about October 24, 2016. Based on my review of public sources and the
            Fund's contributor form, I have learned that contributions to                    Fund
were "allocated sequentially according to the following formula: $2,700 . . . to [
for President] primary account; $2,700 . . . to [                for President] general account;
$33,900 . . . to [the            National Committee's] operating account; $101,700 . . . to [the
            National Committee's] headquarters account; $101,700 . . . to [the
National Committee's] legal proceedings account; $101,700 . . . to [the                National
Committee's] convention account." The form also indicated that "the allocation formula may
change if any contribution would exceed applicable contribution limits." Thus, because
            contributed a total of $30,000 after the            primary was over, his

8

contribution was allocated as a $2,700 contribution to the Trump Campaign (the maximum) and $27,300 to the ▮▮▮▮ National Committee's operating account. Accordingly, it appears that ▮▮▮▮ was legally barred from having his funds allocated in the manner that the $50,000 from Parnas and $5,000 from Correia were allocated to the ▮▮▮▮ Fund. In other words, it appears that because the contributions were made in the names of Parnas and Correia, ▮▮▮▮ funded two additional maximum contributions to ▮▮▮▮ for President.

14.   Based on my review of bank records for the ▮▮▮▮ Account, I have learned that, in addition to the donations to the ▮▮▮▮ Fund, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the remaining money transferred from ▮▮▮▮ on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the ▮▮▮▮ Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds ▮▮▮▮ were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ▮▮▮▮ ever asked for a return of his "investment" in Fraud Guarantee, even though ▮▮▮▮ did ask for a return of his investment in a separate company, ▮▮▮▮ (which investment actually appears to have been made using different funds), as set forth above.

15.   Based on the foregoing, it appears that the contributions to the ▮▮▮▮ Fund were solicited and funded by ▮▮▮▮ but were made in the names of Parnas and ▮▮▮▮ in violation of certain of the Subject Offenses, including 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and

9

abetting the same), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to

the FEC). Specifically,                          solicited Correia's and Parnas's attendance at a
              Fund event.                         wired Parnas $300,000, but while                        had

discussed an investment in Correia's business Fraud Guarantee, the money was wired to a different

entity,                          and the only documented investment                        seems to have

made was a $100,000 investment, using separate funds, in                                    . The funds

              sent to Parnas through                              by contrast, do not appear to have been

used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as

discussed above, Parnas used $55,000 of those funds to fund his and Correia's donations to the

              Fund, and spent the remainder of the funds over the following two months on

luxury and personal expenses for Parnas. In addition,                        did not ask for his

"investment" to be returned, although he was comfortable doing so with respect to his

              investment, which indicates that                        did not actually believe that his $300,000

wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the

contributions to the                        Fund were made in violation of federal law and as part of the

Subject Offenses.

### Straw Donations to Campaigns and PACs in 2018

16.    Based on my review of emails obtained pursuant to the January 18 Warrant, I have

learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs

supporting                  candidates, with a principal focus on the 2018 midterm elections. For

instance, Parnas was invited to participate in exclusive events hosted by                        (a

501(c)(4) nonprofit entity organized by senior staff members from the Trump Campaign to

promote President Trump's policy agenda),                        PAC (which describes itself as

"the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump- administration"), and PAC (which had a stated purpose of working to keep in control of Congress). Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. Parnas and Igor Fruman attended some of those events together. In order to attend these events, however, Parnas and Igor Fruman were required to, and did, make sizeable political contributions including to PAC and PAC. The investigation has revealed that while Igor Fruman financed all of these contributions with the help of his brother some of them were reported in Parnas's name, or in the name of GEP, as described below, a LNG import-export business incorporated by Parnas and Igor Fruman around the time the contributions were made, seemingly in order to obscure the source of the funds and/or evade contribution limitations.

17. Specifically, based on my review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following regarding contributions made by Igor Fruman, Parnas, and GEP:

a. In early February 2018, Parnas was invited to attend the 2018 National Committee Spring Retreat at the resort in Palm Beach, Florida, scheduled for March 3 through 5, 2018. President Trump was scheduled to be the keynote speaker. Parnas and Igor Fruman both appear to have attended the event and met President Trump. Fruman subsequently stated to a Russian-language newspaper, which has been translated into English, the following regarding the event: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in was the start of his Campaign

11



in the 2020 election . . . And before that, he set the goal of the ███████ victory in the mid-term elections to Congress in November 2018."

b. On or about February 23, 2018, ███████ the director of development for the ███████ PAC and ███████ PAC, invited Parnas to attend a ███████ dinner in New York on or about March 12, 2018, with Vice-President ███ and Majority Leader ███████ In order to attend the event, Parnas was required to make a minimum contribution of $125,000 to ███████ PAC, with $50,000 contributed before the event.[2] Parnas and Fruman attended the event and on or about March 19, 2018, Fruman made a $50,000 contribution to the PAC in the name ███████" That contribution was transferred to multiple committees, including as a maximum $33,900 contribution to the ███████

c. Over the next two months, Parnas and Igor Fruman attended multiple ███████ events at the invitation of ███████ For instance, on or about March 26, 2018, ███████ invited Parnas and Fruman to attend a dinner at ███████ and on or about March 29, 2018, Parnas, Fruman, ███████ dined at the resort. The next day, ███████ emailed Parnas a link to an ███████ advertisement and the PAC's donor form. Fruman, Parnas, and Parnas's son appear to have attended another ███████ event on or about April 11, 2018. On or about April 20, 2018, Fruman attended at ███████ roundtable event at ███████ at which President Trump was present, as was Representative ███████ a congressman from Texas, and other congressional Representatives. On or about April 23, 2018, ███████ sent Parnas the donor form again as well as some more information on ███████

─────────

[2] Based on my review of materials obtained pursuant to the January 18 Warrant, I have learned that on June 25, 2018, a confirmation of the ███████ donation in the amount of $50,000 was forwarded to ███████

2017.08.02



d. On or April 30, 2018, Igor Fruman and Parnas appear to have attended a dinner at the Trump International Hotel in Washington, D.C., that was affiliated with [        ] The next day, on or about May 1, 2018, [        ] sent Parnas the contribution form. Parnas responded, "Got it will text you when I send it." On or about May 6, 2018, [        ] Parnas's assistant, emailed [        ] for wiring instructions for [        ] and [        ]

e. On or about May 17, 2018, Parnas, with [        ] assistance, made a $325,000 contribution, in the name of GEP, to [        ] PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor, will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."

f. On or about May 31, 2018, [        ] emailed [        ] and asked whether "Lev could complete the last $75k to [        ] which was a reference to the fact that Parnas committed to contribute $125,000 to [        ] to attend the March 12, 2018 dinner in New York, but Fruman had only paid $50,000. On or about June 12, 2018, Igor Fruman made another $50,000 contribution to [        ] PAC, and on June 29, 2018, Parnas made an $11,000 contribution to the [        ] PAC.

g. As noted above, on or about April 20, 2018, Parnas met Representative [        ] at [        ] On or about April 22, 2018, [        ] contacted Representative [        ] staff to request a meeting on behalf of Parnas; a dinner was scheduled for April 26, 2018, but then

13

2017.08.02

canceled. Parnas met Representative       at his office in Washington, D.C., on or about May 9, 2018. On or about June 6, 2018, Parnas met with Representative      again at his office. On June 7, 2018,      wrote     staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman      "

later explained that she had an "initial list of donors" who would make a donation of $21,000 on one credit card.     staff explained the applicable campaign finance regulations and said she was unsure if "we can do that entire amount on one credit card but I can find out." Parnas appears to have again met Representative     on June 14, 2018. On June 25, 2018, Parnas and Igor Fruman each made $2,700 contributions to Representative     who was running for reelection in November 2018. They listed GEP as their employer.

18. Based on my review of financial records, it appears that the contributions to

PAC and Representative     that were made in Parnas's name were, in fact, funded by Igor Fruman and     in violation of certain of the Subject Offenses. Additionally, it appears that the contribution to     PAC, which was made in the name of GEP, was actually funded not by GEP, but rather through a private loan from third parties to Igor Fruman and     having nothing to do with GEP, in violation of certain of the Subject Offenses. Specifically, from my review of financial records and emails obtained pursuant to the January 18 Warrant, I have learned the following:

    a. On or about on May 15, 2018, Igor and     obtained a $3 million commercial loan from     a businessman in Florida, and     an

---

[3] Based on my review of the materials obtained pursuant to the May 16 Warrant, I have learned that in May 2018, Parnas and     exchanged several text messages referencing the private lending transaction, including confirmation that the wire had been released, and that the documents would be emailed to

14

attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identified █████████ as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, █████████ lent the money to █████ █████████ (which is owned by Igor and █████████ ) and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by █████████ .

b. On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and █████ █████ was transferred from █████████ to a bank account in the name of █████ █████ (the "█████████ Account"), on which Parnas was a signer (but neither Igor nor █████ was). Prior to receiving that transfer, the █████████ Account generally had a low balance and minimal account activity. For instance, in January 2018, the █████ █████████ Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the █████████ Account two days prior, on or about May 17, 2018, Parnas, with █████████ assistance, wired $325,000 to █████████ PAC. As described above, Parnas told █████ to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c. On or about May 22, 2018, $100,000 was transferred from the █████████ Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the █████████ loan to █████ and Igor Fruman. The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the █████████ PAC in Parnas's name.

