bank account at this time. Further, based on my discussions with the CEO, I understand he is not aware of Parnas contributing any money—much less $300,000—to Fraud Guarantee at or around this time.

d. On or about December 9, 2015, Victim-1 asked Correia for an update regarding, among other things, Fraud Guarantee's effort to reach a deal with an insurance carrier—a necessary prerequisite for the company to offer its insurance product—and Fraud Guarantee's effort to obtain a multimillion-dollar grant from the Consumer Financial Protection Bureau ("CFPB"). Correia responded that, with respect to the insurance carrier, he was "finalizing all of the information they need to move to a final agreement," which was a "tedious process and can take another couple of weeks"; and with respect to the grant application: "We should have first draft of application for the CFPB by tomorrow afternoon and most likely will submit final application by Monday of next week. We already have one of three congressman on board ▆▆ (▆) from Mississippi. We should have ▆▆▆▆ (▆) from New York and senator ▆▆▆ (▆) from Alabama on board by Monday the latest. . . . Assuming all goes well, and everything is pointing that way, we could receive funding as early as early February."

e. On or about December 30, 2015, Victim-1 emailed Parnas to confirm that he received his wire payment, and Parnas confirmed. Based on my review of financial records, I have learned that Victim-1 continued to wire money to the ▆▆ Account in installments from in or about January 2016 to in or about May 2016, noting that each wire constituted a partial repayment of a "loan" to satisfy his investment into Fraud Guarantee. Financial records further reflect that after these funds were wired into the ▆▆ Account, Parnas used them for predominantly personal purposes, such as restaurants, hotels, and retail stores; and also transferred approximately $5,500

12.06.2018

to Correia's wife. Records do not reflect that any of the funds were used for the purposes set forth in the Business Plan that had been sent to Victim-1. *See supra* ¶ 12(a)(vii).

      f. On or about March 18, 2016, Correia, copying Parnas, emailed Victim-1 and attached documentation providing that (i) Victim-1's agreement with Fraud Guarantee, pursuant to which he received 1.5% equity in exchange for $300,000, would be terminated, and (ii) in its place, Victim-1 would enter into a transaction directly with Parnas, pursuant to which the same $300,000 would result in Victim-1 receiving 3% equity in the company. It does not appear that this transaction served any legitimate business purpose, apart from providing a *post hoc* justification for the fact that Victim-1 had wired his "investment" to Parnas directly (via the ████ Account). Furthermore, by structuring the transaction as a direct equity sale between Parnas and Victim-1, the contract no longer contained representations regarding how the funds would be used by Fraud Guarantee. As noted below, Parnas and Correia used the same structure with subsequent victim "investors."

      g. On or about March 21, 2016, Parnas exchanged emails with a new potential investor (Victim-2), in which Parnas and Victim-2 agreed, in sum, that Parnas would provide Victim-2's entity with a 2.5% equity stake in Fraud Guarantee in exchange for the equivalent of $250,000— comprised of $115,000 plus a 2009 Nissan GTR, a 2014 Toyota Tacoma, and a 2004 Jeep Wrangler. On or about two days later, Victim-2 emailed Correia to confirm that "Lev [Parnas] has received payment." On or about six days later, Correia, copying Parnas, sent Victim-2 certain Fraud Guarantee corporate documents, one of which reflected that Parnas, as a member of Fraud Guarantee, had a "capital account" of $570,000. However, based on my review of financial records, I have identified no evidence of Parnas contributing $570,000 to Fraud Guarantee, nor

any evidence that Fraud Guarantee had any non-*de minimis* assets at this time. Indeed, as noted above, it does not appear that Fraud Guarantee had even opened a bank account by this point.

      h. On or about April 19, 2016, Correia, copying Parnas, sent Victim-2 a signed agreement finalizing the deal for Parnas to sell a 2.5% equity stake in Fraud Guarantee in exchange for $250,000 from Victim-2. This email attached another copy of the Fraud Guarantee Operating Agreement, reflecting that Parnas had a "capital account" of $570,000.

