conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. Prior Warrants and Subject Device

3. On or about January 18, 2019, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant"), criminal number 19 Mag. 729, for email accounts belonging to Lev Parnas, Igor Fruman, David Correia, and ▇▇▇▇▇▇▇▇, among others.

4. On or about October 17, 2019, the USAO sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant, criminal number 19 Mag. 7595, for the January 18 Warrant returns.[1]

5. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant"), criminal number 19 Mag. 4784, for the following iCloud accounts:[2]

---

[1] On August 14, 2019, the USAO and FBI sought a warrant from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, to conduct an expanded search of the January 18 Warrant returns. Judge Pitman reviewed and approved the application, and both the affiant and Judge Pitman signed the affidavit in support of the application for a warrant, which was assigned docket number 19 Mag. 7595. However, at present, the Government is unable to locate a copy of the search warrant, which, to the extent it was presented to Judge Pitman, was not retained. Accordingly, on October 17, 2019, the USAO presented the signed copy of the 19 Mag. 7595 application to Judge Oetken, who, that same day, issued a new warrant authorizing the seizure of the same materials sought in the August 14 application. Moreover, no material identified herein was seized pursuant to the August 14 application. All of the material discussed herein that is attributed to the January 18 Warrant was seized and identified pursuant to that original judicial authorization.

[2] Based on my review of the iCloud account returns obtained pursuant to the May 16 Warrant, which is still ongoing, I understand that Parnas stored relevant text messages (including iMessages sent from an iPhone) and photos, among other materials, on Subject Account-1; that Parnas stored

3

| iCloud Account | Owner | Referred To As |
|---|---|---|
| ■■■ | Lev Parnas | Subject Account-1 |
| ■■■ | Lev Parnas | Subject Account-2 |
| ■■■ | Igor Fruman | Subject Account-3 |
| ■■■ | ■■■ | Subject Account-4 (collectively, the "Subject Accounts") |

6. With respect to the May 16 Warrant, Judge Aaron directed Apple to provide content and other information for the iCloud accounts in the chart below to search for evidence of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), and 18 U.S.C. § 1956 (money laundering) (together, the "May 16 Warrant Subject Offenses").

7. The Subject Device is particularly described as a hard drive in the possession of the FBI which contains the results of the May 16 Warrant for the Subject Accounts. Apple provided the content and information responsive to the May 16 Warrant electronically, which was downloaded by the FBI onto the Subject Device. As detailed herein, by this application, the

---

relevant text messages (including iMessages sent from an iPhone), WhatsApp messages, and photos on Subject Account-2, and that Fruman stored relevant documents on Subject Account-3. While my review of Subject Account-4 has not yet begun, based on my review of materials obtained pursuant to the May 16 Warrant for Subject Account-2, I have learned that ■■■ used the phone associated with Subject Account-4 to exchange relevant messages and emails with Parnas regarding the Subject Offenses. Thus, for the reasons discussed herein, there is probable cause to believe that evidence of the Subject Offenses, in addition to evidence of the May 16 Warrant Offenses, will be found on the Subject Accounts.

4

Government seeks authorization to expand the scope of its search of the iCloud accounts contained on the Subject Device.[3]

8. On October 9, 2019, a grand jury sitting in the United States Attorney's Office for the Southern District of New York returned an indictment charging (i) Lev Parnas and Igor Fruman with conspiring to make unlawful straw donations, making and willfully causing false statements to be made to the FEC, and fabricating documents to impede, obstruct, and influence the proper administration of a matter within the FEC's jurisdiction, in violation of 52 U.S.C. §§ 30122 and 18 U.S.C. §§ 371, 1001, 2, and 1519; and (ii) charging Lev Parnas, Igor Fruman, David Correia and Andrey Kukushkin with conspiring to make unlawful foreign contributions in violation of 52 U.S.C. § 30121 and 18 U.S.C. § 371.

C. The Subject Offenses

9. In the course of reviewing the content contained on the Subject Accounts for evidence of the May 16 Warrant Subject Offenses, I have discovered materials which, as set forth in greater detail below, establish probable cause to believe the Subject Accounts contain evidence of additional offenses. I am therefore requesting authority to search the Subject Device for evidence, fruits, and/or instrumentalities of these additional offenses.

