The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the ▮ PAC in Parnas's name.

　　d.　Additionally, Parnas's June 25, 2018 contribution to Representative ▮ was paid for using an ▮ account held in the name of ▮ (registered signer, ▮), using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to ▮ PAC and Representative ▮.

　　e.　On or about May 3, 2018, ▮ assisted Parnas with making a $15,000 donation in GEP's name to ▮ PAC. However, this donation does not appear to have come from GEP. Rather, ▮ used an ▮ card held in Igor Fruman's name, which drew on an account held in the name of "▮ - ▮" — which appears to be a credit card account associated with Igor and ▮'s business — to make the donation.

22.　Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to ▮ PAC was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

　　a.　GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with ▮ as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC in any public filing until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many

18

of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[5]

23. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, on or about June 25, 2019, Igor Fruman made a $2,700 contribution to Representative ▮▮▮ – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that ▮▮▮ is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the ▮▮▮

---

[5] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and ▮▮▮, and asked for Parnas' approval. Corriea also emailed copies to ▮▮▮ on the same date. According to the NDA, GEP and ▮▮▮ wished to "explore a business possibility," and was signed by Fruman but not by ▮▮▮. Based on my review of publicly available materials, it appears that ▮▮▮ may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business with ▮▮▮ or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.

contribution form stated that contributions by individuals would be given in priority order to: ▮ ▮ Committee (up to $5,000), ▮ for Congress (up to $2,700), the ▮ (up to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor Fruman contributed $50,000 in March 2018 to ▮ (as discussed below, in the name ▮"), his funds were used to make maximum contributions to the ▮ and ▮ Committee. When Parnas subsequently contributed $11,000 in June 2018 to ▮ those funds were used to make maximum contributions to ▮ Committee and ▮ for Congress, as well as a $3,300 contribution to ▮ Thus, it appears that by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum contributions to ▮ Committee and exceeded the contribution limit to the ▮

24. Based on my review of public sources and emails obtained pursuant to the January 18 Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up initially for the primary purpose of making a contribution. Specifically:

   a. On or about July 17, 2018, the ▮ asked for comment on a story relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant wrote to Parnas and Correia, "This is what happens, when you become visible. The buzzards descend." Parnas responded, "That's why we need to stay under the radar and have the best lawyers."

   b. On or about July 23, 2018, ▮ published an article about LLC donations to ▮ which mentioned the contribution by GEP. The following day, on or about July 24, 2018, a reporter for ▮ emailed Parnas about GEP. Parnas did not respond,

20

and on or about July 25, 2018, ▮▮▮▮ published an article suggesting that GEP was a mere shell company used to make a contribution to the PAC. On the same day, the ▮▮▮▮ ▮▮▮▮ filed a complaint with the FEC about the contribution.

c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from @▮▮▮▮ and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to ▮▮▮▮ was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the ▮▮▮▮ loan to ▮▮▮▮.

d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the ▮▮▮▮ FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the ▮▮▮▮ PAC contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to ▮▮▮▮ for Congress "was made with a business

21

credit card . . . which [he] reimbursed." These statements to the FEC, and GEP's filed response to the FEC, appear to be false, in violation of the May 16 Warrant Subject Offenses and the Subject Offenses. As set forth above, the ▮ PAC contribution was made with funds from a third party private loan to an entity run by Igor ▮ Fruman that were moved through multiple bank accounts – none belonging to GEP – before being paid to ▮ PAC by the ▮ Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and ▮ ▮ the analyst found no evidence of reimbursement by Parnas to ▮ or ▮ for the contributions to Congressman ▮.

e. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.

25. Based on my review of financial records for a bank account held in the name of ▮▮▮▮▮ at Chase Bank for which ▮▮▮▮▮ is an authorized signatory (the "▮▮▮▮▮ Account"), I have learned that on September 19, 2018 – the day after the ▮▮▮▮▮ Account received a wire transfer from Andrey Muraviev in the amount of $500,000, as discussed below – the ▮▮▮▮▮ Account was used to pay the ▮▮▮▮▮ bill in the amount of $494,415.21. That bill included Igor Fruman's donations to the ▮▮▮▮▮ Fund, ▮▮▮▮▮ PAC, ▮▮▮▮▮ for Congress, and Parnas' and Igor Fruman's donations to ▮▮▮▮▮ among other donations.

