of the federal campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions. *See* 52 U.S.C. § 30121. In addition, this conduct violates the money laundering and wire fraud laws, in that the defendants deprived campaigns and candidates of information regarding the true source of the funds for those donations (that, is a foreign national), which affected their allocution or use of assets and exposed the candidates and campaigns to the risk of economic harm in the form of fines by federal and state election commissions tasked with enforcing the campaign finance laws, *see* 18 U.S.C. §§ 1343, 1956; 52 U.S.C. § 30121.

12. The FBI and USAO are also investigating whether Fruman and Parnas, at the request of a foreign government, entity, or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine. The Foreign Agents Registration Act ("FARA") criminalize acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities, including engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-2. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. 18 U.S.C. § 951. As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the then-Ambassador to the Ukraine, [REDACTED] at the direction and request of at least one Ukrainian government official, and that they did so without registering under FARA. *See* 22

U.S.C. §§ 612 (setting forth the requirements of the registration statement), 618 (providing criminal liability for any willful violations of the statute).

13. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, materials obtained pursuant to the May 16 Warrant, FEC records, financial records, and public sources, it appears that Parnas and Fruman, with the assistance of [REDACTED], used electronic devices to among other things, communicate regarding the illegal campaign finance donation schemes, create documents and store financial and incorporation records related to GEP matters, make campaign contributions, and communicate with co-conspirators and others regarding their efforts to seek the removal of the U.S. Ambassador to Ukraine at the request of a foreign government official. Accordingly, there is probable cause to believe that the Subject Device, which contains the contents of the Subject Accounts, will contain evidence of the Subject Offenses.

Straw Donations to the [REDACTED] Fund in 2016

14. Based on my review of public sources and financial records, I have learned that Parnas is a businessman and entrepreneur who lives in south Florida. According to a sworn affidavit that Parnas filed with the FEC, discussed below, he has worked in a number of industries including as a real estate broker, stockbroker, and most recently as the founder of Fraud Guarantee, which "provides risk management tools for investors to prevent losses from fraudulent activities." Based on my review of communications obtained pursuant to the January 18 Warrant and the May 16 Warrant and records from financial institutions, I have learned that, from time to time, including in 2016 and 2018, Parnas has had trouble paying creditors on time and as of 2018, appeared to have struggled financially. Parnas's business partner in Fraud Guarantee is Correia, who, based on my review of the same materials, also appears to have experienced financial troubles.



15. Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, there is probable cause to believe that Parnas and Correia made unlawful straw donations to the Fund in 2016 at the suggestion of a businessman who had previously contributed to the Fund, using funds provided by . Specifically, I have learned, among other things, the following:

a. On or about October 3, 2016, Correia emailed , copying Parnas: "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent "some information about our group . . . and a few properties that owns." Based on my review of this and other emails, it appears that solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in , a private equity group with which Parnas and Correia were affiliated.

b. On or about October 11, 2016, sent Parnas and Correia a registration link for a Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow."

c. On or about October 14, 2016, Correia emailed that Parnas had said he and had "connected and worked things out" and that Correia was "happy to have you as part of the team!" In a subsequent email copying Parnas, Correia asked to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, replied that he was

"happy to be part of the team" and "looking forward for more ventures in the future." [REDACTED] wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, [REDACTED] did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between [REDACTED] and Parnas or Correia.

d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of [REDACTED], on which Parnas was a signer, received a wire transfer from [REDACTED] in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from [REDACTED] the balance of the [REDACTED] account was negative $801.82.

e. On or about October 14, 2016, $100,000 was transferred from a bank account in the name of [REDACTED] at [REDACTED] (the [REDACTED] Account") to an account in Lev and [REDACTED] names at [REDACTED]. On the same date, $25,000 was wired from the account in Parnas's name to an account in the name [REDACTED] which is the name of David Correia's wife.

f. On or about October 24, 2016, Parnas contributed $50,000 to the [REDACTED] Fund. On the same day, a $5,000 contribution was made in the name of [REDACTED] to the [REDACTED] [REDACTED] PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by [REDACTED]

16. Based on my review of public records, I have learned that [REDACTED] who is a lawful permanent resident, contributed $15,000 to the [REDACTED] Fund on October 14, 2016,

and another $15,000 on or about October 24, 2016. Based on my review of public sources and the [REDACTED] Fund's contributor form, I have learned that contributions to [REDACTED] Fund were "allocated sequentially according to the following formula: $2,700 . . . to [Donald J. Trump for President] primary account; $2,700 . . . to [Donald J. Trump for President] general account; $33,900 . . . to [the [REDACTED] National Committee's] operating account; $101,700 . . . to [the [REDACTED] National Committee's] headquarters account; $101,700 . . . to [the [REDACTED] National Committee's] legal proceedings account; $101,700 . . . to [the [REDACTED] National Committee's] convention account." The form also indicated that "the allocation formula may change if any contribution would exceed applicable contribution limits." Thus, because [REDACTED] contributed a total of $30,000 after the [REDACTED] primary was over, his contribution was allocated as a $2,700 contribution to the Trump Campaign (the maximum) and $27,300 to the [REDACTED] National Committee's operating account. Accordingly, it appears that [REDACTED] was legally barred from having his funds allocated in the manner that the $50,000 from Parnas and $5,000 from Correia were allocated to the [REDACTED] Fund. In other words, it appears that because the contributions were made in the names of Parnas and Correia, [REDACTED] funded two additional maximum contributions to Donald J. Trump for President.

17. Based on my review of bank records for the [REDACTED] Account, I have learned that, in addition to the donations to the [REDACTED] Fund, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the remaining money transferred from [REDACTED] on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the [REDACTED]



Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ever asked for a return of his "investment" in Fraud Guarantee, even though did ask for a return of his investment in a separate company, (which investment actually appears to have been made using different funds).

18. Based on the foregoing, it appears that the contributions to the Fund were solicited and funded by , but were made in the names of Parnas and in violation of certain of the Subject Offenses, including 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC). Specifically, solicited Correia's and Parnas's attendance at a Fund event. wired Parnas $300,000, but while had discussed an investment in Correia's business Fraud Guarantee, the money was wired to a different entity, s, and the only documented investment seems to have made was a $100,000 investment, using separate funds, in . The funds sent to Parnas through by contrast, do not appear to have been used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as discussed above, Parnas used $55,000 of those funds to fund his and Correia's donations to the Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition, did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his investment, which indicates that did not actually believe that his $300,000

wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the [REDACTED] Fund were made in violation of federal law and as part of the May 16 Warrant Subject Offenses.

Straw Donations to Campaigns and PACs in 2018

19. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting [REDACTED] candidates, with a principal focus on the 2018 midterm elections. For instance, Parnas was invited to participate in exclusive events hosted by [REDACTED] (a 501(c)(4) nonprofit entity organized by senior staff members from the Trump Campaign to promote President Trump's policy agenda), [REDACTED] (which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-[REDACTED] administration"), and [REDACTED] (which had a stated purpose of working to keep [REDACTED] in control of Congress). Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. Parnas and Igor Fruman attended some of those events together. In order to attend these events, however, Parnas and Igor Fruman were required to, and did, make sizeable political contributions including to [REDACTED] and [REDACTED]. The investigation has revealed that while Igor Fruman financed all of these contributions, some of them were reported in Parnas's name, or in the name of GEP, as described below, a LNG import-export business incorporated by Parnas and Igor Fruman around the time the contributions were made, seemingly in order to obscure the source of the funds and/or evade contribution limitations.

20. Specifically, based on my review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following regarding contributions made by Igor Fruman, Parnas, and GEP:



a. In early February 2018, Parnas was invited to attend the 2018 [REDACTED] National Committee Spring Retreat at the [REDACTED] resort in Palm Beach, Florida, scheduled for March 3 through 5, 2018. President Trump was scheduled to be the keynote speaker. Parnas and Igor Fruman both appear to have attended the event and met President Trump. Fruman subsequently stated to a Russian-language newspaper, which has been translated into English, the following regarding the [REDACTED] event: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting [REDACTED] was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the Republicans' victory in the mid-term elections to Congress in November 2018."

b. On or about February 23, 2018, [REDACTED] the director of development for the [REDACTED] PAC and [REDACTED] PAC, invited Parnas to attend a [REDACTED] dinner in New York on or about March 12, 2018, with Vice-President [REDACTED] and Majority Leader [REDACTED]. In order to attend the event, Parnas was required to make a minimum contribution of $125,000 to [REDACTED], with $50,000 contributed before the event. Parnas and Fruman attended the event and on or about March 19, 2018, Fruman made a $50,000 contribution to the PAC in the name [REDACTED] That contribution was transferred to multiple committees, including as a maximum $33,900 contribution to the [REDACTED].

c. Over the next two months, Parnas and Igor Fruman attended multiple [REDACTED] events at the invitation of [REDACTED]. For instance, on or about March 26, 2018, [REDACTED] invited Parnas and Fruman to attend a dinner at [REDACTED] and on or about March 29, 2018, Parnas, Fruman, [REDACTED] dined at the resort. The next day, [REDACTED] emailed Parnas a link to an [REDACTED] advertisement and the PAC's donor form. Fruman, Parnas, and Parnas's son

appear to have attended another [redacted] event on or about April 11, 2018. On or about April 20, 2018, Fruman attended a [redacted] roundtable event [redacted] at which President Trump was present, as was Representative [redacted] a congressman from Texas, and other congressional Representatives. On or about April 23, 2018, [redacted] sent Parnas the donor form again as well as some more information on [redacted].

d. On or April 30, 2018, Igor Fruman and Parnas appear to have attended a dinner at the Trump International Hotel in Washington, D.C., that was affiliated with [redacted]. The next day, on or about May 1, 2018, [redacted] sent Parnas the contribution form. Parnas responded, "Got it will text you when I send it." On or about May 6, 2018, [redacted], Parnas's assistant, emailed [redacted] for wiring instructions for [redacted] and [redacted]

e. On or about May 17, 2018, Parnas, with [redacted] assistance, made a $325,000 contribution, in the name of GEP, to [redacted]. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor, will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."

f. On or about May 31, 2018, [redacted] emailed [redacted] and asked whether "Lev could complete the last $75k to [redacted]" which was a reference to the fact that Parnas committed to contribute $125,000 to [redacted] to attend the March 12, 2018 dinner in New York, but Fruman had only paid $50,000. On or about June 12, 2018, Igor Fruman made



another $50,000 contribution to , and on June 29, 2018, Parnas made an $11,000 contribution to the

g. As noted above, on or about April 20, 2018, Parnas met Representative at . On or about April 22, 2018, contacted Representative staff to request a meeting on behalf of Parnas; a dinner was scheduled for April 26, 2018, but then canceled. Parnas met Representative at his office in Washington, D.C., on or about May 9, 2018. On or about June 6, 2018, Parnas met with Representative again at his office. On June 7, 2018, wrote staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman ." later explained that she had an "initial list of donors" who would make a donation of $21,000 on one credit card. staff explained the applicable campaign finance regulations and said she was unsure if "we can do that entire amount on one credit card but I can find out." Parnas appears to have again met Representative on June 14, 2018. On June 25, 2018, Parnas and Igor Fruman each made $2,700 contributions to Representative who was running for reelection in November 2018. They listed GEP as their employer.

