# EXHIBIT 1

**19 MAG 11651**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Maintained at Premises Controlled by
Google, LLC, USAO Reference No.
▮▮▮▮▮▮▮▮

TO BE FILED UNDER SEAL

AGENT AFFIDAVIT

Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

▮▮▮▮▮▮▮▮▮▮▮▮ being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption, including wire fraud and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence.

### B. The Provider, the Subject Accounts and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email accounts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Subject Account-1") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Subject Account-2") (together, the "Subject Accounts"), maintained and controlled by Google, LLC (the

"Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) and § 1349 (attempting and/or conspiring to commit wire fraud) (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### C. Services and Records of the Provider

4. I have learned the following about the Provider:

   a. The Provider offers email services to the public. In particular, the Provider permits subscribers to maintain email accounts under the domain name gmail.com or under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "xyzbusiness.com," the Provider enables the subscriber to host any email address under this domain name (e.g., "john@xyzbusiness.com"), on servers operated by the Provider. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.

   b. The Provider maintains the following records and information with respect to every subscriber account:

12.06.2018

i. *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii. *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv. *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

v. *Google Drive Content.* The Provider provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can

purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his subscriber account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

vi. *Google Docs.* The Provider provides users with the ability to write, edit, and collaborate on various documents with other users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

vii. *Google Calendar.* The Provider provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

viii. *Location History.* The Provider maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by the Provider. For example, the Provider collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Provider-1 apps and services also allow for location reporting, which allows the Provider to periodically store and use a device's most recent location data in connection with a subscriber account.

ix. *Device Information.* The Provider collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts,

including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

x. *Android Services.* The Provider also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by the Provider, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. The Provider retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xi. *Cookie Data.* The Provider uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

xii. *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon

5

12.06.2018

receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). On or about November 11, 2019, the Government served the Provider with a preservation request for the Subject Accounts. The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### D. Jurisdiction and Authority to Issue Warrant

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

#### Overview

8. On or about October 9, 2019, a grand jury sitting in the Southern District of New York returned an indictment charging defendants Lev Parnas and Igor Fruman with conspiring to make

contributions in connection with federal elections in the names of others, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30122 and 30109; and with making false statements and falsifying records to obstruct the administration of a matter within the jurisdiction of the Federal Election Commission, in violation of 18 U.S.C. §§ 1001 and 1519. Additionally, the same indictment charges Parnas, Fruman, David Correia, and Andrey Kukushkin with conspiring to violate the ban on foreign donations and contributions in connection with federal and state elections, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30121, 30122, and 30109.

9. In addition to prosecuting Parnas, Fruman, Correia, and Kukushkin for the above-referenced crimes, the FBI and U.S. Attorney's Office for the Southern District of New York ("USAO") are investigating, among other things, whether Parnas and Correia, and others known and unknown, perpetrated a fraudulent scheme through their efforts to raise funds ostensibly for their business "Fraud Guarantee," in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and attempt/conspiracy to commit the same). In sum, and as described below, the evidence provides probable cause to believe that Parnas and Correia solicited multiple investors to contribute hundreds of thousands of dollars to Fraud Guarantee based on materially false explicit and implicit representations regarding the Fraud Guarantee business, including its finances, leadership, and relationship with Rudolph Giuliani and his firm, ▆▆▆▆▆▆▆▆.

Probable Cause as to the Wire Fraud Scheme

10. Based on my review of records obtained from the State of Delaware, Division of Corporations, I have learned that (i) "Fraud Guarantee, LLC" was registered in Delaware on or about October 4, 2013, and that corporate registration was cancelled by Delaware on or about June 1, 2018 "by reason of its neglect, refusal, or failure to pay its annual taxes"; and (ii) "Fraud Guarantee Holdings, LLC" was registered in Delaware on or about February 22, 2016, and "ceased

to be in good standing on [June 1, 2019] by reason of neglect, refusal, or failure to pay an annual tax."

11. According to the Fraud Guarantee website (fraudguarantee.com), Parnas is listed as the Co-Founder and CEO, and Correia is listed as the Co-Founder and COO of the company. The website describes Fraud Guarantee as a company that "help[s] reduce the risk of fraud as well as mitigate the damage caused by fraudulent acts . . . by building products that protect investors in the private equity marketplace," and states that "Fraud Guarantee provides . . . investors peace of mind through comprehensive intelligence, and insurance against losses due to fraudulent behavior, or defaults due to fraud." The website states that Fraud Guarantee's "InvestSafe" product "is expected to launch in Spring 2016" and "[i]s an insurance product which will insure investors against investment fraud." It further states that "Fraud Guarantee provides best of breed technology with respect to background check and due diligence products" and "also offer[s] a new product that does not currently exist in the industry today."

12. Based on my discussions with four individuals who invested in Fraud Guarantee and/or their counsel ("Victim-1," "Victim-2," "Victim-3," and "Victim 4"), my discussion with an individual who served as Chief Executive Officer of Fraud Guarantee (the "CEO"), my review of documents produced by the foregoing individuals, my review of financial records, and my participation in this investigation, I have learned the following, in substance and in part:

a. On or about September 6, 2015, Correia emailed a potential investor (Victim-1) and stated, in sum, that Fraud Guarantee would be raising $3 to $5 million in capital, and was offering a "small piece to our friends and family network at a $20 million dollar valuation," noting that the next round of capital would be raised "at a $30,000,000 to $50,000,000 valuation, thus, a

12.06.2018

discount to our close network." Correia said that "[d]ue to the significant demand we have . . . we are only able to offer $300,000 at this time."

   i. Based on my discussions with the CEO and my review of Parnas's and Correia's correspondence, as well as financial records and other documents, it does not appear that Fraud Guarantee had any significant impending investment at this time, much less one in the range of $3 to $5 million. Nor is it clear on what basis Parnas and Correia ascribed a $20 million valuation—or $30 to $50 million valuation—to Fraud Guarantee which, at this time, appears to have had no viable products, no customers, no revenue, no sales, no employees, and at most *de minimus* assets.

   ii. Correia attached two documents to his email to Victim-1: a Fraud Guarantee business plan (the "Business Plan") and a proposed Convertible Loan Agreement. The Business Plan began with an introduction signed by Parnas which stated that "[t]he market we are entering exceeds $1 Trillion on an annual basis," and that "[w]e project to obtain 2% of this market, a highly conservative estimate, due to the complete lack of competition. Gaining this market share equates to over $60 Million in revenue by year three. This business plan has been prepared to provide investors with the information necessary to make an informed investment decision."

   iii. The Business Plan stated that Parnas, the Founder and CEO of Fraud Guarantee, "founded a brokerage firm that eventually became the fifth largest wholesale-market maker in the United States, employing over 200 traders. Mr. Parnas' firm made markets for over 4,500 stocks, and took over 1000 companies public." Based on my involvement in this investigation and review of publicly available information, this statement appears to be false. Records in the public domain reflect that Parnas previously worked for three stock brokerage firms, each of which was expelled by the Financial Industry Regulatory Authority (FINRA) for fraud or