other violations. The Business Plan further stated that Parnas "align[ed]" with "an emerging technology company" and "took it public, ultimately realizing a \$600MM market cap." Based on my review of public records, I have identified no evidence of Parnas assisting any company in achieving an Initial Public Offering (IPO) or obtaining a \$600 million market capitalization. The Business Plan also made various assertions about Correia's professional history—for example, that he "has built, operated and sold several companies"—that appear, based on my review of publicly available documents, to be gross exaggerations if not falsehoods.

iv.     The Business Plan described the "Original Seed Capital Budget" as follows:

| Original Seed Capital Budget | |
| --- | --- |
| Already accomplished | |
| Start-up Expenses | \$1,500 |
| Legal | \$5,000 |
| Insurance | \$15,000 |
| Meals and Entertainment | \$3,000 |
| Utilities | \$12,000 |
| Accounting | \$25,000 |
| Travel Expense | \$50,000 |
| Lobbying | \$12,000 |
| Admin payroll | \$10,000 |
| Web development | \$5,000 |
| FF+E | \$26,500 |
| Office lease | \$800 |
| Supplies | \$3,000 |
| IT support | \$167,305 |
| Total Start-up Expenses | |
| Start-up Assets | |
| Cash Required | \$100,000 |
| Start-up Inventory | \$0 |
| Other Current Assets | \$0 |
| Long-term Assets | \$25,000 |
| Total Assets | \$125,000 |
| Long-term Assets | \$25,000 |
| Total Assets | \$125,000 |
| Total Requirements | \$292,305 |

12.06.2018

Although the Business Plan stated that these financing needs were "[a]lready accomplished," based on my review of financial records and correspondence, it does not appear that Fraud Guarantee even maintained a bank account at this time; and based on my discussions with the CEO, I understand that he is not aware of any Fraud Guarantee funds having been used to cover such expenses.

v.    The Business Plan provided a sales forecast as follows, despite the fact that, as noted above, it does not appear that Fraud Guarantee had any viable products or customers at this time, and had not reached an agreement with an insurance carrier to back any of the products it hoped to bring to market:

| Sales Forecast | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Sales | | | |
| Fraud Protection | $1,670,827 | $11,430,887 | $66,000,000 |
| Background/Risk analysis | $128,310 | $953,334 | $1,040,000 |
| Website Subscription | $0 | $42,755 | $680,540 |
| FRAUDalert Product | $178,105 | $532,174 | $585,000 |
| Total Sales | $1,977,242 | $12,959,150 | $68,305,540 |
| | | | |
| Direct Cost of Sales | | | |
| Fraud protection Rev-Share | $334,167 | $2,286,177 | $13,200,000 |
| Background check/risk analysis | $10,706 | $88,085 | $99,753 |
| Subscription/Membership | $0 | $0 | $0 |
| FRUADalert | $0 | $0 | $0 |
| Subtotal Direct Cost of Sales | $344,873 | $2,374,262 | $13,299,753 |



vi.    The Business Plan stated that Fraud Guarantee was seeking to raise at least approximately $3.5 million, which "Mr. Parnas believes . . . can be completed no later than April 1st, 2015."

12.06.2018

vii.   The Business Plan provided the following description of how the approximately $3.5 would be spent:

| Start-up Funding | |
|---|---|
| | **Year 1** |
| Sales | $1,977,242 |
| Direct Cost of Sales | $344,873 |
| Other Costs of Sales | $34,805 |
| Total Cost of Sales | $379,678 |
| | |
| Gross Margin | $1,597,564 |
| Gross Margin % | 80.80% |
| | |
| | |
| Expenses | |
| Payroll | $1,431,070 |
| Marketing/Promotion | $290,024 |
| Depreciation | $0 |
| Rent | $55,500 |
| Utilities | $6,000 |
| Insurance | $5,400 |
| Payroll Taxes | $214,661 |
| Website development/SEO | $75,000 |
| Computers/Technology | $30,000 |
| FF&E | $24,000 |
| Meals and Entertainment | $102,000 |
| Accounting | $49,992 |
| Travel Expense | $300,000 |
| Consulting | $150,000 |
| Lobbeying/political donations | $120,000 |
| Markting materials | $24,996 |
| Health Insurance | $75,000 |
| Risk analysis tool Investment | $150,000 |
| Captive build-out | $500,000 |
| | |
| **Total Operating Expenses** | **$3,603,643** |

