a.   On or about on May 15, 2018, Igor and ▮▮▮▮ obtained a $3 million commercial loan from ▮▮▮▮, a businessman in Florida, and ▮▮▮▮, an attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identified ▮▮▮▮ as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, ▮▮▮▮ lent the money to ▮▮▮▮ (which is owned by Igor and ▮▮▮▮ and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by ▮▮▮▮.

b.   On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and ▮▮▮▮ was transferred from ▮▮▮▮ to a bank account in the name of ▮▮▮▮ (the "▮▮▮▮ Account"), on which Parnas was a signer (but neither Igor nor ▮▮▮▮ was). Prior to receiving that transfer, the ▮▮▮▮ Account generally had a low balance and minimal account activity. For instance, in January 2018, the ▮▮▮▮ Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the ▮▮▮▮ Account two days prior, on or about May 17, 2018, Parnas, with ▮▮▮▮ assistance, wired $325,000 to ▮▮▮▮ PAC. As described above, Parnas told ▮▮▮▮ to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c.   On or about May 22, 2018, $100,000 was transferred from the ▮▮▮▮ Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the ▮▮▮▮ loan to ▮▮▮▮ and Igor Fruman.

The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the ▇▇▇▇▇▇ PAC in Parnas's name.

d.   Additionally, Parnas's June 25, 2018 contribution to Representative ▇▇▇▇ was paid for using an ▇▇▇▇▇▇ account held in the name of ▇▇▇▇▇▇ (registered signer, ▇▇▇▇▇ using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to ▇▇▇▇▇ PAC and Representative Sessions.

e.   On or about May 3, 2018, ▇▇▇▇▇ assisted Parnas with making a $15,000 donation in GEP's name to ▇▇ PAC. However, this donation does not appear to have come from GEP. Rather, ▇▇▇▇ used an ▇▇▇▇▇▇ card held in Igor Fruman's name, which drew on an account held in the name of "▇▇▇▇▇ - ▇▇▇▇▇ — which appears to be a credit card account associated with Igor and ▇▇▇▇▇ s business – to make the donation.

22.   Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to ▇▇▇▇▇▇ was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

a.   GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with ▇▇▇▇▇▇ as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC in any public filing until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many

18

of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[5]

23. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, on or about June 25, 2019, Igor Fruman made a $2,700 contribution to Representative      – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that      is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the

---

[5] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and    and asked for Parnas' approval. Correia also emailed copies to    on the same date. According to the NDA, GEP and    wished to "explore a business possibility," and was signed by Fruman but not by    Based on my review of publicly available materials, it appears that    may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business with    or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.

19



contribution form stated that contributions by individuals would be given in priority order to: ▮▮▮
▮▮▮ Committee (up to $5,000), ▮▮▮▮▮ for Congress (up to $2,700), the ▮▮ (up
to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor
Fruman contributed $50,000 in March 2018 to ▮▮▮▮▮ (as discussed below, in the name
" ▮▮▮▮ his funds were used to make maximum contributions to the ▮▮ and ▮▮
▮▮▮ Committee. When Parnas subsequently contributed $11,000 in June 2018 to ▮▮▮
▮▮ those funds were used to make maximum contributions to ▮▮▮▮ Committee and
▮▮▮▮ for Congress, as well as a $3,300 contribution to ▮▮ Thus, it appears that
by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum
contributions to ▮▮▮▮ Committee and exceeded the contribution limit to the ▮▮

24. Based on my review of public sources and emails obtained pursuant to the January 18
Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was
filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be
false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up
initially for the primary purpose of making a contribution. Specifically:

a. On or about July 17, 2018, the ▮▮▮▮ asked for comment on a story
relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant
wrote to Parnas and Correia, "This is what happens when you become visible. The buzzards
descend." Parnas responded, "That's why we need to stay under the radar and have the best
lawyers."

b. On or about July 23, 2018, ▮▮▮▮ published an article about LLC donations to
▮▮▮▮▮ which mentioned the contribution by GEP. The following day, on or about
July 24, 2018, a reporter for ▮▮▮▮ emailed Parnas about GEP. Parnas did not respond,

20

and on or about July 25, 2018,  published an article suggesting that GEP was a mere shell company used to make a contribution to the PAC. On the same day, filed a complaint with the FEC about the contribution.

  c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the loan to .

  d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the PAC contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to for Congress "was made with a business

credit card . . . which [he] reimbursed." These statements to the FEC, and GEP's filed response to the FEC, appear to be false, in violation of the May 16 Warrant Subject Offenses and the Subject Offenses. As set forth above, the ▇▇▇▇▇▇▇▇ PAC contribution was made with funds from a third party private loan to an entity run by Igor and ▇▇▇▇▇ that were moved through multiple bank accounts – none belonging to GEP – before being paid to ▇▇▇▇▇▇▇ PAC by the ▇▇▇▇▇▇ Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and ▇ ▇▇▇▇ the analyst found no evidence of reimbursement by Parnas to ▇▇▇▇ or ▇▇▇▇ for the contributions to Congressman ▇▇▇.

c. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.



25. Based on my review of financial records for a bank account held in the name of ███ ██████████ at Chase Bank for which ███████████ is an authorized signatory (the "███ Account"), I have learned that on September 19, 2018 – the day after the ███ ████████████ Account received a wire transfer from Andrey Muraviev in the amount of $500,000, as discussed below – the ██████████████ Account was used to pay the █████ ███ ██████████████ bill in the amount of $494,415.21. That bill included Igor Fruman's donations to the █████████ Fund, ██████████ PAC, █████████ for Congress, and Parnas' and Igor Fruman's donations to ███████████ among other donations.

