were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along." ▇ claimed that "he raised the issue of ▇ in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because ▇ own letter to Secretary ▇ noted that others had brought the issue of ▇ to his attention.

c. On July 25, 2019, President Trump spoke to Ukrainian President ▇. According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to ▇ who was still in place at that time following ▇'s election but subsequently removed from office, or possibly ▇ the former prosecutor.

d. As noted above, Parnas, Fruman, Giuliani, and ▇ have never registered with the FARA unit of the Department of Justice. The firm of ▇ & ▇ LLP previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine.

57. Accordingly, there is further reason to believe that the efforts by Parnas, Fruman, Correia, ▇ ▇ and Giuliani to lobby for the removal of Ambassador ▇ may have been done at the direction or request of Ukrainian officials, particularly ▇ in violation of certain of the Subject Offenses. While Parnas has characterized his discussions with Congressman ▇ regarding the Ambassador as "passing information along," it appears likely that that information originated from Ukrainian sources. In particular, Parnas and Fruman appear

64

to have close relationships with Ukrainian government officials, including ▓▓▓ who appears to have solicited Parnas's help in removing the Ambassador. Parnas and Fruman arranged for meetings and telephone calls between Giuliani and ▓▓▓ in early 2019 regarding, among other things, derogatory information about the Ambassador. Parnas and others then facilitated the publication of ▓▓▓ derogatory information about the Ambassador in the media in March 2019, which, in conjunction with the ▓▓▓ letter being made public, ultimately led to her removal. Giuliani also privately lobbied Secretary of State ▓▓▓ and the President for ▓▓▓ removal, after he had met with ▓▓▓ in New York in January 2019. Giuliani drafted retainer agreements between ▓▓▓ & ▓▓▓ and ▓▓▓ specifically, and played a key part in the group's media campaign to remove ▓▓▓ by appearing on television, tweeting information related to Ukraine, and giving media interviews. Giuliani did so while continuing to lobby executive branch officials and the State Department (including by compiling a package of materials that included the anti-▓▓▓ media articles the group had planted) for ▓▓▓ removal. ▓▓▓ and ▓▓▓ also appear to have been involved in the publicity campaign to remove the Ambassador, and connected Parnas to ▓▓▓, whose articles spurred the media campaign.

### A. Probable Cause Regarding the Subject Accounts

58. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about Parnas's and Fruman's efforts to cause the U.S. government to recall or remove the U.S. Ambassador to the Ukraine, efforts which may have been at the request or direction of a foreign government or individual. In particular:

a. As set forth above, there is probable cause to believe that Parnas, Fruman, and ▮▮ are the users of the Subject Accounts, and that they have used the Subject Accounts, or iPhones registered to the Subject Accounts, to communicate with each other by email, text, and WhatsApp messages in furtherance of the Subject Offenses. Moreover, based on my review of Subject Account-1 through -3, each account contained evidence relevant to the Subject Offenses. Parnas stored relevant text messages and photos, among other materials, on Subject Account-1; Parnas stored relevant text messages, WhatsApp messages, and photos on Subject Account-2, and Fruman stored relevant documents on Subject Account-3. With respect to Subject Account-4, while my review has not yet begun, based on my review of Subject Account-2, I have learned that ▮▮ used the phone associated with Subject Account-4 to communicate with Parnas in furtherance of the Subject Offenses, including with respect to scheduling travel and coordinating meetings. Based on my training and experience and my review of publicly-available information provided by Apple, described above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled. Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas, Fruman, and ▮▮.

b. Based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses, often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over

messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

### B. Evidence, Fruits and Instrumentalities

59. Based upon the foregoing, I respectfully submit there is probable cause to believe that the Subject Device, which contains the contents of the Subject Accounts, will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence related to any false statements or documents made or caused to be made to the Federal Election Commission.

b. Evidence relating to the May 9, 2018 letter from Congressman ▬▬▬ to Secretary of State ▬▬▬ regarding U.S. Ambassador ▬▬▬, including correspondence attaching or concerning the letter.

c. Communications with individuals associated with the government or a political party in the Ukraine, including ▅▅▅▅ ▅▅▅▅ ▅▅▅▅ ▅▅▅▅, or ▅▅▅▅ ▅▅▅▅.

d. Communications regarding ▅▅▅▅ ▅▅▅▅ specifically or the position of U.S. Ambassador to Ukraine generally.

e. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, ▅▅▅▅ ▅▅▅▅ Parnas, or Fruman.

f. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

g. Evidence of the intent of Parnas, Igor Fruman, ▅▅▅▅, David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani, ▅▅▅▅ ▅▅▅▅ and ▅▅▅▅, as it relates to the Subject Offenses under investigation.

### III. Procedures for Searching ESI

#### A. Review of ESI

60. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

61. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails contained on the Subject Device. This method is

analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Conclusion and Ancillary Provisions

62. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

63. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption and campaign finance offenses, I know that individuals who participate in such offenses communicate about known government investigations and sometimes tailor their stories to be consistent, and/or tamper with or hide potential evidence. In addition, the subjects of this investigation include dual citizens, who would have the ability and incentive to flee and evade prosecution. Accordingly, premature disclosure of the scope of this

investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering, flight and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

64.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Sworn to before me on
21 day of October, 2019

HON. J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

## Attachment A

### I. Device to be Searched

The device to be searched (the "Subject Device") is described as a hard drive containing the contents of the below four iCloud accounts, which were obtained pursuant to a search warrant authorized on or about May 16, 2019, by the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, criminal number 19 Mag. 4784:

| iCloud Account | Owner | Referred To As |
|---|---|---|
| ▮ | Lev Parnas | Subject Account-1 |
| ▮ | Lev Parnas | Subject Account-2 |
| ▮ | Igor Fruman | Subject Account-3 |
| ▮ | ▮ | Subject Account-4 (collectively, the "Subject Accounts") |

### II. Review of ESI on the Subject Device

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) are authorized to review the ESI contained on the Subject Accounts for evidence, fruits, and instrumentalities of one or more violations of 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); and 18 U.S.C. § 1343 (wire fraud) (together, the "Subject Offenses"), as listed below:

    a. Evidence related to any false statements or documents made or caused to be made to the Federal Election Commission.

    b. Evidence relating to the May 9, 2018 letter from Congressman ▮ to Secretary of State ▮ regarding U.S. Ambassador ▮ including correspondence attaching or concerning the letter.

    c. Communications with individuals associated with the government or a political party in the Ukraine, including ▮, ▮, or ▮.

    d. Communications regarding ▮ specifically or the position of U.S. Ambassador to Ukraine generally.

    e. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, ▮ Parnas, or Fruman.

    f. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

g. Evidence of the intent of Parnas, Igor Fruman, ████, David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani, ████ ████ and ████, as it relates to the Subject Offenses under investigation.