"Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) and § 1349 (attempting and/or conspiring to commit wire fraud) (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### C. Services and Records of the Provider

4. I have learned the following about the Provider:

   a. The Provider offers email services to the public. In particular, the Provider permits subscribers to maintain email accounts under the domain name gmail.com or under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "xyzbusiness.com," the Provider enables the subscriber to host any email address under this domain name (*e.g.*, "john@xyzbusiness.com"), on servers operated by the Provider. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.

   b. The Provider maintains the following records and information with respect to every subscriber account:

i.  *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii.  *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.  *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.  *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

v.  *Google Drive Content.* The Provider provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can

purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his subscriber account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

  vi. *Google Docs.* The Provider provides users with the ability to write, edit, and collaborate on various documents with other users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

  vii. *Google Calendar.* The Provider provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

  viii. *Location History.* The Provider maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by the Provider. For example, the Provider collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Provider-1 apps and services also allow for location reporting, which allows the Provider to periodically store and use a device's most recent location data in connection with a subscriber account.

  ix. *Device Information.* The Provider collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts,

including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

    x. *Android Services.* The Provider also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by the Provider, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. The Provider retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

    xi. *Cookie Data.* The Provider uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

    xii. *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon

receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). On or about November 11, 2019, the Government served the Provider with a preservation request for the Subject Accounts. The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### D. Jurisdiction and Authority to Issue Warrant

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

#### Overview

8. On or about October 9, 2019, a grand jury sitting in the Southern District of New York returned an indictment charging defendants Lev Parnas and Igor Fruman with conspiring to make

6

12.06.2018

contributions in connection with federal elections in the names of others, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30122 and 30109; and with making false statements and falsifying records to obstruct the administration of a matter within the jurisdiction of the Federal Election Commission, in violation of 18 U.S.C. §§ 1001 and 1519. Additionally, the same indictment charges Parnas, Fruman, David Correia, and Andrey Kukushkin with conspiring to violate the ban on foreign donations and contributions in connection with federal and state elections, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30121, 30122, and 30109.

9. In addition to prosecuting Parnas, Fruman, Correia, and Kukushkin for the above-referenced crimes, the FBI and U.S. Attorney's Office for the Southern District of New York ("USAO") are investigating, among other things, whether Parnas and Correia, and others known and unknown, perpetrated a fraudulent scheme through their efforts to raise funds ostensibly for their business "Fraud Guarantee," in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and attempt/conspiracy to commit the same). In sum, and as described below, the evidence provides probable cause to believe that Parnas and Correia solicited multiple investors to contribute hundreds of thousands of dollars to Fraud Guarantee based on materially false explicit and implicit representations regarding the Fraud Guarantee business, including its finances, leadership, and relationship with Rudolph Giuliani and his firm, ███████████

Probable Cause as to the Wire Fraud Scheme

10. Based on my review of records obtained from the State of Delaware, Division of Corporations, I have learned that (i) "Fraud Guarantee, LLC" was registered in Delaware on or about October 4, 2013, and that corporate registration was cancelled by Delaware on or about June 1, 2018 "by reason of its neglect, refusal, or failure to pay its annual taxes"; and (ii) "Fraud Guarantee Holdings, LLC" was registered in Delaware on or about February 22, 2016, and "ceased

to be in good standing on [June 1, 2019] by reason of neglect, refusal, or failure to pay an annual tax."

11. According to the Fraud Guarantee website (fraudguarantee.com), Parnas is listed as the Co-Founder and CEO, and Correia is listed as the Co-Founder and COO of the company. The website describes Fraud Guarantee as a company that "help[s] reduce the risk of fraud as well as mitigate the damage caused by fraudulent acts . . . by building products that protect investors in the private equity marketplace," and states that "Fraud Guarantee provides . . . investors peace of mind through comprehensive intelligence, and insurance against losses due to fraudulent behavior, or defaults due to fraud." The website states that Fraud Guarantee's "InvestSafe" product "is expected to launch in Spring 2016" and "[i]s an insurance product which will insure investors against investment fraud." It further states that "Fraud Guarantee provides best of breed technology with respect to background check and due diligence products" and "also offer[s] a new product that does not currently exist in the industry today."

