talk." Parnas then reported to [redacted] that President Trump had re-tweeted a story about [redacted] [redacted] responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that [redacted]'s reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

c. The day after [redacted] published [redacted] interview, on March 21, 2019, Parnas complained to [redacted] and [redacted] that the top news story in Ukraine was the reporting regarding Ambassador [redacted], which prompted the Ambassador to put out a statement saying that [redacted] was a "prime example of corruption." [redacted] was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," [redacted] continued, "they are saying in the State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call [redacted] and had "good news." Then, in an apparent effort to quell the negative press [redacted] was receiving and further publicize their allegations against [redacted], Parnas offered to [redacted] and [redacted] "You want me to go on [redacted] and talk about it? I would not mention any names if I did that. I would just say a client approached me six months back with allegations that FBI and US Ambassador in Ukraine were playing favorites. And reference [redacted] getting free pass and alleged ties to 'high level [redacted] administration officials'. Maybe mention allegations about setting up [redacted] The media could connect the dots from there." Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant, Parnas's reference to his "client" appears to refer to [redacted]



d. Based on my review of public reporting, I have learned that article soon received substantially increased press attention. On March 23, 2019, on the on , aired a segment highlighting that former-Congressman sent Secretary of State "an urgent letter" in May 2018, asking that Ambassador be removed from her position, and published a copy of that letter. was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that Trump had decided, at least at that point, to fire appears to be the "good news" that Parnas reported back to two days prior.

e. In an apparent reference to interview, Parnas happily wrote to "I love you and your husband you are the best," and "Tell he was awesome my hero." responded, "We can be really great if we have a retainer signed." Parnas agreed, and asked if the "Wicket Witch" was gone, which appears to be a reference to .

f. On March 23, 2019, Correia texted Parnas: " must be pretty happy!! And grateful?!," Based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that Correia's statement appears to be a reference to the possibility that

Congressman [redacted] would replace [redacted][23] Correia then wrote, "This is insane! Finally the facts come out, [redacted] etc., and, looks like she's finally fired . . . This is even better than if it happened before." Parnas replied, "Just the beginning."

g. Around this time, [redacted] and Giuliani began frequently posting messages related to Ukraine, [redacted], [redacted] and the 2016 election on Twitter, apparently in an effort to further magnify the press attention their claims against [redacted] would receive.

h. On March 24, 2019, [redacted] retweeted an article summarizing [redacted] reporting in the [redacted], entitled "Calls Grow to Remove [redacted]'s U.S. Ambassador to Ukraine."

i. Although Parnas, Giuliani, and [redacted] appeared to be pleased with the press response in the U.S., the press response in Ukraine appeared to be unfavorable to [redacted] On March 26, 2019, [redacted] sent Parnas pictures of documents that allegedly contained information about [redacted] and noted, "I hope this is enough." He then complained to Parnas that despite the information he was gathering about [redacted] the Ambassador had not been fired. In particular, he wrote the "[redacted] is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the

[23] Based on my review of the materials obtained pursuant to the January 18 and May 16 Warrants, it appears that Parnas and Correia had discussed replacing [redacted] with [redacted] at least as early as January 2019. On January 7, 2019, Correia sent Parnas a document entitled "Discussion List," which had a section labeled "Ukraine," which referenced their efforts to remove [redacted] Specifically, Correia noted that the "former Inspector General," which appears to be a reference to [redacted], was waiting on a visa, and that they would "need help if denied." The existing inspector general, which appears to be a reference to [redacted] was "coming January 10-15th." With respect to "Ambassador to Ukraine," Correia wrote "Replace with [redacted] and noted that they "[s]hould be receiving very important info by both [redacted] including information regarding "payoffs and bribes," an "Anti-Trump" room in the embassy, and "Telling current President (and others) that Trump will be impeached." Correia also noted that "We will be returning January 20th, or thereabouts," which appeared to be a reference to Parnas returning to Ukraine.

conversation. My case on [a Ukrainian public figure who allegedly helped [redacted] is proceeding along in force. Testimony about [redacted] [likely [redacted] monetary transfer is available. And only you are unable to bring down a single, stupid woman ☹." Parnas wrote back, "She is not a simple, stupid woman. Believe me. But she is not going anywhere."

