UNITED STATES DISTRICT COURT **19 MAG 11501**
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All Content
and Other Information Associated with
the Instagram Account
Maintained at Premises Controlled by
Facebook Inc., USAO Reference No.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

## Agent Affidavit in Support of Application for a Search Warrant
## for Stored Electronic Communications

STATE OF NEW YORK )
                                    ) ss.
COUNTY OF NEW YORK )

being duly sworn, deposes and states:

## I.Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course
of my experience and training in this position, I have participated in criminal investigations into
federal offenses involving public corruption and violations of the federal campaign finance laws.
I also have training and experience executing search warrants, including those involving electronic
evidence.

### B. The Provider, the Subject Account and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18
U.S.C. § 2703 for all content and other information associated with the Instagram account

(the "Subject Account"), maintained and controlled by Facebook, Inc. (the "Provider"),
headquartered at 1601 Willow Road, Menlo Park, California 94025. The information to be
searched is described in the following paragraphs and in Attachment A to the proposed warrant.

1

12.06.2018

3.  As detailed below, there is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), 18 U.S.C. § 1519 (fabrication of documents), 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); 18 U.S.C. § 2 (willfully causing or aiding and abetting a violation of the foregoing); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses and to defraud the United States) (the "Subject Offenses").

4.  This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email, internet, and social media in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Provider**

5.  Based on my training, experience, and review of publicly-available information about services offered by the Provider, I know the following about Instagram:

a.  Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

2

b.   Instagram permits users to post photos and videos to their profiles on Instagram and otherwise share photos and videos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter.   When posting or sharing a photo or video on Instagram, a user can add to the photo or video, among other things: a caption; a "tag" that can be used to identify other Instagram users in the photo or video; various "tags" that can be used to search for the photo or video (e.g., a user may add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo or video); location information provided by the user.   A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos.   In addition, Instagram allows users to make comments on posted photos or videos, including photos or videos that the user posts or photos or videos posted by other users of Instagram.   Users can also "like" photos or videos.

c.   Based on my training, experience, and review of publicly-available information about services offered by the Provider, I have learned that Instagram collects and maintains the following information:

i.   *Subscriber information.*   Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password.   Instagram also asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram.   Once an account is created, users may also adjust various privacy and account settings for the account on Instagram.   Instagram collects and maintains this information.

3

ii. *"Friends" and "follows" lists.* Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

iii. *Posted content.* Instagram allows users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram. Instagram also collects data associated with posted content including, but not limited to, hashtags associated with user content, location markers (which may include latitude and longitude information), tags of users in photos and videos, and comments on photos.

iv. *Instagram Direct.* Instagram allows users to send private messages directly to one or more other Instagram users. An Instagram user can send photos or videos, posts on Instagram, profiles, text messages, hashtags, and locations via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile. Instagram collects and maintains this information.

v. *Search history.* Users on Instagram may also search Instagram for other users or particular types of photos or other content. Instagram collects and maintains this information.

vi. *Access logs.* Instagram collects and retains "log file" information of every time a user requests access to Instagram, whether through a web page or through an app. Log file

4

information includes Internal Protocol ("IP") address information associated with a request, the type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

vii. *Device information.* Instagram collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

viii. *Customer correspondence.* The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

ix. *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

## D. Jurisdiction and Authority to Issue Warrant

6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

5

8. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Prior Search Warrant Applications

9. On or about January 18, 2019, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, and

among others. On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the January 18 Warrant returns for evidence of additional offenses.

10. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for records in Apple iCloud accounts belonging to Parnas, Fruman, and

On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the May 16 Warrant returns for evidence of additional offenses.

11. On or about August 14, 2019, the USAO and FBI sought and obtained from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, a search

warrant (the "August 14 Warrant") for email accounts belonging to Lev Parnas, Igor Fruman, and others.

## III. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

#### Parnas's Commission of the Campaign Finance Offenses

12. On October 9, 2019, a grand jury sitting in the United States Attorney's Office for the Southern District of New York returned an indictment charging (i) Lev Parnas and Igor Fruman with conspiring to make unlawful straw donations, making and willfully causing false statements to be made to the FEC, and fabricating documents to impede, obstruct, and influence the proper administration of a matter within the FEC's jurisdiction, in violation of 52 U.S.C. §§ 30122 and 18 U.S.C. §§ 371, 1001, 2, and 1519; and charging Lev Parnas, Igor Fruman, David Correia and Andrey Kukushkin with conspiring to make unlawful foreign contributions in violation of 52 U.S.C. § 30121 and 18 U.S.C. § 371.

13. As described in the Indictment, Parnas and Fruman made illegal "straw donations," in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person, and caused false forms to be submitted to the FEC. Some of the largest contributions were made in the name of Global Energy Producers LLC ("GEP"), a purported liquefied natural gas import-export business that had been incorporated by Fruman and Parnas around the time the contributions were made. Parnas and Fruman contributed in the name of GEP in order to conceal from the public and potential creditors the true source of the funds and their personal involvement in making the contribution. Additionally, Parnas and Fruman also conspired to make contributions in Parnas's name, but that were funded by Fruman, in order to evade the contribution limits and so that Parnas gained credit with politicians for some contributions. While Parnas and Fruman undertook efforts to conceal the true source of the funds

12.06.2018

for these contributions from the public and the FEC,[1] they made them in order to gain access to exclusive fundraising events – and the politicians who attended them – in order advance their personal financial interests and the political interests of at least one Ukrainian government official. Those interests included, but were not limited to, lobbying for the removal of the then-U.S. Ambassador to Ukraine.

14. Additionally, and as described in the Indictment, Parnas, Fruman, Correia, and Kukushkin conspired with a foreign national, Andrey Muraviev (identified as "Foreign National-1" in the Indictment), to attempt to acquire cannabis licenses in multiple states by, among other things, donating to politicians in those states. The members of the scheme agreed that they would attempt to advance their cannabis business by making political contributions to candidates – funded by Muraviev – in an effort to obtain retail marijuana licenses. Indeed, between September and October 2018, Muraviev wired $1 million from overseas to the United States with the understanding and expectation that those funds would be used to make donations to candidates and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for a planned business venture. Parnas, Fruman, Correia, and Kukushkin worked with Muraviev to ensure that his money was used to make political donations that the group believed would be beneficial to their cannabis business interests, without reporting the true source of the funds, or that they were taking these actions in coordination with Muraviev, a foreign principal. Some of the wired funds were, in fact, used to make political contributions in Nevada, where Parnas, Fruman, and Kukushkin had attended fundraising events.

---

[1] As described in the Indictment, a complaint was filed with the FEC alleging that the GEP contribution was an unlawful straw donation. In response to that complaint, Parnas and Fruman submitted false affidavits to the FEC.

