Congressman ▓ reported that he had "received notice of concrete evidence from close companions that Ambassador ▓ has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. ▓ as U.S. Ambassador to the Ukraine immediately." Congressman ▓ asked that Secretary ▓ "consider terminating her ambassadorship and find a replacement as soon as possible." Less than an hour later, ▓ forwarded the email from ▓ to Parnas. Based on this email and my participation in the investigation, I believe that the "political matter involving Eastern European relations" ▓ referenced above as the purpose for the June 14, 2018 meeting between Parnas and Congressman ▓ was related to Parnas's and Fruman's May 9, 2018 request to Congressman ▓ to remove the current U.S. Ambassador to Ukraine.

   f. On June 25, 2018, Igor Fruman and Parnas each made $2,700 contributions in their own names to ▓ for Congress. Based on my review of ▓ and FEC records, I have learned that the ▓ bill included two $2,700 contributions – the maximum an individual could at the time contribute – to ▓ for Congress. Based on my review of FEC records, described above, I know that despite the fact that these contributions were paid for using different credit cards linked to the same credit card account, they were reported as separate contributions by Fruman and Parnas.

   g. Between June and November 2018, ▓ repeatedly e-mailed ▓ to request additional meetings between Parnas, Fruman, and others with Congressman ▓ Specifically, on June 28, 2018, Correia, who is an associate and business partner of Parnas, had meetings set up with Congressman ▓ On July 12, 2018, Parnas appears to have again met with Congressman ▓ On September 5, 2018, Parnas and Rudolph Giuliani appear to have

12.13.2017

had a meeting scheduled with Congressman ▮ Finally, Fruman, Correia, and Parnas had a meeting scheduled with Congressman ▮ on November 16, 2018.

    h. On or about May 15, 2019, according to public sources, ▮ was prematurely recalled or removed from her position as U.S. Ambassador to Ukraine.

### E. False Statements to the FEC

    29. Based on my review of emails and discussions with other law enforcement officers who have reviewed emails, it does not appear that Parnas, Igor Fruman, or ▮ told the campaigns or PACs to which they were making contributions that the funds used to make the contributions came from third parties and overseas bank accounts. Based on my training and experience, as well as my review of emails, I believe that had the PACs and campaigns known that these were unlawful contributions, they would not have accepted the funds.

    30. Based on my review of records obtained pursuant to the E-Mail Search Warrant, I have learned that Parnas and Igor Fruman have submitted affidavits to the FEC in connection with a pending complaint made by a non-profit advocacy group. Based on my review of those affidavits, it appears that Parnas and Igor Fruman have made multiple false statements to the FEC in connection with that matter. For instance, their sworn affidavits falsely state that Parnas and Fruman "funded the [GEP] entities with over $2.8 million in assets" and that the ▮ ▮ PAC contribution "was made with GEP funds for GEP purposes." In fact, as set forth above, the ▮ PAC contribution was made with funds from a third party that were moved through multiple bank accounts before being paid to ▮ PAC. Additionally, Parnas stated in his affidavit that his contribution to ▮ for Congress "was made with a business credit card . . . which [he] reimbursed." Based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Fruman, Parnas, and



███████████ I have learned that the analyst found no evidence of reimbursement by Parnas to Fruman or ███████████ for the contribution to Congressman ███████████

31. Based on the foregoing, I respectfully submit that there is probable cause to believe that Parnas, Igor Fruman, and ███████ are involved in the commission of the Subject Offenses by using foreign funds obtained by third-parties to make contributions in their own names or in the name of GEP.[2]

### F. Probable Cause Regarding the Subject Accounts

32. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about and records of movement of money and bank transactions, including the contributions described above; communications regarding the origin of the money that funded those contributions; communications regarding Parnas, Fruman, and ███████ relationships with third parties who provided them with foreign funds; and evidence of a scheme to disguise the true source of the contributions to candidates, campaigns, and political action committees. In particular:

    a.    *First*, as set forth above, there is probable cause to believe that Parnas, Igor Fruman, and ███████ are the users of the Subject Accounts. Based on my review of telephone subscriber records and emails, it appears that during the period covered by this application, Parnas, Fruman, and ███████ all used iPhones to communicate with each other. Based on my training and experience and my review of publicly-available information provided by Apple, described

---

[2] In the application for the E-Mail Search Warrant, the agent affidavit stated that it appeared that e-mail communications with ███████████ of Belmont Strategies related to the solicitation of contributions. Based on my subsequent review of e-mails obtained pursuant to the E-Mail Search Warrant, I have learned that Parnas and Igor Fruman were communicating with ███████ about public relations issues concerning contributions, not the making of contributions themselves.

above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled. Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas, Fruman, and ▮.

  b. *Second*, there is probable cause to believe that Parnas, Igor Fruman, and ▮ used iPhones to communicate with each other and with third parties in furtherance of the Subject Offenses. From my review of telephone records, I have learned the following:

    i. Igor Fruman used a telephone number registered to an iPhone to communicate with two phone numbers associated with Parnas, which are registered to iPhones. Specifically, Fruman and Parnas exchanged calls and text messages around the time of the contributions identified above. For example, on or about June 15, 2018, the day that ▮ and Parnas received a copy of the letter to Secretary ▮ from Congressman ▮ Fruman and Parnas exchanged approximately twelve text messages. Similarly, on or about June 25, 2018, which is the day Fruman and Parnas made contributions to Congressman ▮ Parnas sent Fruman approximately three text messages.

    ii. Parnas communicated by text message with ▮ ▮ and ▮ ▮ at or around the time political contributions were made to the ▮ PAC and ▮ for Congress. For instance, Parnas sent a text message to ▮ on May 14, 2018, and on June 20, 2018, Parnas and ▮ exchanged text messages. On June 14 and June 17, 2018, Parnas sent text messages to Congressman ▮. Based on the timing of these text messages, it appears that they could be related to contributions.

