finance offenses may communicate about known government investigations and tailor their stories to be consistent, and tamper with or hide potential evidence. Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering and/or obstruction of justice. In addition, the investigation relates to financial transactions involving foreign bank accounts, and premature disclosure of the focus of this investigation could lead to efforts to hide or conceal foreign funds or transactions. Lastly, if the subjects of this investigation were alerted to the existence of a criminal investigation, it may prompt them to delete electronic records, including in e-mail accounts or other electronic media not presently known to the government. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

38. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

VI.     **Conclusion**

39. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

12.13.2017

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Sworn to before me this
16th day of May, 2019

_____
HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

37

12.13.2017

**Exhibit 2**

**(October 17, 2019 Warrant and Application)**

2017.08.02

AO 93 (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>the Contents of Nine Email Accounts Located on Two Devices Containing the Results of An Email Search Warrant | )<br>)<br>)  Case No. 19 Mag. 7595<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location):*

the Contents of Nine Email Accounts Located on Two Devices Containing the Results of An Email Search Warrant

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations):*
18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before   October 31, 2019
   *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.   ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. *JPO*
   *USMJ Initials*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for __30__ days *(not to exceed 30).*
   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  *October 17, 2019 12:15 PM*   [signature]
   *Judge's signature*

City and state:   New York, New York   J. Paul Oetken, United States District Judge
   *Printed name and title*

AO 93 (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>19 Mag. 7595 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

                                                          *Executing officer's signature*

                                                          *Printed name and title*

## Attachment A

**I. Devices to be Searched**

The devices to be searched (the "Subject Devices") are described as the electronic devices listed below which contain emails and other content information obtained pursuant to a search warrant issued on January 18, 2019 by the Honorable Sarah Netburn, numbered 19 Mag. 729.

| Account | Provider | Owner | Referred To As | Subject Device |
|---|---|---|---|---|
| ███████████████ | Google | Igor Fruman | I-Fruman GEP Account | 1 |
| ███████████████ | Google | Lev Parnas | L-Parnas GEP Account | 1 |
| ███████████████ | | | | 1 |
| ███████████████ | | | | 1 |
| ███████████████ | | | | 1 |
| ███████████████ | Google | David Correia | D-Correia GEP Account | 1 |
| ███████████████ | Google | Igor Fruman | I-Fruman Gmail Account | 1 |
| ███████████████ | | | | 1 |
| ███████████████ | | | | 1 |
| ███████████████ | Oath | Lev Parnas | L-Parnas Yahoo Account | 2 |
| ███████████████ | Oath | David Correia | D-Correia Yahoo Account | 2 |

This warrant applies only to the following accounts on the Subject Devices: the I-Fruman GEP Account, the L-Parnas GEP Account, the ███████████████ the D-Correia GEP Account, the I-Fruman Gmail Account; the ███████████████ the L-Parnas Yahoo Account, and the D-Correia Yahoo Account (the "Selected Accounts").

## II. Review of ESI on the Selected Accounts on the Subject Devices

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) are authorized to review the ESI contained on the Selected Accounts on the Subject Devices for evidence, fruits, and instrumentalities of one or more violations of 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses"), as listed below:

 a. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

 b. Evidence relating to the May 9, 2018 letter from Congressman ▬▬▬ to Secretary of State ▬▬▬, including correspondence attaching or concerning the letter.

 c. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including ▬▬▬ ▬▬▬, or ▬▬▬.

 d. Communications regarding ▬▬▬.

 e. Evidence, including travel records, related to meetings with foreign government officials, representatives of foreign corporations, or foreign individuals, involving Rudolph Giuliani, Lev Parnas, Igor Fruman, ▬▬▬ and David Correia.

 f. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 17, 2019

**REQUEST TO BE FILED UNDER SEAL**

**By Hand**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:   *Warrant Application Dated August 14, 2019*, 19 Mag. 7595

Dear Judge Oetken:

On January 18, 2019, the Government sought and obtained from the Honorable Sarah Netburn a sealed search warrant for the contents of eleven email accounts for campaign finance related offenses (the "January 18 Warrant Returns"), with docket number 19 Mag. 729. On August 14, 2019, the Government sought from the Honorable Henry B. Pitman, pursuant to Fed. R. Crim. P. 41, a second sealed warrant to search a subset of the January 18 Warrant Returns for evidence of certain additional foreign agent related offenses not listed in the January 18 Warrant. Judge Pitman reviewed and approved the agent affidavit in support of the August 14 warrant, a copy of which, as signed by Judge Pitman, is attached hereto. However, the Government is not presently able to locate a copy of the August 14 warrant itself, which may be the result of a clerical error, although it is possible a warrant was not submitted in connection with the August 14 application. As such, the Government respectfully requests that the Court review the attached agent affidavit, which was sworn before Judge Pitman on August 14, and issue the attached warrant which would authorize the Government to seize the materials sought in the August 14 application. Finally, the Government respectfully requests that this letter be filed under seal, as both the January 18 Warrant and August 14 warrant application are currently filed under seal.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:   /s/
Rebekah Donaleski/Nicolas Roos
Assistant United States Attorneys
(212) 637-2423/2421

19MAG 7595

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search Warrant for the Contents of Nine-Email Accounts Located on Two Devices Containing the Results of An Email Search Warrant, USAO Reference No ▮ | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for a Search Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

▮▮▮▮▮▮▮▮▮ being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence, including emails.

2.  I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search nine email accounts on the electronic devices specified below (the "Subject Devices") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and

conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Prior Warrant and Subject Devices

3.  On January 18, 2019, the Honorable Sarah Netburn authorized a search warrant (the "January 18 Warrant") numbered 19 Mag. 729, directing Google, Inc. and Oath Holdings, Inc. (collectively, the "Providers") to provide content and other information for the email accounts in the chart below to search for evidence of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful foreign contributions), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering) (together, the "January 18 Warrant Subject Offenses"). The Subject Devices are particularly described as the following two electronic devices in the possession of the FBI which, respectively, contain the results of the January 18 Warrant on eleven email accounts, as specifically described in the chart below:

| Account | Provider | Owner | Referred To As | Subject Device |
|---|---|---|---|---|
|  | Google | Igor Fruman | I-Fruman GEP Account | 1 |
|  | Google | Lev Parnas | L-Parnas GEP Account | 1 |
|  |  |  |  | 1 |
|  |  |  |  | 1 |
|  |  |  |  | 1 |
|  | Google | David Correia | D-Correia GEP Account | 1 |
|  | Google | Igor Fruman | I-Fruman Gmail Account | 1 |
|  |  |  |  | 1 |

| | | | | 1 |
|---|---|---|---|---|
| | Oath | Lev Parnas | L-Parnas Yahoo Account | 2 |
| | Oath | David Correia | D-Correia Yahoo Account | 2 |

4.      Google provided the content and information responsive to the January 18 Warrant electronically, which was downloaded by a paralegal specialist at the United States Attorney's Office for the Southern District of New York ("USAO") onto a hard drive, which is Subject Device-1. Oath provided the content and information responsive to the January 18 Warrant in the form of a compact disc, which is Subject Device-2. The contents of those Subject Devices have been loaded onto a shared database to which the prosecution team has access, and which is the principal system I have used to review the contents of the devices.[1]

C.  **The Subject Offenses**

5.      In the course of reviewing the content contained on the Subject Devices for evidence of the January 18 Warrant Subject Offenses, I have discovered emails which, as set forth in greater detail below, establish probable cause to believe the following accounts on the Subject Devices contain evidence of additional offenses: the I-Fruman GEP Account, the L-Parnas GEP Account, the ▓▓▓▓ the D-Correia GEP Account, the I-Fruman Gmail Account; the ▓▓▓▓ the L-Parnas Yahoo Account, and the D-Correia Yahoo Account (the "Selected Accounts"). I am therefore requesting authority

---

[1] A filter team comprised of Assistant United States Attorneys and FBI agents who are not a part of the prosecution team have used search terms to separate any potentially privileged documents out of the shared database to which the prosecution team has access.

to search the Selected Accounts on the Subject Devices for evidence, fruits, and/or instrumentalities of these additional offenses.