2017.08.02



d.    Additionally, Parnas's June 25, 2018 contribution to Representative          was paid for using an                          account held in the name of                          (registered signer,                          ), using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to                          PAC and Representative

e.    On or about May 3, 2018,                          assisted Parnas with making a $15,000 donation in GEP's name to          PAC. However, this donation does not appear to have come from GEP. Rather,                          used an                          card held in Igor Fruman's name, which drew on an account held in the name of "                          -                          ' — which appears to be a credit card account associated with Igor and                          business – to make the donation. On June 25, 2018,                          emailed a confirmation of the donation to who forwarded it to

19.    Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that          nd Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to          PAC was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

a.    GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with                          as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many of those

16

2017.08.02

entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[4]

20. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, Igor Fruman made a $2,700 contribution to Representative           – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that                         is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the                         contribution form stated that

---

[4] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and            , and asked for Parnas' approval. Corriea also emailed copies to            on the same date. According to the NDA, GEP and            wished to "explore a business possibility," and was signed by Fruman but not by            Based on my review of publicly available materials, it appears that            may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business with            or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.

17

contributions by individuals would be given in priority order to: ▮▮▮▮▮ Committee (up to $5,000), ▮▮▮▮▮ for Congress (up to $2,700), the ▮▮▮ (up to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor Fruman contributed $50,000 in March 2018 to ▮▮▮▮▮ his funds were used to make maximum contributions to the ▮▮▮ and ▮▮▮▮▮ Committee. When Parnas subsequently contributed $11,000 in June 2018 to ▮▮▮▮▮ those funds were used to make maximum contributions to ▮▮▮ ▮▮▮ Committee and ▮▮▮▮▮ for Congress, as well as a $3,300 contribution to ▮▮▮ Thus, it appears that by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum contributions to ▮▮▮▮▮ Committee and exceeded the contribution limit to the ▮▮▮

21. Based on my review of public sources and emails obtained pursuant to the January 18 Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up initially for the primary purpose of making a contribution. Specifically:

a. On or about July 17, 2018, the ▮▮▮▮▮ asked for comment on a story relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant wrote to Parnas and Correia, "This is what happens when you become visible. The buzzards descend." Parnas responded, "That's why we need to stay under the radar and have the best lawyers."

b. On or about July 23, 2018, ▮▮▮▮▮ published an article about LLC donations to ▮▮▮▮▮ which mentioned the contribution by GEP. The following day, on or about July 24, 2018, a reporter for ▮▮▮▮▮ emailed Parnas about GEP. Parnas did not respond,

18

and on or about July 25, 2018, published an article suggesting that GEP was a mere shell company used to make a contribution to the PAC. On the same day, the

filed a complaint with the FEC about the contribution.

c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the loan to .

d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the

PAC contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to for Congress "was made with a business

19

credit card . . . which [he] reimbursed." These statements to the FEC appear to be false. As set forth above, the ████████████ PAC contribution was made with funds from a third party private loan to an entity run by Igor and ████████████ that were moved through multiple bank accounts – none belonging to GEP – before being paid to ████████████ PAC by the ████

████████ Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and ████████████

████████████ account), the analyst found no evidence of reimbursement by Parnas to

████████ or ████████████ for the contributions to Congressman ████████

22. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.

23. Based on my review of financial records for a bank account held in the name of ████

████ at ████████ for which ████████████ s the authorized signatory (the ████

20

2017.08.02



Account"), I have learned that on September 19, 2018 – the day after the
▊ Account received a wire transfer from Muraviev in the amount of $500,000, as
discussed below – the ▊ Account was used to pay the ▊
▊ bill in the amount of $494,415.21. That bill included Igor Fruman's donations
to the ▊ Fund, ▊ PAC, ▊ for Congress, and Parnas' and
Igor Fruman's donations to ▊ among other donations.

24.     Based on the foregoing, it appears that the contributions to ▊ PAC
and Representative ▊ were funded by Igor Fruman and ▊ but were made in
the name of Parnas in violation of certain of the Subject Offenses. In addition, it appears that the
contributions made in the name of GEP to ▊ PAC and ▊ Inc. PAC were
unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation
of certain of the Subject Offenses.

## Unlawful Contributions by Fruman in a False Name

25.     It appears that Fruman made multiple contributions, using another person's name
and identity, in the name ▊ ' and listed an incorrect employer in order to disguise the
true donor of the contributed funds and potentially conceal assets from others, including creditors.
Specifically, based on my review of FEC records, financial records, emails obtained pursuant to
the January 18 Warrant, public sources, and my training and experience, I have learned the
following:

        a.     On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution
to ▊ PAC. The contribution was reported to the FEC as coming from ▊
▊ with his employer as " ▊ Corp." The funds from that contribution were
distributed to the ▊ Committee PAC, and ▊ House candidates.

21



b. On or about April 27, 2018, Fruman made a $100,000 contribution to the

PAC. The contribution was reported to the FEC as coming from

with his employer as " The funds were distributed to the

and the National Committee.

c. On or about June 12, 2018, Fruman made a $50,000 contribution to

PAC. The contribution was reported to the FEC as coming from ' with his

employer as " Corp." The funds were distributed to various House

candidates.

26. Based on my review of public sources, it appears that there is another individual –

who did not make the contribution – but who is named and works for

. Accordingly, it appears that Fruman may have made contributions in a variation of

his name, or in another person's name, to avoid contribution limits.

## Donations Funded by Muraviev

27. Parnas and Igor Fruman made additional contributions to state and federal

candidates in 2018 that were in fact funded by Andrey Muraviev, a Russian national. Specifically,

between September and October 2018, Muraviev wired Parnas and Fruman $1 million with the

understanding and expectation that those funds would be used to make donations to candidates

and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for

a planned business venture. Parnas, Fruman, Correia, and another business partner, Andrey

Kukushkin, worked with Muraviev to ensure that his money was used to make political donations

that the group believed would be beneficial to their cannabis business interests, without reporting

the true source of the funds, or that they were taking these actions in coordination with Muraviev,

a foreign principal.

22

28.     Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in the summer of 2018, Kukushkin, a U.S. citizen who resides in California, approached Correia and eventually Parnas and Fruman about engaging in a cannabis business that was ultimately funded by Kukushkin's partner, Muraviev.   Specifically, I have learned the following:

a.  In or about July 2018, Correia began discussing a cannabis business in San Francisco with Kukushkin.  In an email sent on or about July 22, 2018, Kukushkin complained to Correia about a number of local regulatory issues associated with his cannabis business, and over the next few days Correia and Kukushkin discussed collaborating on a cannabis business in the future.  On August 10, 2018, Correia and Kukushkin met in San Diego, California, and appear to have discussed a potential cannabis venture.

b.  On or about August 21, 2018, Correia relayed information regarding the business opportunity with Kukushkin to Parnas, writing in an email:

> Great opportunity with these guys since big Andre is funding.
> However, it is obvious I'm going to have to spend more time on this
> than originally planned. These guys are not smart-businessman and
> the one issue I'm dealing with, which began last night, is literally
> retarded. I think Andrey Kukushkin is a really good guy, but needs
> a lot of handholding on some very easy issues. This creates a great
> opportunity for us!....because they need this help, but, I'm not sure
> how to find enough time along with everything else we/I am doing
> if we're not getting paid some sort of consulting fee or salaries in
> the meantime. Let's discuss. We are going to make it happen no
> matter what, just trying to figure out the best structure.

c.  Based on my review of email correspondence obtained pursuant to the January 18 Warrant, and my participation in the investigation, I believe that Correia's reference to "big Andre" is to Andrey Muraviev, a business partner of Kukushkin's who would be "funding" the venture.

23

2017.08.02

d. On or about September 7, 2018, Parnas, Fruman, and Kukushkin attended a fundraiser in Las Vegas for who was at that time the attorney general of Nevada, and a candidate for governor in the state's November 2018 election. According to a subsequent email, the event was attended by Vice President and a minimum \$10,000 donation was required for attendance. In a subsequent email, promised, on behalf of the group, to "send [a] donation out in the next couple of days."

e. Parnas, Fruman, Muraviev, Kukushkin, and began communicating via WhatsApp in the days following the September 7, 2018, event regarding their scheme to use Muraviev's money to make political donations that they believed would benefit their cannabis business. Specifically, on or about September 9, 2018, Parnas created a WhatsApp text chain between himself, "Andrey Muravyev", Igor Fruman, Andrey Kukushkin, and [5] (the "Text Chain").[6] Parnas wrote: " Andrey, Igor, Kukhnya. Brothers, I just wanted to introduce you to each other, and if you can, get in touch with Andrey and Kuynya."

---

[5] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that beginning in approximately September 2016, David Correia and Lev Parnas began discussing a cannabis and medical marijuana business with prospective partners, including Based on my review of law enforcement records, I am aware that was born in Russia and is an American citizen. In May 2017, Correia, Parnas, and others met in Miami and discussed a plan to acquire a medical marijuana license in Florida and elsewhere. However, based on my review of email correspondence, it appears that this business venture did not come to fruition in 2017. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on July 25, 2018, sent Parnas an iMessage asking the name of a company "you mentioned when we talked about muraviev," which Parnas then provided. Parnas and exchanged several messages on September 8, 2018 in Russian, which I do not speak and which have not yet been translated, and then Parnas provided with his email address on or about September 11, 2018.

[6] The Text Chain is in English and Russian, the latter of which I do not speak. I have reviewed preliminary English-language translations of the Russian-language text messages in the Text Chain, and my summaries of those Russian-language text messages herein are based on those draft translations.