      i. Based on my review of financial records, I have learned that Victim-2's entity transferred funds to an account in the name of Parnas and his wife in multiple installments between in or about January 2016 and in or about June 2016, noting each time that the funds were to be used to purchase equity in Fraud Guarantee. Financial records further reflect that Parnas and his wife used these funds for predominantly personal purposes, including withdrawing thousands of dollars in cash and transferring thousands of dollars to Correia's wife.

      j. On or about May 4, 2016, Fraud Guarantee's CEO emailed Parnas and Correia regarding his employment agreement. The CEO had been hired as of September 15, 2015, pursuant to an agreement which entitled him to an annual salary of $250,000, paid bi-monthly. Emails and other documents reflect that, since that time, the CEO had worked on various Fraud Guarantee projects. In this email to Parnas and Correia, the CEO complained that he was owed $180,958.20 in back wages, and provided certain options for him to be paid "[u]pon receipt of any funding."

      k. Also on or about the same day, the CEO, copying Correia, contacted a bank in regard to opening an account for Fraud Guarantee. On or about May 26, 2016, the CEO informed Parnas and Correia that the account had been opened and would "provide us with all of our required banking needs now and as we grow." Based on my discussions with the CEO, I have learned that

18

although he assumed that Fraud Guarantee must have had a bank account prior to that point, he never saw any evidence of it.

l.   On or about October 10, 2016, Correia, copying Parnas, emailed a new potential investor (Victim-3) attaching a proposed agreement whereby Parnas would sell 300,000 units of Fraud Guarantee—representing "3% of the outstanding membership interests of the [c]ompany"— to Victim 3, in exchange for $300,000.  Correia, copying Parnas, also sent Victim-3 various Fraud Guarantee corporate documents, including the company's "Business Plan."  This version of the Business Plan was largely the same as the one previously sent to Victim-1—including making essentially the same apparently false and baseless representations regarding Parnas, Correia, and the company (*see supra* ¶¶ 12(a)(ii) – (ix))—except that it no longer stated that the $292,305 "Original Seed Capital Budget" was "already accomplished."

m.   On or about the next day, Victim-3 (through his agent) asked Correia to identify the "active members of the LLC (names and percentages), as well as the current value of the LLC, if any."  In response, Correia wrote that Victim-3 "is buying in at a $10M valuation."  Correia also attached the Fraud Guarantee Operating Agreement, noting that it "shows the members and number of units owned."  In a follow-up email, Correia told Victim-3 that although the "Cap Table of the operating agreement [states] that the capital contributions for all member are only $100," "[t]his was done simply to create a cost basis going into this new entity" since "[w]e were previously in a different entity and migrated into what is now Fraud Guarantee Holdings, LLC. There was 'significant' investment from all parties in order to take ownership. Is equated to several millions of dollars invested."  Based on my discussions with the CEO, I understand that although Parnas told him that he (Parnas) had invested "millions" in Fraud Guarantee, the CEO never saw

any evidence of such funds, and indeed, saw no evidence of a Fraud Guarantee bank account until he opened one in May 2016.

n. On or about October 14, 2016, Victim-3 returned the signed agreement, and wired $300,000 to the ▮▮▮ Account pursuant to Parnas's and Correia's directions.[1] Financial records reflect that after these funds were received by the ▮▮▮ Account, Parnas used them for predominantly personal purposes, including transferring approximately $160,000 to an account in his and his wife's name (of which $25,000 was transferred to Correia's wife), withdrawing approximately $19,000 in cash, and spending thousands of dollars on restaurants and retail stores.