10. In particular, I respectfully submit that there is probable cause to believe that the Subject Accounts on the Subject Device also contain evidence, fruits, and/or instrumentalities of the commission of one or more of the following: 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); and 18 U.S.C. § 1343 (wire fraud) (together, the "Subject Offenses").

---

[3] A filter team comprised of Assistant United States Attorneys and FBI agents who are not a part of the prosecution team have used search terms to separate any potentially privileged documents out of the shared database to which the prosecution team has access.

## II. Probable Cause Regarding the Subject Offenses

11. The FBI and the USAO-SDNY are investigating, among other things discussed herein, schemes involving Lev Parnas, Igor Fruman, David Correia, Andrey Kukushkin and others to make political contributions to candidates and political action committees ("PACs") in order to gain access to politicians and influence policy, in violation of certain of the Subject Offenses. First, there is probable cause to believe that Parnas made illegal "straw donations," funded by third parties, in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person, and caused false forms to be submitted to the FEC. *See* 18 U.S.C. § 1001, 1519, and 2, 52 U.S.C. § 30122. Some of those contributions were made in the name of Global Energy Producers LLC ("GEP"), a purported liquefied natural gas ("LNG") import-export business that had been incorporated by Igor Fruman and Parnas around the time the contributions were made.[4] The rest of the contributions were made in the names of Igor Fruman and Parnas, although, as discussed below, Igor Fruman paid for Parnas's contributions. Second, in 2018, it appears that Parnas, Igor Fruman, Correia, Andrey Muraviev, and Kukushkin conspired to attempt to acquire cannabis licenses in multiple states by, among other things, donating to politicians in those states. Members of the group hired lobbyists, Correia identified the specific contributions the group should make in order to obtain licenses, and Muraviev – a Russian national with no legal status in the United States – wired $1 million from overseas to the United States, some of which was used to make contributions to politicians in Nevada and elsewhere, in violation

---

[4] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a corporation created at or shortly before the time the contributions were made for the principal purpose of obscuring the true donor's identity. The FEC has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

6

of the federal campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions. *See* 52 U.S.C. § 30121. In addition, this conduct violates the money laundering and wire fraud laws, in that the defendants deprived campaigns and candidates of information regarding the true source of the funds for those donations (that, is a foreign national), which affected their allocution or use of assets and exposed the candidates and campaigns to the risk of economic harm in the form of fines by federal and state election commissions tasked with enforcing the campaign finance laws, *see* 18 U.S.C. §§ 1343, 1956; 52 U.S.C. § 30121.

12. The FBI and USAO are also investigating whether Fruman and Parnas, at the request of a foreign government, entity, or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine. The Foreign Agents Registration Act ("FARA") criminalize acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities, including engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-2. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. 18 U.S.C. § 951. As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the then-Ambassador to the Ukraine, ▮▮▮▮▮▮▮▮, at the direction and request of at least one Ukrainian government official, and that they did so without registering under FARA. *See* 22

7

U.S.C. §§ 612 (setting forth the requirements of the registration statement), 618 (providing criminal liability for any willful violations of the statute).

13. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, materials obtained pursuant to the May 16 Warrant, FEC records, financial records, and public sources, it appears that Parnas and Fruman, with the assistance of ███████, used electronic devices to among other things, communicate regarding the illegal campaign finance donation schemes, create documents and store financial and incorporation records related to GEP matters, make campaign contributions, and communicate with co-conspirators and others regarding their efforts to seek the removal of the U.S. Ambassador to Ukraine at the request of a foreign government official. Accordingly, there is probable cause to believe that the Subject Device, which contains the contents of the Subject Accounts, will contain evidence of the Subject Offenses.