26. Based on the foregoing, it appears that the contributions to ▮▮▮▮▮ PAC and Representative ▮▮▮▮▮ were funded by Igor Fruman, but were made in the name of Parnas in violation of certain of the May 16 Warrant Subject Offenses. In addition, it appears that the contributions made in the name of GEP to ▮▮▮▮▮ PAC and ▮▮▮▮▮ PAC were unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation of certain of the May 16 Warrant Subject Offenses.

## Unlawful Contributions by Fruman in a False Name

27. It appears that Fruman made multiple contributions, using another person's name and identity, in the name ▮▮▮▮▮" and listed an incorrect employer in order to disguise the true donor of the contributed funds and potentially conceal assets from others, including creditors. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

   a. On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution to ▮▮▮▮▮ PAC. The contribution was reported to the FEC as coming from ▮▮▮▮▮

23

▮▮▮ with his employer as ▮▮▮ The funds from that contribution were distributed to the ▮▮▮ PAC, and ▮▮▮ House candidates.[6]

b. On or about April 27, 2018, Fruman made a $100,000 contribution to the ▮▮▮ PAC. The contribution was reported to the FEC as coming from ▮▮▮" with his employer as ▮▮▮." The funds were distributed to the ▮▮▮ and the ▮▮▮ National Committee.

c. On or about June 12, 2018, Fruman made a $50,000 contribution to ▮▮▮ PAC. The contribution was reported to the FEC as coming from ▮▮▮" with his employer as "▮▮▮ Corp." The funds were distributed to various ▮▮▮ House candidates.

28. Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but who is named ▮▮▮ and works for ▮▮▮. Accordingly, it appears that Fruman may have made contributions in a variation of his name, or in another person's name, to avoid contribution limits, in violation of the May 16 Warrant Subject Offenses.

---

[6] Based on my participation in the investigation, including my review of FEC records, financial records, and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that the pattern of donations indicate that Parnas and Fruman were creditor-conscious in deciding which donations to make in their true names. Almost all of the large contributions they arranged were not made in their true names. Instead, such large donations were typically made either in the name of GEP or in the name ▮▮▮ As a result, a search of the FEC database in 2018 would have shown that Fruman's only five-digit contribution was $15,000 to the ▮▮▮ Fund, and Parnas's only five-digit contribution was $11,000 to ▮▮▮ In 2018, contributing in the name of GEP or ▮▮▮" would have had the effect of disguising the fact that Fruman and Parnas were behind large contributions.

## Donations Funded by Muraviev

29.    Parnas and Igor Fruman made additional contributions to state and federal candidates in 2018 that were in fact funded by Andrey Muraviev, a Russian national. Specifically, between September and October 2018, Muraviev wired Parnas and Fruman $1 million with the understanding and expectation that those funds would be used to make donations to candidates and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for a planned business venture. Parnas, Fruman, Correia, and another business partner, Andrey Kukushkin, worked with Muraviev to ensure that his money was used to make political donations that the group believed would be beneficial to their cannabis business interests, without reporting the true source of the funds, or that they were taking these actions in coordination with Muraviev, a foreign principal.

30.    Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in the summer of 2018, Kukushkin, a U.S. citizen who resides in California, worked with Correia and eventually Parnas and Fruman about engaging in a cannabis business that was ultimately funded by Kukushkin's partner, Muraviev. Specifically, I have learned the following:

   a. In or about July 2018, Correia began discussing a cannabis business in San Francisco with Kukushkin. In an email sent on or about July 22, 2018, Kukushkin complained to Correia about a number of local regulatory issues associated with his cannabis business, and over the next few days Correia and Kukushkin discussed collaborating on a cannabis business in the future. On August 10, 2018, Correia and Kukushkin met in San Diego, California, and appear to have discussed a potential cannabis venture.

   b. On or about August 21, 2018, Correia relayed information regarding the business opportunity with Kukushkin to Parnas, writing in an email: .