21. Based on my review of financial records, it appears that the contributions to the House PAC and Representative that were made in Parnas's name were, in fact, funded by Igor Fruman, in violation of certain of the Subject Offenses. Additionally, it appears that the contribution to PAC, which was made in the name of GEP, was actually funded not by GEP, but rather through a private loan from third parties to Igor Fruman and his brother, , having nothing to do with GEP, in violation of certain of the Subject Offenses. Specifically, from my review of financial records and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a. On or about on May 15, 2018, Igor and [redacted] obtained a $3 million commercial loan from [redacted], a businessman in Florida, and [redacted] an attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identif[redacted] as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, [redacted] lent the money to [redacted] [redacted] (which is owned by Igor and [redacted] [redacted]) and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by [redacted].

b. On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and [redacted] [redacted] was transferred from [redacted] to a bank account in the name of [redacted] [redacted] (the [redacted] Account"), on which Parnas was a signer (but neither Igor nor [redacted] was). Prior to receiving that transfer, the [redacted] Account generally had a low balance and minimal account activity. For instance, in January 2018, the [redacted] [redacted] Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the [redacted] Account two days prior, on or about May 17, 2018, Parnas, with [redacted] assistance, wired $325,000 to [redacted]. As described above, Parnas told [redacted] to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c. On or about May 22, 2018, $100,000 was transferred from the [redacted] Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the [redacted] loan to [redacted] and Igor Fruman.

The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the [REDACTED] in Parnas's name.

d. Additionally, Parnas's June 25, 2018 contribution to Representative [REDACTED] was paid for using an [REDACTED] account held in the name of [REDACTED] (registered signer, [REDACTED], using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to [REDACTED] PAC and Representative [REDACTED]

e. On or about May 3, 2018, [REDACTED] assisted Parnas with making a $15,000 donation in GEP's name to [REDACTED] PAC. However, this donation does not appear to have come from GEP. Rather, [REDACTED] used an [REDACTED] card held in Igor Fruman's name, which drew on an account held in the name of "[REDACTED] - [REDACTED] – which appears to be a credit card account associated with Igor and [REDACTED] business – to make the donation.

22. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to [REDACTED] was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

a. GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with [REDACTED] as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC in any public filing until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many

of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[5]

23. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, on or about June 25, 2019, Igor Fruman made a $2,700 contribution to Representative [REDACTED] – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that [REDACTED] is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the [REDACTED]

[5] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and [REDACTED] and asked for Parnas' approval. Corriea also emailed copies to [REDACTED] on the same date. According to the NDA, GEP and [REDACTED] wished to "explore a business possibility," and was signed by Fruman but not by [REDACTED] Based on my review of publicly available materials, it appears that [REDACTED] may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business with [REDACTED] or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.



contribution form stated that contributions by individuals would be given in priority order to: [redacted] [redacted] (up to $5,000), [redacted] for Congress (up to $2,700), the [redacted] (up to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor Fruman contributed $50,000 in March 2018 to [redacted] (as discussed below, in the name "[redacted] his funds were used to make maximum contributions to the [redacted] and [redacted] [redacted]. When Parnas subsequently contributed $11,000 in June 2018 to [redacted] [redacted] those funds were used to make maximum contributions to [redacted] and [redacted] for Congress, as well as a $3,300 contribution to [redacted]. Thus, it appears that by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum contributions to [redacted] [redacted] Committee and exceeded the contribution limit to the [redacted].

24. Based on my review of public sources and emails obtained pursuant to the January 18 Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up initially for the primary purpose of making a contribution. Specifically:

a. On or about July 17, 2018, the [redacted] [redacted] [redacted] asked for comment on a story relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant wrote to Parnas and Correia, "This is what happens when you become visible. The buzzards descend." Parnas responded, "That's why we need to stay under the radar and have the best lawyers."

b. On or about July 23, 2018, [redacted] published an article about LLC donations to [redacted] [redacted] which mentioned the contribution by GEP. The following day, on or about July 24, 2018, a reporter for [redacted] [redacted] emailed Parnas about GEP. Parnas did not respond,

and on or about July 25, 2018, [redacted] published an article suggesting that GEP was a mere shell company used to make a contribution to the PAC. On the same day, the [redacted] filed a complaint with the FEC about the contribution.

c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from [redacted] and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to [redacted] was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the [redacted] loan to [redacted]

d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the [redacted] FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the [redacted] contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to [redacted] for Congress "was made with a business

credit card . . . which [he] reimbursed." These statements to the FEC, and GEP's filed response to the FEC, appear to be false, in violation of the May 16 Warrant Subject Offenses and the Subject Offenses. As set forth above, the [redacted] contribution was made with funds from a third party private loan to an entity run by Igor and [redacted] that were moved through multiple bank accounts – none belonging to GEP – before being paid to [redacted] PAC by the [redacted] Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and [redacted], the analyst found no evidence of reimbursement by Parnas to [redacted] or [redacted] for the contributions to Congressman [redacted]

e. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.

25. Based on my review of financial records for a bank account held in the name of for which is an authorized signatory (the " "), I have learned that on September 19, 2018 – the day after the received a wire transfer from Andrey Muraviev in the amount of $500,000, as discussed below – the was used to pay the bill in the amount of $494,415.21. That bill included Igor Fruman's donations to the , , and Parnas' and Igor Fruman's donations to among other donations.

26. Based on the foregoing, it appears that the contributions to Protect the House PAC and Representative were funded by Igor Fruman, but were made in the name of Parnas in violation of certain of the May 16 Warrant Subject Offenses. In addition, it appears that the contributions made in the name of GEP to and were unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation of certain of the May 16 Warrant Subject Offenses.

Unlawful Contributions by Fruman in a False Name

27. It appears that Fruman made multiple contributions, using another person's name and identity, in the name " and listed an incorrect employer in order to disguise the true donor of the contributed funds and potentially conceal assets from others, including creditors. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a. On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution to Protect the House PAC. The contribution was reported to the FEC as coming from



[redacted] with his employer as [redacted]." The funds from that contribution were distributed to the [redacted], [redacted] PAC, and [redacted] House candidates.[6]

b. On or about April 27, 2018, Fruman made a $100,000 contribution to the [redacted] PAC. The contribution was reported to the FEC as coming from "[redacted]" with his employer as "[redacted]." The funds were distributed to the [redacted] and the [redacted] National Committee.

c. On or about June 12, 2018, Fruman made a $50,000 contribution to [redacted]. The contribution was reported to the FEC as coming from [redacted]" with his employer as "[redacted] The funds were distributed to various [redacted] House candidates.

28. Based on my review of public sources, it appears that there is another individual -- who did not make the contribution -- but who is named [redacted] and works for [redacted] Accordingly, it appears that Fruman may have made contributions in a variation of his name, or in another person's name, to avoid contribution limits, in violation of the May 16 Warrant Subject Offenses.

---

[6] Based on my participation in the investigation, including my review of FEC records, financial records, and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that the pattern of donations indicate that Parnas and Fruman were creditor-conscious in deciding which donations to make in their true names. Almost all of the large contributions they arranged were not made in their true names. Instead, such large donations were typically made either in the name of GEP or in the name [redacted] As a result, a search of the FEC database in 2018 would have shown that Fruman's only five-digit contribution was $15,000 to the [redacted] Fund, and Parnas's only five-digit contribution was $11,000 to [redacted]. In 2018, contributing in the name of GEP [redacted]" would have had the effect of disguising the fact that Fruman and Parnas were behind large contributions.

Donations Funded by Muraviev

29. Parnas and Igor Fruman made additional contributions to state and federal candidates in 2018 that were in fact funded by Andrey Muraviev, a Russian national. Specifically, between September and October 2018, Muraviev wired Parnas and Fruman $1 million with the understanding and expectation that those funds would be used to make donations to candidates and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for a planned business venture. Parnas, Fruman, Correia, and another business partner, Andrey Kukushkin, worked with Muraviev to ensure that his money was used to make political donations that the group believed would be beneficial to their cannabis business interests, without reporting the true source of the funds, or that they were taking these actions in coordination with Muraviev, a foreign principal.

30. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in the summer of 2018, Kukushkin, a U.S. citizen who resides in California, worked with Correia and eventually Parnas and Fruman about engaging in a cannabis business that was ultimately funded by Kukushkin's partner, Muraviev. Specifically, I have learned the following:

a. In or about July 2018, Correia began discussing a cannabis business in San Francisco with Kukushkin. In an email sent on or about July 22, 2018, Kukushkin complained to Correia about a number of local regulatory issues associated with his cannabis business, and over the next few days Correia and Kukushkin discussed collaborating on a cannabis business in the future. On August 10, 2018, Correia and Kukushkin met in San Diego, California, and appear to have discussed a potential cannabis venture.

b. On or about August 21, 2018, Correia relayed information regarding the business opportunity with Kukushkin to Parnas, writing in an email:

> Great opportunity with these guys since big Andre is funding.' However, it is obvious I'm going to have to spend more time on this than originally planned. These guys are not smart-businessman and the one issue I'm dealing with, which began last night, is literally retarded. I think Andrey Kukushkin is a really good guy, but needs a lot of handholding on some very easy issues. This creates a great opportunity for us!....because they need this help, but, I'm not sure how to find enough time along with everything else we/I am doing if we're not getting paid some sort of consulting fee or salaries in the meantime. Let's discuss. We are going to make it happen no matter what, just trying to figure out the best structure.

c. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, and my participation in the investigation, I believe that Correia's reference to "big Andre" is to Andrey Muraviev, a business partner of Kukushkin's who would be "funding" the venture.