12.06.2018

viii.    The Business Plan stated that Fraud Guarantee "expects to continue its

steady growth in profitability over the next three years of operation," and projected as follows:

| Pro Forma Profit and Loss | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Sales | $1,977,242 | $12,959,150 | $68,305,540 |
| Direct Cost of Sales | $344,873 | $2,374,262 | $13,299,753 |
| Other Costs of Sales | $34,805 | $259,183 | $1,365,110 |
| Total Cost of Sales | $379,678 | $2,633,445 | $14,665,863 |
| | | | |
| Gross Margin | $1,597,564 | $10,325,705 | $53,639,677 |
| Gross Margin % | 80.80% | 79.58% | 78.53% |
| | | | |
| Expenses | | | |
| Payroll | $1,431,070 | $1,928,434 | $2,330,139 |
| Marketing/Promotion | $290,024 | $500,000 | $700,000 |
| Depreciation | $0 | $0 | $0 |
| Rent | $55,500 | $57,000 | $58,720 |
| Utilities | $6,000 | $6,500 | $7,000 |
| Insurance | $5,400 | $5,800 | $6,200 |
| Payroll Taxes | $214,661 | $289,265 | $349,521 |
| Website development/SEO | $75,000 | $50,000 | $70,000 |
| Computers/Technology | $30,000 | $10,000 | $10,000 |
| FF&E | $24,000 | $5,000 | $5,000 |
| Meals and Entertainment | $102,000 | $120,000 | $150,000 |
| Accounting | $49,992 | $60,000 | $70,000 |
| Travel Expense | $300,000 | $400,000 | $500,000 |
| Consulting | $150,000 | $170,000 | $190,000 |
| Lobbying/political donations | $120,000 | $200,000 | $250,000 |
| Marketing materials | $24,596 | $40,000 | $50,000 |
| Health Insurance | $75,000 | $80,000 | $85,000 |
| SSP White Investment | $450,000 | $0 | $0 |
| Insurance product build-out | $200,000 | $0 | $0 |
| | | | |
| Total Operating Expenses | $3,603,643 | $3,921,999 | $4,831,580 |
| | | | |
| Profit Before Interest and Taxes | ($2,006,079) | $6,403,706 | $48,808,097 |
| EBITDA | ($2,006,079) | $6,403,705 | $48,808,097 |
| Interest Expense | $0 | $0 | $0 |
| Taxes Incurred | $0 | $1,921,112 | $14,642,429 |
| | | | |
| Net Profit | ($2,006,079) | $4,482,594 | $34,165,668 |
| Net Profit/Sales | -101.46% | 34.59% | 50.02% |

ix.    The Business Plan provided various other financial projections, including a
"pro forma balance sheet" which showed "strong profits beginning in year two."

b. On or about October 20, 2015, Correia, copying Parnas, emailed Victim-1 a
Convertible Loan Agreement. The agreement was signed by Parnas and provided that Victim-1
(through his entity) would provide a $300,000 loan to Fraud Guarantee, which could be converted

14

into equity in the company, "to be used . . . to finance the development, promotion and initial operation of an investment protection business known as 'Fraud Guarantee.'" The agreement further stated that "[t]he purpose of the Loan is to provide funds for certain approved costs for the development, staffing, promotion, sales and marketing arrangements, and operation of the Business . . . The Loan shall be fully reserved and committed for the costs to complete the funding of the Business Investment with proceeds of the Loan." The agreement provided for a maturity date of October 19, 2017. The agreement also provided that Fraud Guarantee represented, among other things, that "[a]ll information furnished to [Victim-1] regarding the financial status of [Fraud Guarantee] will be, at the time the same are so furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give [Victim-1] a true and accurate knowledge of the subject matter." At some point thereafter, Victim-1 signed the agreement.