26. Based on the foregoing, it appears that the contributions to █████████████ PAC and Representative ████████ were funded by Igor Fruman, but were made in the name of Parnas in violation of certain of the May 16 Warrant Subject Offenses. In addition, it appears that the contributions made in the name of GEP to ████████████ PAC and ████ PAC were unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation of certain of the May 16 Warrant Subject Offenses.

### Unlawful Contributions by Fruman in a False Name

27. It appears that Fruman made multiple contributions, using another person's name and identity, in the name "██████████ and listed an incorrect employer in order to disguise the true donor of the contributed funds and potentially conceal assets from others, including creditors. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a. On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution to ██████████ PAC. The contribution was reported to the FEC as coming from "██

███████ " with his employer as " ███████ Corp." The funds from that contribution were distributed to the ███████ ███████ Committee PAC, and ███████ House candidates.[6]

    b.  On or about April 27, 2018, Fruman made a $100,000 contribution to the ███████ ███████ PAC. The contribution was reported to the FEC as coming from " ███████ with his employer as " ███████ " The funds were distributed to the ███████ and the ███████ National Committee.

    c.  On or about June 12, 2018, Fruman made a $50,000 contribution to ███████ PAC. The contribution was reported to the FEC as coming from " ███████ with his employer as " ███████ Corp." The funds were distributed to various ███████ House candidates.

    28.  Based on my review of public sources, it appears that there is another individual — who did not make the contribution – but who is named ███████ and works for ███████ ███████ . Accordingly, it appears that Fruman may have made contributions in a variation of his name, or in another person's name, to avoid contribution limits, in violation of the May 16 Warrant Subject Offenses.

---

[6] Based on my participation in the investigation, including my review of FEC records, financial records, and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that the pattern of donations indicate that Parnas and Fruman were creditor-conscious in deciding which donations to make in their true names. Almost all of the large contributions they arranged were not made in their true names. Instead, such large donations were typically made either in the name of GEP or in the name " ███████ As a result, a search of the FEC database in 2018 would have shown that Fruman's only five-digit contribution was $15,000 to the ███████ Fund, and Parnas's only five-digit contribution was $11,000 to Protect the House. In 2018, contributing in the name of GEP or Igor " ███████ " would have had the effect of disguising the fact that Fruman and Parnas were behind large contributions.

#### Donations Funded by Muraviev

29.     Parnas and Igor Fruman made additional contributions to state and federal candidates in 2018 that were in fact funded by Andrey Muraviev, a Russian national. Specifically, between September and October 2018, Muraviev wired Parnas and Fruman $1 million with the understanding and expectation that those funds would be used to make donations to candidates and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for a planned business venture. Parnas, Fruman, Correia, and another business partner, Andrey Kukushkin, worked with Muraviev to ensure that his money was used to make political donations that the group believed would be beneficial to their cannabis business interests, without reporting the true source of the funds, or that they were taking these actions in coordination with Muraviev, a foreign principal.

30.     Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in the summer of 2018, Kukushkin, a U.S. citizen who resides in California, worked with Correia and eventually Parnas and Fruman about engaging in a cannabis business that was ultimately funded by Kukushkin's partner, Muraviev. Specifically, I have learned the following:

a.     In or about July 2018, Correia began discussing a cannabis business in San Francisco with Kukushkin. In an email sent on or about July 22, 2018, Kukushkin complained to Correia about a number of local regulatory issues associated with his cannabis business, and over the next few days Correia and Kukushkin discussed collaborating on a cannabis business in the future. On August 10, 2018, Correia and Kukushkin met in San Diego, California, and appear to have discussed a potential cannabis venture.

b.     On or about August 21, 2018, Correia relayed information regarding the business opportunity with Kukushkin to Parnas, writing in an email: .

Great opportunity with these guys since big Andre is funding.
However, it is obvious I'm going to have to spend more time on this
than originally planned. These guys are not smart-businessman and
the one issue I'm dealing with, which began last night, is literally
retarded. I think Andrey Kukushkin is a really good guy, but needs
a lot of handholding on some very easy issues. This creates a great
opportunity for us!....because they need this help, but, I'm not sure
how to find enough time along with everything else we/I am doing
if we're not getting paid some sort of consulting fee or salaries in
the meantime. Let's discuss. We are going to make it happen no
matter what, just trying to figure out the best structure.

c.  Based on my review of email correspondence obtained pursuant to the January 18
Warrant, and my participation in the investigation, I believe that Correia's reference to "big Andre"
is to Andrey Muraviev, a business partner of Kukushkin's who would be "funding" the venture.

d.  On or about September 7, 2018, Parnas, Fruman, and Kukushkin attended a
fundraiser in Las Vegas for          who was at that time the attorney general of Nevada,
and a candidate for government in the state's November 2018 election. According to a subsequent
email, the event was attended by Vice President     , and a minimum $10,000 donation was
required for attendance. In a subsequent email,          promised, on behalf of the group,
to "send [a] donation out in the next couple of days."

e.  Parnas, Fruman, Muraviev, Kukushkin, and          [7] began communicating via
WhatsApp in the days following the September 7, 2018,          event regarding their scheme
to use Muraviev's money to make political donations that they believed would benefit their

---

[7] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned
that beginning in approximately September 2016, David Correia and Lev Parnas began discussing
a cannabis and medical marijuana business with prospective partners, including        . Based
on my review of law enforcement records, I am aware that     was born in Russia and is an
American citizen. In May 2017, Correia, Parnas,     and others met in Miami and discussed a
plan to acquire a medical marijuana license in Florida and elsewhere. However, based on my
review of email correspondence, it appears that this business venture did not come to fruition in
2017.