12. Based on my discussions with four individuals who invested in Fraud Guarantee and/or their counsel ("Victim-1," "Victim-2," "Victim-3," and "Victim 4"), my discussion with an individual who served as Chief Executive Officer of Fraud Guarantee (the "CEO"), my review of documents produced by the foregoing individuals, my review of financial records, and my participation in this investigation, I have learned the following, in substance and in part:

   a. On or about September 6, 2015, Correia emailed a potential investor (Victim-1) and stated, in sum, that Fraud Guarantee would be raising $3 to $5 million in capital, and was offering a "small piece to our friends and family network at a $20 million dollar valuation," noting that the next round of capital would be raised "at a $30,000,000 to $50,000,000 valuation, thus, a

discount to our close network." Correia said that "[d]ue to the significant demand we have . . . we are only able to offer $300,000 at this time."

      i.    Based on my discussions with the CEO and my review of Parnas's and Correia's correspondence, as well as financial records and other documents, it does not appear that Fraud Guarantee had any significant impending investment at this time, much less one in the range of $3 to $5 million. Nor is it clear on what basis Parnas and Correia ascribed a $20 million valuation—or $30 to $50 million valuation—to Fraud Guarantee which, at this time, appears to have had no viable products, no customers, no revenue, no sales, no employees, and at most *de minimus* assets.

      ii.    Correia attached two documents to his email to Victim-1: a Fraud Guarantee business plan (the "Business Plan") and a proposed Convertible Loan Agreement. The Business Plan began with an introduction signed by Parnas which stated that "[t]he market we are entering exceeds $1 Trillion on an annual basis," and that "[w]e project to obtain 2% of this market, a highly conservative estimate, due to the complete lack of competition. Gaining this market share equates to over $60 Million in revenue by year three. This business plan has been prepared to provide investors with the information necessary to make an informed investment decision."

      iii.    The Business Plan stated that Parnas, the Founder and CEO of Fraud Guarantee, "founded a brokerage firm that eventually became the fifth largest wholesale-market maker in the United States, employing over 200 traders. Mr. Parnas' firm made markets for over 4,500 stocks, and took over 1000 companies public." Based on my involvement in this investigation and review of publicly available information, this statement appears to be false. Records in the public domain reflect that Parnas previously worked for three stock brokerage firms, each of which was expelled by the Financial Industry Regulatory Authority (FINRA) for fraud or

other violations. The Business Plan further stated that Parnas "align[ed]" with "an emerging technology company" and "took it public, ultimately realizing a $600MM market cap." Based on my review of public records, I have identified no evidence of Parnas assisting any company in achieving an Initial Public Offering (IPO) or obtaining a $600 million market capitalization. The Business Plan also made various assertions about Correia's professional history—for example, that he "has built, operated and sold several companies"—that appear, based on my review of publicly available documents, to be gross exaggerations if not falsehoods.

    iv. The Business Plan described the "Original Seed Capital Budget" as follows:

| Original Seed Capital Budget | |
|---|---|
| Already accomplished | |
| Start-up Expenses | $1,500 |
| Legal | $5,000 |
| Insurance | $15,000 |
| Meals and Entertainment | $3,000 |
| Utilities | $12,000 |
| Accounting | $25,000 |
| Travel Expense | $50,000 |
| Lobbying | $12,000 |
| Admin payroll | $10,000 |
| Web development | $5,000 |
| FF+E | $26,500 |
| Office lease | $800 |
| Supplies | $3,000 |
| IT support | $167,305 |
| Total Start-up Expenses | |
| Start-up Assets | |
| Cash Required | $100,000 |
| Start-up Inventory | $0 |
| Other Current Assets | $0 |
| Long-term Assets | $25,000 |
| Total Assets | $125,000 |
| Long-term Assets | $25,000 |
| Total Assets | $125,000 |
| Total Requirements | $292,305 |

10

12.06.2018

Although the Business Plan stated that these financing needs were "[a]lready accomplished," based on my review of financial records and correspondence, it does not appear that Fraud Guarantee even maintained a bank account at this time; and based on my discussions with the CEO, I understand that he is not aware of any Fraud Guarantee funds having been used to cover such expenses.