j. On March 29, 2019, Parnas wrote to [redacted] "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." [redacted] then told Parnas that he had additional documents related to [redacted] and when Parnas asked [redacted] to send them to him, [redacted] replied that he would "pass it along with the new Ambassador ☺."

k. Over the next several days, Parnas continued to feed information to [redacted] who asked Parnas to "eyeball" articles for "accuracy," and continued to publish articles in [redacted]. On March 27, 2019, Parnas told Giuliani that "[redacted] just canceled on [[redacted] which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on March 30, 2019, Giuliani confirmed that he would be appearing on [redacted] that morning, to which Parnas responded, "Great." Parnas sent some of [redacted] articles to Giuliani, among many other contacts.

l. However, when [redacted] still had not been removed, [redacted] continued his complaints about [redacted] to Parnas. On March 29, 2019, [redacted] told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding [redacted]. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On April 2, 2019, [redacted] bragged, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week."

On April 9, 2019, [redacted] provided the names of "Advisors and public speakers of the presidential candidate" [redacted] who was running against [redacted], and their alleged connections to [redacted] (to whom [redacted] referred by her nickname, "[redacted]"), and wrote that the candidate for Prosecutor-General—who would replace [redacted] in the event [redacted] was elected—was a "Favorite activist of [redacted]."

54. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas, [redacted] and Giuliani made efforts to formalize the relationship with [redacted] in April 2019. On April 13, 2019, Giuliani sent Parnas a retainer agreement between [redacted] and [redacted] and his deputy. The agreement indicated that [redacted] was retaining [redacted] LLP to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."[24] The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain activities on behalf of foreign political parties or entities." Per the agreement, [redacted] would to pay a $125,000 retainer and $25,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that [redacted] subsequently signed a copy of the retainer agreement.

---

[24] Based on my participation in the investigation, I believe that "embezzlement of funds" may be a reference to an allegation that [redacted] [redacted] misappropriated money from Ukraine or [redacted]. "Interference in the 2016 U.S. election" may be a reference to the allegation that there was a plot to turn up information about then-candidate Trump and individuals working with him, including [redacted].

55. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that between April 11 and 23, 2019, Parnas worked with [REDACTED] to arrange additional interviews with Ukrainian government officials, and provided the questions that [REDACTED] would ask one official. Specifically, I have learned, among other things, the following:

a. [REDACTED] ran multiple articles during that period. However, [REDACTED] walked back some of his claims and told [REDACTED] on April 17, 2019, that Ambassador [REDACTED] had never requested a "do not prosecute" list, and it was instead he who had requested that list. In addition, on April 21, 2019, [REDACTED] won the Ukrainian presidential runoff against [REDACTED] Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and public reporting, I believe that [REDACTED] may have walked back his comments due to the negative press attention his unfounded allegations had garnered, or in an effort to maintain credibility with the incoming [REDACTED] administration, so that he would not be removed by any incoming administration.

b. On April 23, 2019, Parnas asked Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on May 4, 2019, Giuliani joked, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day, [REDACTED] told Parnas that "People here are talking that there will be a very high level coming from you to the inauguration," to which Parnas replied "You do understand Who is dealing with this." Two days

later, on May 6, 2019, according to public reporting, the State Department confirmed that Ambassador [redacted] would leave her post on May 20, 2019.[25]

56. Based on my review of public reporting, I have learned that after [redacted] removal, Giuliani and Parnas both gave multiple press interviews in which they admitted to meeting with [redacted] among other things. Specifically, I have learned, among other things, the following:

a. On May 9, 2019, Giuliani publicly confirmed that he had met with [redacted] on multiple occasions, and stated his intention to travel to Ukraine to meet with newly-elected President [redacted] to push him to press ahead with two investigations he hoped would benefit President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) [redacted] [redacted] involvement in [redacted]. According to the [redacted] [redacted], Giuliani was to be accompanied by Parnas and [redacted] However, on May 15, 2019, Giuliani announced that his trip to Ukraine was cancelled.

b. On July 22, 2019, articles were published by [redacted] and the [redacted] [redacted] regarding Parnas and Fruman's campaign for the removal of [redacted] Parnas and [redacted] were interviewed for the articles. Parnas said that he and Fruman were not "acting at the behest of anyone." Parnas also said that he and Fruman