12.06.2018

15. Accordingly, as a grand jury found, and for the reasons set forth in the Indictment, there is probable cause to believe that Parnas, Fruman, Correia, Kukushkin, and Muraviev have been involved in the commission of violations of 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), 18 U.S.C. § 1519 (fabrication of documents), 18 U.S.C. § 2 (willfully causing or aiding and abetting a violation of the foregoing); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses and to defraud the United States).

### Parnas's Unregistered Lobbying as a Foreign Agent

16. In addition to the charges in the Indictment, the United States Attorney's Office ("USAO") and FBI are investigating whether Parnas, the apparent user of the Subject Account, and others known and unknown, undertook unregistered lobbying and other unlawful actions on behalf of or at the request and/or under the direction of a foreign government, entity, or person to, among other things, cause the removal of Ambassador

17. The Foreign Agents Registration Act ("FARA") criminalizes acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities. Activities covered by FARA include acting as a "publicity agent" or engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-12. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* As relevant here, FARA requires any person acting "at the order, request, or under the direction or control" of (i) a foreign principal, or (ii) a person whose activities are "indirectly

supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," to register with the Attorney General and to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. *Id.* Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. 18 U.S.C. § 951.

18. As described below, there is probable cause to believe that Parnas and others lobbied for the removal of then-Ambassador                    at the direction and request of at least one Ukrainian government official, and that they did so without registering under FARA or providing notice to the Attorney General.

*Parnas's Relationship with Ukrainian Government Officials*

19. Since at least 2016, Parnas has had a close relationship with Ukrainian government officials, including                    (who was President of Ukraine from 2014 to 2019),

(who was Head of the State Fiscal Service[2] of Ukraine from 2015 to 2018), and

(who was General Prosecutor of Ukraine from 2015 to 2016), and appears to have acted as an intermediary on their behalf in the United States. Specifically, based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned the following with respect to Parnas's activities in 2016 and 2017 related to Ukrainian officials:

a. On or about December 15, 2016, Parnas met with            at            resort in Palm Beach, Florida. It appears that the purpose of the dinner was, at least in part, to pitch

---

[2] Based on my review of public reporting and participation in the investigation, I have learned that the State Fiscal Service of Ukraine is a governmental agency that combines the powers of tax authorities, customs, and financial police, and is responsible for, among other things, implementing state tax and customs policy.

on investing i[              ] a real estate investment fund in which Correia was a partner. Based on my review of financial records, I have learned tha[    ] subsequently wired $500,000 (from [              ]' which based on my review of publicly available corporate records, appears to be a U.K. company that was dissolved in 2018) to an account Parnas controlled on January 11, 2017 (unrelated t[    ] the fund that Correia pitched). Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that [    ] transferred the funds to Parnas pursuant to a promissory note, signed only by Parnas, which described the funds as a loan.[3]

b. Several weeks later, Parnas began communicating with [          ] a Florida-based lobbyist, in order to hav[    ] represent [    ] personal interests in the United States. Between December 2016 and January 2017, Parnas served as an intermediary betwee[    ] and [    ] and received a referral fee from[    ] after [    ] was retained. However, it appears that [    ] and Parnas took efforts to hide the fact that [    ] was the ultimate client: in an early draft of a retainer agreement circulated in early January 2017, the client was listed as a British law firm "acting in the interests of [          ] a citizen of Ukraine." However, after [    ] told Parnas that he needed to run the contract by the Senate Foreign Relations staff, subsequent drafts (and the final signed version) omitted any reference t[    ] and described the client simply as the British law firm. Email correspondence makes clear that [    ] was the ultimate client: Parnas sent the contract (which he received from [    ] to [    ] for his final signature, although a different individual actually signed the contract as an "authorized representative," and Parnas directed [    ] to pay [    ] $100,000, which [    ] appears to have done. The

---

[3] Based on my review of bank account records, it appears that Parnas used these funds for largely personal expenses, and does not appear to have repaid [    ]

contract memorialized an agreement for     to "consult with the Client and advocate on its behalf" on any issues "before the Federal government of the United States" in exchange for \$100,000 per month, plus costs.

     c. Parnas also solicited    help in ensuring that    and other Ukrainian officials were invited to the U.S. presidential inauguration, and had access to tickets to inaugural events. On January 4, 2017, Parnas emailed   a copy    passport, with the subject line "Inaugural." On January 11, 2017, Parnas asked   for invitation letters, apparently to the Inauguration, for    (a Ukrainian entrepreneur and former government official), and    (the former Prosecutor General). On January 14, 2017, a representative of the inaugural committee emailed Parnas to confirm that tickets had been set aside for Parnas, Fruman,    . It appears that   attended at least some inaugural events with Parnas, and while   may have been invited, he did not attend.

     d. Following the presidential inauguration, Parnas acted again as an intermediary between   and the Ukrainian government. On February 10, 2017,   emailed Parnas a copy of a contract for services between the "Government of Ukraine" and    which appeared to be separate from   work for   (which was already subject to a paid retainer and signed contract). On February 14, 2017,   sent Parnas a copy of a letter from   to President   , in which   apologized for not being able to travel to meet   but looked forward to meeting him in New York to "discuss the issues of importance to Ukraine in its relations with the United States." Parnas then forwarded a copy of the letter to   . However,   terminated his work on behalf of these Ukrainian clients shortly thereafter: on February 19, 2017, Parnas forwarded   a copy of an article in the   entitled "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates."

Case 1:19-cr-00725-JPO Document 374-59 Filed 12/19/23 Page 13 of 46

███████████, the managing partner o███████ Washington office, wrote back "Not good."

On March 14, 2017 ████ emailed Parnas in reference t███████ "representation of the [British law firm]," and wrote that because they have not "received any direction" in the three months they have been under contract████ was terminating the agreement. Parnas replied, "Got it. I will let them know." Based on my review of Department of Justice filings related to FARA, I have learned that neither ████ nor Parnas registered under FARA in connection with any work performed in 2017 fo███████ the British law firm, or the government of Ukraine.

*Parnas's Efforts to Cause the U.S. Ambassador to Ukraine to be Removed*

20. Beginning in early 2018, it appears that Parnas and others undertook efforts to cause the U.S. Ambassador to Ukraine,███████████ to be removed from her posting. As described below, it appears that Parnas lobbied for ████████ removal at the direction and request ██████████ who was at that point the Ukrainian Prosecutor-General and an ally of then-President ███████

21. It appears from public reporting that ████ and others allied with then-President ████████ were motivated to seek the removal of Ambassador ████ for multiple reasons, which were subsequently referenced by ████ in his communications with Parnas regarding ████████ removal in the spring of 2019. Specifically, based on my review of materials obtained pursuant to the May 16 Warrant and public reporting, I have learned the following:

a. According to public reporting, on April 4, 2018, Ukraine's National Anti-Corruption Bureau ("NABU") released an audio recording of ████████████ the head of the

---

[4] Based on my review of public reporting, I have learned that in 2016, former Prosecutor-General, ████████ was removed from his office by Ukraine's parliament. After ████ removal, on or about May 12, 2016, President ████ appointed ████ as Prosecutor-General.