    iii. ▮ using a telephone number registered to an iPhone, was in near-daily contact with Parnas and frequent contact with Igor Fruman. Based on my review of records,

12.13.2017

it appears that ▮▮▮▮ regularly exchanged telephone calls and text messages with Parnas and Fruman, including at or around the time that contributions were made.

       iv. Based on my review of information provided by Apple, I know that text messages, call records, and voicemails can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain text messages, call records, and voicemails relating to the Subject Offenses.

    c. *Third*, from my review of emails obtained pursuant to the E-Mail Search Warrant, I have learned the following:

       i. Parnas, Igor Fruman, and ▮▮▮▮ used e-mail to communicate with each other, campaigns, PACs, and others in furtherance of the Subject Offenses. As described above, the owners of the Subject Accounts regularly communicated by email regarding making contributions. As noted above, the email accounts associated with the Subject Accounts' subscriber information were used in furtherance of the scheme. Based on my review of information from Apple, I understand that iCloud backups can include e-mail accounts. Based on my review of information provided by Apple, I know that emails can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain emails relating to the Subject Offenses.

       ii. ▮▮▮▮ references making or receiving telephone calls relating to political contributions or meetings with political figures. Specifically, in multiple emails ▮▮▮▮ referred to calls to schedule meetings or to discuss the logistics of making contributions. As noted above, based on my review of information provided by Apple, I know that text messages, call records, and voicemails can be stored on the iCloud. Accordingly, there is probable cause to

believe that Subject Account-4 contain text messages, call records, and voicemails relating to the Subject Offenses.

    iii. ▬▬▬ has an email address associated with Subject Account-4 – ▬▬▬▬▬▬▬▬▬ – that she sends materials from concerning political contributions, including contribution forms, political meeting information, and photographs of meetings. Accordingly, there is probable cause to believe that Subject Account-4 contains emails, photographs, documents, and calendar entries relating to the Subject Offenses.

    iv. Based on my review of records from WhatsApp, I know that the telephone numbers used by Parnas, Fruman (which is also registered to Subject Account-3), and ▬▬▬ (which is also registered to Subject Account-4) are registered with WhatsApp accounts. Additionally, from my review of emails, I have learned that ▬▬▬ used WhatsApp to communicate with Parnas some of the time. For instance, on or about August 1, 2018, ▬▬▬ told a third party that Parnas was out of the country and that she had "been reaching him by way of WhatsApp." Based on my training and experience, I know that individuals use WhatsApp to communicate with other individuals overseas, and as described above, the sources of the funds used to make the contributions are or have been outside the United States. Additionally, based on my training and experience, I know that individuals involved in criminal activity use WhatsApp to communicate with their co-conspirators over encrypted channels to evade detection by law enforcement. Based on my review of information provided by Apple, I know that WhatsApp and other encrypted messaging application messages can be stored on the iCloud. Accordingly, there is probable cause to believe that the Subject Accounts contain encrypted messages, including WhatsApp messages.

12.13.2017

v. The Parnas Yahoo email address received emails from Apple indicating that he used devices, including an iPhone X and a MacBook Air, to log into Subject Account-1. Additionally, on multiple occasions, receipts were sent from Apple to the Parnas Yahoo email account for purchases of additional storage for Subject Account-1, which appears to indicate that Parnas is backing up information to Subject Account-1.

d. *Fourth*, based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others about unlawful campaign finance donations, often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

12.13.2017

33. <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received between September 1, 2016, which is approximately two months before Parnas first gave a contribution to then-candidate Trump, and the present, as it appears from my review of emails that Parnas, Igor Fruman, and ▇ are still engaged in political activity and are contemplating making additional contributions.

### G. Evidence, Fruits and Instrumentalities

34. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

  a. Evidence, including but not limited to communications, relating to contributions made or facilitated by Parnas, Igor Fruman, and/or ▇ on behalf of and/or funded by third parties to political candidates, campaigns, committees or other similar entities.

  b. Evidence relating to the sources of the funds used to make contributions in the name of Parnas, Fruman, or GEP.

  c. Evidence of Parnas or Fruman's relationship and/or business dealings with ▇, Muraviev, or ▇

  d. Evidence of Parnas, Igor Fruman, or ▇ communications with campaigns, candidates, or PACs.

  e. Evidence of Parnas or Igor Fruman attending events sponsored or hosted by, or for the benefit of, ▇ PAC, ▇ PAC, ▇ PAC, ▇ ▇ PAC, and/or ▇ for Congress.

33

12.13.2017

  f. Evidence relating to contributions to the ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, ▮▮▮▮▮ PAC, and/or ▮▮▮▮▮ for Congress.

  g. Evidence relating to any request by Parnas or Fruman to ▮▮▮▮▮ that he take any official action, including but not limited to recommendations relating to the ambassador to Ukraine.

  h. Evidence sufficient to establish the ownership of GEP or any related entities, and the extent to which GEP is engaged in the actual operation of an energy business.

  i. Evidence sufficient to establish the ownership of bank accounts in the name of ▮▮▮▮▮ and/or ▮▮▮▮▮.

  j. Evidence of intent to make unlawful political contributions to violate the campaign finance laws.

  k. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on donations or contributions by foreign nationals.

  l. Passwords or other information related to online or encrypted messaging.

## IV. Review of the Information Obtained Pursuant to the Warrant

  35. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 10 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and

instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

36. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all records within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## V.  Request for Non-Disclosure and Sealing Order

37. While there has been public reporting about some of the contributions made by GEP, the existence of a criminal investigation, as well as the scope and focus of this criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation and/or to the scope and focus of the investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption offenses, I know that individuals who participate in campaign