6. In particular, I respectfully submit that there is probable cause to believe that the Selected Accounts on the Subject Devices also contain evidence, fruits, and/or instrumentalities of the commission of one or more of the following: 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses").

## II. Probable Cause Regarding the Subject Offenses

7. The FBI and the USAO are investigating, among other things discussed herein, political contributions made to campaigns and political action committees ("PACs") by Lev Parnas, Igor Fruman, and Global Energy Producers LLP ("GEP"), in violation of federal law – including the federal campaign finance laws – and as part of the Subject Offenses. Specifically, the FBI and USAO are investigating whether contributions made by Parnas in 2016 and 2018 were illegal "straw donations," funded by third parties, made in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person. Additionally, the FBI and USAO are investigating whether Fruman illegally funded some of Parnas's contributions,[2] and whether he and Parnas paid for political contributions using funds

---

[2] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a shell corporation created at or shortly before the time the contributions were made for the purpose of obscuring the true donor's identity. The Federal Election Commission ("FEC") has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

5

from a foreign national, in violation of the campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions.

8. The FBI and USAO are also investigating whether Fruman and Parnas, at the direction of a foreign government or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine. The applicable statutes in the foreign agent registration act ("FARA") criminalize acting as an agent of a foreign principal and failing to register as such, as required by the statute. Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the Ambassador to the Ukraine and that they may have done so in coordination with foreign officials. Moreover, it appears that as part of that effort, Fruman and Parnas made contributions to a United States congressman in exchange for that congressman's successful effort to persuade the United States Secretary of State to remove the Ambassador, in what may be a violation of the federal honest services fraud statute and federal anti-bribery statutes, which prohibit the giving or offering of anything of value to a public official to influence an official act.[3]

9. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, FEC records, financial records, and public sources, it appears that the Selected Accounts were used by Fruman, Parnas, and others to, among other things, communicate about GEP-related matters, communicate with individuals working for campaigns or political action

---

[3] It appears, as noted above, that these contributions were funded by a foreign principal and routed through multiple bank accounts, in an apparent violation of the federal money laundering statute, which as applied here, prohibits the transferring of funds from outside the United States to inside the United States for the purpose of promoting such an honest services wire fraud, or in furtherance of a FARA violation.

6

committees, communicate with a congressman's staff in furtherance of their efforts to seek the removal of a U.S. Ambassador, and coordinate financial transactions that appear to be related to the Subject Offenses. There is therefore is probable cause to believe that the Selected Accounts on the Subject Devices will contain evidence of the Subject Offenses.

### A. Probable Cause Regarding the Subject Offenses

<u>Parnas's Contribution to the ▮▮▮▮ Fund Using Third Party Funds</u>

10. Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, I have learned, among other things, the following:

a. On or about October 3, 2016, David Correia, a business partner of Parnas, emailed ▮▮▮▮ (using the email address ▮▮▮▮ copying Parnas at the L-Parnas Yahoo Account): "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent ▮▮▮▮ "some information about our group ▮▮▮▮ . . . and a few properties that ▮▮▮▮ owns." Based on my review of this and other emails, it appears that ▮▮▮▮ solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in ▮▮▮▮ Correia's signature line in that e-mail read: "David Correia, Principal, ▮▮▮▮"

b. On or about October 11, 2016, ▮▮▮▮ emailed Parnas a link to a video about Trump, and on or about the same day, he sent Parnas (at the L-Parnas Yahoo Account) and Correia (at the ▮▮▮▮ account) a registration link for a ▮▮▮▮ Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email, ▮▮▮▮ wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow." Based on my review of public records, I know that funds contributed to the

███████ PAC were disbursed to the ███████ ███████ for President, Inc. campaign committee (the "Trump Campaign") and the ███████ National Committee.