2017.08.02

responded by providing the ____ Number, and wrote, "Who should I call and at what number?" Parnas then told him to call Andrey, which appears to be a reference to Muraviev, and noted that Parnas would "send you his number and contact info momentarily."

  f. In the same Text Chain, on or about September 10, 2018, Igor Fruman sent the account details for the ____ Account, along with a photograph of ____ tax identification number.

  g. On or about September 12, 2018, Correia emailed Parnas a document entitled "Cannabis Schedule and budget," which listed a number of intended political donations across five states. The header of the document read "Schedule and Contribution Budget Cannabis Multi-State License Strategy." The document described an effort to "schedule trips to meet with" politicians and candidates in California, Nevada, Florida, New York, and New Jersey – all states with legalized medical or recreational cannabis – and make political donations in the multi-hundred thousand dollars to support those politicians. With respect to Nevada, the document noted that trips would be scheduled to meet with " ____ [sic] (AG/next Governor), ____ (LV Mayor), Clark County Officials and other relevant associates/agencies in Las Vegas, Reno and Lake Tahoe areas" and that the campaign contribution budget would be $250,000. With respect to Florida, the document noted that trips would be scheduled to meet with "Rep. ____ (next Gov)" among others, and that the campaign contribution budget would be between $250,000 and $500,000. In total, the document projected between $1.3 and $2 million in political contributions. The document also included a "funding schedule," which noted that $500,000 was "due by 9/12," an additional $500,000 was due by October 1, 2018, and that "remaining funds TBD." For the reasons set forth below, I believe that this funding was to come from Muraviev.

25

2017.08.02

h. On or about September 12, 2018, Correia forwarded the "Cannabis Schedule and Budget" document to Parnas by WhatsApp message, and Parnas replied "Perfect send to Igor." Later that day, Correia wrote "Praying for a good response from Andrey," likely referring to Muraviev. Correia subsequently wrote Parnas to ask for an in-person meeting, and noted that "I would love to be updated on things that we can't discuss over the phone."

i. Following their meeting in Las Vegas in September 2018, Kukushkin and Correia worked on behalf of the group to take some steps to formalize their business arrangement. Specifically, on or about September 14, 2018, Correia emailed Kukushkin documents relating to the incorporation of a new entity. On or about September 15, 2018, in a conversation about how to structure the new company, "NewCo," Kukushkin wrote "I believe whats left was for Igor and Lev to establish who is going to be shareholder(s) of the NewCo and could we all use LLC's as our proxy's in it. I am just trying to establish core structure and how transparent should Andrey be exposed for the benefits of NewCo Transparency, his Russian roots and current political paranoia about it." Based on my review of emails pursuant to the January 18 Warrant and my participation in the investigation, I believe that Kukushkin was responding to the corporate documents Correia had sent the day prior, and was noting the importance of concealing Muraviev's involvement in the corporation due to "his Russian roots and current political paranoia about it."

j. On or about October 1, 2018, Correia forwarded a document entitled " Bylaws" to Kukushkin, and asked him to "take a look." On October 2, 2018, Kukushkin executed the ' bylaws in an email confirmation to Correia. The by-laws provided that " ' would be incorporated in Nevada and that Kukushkin would be the president and treasurer, while Correia would be the secretary. Correia then forwarded the executed by-laws to Fruman and Parnas. Based on my participation in the investigation and my

26

review of emails obtained pursuant to the January 18 Warrant, I believe that the "       Bylaws" reflected the new corporation that Kukushkin and Correia (who were the only listed parties on the corporate documents) formed to represent the business venture between Kukushkin, Correia, Parnas, Fruman, and Muraviev.

k. In late September 2018, Parnas and Correia spoke about their plans with respect to Muraviev's money. Specifically, on or about September 30, 2019, Parnas and Correia spoke about the fact that Kukushkin was going to send signed corporate documents so Correia could open a bank account, and Correia updated Parnas regarding travel that Kukushkin wanted to book on his behalf. Correia closed by noting that "Then....Andrey M can wire the $500k...." Parnas replied and directed Correia not to use their credit cards to book Kukushkin's flight. Correia sent Parnas a proposed draft text message for Kukushkin, that read:

> Hey there buddy. I understand completely. However the new bank and the next $500k is different. The original funding was for charitable donations for political donations, prior to a company being opened. Our agreement was for $1M for 'startup' moneys. However, the next $500,000 is for the "operationa[l]" budget, which would include general company expenses, such as your travel. Therefore our bank account needs to be open tomorrow and a new wire for the remain[ing] $500k needs to be sent to accommodate such expenses."

Parnas responded, "Sounds good but confirm with Igor before you send it."[7]

29. Based on my review of financial records, I have learned the following about the manner in which the funds from Muraviev were laundered through the

Account which, as described above, was provided by Igor Fruman to the group on the Text Chain:

---

[7] Based on my review of public sources, I have learned that September 2018 was the deadline in Nevada for certain retail marijuana licenses. Nonetheless, it appears from my review of materials obtained pursuant to the May 16 Warrant that Parnas, Igor Fruman, Correia, Kukushkin, and Muraviev contemplated that their contributions and donations would aid them in changing Nevada's rules or getting them preferential access to new licenses.

27

2017.08.02

a.                      is the authorized signatory. On or about September 18, 2018, the

account received a $500,000 wire transfer from an account held in the name

of                      Ltd. at                      a Swiss bank, with the note "payment as

per the loan agreement d."[8] Based on my review of financial records and public sources, I have

learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a

Russian national.

b. The day before the $500,000 transfer from                      Ltd., the

account balance of the                      Account was $1,662.61.

c. The following day, on or about September 19, 2018, approximately $494,415 of

the funds in the                      Account – most if not all of which came from

– were used to pay an                      bill for a credit card in the name of

As discussed infra, based on my review of records from                      I have learned that the

credit card account was used to pay for a June 12, 2018 $50,000 contribution

to                      PAC in the name of "                      " referenced above, as well as a $15,000

contribution to the                      Fund, and a $5,400 contribution to                      for Congress,

all of which were also made in Igor Fruman's name. Muraviev thus appears to have funded each

of these donations. The remainder of the                      expenses paid by Muraviev's funding

were for travel and other personal expenses. Thus, it appears that while Parnas and Fruman did

use a portion of Muraviev's money to, as agreed, fund political donations and pay for travel that

---

[8] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned
that                      entered into a loan agreement with                      for the
amount of $500,000, which was set to be repaid by December 31, 2018. Based on my review of
available bank records for the                      account through May 2019, it does not appear
that this "loan" was ever repaid.

28

may be related to their venture, at least some portion of the funds appear to have been used for purposes other than what was discussed with Muraviev and Kukushkin.

30.     Based on my review of emails pursuant to the January 18 Warrant, I have learned that in early October 2018, Correia circulated several documents to Parnas and Igor Fruman that appeared to be more detailed versions of his prior "Cannabis Schedule and budget" described above, which set forth the precise candidates and campaigns that Muraviev's funds would be donated to. Specifically, I have learned the following:

        a. On October 8, 2018, Correia emailed Parnas and Igor Fruman a document entitled "State Campaign Contributions." In the cover email, Correia noted that the document was a draft, and that he would put it into a "final format" once "we go over these things." Correia also told Parnas and Fruman that they needed to discuss "which donations have been made" and "which are only committed." Specifically, I have learned the following with respect to the draft document:

        i.      The document contained a table of intended campaign contributions to support state and local candidates in New Jersey totaling $102,500; New York totaling $160,000; Florida totaling $390,000; Nevada totaling $225,000; California totaling $120,000; and Colorado totaling $110,000. The total sum of intended contributions was approximately $1.1 million, to support 25 separate candidates, who were both          and          .

        ii.     With respect to Nevada, the chart listed intended donations of $150,000 to support          and $75,000 to support          a candidate for state attorney general. With respect to Florida, the chart listed an intended donation of $250,000 to support with a note that it had been made or promised on October 3, 2018.

        iii.    Later on October 8, 2018, Correia sent a "final draft" of the same document to Parnas and Igor Fruman. Correia wrote "Gents, please see attached. If all good. Please forward

2017.08.02

on …." The document was entitled the "███ Contribution List" and the document's header read

████████████████  ████████, State Campaign Contributions."  Specifically, the document

reflected the following donations and commitments:

| Candidate | Office | Noted Commitment or Payment | Amount |
|---|---|---|---|
| | US. Senator (New Jersey) | Committed | $45,000 |
| | U.S. Rep. (New Jersey) | Paid | $50,000 |
| | U.S. Rep. (New Jersey) | Committed | $15,000 |
| | U.S. Rep. (New Jersey) | Committed | $20,000 |
| | U.S. Senate Candidate (New Jersey) | Committed | $15,000 |
| | U.S. Rep. Candidate (New Jersey) | Committed | $15,000 |
| | New Jersey Attorney General | Paid | $50,000 |
| | U.S. Senator (New York) | Paid | $35,000 |
| | U.S. Rep. (New York) | Committed | $20,000 |
| | U.S. Rep. (New York) | Committed | $50,000 |
| | U.S. Rep. (New York) | Committed | $15,000 |
| | New York Attorney General Candidate | Committed | $40,000 |
| | New York Attorney General Candidate | Paid | $30,000 |
| | New York Governor | Paid | $125,000 |
| | U.S. Rep. (Florida) | Paid | $15,000 |
| | Florida Attorney General Candidate | Committed | $75,000 |
| | Florida Governor Candidate | Committed | $250,000 |
| | U.S. Rep. (Florida) | Committed | $50,000 |
| | U.S. Senate Candidate (Florida) | Paid | $100,000 |
| | Nevada Governor Candidate | Committed | $200,000 |
| | Nevada Attorney General Candidate | Committed | $50,000 |
| | U.S. Senator (Nevada) | Paid | $40,000 |
| | California Attorney General Candidate | Committed | $40,000 |
| | California Governor Candidate | Committed | $80,000 |
| | U.S. Rep. (California) | Paid | $125,000 |
| | U.S. Rep. (Texas) | Paid | $150,000 |

2017.08.02

| | PAC | Committed | $250,000 |
| PAC | | | |

iv.      In total, the chart reflected that $720,000 contributions had been paid, and that $1,230,000 in commitments were outstanding, for a total projected amount of campaign contributions of $1,950,000. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and participation in the investigation, I believe that the "███Contribution List" was a more detailed accounting of the campaign contributions that Parnas, Igor Fruman, and Correia intended to make, including with Muraviev's funds. "███" is the name of the corporation that Correia and Kukushkin formed following their meeting in Las Vegas with Parnas, Igor Fruman, and Muraviev. Moreover, from my review of material obtained pursuant to the May 16 Warrant, I have learned that on or about October 9, 2018, Igor Fruman sent the ███Contribution List" that Correia had prepared to Muraviev and Kukushkin via WhatsApp.