o. On or about November 12, 2016, Correia, copying Parnas, emailed a new potential investor ("Intended Victim-1"), attaching a proposed agreement "for the transaction you are executing." The proposed agreement provided for Intended Victim-1 to pay $1 million to Parnas (via the ▮▮▮ Account) in exchange for 1,000,000 units of Fraud Guarantee, "represent[ing] 10% of the outstanding membership interests of the [c]ompany." Correia, copying Parnas, also sent Intended Victim-1 various Fraud Guarantee documents, including the Business Plan—which, as noted above, contained multiple apparently false and baseless representations and projections about the company (*see supra* ¶¶ 12(a)(ii) – (ix)).

p. Intended Victim-1 ultimately decided not to invest in Fraud Guarantee. On or about February 11, 2017, Intended Victim-1 forwarded Victim-3 an email from Correia (copying Parnas)

---

[1] In prior search warrant affidavits, the FBI asserted that there was probable cause to believe that Victim-3's $300,000 payment was intended by Victim-3 to cover the cost of Parnas's and Correia's donations to ▮▮▮ PAC. *See, e.g.*, 19 Mag. 7594; 19 Mag. 8274. However, as set forth herein, Victim-3, having now spoken with Victim-3 and reviewed documents produced by him, Victim-3 has indicated that he had no knowledge his funds would be used to cover the cost of any political donation and there is thus probable cause to believe that Victim-3 was defrauded as part of the scheme described herein and did not intend for his investment to cover the cost of any political donations.

12.06.2018

in which they purported to "cancel[]" the purchase agreement. Intended Victim-1 said to Victim-3, "He called me about fraud GUARANTEE and went ballistic . . . . Evidently he thought I was still giving him a million bucks. He said I can't believe you signed the papers and he made a big change in his company to help me get 10% of his business like he was doing me a great favor. He said he had to convince the board and all that bullshit to get me those shares. He basically forced me to sign on my plane because he told me it had to be done by a certain date and I told him I never invest in anything unless I ve[]t it. Obviously he didn't get that part."

q.   On or about February 24, 2017, the CEO—who, as noted above, had emailed Parnas and Correia in or about May 2016 regarding back-owed wages of $180,958.20 (*see supra* ¶ 12(j))—emailed Parnas and Correia to follow up concerning his "continued, defaulted employment / equity agreement." The CEO stated that he was now owed $404,494.80 in "unpaid salary and benefits starting from my hiring date – September 15, 2015 to present."

r.   On or about June 6, 2017, Victim-3's counsel transmitted a letter to Parnas, Correia, and the CEO (the "Demand Letter"), in which he stated that "[s]ince his investment last year, [Victim-3] has not received any of the information required by [certain sections of Fraud Guarantee's Operating Agreement], nor has he received any of the information required by [certain provisions of Delaware law]," and demanded certain specific information. On or about June 13, 2017, Correia sent the CEO draft responses to the Demand Letter. In this draft response, Correia wrote, among other things, that Fraud Guarantee Holdings, LLC "was created as a holding company in February 2016" and that prior Fraud Guarantee entities "were combined into this new holding company, and thus, the members of those entities" became members of the new entity; and that "[s]ignificant dollars were invested into the previous entities." It does not appear that this draft was sent back to Victim-3's counsel.

s.  In or about mid-June 2017, the CEO—having still not been paid for the work he had done since September 2015—separated from Fraud Guarantee.

t.  In or about September 2017, the CEO emailed Correia regarding a $140 fee owed by Fraud Guarantee to its bank, which had gone unpaid since June 2017.