<u>Straw Donations to the ███████ Fund in 2016</u>

14. Based on my review of public sources and financial records, I have learned that Parnas is a businessman and entrepreneur who lives in south Florida. According to a sworn affidavit that Parnas filed with the FEC, discussed below, he has worked in a number of industries including as a real estate broker, stockbroker, and most recently as the founder of Fraud Guarantee, which "provides risk management tools for investors to prevent losses from fraudulent activities." Based on my review of communications obtained pursuant to the January 18 Warrant and the May 16 Warrant and records from financial institutions, I have learned that, from time to time, including in 2016 and 2018, Parnas has had trouble paying creditors on time and as of 2018, appeared to have struggled financially. Parnas's business partner in Fraud Guarantee is Correia, who, based on my review of the same materials, also appears to have experienced financial troubles.

15. Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, there is probable cause to believe that Parnas and Correia made unlawful straw donations to the ▇▇▇ Fund in 2016 at the suggestion of ▇▇▇ ▇▇▇, a businessman who had previously contributed to the ▇▇▇ Fund, using funds provided by ▇▇▇. Specifically, I have learned, among other things, the following:

a. On or about October 3, 2016, Correia emailed ▇▇▇, copying Parnas: "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent ▇▇▇ "some information about our group ▇▇▇ . . . and a few properties that ▇▇▇ owns." Based on my review of this and other emails, it appears that Vougiouklakis solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in ▇▇▇, a private equity group with which Parnas and Correia were affiliated.

b. On or about October 11, 2016, ▇▇▇ sent Parnas and Correia a registration link for a ▇▇▇ Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email, ▇▇▇ wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow."

c. On or about October 14, 2016, Correia emailed ▇▇▇ that Parnas had said he and ▇▇▇ had "connected and worked things out" and that Correia was "happy to have you as part of the team!" In a subsequent email copying Parnas, Correia asked ▇▇▇ to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, ▇▇▇ replied that he was

9

"happy to be part of the team" and "looking forward for more ventures in the future." ▮▮▮ wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, ▮▮▮ did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between ▮▮▮ and Parnas or Correia.

    d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of ▮▮▮ LLC, on which Parnas was a signer, received a wire transfer from ▮▮▮ in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from ▮▮▮ the balance of the ▮▮▮ account was negative $801.82.

    e. On or about October 14, 2016, $100,000 was transferred from a bank account in the name of ▮▮▮ I LLC at ▮▮▮ (the "▮▮▮ Account") to an account in Lev and ▮▮▮'s names at ▮▮▮. On the same date, $25,000 was wired from the account in Parnas's name to an account in the name of ▮▮▮, which is the name of David Correia's wife.

    f. On or about October 24, 2016, Parnas contributed $50,000 to the ▮▮▮ Fund. On the same day, a $5,000 contribution was made in the name of ▮▮▮ to the ▮▮▮ PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by ▮▮▮.

    16. Based on my review of public records, I have learned that ▮▮▮, who is a lawful permanent resident, contributed $15,000 to the ▮▮▮ Fund on October 14, 2016,

10

and another $15,000 on or about October 24, 2016. Based on my review of public sources and the ▓▓▓ Fund's contributor form, I have learned that contributions to ▓▓▓ Fund were "allocated sequentially according to the following formula: $2,700 . . . to [▓▓▓ for President] primary account; $2,700 . . . to [▓▓▓ for President] general account; $33,900 . . . to [the ▓▓▓ National Committee's] operating account; $101,700 . . . to [the ▓▓▓ National Committee's] headquarters account; $101,700 . . . to [the ▓▓▓ National Committee's] legal proceedings account; $101,700 . . . to [the ▓▓▓ National Committee's] convention account." The form also indicated that "the allocation formula may change if any contribution would exceed applicable contribution limits." Thus, because ▓▓▓ contributed a total of $30,000 after the ▓▓▓ primary was over, his contribution was allocated as a $2,700 contribution to the Trump Campaign (the maximum) and $27,300 to the ▓▓▓ National Committee's operating account. Accordingly, it appears that ▓▓▓ was legally barred from having his funds allocated in the manner that the $50,000 from Parnas and $5,000 from Correia were allocated to the ▓▓▓ Fund. In other words, it appears that because the contributions were made in the names of Parnas and Correia, ▓▓▓ funded two additional maximum contributions to ▓▓▓ for President.