25

> Great opportunity with these guys since big Andre is funding. However, it is obvious I'm going to have to spend more time on this than originally planned. These guys are not smart-businessman and the one issue I'm dealing with, which began last night, is literally retarded. I think Andrey Kukushkin is a really good guy, but needs a lot of handholding on some very easy issues. This creates a great opportunity for us!....because they need this help, but, I'm not sure how to find enough time along with everything else we/I am doing if we're not getting paid some sort of consulting fee or salaries in the meantime. Let's discuss. We are going to make it happen no matter what, just trying to figure out the best structure.

c. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, and my participation in the investigation, I believe that Correia's reference to "big Andre" is to Andrey Muraviev, a business partner of Kukushkin's who would be "funding" the venture.

d. On or about September 7, 2018, Parnas, Fruman, and Kukushkin attended a fundraiser in Las Vegas for ▮▮▮▮ who was at that time the attorney general of Nevada, and a candidate for government in the state's November 2018 election. According to a subsequent email, the event was attended by Vice President ▮▮▮▮ and a minimum $10,000 donation was required for attendance. In a subsequent email, ▮▮▮▮ promised, on behalf of the group, to "send [a] donation out in the next couple of days."

e. Parnas, Fruman, Muraviev, Kukushkin, and ▮▮▮▮ began communicating via WhatsApp in the days following the September 7, 2018, ▮▮▮▮ event regarding their scheme to use Muraviev's money to make political donations that they believed would benefit their

---

[7] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that beginning in approximately September 2016, David Correia and Lev Parnas began discussing a cannabis and medical marijuana business with prospective partners, including ▮▮▮▮. Based on my review of law enforcement records, I am aware that ▮▮▮▮ was born in Russia and is an American citizen. In May 2017, Correia, Parnas, ▮▮▮▮, and others met in Miami and discussed a plan to acquire a medical marijuana license in Florida and elsewhere. However, based on my review of email correspondence, it appears that this business venture did not come to fruition in 2017.

cannabis business. Specifically, on or about September 9, 2018, Parnas created a WhatsApp text chain between himself, "Andrey Muravyev", Igor Fruman, Andrey Kukushkin, and ▇ (the "Text Chain").[8] Parnas wrote: ▇, Andrey, Igor, Kukhnya. Brothers, I just wanted to introduce you to each other, and ▇, if you can, get in touch with Andrey and Kuynya." ▇ responded by providing the ▇, and wrote, "Who should I call and at what number?" Parnas then told him to call Andrey, which appears to be a reference to Muraviev, and noted that Parnas would "send you his number and contact info momentarily."

   f. In the same Text Chain, on or about September 10, 2018, Igor Fruman sent the account details for the ▇ Account, along with a photograph of ▇ ▇ tax identification number.

   g. On or about September 12, 2018, Correia emailed Parnas a document entitled "Cannabis Schedule and budget," which listed a number of intended political donations across five states. The header of the document read "Schedule and Contribution Budget Cannabis Multi-State License Strategy." The document described an effort to "schedule trips to meet with" politicians and candidates in California, Nevada, Florida, New York, and New Jersey – all states with legalized medical or recreational cannabis – and make political donations in the multi-hundred thousand dollars to support those politicians. With respect to Nevada, the document noted that trips would be scheduled to meet with "▇ [sic] (AG/next Governor), ▇ (LV Mayor), Clark County Officials and other relevant associates/agencies in Las Vegas, Reno and Lake Tahoe areas" and that the campaign contribution budget would be

---

[8] The Text Chain is in English and Russian, the latter of which I do not speak. I have reviewed preliminary English-language translations of the Russian-language text messages in the Text Chain, and my summaries of those Russian-language text messages herein are based on those draft translations.