d. On or about September 7, 2018, Parnas, Fruman, and Kukushkin attended a fundraiser in Las Vegas for [redacted] who was at that time the attorney general of Nevada, and a candidate for government in the state's November 2018 election. According to a subsequent email, the event was attended by Vice President [redacted], and a minimum $10,000 donation was required for attendance. In a subsequent email, [redacted] promised, on behalf of the group, to "send [a] donation out in the next couple of days."

e. Parnas, Fruman, Muraviev, Kukushkin, and [redacted][7] began communicating via WhatsApp in the days following the September 7, 2018 [redacted] event regarding their scheme to use Muraviev's money to make political donations that they believed would benefit their

[7] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that beginning in approximately September 2016, David Correia and Lev Parnas began discussing a cannabis and medical marijuana business with prospective partners, including [redacted]. Based on my review of law enforcement records, I am aware that [redacted] was born in Russia and is an American citizen. In May 2017, Correia, Parnas, [redacted] and others met in Miami and discussed a plan to acquire a medical marijuana license in Florida and elsewhere. However, based on my review of email correspondence, it appears that this business venture did not come to fruition in 2017.

cannabis business. Specifically, on or about September 9, 2018, Parnas created a WhatsApp text chain between himself, "Andrey Muravyev", Igor Fruman, Andrey Kukushkin, and [redacted] (the "Text Chain").[8] Parnas wrote: [redacted] Andrey, Igor, Kukhnya. Brothers, I just wanted to introduce you to each other, an[redacted], if you can, get in touch with Andrey and Kuynya." [redacted] responded by providing the [redacted] Number, and wrote, "Who should I call and at what number?" Parnas then told him to call Andrey, which appears to be a reference to Muraviev, and noted that Parnas would "send you his number and contact info momentarily."

f. In the same Text Chain, on or about September 10, 2018, Igor Fruman sent the account details for the [redacted] Account, along with a photograph of [redacted] tax identification number.

g. On or about September 12, 2018, Correia emailed Parnas a document entitled "Cannabis Schedule and budget," which listed a number of intended political donations across five states. The header of the document read "Schedule and Contribution Budget Cannabis Multi-State License Strategy." The document described an effort to "schedule trips to meet with" politicians and candidates in California, Nevada, Florida, New York, and New Jersey – all states with legalized medical or recreational cannabis – and make political donations in the multi-hundred thousand dollars to support those politicians. With respect to Nevada, the document noted that trips would be scheduled to meet with '[redacted] [sic] (AG/next Governor), [redacted] (LV Mayor), Clark County Officials and other relevant associates/agencies in Las Vegas, Reno and Lake Tahoe areas" and that the campaign contribution budget would be

[8] The Text Chain is in English and Russian, the latter of which I do not speak. I have reviewed preliminary English-language translations of the Russian-language text messages in the Text Chain, and my summaries of those Russian-language text messages herein are based on those draft translations.

$250,000. With respect to Florida, the document noted that trips would be scheduled to meet with "Rep. [redacted] (next Gov)" among others, and that the campaign contribution budget would be between $250,000 and $500,000. In total, the document projected between $1.3 and $2 million in political contributions. The document also included a "funding schedule," which noted that $500,000 was "due by 9/12," an additional $500,000 was due by October 1, 2018, and that "remaining funds TBD." For the reasons set forth below, I believe that this funding was to come from Muraviev.

h. On or about September 12, 2018, Correia forwarded the "Cannabis Schedule and Budget" document to Parnas by WhatsApp message, and Parnas replied "Perfect send to Igor." Later that day, Correia wrote "Praying for a good response from Andrey," likely referring to Muraviev. Correia subsequently wrote Parnas to ask for an in-person meeting, and noted that "I would love to be updated on things that we can't discuss over the phone."

i. Following their meeting in Las Vegas in September 2018, Kukushkin and Correia worked on behalf of the group to take steps to formalize their business arrangement. Specifically, on or about September 14, 2018, Correia emailed Kukushkin documents relating to the incorporation of a new entity. On or about September 15, 2018, in a conversation about how to structure the new company, "NewCo," Kukushkin wrote "I believe whats left was for Igor and Lev to establish who is going to be shareholder(s) of the NewCo and could we all use LLC's as our proxy's in it. I am just trying to establish core structure and how transparent should Andrey be exposed for the benefits of NewCo Transparency, his Russian roots and current political paranoia about it." Based on my review of emails pursuant to the January 18 Warrant and my participation in the investigation, I believe that Kukushkin was responding to the corporate documents Correia

had sent the day prior, and was noting the importance of concealing Muraviev's involvement in the corporation due to "his Russian roots and current political paranoia about it."

j. On or about October 1, 2018, Correia forwarded a document entitled [REDACTED] Bylaws" to Kukushkin, and asked him to "take a look." On October 2, 2018, Kukushkin executed the [REDACTED]" bylaws in an email confirmation to Correia. The by-laws provided that [REDACTED] [REDACTED]" would be incorporated in Nevada and that Kukushkin would be the president and treasurer, while Correia would be the secretary. Correia then forwarded the executed by-laws to Fruman and Parnas. Based on my participation in the investigation and my review of emails obtained pursuant to the January 18 Warrant, I believe that the [REDACTED] Bylaws" reflected the new corporation that Kukushkin and Correia (who were the only listed parties on the corporate documents) formed to represent the business venture between Kukushkin, Correia, Parnas, Fruman, and Muraviev.

k. In late September 2018, Parnas and Correia spoke about their plans with respect to Muraviev's money. Specifically, on or about September 30, 2019, Parnas and Correia spoke about the fact that Kukushkin was going to send signed corporate documents so Correia could open a bank account, and Correia updated Parnas regarding travel that Kukushkin wanted [REDACTED] to book on his behalf. Correia closed by noting that "Then....Andrey M can wire the $500k...." Parnas replied and directed Correia not to use their credit cards to book Kukushkin's flight. Correia sent Parnas a proposed draft text message for Kukushkin, that read:

> Hey there buddy. I understand completely. However the new bank and the next $500k is different. The original funding was for charitable donations for political donations, prior to a company being opened. Our agreement was for $1M for 'startup' moneys. However, the next $500,000 is for the "operationa[l]" budget, which would include general company expenses, such as your travel. Therefore our bank account needs to be open tomorrow and a new

> wire for the remain[ing] $500k needs to be sent to accommodate such expenses."

Parnas responded, "Sounds good but confirm with Igor before you send it."[9]



31. Based on my review of financial records, I have learned the following about the manner in which the funds from Muraviev were laundered through the Account which, as described above, was provided by Igor Fruman to the group on the Text Chain:

a. is an authorized signatory. On or about September 18, 2018, the account received a $500,000 wire transfer from an account held in the name of Intellect Capital Cypress Ltd. at , a Swiss bank, with the note "payment as per the loan agreement d."[10] Based on my review of financial records and public sources, I have learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a Russian national.

b. The day before the $500,000 transfer from the account balance of the Account was $1,662.61.

c. The following day, on or about September 19, 2018, approximately $494,415 of the funds in the Account—most if not all of which came from —were used to pay an bill for a credit card in the name of . As discussed infra, based on my review of records from s, I have learned that the

[9] Based on my review of public sources, I have learned that September 2018 was the deadline in Nevada for certain retail marijuana licenses. Nonetheless, it appears from my review of materials obtained pursuant to the May 16 Warrant that Parnas, Igor Fruman, Correia, Kukushkin, and Muraviev contemplated that their contributions and donations would aid them in changing Nevada's rules or getting them preferential access to new licenses.

[10] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Cypress entered into a loan agreement with for the amount of $500,000, which was set to be repaid by December 31, 2018. Based on my review of available bank records for the account through May 2019, it does not appear that this "loan" was ever repaid.

[REDACTED] credit card account was used to pay for a June 12, 2018 $50,000 contribution to [REDACTED] PAC in the name of [REDACTED]," referenced above, as well as a $15,000 contribution to the [REDACTED] Fund, and a $5,400 contribution to [REDACTED] for Congress, all of which were also made in Igor Fruman's name. As discussed below, [REDACTED] was listed on the group's contribution chart. Muraviev thus appears to have funded each of these donations. The remainder of the [REDACTED] expenses paid by Muraviev's funding were for travel and other personal expenses. Thus, it appears that while Parnas and Fruman did use a portion of Muraviev's money to, as agreed, fund political donations and pay for travel that may be related to their venture, at least some portion of the funds appear to have been used for purposes other than what was discussed with Muraviev and Kukushkin.

32. Based on my review of emails pursuant to the January 18 Warrant, I have learned that in early October 2018, Correia circulated several documents to Parnas and Igor Fruman that appeared to be more detailed versions of his prior "Cannabis Schedule and budget" described above, which set forth the precise candidates and campaigns that Muraviev's funds would be donated to. Specifically, I have learned the following:

a. On October 8, 2018, Correia emailed Parnas and Igor Fruman a document entitled "State Campaign Contributions." In the cover email, Correia noted that the document was a draft, and that he would put it into a "final format" once "we go over these things." Correia also told Parnas and Fruman that they needed to discuss "which donations have been made" and "which are only committed." Specifically, I have learned the following with respect to the draft document:

i. The document contained a table of intended campaign contributions to support state and local candidates in New Jersey totaling $102,500; New York totaling $160,000; Florida totaling $390,000; Nevada totaling $225,000; California totaling $120,000; and Colorado

totaling $110,000. The total sum of intended contributions was approximately $1.1 million, to support 25 separate candidates, who were both [REDACTED] and [REDACTED].

ii. With respect to Nevada, the chart listed intended donations of $150,000 to support [REDACTED] and $75,000 to support [REDACTED], a candidate for state attorney general. With respect to Florida, the chart listed an intended donation of $250,000 to support [REDACTED] with a note that it had been made or promised on October 3, 2018.

iii. Later on October 8, 2018, Correia sent a "final draft" of the same document to Parnas and Igor Fruman. Correia wrote "Gents, please see attached. If all good. Please forward on ...." The document was entitled the [REDACTED] Contribution List" and the document's header read [REDACTED] State Campaign Contributions." Specifically, the document reflected the following donations and commitments:

| *Candidate* | *Office* | *Noted Commitment or Payment* | *Amount* |
|---|---|---|---|
| [REDACTED] | US. Senator (New Jersey) | Committed | $45,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Paid | $50,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Committed | $15,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Committed | $20,000 |
| [REDACTED] | U.S. Senate Candidate (New Jersey) | Committed | $15,000 |
| [REDACTED] | U.S. Rep. Candidate (New Jersey) | Committed | $15,000 |
| [REDACTED][11] | New Jersey Attorney General | Paid | $50,000 |
| [REDACTED] | U.S. Senator (New York) | Paid | $35,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $20,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $50,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $15,000 |
| [REDACTED] | New York Attorney General Candidate | Committed | $40,000 |
| [REDACTED] | New York Attorney General Candidate | Paid | $30,000 |