c. On or about December 1, 2015, Parnas, copying Correia, emailed Victim-1 with the subject line, "Wire info." Parnas provided the bank information for an account in the name of " ██████████████ " (the " ████ Account") and indicated that the wire was for "[r]epayment of loan to satisfy investment info Fraud Guarantee." Based on my review of bank records, I have learned that Parnas was the sole signatory on the ████ Account, and that this account was used by Parnas personally, not by Fraud Guarantee. On or about the same day, Victim-1 emailed Correia to confirm that he had wired the first payment "to [the ████████ ] who paid the 300000$ to [F]raud [G]uarantee." Accordingly, it appears that Parnas told Victim-1 that he (Parnas) had paid $300,000 to Fraud Guarantee to cover Victim-1's forthcoming investment, and that Victim-1 should thus repay the "loan" to Parnas directly via the ████ Account. As noted above, however, it does not appear that Fraud Guarantee even maintained a

bank account at this time. Further, based on my discussions with the CEO, I understand he is not aware of Parnas contributing any money—much less $300,000—to Fraud Guarantee at or around this time.

    d. On or about December 9, 2015, Victim-1 asked Correia for an update regarding, among other things, Fraud Guarantee's effort to reach a deal with an insurance carrier—a necessary prerequisite for the company to offer its insurance product—and Fraud Guarantee's effort to obtain a multimillion-dollar grant from the Consumer Financial Protection Bureau ("CFPB"). Correia responded that, with respect to the insurance carrier, he was "finalizing all of the information they need to move to a final agreement," which was a "tedious process and can take another couple of weeks"; and with respect to the grant application: "We should have first draft of application for the CFPB by tomorrow afternoon and most likely will submit final application by Monday of next week. We already have one of three congressman on board, 
     (R) from Mississippi. We should have          (D) from New York and senator
     (R) from Alabama on board by Monday the latest. . . . Assuming all goes well, and everything is pointing that way, we could receive funding as early as early February."

    e. On or about December 30, 2015, Victim-1 emailed Parnas to confirm that he received his wire payment, and Parnas confirmed. Based on my review of financial records, I have learned that Victim-1 continued to wire money to the      Account in installments from in or about January 2016 to in or about May 2016, noting that each wire constituted a partial repayment of a "loan" to satisfy his investment into Fraud Guarantee. Financial records further reflect that after these funds were wired into the      Account, Parnas used them for predominantly personal purposes, such as restaurants, hotels, and retail stores; and also transferred approximately $5,500

to Correia's wife. Records do not reflect that any of the funds were used for the purposes set forth in the Business Plan that had been sent to Victim-1. *See supra* ¶ 12(a)(vii).

f. On or about March 18, 2016, Correia, copying Parnas, emailed Victim-1 and attached documentation providing that (i) Victim-1's agreement with Fraud Guarantee, pursuant to which he received 1.5% equity in exchange for $300,000, would be terminated, and (ii) in its place, Victim-1 would enter into a transaction directly with Parnas, pursuant to which the same $300,000 would result in Victim-1 receiving 3% equity in the company. It does not appear that this transaction served any legitimate business purpose, apart from providing a *post hoc* justification for the fact that Victim-1 had wired his "investment" to Parnas directly (via the Account). Furthermore, by structuring the transaction as a direct equity sale between Parnas and Victim-1, the contract no longer contained representations regarding how the funds would be used by Fraud Guarantee. As noted below, Parnas and Correia used the same structure with subsequent victim "investors."