     v.    The Business Plan provided a sales forecast as follows, despite the fact that, as noted above, it does not appear that Fraud Guarantee had any viable products or customers at this time, and had not reached an agreement with an insurance carrier to back any of the products it hoped to bring to market:

| Sales Forecast | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Sales | | | |
| Fraud Protection | $1,670,827 | $11,430,887 | $66,000,000 |
| Background/Risk analysis | $128,310 | $953,334 | $1,040,000 |
| Website Subscription | $0 | $42,755 | $680,540 |
| FRAUDalert Product | $178,105 | $532,174 | $585,000 |
| Total Sales | $1,977,242 | $12,959,150 | $68,305,540 |
| | | | |
| Direct Cost of Sales | | | |
| Fraud protection Rev-Share | $334,167 | $2,286,177 | $13,200,000 |
| Background check/risk analysis | $10,706 | $88,085 | $99,753 |
| Subscription/Membership | $0 | $0 | $0 |
| FRUADalert | $0 | $0 | $0 |
| Subtotal Direct Cost of Sales | $344,873 | $2,374,262 | $13,299,753 |



    vi.    The Business Plan stated that Fraud Guarantee was seeking to raise at least approximately $3.5 million, which "Mr. Parnas believes . . . can be completed no later than April 1st, 2015."

12.06.2018

12

vii. The Business Plan provided the following description of how the approximately $3.5 would be spent:

| Start-up Funding | |
|---|---|
| | Year 1 |
| Sales | $1,977,242 |
| Direct Cost of Sales | $344,873 |
| Other Costs of Sales | $34,805 |
| Total Cost of Sales | $379,678 |
| | |
| Gross Margin | $1,597,564 |
| Gross Margin % | 80.80% |
| | |
| Expenses | |
| Payroll | $1,431,070 |
| Marketing/Promotion | $290,024 |
| Depreciation | $0 |
| Rent | $55,500 |
| Utilities | $6,000 |
| Insurance | $5,400 |
| Payroll Taxes | $214,661 |
| Website development/SEO | $75,000 |
| Computers/Technology | $30,000 |
| FF&E | $24,000 |
| Meals and Entertainment | $102,000 |
| Accounting | $49,992 |
| Travel Expense | $300,000 |
| Consulting | $150,000 |
| Lobbeying/political donations | $120,000 |
| Markting materials | $24,996 |
| Health Insurance | $75,000 |
| Risk analysis tool Investment | $150,000 |
| Captive build-out | $500,000 |
| | |
| Total Operating Expenses | $3,603,643 |

13

12.06.2018

viii.   The Business Plan stated that Fraud Guarantee "expects to continue its steady growth in profitability over the next three years of operation," and projected as follows:

| Pro Forma Profit and Loss | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Sales | $1,977,242 | $12,959,150 | $68,305,540 |
| Direct Cost of Sales | $344,873 | $2,374,262 | $13,299,753 |
| Other Costs of Sales | $34,805 | $259,183 | $1,366,110 |
| Total Cost of Sales | $379,678 | $2,633,445 | $14,665,863 |
| | | | |
| Gross Margin | $1,597,564 | $10,325,705 | $53,639,677 |
| Gross Margin % | 80.80% | 79.68% | 78.53% |
| | | | |
| Expenses | | | |
| Payroll | $1,431,070 | $1,928,434 | $2,330,139 |
| Marketing/Promotion | $290,024 | $500,000 | $700,000 |
| Depreciation | $0 | $0 | $0 |
| Rent | $55,500 | $57,000 | $58,720 |
| Utilities | $6,000 | $6,500 | $7,000 |
| Insurance | $5,400 | $5,800 | $6,200 |
| Payroll Taxes | $214,661 | $289,265 | $349,521 |
| Website development/SEO | $75,000 | $50,000 | $70,000 |
| Computers/Technology | $30,000 | $10,000 | $10,000 |
| FF&E | $24,000 | $5,000 | $5,000 |
| Meals and Entertainment | $102,000 | $120,000 | $150,000 |
| Accounting | $49,992 | $60,000 | $70,000 |
| Travel Expense | $300,000 | $400,000 | $500,000 |
| Consulting | $150,000 | $170,000 | $190,000 |
| Lobbeying/political donations | $120,000 | $200,000 | $250,000 |
| Markting materials | $24,996 | $40,000 | $50,000 |
| Health Insurance | $75,000 | $80,000 | $85,000 |
| SSP White Investment | $450,000 | $0 | $0 |
| Insurance product build-out | $200,000 | $0 | $0 |
| | | | |
| Total Operating Expenses | $3,603,643 | $3,921,999 | $4,831,580 |
| | | | |
| Profit Before Interest and Taxes | ($2,006,079) | $6,403,706 | $48,808,097 |
| EBITDA | ($2,006,079) | $6,403,706 | $48,808,097 |
| Interest Expense | $0 | $0 | $0 |
| Taxes Incurred | $0 | $1,921,112 | $14,642,429 |
| | | | |
| Net Profit | ($2,006,079) | $4,482,594 | $34,165,668 |
| Net Profit/Sales | -101.46% | 34.59% | 50.02% |

ix.   The Business Plan provided various other financial projections, including a "pro forma balance sheet" which showed "strong profits beginning in year two."