[25] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Parnas explicitly discussed FARA with at least two individuals, separate from [redacted] in the spring of 2019. *First*, on March 5, 2019, Parnas texted with [redacted], and [redacted] sent Parnas a FARA registration for a different individual, and Parnas confirmed "Got it." Notably, that FARA registration was completed on behalf of two embassies (the Embassy of [redacted]) and on behalf of a foreign individual. *Second*, in April 2019, Parnas texted with [redacted], a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding [redacted] [redacted] On April 24, 2019, Parnas asked [redacted] to send him the "fara registration," and [redacted] responded with a FARA registration completed by a public relations firm on behalf of [redacted]

were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along." ██████ claimed that "he raised the issue of ██████ in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because ██████ own letter to Secretary ██████ noted that others had brought the issue of ██████ to his attention.

c. On July 25, 2019, President Trump spoke to Ukrainian President ██████ According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to ██████ who was still in place at that time following ██████ election but subsequently removed from office, or possibly ██████ the former prosecutor.

d. As noted above, Parnas, Fruman, Giuliani, and ██████ have never registered with the FARA unit of the Department of Justice. The firm of ██████ ██████ previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine.

57. Accordingly, there is further reason to believe that the efforts by Parnas, Fruman, Correia, ██████ and Giuliani to lobby for the removal of Ambassador ██████ may have been done at the direction or request of Ukrainian officials, particularly ██████ in violation of certain of the Subject Offenses. While Parnas has characterized his discussions with Congressman ██████ regarding the Ambassador as "passing information along," it appears likely that that information originated from Ukrainian sources. In particular, Parnas and Fruman appear

to have close relationships with Ukrainian government officials, including [redacted] who appears to have solicited Parnas's help in removing the Ambassador. Parnas and Fruman arranged for meetings and telephone calls between Giuliani and [redacted] in early 2019 regarding, among other things, derogatory information about the Ambassador. Parnas and others then facilitated the publication of [redacted] derogatory information about the Ambassador in the media in March 2019, which, in conjunction with the [redacted] letter being made public, ultimately led to her removal. Giuliani also privately lobbied Secretary of State [redacted] and the President for [redacted] removal, after he had met with [redacted] in New York in January 2019. Giuliani drafted retainer agreements between [redacted] [redacted] and [redacted] specifically, and played a key part in the group's media campaign to remove [redacted] by appearing on television, tweeting information related to Ukraine, and giving media interviews. Giuliani did so while continuing to lobby executive branch officials and the State Department (including by compiling a package of materials that included the anti-[redacted] media articles the group had planted) for [redacted] removal. [redacted] and [redacted] also appear to have been involved in the publicity campaign to remove the Ambassador, and connected Parnas to [redacted] whose articles spurred the media campaign.

**A. Probable Cause Regarding the Subject Accounts**

58. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about Parnas's and Fruman's efforts to cause the U.S. government to recall or remove the U.S. Ambassador to the Ukraine, efforts which may have been at the request or direction of a foreign government or individual. In particular:

a. As set forth above, there is probable cause to believe that Parnas, Fruman, and [redacted] are the users of the Subject Accounts, and that they have used the Subject Accounts, or iPhones registered to the Subject Accounts, to communicate with each other by email, text, and WhatsApp messages in furtherance of the Subject Offenses. Moreover, based on my review of Subject Account-1 through -3, each account contained evidence relevant to the Subject Offenses. Parnas stored relevant text messages and photos, among other materials, on Subject Account-1; Parnas stored relevant text messages, WhatsApp messages, and photos on Subject Account-2, and Fruman stored relevant documents on Subject Account-3. With respect to Subject Account-4, while my review has not yet begun, based on my review of Subject Account-2, I have learned that [redacted] used the phone associated with Subject Account-4 to communicate with Parnas in furtherance of the Subject Offenses, including with respect to scheduling travel and coordinating meetings. Based on my training and experience and my review of publicly-available information provided by Apple, described above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled. Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas, Fruman, and [redacted]

b. Based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses, often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over

messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

**B. Evidence, Fruits and Instrumentalities**

59. Based upon the foregoing, I respectfully submit there is probable cause to believe that the Subject Device, which contains the contents of the Subject Accounts, will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence related to any false statements or documents made or caused to be made to the Federal Election Commission.

b. Evidence relating to the May 9, 2018 letter from Congressman [REDACTED] to Secretary of State [REDACTED] regarding U.S. Ambassador [REDACTED] [REDACTED], including correspondence attaching or concerning the letter.