Special Anti-Corruption Office ("SAPO") implicating         in corruption. According to public reporting, NABU receives funding from the U.S. and European Union aid programs, and has worked with U.S. law enforcement to share information in the past. In the recordings, tipped off corruption targets that they were going to be searched, and pressured anti-corruption prosecutors and judges. As discussed below     referenced this episode the following year, when she called for     removal. Based on subsequent messages between    and Parnas which are discussed below, in which     arranged for     to be interviewed by a journalist as part of their efforts to remove     it appears that     were aligned, or at the very least, were aligned in their opposition to NABU and

b. According to public reporting, in early 2018    led an investigation into corruption within the State Migration Service ("SMS"), which led to the arrests of NABU agents. used this episode to attack the head of NABU     as incompetent, and introduced an anti-NABU piece of legislation. However,   announced that   arrests had thwarted a joint FBI-NABU investigation into the SMS allowing Iranians to obtain Ukrainian passports. According to public reporting,    and officials from the European Union used this incident (the thwarted investigation) to stop lawmakers from passing the anti-NABU legislation introduced by    subsequently sent documents related to this incident to Parnas in the spring of 2019, as their efforts to remove    intensified, and his messages evinced a belief that    were aligned against

c. According to an interview with    published in the    on October 5, 2019   frequently clashed with Ambassador    beginning in as early as 2016. For instance,    stated that in his first meeting with    in 2016,

14

      ████ told         that "no one is going to dictate to me who is going to be investigated," with respect to     investigations into anti-corruption activists, and that        left the meeting.

22. Based on my participation in the investigation to date, it appears that the push to remove ████ began in the spring of 2018. Based on my review of border crossing records, it appears that Parnas was in the United States in early 2018. Fruman, however, traveled to Ukraine in March, April, and May 2018. While the exact nature of Fruman's trips—and who he met with—is unknown, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that at least some of those trips were geared towards various business ventures. Around this time, in the spring of 2018, based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Fruman began exchanging messages with Parnas regarding energy companies in Ukraine and Poland. As discussed above, around that same time period, in March and April 2018, Parnas and Fruman began attending a number of political fundraising events and making large contributions to congressional candidates and political action committees with the apparent purpose of enhancing their influence in     circles.

23. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound political access to seek     removal. Specifically, I have learned the following:

    a. During an April 20, 2018 roundtable at     sponsored by the     PAC (to which Fruman contributed $100,000), Parnas met then-Congressman (R-TX), and subsequently scheduled a meeting with     for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with



Fruman was in Ukraine at the time, and so Parnas sent Fruman two photographs of the meeting: one depicted Parnas pointing at a map of Ukraine and Eastern Europe whil looked on, and the other photo depicte posing with Parnas.

b. It appears that in that first meeting, Parnas discusse with and advocated for her removal from that position. In a letter dated that same day—May 9, 2018— wrote to Secretary of State

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine. As you likely know is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. as U.S. Ambassador to Ukraine immediately. I kindly ask you to consider terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and staff noted, "Please don't distribute, this is only for your records." Parnas had multiple other meetings with in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to who was running for reelection in November 2018, which were funded by Fruman (and reimbursed later with funds from Muraviev).

d. Parnas's efforts to remove continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President of Ukraine. Later that month, staff arranged a call with the State Department regarding Ambassador Prior to that call, s chief of staff asked

16

Parnas if there was anything else he wanted to discuss before she spoke to the State Department. Despite          letter and subsequent efforts, Ambassador          was not removed from her posting at that time.

*Parnas Enlisted Rudolph Giuliani and Others to Lobby for          Removal*

24. After efforts to lobby          to cause the State Department to remove or recall          did not, themselves, result in her removal, it appears that Parnas soon enlisted Giuliani in his efforts to remove          Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

a. Parnas appeared to have met Giuliani at a          fundraising event, and they subsequently had a meeting in or around July 2018 to discuss a number of matters, including Parnas's fledgling insurance business, Fraud Guarantee. In September 2018, Parnas retained Giuliani, through his consulting firm          ostensibly to act as a consultant and spokesman for Fraud Guarantee. As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid, according to my review of the text messages between Giuliani and Parnas. Parnas and Giuliani exchanged a number of messages regarding the payment of Giuliani's retainer, but it did not appear from the messages that Parnas himself directly paid Giuliani. Instead, it appears that Parnas and Correia solicited third parties to invest in Fraud Guarantee, and directed at least one third party to wire $500,000 to a bank account in the name of          with the notation "Credit towards Fraud Guarantee Holdings, LLC agreement." Accordingly, it appears from my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant that the investor in Fraud

17

Guarantee believed he was paying Giuliani to help advance the business interests of Fraud
Guarantee.[5]

25. It appears that Giuliani's assistance on the Ambassador issue began in earnest in
December 2018. Based on my review of public reporting and materials obtained pursuant to the
January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

a. On December 7, 2018, Parnas forwarded Giuliani a copy of the May 9, 2018
letter.



b. In January 2019, Giuliani and Parnas met with           at the offices of
          in New York. A memorandum regarding the meeting, which appears to have been
subsequently provided to the State Department by Giuliani, discussed below, indicates that they
discussed Ambassador          who          asserted "protects" the "ineffective"
Specialized Anticorruption Prosecutor's Office in Ukraine – an apparent reference to NABU and
          and who          claimed asked him to close three cases, including a case against
the member of Ukraine's Parliament who was involved in the disclosure of          -related
information. According to the memorandum,          also reported that he had re-initiated an

---

[5] FARA contains a narrow exemption from the registration requirement for attorneys
engaged in the practice of law on behalf of a foreign client. However, based on my review of the
January 18 Warrant, I have learned that while Giuliani is an attorney, it does not appear that he
was performing legal work and therefore it does not appear the attorney exemption applies.
Indeed, Giuliani's contract with Parnas included a detailed description of the scope of work to be
performed by          none of which was legal in nature. To the contrary, the terms of
the contract expressly state that          was being retained "as a consultant" and
described a series of non-legal tasks to be completed in that capacity. Thus, based on my
participation in the investigation, it does not appear that Giuliani was representing Fruman or
Parnas as an attorney, and it does not appear that Giuliani was performing legal work. In any
event, even if the practice-of-law exemption applied to Giuliani, it would not apply to Parnas's or
Fruman's actions on behalf of          or another foreign principal.