c. On or about October 14, 2016, Correia (using the email address ███████████████████ which appears to have backed up to the D-Correia Yahoo Account) emailed ███████ that Parnas had said he and ███████ had "connected and worked things out" and that Correia was "happy to have you as part of the team!" Correia's signature line read "David Correia, Founder/COO, ███████." In a subsequent email copying Parnas (at the L-Parnas Yahoo Account), Correia asked ███████ to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, ███████ replied that he was "happy to be part of the team" and "looking forward for more ventures in the future." ███████ wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, ███████ did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between ███████ and Parnas or Correia.[4]

---

[4] Based on my review of the emails obtained pursuant to the January 18 Warrant and bank records, I have learned that on November 3, 2016, after ███████ $300,000 wire to Parnas, Correia (using the email ███████████████████ and copying the L-Parnas Yahoo Account) forwarded a "subscription agreement" signed by ███████ to ███████ at ███████. The agreement contemplated ███████ would make a $100,000 investment in the "███████████████████ and included wiring instructions for ███████ ███████ bank account. In that email, Correia confirmed that "His ███████ wire was received today." Beginning in December 2017, ███████ and another investor ("Investor-1") in the ███████████████████ began emailing the managing director of ███████ to demand a refund of their investment. These emails were forwarded by Investor-1 to Correia, at using the email address ███████████████████ which appears to have automatically backed up to the D-Correia Yahoo Account, and the L-Parnas Yahoo Account. Based on my review of emails obtained pursuant to the January 18 Warrant and bank records, it does not appear that ███████ investment in ███████████████████ was made through Parnas, and thus it appears that ███████ wired the funds directly from his bank account. However, I am

8

d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of ▇▇▇ on which Parnas was a signer, received a wire transfer from ▇▇▇ in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from ▇▇▇ the balance of the ▇▇▇ account was negative $801.82.

e. On or about October 14, 2016, $100,000 was transferred from the ▇▇▇ account at ▇▇▇ to an account in Lev and ▇▇▇ names at ▇▇▇ On the same date, $25,000 was wired from the account in Parnas's name to an account in the name of ▇▇▇ which is the name of David Correia's wife.

f. On or about October 24, 2016, Parnas contributed $50,000 to the ▇▇▇ PAC. On the same day, a $5,000 contribution was made in the name of ▇▇▇ to the ▇▇▇ PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by ▇▇▇

11. Based on my review of public records, I have learned that ▇▇▇ who is a lawful permanent resident, contributed $15,000 to the ▇▇▇ PAC on October 14, 2016, which was paid as a $2,700 contribution to the Trump Campaign (the maximum) and a $12,300 contribution to the ▇▇▇ National Committee. On or about October 24, 2016, ▇▇▇ again contributed $15,000 to the ▇▇▇ PAC. Because of these contributions,

---

awaiting subpoena returns from ▇▇▇ bank account, which will reflect how he funded the ▇▇▇ investment.

███████ was precluded by federal campaign finance law from making, in his own name, the full $55,000 in contributions to the ███ PAC made by Parnas and Correia as described above.

12. Based on my review of bank records for the ███████ Account, I have learned that, with the exception of the donations to the ███████ PAC, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the money transferred from ███ on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, on hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the ███████ Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds from ███████ were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ███████ ever asked for a return of his "investment" in Fraud Guarantee, even though ███████ did ask for a return of his investment in a separate company, ███████ (which investment actually appears to have been made using different funds), as set forth above.

13. Based on the foregoing, it appears that the contributions to the ███████ PAC were solicited and funded by ███████ but were made in the names of Parnas and ███████ in violation of federal law. Specifically, ███████ solicited Correia's and Parnas's attendance at a ███████ Fund event. ███████ wired Parnas $300,000, but while ███████ had discussed an investment in Correia's business ███████ the money was wired to a different entity, ███████ and the only investment ███████ seems to have made was a $100,000 investment, using separate funds, in ███████ The funds ███████ sent to Parnas through ███████ by contrast, do not appear to have been

10

used in connection with ▓▓▓ business, or for a business purpose. Instead, as discussed above, Parnas used $100,000 of those funds to fund his and Correia's donations to the ▓▓▓ Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition, ▓▓▓ did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his ▓▓▓ investment, which indicates that ▓▓▓ did not actually believe that his $300,000 wire transfer to Parnas was an investment in ▓▓▓. Accordingly, it appears that the contributions to the ▓▓▓ Fund were made in violation of federal law and as part of the January 18 Warrant Subject Offenses.