31.      After receiving the ███Contribution list, Muraviev sent an additional $500,000 to Parnas and Igor Fruman (at ███████████ Account) in October 2018. Specifically, based on my review of financial records, I have learned the following:



a. On or about October 16, 2018, the ███████ Account received a $500,000 transfer from ██████████████, from an account at the ████ ████. Based on my review of public sources, it appears that ███ has the same registered director, secretary, and address as ███████ Cyprus. The day before the transfer, the account balance of the ███████ Account was $5,982.16. The same day that the ███ ███████ Account received the wire transfer from ████████, those funds were used to pay a $79,054 ████████ credit card bill at ████████ and nearly all of the remaining money was wired out to accounts controlled by Parnas and Igor Fruman.

31

2017.08.02

b. Based on my review of records from ▮▮▮▮▮▮▮▮ I have learned that the ▮ ▮▮▮▮ credit card account was used to pay for two donations on November 1, 2018, which were made in Igor Fruman's name: $10,000 to ▮▮▮▮ for Nevada, and $10,000 to ▮▮▮▮ – Candidate for Nevada Attorney General, which are discussed below. Thus, Muraviev's money appears to have funded these donations, both of which were on the ▮ Contribution List.

c. Based on my review of financial records, it appears that most of Muraviev's funds from the second wire transfer were not used for legitimate cannabis-related business expenses, but were instead used for personal expenses, other payments to consultants, and the donations to ▮ and ▮▮▮▮ In addition, based on my review of emails obtained pursuant to the January 18 Warrant, I believe that this is the second transfer contemplated by Correia's "Cannabis Schedule and budget" described above, which was circulated within days of the group's Las Vegas meeting, and contemplated that funding in the amount of $500,000 would be due on October 1, 2018.

32. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and public reporting, I have learned the following about the political activities and conversations of Parnas, Fruman, Kukushkin, Muraviev, and Correia after Muraviev made the second $500,000 wire transfer in October 2018:

a. On or about October 19, 2018, ▮▮▮▮ emailed ▮▮▮▮ at the ▮▮▮▮ National Committee, to confirm that Parnas, Igor Fruman, and Kukushkin would attend an October 20, 2018 campaign rally that featured ▮▮▮▮ and President Trump. ▮ ▮▮▮▮ wrote that, with respect to making a donation, "think the only problem we might run into is that our FEC lawyer has advised us not to make any contributions until this matter is resolved. But I will double check with both our lawyers and Lev to see how we should proceed."

32

Based on my participation in the investigation, I believe that            was referring to the FEC complaint filed against Fruman and Parnas, discussed above, related to the $325,000 donation from GEP to

b. On or about October 20, 2018, Kukushkin, Parnas, and Igor Fruman attended the campaign rally for          in Nevada.[9] Kukushkin, Parnas, and Fruman sent 10 photographs of themselves to Muraviev. The photographs depict, among other things, Kukushkin posing with

        a candidate for Nevada state attorney general; and Kukushkin with Parnas and Igor Fruman.

c. On or about October 22, 2018, a member of        staff emailed Parnas, and noted that "   asked [that] I reach out and send you his W9. I have also attached his contribution form."         emailed       staff member the next day because "Lev asked me to get in touch with you regarding donations," and subsequently coordinated the donation with the staff member over the next week.           confirmed that the donation had been made on November 1, 2018, in the amount of $10,000, in response to which        campaign staff asked if the donation was "just" the $10,000. Based on my review of emails obtained pursuant to the January 18 Warrant, including the    Contribution List," I believe that Parnas may have committed to donate $50,000 to       but only donated $10,000, which, as noted above, was funded by Muraviev.

33. Based on my review of the Text Chain, I have learned the following:

a. Following the October 20, 2018 rally, Kukushkin learned that their efforts to obtain retail licenses in Nevada were failing, including because the group had missed the September 20,

---

[9] Based on my review of the Text Chain, it appears that      eft the Text Chain on or about October 19, 2018, and thus did not receive any messages sent after that date.

2018 application deadline,[10] and he advocated taking additional steps to "change the rules" in order to benefit their business interests, which he noted would need the Governor's approval. As noted above, the group had donated to ██████████ a Nevada gubernatorial candidate.

b. Starting on or about October 30, 2018, it appears that Parnas, Igor Fruman, Kukushkin, and Muraviev had a disagreement with respect to the next steps for their business venture. Parnas complained in a text message that "It['s] very disturbing after all our talks and meetings that we are still nowhere in our understandings," and proposed "to stop this partnership and meet to discuss how we can move forward."

c. Muraviev responded in Russian. Based on my review of a draft translation of Muraviev's response, I have learned that Muraviev stated that "In Las Vegas we agreed on principals of our cooperation and share in future enterprise, as well as a movement strategy. It was decided that I will provide $1 million for our future enterprise (500 Nevada, California and 500 New York, New Jersey). As of today, I fulfilled all my obligations completely! Then we're supposed to work on obtaining licenses at these states. If our company is registered, then we have to move to the part two, filing the applications. Yesterday Igor told me that 2 more millions needed for other states. It was not in our agreement! And if conditions change, then I have no objections against termination of our partnership. I plan to be at the USA after November 15, ready for meetings." Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Muraveiv's reference to "$1 million

---

[10] Based on my review of Nevada law and information published by Nevada's Marijuana Enforcement Division, I have learned that Nevada law permits the Nevada Department of Taxation (the "DOT") to allocate recreational retail marijuana licenses. The DOT only accepts applications for recreational retail licenses during limited time periods. On July 5, 2018, the DOT announced that it would accept applications during September 7, 2018, and September 20, 2018, for a limited number of recreational retail licenses. The DOT has not held a subsequent application period since that time, and has not announced whether any additional licensing periods will open.

34

for our future enterprise" referred to his payment of $1 million to fund donations to politicians in five states, as set forth in Correia's "Cannabis Schedule and budget" described above. In addition, because by this time Muraviev had already transferred $1 million to Parnas and Igor Fruman, he confirmed that "I fulfilled all my obligations completely!" However, the revised version of Correia's donation document, the "☐ Contribution" list, added additional states and donations which totaled more than $2 million. This change appears to have been conveyed to Muraviev by Igor Fruman ("Yesterday Igor told me 2 more millions needed"), which led Muraviev to dispute that the additional amount for the other states was "not in our agreement."

d. In response, Parnas wrote, "I don't want to discuss everything over text when we met in vegas I agree I also thought we are [on] the same page and yes you sent what discussed for part one the 2 mm that Igor spoke with you was a suggestion not a deal changer. We did very thing we are supposed to do with part 1 but we never started part 2 – office and personal to do the work. Now as far as deal changing it is your partner that told me a different deal than we discussed I wanted to send this text when I was in vegas but Igor talked me into waiting til he spoke with you."

e. Kukushin replied to the Text Chain that, "I believe we all have a clarity from day 1 and precise course of action. We have performed everything that we have agreed upon on our end. The Nevada company has been formed, the operating agreement signed and bank account opened. *Money transferred by Andrey M to Global Energy was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing.* I haven't changed any rules of our engagement and was present at all the scheduled meetings with officials in Nevada." (emphasis added). Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Kukushkin was referring to the

35

fact that they had formed ██ signed an operating agreement, and opened a bank account as they had agreed. Kukushkin's reference to Muraviev's money being intended to "support the very specific people & states (per Igor's table)" was a reference to the specific donations intended in the five states set forth in Correia's "Cannabis Schedule and budget" described above, which Correia forwarded to Parnas, which appears to have ultimately been provided to Igor Fruman and/or Kukushkin and Muraviev.

f. On or about October 31, 2018, Igor Fruman wrote, "Just a reminder what they told in Las Vegas in Kunya's presence: They give us right and possibility to become as ██ and ██ for this town and state!!!!!!!!" Based on my participation in the investigation, I believe that Igor Fruman was referring to what "they," possibly Nevada politicians or candidates, told Fruman and Kukushkin in Las Vegas, namely that they could be as rich as ██ and ██ wealthy casino magnates from Las Vegas.