u.  On or about September 7, 2017, Correia emailed Victim-1 to request that he "extend [Correia] another $4,500." On or about November 6, 2017, Correia emailed Victim-1 to provide him with an update on Fraud Guarantee and to request "a new loan for $12,000," for a total loan of $18,500, which Correia promised to repay with interest "by January 15th, the latest." Correia stated that such a loan would "relieve one of the 'business' concerns that you and I both have had regarding my ability to concentrate fully on Fraud Guarantee. This loan would get me through the next couple months with less stress and time I can devote to getting [an] agreement finalized with the [insurance] carriers." During this time period, Correia also forwarded Victim-1 various correspondence that Correia was apparently having with certain potential insurance carrier partners. On or about February 6, 2018, Correia emailed Victim-1 to request an additional $3,500 loan. Correia stated, "I know the company isn't profitable yet, but, EVEN IF, it takes longer to get the insurance company approval, I am going to move forward with the monitoring product which will be instant revenue and very successful. I just spoke to a family office association and they want to promote it to their entire client base of over 20,000 f[amily] offices as soon as it's ready. I could do this in 90 days at the most. . . . [T]his will be very profitable." On or about May 2, 2018, Correia emailed Victim-1 to request "another small loan ($8500?)." In connection with these various personal loans, Correia agreed to "share with [Victim-1] the proceeds that [Correia] receive[s] from distributions or the sale of .7% of [his] stock, once [he] receive such funds in [his] personal bank account."

12.06.2018

v.  In or about late July and early August 2018, Correia informed Victim-1 and Victim-3 that Fraud Guarantee was in discussions with Rudolph Giuliani and his firm, ████████████, to enter into some form of business partnership.

w.  On or about September 3, 2018, Correia emailed a new potential investor (Victim-4) with the subject line, "Per Lev Parnas": "It was a pleasure meeting you a few weeks ago in New York and I look forward to seeing you again soon.  I wanted to congratulate you on joining our team at Fraud Guarantee. . . ."  About a week later, Correia emailed Victim-4 to "reach out as we never did connect.  We will be finalizing this raise and wanted to reach out to see if you are still interested in participating."

x.  On or about September 12, 2018, Correia, copying Parnas, emailed a Fraud Guarantee update to Victim-3 and others.  The update stated, among other things, that (i) "we are . . . at the final stages of a viable product," (ii) "we are finalizing a policy with A-rated insurance carriers (via our ████████████ partners) that will cover our company through a rather traditional E&O (errors and omissions) insurance policy" and "expect to receive final policy language and pricing, within the next few weeks," (iii) "[w]e have had numerous meetings with Rudy [Giuliani] and his team over the past few months and are in the process of finalizing an agreement with them"; ████████████ will provide Fraud Guarantee with a "road map and structure to proactively prevent . . . compliance issues and to properly respond to any inquiries as to our practices," and will "also help open doors to larger institutional clients by working in a business development capacity"; and "Rudy Giuliani is willing to put his name and reputation on the line, personally helping to bring future clients to the table," and (iv) Fraud Guarantee needs to raise an additional "approximately $5 million to successfully launch our company into the market," including to pay "$1-$2M in consulting fees for the first year" to ████████████; and that current

23

members (including Victim-1) were being offered a "first-right-of-refusal on allocations for this raise."

       y.  Following this update, Victim-3 did not learn of any work being performed by Rudolph Giuliani or ████████████ in relation to Fraud Guarantee. Nor did Victim-3 learn of Fraud Guarantee entering into any deal with an insurance carrier, bringing any product to market, or otherwise engaging in any business operations.

       z.  On or about September 19, 2018, Victim-4 transferred $250,000 to ████████ ████ pursuant to a Note Purchase Agreement with Fraud Guarantee, which provided that Victim-4 was being provided with promissory notes that could convert into Fraud Guarantee equity. Victim-4 understood that this money was covering part of the cost of Fraud Guarantee's contract with ████████████. On or about October 5, 2018, Victim-4 transferred another $250,000 to ████████████, apparently after Parnas led him to believe that a different potential investor had withdrawn his pledge.

       aa.  Subsequent to investing in Fraud Guarantee, Victim-4 did not learn of any work being performed by Rudolph Giuliani or ████████████ in relation to Fraud Guarantee. Nor did Victim-4 learn of Fraud Guarantee otherwise engaging in any business operations.[2]

13. Based on my review of materials obtained pursuant to search warrants, in particular search warrants on the iCloud accounts of Parnas, Fruman, and others, which revealed electronic