17. Based on my review of bank records for the ▓▓▓ Account, I have learned that, in addition to the donations to the ▓▓▓ Fund, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the remaining money transferred from ▓▓▓ on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the ▓▓▓

11

███████ Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds ███████ were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ███████ ever asked for a return of his "investment" in Fraud Guarantee, even though ███████ did ask for a return of his investment in a separate company, ███████ (which investment actually appears to have been made using different funds).

18. Based on the foregoing, it appears that the contributions to the ███████ Fund were solicited and funded by ███████, but were made in the names of Parnas and ███████, in violation of certain of the Subject Offenses, including 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC). Specifically, ███████ solicited Correia's and Parnas's attendance at a ███████ Fund event. ███████ wired Parnas $300,000, but while ███████ had discussed an investment in Correia's business Fraud Guarantee, the money was wired to a different entity, ███████ and the only documented investment ███████ seems to have made was a $100,000 investment, using separate funds, in ███████. The funds ███████ sent to Parnas through ███████, by contrast, do not appear to have been used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as discussed above, Parnas used $55,000 of those funds to fund his and Correia's donations to the ███████ Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition, ███████ did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his ███████ investment, which indicates that ███████ did not actually believe that his $300,000

wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the ▮▮▮▮ Fund were made in violation of federal law and as part of the May 16 Warrant Subject Offenses.

Straw Donations to Campaigns and PACs in 2018

19. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting ▮▮▮▮ candidates, with a principal focus on the 2018 midterm elections. For instance, Parnas was invited to participate in exclusive events hosted by ▮▮▮▮ (a 501(c)(4) nonprofit entity organized by senior staff members from the Trump Campaign to promote President Trump's policy agenda), ▮▮▮▮ PAC (which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-▮▮▮▮ administration"), and ▮▮▮▮ PAC (which had a stated purpose of working to keep ▮▮▮▮ in control of Congress). Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. Parnas and Igor Fruman attended some of those events together. In order to attend these events, however, Parnas and Igor Fruman were required to, and did, make sizeable political contributions including to ▮▮▮▮ PAC and ▮▮▮▮ PAC. The investigation has revealed that while Igor Fruman financed all of these contributions, some of them were reported in Parnas's name, or in the name of GEP, as described below, a LNG import-export business incorporated by Parnas and Igor Fruman around the time the contributions were made, seemingly in order to obscure the source of the funds and/or evade contribution limitations.

20. Specifically, based on my review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following regarding contributions made by Igor Fruman, Parnas, and GEP:

13

a. In early February 2018, Parnas was invited to attend the 2018 ▮▮▮ National Committee Spring Retreat at the ▮▮▮ resort in Palm Beach, Florida, scheduled for March 3 through 5, 2018. President Trump was scheduled to be the keynote speaker. Parnas and Igor Fruman both appear to have attended the event and met President Trump. Fruman subsequently stated to a Russian-language newspaper, which has been translated into English, the following regarding the ▮▮▮ event: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in ▮▮▮ was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the ▮▮▮ victory in the mid-term elections to Congress in November 2018."

b. On or about February 23, 2018, ▮▮▮ the director of development for the ▮▮▮ PAC and ▮▮▮ PAC, invited Parnas to attend a ▮▮▮ dinner in New York on or about March 12, 2018, with Vice-President ▮▮▮ and Majority Leader ▮▮▮ In order to attend the event, Parnas was required to make a minimum contribution of $125,000 to ▮▮▮ PAC, with $50,000 contributed before the event. Parnas and Fruman attended the event ▮ on or about March 19, 2018, Fruman made a $50,000 contribution to the PAC in the name ▮▮▮." That contribution was transferred to multiple committees, including as a maximum $33,900 contribution to the ▮▮▮

c. Over the next two months, Parnas and Igor Fruman attended multiple ▮▮▮ events at the invitation of ▮▮▮ For instance, on or about March 26, 2018, ▮▮▮ invited Parnas and Fruman to attend a dinner at ▮▮▮, and on or about March 29, 2018, Parnas, Fruman, ▮▮▮ dined at the resort. The next day, ▮▮▮ emailed Parnas a link to an ▮▮▮ advertisement and the PAC's donor form. Fruman, Parnas, and Parnas's son