27

$250,000. With respect to Florida, the document noted that trips would be scheduled to meet with "Rep. ▮▮▮▮ (next Gov)" among others, and that the campaign contribution budget would be between $250,000 and $500,000. In total, the document projected between $1.3 and $2 million in political contributions. The document also included a "funding schedule," which noted that $500,000 was "due by 9/12," an additional $500,000 was due by October 1, 2018, and that "remaining funds TBD." For the reasons set forth below, I believe that this funding was to come from Muraviev.

  h. On or about September 12, 2018, Correia forwarded the "Cannabis Schedule and Budget" document to Parnas by WhatsApp message, and Parnas replied "Perfect send to Igor." Later that day, Correia wrote "Praying for a good response from Andrey," likely referring to Muraviev. Correia subsequently wrote Parnas to ask for an in-person meeting, and noted that "I would love to be updated on things that we can't discuss over the phone."

  i. Following their meeting in Las Vegas in September 2018, Kukushkin and Correia worked on behalf of the group to take steps to formalize their business arrangement. Specifically, on or about September 14, 2018, Correia emailed Kukushkin documents relating to the incorporation of a new entity. On or about September 15, 2018, in a conversation about how to structure the new company, "NewCo," Kukushkin wrote "I believe whats left was for Igor and Lev to establish who is going to be shareholder(s) of the NewCo and could we all use LLC's as our proxy's in it. I am just trying to establish core structure and how transparent should Andrey be exposed for the benefits of NewCo Transparency, his Russian roots and current political paranoia about it." Based on my review of emails pursuant to the January 18 Warrant and my participation in the investigation, I believe that Kukushkin was responding to the corporate documents Correia

had sent the day prior, and was noting the importance of concealing Muraviev's involvement in the corporation due to "his Russian roots and current political paranoia about it."

j. On or about October 1, 2018, Correia forwarded a document entitled " ▮ Bylaws" to Kukushkin, and asked him to "take a look." On October 2, 2018, Kukushkin executed the " ▮▮▮▮▮" bylaws in an email confirmation to Correia. The by-laws provided that " ▮▮▮▮▮" would be incorporated in Nevada and that Kukushkin would be the president and treasurer, while Correia would be the secretary. Correia then forwarded the executed by-laws to Fruman and Parnas. Based on my participation in the investigation and my review of emails obtained pursuant to the January 18 Warrant, I believe that the ▮ Bylaws" reflected the new corporation that Kukushkin and Correia (who were the only listed parties on the corporate documents) formed to represent the business venture between Kukushkin, Correia, Parnas, Fruman, and Muraviev.

k. In late September 2018, Parnas and Correia spoke about their plans with respect to Muraviev's money. Specifically, on or about September 30, 2019, Parnas and Correia spoke about the fact that Kukushkin was going to send signed corporate documents so Correia could open a bank account, and Correia updated Parnas regarding travel that Kukushkin wanted ▮▮▮ to book on his behalf. Correia closed by noting that "Then….Andrey M can wire the $500k…." Parnas replied and directed Correia not to use their credit cards to book Kukushkin's flight. Correia sent Parnas a proposed draft text message for Kukushkin, that read:

> Hey there buddy. I understand completely. However the new bank and the next $500k is different. The original funding was for charitable donations for political donations, prior to a company being opened. Our agreement was for $1M for 'startup' moneys. However, the next $500,000 is for the "operationa[l]" budget, which would include general company expenses, such as your travel. Therefore our bank account needs to be open tomorrow and a new

wire for the remain[ing] $500k needs to be sent to accommodate such expenses."

Parnas responded, "Sounds good but confirm with Igor before you send it."[9]

31. Based on my review of financial records, I have learned the following about the manner in which the funds from Muraviev were laundered through the ▮▮▮ Account which, as described above, was provided by Igor Fruman to the group on the Text Chain:

a. ▮▮▮ is an authorized signatory. On or about September 18, 2018, the ▮▮▮ received a $500,000 wire transfer from an account held in the name of ▮▮▮ Ltd. at ▮▮▮, a Swiss bank, with the note "payment as per the loan agreement d."[10] Based on my review of financial records and public sources, I have learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a Russian national.

b. The day before the $500,000 transfer from ▮▮▮ Ltd., the account balance of the ▮▮▮ Account was $1,662.61.

c. The following day, on or about September 19, 2018, approximately $494,415 of the funds in the ▮▮▮ Account – most if not all of which came from ▮▮▮ – were used to pay an American Express bill for a credit card in the name of ▮▮▮. As discussed infra, based on my review of records from ▮▮▮, I have learned that the

---

[9] Based on my review of public sources, I have learned that September 2018 was the deadline in Nevada for certain retail marijuana licenses. Nonetheless, it appears from my review of materials obtained pursuant to the May 16 Warrant that Parnas, Igor Fruman, Correia, Kukushkin, and Muraviev contemplated that their contributions and donations would aid them in changing Nevada's rules or getting them preferential access to new licenses.