[11] Based on my review of public reporting, I have learned that [REDACTED] was at that time the attorney general of Rhode Island. Similarly, while [REDACTED] is listed as a candidate, he was in office at that time.

| | | | |
|---|---|---|---|
| [redacted] | New York Governor | Paid | $125,000 |
| [redacted] | U.S. Rep. (Florida) | Paid | $15,000 |
| [redacted] | Florida Attorney General Candidate | Committed | $75,000 |
| [redacted] | Florida Governor Candidate | Committed | $250,000 |
| [redacted] | U.S. Rep. (Florida) | Committed | $50,000 |
| [redacted] | U.S. Senate Candidate (Florida) | Paid | $100,000 |
| [redacted] | Nevada Governor Candidate | Committed | $200,000 |
| [redacted] | Nevada Attorney General Candidate | Committed | $50,000 |
| [redacted] | U.S. Senator (Nevada) | Paid | $40,000 |
| [redacted] | California Attorney General Candidate | Committed | $40,000 |
| [redacted] | California Governor Candidate | Committed | $80,000 |
| [redacted] | U.S. Rep. (California) | Paid | $125,000 |
| [redacted] | U.S. Rep. (Texas) | Paid | $150,000 |
| [redacted] | PAC | Committed | $250,000 |

iv. In total, the chart reflected that $720,000 contributions had been paid, and that $1,230,000 in commitments were outstanding, for a total projected amount of campaign contributions of $1,950,000. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and participation in the investigation, I believe that the [redacted] Contribution List" was a more detailed accounting of the campaign contributions that Parnas, Igor Fruman, and Correia intended to make, including with Muraviev's funds. [redacted]" is the name of the corporation that Correia and Kukushkin formed following their meeting in Las Vegas with Parnas, Igor Fruman, and Muraviev. Moreover, from my review of material obtained pursuant to the May 16 Warrant, I have learned that on or about October 9, 2018, Igor Fruman sent the "[redacted] Contribution List" that Correia had prepared to Muraviev and Kukushkin via WhatsApp.

33. After receiving the [REDACTED] Contribution list, Muraviev sent an additional $500,000 to Parnas and Igor Fruman (at [REDACTED] Account) in October 2018. Specifically, based on my review of financial records, I have learned the following:

a. On or about October 16, 2018, the [REDACTED] Account received a $500,000 transfer from [REDACTED] from an account at the [REDACTED]. Based on my review of public sources, it appears that [REDACTED] has the same registered director, secretary, and address as [REDACTED], Cyprus. The day before the transfer, the account balance of the [REDACTED] Account was $5,982.16. The same day that the [REDACTED] Account received the wire transfer from [REDACTED] those funds were used to pay a $79,054 [REDACTED] credit card bill at [REDACTED] and nearly all of the remaining money was wired out to accounts controlled by Parnas and Igor Fruman.

b. Based on my review of records from [REDACTED] I have learned that the [REDACTED] credit card account was used to pay for two donations on November 1, 2018, which were made in Igor Fruman's name: $10,000 to [REDACTED] for Nevada, and $10,000 to [REDACTED] – Candidate for Nevada Attorney General, which are discussed below. Thus, Muraviev's money appears to have funded these donations, both of which were on the [REDACTED] Contribution List.

c. Based on my review of financial records, it appears that most of Muraviev's funds from the second wire transfer were not used for legitimate cannabis-related business expenses, but were instead used for personal expenses, other payments to consultants, and the donations to [REDACTED] and [REDACTED]. In addition, based on my review of emails obtained pursuant to the January 18 Warrant, I believe that this is the second transfer contemplated by Correia's "Cannabis Schedule

and budget" described above, which was circulated within days of the group's Las Vegas meeting, and contemplated that funding in the amount of $500,000 would be due on October 1, 2018.

34. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and public reporting, I have learned the following about the political activities and conversations of Parnas, Fruman, Kukushkin, Muraviev, and Correia after Muraviev made the second $500,000 wire transfer in October 2018:

a. On or about October 19, 2018, [redacted] emailed [redacted] at the [redacted] National Committee, to confirm that Parnas, Igor Fruman, and Kukushkin would attend an October 20, 2018 campaign rally that featured [redacted] and President Trump. [redacted] wrote that, with respect to making a donation, "think the only problem we might run into is that our FEC lawyer has advised us not to make any contributions until this matter is resolved. But I will double check with both our lawyers and Lev to see how we should proceed." Based on my participation in the investigation, I believe that [redacted] was referring to the FEC complaint filed against Fruman and Parnas, discussed above, related to the $325,000 donation from GEP to [redacted].

b. On or about October 20, 2018, Kukushkin, Parnas, and Igor Fruman attended the campaign rally for [redacted] in Nevada.[12] Kukushkin, Parnas, and Fruman sent 10 photographs of themselves to Muraviev. The photographs depict, among other things, Kukushkin posing with [redacted] a candidate for Nevada state attorney general; and Kukushkin with Parnas and Igor Fruman.

[12] Based on my review of the Text Chain, it appears that [redacted] left the Text Chain on or about October 19, 2018, and thus did not receive any messages sent after that date.

c. On or about October 22, 2018, a member of [redacted] staff emailed Parnas, and noted that "[redacted] asked [that] I reach out and send you his W9. I have also attached his contribution form." [redacted] emailed [redacted] staff member the next day because "Lev asked me to get in touch with you regarding donations," and subsequently coordinated the donation with the staff member over the next week. [redacted] confirmed that the donation had been made on November 1, 2018, in the amount of $10,000, in response to which [redacted] campaign staff asked if the donation was "just" the $10,000. Based on my review of emails obtained pursuant to the January 18 Warrant, including the "[redacted] Contribution List," I believe that Parnas may have committed to donate $50,000 to [redacted] but only donated $10,000, which, as noted above, was funded by Muraviev.

35. Based on my review of the Text Chain, I have learned the following:

a. Following the October 20, 2018 rally, Kukushkin learned that their efforts to obtain retail licenses in Nevada were failing, including because the group had missed the September 20, 2018 application deadline,[13] and he advocated taking additional steps to "change the rules" in order to benefit their business interests, which he noted would need the Governor's approval. As noted above, the group had donated to [redacted] a Nevada gubernatorial candidate.

b. Starting on or about October 30, 2018, it appears that Parnas, Igor Fruman, Kukushkin, and Muraviev had a disagreement with respect to the next steps for their business venture. Parnas complained in a text message that "It['s] very disturbing after all our talks and

[13] Based on my review of Nevada law and information published by Nevada's Marijuana Enforcement Division, I have learned that Nevada law permits the Nevada Department of Taxation (the "DOT") to allocate recreational retail marijuana licenses. The DOT only accepts applications for recreational retail licenses during limited time periods. On July 5, 2018, the DOT announced that it would accept applications during September 7, 2018, and September 20, 2018, for a limited number of recreational retail licenses. The DOT has not held a subsequent application period since that time, and has not announced whether any additional licensing periods will open.

meetings that we are still nowhere in our understandings," and proposed "to stop this partnership and meet to discuss how we can move forward."

c. Muraviev responded in Russian. Based on my review of a draft translation of Muraviev's response, I have learned that Muraviev stated that "In Las Vegas we agreed on principals of our cooperation and share in future enterprise, as well as a movement strategy. It was decided that I will provide $1 million for our future enterprise (500 Nevada, California and 500 New York, New Jersey). As of today, I fulfilled all my obligations completely! Then we're supposed to work on obtaining licenses at these states. If our company is registered, then we have to move to the part two, filing the applications. Yesterday Igor told me that 2 more millions needed for other states. It was not in our agreement! And if conditions change, then I have no objections against termination of our partnership. I plan to be at the USA after November 15, ready for meetings." Based on my participation in the Investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Muraveiv's reference to "$1 million for our future enterprise" referred to his payment of $1 million to fund donations to politicians in five states, as set forth in Correia's "Cannabis Schedule and budget" described above. In addition, because by this time Muraviev had already transferred $1 million to Parnas and Igor Fruman, he confirmed that "I fulfilled all my obligations completely!" However, the revised version of Correia's donation document, the [REDACTED] Contribution" list, added additional states and donations which totaled more than $2 million. This change appears to have been conveyed to Muraviev by Igor Fruman ("Yesterday Igor told me 2 more millions needed"), which led Muraviev to dispute that the additional amount for the other states was "not in our agreement."

d. In response, Parnas wrote, "I don't want to discuss everything over text when we met in vegas I agree I also thought we are [on] the same page and yes you sent what discussed for

part one the 2 mm that Igor spoke with you was a suggestion not a deal changer. We did very thing we are supposed to do with part 1 but we never started part 2 – office and personal to do the work. Now as far as deal changing it is your partner that told me a different deal than we discussed I wanted to send this text when I was in vegas but Igor talked me into waiting til he spoke with you."

e. Kukushin replied to the Text Chain that, "I believe we all have a clarity from day 1 and precise course of action. We have performed everything that we have agreed upon on our end. The Nevada company has been formed, the operating agreement signed and bank account opened. *Money transferred by Andrey M to Global Energy was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing.* I haven't changed any rules of our engagement and was present at all the scheduled meetings with officials in Nevada." (emphasis added). Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Kukushkin was referring to the fact that they had formed [redacted] signed an operating agreement, and opened a bank account as they had agreed. Kukushkin's reference to Muraviev's money being intended to "support the very specific people & states (per Igor's table)" was a reference to the specific donations intended in the five states set forth in Correia's "Cannabis Schedule and budget" described above, which Correia forwarded to Parnas, which appears to have ultimately been provided to Igor Fruman and/or Kukushkin and Muraviev.

f. On or about October 31, 2018, Igor Fruman wrote, "Just a reminder what they told in Las Vegas in Kunya's presence: They give us right and possibility to become as [redacted] and [redacted] for this town and state!!!!!!!!" Based on my participation in the investigation, I believe that Igor Fruman was referring to what "they," possibly Nevada politicians or candidates, told

Fruman and Kukushkin in Las Vegas, namely that they could be as rich as [redacted] and [redacted] wealthy casino magnates from Las Vegas.