g. On or about March 21, 2016, Parnas exchanged emails with a new potential investor (Victim-2), in which Parnas and Victim-2 agreed, in sum, that Parnas would provide Victim-2's entity with a 2.5% equity stake in Fraud Guarantee in exchange for the equivalent of $250,000— comprised of $115,000 plus a 2009 Nissan GTR, a 2014 Toyota Tacoma, and a 2004 Jeep Wrangler. On or about two days later, Victim-2 emailed Correia to confirm that "Lev [Parnas] has received payment." On or about six days later, Correia, copying Parnas, sent Victim-2 certain Fraud Guarantee corporate documents, one of which reflected that Parnas, as a member of Fraud Guarantee, had a "capital account" of $570,000. However, based on my review of financial records, I have identified no evidence of Parnas contributing $570,000 to Fraud Guarantee, nor

any evidence that Fraud Guarantee had any non-*de minimis* assets at this time. Indeed, as noted above, it does not appear that Fraud Guarantee had even opened a bank account by this point.

h. On or about April 19, 2016, Correia, copying Parnas, sent Victim-2 a signed agreement finalizing the deal for Parnas to sell a 2.5% equity stake in Fraud Guarantee in exchange for $250,000 from Victim-2. This email attached another copy of the Fraud Guarantee Operating Agreement, reflecting that Parnas had a "capital account" of $570,000.

i. Based on my review of financial records, I have learned that Victim-2's entity transferred funds to an account in the name of Parnas and his wife in multiple installments between in or about January 2016 and in or about June 2016, noting each time that the funds were to be used to purchase equity in Fraud Guarantee. Financial records further reflect that Parnas and his wife used these funds for predominantly personal purposes, including withdrawing thousands of dollars in cash and transferring thousands of dollars to Correia's wife.

j. On or about May 4, 2016, Fraud Guarantee's CEO emailed Parnas and Correia regarding his employment agreement. The CEO had been hired as of September 15, 2015, pursuant to agreement which entitled him to an annual salary of $250,000, paid bi-monthly. Emails and other documents reflect that, since that time, the CEO had worked on various Fraud Guarantee projects. In this email to Parnas and Correia, the CEO complained that he was owed $180,958.20 in back wages, and provided certain options for him to be paid "[u]pon receipt of any funding."

k. Also on or about the same day, the CEO, copying Correia, contacted a bank in regard to opening an account for Fraud Guarantee. On or about May 26, 2016, the CEO informed Parnas and Correia that the account had been opened and would "provide us with all of our required banking needs now and as we grow." Based on my discussions with the CEO, I have learned that

12.06.2018

although he assumed that Fraud Guarantee must have had a bank account prior to that point, he never saw any evidence of it.

l. On or about October 10, 2016, Correia, copying Parnas, emailed a new potential investor (Victim-3) attaching a proposed agreement whereby Parnas would sell 300,000 units of Fraud Guarantee—representing "3% of the outstanding membership interests of the [c]ompany"—to Victim 3, in exchange for $300,000. Correia, copying Parnas, also sent Victim-3 various Fraud Guarantee corporate documents, including the company's "Business Plan." This version of the Business Plan was largely the same as the one previously sent to Victim-1—including making essentially the same apparently false and baseless representations regarding Parnas, Correia, and the company (*see supra* ¶¶ 12(a)(ii) – (ix))—except that it no longer stated that the $292,305 "Original Seed Capital Budget" was "already accomplished."

m. On or about the next day, Victim-3 (through his agent) asked Correia to identify the "active members of the LLC (names and percentages), as well as the current value of the LLC, if any." In response, Correia wrote that Victim-3 "is buying in at a $10M valuation." Correia also attached the Fraud Guarantee Operating Agreement, noting that it "shows the members and number of units owned." In a follow-up email, Correia told Victim-3 that although the "Cap Table of the operating agreement [states] that the capital contributions for all member are only $100," "[t]his was done simply to create a cost basis going into this new entity" since "[w]e were previously in a different entity and migrated into what is now Fraud Guarantee Holdings, LLC. There was 'significant' investment from all parties in order to take ownership. Is equated to several millions of dollars invested." Based on my discussions with the CEO, I understand that although Parnas told him that he (Parnas) had invested "millions" in Fraud Guarantee, the CEO never saw

12.06.2018