b.   On or about October 20, 2015, Correia, copying Parnas, emailed Victim-1 a Convertible Loan Agreement. The agreement was signed by Parnas and provided that Victim-1 (through his entity) would provide a $300,000 loan to Fraud Guarantee, which could be converted

14

12.06.2018

into equity in the company, "to be used . . . to finance the development, promotion and initial operation of an investment protection business known as 'Fraud Guarantee.'" The agreement further stated that "[t]he purpose of the Loan is to provide funds for certain approved costs for the development, staffing, promotion, sales and marketing arrangements, and operation of the Business . . . The Loan shall be fully reserved and committed for the costs to complete the funding of the Business Investment with proceeds of the Loan." The agreement provided for a maturity date of October 19, 2017. The agreement also provided that Fraud Guarantee represented, among other things, that "[a]ll information furnished to [Victim-1] regarding the financial status of [Fraud Guarantee] will be, at the time the same are so furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give [Victim-1] a true and accurate knowledge of the subject matter." At some point thereafter, Victim-1 signed the agreement.

  c. On or about December 1, 2015, Parnas, copying Correia, emailed Victim-1 with the subject line, "Wire info." Parnas provided the bank information for an account in the name of "▆▆▆▆ Group" (the "▆▆▆ Account") and indicated that the wire was for "[r]epayment of loan to satisfy investment info Fraud Guarantee." Based on my review of bank records, I have learned that Parnas was the sole signatory on the ▆▆▆ Account, and that this account was used by Parnas personally, not by Fraud Guarantee. On or about the same day, Victim-1 emailed Correia to confirm that he had wired the first payment "to [the ▆▆▆ Account] who paid the 300000$ to [F]raud [G]uarantee." Accordingly, it appears that Parnas told Victim-1 that he (Parnas) had paid $300,000 to Fraud Guarantee to cover Victim-1's forthcoming investment, and that Victim-1 should thus repay the "loan" to Parnas directly via the ▆▆▆ Account. As noted above, however, it does not appear that Fraud Guarantee even maintained a

bank account at this time. Further, based on my discussions with the CEO, I understand he is not aware of Parnas contributing any money—much less $300,000—to Fraud Guarantee at or around this time.

    d. On or about December 9, 2015, Victim-1 asked Correia for an update regarding, among other things, Fraud Guarantee's effort to reach a deal with an insurance carrier—a necessary prerequisite for the company to offer its insurance product—and Fraud Guarantee's effort to obtain a multimillion-dollar grant from the Consumer Financial Protection Bureau ("CFPB"). Correia responded that, with respect to the insurance carrier, he was "finalizing all of the information they need to move to a final agreement," which was a "tedious process and can take another couple of weeks"; and with respect to the grant application: "We should have first draft of application for the CFPB by tomorrow afternoon and most likely will submit final application by Monday of next week. We already have one of three congressman on board, ▮▮▮▮ (R) from Mississippi. We should have ▮▮▮▮ (D) from New York and senator ▮▮▮▮ (R) from Alabama on board by Monday the latest. . . . Assuming all goes well, and everything is pointing that way, we could receive funding as early as early February."

    e. On or about December 30, 2015, Victim-1 emailed Parnas to confirm that he received his wire payment, and Parnas confirmed. Based on my review of financial records, I have learned that Victim-1 continued to wire money to the ▮▮▮▮ Account in installments from in or about January 2016 to in or about May 2016, noting that each wire constituted a partial repayment of a "loan" to satisfy his investment into Fraud Guarantee. Financial records further reflect that after these funds were wired into the ▮▮▮▮ Account, Parnas used them for predominantly personal purposes, such as restaurants, hotels, and retail stores; and also transferred approximately $5,500