12.06.2018

investigation his predecessor       , had opened into    in which     , a board member, was implicated.

     c. Around the same time, also according to a memorandum which appears to have been provided to the State Department by Giuliani, Parnas and Giuliani participated in a phone interview of    (the former Prosecutor General), who provided information about his investigation and claimed that President    had put an end to the investigation at the request of then-Vice-President

    26. In or about February 2019, it appears that Giuliani formalized his representation of a Ukrainian principal by entering into consulting agreement between Giuliani, former Washington D.C. United States Attorney    and his partner and spouse    on the one side, and the Government of Ukraine, on the other. As described below, the arrangement was facilitated by Parnas. Specifically, based on my review of materials obtained pursuant to the January 18 Warrant, the May 16 Warrant, and August 14 Warrant, as well as public sources and travel records, I have learned, among other things, the following:

     a. On or about February 11, 2019, Giuliani and Parnas met with    in Warsaw, Poland. In the days that followed the meeting, Parnas communicated with Giuliani and    about a retainer agreement. For instance, on or about February 14, 2019,    texted Parnas: "Welcome back. . . . How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA."[6] Parnas responded on February 15, 2019,

---

[6] "FARA" appears to be a reference to the Foreign Agents Registration Act, i.e., one of the Subject Offenses. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that Parnas is familiar with FARA from this and prior conversations. For instance, on March 5, 2019, Parnas texted with    and    sent Parnas a FARA registration for a different individual, and Parnas confirmed "Got it." Notably, that FARA registration was completed on behalf of two embassies (the Embassy of    ) and on behalf of a foreign individual. Similarly, in April 2019, Parnas texted with    a naturalized

19

that Giuliani was working on the retainer. Parnas reiterated t       on or about February 16, 2019, that he would follow up with Giuliani about the retainer.

      b.  On or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between        as the General Prosecutor of Ukraine," an

       . The retainer amount was $200,000 and, according to the draft retainer, was ostensibly for Giuliani       assistance in recovering "sums of money in various financial institutions outside Ukraine." It is not clear what this phrase refers to, and may simply have been an effort to legitimize, or give the appearance of legitimacy to, what were in truth their efforts to cause the U.S. Government to remove the U.S. ambassador to Ukraine. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement."

      c.  On or about February 18, 2019, Parnas texted Giuliani: "This is who the retainer should be me out to: ministry of justice of Ukraine, Att: minster       " Based on my review of public sources, it appears that       was the Minister of Justice of Ukraine (from in or about 2014 to in or about July 2019), and was a political ally of       and

      d.  On or about February 19, 2019, Parnas texted Giuliani, "Hi my brother let me know when to expect the retainer agreement." Giuliani responded, "It will be there in ten minutes." Parnas responded that he got it and would "deliver it tomorrow." Parnas also asked Giuliani for

---

Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding       On April 24, 2019, Parnas asked    to send him the "fara registration," and     responded with a FARA registration completed by a public relations firm on behalf of Ukrainian President

12.06.2018

wiring instructions and to "please send me a signed copy by yo█████████ so they can execute and wire funds." Giuliani texted back, in substance, that he would do so the next day.[7]

e.   On or about February 20, 2019, the office manager at █████████ emailed Parnas (copying Giuliani) a copy of a retainer agreement signed by Giuliani. Pursuant to the terms of the agreement█████████ for the Ministry of Justice of the Republic of Ukraine . . . retains █████████ an█████████ to advise on Ukrainian claims for the recovery of sums of money in various financial institutions outside Ukraine." The agreement also stated that the Ministry of Justice agreed to pay $300,000 t█ █████████ as a retainer, and that the agreement would be superseded by a later agreement. Parnas subsequently confirmed to Giuliani by text message that he had received the retainer.

f.   On or about February 21, 2019, Giuliani texted Parnas, "How's it going???" Parnas responded, "Meeting with █ now everything good," which appears to be a reference to the fact that, based on public reports, Parnas was meeting with █████████ who was originally identified as the client in the draft retainer agreement described above. Three days later, Giuliani again asked how things were going, and Parnas explained that he was "meeting with █████████ in 2 hours he has some paperwork to give us I'll call you after the meeting."[8]

---

[7] Based on my review of materials obtained pursuant to the May 16 Warrant, it is not clear whether Parnas or Giuliani forwarded a copy of the February 2019 draft retainer agreement to █████████ Around that time, █████████ repeatedly asked Parnas what the status of the retainer ▆▆▆▆▆▆▆ was, and asked him to forward her a copy. Parnas responded that he was trying but it was not going through, although it is not clear whether Parnas ultimately succeeded in forwarding the draft retainer to█████████

[8] It is currently unclear whether these meetings between Parnas and █████████ regarded █████████ desire to have the Ambassador removed; Giuliani's desire for information about █████████ and█████████ both; or another topic. Nonetheless, as reflected in text messages below, it does appear that Parnas's efforts to have Ambassador █████████ removed were done at the request █████████

27. At or around the same time that Parnas, Giuliani, and ▮▮▮▮▮ were formalizing an agreement with Ukrainian government officials, it appears that Giuliani privately lobbied high-level officials—including, apparently, Secretary of State ▮▮▮▮ and President Trump—for the removal of Ambassad▮▮▮▮▮. Specifically, based on my review of materials obtained from the May 16 Warrant, I have learned, among other things, the following:

a. On or about February 11, 2019, the same day that Giuliani and Parnas met with ▮▮▮▮▮ ▮▮▮▮▮ asked Parnas and Giuliani in a text message "Is there absolute commitment for HER to be gone this week?" Giuliani replied, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. ▮▮▮▮ is now aware of it. Talked to him on Friday."

b. On or about February 14, 2019, the same day that ▮▮▮▮ asked Parnas if he had heard from Giuliani about a retainer, Parnas encouraged ▮▮▮▮ to "nudge [Giuliani] about the Mrs. A.," which appears to be a reference to Ambassador ▮▮▮▮▮

c. On or about February 16, 2019, Parnas texted ▮▮▮▮ that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." It appears Parnas was in Ukraine at the time. ▮▮▮▮▮ responded, "That's for Rudy to get tonight."

d. On or about February 17, 2019, ▮▮▮▮ asked Parnas if Giuliani "me[]t with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to President Trump. Later that day, ▮▮▮▮ asked "Was he successful re Amb?" to which Parnas replied "this week."