<u>Contributions to PACs in 2018 Using Third Party Funds</u>

14. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting ▓▓▓ candidates, with a principal focus on the 2018 midterm elections. Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. In order to attend these events, however, Parnas and his associates were required to, and did, make sizeable political contributions. In particular, Parnas and Igor Fruman made sizeable contributions to ▓▓▓ PAC, ▓▓▓ PAC, and ▓▓▓ PAC. The investigation has revealed that Parnas and Igor Fruman financed these contributions with funds from third parties, including foreign nationals, in apparent violation of the January 18 Warrant Subject Offenses. Several such examples are listed below.

<u>▓▓▓ PAC Donation</u>

15. According to a publicly available article published in a Russian-language newspaper, as translated into English, on or about March 3, 2018, Igor Fruman met with President Trump at the ▓▓▓ resort in Palm Beach, Florida. The article quotes Fruman, who is

11

pictured with President Trump, as saying: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in ▇ was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the ▇ victory in the mid-term elections to Congress in November 2018." Based on a review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, it appears that following that meeting, Igor Fruman began attending political fundraising events with Parnas.

16. On or about May 17, 2018, Parnas and Fruman made a $325,000 contribution to the ▇ PAC, which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-▇ administration." Parnas and Fruman made the contribution to the PAC using the name GEP – rather than their own names – in an apparent effort to obscure their identities and the true source of the funds, in violation of the Subject Offenses. As described below, based on my review of financial records and emails obtained pursuant to the January 18 Warrant, it appears that Igor Fruman and his brother, ▇ borrowed these funds from a third party as part of a private lending transaction, and then transferred some of the money to Parnas, who made the contribution in the name of GEP, which appears to have been a shell entity. Specifically, I have learned the following:

    a. On or about April 25, 2018, Correia (using the D-Correia Yahoo Account) contacted a Miami-based commercial mortgage broker ("Broker-1") – on behalf of Parnas and Fruman – to inquire about obtaining a short-term loan.

    b. In the days that followed, Broker-1 arranged for a $3 million commercial loan from ▇ a businessman, and ▇ an attorney, to ▇ which is owned and managed by Igor and ▇ Based on a review of email

12

correspondence, ▆ and Igor Fruman were involved in, and copied on (using the I-Fruman Gmail Account and the ▆, along with Parnas (using the L-Parnas GEP Account and the L-Parnas Yahoo Account), correspondence related to the loan from ▆ and ▆ On or about May 15, 2018, ▆ entered into a mortgage agreement with ▆ which documented the $3,000,000 transfer as a loan to ▆ secured by the Fruman condominium in Bal Harbour, Florida, which is owned by ▆ ▆ Parnas and Fruman's assistant, was also copied on the email correspondence pertaining to the ▆ loan, using the ▆ ▆ Correia was copied throughout the email correspondence relating to the loan using the D-Correia Yahoo Account and the D-Correia GEP Account.

  c. On or about May 11 and May 14, 2018, ▆ wired a total of $3,000,000 ($2,500,000 from ▆ who wired the funds from overseas, and $500,000 from ▆ into an attorney escrow account. On or about May 15 and May 16, 2018, substantially all of that money was transferred from the attorney escrow account in multiple transfers, including a $1,260,329.80 transfer to the ▆ Account, on which Parnas is a signer. Prior to receiving that transfer, the ▆ Account generally had a low balance and minimal account activity. For instance, in January 2018, the ▆ Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79.

  d. On or about May 17, 2018, Parnas, with ▆ assistance, made a $325,000 contribution in the name of GEP to ▆ PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor,



13