g. Later on October 31, 2018, Muraviev replied in Russian (which has since been translated): "Good morning, everybody! If the question is opening of the office in Vegas, then I suggest taking careful, business-like approach to it. Particularly, we need to define goals, get the employees and give them clear-cut tasks. In my opinion, organizing office and spending 100K a month, as Igor suggests, is not practical at the current stage of company development. I just don't see goals [y]et! If we need an office in NY, then we have to understand what for. . . . After receiving first licenses, we can organize central business office. That's how it usually works! And it seems that we agreed on it."

h. A few days later, Parnas and Kukushkin had a further disagreement about an intended donation to ██ As noted above, while a $10,000 donation had already been made, the group had planned to donate more to ██ On or about November 4, 2018, Parnas

36

wrote, "Kunya make sure you get ▇▇▇▇▇▇ the 12,500 !!! I was very embarrassed just now they said they never received the check from ▇▇. I don't understand?"[11]

    i. Kukushkin replied, "Excuse me ?! *Leva, the money where wired to Global Energy in order to cover all the donations whatsoever.* What does it have to do with ▇▇? You are the ones issuing them the checks NOT me or Andrey. You should be embarrassed bringing it up after all." (emphasis added). Parnas wrote back, "Are you fuckin crazy What are you talking about you when to meet him and the VP and pledged 12,500 from ▇▇. I don't want to play these games You are going to get everybody in trouble." Kukushkin replied, "From us – not ▇▇▇▇ ▇▇▇▇ doesn't do any business in Vegas." Based on my training, experience, and participation in this investigation, I believe that this dispute centered around whether the money that Muraviev had already wired was intended to cover this donation to ▇▇▇▇

    j. Parnas wrote, " Your fuckin sick [y]ou don't remember what you say to people[, t]his is the governor and attorney general[, h]e came up to me and asked about the group he met ▇▇ and why they still don't send a check[.] I'm not going to argue with you[, y]ou can talk to Igor." Kukushkin clarified, "We were supposed to tell him that the check(s) from Global are indeed the donations from us." Parnas wrote back, "This is crazy and stupid shit I'm done." Kukushkin replied, "You supposed to tell them, not me!"

    34.    Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas, Fruman, and Correia ceased their business relationship with Kukushkin and Muraviev in or about November 2018. Specifically, in a memorandum drafted by Correia to Parnas dated November 17, 2018, Correia outlined problems with respect to the proposed cannabis

---

[11] From my involvement in this investigation, I have learned that '▇▇▇▇' is the name of one of Kukushkin's cannabis businesses, which is based in San Francisco.

2017.08.02

business with Kukushkin, including that Kukushkin's existing cannabis ventures were poorly managed. In addition, based on my review of bank records, it does not appear that Parnas or Fruman ever returned or repaid Muraviev his $1 million.

**B. Probable Cause Justifying Search of the Subject Premises Described in Attachment A.**

35. There is probable cause to believe that the Subject Premises described in Attachment A, and the electronic devices and closed containers therein, contain evidence, fruits, and instrumentalities of the Subject Offenses, as listed in Attachment B.

36. Based on my review of emails obtained pursuant to the January 18 Warrant, including emails sent by the                                    building to Igor Fruman, I have learned that Igor Fruman has resided at the Subject Premises since at least in or about January 2016, if not earlier. Based on my review of financial records, FEC records, and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of the Subject Offenses. Specifically:

a. Based on my review of emails obtained pursuant to the January 18 Warrant, and FEC contribution records, I have learned that Igor Fruman provided the address for the Subject Premises in connection with political contributions he made and fundraising events he attended, including an                      event. Accordingly, there is probable cause to believe that the Subject Premises contain evidence of political contributions.

b. Based on my review of financial records, I have learned that Fruman used the Subject Premises as the registered address on his American Express credit card, which as described above, was used in furtherance of the Subject Offenses to make contributions. Based on my training and experience, I have learned that financial institutions often send records relating to

38

credit card accounts to a signer's physical address. Accordingly, there is probable cause to believe that the Subject Premises contain financial records related to the Subject Offenses.

c. As described above, in order to make the ▓▓▓▓▓▓▓▓▓ contribution, Igor Furman and ▓▓▓▓▓▓▓ obtained funds through a private lending transaction, which was secured by a mortgage on real property, which is the Subject Premises. Accordingly, the Subject Premises is likely to contain evidence of that transaction, the use of the funds from that transaction, and movement of funds for purposes of making contributions in the name of GEP.

d. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that from time to time, Igor Fruman uses the address for the Subject Premises in financial and business documents relating to ▓▓▓▓▓▓▓▓▓ As noted above, bank and credit card accounts in the name of ▓▓▓▓▓▓▓ were used to make political contributions in violation of the campaign finance laws, and to receive overseas funds from Muraviev. Accordingly, there is probable cause to believe that the Subject Premises will contain evidence relating to ▓▓▓▓▓▓▓ ▓▓▓ its operations, and the use of its bank accounts in furtherance of the Subject Offenses.

e. As described above, Igor Fruman used email and text messages, including encrypted messaging platforms, to communicate with his co-conspirators about the commission of the Subject Offenses. Based on my training and experience, and my review of public sources, I have learned that emails, text messages, encrypted messages, and electronic documents can be stored on cellphones, tablets, computers, and memory devices. I have also learned from telephone records that Igor Fruman has a cellphone that he uses to send messages related to the Subject Offenses. That cellphone is assigned the number ▓▓▓▓▓▓. Based on my training and experience, I have also learned that individuals regularly keep electronic devices – including computers, memory storage devices, cellphones, and tablets – in their homes or on their persons.

39

2017.08.02

Indeed, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears based on the time emails are sent (i.e., early or late in the day) Igor Fruman regularly operates electronic devices to make send messages or create documents from his home. Accordingly, there is probable cause to believe that the Subject Premises will contain electronic devices containing evidence, fruits, and instrumentalities of the Subject Offenses.

37.     Based on my training and experience, I know that individuals who engage in campaign finance-related offenses commonly use computers and cellphones to communicate with co-conspirators, keep financial ledgers, keep ledgers of contributions, keep track of politicians' contact information, and retain relevant documents or agreement. As a result, they often store data on their computers related to their illegal activity, which can include logs of online or cellphone-based "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; bank account numbers; and/or records of uses of funds.

38.     Based on my training and experience, I also know that, where computers and cellphones are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

2017.08.02

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

39.     Based on the foregoing, I respectfully submit there is probable cause to believe that Igor Fruman, among others, engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises, and on computers and electronic media found in the Subject Premises. In particular, there is probable cause to believe that the Subject Premises will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, as more fully described in Section II of Attachments A and B to the proposed warrant, including the following:

a.   Evidence necessary to establish the occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, and keys.

b.   Passwords or other information needed to access user's online accounts or electronic devices that may be encrypted.

c.   Evidence relating to the creation, incorporation, or operation of GEP, or other LLCs or closely held corporations used to make political contributions.

d.   Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

e.   Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

f.   Evidence relating to the funding of bank accounts held in the name of GEP.

2017.08.02

g. Evidence relating to political contributions made by Igor Fruman, Parnas, Correia, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by █████████ Igor Fruman and Parnas.

h. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by █████████, Igor Fruman and Parnas.

i. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman, █████████ Correia, or Parnas, or on which those individuals are listed as a signatory.

j. Evidence of other bank accounts or entities related to GEP, Parnas, █████████ or Igor Fruman including emails reflecting registration of other accounts potentially containing relevant evidence.

k. Evidence relating to the planning, creation, or operation of a marijuana or cannabis business, such as the incorporation of businesses, the opening of bank accounts, lobbying, licensing, and funding of the business.

l. Evidence relating to any agreements or communications with Muraviev or Kukushkin.

m. Evidence relating to contributions made in the name of █████████."

n. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

o. Evidence relating to contributions to any federal, state, or local candidate, or any political action committee, such as to █████████ PAC, █████████ PAC, █████

2017.08.02



PAC, the ▮▮▮ Fund, ▮▮▮ for Congress, ▮▮▮ for Congress, the ▮▮▮ Fund, ▮▮▮ or ▮▮▮

p. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

q. Any documents or communications referencing or relating to communications and/or filings with the FEC or FEC rules, regulations, and laws.

r. Evidence of knowledge of the campaign finance laws, such as knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

s. Evidence of the transfer of funds from outside the United States to bank accounts within the United States.

## IV. Procedures for Searching ESI

### A. Execution of Warrant for ESI

40. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

43

2017.08.02

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

### B.  Review of ESI

41.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

42.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[12]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

43.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

**C.  Return of ESI**

44.    If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

---

[12] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

2017.08.02

## V. Conclusion and Ancillary Provisions

45. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachments A and B to this affidavit and to the Search and Seizure Warrant.

46. In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Sworn to before me on October 9, 2019

HON. WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida
By
Deputy Clerk
Date 10/10/2019

46

2017.08.02

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The premises to be searched ("Subject Premises") is described as follows, and include all locked and closed containers, and all electronic devices, found therein: Subject Premises is a condominium bearing number ███ located in the ███████████████ at ███████ ███ Sunny Isles Beach, Florida. The exterior of the ███████████████████ in which Subject Premises is located, is pictured below:



## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), 18 U.S.C. § 1519 (fabrication of documents), and 18 U.S.C. § 1956 (international promotion money laundering) (the "Subject Offenses") described as follows. The material covered by this warrant, to the extent it can be dated, is for the period October 1, 2016, through the present.