---

[2] According to an October 31, 2019 report in ████████████████—which cited "interviews with former business partners, investors and associates of Messrs. Parnas and Correia, as well as company emails, corporate documents and court records"—"[s]ince its inception in 2013, a Florida firm called Fraud Guarantee has attracted no identifiable customers, generated zero returns for investors and—according to Florida court records—defaulted on its office lease years ago after falling behind on rent."

communications between Parnas and Giuliani (among others),[3] I have learned, in substance and in part, that after ▊▊▊▊▊▊ was paid $500,000, ostensibly to retain ▊▊▊▊▊▊ consulting services for Fraud Guarantee, it appears that Giuliani principally worked to assist Parnas in his ongoing effort to remove ▊▊▊▊▊▊ the then-U.S. Ambassador to Ukraine, from her post. These facts are described at length in the affidavit attached hereto as Exhibit 1 and incorporated by reference herein. *See* Exhibit 1 ¶¶ 44-57.

14. As noted above, Fraud Guarantee's website indicates that the company remains active today. Based on my discussions with the victim-investors and/or their counsel, and the CEO, and my review of documents and financial records, I have learned that, to date, none of the victim-investors has recouped their investments, and that the CEO had not been paid the back-wages he is owed; and that Fraud Guarantee still has no viable products or customers. Further, as reflected in Exhibit 1, Giuliani's work in conjunction with Parnas to remove Ambassador ▊▊▊▊▊▊ continued at least through May 2019.

## B. Probable Cause Regarding the Subject Accounts

15. Based on the information set forth above, I believe there is probable cause to believe that Parnas, Correia, and others known and unknown engaged in the Subject Offenses by, among other things, inducing and conspiring to induce multiple victims to invest in Fraud Guarantee based on materially false representations about the company, its leadership, and its business partners and prospects. Furthermore, based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses.

---

[3] *See* search warrants and accompanying affidavits marked 19 Mag. 4784 (May 16, 2019); 19 Mag. 9832 (October 21, 2019) (attached hereto as Exhibit 1 and incorporated by reference herein);

12.06.2018

16. In particular, the Subject Accounts were used to carry out this fraudulent scheme as Parnas used Subject Account-1 and Correia used Subject Account-2 to engage in communications with each other and with actual and potential victims and business partners in furtherance of the scheme.    With respect to Correia, he used Subject Account-2 for virtually all of the communications with Victim-1, Victim-2, Victim-3, Victim-4, Intended Victim-1, and the CEO described above, including multiple communications with each of the actual or potential investors in which Correia transmitted apparently false and baseless representations about the company and its finances, leadership, and relationship with Giuliani and ▮▮▮▮▮▮▮

17. With respect to Parnas, he appears to have alternated between using Subject Account-1 and a Yahoo account in conjunction with Fraud Guarantee. Among other things, as described above, Parnas used Subject Account-1 to communicate with (i) Victim-1, including on the email in which Victim-1 was sent the Fraud Guarantee loan agreement and the email in which Parnas and Correia determined to cancel that agreement and replace it with an alternative arrangement; (ii) Victim-2, including on the emails in which Victim-2 was sent the Fraud Guarantee purchase agreement and the Operating Agreement reflecting a $570,000 "capital account" held by Parnas; (iii) Victim-3, including on the email in which Victim-3 was sent the Fraud Guarantee Business Plan containing various apparently false and baseless representations and projections about the company; (iv) Intended Victim-1, including on emails soliciting his investment and sending him the Business Plan; and (v) the CEO, including on emails regarding the CEO's work for Fraud Guarantee and his demand to be paid for back-owed wages.

18. Accordingly, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications with actual or potential investors; communications between Parnas and Correia reflecting the business plans and

26

operations (if any) of the company; communications with outside parties, such as insurance companies or consultants like ███████████ that would shed light on the nature of the company's plans and operations (if any) and/or the scope of the fraudulent scheme or true purpose of the money obtained from investors; and communications with or regarding Giuliani or █████ ████, which would reveal whether Giuliani was, in fact, performing services for Fraud Guarantee in exchange for the $500,000 payment to his firm.