14

appear to have attended another ▮ event on or about April 11, 2018. On or about April 20, 2018, Fruman attended at ▮ roundtable event at ▮, at which President Trump was present, as was Representative ▮ a congressman from Texas, and other congressional Representatives. On or about April 23, 2018, ▮ sent Parnas the donor form again as well as some more information on ▮

    d. On or April 30, 2018, Igor Fruman and Parnas appear to have attended a dinner at the Trump International Hotel in Washington, D.C., that was affiliated with ▮ The next day, on or about May 1, 2018, ▮ sent Parnas the contribution form. Parnas responded, "Got it will text you when I send it." On or about May 6, 2018, ▮, Parnas's assistant, emailed ▮ for wiring instructions for ▮ and ▮ ▮

    e. On or about May 17, 2018, Parnas, with ▮ assistance, made a $325,000 contribution, in the name of GEP, to ▮ PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor, will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."

    f. On or about May 31, 2018, ▮ emailed ▮ and asked whether "Lev could complete the last $75k to ▮ which was a reference to the fact that Parnas committed to contribute $125,000 to ▮ to attend the March 12, 2018 dinner in New York, but Fruman had only paid $50,000. On or about June 12, 2018, Igor Fruman made

another $50,000 contribution to ▬▬▬ PAC, and on June 29, 2018, Parnas made an $11,000 contribution to the ▬▬▬ PAC.

  g. As noted above, on or about April 20, 2018, Parnas met Representative ▬▬▬ at ▬▬▬. On or about April 22, 2018, ▬▬▬ contacted Representative ▬▬▬ staff to request a meeting on behalf of Parnas; a dinner was scheduled for April 26, 2018, but then canceled. Parnas met Representative ▬▬▬ at his office in Washington, D.C., on or about May 9, 2018. On or about June 6, 2018, Parnas met with Representative ▬▬▬ again at his office. On June 7, 2018, ▬▬▬ wrote ▬▬▬s' staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman ▬▬▬" ▬▬▬ later explained that she had an "initial list of donors" who would make a donation of $21,000 on one credit card. ▬▬▬' staff explained the applicable campaign finance regulations and said she was unsure if "we can do that entire amount on one credit card but I can find out." Parnas appears to have again met Representative ▬▬▬ on June 14, 2018. On June 25, 2018, Parnas and Igor Fruman each made $2,700 contributions to Representative ▬▬▬ who was running for reelection in November 2018. They listed GEP as their employer.

  21. Based on my review of financial records, it appears that the contributions to ▬▬▬ PAC and Representative ▬▬▬ that were made in Parnas's name were, in fact, funded by Igor Fruman, in violation of certain of the Subject Offenses. Additionally, it appears that the contribution to ▬▬▬ PAC, which was made in the name of GEP, was actually funded not by GEP, but rather through a private loan from third parties to Igor Fruman and his brother, ▬▬▬, having nothing to do with GEP, in violation of certain of the Subject Offenses. Specifically, from my review of financial records and emails obtained pursuant to the January 18 Warrant, I have learned the following:



16

a. On or about on May 15, 2018, Igor and ▮ obtained a $3 million commercial loan from ▮, a businessman in Florida, and ▮, an attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identified ▮ and ▮ as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, ▮ and ▮ lent the money to ▮ (which is owned by Igor and ▮) and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by ▮.

b. On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and ▮ was transferred from ▮ to a bank account in the name of ▮ (the "▮ Account"), on which Parnas was a signer (but neither Igor nor ▮ was). Prior to receiving that transfer, the ▮ Account generally had a low balance and minimal account activity. For instance, in January 2018, the ▮ Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the ▮ Account two days prior, on or about May 17, 2018, Parnas, with ▮'s assistance, wired $325,000 to ▮ PAC. As described above, Parnas told ▮ to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c. On or about May 22, 2018, $100,000 was transferred from the ▮ Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the ▮ loan to ▮ Igor Fruman.

17