[10] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that ▮▮▮ entered into a loan agreement with ▮▮▮ for the amount of $500,000, which was set to be repaid by December 31, 2018. Based on my review of available bank records for the ▮▮▮ccount through May 2019, it does not appear that this "loan" was ever repaid.

30

███████████ credit card account was used to pay for a June 12, 2018 $50,000 contribution to ███████ PAC in the name of ███████ referenced above, as well as a $15,000 contribution to the ███████ Fund, and a $5,400 contribution to ███████ for Congress, all of which were also made in Igor Fruman's name. As discussed below, ███████ was listed on the group's contribution chart. Muraviev thus appears to have funded each of these donations. The remainder of the ███████ expenses paid by Muraviev's funding were for travel and other personal expenses. Thus, it appears that while Parnas and Fruman did use a portion of Muraviev's money to, as agreed, fund political donations and pay for travel that may be related to their venture, at least some portion of the funds appear to have been used for purposes other than what was discussed with Muraviev and Kukushkin.

32. Based on my review of emails pursuant to the January 18 Warrant, I have learned that in early October 2018, Correia circulated several documents to Parnas and Igor Fruman that appeared to be more detailed versions of his prior "Cannabis Schedule and budget" described above, which set forth the precise candidates and campaigns that Muraviev's funds would be donated to. Specifically, I have learned the following:

a. On October 8, 2018, Correia emailed Parnas and Igor Fruman a document entitled "State Campaign Contributions." In the cover email, Correia noted that the document was a draft, and that he would put it into a "final format" once "we go over these things." Correia also told Parnas and Fruman that they needed to discuss "which donations have been made" and "which are only committed." Specifically, I have learned the following with respect to the draft document:

i. The document contained a table of intended campaign contributions to support state and local candidates in New Jersey totaling $102,500; New York totaling $160,000; Florida totaling $390,000; Nevada totaling $225,000; California totaling $120,000; and Colorado

totaling $110,000. The total sum of intended contributions was approximately $1.1 million, to support 25 separate candidates, who were both ▮▮▮▮ and ▮▮▮▮.

  ii.  With respect to Nevada, the chart listed intended donations of $150,000 to support ▮▮▮▮ and $75,000 to support ▮▮▮▮ a candidate for state attorney general. With respect to Florida, the chart listed an intended donation of $250,000 to support ▮▮▮▮, with a note that it had been made or promised on October 3, 2018.

  iii.  Later on October 8, 2018, Correia sent a "final draft" of the same document to Parnas and Igor Fruman. Correia wrote "Gents, please see attached. If all good. Please forward on …." The document was entitled the "▮ Contribution List" and the document's header read ▮▮▮▮▮▮▮, Inc. State Campaign Contributions." Specifically, the document reflected the following donations and commitments:

| Candidate | Office | Noted Commitment or Payment | Amount |
|---|---|---|---|
| | US. Senator (New Jersey) | Committed | $45,000 |
| | U.S. Rep. (New Jersey) | Paid | $50,000 |
| | U.S. Rep. (New Jersey) | Committed | $15,000 |
| | U.S. Rep. (New Jersey) | Committed | $20,000 |
| | U.S. Senate Candidate (New Jersey) | Committed | $15,000 |
| | U.S. Rep. Candidate (New Jersey) | Committed | $15,000 |
| | New Jersey Attorney General | Paid | $50,000 |
| | U.S. Senator (New York) | Paid | $35,000 |
| | U.S. Rep. (New York) | Committed | $20,000 |
| | U.S. Rep. (New York) | Committed | $50,000 |
| | U.S. Rep. (New York) | Committed | $15,000 |
| | New York Attorney General Candidate | Committed | $40,000 |
| | New York Attorney General Candidate | Paid | $30,000 |

---

[11] Based on my review of public reporting, I have learned that ▮▮▮▮ was at that time the attorney general of Rhode Island. Similarly, while ▮▮▮▮ is listed as a candidate, he was in office at that time.