g. Later on October 31, 2018, Muraviev replied in Russian (which has since been translated): "Good morning, everybody! If the question is opening of the office in Vegas, then I suggest taking careful, business-like approach to it. Particularly, we need to define goals, get the employees and give them clear-cut tasks. In my opinion, organizing office and spending 100K a month, as Igor suggests, is not practical at the current stage of company development. I just don't see goals [y]et! If we need an office in NY, then we have to understand what for. . . . After receiving first licenses, we can organize central business office. That's how it usually works! And it seems that we agreed on it."

h. A few days later, Parnas and Kukushkin had a further disagreement about an intended donation to [redacted] As noted above, while a $10,000 donation had already been made, the group had planned to donate more to [redacted] On or about November 4, 2018, Parnas wrote, "Kunya make sure you get [redacted] the 12,500 !!! I was very embarrassed just now they said they never received the check from [redacted] I don't understand?"[14]

i. Kukushkin replied, "Excuse me ?! *Leva, the money where wired to Global Energy in order to cover all the donations whatsoever.* What does it have to do with [redacted] You are the ones issuing them the checks NOT me or Andrey. You should be embarrassed bringing it up after all." (emphasis added). Parnas wrote back, "Are you fuckin crazy What are you talking about you when to meet him and the VP and pledged 12,500 from [redacted]. I don't want to play these games You are going to get everybody in trouble." Kukushkin replied, "From us -- not [redacted] [redacted]

[14] From my involvement in this investigation, I have learned that "[redacted]" is the name of one of Kukushkin's cannabis businesses, which is based in San Francisco.

doesn't do any business in Vegas." Based on my training, experience, and participation in this investigation, I believe that this dispute centered around whether the money that Muraviev had already wired was intended to cover this donation to [redacted].

j. Parnas wrote, " Your fuckin sick [y]ou don't remember what you say to people[, t]his is the governor and attorney general[, h]e came up to me and asked about the group he met [redacted] and why they still don't send a check[.] I'm not going to argue with you[, y]ou can talk to Igor." Kukushkin clarified, "We were supposed to tell him that the check(s) from Global are indeed the donations from us." Parnas wrote back, "This is crazy and stupid shit I'm done." Kukushkin replied, "You supposed to tell them, not me!"

36. Based on my review of public sources, I am aware that federal and state election commissions have the authority to subject campaigns to fines and financial penalties if they violate the campaign finance laws by accepting foreign-funded donations. This is true specifically with respect to Nevada state law. Thus, had the [redacted] and [redacted] campaigns in particular been aware of information that the defendants hid from them (that Muraviev was the true source of the donations) then it appears that they would not have accepted those donations. Thus, the defendants exposed the campaigns to which they donated to the risk of economic harm by hiding information regarding the ultimate source of funds, in violation of certain of the Subject Offenses.

37. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas, Fruman, and Correia ceased their business relationship with Kukushkin and Muraviev in or about November 2018. Specifically, in a memorandum drafted by Correia to Parnas dated November 17, 2018, Correia outlined problems with respect to the proposed cannabis business with Kukushkin, including that Kukushkin's existing cannabis ventures were poorly

managed. In addition, based on my review of bank records, it does not appear that Parnas or Fruman ever returned or repaid Muraviev his $1 million.

Contributions to Representative [redacted] and Unregistered Activities as Foreign Agents

38. In 2018 and 2019, Parnas, and possibly others, appear to have worked to remove the U.S. Ambassador to Ukraine [redacted], at the direction and request of a Ukrainian government official, in violation of certain of the Subject Offenses.

39. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned that going back to at least 2016, Parnas and Fruman had close relationships with Ukrainian government officials, to include [redacted] (then-Head of the State Fiscal Service of Ukraine),[15] [redacted] (then-General Prosecutor of Ukraine), and [redacted] (then-President of Ukraine). Parnas also appears to have acted as an intermediary on their behalf in the United States. Specifically, I have learned the following with respect to Parnas's activities in 2016 and 2017 related to Ukrainian officials:

a. In December 2016, Fruman flew with [redacted] from Munich to Miami, and arranged a dinner for [redacted] Fruman, Parnas, Correia, and others at [redacted] on December 15, 2016, apparently to pitch [redacted] on investing in [redacted] a fund associated with Correia. Based on my review of financial records, I have learned that [redacted] subsequently wired $500,000 (from [redacted]," which based on my review of publicly available corporate records, appears to be a U.K. company that was dissolved in 2018) to an account Parnas controlled on January 11, 2017 (unrelated to [redacted], the fund that Correia pitched). Based on my

---

[15] Based on my review of public reporting and participation in the investigation, I have learned that the State Fiscal Service of Ukraine is a governmental agency that combines the powers of tax authorities, customs, and financial police, and is responsible for, among other things, implementing state tax and customs policy.

review of emails obtained pursuant to the January 18 Warrant, I have learned that [REDACTED] transferred the funds to Parnas pursuant to a promissory note, signed only by Parnas, which described the funds as a loan.[16]

b. Several weeks later, Parnas began communicating with [REDACTED] a Florida-based lobbyist, in order to have [REDACTED] represent [REDACTED] personal interests in the United States. Between December 2016 and January 2017, Parnas served as an intermediary between [REDACTED] and [REDACTED] and received a referral fee from [REDACTED] after [REDACTED] was retained. However, it appears that [REDACTED] and Parnas took efforts to hide the fact that [REDACTED] was the ultimate client: in an early draft of a retainer agreement circulated in early January 2017, the client was listed as a British law firm "acting in the interests of [REDACTED] a citizen of Ukraine." However, after [REDACTED] told Parnas that he needed to run the contract by the Senate Foreign Relations staff, subsequent drafts (and the final signed version) omitted any reference to [REDACTED] and described the client simply as the British law firm. Email correspondence makes clear that [REDACTED] was the ultimate client: Parnas sent the contract (which he received from [REDACTED]) to [REDACTED] for his final signature, although a woman signed the contract as an "authorized representative," and Parnas directed [REDACTED] to pay [REDACTED] $100,000, which [REDACTED] appears to have done. The contract memorialized an agreement for [REDACTED] to "consult with the Client and advocate on its behalf" on any issues "before the Federal government of the United States" in exchange for $100,000 per month, plus costs.

c. Parnas also solicited [REDACTED] help in ensuring that [REDACTED] and other Ukrainian officials were invited to the U.S. presidential inauguration, and had access to tickets to inaugural

---

[16] Based on my review of bank account records, it appears that Parnas used these funds for largely personal expenses, and does not appear to have repaid [REDACTED].

events. On January 4, 2017, Parnas emailed [redacted] a copy [redacted] passport, with the subject line "Inaugural." On January 11, 2017, Parnas asked [redacted] for invitation letters, apparently to the Inauguration, for [redacted] (a Ukrainian entrepreneur and former government official), and [redacted] (the former Prosecutor General). On January 14, 2017, a representative of the inaugural committee emailed Parnas to confirm that tickets had been set aside for Parnas, Fruman, [redacted]. It appears tha [redacted] attended at least some inaugural events with Parnas, and while [redacted] may have been invited, he did not attend.

d. Following the presidential inauguration, Parnas acted again as an intermediary between [redacted] and the Ukrainian government. On February 10, 2017, [redacted] emailed Parnas a copy of a contract for services between the "Government of Ukraine" [redacted] which appeared to be separate from [redacted] work for [redacted] (which was already subject to a paid retainer and signed contract). On February 14, 2017, [redacted] sent Parnas a copy of a letter from [redacted] to President [redacted], in which [redacted] apologized for not being able to travel to meet [redacted], but looked forward to meeting him in New York to "discuss the issues of importance to Ukraine in its relations with the United States." Parnas then forwarded a copy of the letter to [redacted]. However, [redacted] terminated his work on behalf of these Ukrainian clients shortly thereafter: on February 19, 2017, Parnas forwarded [redacted] a copy of an article in the [redacted] entitled "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates." [redacted] the managing partner of [redacted] Washington office, wrote back "Not good." On March 14, 2017, [redacted] emailed Parnas in reference to [redacted] "representation of the [British law firm]," and wrote that because they have not "received any direction" in the three months they have been under contract, [redacted] was terminating the agreement. Parnas replied, "Got it. I will let them know." Based on my review of Department of Justice filings related to FARA, I have

learned that neither [redacted] nor Parnas registered under FARA in connection with any work performed in 2017 for [redacted] the British law firm, or the government of Ukraine.

40. Based on my review of materials obtained pursuant to the May 16 Warrant and public reporting, it appears that at least two events—both of which were subsequently referenced by [redacted],[17] the Ukrainian Prosecutor-General, in his communications with Parnas regarding [redacted] removal in the spring of 2019—appear to have provided motives for [redacted] or others allied with then-President [redacted] to seek [redacted] removal in the spring of 2018. Specifically, I have learned the following:

a. According to public reporting, on April 4, 2018, Ukraine's National Anti-Corruption Bureau ("NABU") released an audio recording of [redacted] the head of the Special Anti-Corruption Office ("SAPO") implicating [redacted] in corruption. According to public reporting, NABU receives funding from the U.S. and European Union aid programs, and has worked with U.S. law enforcement to share information in the past. In the recordings, [redacted] tipped off corruption targets that they were going to be searched, and pressured anti-corruption prosecutors and judges. As discussed below, [redacted] referenced this episode the following year, when she called for [redacted] removal. Based on subsequent messages

[17] Based on my review of public reporting and participation in the investigation, I have learned that [redacted] appointed [redacted] as Prosecutor-General on or about May 12, 2016, after the former Prosecutor-General, [redacted] was removed from his office by parliament. According to public reporting, [redacted] has no legal training and is an ally of [redacted] Based on my review of the May 16 Warrant returns, I have learned that according to a message between Parnas and [redacted] dated May 2, 2019, Parnas referred to [redacted] as "the head of the Ukrainian Republican party." According to public reporting, in 2014, [redacted] was elected the leader of the Bloc of [redacted] political party. In August 2015, the Ukrainian Democratic Alliance for Reform merged with the Bloc of [redacted] party, and [redacted] became its leader. [redacted] is currently the mayor of Kiev, and was a former professional boxer who hired Rudolph Giuliani in 2008 as a campaign consultant. In September 2019, [redacted] was fired by [redacted], the newly-elected president of Ukraine.

between [redacted] and Parnas which are discussed below, in which [redacted] arranges for [redacted] to be interviewed by a journalist as part of their efforts to remove [redacted], it appears that [redacted] are aligned, or at the very least, are aligned in their opposition to NABU and [redacted]

b. According to public reporting, in early 2018 [redacted] led an investigation into corruption within the State Migration Service ("SMS"), which led to the arrests of NABU agents. [redacted] used this episode to attack the head of NABU [redacted] as incompetent, and introduced an anti-NABU piece of legislation. However, [redacted] announced that [redacted] arrests had thwarted a joint FBI-NABU investigation into the SMS allowing Iranians to obtain Ukrainian passports. According to public reporting, [redacted] and officials from the European Union used this incident (the thwarted investigation) to stop lawmakers from passing the anti-NABU legislation introduced by [redacted]. [redacted] subsequently sent documents related to this incident to Parnas in the spring of 2019, as their efforts to remove [redacted] intensified, and his messages evinced a belief that [redacted] were aligned against [redacted].

c. According to an interview with [redacted] published in the [redacted] on October 1, 2019, [redacted] frequently clashed with Ambassador [redacted] beginning in as early as 2016. Specifically, [redacted] stated that in his first meeting with [redacted] in 2016, [redacted] snapped at [redacted] that "no one is going to dictate to me who is going to be investigated," with respect to [redacted] investigations into anti-corruption activists, and that [redacted] left the meeting. According to the [redacted] article, as [redacted] stepped up her criticism of Ukraine's failure to root out corruption, [redacted] "personal animus toward [redacted] grew," and he became convinced that "he needed to go around her and find a direct path to a more receptive audience: Mr. Trump's inner circle."