### *The Public Press Campaign to Remove* ▮▮▮▮▮

28. Following Parnas's meeting with ▮▮▮▮ in February 2019, and since Giuliani's private lobbying efforts appeared to have failed, Parnas, ▮▮▮▮ Giuliani, and ▮▮▮▮ worked with a journalist, ▮▮▮▮▮ at ▮▮▮▮ to mount an aggressive public media campaign to

22

remove               Their media campaign began within days of         complaining to Parnas about actions that        had taken in Ukraine against an ally of       . Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

     a. On or around March 5, 2019,       gave a speech in which she called for       removal from SAPO. As discussed above, NABU had previously called for the removal of       (who, according to public reporting, was an ally of      and      ), and claimed that      had leaked information about corruption cases to corruption targets; yet a year later,      was still in his position.      also criticized the Ukrainian court system, which she described as riddled with compromised judges.

     b.      immediately complained about      statements to Parnas. Specifically, on March 5, 2019     texted Parnas "Ambassador openly called to fire head of the SAPO," which was a reference to      Parnas asked     to call him, and it appears     reported that the Ambassador had also criticized Ukrainian Supreme Court judges.

     c. On or about March 8, 2019, Parnas sent     a photograph of     letter, and she replied by sending the contact information for     a reporter at     That same day, according to text messages, it appears that Parnas,     and possibly Giuliani met with     about Ambassador     and the next day Parnas sent     information about the Ambassador.

     d. On or about March 8, 2019,     wrote Parnas again, and referred to a statement     made in which she called for     removal; Parnas replied "we are all in the loop," and wrote to confirm that they were setting up an interview with     and

23

a journalist (         as discussed below).          then sent Parnas the contact info for          and         wrote:                     is waiting I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and         discussed setting up an interview between                     but         told Parnas tha         could not answer questions about "the Ambassador,         in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time         was running for re-election, which he would ultimately lose.

29.         appeared to grow impatient with Parnas's failure to secure removal. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that on March 11, 2019         asked Parnas when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On March 13, 2019         wrote Parnas "I am fucking sick of everything. I did not get the visit. My First did not get shit. I am ready to screw your opponents. But you want even more. We – everything. You – later. This is not fair." Based on my participation in the investigation, this appears to be a reference to         and others' willingness to share information about         and         and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador         and meeting with the Attorney General. On March 14, 2019, Parnas responded "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or

30. Parnas,                     continued to work together to publicize         allegations through         Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

24

12.06.2018



a. On or about March 12, 2019, Parnas received from ▮▮▮▮ a written narrative and answers to questions posed by ▮▮▮ about ▮▮▮, Vice-President ▮▮▮ and ▮▮▮ Parnas forwarded ▮▮▮ answers to ▮▮▮ Around that time, Parnas also spoke to ▮▮▮ and conveyed additional information back to ▮▮▮ indicated that he needed President ▮▮▮ and ▮▮▮ "on the record about the ambassador and ▮▮▮ and so Parnas set up an interview between ▮▮▮

b. Based on my review of public reporting, I have learned that on March 20, 2019, a portion of ▮ video interview with ▮▮▮ and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in ▮▮▮ In his interview ▮▮▮ claimed he would open an investigation into whether the director of NABU ▮▮▮ attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee ▮▮▮ In a second video interview published on March 20, 2019, by ▮▮▮ in ▮▮▮ told ▮▮▮ that Ambassador ▮▮▮ had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017. ▮▮▮ reported that ▮▮▮ was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman ▮▮▮ wrote a "private letter asking Secretary of State ▮▮▮ to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." ▮▮▮ also posted a copy of the letter. The article quoted ▮▮▮ as describing ▮▮▮ allegations as untrue and an "absurd attempt" to discredit NABU.

31. Parnas continued working to publicize ▮▮▮ allegations against ▮▮▮ and texted links to ▮▮▮ articles to many of his contacts. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

25

a. On March 20, 2019, Parnas sent                    the development director of

                    (to which Parnas and Fruman had previously contributed) links to both of

              articles in          along with links to tweets by                    and

Parnas instructed          "have    retweet it," an apparent reference to

confirmed "sent." As discussed below,              did, in fact, retweet a related article several

days later. Moreover, President Trump retweeted one of the links that Parnas sent to          that

same day, on March 20, 2019: an article entitled "As Russia Collusion fades, Ukrainian plot to

help        emerges."        then sent a copy of President Trump's tweet to Parnas.

b. Parnas frequently updated              on the success of their March 20, 2019 press

blitz. Parnas promptly sent a screenshot of President Trump's tweet to              In an apparent

effort to garner more information for          Parnas asked          to send him "the names of

the people that she said," which appears to be a reference to              claimed "do not prosecute

list."          sent Parnas three names              MP,          MP,          ngo") and

described them all as "loud NABU activist[s]." As discussed above, based on public reporting, it

appears that          may have clashed with              regarding NABU in the spring of 2018,

and was frustrated by her continued alignment with NABU, which appears to have provided a

motive for          to claim that              had asked him not to prosecute "loud NABU

activist[s]." Parnas congratulated              and told him that "Today you become a world-class

political figure. Glory to the Ukraine !!!"              then asked Parnas if it was "true, that the

Ambassador chick and          [sic] were called to Washington," which appears to be a reference

to                    the head of NABU, to which Parnas replied, "I will call later. We'll

talk."

c.  Parnas then reported            that President Trump had re-tweeted a story about
            responded, "If I am not going to get invited for an official visit in the
nearest future, I will not be able to fight off our or your [people]." Based on my participation in
the investigation, it appears that            reference to fighting off "our or your [people]"
referred to their perceived enemies in Ukraine and the U.S., respectively.

d.  The day after        published the        interview, on March 21, 2019, Parnas
complained to            that the top news story in Ukraine was the reporting
regarding Ambassador            which prompted the Ambassador to put out a statement
saying that        was a "prime example of corruption."            was upset about that
statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why
the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine.
"Moreover,        continued, "they are saying in the State Department that my reports work
in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call
        and had "good news." Then, in an apparent effort to quell the negative press
was receiving and further publicize their allegations against            Parnas offered via text
to            "You want me to go on        and talk about it? I would not mention
any names if I did that. I would just say a client approached me six months back with allegations
that FBI and US Ambassador in Ukraine were playing favorites. And reference        getting
free pass and alleged ties to 'high level        administration officials'. Maybe mention
allegations about setting up        The media could connect the dots from there." Based on
my participation in the investigation and my review of materials obtained pursuant to the May 16
Warrant, Parnas's reference to his "client" appears to refer to