1. Evidence necessary to establish the occupancy or ownership of the Subject Premises, such as utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, and keys.

2. Passwords or other information needed to access user's online accounts or electronic devices that may be encrypted.

3. Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other LLCs or closely held corporations used to make political contributions.

4. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

5. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

6. Evidence relating to the funding of bank accounts held in the name of GEP.

7. Evidence relating to political contributions made by Igor Fruman, Lev Parnas, David Correia, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by               Igor Fruman and Parnas.

8. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by               Igor Fruman and Parnas.

9. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman,               Correia, or Parnas, or on which those individuals are listed as a signatory.

2

10.     Evidence of other bank accounts or entities related to GEP, Parnas
or Igor Fruman including emails reflecting registration of other accounts potentially containing
relevant evidence.

11.     Evidence relating to the planning, creation, or operation of a marijuana or cannabis
business, such as the incorporation of businesses, the opening of bank accounts, lobbying,
licensing, and funding of the business.

12.     Evidence relating to any agreements or communications with Andrey Muraviev or
Andrey Kukushkin.

13.     Evidence relating to contributions made in the name of "                            "

14.     Evidence relating to communications with or regarding political candidates,
campaigns, political action committees, political consultants, or political contributions.

15.     Evidence relating to contributions to any federal, state, or local candidate, or any
political action committee, such as                            PAC,                            PAC,
            PAC, the                            Fund,                    for Congress,                            for
Congress, the                            Fund,                or

16.     Evidence of intent to make unlawful political contributions or violate the campaign
finance laws.

17.     Any documents or communications referencing or relating to communications
and/or filings with the FEC or FEC rules, regulations, and laws.

18.     Evidence of knowledge of the campaign finance laws, such as knowledge of the
prohibition of making contributions in the name of another person, and knowledge of the
prohibition on contributions by foreign nationals.

19.     Evidence of the transfer of funds from outside the United States to bank accounts
within the United States.

## A. Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and
storage media that may contain any electronically stored information falling within the categories
set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop
computers, cellphones (including the cellphone registered with number                    ), disk
drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and
scanners. In lieu of seizing any such computer devices or storage media, this warrant also
authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

3

2017.08.02

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## B.  Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

4

**ATTACHMENT TO AGENT AFFDIAVIT**

(Indictment)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

                                      **SEALED INDICTMENT**

UNITED STATES OF AMERICA         :

                                       19 Cr.

      - v. -               :

LEV PARNAS,                  :
IGOR FRUMAN,
DAVID CORREIA, and          :
ANDREY KUKUSHKIN,

                              :

         Defendants.       19 CRIM 725

- - - - - - - - - - - - - - - - - x

The Grand Jury charges:

## INTRODUCTION

1.     Through its election laws, Congress prohibits
foreign nationals from making contributions, donations, and
certain expenditures in connection with federal, State, and local
elections, and prohibits anyone from making contributions in the
name of another.   Congress further requires public reporting
through the Federal Election Commission (the "FEC") of the sources
and amounts of contributions and expenditures made in connection
with federal elections.  A purpose of these laws, taken together,
is to protect the United States electoral system from illegal
foreign financial influence, and to further inform all candidates,
their campaign committees, federal regulators, and the public of
(i) the true sources of contributions to candidates for federal

office; and (ii) any effort by foreign nationals to influence federal, State, or local elections with foreign money.

2.    LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, conspired to circumvent the federal laws against foreign influence by engaging in a scheme to funnel foreign money to candidates for federal and State office so that the defendants could buy potential influence with candidates, campaigns, and the candidates' governments.    The defendants concealed the scheme from the candidates, campaigns, federal regulators, and the public by entering into secret agreements, laundering foreign money through bank accounts in the names of limited liability corporations, and through the use of straw donors (also known as "conduits" or "straw contributors") who purported to make legal campaign contributions in their own names, rather than in the name of the true source of the funds.

3.    LEV PARNAS and IGOR FRUMAN, the defendants, made additional contributions to federal candidates, joint fundraising committees, and independent expenditure committees that either (i) were intentionally funneled through, and made in the name of, a limited liability corporation to conceal that PARNAS and FRUMAN were the true source of contributions and skirt the federal reporting requirements; or (ii) were reported in PARNAS's name but were funded by FRUMAN, which allowed FRUMAN to exceed limits on

contributions to candidates or committees to whom he had previously contributed.  The defendants further concealed this aspect of the conspiracy by, among other things, making and causing others to make false statements to the FEC.

THE CAMPAIGN FINANCE LAWS

4.    The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Section 30101, *et seq.*, (the "Election Act"), prohibits certain financial influences on the election of candidates for federal office.

5.    To prevent the influence of foreign nationals on elections, the Election Act prohibits foreign nationals, directly or indirectly, from making any contributions or donations in connection with federal, State, or local elections.  Additionally, to limit the influence that any one person could have on the outcome of a federal election, the Election Act establishes limits on the amounts that even United States citizens or lawful permanent residents can contribute to a federal candidate and the candidate's authorized committee, including joint fundraising committees, which are committees established for the purpose of fundraising for multiple committees at the same time.

6.    To prevent individuals from circumventing the Election Act, and to enable the detection of attempts to circumvent the Act, the Election Act also prohibits a person from making a

3

political contribution in the name of another in connection with any federal election, including, for example, by giving funds to a straw donor for the purpose of having the straw donor pass the funds on to a federal candidate or to a candidate's federal campaign committee or joint fundraising committee as a donation from the straw donor, rather than in the name of the true source of the money. The Election Act also prohibits contributing in the name of another to an independent expenditure committee spending to influence the outcome of that federal campaign.

7. The FEC is an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, in part by requiring candidates, joint fundraising committees, and independent expenditure committees to file regular reports of the sources and amounts of the contributions they receive. To deter abuses of the Election Act and instill public confidence in the election process against corruption and the appearance of corruption, the Election Act requires the FEC to publish the reports that it receives so that all of the candidates, the entire public, and law enforcement may all see the specific information about the amounts and sources of political contributions and expenditures involving federal candidates and registered political committees.

4

RELEVANT INDIVIDUALS AND ENTITIES

8.   LEV PARNAS, the defendant, is a businessman and United States citizen who was born in Ukraine.

9.   IGOR FRUMAN, the defendant, is a businessman and United States citizen who was born in Belarus.

10.   DAVID CORREIA, the defendant, is a businessman and United States citizen who was born in the United States.

11.   ANDREY KUKUSHKIN, the defendant, is a businessman and United States citizen who was born in Ukraine.

12.   Foreign National-1 is a foreign national Russian citizen and businessman who, at all relevant times, was not a citizen or lawful permanent resident of the United States.

THE STRAW DONOR SCHEME

13.   Beginning in or about March 2018, LEV PARNAS and IGOR FRUMAN, the defendants, began attending political fundraising events in connection with federal elections and making substantial contributions to candidates, joint fundraising committees, and independent expenditure committees with the purpose of enhancing their influence in political circles and gaining access to politicians. PARNAS and FRUMAN, who had no significant prior history of political donations, sought to advance their personal financial interests and the political interests of at least one Ukrainian government official with whom they were working. In

order to conceal from third parties, including creditors, their sources of funding and capital, PARNAS and FRUMAN created a limited liability corporation, Global Energy Producers ("GEP"), and then intentionally caused certain large contributions to be reported in the name of GEP instead of in their own names.

14. Specifically, in or about May 2018, to obtain access to exclusive political events and gain influence with politicians, LEV PARNAS and IGOR FRUMAN, the defendants, made a $325,000 contribution to an independent expenditure committee ("Committee-1") and a $15,000 contribution to a second independent expenditure committee ("Committee-2"). Despite the fact that the FEC forms for these contributions required PARNAS and FRUMAN to disclose the true donor of the funds, they falsely reported that the contributions came from GEP, a purported liquefied natural gas ("LNG") import-export business that was incorporated by FRUMAN and PARNAS around the time the contributions were made.

15. In truth and in fact, the donations to Committee-1 and Committee-2 did not come from GEP funds. Rather, the funds came from a private lending transaction between FRUMAN and third parties, and never passed through a GEP account. Indeed, PARNAS and FRUMAN incorporated GEP at and around the time of the contributions to Committee-1 and Committee-2, and deliberately made the contributions in GEP's name, in order to evade the

6

reporting requirements under the Election Act and to conceal that they were the true source of the contributions. At that time, GEP had not engaged in the LNG business, and had no income or significant assets.

16. LEV PARNAS and IGOR FRUMAN, the defendants, intentionally reported that the contributions came from GEP to hide from creditors the fact that they had access to funding, and to conceal from the public and the FEC their involvement in making these contributions. Indeed, when media reports about the GEP contributions first surfaced, an individual working with PARNAS remarked, "[t]his is what happens when you become visible ... the buzzards descend," to which PARNAS responded, "[t]hat's why we need to stay under the radar..."