19. Furthermore, based on my training and experience, and consistent with the pattern of communications reflected in Exhibit 1, I know that individuals who communicate via text or WhatsApp typically also communicate about the same subjects via email.

20. Additionally, based on my training and experience, email accounts like the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses often contain records of that activity, including email correspondence, address books with contact information for co-conspirators, and documents saved as email attachments or to Google Docs or Google Drive folders.

21. Additionally, based on my training and experience, and my participation in this investigation, it appears that Parnas and Correia had various meetings with actual or potential investors in Fraud Guarantee and with Giuliani, and that evidence in the Subject Accounts will corroborate the existence of such meetings. Specifically, location data, IP transaction records, and calendar entries may contain evidence to establish the location of Parnas, Correia, or others at relevant dates set forth above. Furthermore, device information, and cookie data for linked accounts, may contain evidence of other email accounts or electronic devices that could contain evidence of the Subject Offenses, including correspondence with co-conspirators or location information to corroborate the existence of meetings. Indeed, from my participation in this

27

investigation, I have learned that the individuals involved in the commission of the Subject Offenses have used multiple email or iCloud accounts, and/or multiple cellphones, to communicate with co-conspirators.

22. Temporal Limitation. This application is limited to all content created, sent, or received on or after September 1, 2013, which is shortly before Fraud Guarantee was registered in Delaware, to the present.

**C. Evidence, Fruits and Instrumentalities**

23. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

24. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence relating to, including communications with, Rudolph Giuliani, ████████ ████ and any actual or potential investors, members, or partners of Fraud Guarantee;

b. Evidence relating to Fraud Guarantee's plans, finances, assets, and operations, or lack thereof, including any corporate books and records;

c. Evidence relating to Fraud Guarantee's actual or prospective business relationships, including but not limited to business relationships with any insurance carriers;

d. Evidence relating to false and fraudulent representations made to potential or actual investors, including drafts of any corporate documents and related materials;

e. Evidence relating to Fraud Guarantee's members, officers, directors, investors, partners, employees, agents, consultants, affiliates, subsidiaries, and associates.

28

12.06.2018

f.  Evidence relating to the nature and extent of Rudolph Giuliani's and ██████ ██████ work on behalf of Parnas, Correia, and/or Fraud Guarantee, or lack thereof, including any evidence of Giuliani's efforts to assist in the removal of Ambassador ██████ and whether or not such efforts benefited Fraud Guarantee;

g.  Evidence relating to any efforts by Parnas, Correia, their family members, or others associated with Fraud Guarantee in receiving, transferring, withdrawing, or otherwise using any monetary funds or instruments;

h.  Evidence relating to the use of monetary funds or instruments paid to Fraud Guarantee, Parnas, or Correia to make political contributions;

i.  Evidence of meetings between Parnas, Correia, Giuliani, and any actual or potential investors in Fraud Guarantee, including but not limited to travel records, and location and IP records;

j.  Evidence of the existence of email accounts, iCloud accounts, or electronic devices used by Parnas, Correia or others associated with Fraud Guarantee to communicate with actual or potential investors, or co-conspirators;

k.  Passwords or other information needed to access user's online accounts.

**III.    Review of the Information Obtained Pursuant to the Warrant**

25. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

29

12.06.2018

under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

26. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV.    Request for Non-Disclosure and Sealing Order

27. While Parnas, Correia, and others have been publicly indicted with respect to separate charges, and there has been some public reporting about the existence of an investigation into the removal of Ambassador ███████, the scope and focus of this aspect of the criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert criminal targets to the scope and focus of the investigation, causing them to destroy evidence, tamper with witnesses, or otherwise seriously jeopardize the

12.06.2018