41. Based on my participation in the investigation to date, it appears that the initial request to remove [REDACTED] originated in the spring of 2018. Based on my review of border crossing records, it appears that Parnas was in the United States in early 2018. Fruman, however, traveled to Ukraine in March, April, and May 2018.[18] Around that same time period, Parnas and Fruman started attending political fundraising events and making contributions to congressional candidates and political action committees (including in the name of GEP) with the apparent purpose of enhancing their influence in [REDACTED] circles, as discussed above.

42. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound access to seek [REDACTED] removal. Specifically, I have learned the following:

a. During an April 20, 2018 roundtable at [REDACTED] sponsored by the [REDACTED] [REDACTED] PAC, Parnas met then-Congressman [REDACTED] (R-TX), and subsequently scheduled a meeting with [REDACTED] for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with [REDACTED]. Fruman was in Ukraine at the time, and so Parnas sent him two photographs of the meeting: one depicted Parnas pointing at a map of Ukraine and Eastern Europe while [REDACTED] looked on, and the other photo depicted [REDACTED] posing with Parnas.

---

[18] While the exact nature of Fruman's trips—and who he met with—is unknown, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that at least some of those trips were geared towards various business ventures. Based on my participation in the investigation, I have learned that Fruman appears to be an investor in a bar and restaurant in Ukraine, and previously invested in a milk company in Ukraine. Around this time, in the spring of 2018, based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Fruman began exchanging messages with Parnas regarding energy companies in Ukraine and Poland.

b. It appears that in that first meeting, Parnas discussed with the United States Ambassador to Ukraine, , and advocated for her removal from that position. In a letter dated that same day—May 9, 2018— wrote to Secretary of State

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine. As you likely know, is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. as U.S. Ambassador to Ukraine immediately. I kindly ask you to consider terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and noted, "Please don't distribute, this is only for your records." Parnas had multiple other meetings with in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to who was running for reelection in November 2018, which were funded by Fruman (and reimbursed later with funds from Muraviev, a Russian national, as discussed above).

d. Parnas's efforts to remove continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President of Ukraine. Later that month, staff arranged a call with the State Department regarding Ambassador Prior to that meeting, chief of staff asked Parnas if there was anything else he wanted to discuss before she spoke to the State

Department. Despite [redacted] letter and subsequent efforts, Ambassador [redacted] was not removed from her posting at that time.

43. After lobbying [redacted] to remove [redacted] did not on its own succeed, it appears that Parnas soon enlisted Rudolph Giuliani[19] in his efforts to remove [redacted]. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

a. Parnas appeared to have met Giuliani at one of the Republican fundraising events Parnas attended in the spring of 2018. In September 2018, Parnas retained Giuliani, through his consulting firm [redacted] ostensibly to act as a consultant and spokesman for Parnas's fledgling insurance business, Fraud Guarantee. As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid. However, based on my participation in the investigation and my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that Giuliani's work for Parnas involved, in large part, assisting in the efforts to remove Ambassador [redacted]

44. It appears that Giuliani's assistance on the Ambassador issue began in earnest in December 2018. Based on my review of public reporting and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

[19] Based on my review of the January 18 Warrant, I have learned that while Giuliani is an attorney, the parties' contract includes a detailed description of the scope of work to be performed by [redacted] none of which was legal in nature. To the contrary, the terms of the contract expressly state that [redacted] is being retained "as a consultant" and describes a series of non-legal tasks to be completed in that capacity. Based on my participation in the investigation, aside from his statement that Fruman and Parnas were his "clients," described below, it does not appear that Giuliani was ever representing Fruman or Parnas as an attorney at any point.



a. On December 7, 2018, Parnas forwarded Giuliani a copy of the May 9, 2018 Sessions letter.

b. In January 2019, Giuliani and Parnas met with █████ at █████ in New York. A memorandum regarding the meeting, which appears to have been subsequently provided to the State Department by Giuliani,[20] indicates that they discussed Ambassador █████ who █████ asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine – an apparent reference to NABU and █████ – and who █████ claimed asked him to close three cases, including a case against the member of Ukraine's Parliament who was involved in the disclosure of █████ related information. According to the memorandum, █████ also reported that he had re-initiated an investigation his predecessor, █████, had opened into █████, in which █████, a board member, was implicated.

c. Around the same time, also according to a memorandum which appears to have been provided to the State Department by Giuliani, Parnas and Giuliani participated in a phone interview of █████ (the former Prosecutor General), who provided information about his █████

[20] Based on my participation in the investigation, I have learned that according to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Secretary of State █████ received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani, among others, with █████ and █████, dated January 23, 2019, regarding █████. The documents were separated into folders that bore the insignia of the Trump Hotel. The notes from the meeting with █████ include his allegation about the "do not prosecute list," discussed below, and his explanation that the heads of SAPO and NABU "do not like each other" and that the head of NABU favored █████ over Trump, and that █████ spends money on "good public relations" for NABU. The package then contained █████ March 20, 2019 articles (discussed below) featuring his interview with █████ along with documents that appeared to be █████ notes and emails regarding the articles. On October 2, 2019, Giuliani confirmed to █████ that the package originated with him, and that he gave the documents to the White House, which then passed them to █████ Giuliani claimed that █████ told him that █████ would refer the documents for an investigation.

investigation and claimed that President [REDACTED] had put an end to the investigation at the request of then-Vice-President [REDACTED]

45. Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that on February 11, 2019, Parnas and Giuliani again met with [REDACTED], this time in Warsaw, Poland. Based on my review of materials obtained from the May 16 Warrant, I have learned that in February 2019, [REDACTED], an attorney and the spouse of former Washington D.C. United States Attorney [REDACTED] appears to have become involved in the effort to remove Ambassador [REDACTED] On multiple occasions, she asked Parnas if Giuliani had completed drafting a retainer agreement, noting in one instance that "[o]ur hands are pretty tied about doing much until we have it in place as we need it for FARA." Texts messages suggest that Giuliani was preparing a retainer agreement, and Parnas stated in one message that the retainer should be between [REDACTED] and the Ministry of Justice of Ukraine (Attn: [REDACTED]).

46. Based on my review of materials obtained from the May 16 Warrant, I have learned that on or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between "[REDACTED] as the General Prosecutor of Ukraine," and [REDACTED] and [REDACTED].[21] The retainer amount was $200,000 for services by Giuliani, [REDACTED] and [REDACTED] in recovering "sums of money in various financial institutions outside Ukraine." It is not clear what this phrase refers to, and may simply have been an effort to legitimize, or give the

[21] Based on my review of materials obtained pursuant to the May 16 Warrant, it is not clear whether Parnas or Giuliani forwarded a copy of the February 2019 draft retainer agreement to [REDACTED] Around that time, [REDACTED] repeatedly asked Parnas what the status of the retainer agreement was, and asked him to forward her a copy. Parnas responded that he was trying but it was not going through, although it is not clear whether Parnas ultimately succeeded in forwarding the draft retainer to [REDACTED].

appearance of legitimacy to, what were in truth their efforts to remove the U.S. ambassador to Ukraine. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement." On February 20, 2019, Parnas asked Giuliani to send wire instructions and a "signed copy by you [REDACTED] so they can execute and wire funds." Later that day, Parnas confirmed that he "received signed retainer," however, we have not obtained a copy of the signed retainer. As discussed below, drafts of three long-form retainer agreements between [REDACTED] separately – all of which were signed by [REDACTED] – were subsequently circulated in April 2019. Based on my review of Department of Justice records related to FARA filings, I have learned that none of Parnas, Fruman, Giuliani, [REDACTED] registered under FARA at any point in 2018 or 2019.

47. Based on my review of materials obtained from the May 16 Warrant, I have learned that after Giuliani received payments from Parnas, Giuliani appeared to have privately lobbied high-level officials—including, apparently, Secretary of State [REDACTED] and President Trump—for the removal of Ambassador [REDACTED]. On February 11, 2019, the same day that Giuliani and Parnas met with [REDACTED] asked Parnas and Giuliani in a text message "Is there absolute commitment for HER to be gone this week?" Giuliani replied, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. [REDACTED] is now aware of it. Talked to him on Friday." On February 14, 2019, [REDACTED] asked Parnas if he had heard from Giuliani, and Parnas said he had, and encouraged [REDACTED] to "nudge [Giuliani] about the Mrs. A.," which appears to be a

[22] Based on my review of publicly available material, I have learned that [REDACTED] worked under [REDACTED] at that time as the deputy head of International Legal Cooperation. According to an article published on October 5, 2019 in the [REDACTED], [REDACTED] asked [REDACTED] to remove [REDACTED] at a meeting in 2016 due to [REDACTED] corruption.

reference to Ambassador [redacted]. On February 16, 2019, Parnas texted [redacted] that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." It appears Parnas was in Ukraine at the time. [redacted] responded, "That's for Rudy to get tonight." The next day, [redacted] asked Parnas if Giuliani "meet with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to President Trump. Later that day, [redacted] asked "Was he successful re Amb?" to which Parnas replied "this week."

48. Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that shortly after Giuliani's lobbying efforts, Parnas traveled to Ukraine in late February and met with [redacted]. On February 21, 2019, Giuliani texted Parnas, "How is it going????" to which Parnas replied, "Meeting with [redacted] [redacted]] now everything good." Three days later, Giuliani again asked how things were going, and Parnas explained that he was "meeting with [redacted] in 2 hours he has some paperwork to give us I'll call you after the meeting." It is currently unclear whether these meetings between Parnas and [redacted] regarded [redacted] desire to have the Ambassador removed; Giuliani's desire for information about [redacted]; or both; or another topic. Nonetheless, as reflected in text messages below, it does appear that Parnas's efforts to have Ambassador [redacted] removed were done at the request of [redacted].

49. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that following Parnas's meeting with [redacted] in February 2019, and given that Giuliani's lobbying efforts appeared to have failed, Parnas, [redacted], Giuliani, and [redacted] worked with a journalist [redacted] at [redacted] to mount an aggressive public media campaign to remove [redacted]. Their media campaign began within days of [redacted]

complaining to Parnas about actions that [redacted] had taken in Ukraine against an ally of [redacted]. Specifically, I have learned the following:

50. According to articles published on March 6, 2019, [redacted] gave a speech in which she called for [redacted] removal from SAPO. As discussed above, NABU had previously called for the removal of [redacted] (who, according to public reporting, was an ally of [redacted] [redacted] [redacted]), and claimed that [redacted] had leaked information about corruption cases to corruption targets; yet a year later, [redacted] was still in his position. [redacted] also criticized the Ukrainian court system, which she described as riddled with compromised judges.

51. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that [redacted] immediately complained about [redacted] statements to Parnas. Specifically, on March 5, 2019 (which appears to be the day of [redacted] speech, which was not reported until the following day), [redacted] texted Parnas "Ambassador openly called to fire head of the SAPO," which was a reference to [redacted] Parnas asked [redacted] to call him, and [redacted] reported that the Ambassador had also criticized Ukrainian Supreme Court judges.

52. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that in response to [redacted] complaint, on March 8, 2019, Parnas sent [redacted] a photograph of [redacted] letter, and she replied by sending the contact information for [redacted] [redacted], a reporter at [redacted]. That same day, according to text messages, it appears that Parnas, [redacted], and [redacted] met with [redacted] about Ambassador [redacted], and the next day Parnas sent [redacted] information about the Ambassador. Specifically, I have learned the following:



a. [redacted] wrote Parnas again on March 8, 2019, and referred to a statement [redacted] made in which she called for [redacted] removal; Parnas replied "we are all in the loop," and wrote to confirm that they were setting up an interview with [redacted] and a journalist [redacted], as discussed below). [redacted] then sent Parnas the contact info for [redacted] wrote: [redacted]] is waiting I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and [redacted] discussed setting up an interview between [redacted], but [redacted] told Parnas that [redacted] could not answer questions about "the Ambassador, [redacted]" in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, [redacted] was running for re-election, which he would ultimately lose.

b. [redacted] appeared to grow impatient with Parnas's failure to secure [redacted] removal. On March 11, 2019, [redacted] asked Parnas when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On March 13, 2019, [redacted] wrote Parnas "I am fucking sick of everything. I did not get the visit. My First did not get shit. I am ready to screw your opponents. But you want even more. We – everything. You – later. This is not fair." Based on my participation in the investigation, this appears to be a reference to [redacted] and others' willingness to share information about [redacted] and [redacted] and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador [redacted] and meeting with the Attorney General. On March 14, 2019, Parnas responded "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or [redacted]

c. Parnas, continued to work together to publicize allegations through A few days later, on March 12, 2019, Parnas received from a written narrative and answers to questions posed by about , Vice-President Parnas forwarded answers to Around that time, Parnas also spoke to and conveyed additional information back to indicated that he needed President and "on the record about the ambassador and ," and so Parnas set up an interview between .

d. Based on my review of public reporting, I have learned that on March 20, 2019, a portion of video interview with and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in In his interview, claimed he would open an investigation into whether the director of NABU, attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee ." In a second video interview published on March 20, 2019, by in told that Ambassador had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017. reported that was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman wrote a "private letter asking Secretary of State to recall the current U.S. ambassador, alleging that she made disparaging statements about President ." also posted a copy of the letter. The article quoted as describing allegations as untrue and an "absurd attempt" to discredit NABU.

53. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas continued working to publicize allegations against



             and texted links to articles to many of his contacts. Specifically, I have learned the following:

a. On March 20, 2019, Parnas sent , the development director of PAC (to whom Parnas had previously donated in the name of GEP) links to both of articles in along with links to tweets by and . Parnas instructed "have retweet it," an apparent reference to confirmed "sent." As discussed below, retweeted a related article several days later. However, President Trump retweeted one of the links that Parnas sent to that same day, on March 20, 2019: an article entitled "As Russia Collusion fades, Ukrainian plot to help emerges." then sent a copy of President Trump's tweet to Parnas.

b. Parnas frequently updated on the success of their March 20, 2019 press blitz. Parnas promptly sent a screenshot of President Trump's tweet to . In an apparent effort to garner more information for , Parnas asked to send him "the names of the people that she said," which appears to be a reference to claimed "do not prosecute list." sent Parnas three names ( , MP, MP, , ngo") and described them all as "loud NABU activist[s]." As discussed above, based on public reporting, it appears that may have clashed with regarding NABU in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for to claim that had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated and told him that "Today you become a world-class political figure. Glory to the Ukraine !!!" then asked Parnas if it was "true, that the Ambassador chick and [sic] were called to Washington," which appears to be a reference to , the head of NABU, to which Parnas replied, "I will call later. We'll

talk." Parnas then reported to [REDACTED] that President Trump had re-tweeted a story about [REDACTED]. [REDACTED] responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that [REDACTED] reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

c. The day after [REDACTED] published the [REDACTED] interview, on March 21, 2019, Parnas complained to [REDACTED] that the top news story in Ukraine was the reporting regarding Ambassador [REDACTED] which prompted the Ambassador to put out a statement saying that [REDACTED] was a "prime example of corruption." [REDACTED] was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," [REDACTED] continued, "they are saying in the State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call [REDACTED] and had "good news." Then, in an apparent effort to quell the negative press [REDACTED] was receiving and further publicize their allegations against [REDACTED], Parnas offered to [REDACTED] "You want me to go on [REDACTED] and talk about it? I would not mention any names if I did that. I would just say a client approached me six months back with allegations that FBI and US Ambassador in Ukraine were playing favorites. And reference [REDACTED] getting free pass and alleged ties to 'high level [REDACTED] administration officials'. Maybe mention allegations about setting up [REDACTED]. The media could connect the dots from there." Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant, Parnas's reference to his "client" appears to refer to [REDACTED]



d.  Based on my review of public reporting, I have learned that                     article soon received substantially increased press attention. On March 23, 2019, on the

on                 ,                 aired a segment highlighting that former-Congressman                 sent Secretary of State                 "an urgent letter" in May 2018, asking that Ambassador                 be removed from her position, and published a copy of that letter.                 was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post . . . as a result of her activities there which were complained of by Congressman                 She is known and reported by people there to have bad-mouthed the President of the United States                 , to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that Trump had decided, at least at that point, to fire                 appears to be the "good news" that Parnas reported back to                 two days prior.

e.  In an apparent reference to                               interview, Parnas happily wrote to                 "I love you and your husband you are the best," and "Tell     he was awesome my hero."                 responded, "We can be really great if we have a retainer signed." Parnas agreed, and                 asked if the "Wicket Witch" was gone, which appears to be a reference to

f.  On March 23, 2019, Correia texted Parnas:                 must be pretty happy!! And grateful?!," Based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that Correia's statement appears to be a reference to the possibility that

Congressman [redacted] would replace [redacted][23] Correia then wrote, "This is insane! Finally the facts come out, [redacted] etc., and, looks like she's finally fired . . . This is even better than if it happened before." Parnas replied, "Just the beginning."

g. Around this time, [redacted] and Giuliani began frequently posting messages related to Ukraine, [redacted] and the 2016 election on Twitter, apparently in an effort to further magnify the press attention their claims against [redacted] would receive.

h. On March 24, 2019, [redacted] retweeted an article summarizing [redacted] reporting in the [redacted] entitled "Calls Grow to Remove [redacted] U.S. Ambassador to Ukraine."

i. Although Parnas, Giuliani, and [redacted] appeared to be pleased with the press response in the U.S., the press response in Ukraine appeared to be unfavorable to [redacted]. On March 26, 2019, [redacted] sent Parnas pictures of documents that allegedly contained information about [redacted], and noted, "I hope this is enough." He then complained to Parnas that despite the information he was gathering about [redacted] the Ambassador had not been fired. In particular, he wrote the "[redacted] is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the

[23] Based on my review of the materials obtained pursuant to the January 18 and May 16 Warrants, it appears that Parnas and Correia had discussed replacing [redacted] with [redacted] at least as early as January 2019. On January 7, 2019, Correia sent Parnas a document entitled "Discussion List," which had a section labeled "Ukraine," which referenced their efforts to remove [redacted]. Specifically, Correia noted that the "former Inspector General," which appears to be a reference to [redacted] was waiting on a visa, and that they would "need help if denied." The existing inspector general, which appears to be a reference to [redacted] was "coming January 10-15th." With respect to "Ambassador to Ukraine," Correia wrote "Replace with [redacted]?" and noted that they "[s]hould be receiving very important info by both [redacted]" including information regarding "payoffs and bribes," an "Anti-Trump" room in the embassy, and "Telling current President (and others) that Trump will be impeached." Correia also noted that "We will be returning January 20th, or thereabouts," which appeared to be a reference to Parnas returning to Ukraine.

conversation. My case on [a Ukrainian public figure who allegedly helped [redacted]] is proceeding along in force. Testimony about [redacted] [likely [redacted]] monetary transfer is available. And only you are unable to bring down a single, stupid woman ☹." Parnas wrote back, "She is not a simple, stupid woman. Believe me. But she is not going anywhere."

j. On March 29, 2019, Parnas wrote to [redacted], "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." [redacted] then told Parnas that he had additional documents related to [redacted], and when Parnas asked [redacted] to send them to him, [redacted] replied that he would "pass it along with the new Ambassador ☺."

k. Over the next several days, Parnas continued to feed information to [redacted], who asked Parnas to "eyeball" articles for "accuracy," and continued to publish articles in [redacted]. On March 27, 2019, Parnas told Giuliani that "[redacted] just canceled on [redacted]" which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on March 30, 2019, Giuliani confirmed that he would be appearing on [redacted] that morning, to which Parnas responded, "Great." Parnas sent some of [redacted] articles to Giuliani, among many other contacts.

l. However, when [redacted] still had not been removed, [redacted] continued his complaints about [redacted] to Parnas. On March 29, 2019, [redacted] told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding [redacted]. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On April 2, 2019, [redacted] bragged, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week."