27

12.06.2018



e. Based on my review of public reporting, I have learned that                        article soon received substantially increased press attention. On March 23, 2019, on th

on                        aired a segment highlighting that former-Congressman                        sent Secretary of State        "an urgent letter" in May 2018, asking that Ambassado

be removed from her position, and published a copy of that letter                        was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman

                        She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that Trump had decided, at least at that point, to fire                        appears to be the "good news" that Parnas reported back to

two days prior.

f. In an apparent reference to                        interview, Parnas happily wrote via text message to        "I love you and your husband you are the best," and "Tel        he was awesome my hero."                        responded, "We can be really great if we have a retainer signed." Parnas agreed, and                        asked if the "Wicket Witch" was gone, which appears to be a reference to

g. On March 23, 2019, Correia texted Parnas:                        must be pretty happy!! And grateful?!." Based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that Correia's statement appears to be a reference to the possibility that

12.06.2018

Congressman [redacted] would repla[redacted] [redacted].[9] Correia then wrote, "This is insane! Finally the facts come ou[redacted], etc., and, looks like she's finally fired . . . This is even better than if it happened before." Parnas replied, "Just the beginning."

      h.  Around this tim[redacted] and Giuliani began frequently posting messages related to Ukrain[redacted] and the 2016 election on Twitter, apparently in an effort to further magnify the press attention their claims agains[redacted] would receive.

      i.  On March 24, 2019 [redacted] retweeted an article summarizin[redacted] reporting in the [redacted], entitled "Calls Grow to Remove [redacted] U.S. Ambassador to Ukraine."

      j.  Although Parnas, Giuliani, and [redacted] appeared to be pleased with the press response in the U.S., the press response in Ukraine appeared to be unfavorable t[redacted] On March 26, 2019 [redacted] sent Parnas pictures of documents that allegedly contained information about [redacted] and noted, "I hope this is enough." He then complained to Parnas that despite the information he was gathering about [redacted] the Ambassador had not been fired. In particular, he

---

[9] Based on my review of the materials obtained pursuant to the January 18 and May 16 Warrants, it appears that Parnas and Correia had discussed replacing [redacted] with [redacted] at least as early as January 2019. On January 7, 2019, Correia sent Parnas a document entitled "Discussion List," which had a section labeled "Ukraine," which referenced their efforts to remove [redacted] Specifically, Correia noted that the "former Inspector General," which appears to be a reference to [redacted] was waiting on a visa, and that they would "need help if denied." The existing inspector general, which appears to be a reference to [redacted] was "coming January 10-15th." With respect to "Ambassador to Ukraine," Correia wrote "Replace with [redacted] and noted that they "[s]hould be receiving very important info by both [redacted] including information regarding "payoffs and bribes," an "Anti-Trump" room in the embassy, and "Telling current President (and others) that Trump will be impeached." Correia also noted that "We will be returning January 20th, or thereabouts," which appeared to be a reference to Parnas returning to Ukraine. Around this time, in early January 2019, Parnas exchanged messages with Giuliani regarding securing a visa for a Ukrainian (possibly [redacted] and Giuliani reported that he was trying to get the visa, and passed along the contact information for [redacted] another of President Trump's personal attorneys. However, it does not appear that [redacted] got a visa in January 2019.

12.06.2018

wrote th                     is attacking me already . . . Zero results. They want to listen to the

tape. I will get the recording device tomorrow and the testimony of the participants of the

conversation. My case on [a Ukrainian public figure who allegedly helpe          is proceeding

along in force. Testimony abou                     monetary transfer is available. And only you

are unable to bring down a single, stupid woman ☹." Parnas wrote back, "She is not a simple,

stupid woman. Believe me. But she is not going anywhere."

        k.  On March 29, 2019, Parnas wrote to           "I was asked to tell you personally

that America supports you and will not let you get hurt. It does not matter how it looks now.

Everything will soon change and everything will go in the right direction. So that you would

know, that you are being talked about here as a true hero of the Ukraine."          then told

Parnas that he had additional documents related to         and when Parnas asked          to

send them to him          replied that he would "pass it along with the new Ambassador ☺."

        l.  Over the next several days, Parnas continued to feed information to          who

asked Parnas to "eyeball" articles for "accuracy," and continued to publish articles i          On

March 27, 2019, Parnas told Giuliani that          just canceled on          which prompted

Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on March 30,

2019, Giuliani confirmed that he would be appearing on          that morning, to which Parnas

responded, "Great." Parnas sent some of          articles to Giuliani.

        m.  However, when          still had not been removed,          continued his

complaints about          to Parnas. On March 29, 2019,          told Parnas that the

"ambassador chick organized leak of NABU materials to the TV project financed by you about

corruption of those surrounding          Next one is going to be about me." Parnas replied,

"I will call you soon with the news." On April 2, 2019,          bragged, "I am probably the

30

most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week."

On April 9, 2019⬛⬛ provided the names of "Advisors and public speakers of the presidential candidate"⬛⬛ who was running against⬛⬛, and their alleged connections t⬛⬛ (to whom⬛⬛ referred by her nickname⬛⬛), and wrote that the candidate for Prosecutor-General—who would replac⬛⬛ in the even⬛⬛ was elected—was a "Favorite activist o⬛⬛

32. Based on my participation in the investigation, I have learned that according to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Secretary of Stat⬛⬛ received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani, among others, with⬛⬛ and ⬛⬛ dated January 23, 2019, regarding⬛⬛ The documents were separated into folders that bore the insignia of the Trump Hotel. The notes from the meeting with⬛⬛ include his allegation about the "do not prosecute list" and his explanation that the heads of SAPO and NABU "do not like each other" and that the head of NABU favored⬛⬛ over Trump, and that⬛⬛ spent money on "good public relations" for NABU. The package then contained⬛⬛ March 20, 2019 articles featuring his interview with⬛⬛ along with documents that appeared to be⬛⬛ notes and emails regarding the articles. On October 2, 2019, Giuliani confirmed to⬛⬛ that the package originated with him, and that he had "routed" an "outline" of allegations against⬛⬛ to⬛⬛ office. Giuliani claimed that⬛⬛ told him that⬛⬛ would refer the documents for an investigation.

33. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas⬛⬛ and Giuliani appear to have entered into a second,

31

12.06.2018

more formal agreement with      in April 2019.  On April 13, 2019, Giuliani sent Parnas three separate versions of a retainer agreement betwee      , on the one hand, and    and his deputy, on the other hand.[10]  The agreement indicated tha   was retainin     to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."[11]  The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain activities on behalf of foreign political parties or entities."  Per the agreement,

would pay a \$125,000 retainer and \$25,000 per month, plus costs.  Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that   subsequently signed a copy of each of the three retainer agreements.[12]

---

[10]    deputy was     According to an article published on October 5, 2019 in the    asked   to remove   at a meeting in 2016 due to   corruption.