17. In addition to the contributions made and falsely reported in the name of GEP, LEV PARNAS and IGOR FRUMAN, the defendants, caused illegal contributions to be made in PARNAS's name that, in fact, were funded by FRUMAN, in order to evade federal contribution limits. Much as with the contributions described above, these contributions were made for the purpose of gaining influence with politicians so as to advance their own personal financial interests and the political interests of Ukrainian government officials, including at least one Ukrainian government official with whom they were working. For example, in

7

or about May and June 2018, PARNAS and FRUMAN committed to raise $20,000 or more for a then-sitting U.S. Congressman ("Congressman-1"), who had also been the beneficiary of approximately $3 million in independent expenditures by Committee-1 during the 2018 election cycle. PARNAS and FRUMAN had met Congressman-1 at an event sponsored by an independent expenditure committee to which FRUMAN had recently made a substantial contribution.[1] During the 2018 election cycle, Congressman-1 had been the beneficiary of approximately $3 million in independent expenditures by Committee-1. At and around the same time PARNAS and FRUMAN committed to raising those funds for Congressman-1, PARNAS met with Congressman-1 and sought Congressman-1's assistance in causing the U.S. Government to remove or recall the then-U.S. Ambassador to Ukraine (the "Ambassador"). PARNAS's efforts to remove the Ambassador were conducted, at least in part, at the request of one or more Ukrainian government officials. Moreover, in an effort to reach their contribution commitment to Congressman-1 and further their political goals, in or about June 2018, after FRUMAN had already made a maximum $2,700 contribution to Congressman-1,

---

[1] In fact, the contribution — and several other significant contributions made at and around the same time — was made in the name of ▮▮▮▮▮▮▮▮ " not IGOR FRUMAN, the defendant, in a further effort to conceal the source of the funds and to evade federal reporting requirements.

8

FRUMAN paid for another maximum $2,700 contribution to Congressman-1 that was made and reported in PARNAS's name.

18. Similarly, in or about June 2018, to fulfill a financial commitment to gain access to an exclusive political event, LEV PARNAS and IGOR FRUMAN, the defendants, made an $11,000 contribution in PARNAS's name to a joint fundraising committee ("Committee-3") that was actually funded by FRUMAN. As a result of that contribution and a prior contribution FRUMAN had made to Committee-3 in his own name, FRUMAN made contributions in excess of legal contribution limits.

19. Moreover, and to further conceal the true source of the funds used to make certain of the donations described above, in or about October 2018, LEV PARNAS and IGOR FRUMAN, the defendants, submitted materially false sworn affidavits to the FEC. Specifically, and in response to a complaint filed with the FEC regarding the $325,000 contribution to Committee-1 described in paragraph 14, above, and the $2,700 donation to Congressman-1 made in the name of PARNAS, described in paragraph 17, above, PARNAS and FRUMAN made the following false statements, in substance and in part:

a. That "a $325,000 contribution to [Committee-1] . . . was made with GEP funds for GEP purposes," when in truth and in fact, the contribution was made with funds from a private

lending transaction for the purposes described in paragraph 17, above.

b. That "GEP is a real business enterprise funded with substantial bona fide capital investment; its major purpose is energy trading, not political activity," when in truth and in fact, GEP had no existing business, was not funded with bona fide capital investment, and was not engaged in energy trading, as described in paragraph 15, above.

c. That a contribution made by PARNAS on or about June 25, 2018 to [Congressman-1] "was made with a business credit card . . . which [PARNAS] reimbursed," when in truth and in fact, PARNAS did not reimburse FRUMAN or any other individual for that contribution.

THE FOREIGN NATIONAL DONOR SCHEME

20. From in or about June 2018 through April 2019, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, and others known and unknown, conspired to make political donations — funded by Foreign National-1 — to politicians and candidates for federal and State office to gain influence with candidates as to policies that would benefit a future business venture. Moreover, and to conceal the true source of the contributions and donations funded by Foreign National-1, PARNAS, FRUMAN, CORREIA, and KUKUSHKIN caused the contributions and

donations to be made in the defendants' names rather than in the name of Foreign National-1.

21. Beginning in or around July 2018, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, made plans to form a recreational marijuana business that would be funded by Foreign National-1 and required gaining access to retail marijuana licenses in particular States, including Nevada (the "Business Venture"). In early September 2018, PARNAS, FRUMAN, CORREIA, KUKUSHKIN, and Foreign National-1 met in Las Vegas, Nevada to discuss the Business Venture. While in Las Vegas, PARNAS, FRUMAN, and KUKUSHKIN also attended a political fundraiser for a State candidate in Nevada ("Candidate-1"). Shortly after that meeting, PARNAS, FRUMAN, CORREIA, and KUKUSHKIN began to formalize the Business Venture with Foreign National-1 and fund their lobbying efforts, but took steps to hide Foreign National-1's involvement in the Business Venture, including any political contributions associated with the Business Venture, due to, in KUKUSHKIN's words, "his Russian roots and current political paranoia about it."

22. To further the Business Venture, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, planned to use Foreign National-1 as a source of funding for donations and contributions to State and federal candidates and

11

politicians in Nevada, New York, and other States to facilitate acquisitions of retail marijuana licenses. In or about September and October 2018, CORREIA drafted a table of political donations and contributions, which was subsequently circulated to the defendants and Foreign National-1. The table described a "multi-state license strategy" to further the Business Venture. The table contemplated approximately between $1 and $2 million in political contributions to federal and State political committees. The table also included a "funding" schedule of two $500,000 transfers. Foreign National-1 then arranged for two $500,000 wires on or about September 18, 2018 and October 16, 2018 to be sent from overseas accounts to a U.S. corporate bank account controlled by FRUMAN and another individual (the "FRUMAN Account").

23. LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, then used those funds transferred by Foreign National-1, in part, to attempt to gain influence and the appearance of influence with politicians and candidates. For example, on or about October 20, 2018, PARNAS, FRUMAN, and KUKUSHKIN attended a campaign rally for Candidate-1 in Nevada, at which a different Nevada State candidate was present ("Candidate-2"), and sent photographs of themselves posing with Candidate-2 to Foreign National-1. Following that event, on or about November

1, 2018, a donation in the amount of $10,000 was made to Candidate-2 in FRUMAN's name, but it was funded with funds from Foreign National-1.  On or about November 1, 2018, a donation in the amount of $10,000 was made to Candidate-1 in FRUMAN's name, but it was funded with funds from Foreign National-1.

24.    Notwithstanding the purported purpose of Business Venture-1 and the donations described above, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, did not timely apply for a recreational marijuana license in September 2018, the then-deadline for such applications in Nevada.  On or about October 25, 2018, KUKUSHKIN told Foreign National-1, as well as LEV PARNAS and IGOR FRUMAN, the defendants, that they were "2 months too late to the game unless we change the rules," and noted that they needed a particular Nevada State official, the position for which Candidate-1 was running, to "green light to implement this."  As noted above, FRUMAN made a $10,000 donation, funded by Foreign National-1, to Candidate-1 on or about November 1, 2018.  On or about November 4, 2018, PARNAS asked KUKUSHKIN to arrange for additional funding from Foreign National-1 to make an additional donation to Candidate-1, to which KUKUSHKIN responded that the $1 million Foreign National-1 had already provided to GEP was "in order to cover all the donations whatsoever."

13

25.  Moreover,  subsequent  communications  between Foreign National-1, and ANDREY KUKUSHKIN, LEV PARNAS, IGOR FRUMAN, and DAVID CORREIA, the defendants, confirm the defendants' use of foreign funds — and, in particular, funds from Foreign National-1 — to make the donations described above.  For example, on or about October 30, 2018, Foreign National-1 wrote to PARNAS, FRUMAN, and KUKUSHKIN that he had "fulfilled all my obligations completely," including "500 [for] Nevada" in order to "work on obtaining licenses [in] these states."  KUKUSHKIN similarly noted in response that "Money transferred by [Foreign National-1] to [GEP] was to support the very specific people & states (per [FRUMAN's] table) in order to obtain green light for licensing.  I haven't changed any rules of our engagement and was present at all the scheduled meetings with officials in Nevada."  Although PARNAS, FRUMAN, CORREIA, and Foreign National-1 continued to meet into the spring of 2019, the Business Venture did not come to fruition.

## COUNT ONE
### (Conspiracy)

26.  From in or about March 2018 through at least in or about November 2018, in the Southern District of New York and elsewhere, LEV PARNAS and IGOR FRUMAN, the defendants, knowingly conspired with each other and with others known and unknown to:

a. Knowingly  defraud  the  United  States  by impairing, obstructing, and defeating the lawful functions of a

14

department or agency of the United States; to wit, the FEC's function to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to straw donors.

b. Knowingly and willfully make contributions to candidates for federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Section 30122 and 30109(a)(1)(A).

27. In furtherance of the conspiracy and to effect the illegal objects thereof, LEV PARNAS and IGOR FRUMAN, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about March 2018, PARNAS committed to making a $125,000 contribution to Committee-3 to attend a fundraising event in the Southern District of New York.

b. In or about May 2018, FRUMAN, and others known and unknown, obtained a private loan, the proceeds of which were used to fund the contribution made in the name of GEP to Committee-1.

c. In or about May 2018, FRUMAN and PARNAS, and others known and unknown, transferred the proceeds of FRUMAN's

15

private loan through multiple bank accounts – none of which were in the name of GEP – to conceal the true source of the funds before they were paid to Committee-1.

d. In or about May 2018, PARNAS caused a $325,000 contribution to Committee-1 to be falsely reported in the name of GEP.

e. In or about June 2018, PARNAS made an $11,000 contribution to Committee-3 using funds that belonged to FRUMAN and another individual.

f. In or about June 2018, PARNAS used a business credit card registered to a credit card account, with a registered address in the Southern District of New York, belonging to FRUMAN and another individual in order to make a maximum $2,700 contribution to Congressman-1's reelection campaign.

(Title 18, United States Code, Section 371, and Title 52, United States Code, Sections 30122 and 30109(d)(1)(A) & (D))

## COUNT TWO
### (False Statements to the FEC)

The Grand Jury further charges:

28. The Grand Jury incorporates the allegations contained in paragraphs 1 through 19 of this Indictment as though fully set forth herein.