On April 9, 2019, [redacted] provided the names of "Advisors and public speakers of the presidential candidate" [redacted], who was running against [redacted] and their alleged connections to [redacted] (to whom [redacted] referred by her nickname, "[redacted]"), and wrote that the candidate for Prosecutor-General—who would replace [redacted] in the event [redacted] was elected—was a "Favorite activist of [redacted]".

54. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas, [redacted] and Giuliani made efforts to formalize the relationship with [redacted] in April 2019. On April 13, 2019, Giuliani sent Parnas a retainer agreement between [redacted] [redacted] [redacted] and his deputy. The agreement indicated that [redacted] was retaining [redacted] to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."[24] The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain activities on behalf of foreign political parties or entities." Per the agreement, [redacted] would to pay a $125,000 retainer and $25,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that [redacted] subsequently signed a copy of the retainer agreement.

[24] Based on my participation in the investigation, I believe that "embezzlement of funds" may be a reference to an allegation that [redacted] [redacted] misappropriated money from Ukraine or [redacted]. "Interference in the 2016 U.S. election" may be a reference to the allegation that there was a plot to turn up information about then-candidate Trump and individuals working with him, including [redacted]

55. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that between April 11 and 23, 2019, Parnas worked with [REDACTED] to arrange additional interviews with Ukrainian government officials, and provided the questions that [REDACTED] would ask one official. Specifically, I have learned, among other things, the following:

a. [REDACTED] ran multiple articles during that period. However, [REDACTED] walked back some of his claims and told [REDACTED] on April 17, 2019, that Ambassador [REDACTED] had never requested a "do not prosecute" list, and it was instead he who had requested that list. In addition, on April 21, 2019, [REDACTED] won the Ukrainian presidential runoff against [REDACTED] Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and public reporting, I believe that [REDACTED] may have walked back his comments due to the negative press attention his unfounded allegations had garnered, or in an effort to maintain credibility with the incoming [REDACTED] administration, so that he would not be removed by any incoming administration.

b. On April 23, 2019, Parnas asked Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on May 4, 2019, Giuliani joked, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day, [REDACTED] told Parnas that "People here are talking that there will be a very high level coming from you to the inauguration," to which Parnas replied "You do understand Who is dealing with this." Two days

later, on May 6, 2019, according to public reporting, the State Department confirmed that Ambassador [redacted] would leave her post on May 20, 2019.[25]

56. Based on my review of public reporting, I have learned that after [redacted] removal, Giuliani and Parnas both gave multiple press interviews in which they admitted to meeting with [redacted] among other things. Specifically, I have learned, among other things, the following:

a. On May 9, 2019, Giuliani publicly confirmed that he had met with [redacted] on multiple occasions, and stated his intention to travel to Ukraine to meet with newly-elected President [redacted] to push him to press ahead with two investigations he hoped would benefit President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) [redacted] involvement in [redacted]. According to the [redacted], Giuliani was to be accompanied by Parnas and [redacted]. However, on May 15, 2019, Giuliani announced that his trip to Ukraine was cancelled.

b. On July 22, 2019, articles were published by [redacted] and the [redacted] regarding Parnas and Fruman's campaign for the removal of [redacted] Parnas and [redacted] were interviewed for the articles. Parnas said that he and Fruman were not "acting at the behest of anyone." Parnas also said that he and Fruman

[25] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Parnas explicitly discussed FARA with at least two individuals, separate from [redacted], in the spring of 2019. *First*, on March 5, 2019, Parnas texted with [redacted], and [redacted] sent Parnas a FARA registration for a different individual, and Parnas confirmed "Got it." Notably, that FARA registration was completed on behalf of two embassies (the Embassy of [redacted]) and on behalf of a foreign individual. *Second*, in April 2019, Parnas texted with [redacted] a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding [redacted] On April 24, 2019, Parnas asked [redacted] to send him the "fara registration," and [redacted] responded with a FARA registration completed by a public relations firm on behalf of [redacted]

were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along." ████ claimed that "he raised the issue of ████ in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because ████ own letter to Secretary ████ noted that others had brought the issue of ████ to his attention.

c. On July 25, 2019, President Trump spoke to Ukrainian President ████. According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to ████, who was still in place at that time following ████ election but subsequently removed from office, or possibly ████ the former prosecutor.

d. As noted above, Parnas, Fruman, Giuliani, and ████ ████ have never registered with the FARA unit of the Department of Justice. The firm of ████ ████ ████ previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine.

57. Accordingly, there is further reason to believe that the efforts by Parnas, Fruman, Correia, ████ ████, and Giuliani to lobby for the removal of Ambassador ████ may have been done at the direction or request of Ukrainian officials, particularly ████ in violation of certain of the Subject Offenses. While Parnas has characterized his discussions with Congressman ████ regarding the Ambassador as "passing information along," it appears likely that that information originated from Ukrainian sources. In particular, Parnas and Fruman appear

to have close relationships with Ukrainian government officials, including [REDACTED], who appears to have solicited Parnas's help in removing the Ambassador. Parnas and Fruman arranged for meetings and telephone calls between Giuliani and [REDACTED] in early 2019 regarding, among other things, derogatory information about the Ambassador. Parnas and others then facilitated the publication of [REDACTED] derogatory information about the Ambassador in the media in March 2019, which, in conjunction with the [REDACTED] letter being made public, ultimately led to her removal. Giuliani also privately lobbied Secretary of State [REDACTED] and the President for [REDACTED] removal, after he had met with [REDACTED] in New York in January 2019. Giuliani drafted retainer agreements between [REDACTED] specifically, and played a key part in the group's media campaign to remove [REDACTED] by appearing on television, tweeting information related to Ukraine, and giving media interviews. Giuliani did so while continuing to lobby executive branch officials and the State Department (including by compiling a package of materials that included the anti-[REDACTED] media articles the group had planted) for [REDACTED] removal. [REDACTED] also appear to have been involved in the publicity campaign to remove the Ambassador, and connected Parnas to [REDACTED], whose articles spurred the media campaign.

**A. Probable Cause Regarding the Subject Accounts**

58. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about Parnas's and Fruman's efforts to cause the U.S. government to recall or remove the U.S. Ambassador to the Ukraine, efforts which may have been at the request or direction of a foreign government or individual. In particular:

a. As set forth above, there is probable cause to believe that Parnas, Fruman, and [redacted] are the users of the Subject Accounts, and that they have used the Subject Accounts, or iPhones registered to the Subject Accounts, to communicate with each other by email, text, and WhatsApp messages in furtherance of the Subject Offenses. Moreover, based on my review of Subject Account-1 through -3, each account contained evidence relevant to the Subject Offenses. Parnas stored relevant text messages and photos, among other materials, on Subject Account-1; Parnas stored relevant text messages, WhatsApp messages, and photos on Subject Account-2, and Fruman stored relevant documents on Subject Account-3. With respect to Subject Account-4, while my review has not yet begun, based on my review of Subject Account-2, I have learned that [redacted] used the phone associated with Subject Account-4 to communicate with Parnas in furtherance of the Subject Offenses, including with respect to scheduling travel and coordinating meetings. Based on my training and experience and my review of publicly-available information provided by Apple, described above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled. Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas, Fruman, and [redacted]

b. Based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses, often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over

messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

**B. Evidence, Fruits and Instrumentalities**

59. Based upon the foregoing, I respectfully submit there is probable cause to believe that the Subject Device, which contains the contents of the Subject Accounts, will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence related to any false statements or documents made or caused to be made to the Federal Election Commission.

b. Evidence relating to the May 9, 2018 letter from Congressman [REDACTED] to Secretary of State [REDACTED] [REDACTED] regarding U.S. Ambassador [REDACTED], including correspondence attaching or concerning the letter.

c. Communications with individuals associated with the government or a political party in the Ukraine, including [redacted].

d. Communications regarding [redacted] specifically or the position of U.S. Ambassador to Ukraine generally.

e. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, [redacted], Parnas, or Fruman.

f. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

g. Evidence of the intent of Parnas, Igor Fruman, [redacted] David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani, [redacted] as it relates to the Subject Offenses under investigation.

**III. Procedures for Searching ESI**

**A. Review of ESI**

60. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

61. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails contained on the Subject Device. This method is

analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Conclusion and Ancillary Provisions**

62. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

63. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption and campaign finance offenses, I know that individuals who participate in such offenses communicate about known government investigations and sometimes tailor their stories to be consistent, and/or tamper with or hide potential evidence. In addition, the subjects of this investigation include dual citizens, who would have the ability and incentive to flee and evade prosecution. Accordingly, premature disclosure of the scope of this

investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering, flight and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

64. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Sworn to before me on
21 day of October, 2019

HON. J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

## Attachment A

### I. Device to be Searched

The device to be searched (the "Subject Device") is described as a hard drive containing the contents of the below four iCloud accounts, which were obtained pursuant to a search warrant authorized on or about May 16, 2019, by the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, criminal number 19 Mag. 4784:

| *iCloud Account* | *Owner* | *Referred To As* |
|---|---|---|
| [redacted] | Lev Parnas | Subject Account-1 |
| [redacted] | Lev Parnas | Subject Account-2 |
| [redacted] | Igor Fruman | Subject Account-3 |
| [redacted] | [redacted] | Subject Account-4 (collectively, the "Subject Accounts") |

### II. Review of ESI on the Subject Device

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) are authorized to review the ESI contained on the Subject Accounts for evidence, fruits, and instrumentalities of one or more violations of 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); and 18 U.S.C. § 1343 (wire fraud) (together, the "Subject Offenses"), as listed below:

a. Evidence related to any false statements or documents made or caused to be made to the Federal Election Commission.

b. Evidence relating to the May 9, 2018 letter from Congressman [redacted] to Secretary of State [redacted] regarding U.S. Ambassador [redacted]vitch, including correspondence attaching or concerning the letter.

c. Communications with individuals associated with the government or a political party in the Ukraine, including [redacted]

d. Communications regarding [redacted] specifically or the position of U.S. Ambassador to Ukraine generally.

e. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, [redacted] Parnas, or Fruman.

f. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

g. Evidence of the intent of Parnas, Igor Fruman, [redacted] David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani, [redacted], as it relates to the Subject Offenses under investigation.