[11] Based on my participation in the investigation, I believe that "embezzlement of funds" may be a reference to an allegation that    misappropriated money from Ukraine or "Interference in the 2016 U.S. election" may be a reference to the allegation that there was a plot to turn up information about then-candidate Trump and individuals working with him, including

[12] Despite the fact that   signed the agreements, based on my review of Department of Justice records related to FARA filings, I have learned that none of Parnas, Fruman, Giuliani,     registered under FARA or provided notice to the Attorney General at any point in 2018 or 2019.  Based on the investigation to date, it is unclear whether or any member of the Ukrainian government countersigned the proposed retainer agreements with   and Giuliani, or paid   or Giuliani in connection with their purported representation.  (And according to press reports,   and Giuliani have denied ever working as lobbyists on their behalf.)  However, FARA does not require there to be a retainer agreement in place, or a foreign principal to have paid an unregistered agent, for the law to apply.

34. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that between April 11 and 23, 2019, Parnas worked wit███████████ to arrange additional interviews with Ukrainian government officials, and provided the questions that ████████ would ask one official. Specifically, I have learned, among other things, the following:

a███████ ran multiple articles during that period. However, during this time period, ████████ walked back some of his prior claims and, in particular, told ████████ on April 17, 2019, that Ambassado███████ had never requested a "do not prosecute" list, and it was instead he who had requested that list. In addition, on April 21, 201███████ won the Ukrainian presidential runoff against███████. Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and public reporting, I believe that ████████ may have walked back his comments due to the negative press attention his unfounded allegations had garnered, or in an effort to maintain credibility with the incoming ████████ administration, so that he would not be removed by any incoming administration.

b. On April 23, 2019, Parnas asked Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on May 4, 2019, Giuliani joked, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day ████████ told Parnas that "People here are talking that there will be a very high level coming from you to the inauguration," to which Parnas replied "You do understand Who is dealing with this." Two days later, on May 6, 2019, according to public reporting, the State Department confirmed that Ambassador███████ would leave her post on May 20, 2019.

35. Based on my review of public reporting, I have learned that on May 9, 2019, Giuliani publicly confirmed that he had met wit     on multiple occasions, and stated his intention to travel to Ukraine to meet with newly-elected Presiden     to push him to press ahead with two investigations he hoped would benefit President Trump in his reelection campaign: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (i     involvement i     According to th     Giuliani was to be accompanied by Parnas an

36. Based on my review of materials obtained pursuant to the August 14 Warrant, I have learned that on May 10, 2019, Giuliani wrote to President-Elec     to request a meeting with     Giuliani, and     to discuss a "matter." Specifically, I have learned the following:

a. On May 10, 2019, Giuliani's secretary forwarded a copy of a letter from Giuliani to President-Elec     to a Ukrainian government email address. Giuliani's secretary then forwarded that email, including the attached letter, to Giuliani and Parnas. In his letter to which was dated May 10, 2019, Giuliani wrote:

> I am a private counsel to President Donald J. Trump. Just to be precise, I represent him as a private citizen, not as President of the United States. This is quite common under American law because the duties and privileges of a President and a private citizen are not the same. Separate representation is usual process. Congratulations on a truly impressive victory in the recent election. . . . Anything I can do to help you or your country would be a great honor. However, I have a more specific request. In my capacity as personal counsel to President Trump and with his knowledge and consent, I request a meeting with you on this upcoming Monday, May 13th or Tuesday, May 14th. I will need no more than a half hour of your time and I will be accompanied by my colleague     a distinguished American attorney who is very familiar with this matter. Please have your office let me know what time or times are convenient for you,     and I will be there.

b. Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and August 14 Warrant, as well as Giuliani's May 9, 2019

34

interview with th▇▇▇▇▇▇▇▇described above, it appears that Giuliani an▇▇▇▇▇ sought to solicit President▇▇▇▇ assistance in moving ahead with the▇▇▇ and 2016 election interference investigations, which they believed would benefit President Trump's reelection campaign. However, based on my review of public reporting, I have learned that on May 15, 2019, Giuliani announced that his trip to Ukraine was cancelled.

37. On July 22, 2019, articles were published by▇▇▇▇▇ and th▇▇▇▇▇▇

▇▇▇▇▇▇ regarding Parnas and Fruman's campaign for the removal of

▇▇▇▇▇ Parnas and▇▇▇ were interviewed for the articles. Parnas said that he and Fruman were not "acting at the behest of anyone." Parnas also said that he and Fruman were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along."▇▇▇ claimed that "he raised the issue of▇▇▇ in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because▇▇▇ own letter to Secretary▇▇▇ noted that others had brought the issue of▇▇▇ to his attention;▇▇▇ wrote the letter after his first meeting with Parnas; and▇▇▇ staff later forwarded the letter to Parnas and solicited his input on what to discuss with the State Department regarding the letter.

38. Based on my review of public reporting, I have learned that on July 25, 2019, President Trump spoke to Ukrainian President▇▇▇ According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to▇▇▇

35

who was still in place at that time following ▮▮▮▮▮ election but subsequently removed from office, or possibly ▮▮▮▮ the former prosecutor.

39. As noted above, Parnas, Fruman, Giuliani, and ▮▮▮▮▮ have never registered with the FARA unit of the Department of Justice or provided the required notice to the Attorney General. The firm o▮ ▮▮▮▮▮ previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine or provided notice to the Attorney General. Based on my review of public reporting, it appears that Giuliani has been aware of the FARA registration requirements for some time but has publicly stated that he believes that he is not required to register because he contends he has never lobbied the U.S. government on behalf of his clients. According to a July 10, 2018 article in the ▮▮▮▮▮ Giuliani reported that he was working with clients in, among other places, Ukraine, Brazil, and Columbia, and had given a paid speech to an Iranian dissident group, but that he has never registered with the Justice Department on behalf of his foreign clients because he does not directly lobby the U.S. government on behalf of his clients and was not charging President Trump for his legal services. In particular, Giuliani explained that he has never lobbied President Trump on "anything." According to a September 6, 2018 article in the ▮▮▮▮▮ seven Senators wrote the Department of Justice to ask that Giuliani's lobbying on behalf of foreign clients be investigated, after Giuliani wrote a letter on behalf of a ▮▮▮▮ client, in which Giuliani took a position contrary to that of the State Department's. In an interview, Giuliani stated that he "did nothing to invoke FARA either now or ever" because he had never represented his foreign client's interests before the U.S. government. As discussed above, however, Giuliani repeatedly lobbied the U.S. government, including President Trump and Secretary of State ▮▮▮▮ as part of a scheme to seek ▮▮▮▮▮ removal at the request of a Ukrainian government official.