29. In or about October 2018, in the Southern District of New York and elsewhere, LEV PARNAS and IGOR FRUMAN, the

16

defendants, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, PARNAS and FRUMAN made the materially false statements in their affidavits submitted to the FEC, described in paragraph 19 above, that "a $325,000 contribution to [Committee-1] . . . was made with GEP funds for GEP purposes;" that "GEP is a real business enterprise funded with substantial bona fide capital investment; its major purpose is energy trading, not political activity"; and that a contribution made by PARNAS on or about June 25, 2018 to Congressman-1's campaign for reelection "was made with a business credit card . . . which [PARNAS] reimbursed."

(Title 18, United States Code, Sections 1001(a)(2) and 2)

## COUNT THREE
### (Falsification of Records)

The Grand Jury further charges:

30. The Grand Jury incorporates the allegations contained in paragraphs 1 through 19 of this Indictment as though fully set forth herein.

31. In or about October 2018, in the Southern District of New York and elsewhere, LEV PARNAS and IGOR FRUMAN, the defendants, willfully and knowingly did falsify and make a false entry in a record and document with the intent to impede, obstruct,

17

or influence the investigation or proper administration of a matter within the jurisdiction of any department or agency of the United States, and in relation to and in contemplation of any such matter, to wit, PARNAS and FRUMAN made the materially false statements in affidavits submitted to the FEC, described in paragraph 19 above, including that "a $325,000 contribution to [Committee-1] . . . was made with GEP funds for GEP purposes;" that "GEP is a real business enterprise funded with substantial bona fide capital investment; its major purpose is energy trading, not political activity"; and that a contribution made by PARNAS on or about June 25, 2018 to Congressman-1's campaign for reelection "was made with a business credit card . . . which [PARNAS] reimbursed," with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the FEC.

(Title 18, United States Code, Sections 1519 and 2)

## COUNT FOUR
(Conspiracy)

The Grand Jury further charges:

32. The Grand Jury incorporates the allegations contained in paragraphs 1 through 12 and 20 through 25 of this Indictment as though fully set forth herein.

33. From in or about June 2018 through at least in or about April 2019, in the Southern District of New York and elsewhere, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY

18

KUKUSHKIN, the defendants, and others known and unknown, knowingly conspired with each other and with others known and unknown to:

a. Knowingly defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States; to wit, the FEC's function to administer federal law concerning source and amount restrictions in federal and State elections, including the prohibitions applicable to foreign nationals and straw donors.

b. Knowingly and willfully make contributions and donations of money, or express or implied promises to make contributions or donations, directly and indirectly, by a foreign national in connection with federal and State elections, aggregating to \$25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121 and 30109(a)(1)(A).

c. Knowingly and willfully make contributions to candidates for State and federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to \$25,000 and more in a calendar year, in violation of Title 52, United States Code, Section 30122 and 30109(a)(1)(A)(D).

34. In furtherance of the conspiracy and to effect its illegal object, LEV PARNAS, IGOR FRUMAN, DAVID CORREIA, and ANDREY KUKUSHKIN, the defendants, and others known and unknown, committed

19

the following overt acts, among others, in the Southern District
of New York and elsewhere:

a. On or about September 18, 2018, Foreign
National-1 wired $500,000 from a foreign bank account, through the
Southern District of New York, to the defendants for purposes of
making political contributions and donations.

b. On or about October 16, 2018, Foreign
National-1 wired $500,000 from a foreign bank account, through the
Southern District of New York, to the defendants for purposes of
making political contributions and donations.

c. On or about November 1, 2018, the defendants
used funds wired by Foreign National-1 to make maximum donations
to two political candidates for State office in Nevada.

(Title 18, United States Code, Section 371, and Title 52,
United States Code, Sections 30121, 30122 and 30109(d)(1)(A))

GEOFFREY S. BERMAN
United States Attorney

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LEV PARNAS,
IGOR FRUMAN,
DAVID CORREIA, and
ANDREY KUKUSHKIN,

Defendants.

## SEALED INDICTMENT

19 Cr.

Title 18, United States Code,
Sections 371, 1001(a)(2), 1519, and
2 and Title 52, United States Code,
Sections 30121, 30122 and
30109(d)(1)(A) & (D)).

GEOFFREY S. BERMAN
United States Attorney



A TRUE BILL

AO 93 (Rev. 11/13) Search and Seizure Warrant

Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk

Date _10/16/2019_

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.   19-8415-WM
The Premises located under ▮▮▮▮▮▮ )
▮▮▮▮ Sunny Isles Beach (as further described in )
Attachment A) )

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the    Southern    District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

the Premises located under ▮▮▮▮▮▮▮ Sunny Isles Beach (as further described in Attachment A).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before    October 23, 2019    *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____ Duty U.S. Magistrate Judge _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    *Oct. 9, 2019*

9:19 pm

City and state:    West Palm Beach, Florida

_____
*Judge's signature*

William Matthewman, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   19-8415-WM | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____                          _____
                                                                                 *Executing officer's signature*

                                                                         _____
                                                                                  *Printed name and title*

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The premises to be searched ("Subject Premises") is described as follows, and include all locked and closed containers, and all electronic devices, found therein: Subject Premises is a condominium bearing number         located in the
         Sunny Isles Beach, Florida. The exterior of the                                              , in which Subject Premises is located, is pictured below:



## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), 18 U.S.C. § 1519 (fabrication of documents), and 18 U.S.C. § 1956 (international promotion money laundering) (the "Subject Offenses") described as follows. The material covered by this warrant, to the extent it can be dated, is for the period October 1, 2016, through the present.

1. Evidence necessary to establish the occupancy or ownership of the Subject Premises, such as utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, and keys.

2. Passwords or other information needed to access user's online accounts or electronic devices that may be encrypted.

3. Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other LLCs or closely held corporations used to make political contributions.

4. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

5. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

6. Evidence relating to the funding of bank accounts held in the name of GEP.

7. Evidence relating to political contributions made by Igor Fruman, Lev Parnas, David Correia, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by ⬛⬛⬛ Igor Fruman and Parnas.

8. Evidence relating to the source of the funds used to make any political contributions by Igor Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by ⬛⬛⬛ Igor Fruman and Parnas.

9. Evidence relating to the sources of the funds deposited into bank accounts held by Igor Fruman⬛⬛⬛, Correia, or Parnas, or on which those individuals are listed as a signatory.

2

10.     Evidence of other bank accounts or entities related to GEP, Parnas, ▮▮▮▮▮▮▮ or Igor Fruman including emails reflecting registration of other accounts potentially containing relevant evidence.

11.     Evidence relating to the planning, creation, or operation of a marijuana or cannabis business, such as the incorporation of businesses, the opening of bank accounts, lobbying, licensing, and funding of the business.

12.     Evidence relating to any agreements or communications with Andrey Muraviev or Andrey Kukushkin.

13.     Evidence relating to contributions made in the name of "▮▮▮▮▮▮▮"

14.     Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

15.     Evidence relating to contributions to any federal, state, or local candidate, or any political action committee, such as ▮▮▮ PAC, ▮▮▮ PAC, ▮▮▮ PAC, the ▮▮▮ Fund, ▮▮▮ for Congress, ▮▮▮ for Congress, the ▮▮▮ Fund, ▮▮ or ▮▮▮

16.     Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

17.     Any documents or communications referencing or relating to communications and/or filings with the FEC or FEC rules, regulations, and laws.

18.     Evidence of knowledge of the campaign finance laws, such as knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

19.     Evidence of the transfer of funds from outside the United States to bank accounts within the United States.

## A. Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, cellphones (including the cellphone registered with number ▮▮▮▮), disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

3

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**B.  Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

2017.08.02

FD-597 (Rev. 4-13-2015)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▮▮▮▮▮▮▮▮

On (date) 10|10|19          item (s) listed below were:
☑ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name) ▮▮▮▮▮▮▮▮

(Street Address) ▮▮▮▮▮▮▮▮

(City) Sunny Isles Beach, FL 33160

Description of Item (s): - Political Affiliation Documents
- United Global First Land Rover Satellite Phone
- Apple, iPad -Model A1584  serial ▮▮▮▮
- 8GB Transcend Thumbdrive
- Portfolio with letter
- Portfolio with hand written notes
- receipts from purchases
- receipts from purchases
- Building access card
- ATM Sim Card
- Igor Furman business cards for Global Energy Producers
- Receipts from Chase and bestbuy
- 32 MB Panasonic SD Card
- 2.0 GB Sandisk SD Card
- Various business cards
- Vertu cellular phone
- Business documents and bank records
- bank documents
- Various Documents

Received By: ▮▮▮▮▮▮                    Received From: ▮▮▮▮▮▮

Printed Name/Title: ▮▮▮▮▮▮              Printed Name/Title: ▮▮▮▮▮▮

FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date) _10/10/19_        item (s) listed below were:
☑ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name) _____

(Street Address) _____

(City) _Sunny  Isla  Beach, FL  33160_

Description of Item (s): _- Google  Home  FCC I D:_ ▮▮▮
_- container  of  DVDs_
_- Documents  in  foreign  language_
_- American  Express  bill_
_- Documents  in  foreign  language  and  passports_

**Received By:** ▮▮▮          **Received From:** ▮▮▮

**Printed Name/Title:** ▮▮▮          **Printed Name/Title:** ▮▮▮