36

40. Based on the above, there is probable cause to believe that the efforts by Parnas, Fruman, Giuliani, and ▆▆▆ to lobby for the removal of Ambassador ▆▆▆ were done at the direction and/or request of ▆▆▆ and likely other Ukrainian officials, in violation of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government), and 18 U.S.C. § 371 (conspiracy to commit the same). Specifically, as described above, there is probable cause to believe that at the request or direction o▆ ▆▆▆ and others, Parnas (a) lobbied Congressman ▆▆▆ to write a letter to Secretary ▆▆▆ urging the removal of Ambassador ▆▆▆ (b) hired or facilitated the hiring of Giuliani and ▆▆▆ to lobby President Trump and officials at the State Department for the removal of Ambassador ▆▆▆ and (c) with the assistance of Giuliani and ▆▆▆, caused articles and videos to be published about the Ambassador as part of an effort to persuade U.S. government officials to fire the Ambassador. Accordingly, I respectfully submit that there is probable cause to believe that Parnas and others undertook illegal lobbying on behalf o▆ ▆▆▆ and other Ukrainian government officials without providing notice to the Attorney General.

## B. Probable Cause Regarding the Subject Account

41. There is probable cause to believe that the Subject Account belongs to Parnas for the following reasons:

a. Based on my training, experience, and review information provided by the Provider, I know that an Instagram account may be set to "public" or "private" status. To view a "public" account, it is not necessary to be a user of Instagram or a "friend" of the Instagram account holder. On the other hand, to view a "private" account, it is necessary to be an Instagram "friend" of the account holder. That said, even for "private" accounts, there is a publicly-viewable account page that typically shows the account's username, a picture, the number of posts, and information about "followers" or "friends." Based on my review of the publicly-viewable page for the Subject

Account, which is pictured below, I have learned that the Subject Account's username is Parnas's name and that the profile picture is a picture of Parnas and his family.



b. Additionally, on or about January 18, 2019, the United States Attorney's Office for the Southern District of New York and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant, criminal number 19 Mag. 729, for records in email accounts belonging to Parnas, among others. Based on my review of emails obtained pursuant to that search warrant, it appears that Parnas has had an Instagram account since at least April 2016 registered to his email address. According to the emails that I have reviewed, the username associated with that Instagram account is the username of the Subject Account.

c. Accordingly, based on the foregoing, there is probable cause to believe that the Subject Account belongs to Parnas.

42. There is probable cause to believe that the Subject Account contains evidence of the Subject Offenses. Specifically, on or about October 21, 2019, the                    posted a

38

12.06.2018

video entitled, "Private Photos of Indicted Donor Depict Ties to Trump, Giuliani."[13] The video depicts photographs taken from the Subject Account that are evidence of the Subject Offenses, including but not limited to Parnas's attendance at political events or meetings with political candidates. For instance, the ▮▮▮▮▮▮▮▮▮▮ video shows:

a. Parnas meeting with President Donald J. Trump or his attendance at Trump events on multiple occasions, including on or about October 23, 2015, as pictured below:



b. Parnas's presence at meetings with co-conspirators and potential co-conspirators, on multiple occasions including Fruman and Giuliani (as pictured below) and Correia:

---

[13] The video is viewable at https://www.wsj.com/video/private-photos-of-indicted-donor-depict-ties-to-trump-giuliani/7EED4946-5201-4D70-A8FF-0516DCC1488E.html.

12.06.2018



c.  Parnas's location at Trump properties in Florida, New York, and Washington, D.C.,
as well as his presence in New Hampshire, Nevada, Michigan, and Indiana. Based on my
involvement in this investigation, I believe that Parnas attended Trump properties for fundraising
events and was in Nevada and other states for political events. Indeed, the below graphic from the

shows images taken from the Subject Account of Parnas at political events in

multiple states:

12.06.2018



d. As described in the Indictment, Parnas attended a fundraising event in Nevada in furtherance of the cannabis scheme involving Muraviev, and it appears, as pictured below, that the Subject Account contains one or more photos from that event:



e. Parnas's attendance at an election night party for now-Governor                    of

Florida. Based on my involvement in this investigation, I know that GEP made a contribution to

                    which appears to be related to why Parnas was invited to the           event.

41

12.06.2018



f. Parnas's travels to Europe to meet with foreign nationals including Muraviev or ███████ As pictured below and discussed above, Parnas traveled to Poland with Rudolph Giuliani and it appears the purpose of that trip was, at least in part, to meet with one or more Ukrainian government officials.



12.06.2018

43. Based on the foregoing, there is probable cause to believe that the Subject Account will contain posted content – including but not limited to pictures and videos, location information, comments and text, and tagged other users – that will be evidence of the Subject Offenses. Additionally, based on my training and experience, Instagram users who post content typically also utilize Instagram Direct to share content. Accordingly, there is probable cause to believe that the Subject Account will contain evidence sent through Instagram Direct that will be relevant to the Subject Offenses.

44. Temporal Limitation. To the extent materials are dated, this warrant is limited to materials created between October 1, 2015, which is the month in which it appears Parnas first posted a photo related to a political event, to the present.

**C. Evidence, Fruits and Instrumentalities**

45. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

46. In particular, I believe the Subject Account is likely to contain the following information:

a. Evidence sufficient to establish the owner and user of the Subject Account, including but not limited to subscriber information, customer correspondence, access logs, and device information.

b. Evidence relating to political events attended by Parnas, Fruman, Correia, Kukushkin, or Muraviev.

c. Evidence relating to political contributions made by Parnas, Fruman, Correia, Kukushkin, or Muraviev, or entities under their control, including but not limited to GEP.

43

12.06.2018

d. Evidence relating to meeting with Ukrainian government officials, including but not limited to travel with Rudolph Giuliani,                    and others to meet with Ukrainian government officials.

## IV.    Review of the Information Obtained Pursuant to the Warrant

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

48. In conducting this review, law enforcement personnel may use various methods to locate evidence of the Subject Offenses, including but not limited to undertaking a cursory inspection of all content within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure, particularly in an Instagram account with pictures. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently

44

there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## V.  Request for Sealing Order

49. The Indictment in this case was unsealed on October 10, 2019, and therefore the charges are public.  However, the scope of the investigation, and the involvement of uncharged individuals, including as detailed herein, is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets or relevant witnesses to the scope and focus of the investigation, causing them to destroy evidence, flee from prosecution, craft or shape their potential testimony, or otherwise seriously jeopardize the investigation.  Accordingly, while I do not request delayed notification, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## VI.   Conclusion

50. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

12.06.2018

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Sworn to before me on December 10, 2019

HON. J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

12.06.2018