will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another." ▮▮▮ sent a confirmation email to ▮▮▮ PAC in connection with this donation, using her ▮▮▮ and copying Parnas and Fruman at the I-Fruman GEP Account and L-Parnas GEP Account, respectively.

e. While the May 17 $325,000 donation was reported to the FEC as having come from GEP, in fact, the money – which, as noted above, was paid by Parnas using the ▮▮▮ Account – came from the money that ▮▮▮ loaned to ▮▮▮ and Igor Fruman, as described above. The report to the FEC did not indicate that the contribution was made by Parnas or the Fruman▮ and it did not indicate the true source of the funds.

f. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, I have learned that in or about July 2018, a reporter from the ▮▮▮ emailed the registered agent ("Agent-1") for GEP, to ask questions about "who is behind the company or the donation." Agent-1 forwarded the email to Parnas (at the L-Parnas GEP Account) and wrote: "This is what happens when you become visible. The buzzards descend." Parnas replied "[t]hat's why we need to stay under the radar and have the best lawyers." Parnas subsequently forwarded the email to Correia (at the D-Correia GEP Account), who responded, "[w]e are all in agreement with that."

17.     GEP was created shortly before its name was used to make the contributions, and evidence suggests – consistent with Parnas's statement that he and his associates "need to stay under the radar" – that its name may have been used in order to obscure the true source of the funds. Specifically, based on a review of publicly available information and a review of emails obtained pursuant to the January 2018 Warrant, I have learned the following:

14

    a. GEP was incorporated in Delaware on or about April 11, 2018, with

as its registered agent. Neither Fruman nor Parnas was originally registered as an

agent of GEP, nor was either of them named in any filing in Delaware relating to the LLC. Parnas

has made extensive use of various corporate entities in Florida, and it appears for many of those

entities, Parnas has registered those companies in his own name and/or is listed as an officer or

agent.

    b. On July 25, 2018,                                    published an article regarding GEP's

contribution to                    which suggested that GEP is a shell entity without legitimate

business. In response, on July 31, 2018, a "spokesperson" for GEP emailed                    that

"[t]he donation to                PAC was a 100% legal contribution made by American citizens"

and that "[t]he amount donated to                 PAC represents only a small fraction of the

operating costs of GEP." The "spokesperson" also wrote that "[t]he implication that GEP is some

sort of shell company, couldn't be further from the truth, as the company is committed to a long-

term plan to export American [liquid natural gas] and is in the process of partnering with major

industry leaders both domestically and internationally to achieve that end." Specifically, based on

a review of U.S. Department of Energy records, it does not appear that GEP has a permit to engage

in shipping of liquid natural gas.[5] Additionally, based on my review of emails sent and received

by Parnas and Igor Fruman obtained pursuant to the January 18 Warrant, it appears that GEP was

set up at or around the time that the foregoing contributions were made, and it does not appear

---

[5] Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned
that in August 2018, Correia (using the D-Correia GEP Account) exchanged drafts of an unsigned
memorandum of understanding ("MOU") between GEP and                    which
contemplated that the parties would "begin pursuing commercial trading opportunities for the sale
of LNG from the USA into various Eastern European countries." However, based on my review
of emails pursuant to the January 18 Warrant and my review of bank account records, it does not
appear that GEP and                    actually engaged in business together.

15

from bank records that GEP is presently involved in the purchase or sale of oil or gas, or engaged in oil or gas transactions.



### ████████ PAC Donation

18.     It appears that Fruman also made a contribution to the ████████████ PAC using funds from the ██████████████ loan, referenced above, using another person's name and identity. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a.     On or about April 17, 2018, a finance director for the ████████ National Committee e-mailed Parnas at the Parnas Yahoo Account to invite him to attend roundtable event at ████████ with President Trump on April 20, 2018. In order to attend the event, Parnas was required to make a minimum contribution of $100,000 to the ████████████████ The finance director subsequently e-mailed ████████ at the ████████████████ copying Parnas, and noted that, "I believe Mr. Parnas was going to send his contribution information shortly, so we should be good to go for the event."

b.     On or about April 27, 2018, Igor Fruman made a $100,000 donation to the ████████ ████████ PAC in the name "████████ The information reported to the FEC also stated that the occupation of ████████ was employment with ████████████████ Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but who is named ████████ and works for ████████████ ████████

c.     Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

16



i.     On or about May 16, 2018, and May 17, 2018, one day after receiving the
transfer of funds that originated from                    $502,650 of those funds was wired
from the             Account (on which Parnas was a signer) to the
Account.

ii.     Between May 16, 2018, and May 23, 2018, approximately $262,041 was
transferred from the             Account and used to pay an             bill held
in the name of             for which Igor and             were authorized signers.

iii.     That             bill included an April 27, 2018 contribution in the
amount of $100,000 to the             which was charged to the credit card assigned
to Igor Fruman.   While             was the listed contributor in the
disclosure, neither Fruman or Parnas, who was the other individual responsible for the transfer of
the funds, were reported as the contributors in the disclosure. Based on the foregoing, it appears
that Parnas and Fruman made a straw donation to the             in violation of federal
law and in furtherance of the January 18 Warrant Subject Offenses.

             PAC Donations

19.     It appears that the contributions made by Parnas and Fruman to the

   PAC were funded with money from third parties, including Andrey Muraviev, a Russian
national. In an apparent effort to obscure the true donor of the funds, Parnas and Fruman moved
the funds through multiple accounts, and it appears that Fruman made the donations using the
             name.

20.     Specifically, based on my review of FEC records, financial records, emails obtained
pursuant to the January 18 Warrant, and public sources, I have learned the following:

17



a. On or about March 19, 2018, Igor Fruman made a \$50,000 contribution to ▮ ▮ PAC. According to FEC records, this contribution was reported in the name of ▮ ▮ Fruman received a confirmation email for this donation at the I-Fruman Gmail Account from ▮ PAC.

b. On or about June 29, 2018, Parnas made an \$11,000 contribution to ▮ ▮ PAC. Some of the funds used to make this ▮ PAC contribution came from the funds loaned by ▮ discussed above. In particular, on or about May 22, 2018, \$100,000 of the funds that originated from ▮ and were transferred into the ▮ Account – as described above – were wired to a ▮ account in the name of GEP. Based on the financial records associated with the GEP account, it appears that on or about July 2, 2018, \$11,000 of the funds wired into the GEP account – which originated from the loan by ▮ to the Frumans – were used to make a contribution to ▮ PAC in Parnas's name.

c. On or about June 12, 2018, Igor Fruman made another \$50,000 contribution to ▮ PAC, which was reported as given by '▮ with the employer '▮ ▮

d. Based on my review of financial records, I have learned the following about the source of funds that was used to make this contribution:

i. On or about September 18, 2018, a bank account held at ▮ in the name of ▮ to which ▮ (Igor Fruman's brother) is the authorized signer (the '▮ Account") received a \$500,000 wire transfer from an account held in the name of ▮ Ltd. at ▮ a Swiss bank. Based on my review of financial records and public sources, I have learned that a similarly-named

18

entity based in Russia is associated with Andrey Muraviev, a Russian national, who appears from my review of emails to be in communication and/or business with Fruman and Parnas (using the I-Fruman Gmail Account and the L-Parnas Yahoo Account). In addition, based on a review of email correspondence, ██████ (using the ██████) is involved in directing the business operations and finances for ██████

      ii.    On or about September 19, 2018, approximately $494,415 of the funds in the ██████ Account – most if not all of which came from ██████ – were used to pay an ██████ bill for a credit card in the name of ██████

      iii.    Based on my review of records from ██████ I have learned that the ██████ credit card account was used to pay for a June 12, 2018 contribution to ██████ PAC in the name of "██████ referenced above, as well as a $15,000 contribution to the ██████ Fund, and a $5,400 contribution to ██████ for Congress, all of which were also made in Fruman's name.

    21.    Accordingly, for the reasons set forth in the foregoing paragraphs, there is probable cause to believe that the Frumans, Parnas, and others are involved in the commission of the Subject Offenses by making contributions to political committees, including ██████ and ██████ in the names of GEP, Parnas, and Fruman for purposes of concealing the true source of the funds, and that they utilized the Selected Accounts to do so. Specifically, there is probable cause to believe that the contributions to ██████ and other political committees to which Fruman, Parnas, or GEP donated were funded by third parties. With respect to the funds obtained from Muraviev and ██████ the amount of money transferred was far in excess of any stated business purpose, and that excess was used to fund political contributions. Moreover, based on the circuitous nature of the monetary transactions described above, there is probable cause to

19

believe that the Frumans, Parnas, and others are engaged in money laundering in furtherance of their activity, in violation of federal law and in furtherance of the January 18 Warrant Subject Offenses.

Contributions to Representative          Request for Official Action, and Activities as
                                 Agents of a Foreign Principle

22.     Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that, during the April 20, 2018 roundtable at          Parnas met then-Congressman

          of Texas, and that Parnas, Fruman, Correia and others then used subsequent meetings and contributions to gain access to and build a close relationship with Congressman

Those contributions were made by Igor Fruman and Parnas in June 2018. It also appears that at the request of Parnas and Igor Fruman, Congressman          wrote to U.S. Secretary of State

          in May 2018 to ask that the U.S. Ambassador to the Ukraine be fired and replaced.   In March 2019, news outlets published former Congressman          letter to Secretary          and in May 2019, the U.S. Ambassador to the Ukraine was recalled prior to the end of her term.  Based on the timing of the contributions in relation to when Congressman

          sent the letter to Secretary          and the emails discussed below, there is probable cause to believe that the letter was written in exchange for a commitment to make contributions to Congressman          campaign.  Specifically, based on a review of public records, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a.     On April 22, 2018,          (as noted above, Parnas and Fruman's assistant) emailed Congressman          (using the          , copying Parnas (at the L-Parnas GEP Account), to identify herself the "Director of Operations of Global Energy Producers" and thanked Congressman          on Parnas's behalf for an "engaging conversation during the round table meeting," and requested a meeting between Parnas and Congressman          for that

20

week. It appears that ⬛⬛⬛⬛⬛ reference to the "round table meeting" was to the April 20, 2018 roundtable at ⬛⬛⬛ featuring President Trump.

      b. Parnas met with Congressman ⬛⬛ in Washington, D.C. on May 9, 2018. Based on my review of public reporting, I have learned that Parnas posted a photograph of himself (the individual on the far left) and Correia (the individual on the far right) meeting with Congressman ⬛⬛ (the individual on the right of the first photograph and middle of the second photograph) on May 9, 2018, to Parnas' public Facebook profile:



      c. A subsequent meeting between Parnas and Congressman ⬛⬛ occurred on June 6, 2018. The next day, on June 7, 2018, ⬛⬛⬛⬛⬛ (using the ⬛⬛⬛⬛⬛ emailed a member of Congressman ⬛⬛ staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman ⬛⬛ Based on my involvement in this investigation and my review of emails, it appears that ⬛⬛⬛⬛⬛ statement about "help[ing] out by using our contacts" was a reference to individuals contributing to Congressman ⬛⬛

21



d. On June 11, 2018, ▮▮▮ (using the ▮▮▮ wrote to ▮▮▮ Congressman▮ communications director, to report that she had "an initial list of donors" and asked if it could be put "on one CC." When ▮ emailed ▮ to ask "how much do they think they will bring in," ▮ replied "$21k on the one credit card." ▮ wrote back: "the maximum an individual can donate is $2,700 and a PAC can give up to $5,000. I'm unsure if we can do that entire amount on one credit card but I can find out." ▮ replied that "it will be 8 people on that card." Based on my review of publicly available information, I am aware that at this time, Congressman▮ was in the midst of a November 2018 reelection campaign.

e. On June 12, 2018, ▮▮▮ (using the ▮▮▮ asked ▮ for a meeting between Parnas and Congressman▮ which was subsequently scheduled for June 14, 2018. When ▮ asked whether it was about "policy related matters or political," ▮ replied, "Lev said it would be about what you previous[ly] met about. He said you would know, hahaha." ▮ replied "I believe it was a political matter involving Eastern European relations." Based on this email and my involvement in this investigation, it appears that the "political matter involving Eastern European relations" ▮ referenced above as the purpose for the June 14, 2018 meeting between Parnas and Congressman ▮ -- scheduled as ▮ was communicating with the Congressman's office about up to $21,000 in donations for his reelection effort – was related to Parnas's May 9, 2018 request to Congressman▮ to remove the current U.S. Ambassador to Ukraine.

f. On June 15, 2018, the day after Parnas's meeting with Congressman ▮ emailed ▮ (at the ▮▮▮ , attaching a letter, and wrote "I think this is it. Please don't distribute, this is only for your records. Thanks for all of your help!"



The letter, dated May 9, 2018 – i.e., the same day that Congressman ▮ met with Parnas – was addressed from Congressman ▮ to Secretary of State ▮.[6] In the letter, Congressman ▮ wrote to Secretary ▮ to "bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine,"
▮[7] Congressman ▮ reported that he had "received notice of concrete evidence from close companions that Ambassador ▮ has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms.
▮ as U.S. Ambassador to the Ukraine immediately." Congressman ▮ asked that Secretary ▮ "consider terminating her ambassadorship and find a replacement as soon as possible." Less than an hour later, ▮ forwarded the email from ▮ to Parnas (at the L-Parnas GEP Account).

g.  On June 25, 2018, Igor Fruman and Parnas each made $2,700 contributions in their own names to ▮ for Congress. Based on a review of ▮ and FEC records, it appears that the ▮ bill included two $2,700 contributions – the maximum an individual could at the time contribute – to ▮ for Congress. According to the FEC records, described above, despite the fact that these contributions were paid for using

[6] Based on my review of publicly available information, I have learned that between 2012 to 2018, Congressman ▮ was the Chairman of the House Rules Committee. Based on my review of public sources, I have learned that in relation to another matter, ▮ previously stated that as Chairman of the House Rules Committee, Congressman ▮ frequently works to ensure other countries are respecting democratic norms. However, it does not appear that Congressman ▮ had any leadership positions relevant to foreign policy or diplomacy with respect to Ukraine. Similarly, based on public reporting, it does not appear that Congressman ▮ had a close relationship with Secretary of State ▮ beyond simply serving in the House of Representatives at the same time, between approximately 2011 and 2017.

[7] Based on my review of publicly available information, I have learned that ▮ was sworn in as U.S. Ambassador to the Ukraine in August 2016. She previously served as the U.S. Ambassador to Armenia and Kyrgyzstan.

23

different credit cards linked to the same credit card account, they were reported as separate contributions by Fruman and Parnas.

   h.   Between June and November 2018,                     repeatedly emailed          to request additional meetings between Parnas, Fruman, and others with Congressman          On June 28, 2018, Correia, who is an associate and business partner of Parnas, had meetings set up with Congressman          On July 12, 2018, Parnas appears to have again met with Congressman          On September 5, 2018, Parnas and Rudolph Giuliani had a meeting scheduled with Congressman          Finally, Fruman, Correia, and Parnas had a meeting scheduled with Congressman          on November 16, 2018.

   i.   On or about May 6, 2019, according to public sources,                     was prematurely recalled or removed from her position as U.S. Ambassador to Ukraine.

   23.   Based on my review of publicly available reporting, I have learned, among other things, the following with respect to Ambassador          removal as U.S. Ambassador to Ukraine:

   a.   According to a March 6, 2019 article in                     on or about March 5, 2019, Ambassador          gave a public speech in Ukraine in which she called for the Ukrainian anticorruption prosecutor,                     to be fired and voiced frustration that                     (the then-president) had not done enough to root out corruption.

   b.   In a video interview published on March 20, 2019 by          Ukrainian Prosecutor-General          told          s          that          had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about

24



January 2017.[8] [redacted] also announced that Ukrainian authorities would launch a criminal investigation into whether Ukrainians sought to interfere in the U.S. election in 2016 to benefit [redacted] claimed that the National Anti-Corruption Bureau may have been involved in efforts to influence the 2016 U.S. presidential election because it published information about secret payments from former President [redacted] party to [redacted] allegedly in order to hurt the Trump campaign. According to [redacted] in response to that interview, the State Department issued a statement saying that it no longer supported [redacted] office in its anti-corruption mission, and considered his allegation about the "do-not-prosecute" list to be "an outright fabrication." However, [redacted] reported that [redacted] was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman [redacted] wrote a "private letter asking Secretary of State [redacted] to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." [redacted] also included a copy of the letter:

[8] Based on my review of an April 18, 2019 article appearing on a Ukrainian news website, [redacted] later walked back his claim about the "do not prosecute list," and claimed instead that he had asked [redacted] for a "do not prosecute" list at their first in-person meeting in January 2017, but that she had refused.

c. In a March 23, 2019 segment on the ▮▮▮ on ▮▮▮

revealed that former-Congressman ▮▮▮ sent Secretary of State ▮▮▮ "an urgent letter" in

May 2018, asking that Ambassador ▮▮▮ be removed from her position, and published a

copy of that letter. During that segment, commentator ▮▮▮ announced: "have learned

this evening that the President has ordered her dismissal from her post. . . as a result of her activities

there which were complained of by Congressman ▮▮▮ She is known and reported by people

there to have bad-mouthed the President of the United States Donald Trump, to have told

Ukrainians not to listen to him or pay attention to his policies. . . and finally his activities have

caught up with her."[9]

_____

[9] Based on my review of public reporting, I have not found evidence that Ambassador ▮▮▮ publicly criticized President Trump.

d.   Based on my review of public reporting, I have learned that on or about May 6, 2019, the State Department confirmed that Ambassador ▮▮▮▮▮ would leave her post ahead of schedule on May 20, 2019.

e.   According to an article in ▮▮▮▮▮ on or about May 9, 2019, Rudolph Giuliani – who, as noted above, attended at least one meeting between Parnas, Fruman, and Congressman ▮▮▮▮▮ confirmed that he had been meeting with ▮▮▮▮▮ the Ukrainian Prosecutor-General who had criticized Ambassador ▮▮▮▮▮ Giuliani told ▮▮▮▮▮ that he last met with ▮▮▮▮▮ six weeks prior: "I have met with him. I interviewed him for two days in New York. I met with him once in Poland…and I may have met with him one other time in America, I don't remember, I may have just gotten a coffee with him sometime when he was here." According to an article dated May 9, 2019 in the ▮▮▮▮▮ Giuliani also announced that he would travel to Ukraine to meet with Ukranian President-elect ▮▮▮▮▮ to push him to press ahead with two investigations he hoped would benefit President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) ▮▮▮▮▮ involvement in a gas company owned by a Ukrainian oligarch. According to the ▮▮▮▮▮ Giuliani was to be accompanied by Lev Parnas. The article also reported that Parnas had previously traveled to Ukraine as a representative of Giuliani seeking information about both of the above topics.

f.   According to a May 15, 2019 article in a Ukrainian news website, Giuliani announced that his trip to the Ukraine was cancelled: "I was going to visit Ukraine on Monday-Wednesday, but I canceled the trip as I found out that the President-elect is surrounded by the people who treated the U.S. President unfairly. It is about the events of 2016. One of them was

27



caught on having been cooperating and helping the election campaign of Trump's opponent

And these people are among his key advisors."

      g. Based on my review of Giuliani's public Twitter page, I have learned that on May 19, 2019, Giuliani tweeted that Parnas and Fruman were his "clients."

      h. According to an article published on July 22, 2019 in       Parnas and Fruman, while "reporting" to Giuliani, lobbied the Ukrainian government in a bid to assist President Trump's reelection campaign. The article described Parnas and Fruman's "aggressive campaign" in the United States to successfully push for the removal of Ambassador Parnas and       were interviewed for the article. Parnas said that he and Fruman were not "acting at the behest of anyone."       claimed that "he raised the issue of       in the meeting – not Parnas or Fruman," and that he "sought their input."[10]       admitted to speaking with Fruman and Parnas about Ukraine, saying: "They are       They have a strong interest in America not backing away from Ukraine."

      i. According to a July 22, 2019 article published by the

      Parnas said that he and Fruman were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us – either I bury it or I pass it along. I felt it was my duty to pass it along." According to the article, which quoted heavily from an interview with Parnas, in late 2018, Parnas and Fruman organized a call between Giuliani and       the former Prosecutor-General in Ukraine. Parnas and Fruman also attended a meeting in France between Giuliani and       the head

---

[10] Former-Congressman       claim that he brought up Ambassador       rather than Parnas, is contradicted by the text of the letter, in which Congressman       wrote that he *"received notice* from close companions" regarding Ambassador       alleged activities in Ukraine (emphasis added).

28

of Ukraine's Special Anti-Corruption Prosecutor's Office. Parnas said that he and Fruman connected Giuliani with          and that          met Giuliani in New York in January and in Poland in February. Of the meetings, Parnas said that          brought documentation, verification. It opened Giuliani's eyes."

24.     Based on the foregoing, there is probable cause to believe that Parnas and Fruman donated to Congressman          with the intention that those donations be made in exchange for official action, namely, a request to the Secretary of State to remove the Ambassador to the Ukraine, in violation of federal law and in furtherance of the Subject Offenses. Specifically, Parnas appears to have asked Congressman          to write a letter, reflecting information "received" from "close companions" – *i.e.*, Parnas – to Secretary of State          seeking the removal of Ambassador          This action appears to have been outside the purview of Congressman          committee and caucus positions, and appears to have been done at Parnas's request.

25.     The timing of Parnas's and Fruman's donations to Congressman          also indicate that Congressman          wrote the letter with the understanding that Parnas and Fruman would make a substantial donation to his campaign. Specifically, several weeks after the May 9, 2019 meeting, Parnas's assistant emailed with Congressman          staff to coordinate a $21,000 donation on one credit card. After being advised that such a donation exceeded the maximum individual donation, Parnas and Fruman then donated $2,700 each, the maximum amount, in June 2018. Only a week before that donation was made,          sought a copy of Congressman          letter and forwarded it to Parnas. In addition, based on public reporting, it appears that members of the Ukrainian Government met with Giuliani, Parnas, and Fruman in early 2019, and then led what appears to have been a coordinated effort to remove

29

Ambassador          which relied in large part on the publication of Congressman

letter. Finally, Parnas and Fruman used money from a Cyprus-based bank account that appears to

be associated with Muraviev, a Russian national, to pay for the donations they made to

Congressman

26.     For the same reasons, there is further reason to believe the efforts by Parnas and

Fruman -- and Correia and          who attended and facilitated those meetings with

Congressman          – to lobby for the removal of Ambassador          was done in

coordination with Ukranian officials, including          who was at the time the          letter

became public critical of          and who Parnas has acknowledged meeting and

subsequently connected to Giuliani.    While Parnas has characterized his discussions with

Congressman          regarding the Ambassador as "passing information along," it appears likely

that that information originated from Ukranian sources. In particular, Parnas and Fruman appear

to have close relationships with Ukrainian government officials, including          and arranged

for meetings and telephone calls between Giuliani and          in early 2019. At least some of

these meetings and telephone calls occurred, based on public reporting, prior to          making

allegations of impropriety against Ambassador          in March 2019, which, in conjunction

with the          letter being made public, ultimately led to her removal. I am aware, from my

review of publicly available information, that Fruman, Parnas, and Correia have not registered

with the Department of Justice as foreign agents, and their conduct may therefore have violated

federal law regarding foreign agent registration, as described above.

27.     Accordingly, there is probable cause to believe that Parnas, Fruman, Correia,

and others engaged in this activity in violation of federal law and in furtherance of the

Subject Offenses, and used the Selected Accounts to do so. Based on my review of emails obtained

Case 1:19-cr-00725-JPO   Document 374-66   Filed 12/19/23   Page 18 of 40

pursuant to the January 18 Warrant, I am aware that Parnas, Fruman, Correia and

used their personal and business email accounts interchangeably, and with respect to Correia in particular, used his personal account to store other emails sent from different addresses, such as fraudguarantee.com. Thus, there is probable cause to believe that evidence of the Subject Offenses will be found on all of the Selected Accounts, even though the above-referenced communications with Congressman          staff – which were discovered during my review pursuant to only the January 18 Warrant Subject Offenses, and not related to any searches that may lead to additional evidence of the Subject Offenses – occurred over Parnas's and                GEP email addresses.

28.     In addition, the donations to Congressman         were funded by Muraviev's transfer to a bank account held in the name of                  to which             Igor Fruman's brother, is the authorized signatory.  Based on my review of emails pursuant to the January 18 Warrant, I am aware that                uses the                        to correspond regarding                business.  Because that business received the overseas funding to make donations to Congressman          there is probable cause to believe that evidence of the Subject Offenses will be found on the                        including any communications about the source or purpose of the foreign funding.  As set forth above, Parnas' and Fruman's donations, and promises of donations, appear to have led to Congressman authoring the May 9, 2018 letter that ultimately appears to have contributed to the removal of Ambassador          in May 2019.

29.     As such, there is probable cause to believe that evidence of the Subject Offenses will be found on the Selected Accounts on the Subject Devices.

31

## False Statements to the FEC

30. Based on my review of emails obtained pursuant to the January 18 Warrant, it does not appear that Parnas, Igor Fruman, or ▉▉▉▉▉▉ told the campaigns or PACs to which they and/or GEP were making contributions that the funds used to make the contributions came from third parties and overseas bank accounts. Had the PACs and campaigns known that these were unlawful contributions, they likely would not have accepted the funds.

31. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas and Igor Fruman have submitted affidavits to the FEC in connection with a pending complaint made by a non-profit advocacy group. Based on a review of those affidavits, it appears that Parnas and Igor Fruman made multiple false statements to the FEC in connection with that matter. For instance, their sworn affidavits falsely state that Parnas and Fruman "funded the [GEP] entities with over \$2.8 million in assets" and that the ▉▉▉▉▉▉▉▉▉ PAC contribution "was made with GEP funds for GEP purposes." In fact, as set forth above, the

▉▉▉▉▉▉▉ PAC contribution was made with funds from a third party that were moved through multiple bank accounts before being paid to ▉▉▉▉▉▉▉ PAC. Additionally, Parnas stated in his affidavit that his contribution to ▉▉▉▉▉ for Congress "was made with a business credit card . . . which [he] reimbursed." Based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Fruman, Parnas, and ▉

▉▉▉▉▉▉ the analyst found no evidence of reimbursement by Parnas to Fruman or ▉

▉▉▉▉▉ for the contributions to Congressman ▉▉▉▉▉

32. Therefore, there is probable cause to believe that a search of the Selected Accounts on the Subject Devices will reveal evidence, fruit and instrumentalities of the Subject Offenses, including the following:

32

g. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

h. Evidence relating to the May 9, 2018 letter from Congressman ▮▮▮ to Secretary of State ▮▮▮ including correspondence attaching or concerning the letter.

i. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including ▮▮▮

j. Communications regarding ▮▮▮.

k. Evidence, including travel records, related to meetings with foreign government officials, representatives of foreign corporations, or foreign individuals, involving Rudolph Giuliani, Lev Parnas, Igor Fruman ▮▮▮ and David Correia.

l. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

## III. Procedures for Searching ESI

### A. Review of ESI

33.     Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) will review the ESI contained on the Subject Devices for information responsive to the warrant.

34.     In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails contained on the Subject Devices. This method is

33

analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV.  Conclusion and Ancillary Provisions

35.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

36.     The existence and scope of this ongoing criminal investigation is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  Specifically, from my experience investigating public corruption and campaign finance offenses, I know that individuals who participate in such offenses communicate about known government investigations and sometimes tailor their stories to be consistent, and/or tamper with or hide potential evidence.  In addition, the subjects of this investigation include dual citizens, who would have the ability and incentive to flee and evade prosecution.  Accordingly, premature disclosure of the scope of this

investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering, flight and/or obstruction of justice. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

37.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Sworn to before me on
14th day of August, 2019

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

35

## Attachment A

### I. Devices to be Searched

The devices to be searched (the "Subject Devices") are described as the electronic devices listed below which contain emails and other content information obtained pursuant to a search warrant issued on January 18, 2019 by the Honorable Sarah Netburn, numbered 19 Mag. 729.

| Account | Provider | Owner | Referred To As | Subject Device |
|---|---|---|---|---|
|  | Google | Igor Fruman | I-Fruman GEP Account | 1 |
|  | Google | Lev Parnas | L-Parnas GEP Account | 1 |
|  |  |  |  | 1 |
|  |  |  |  | 1 |
|  |  |  |  | 1 |
|  | Google | David Correia | D-Correia GEP Account | 1 |
|  | Google | Igor Fruman | I-Fruman Gmail Account | 1 |
|  |  |  |  | 1 |
|  |  |  |  | 1 |
|  | Oath | Lev Parnas | L-Parnas Yahoo Account | 2 |
|  | Oath | David Correia | D-Correia Yahoo Account | 2 |

This warrant applies only to the following accounts on the Subject Devices: the I-Fruman GEP Account, the L-Parnas GEP Account, the                        the D-Correia GEP Account, the I-Fruman Gmail Account; the
the L-Parnas Yahoo Account, and the D-Correia Yahoo Account (the "Selected Accounts").

**II. Review of ESI on the Selected Accounts on the Subject Devices**

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, interpreters, and outside vendors or technical experts under government control) are authorized to review the ESI contained on the Selected Accounts on the Subject Devices for evidence, fruits, and instrumentalities of one or more violations of 18 U.S.C. § 1001 (false statements in a matter within the jurisdiction of the executive branch), 18 U.S.C. § 1346 (honest services fraud), 22 U.S.C. §§ 612, 618 (failure to register as an agent of a foreign principal violation), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 201 (bribery); and 18 U.S.C. § 203 (bribery with respect to a member of congress) (together, the "Subject Offenses"), as listed below:

  a. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

  b. Evidence relating to the May 9, 2018 letter from Congressman ▮▮▮ to Secretary of State ▮▮▮ including correspondence attaching or concerning the letter.

  c. Communications related to the Ukraine or with individuals associated with the government, a corporation, or a political party in the Ukraine, including ▮▮▮

  d. Communications regarding ▮▮▮

  e. Evidence, including travel records, related to meetings with foreign government officials, representatives of foreign corporations, or foreign individuals, involving Rudolph Giuliani, Lev Parnas, Igor Fruman, ▮▮▮ and David Correia.

  f. Evidence of knowledge of the foreign agent registration laws and requirements, including knowledge of the requirement to register as an agent of a foreign principal.

2

**Exhibit 3**

**(October 21, 2019 Warrant and Application)**

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

In the Matter of a Warrant for All Content and
Other Information Associated with the iCloud
Accounts  with  Apple  IDs
▇▇▇▇▇▇, and ▇▇▇▇▇▇, Maintained at
Premises Controlled by Apple, Inc. USAO
Reference No. ▇▇▇▇▇

1 9MAG  9829

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:   Apple Inc. ("Provider")

United States Attorney's Office for the Southern District of New York and the Federal
Bureau of Investigation (collectively, the "Investigative Agencies")

**1. Warrant.** Upon an affidavit of Special Agent▇▇▇▇▇▇ of the Federal Bureau

of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C.

§ 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal

Procedure 41, the Court hereby finds there is probable cause to believe the iCloud Accounts with

Apple IDs ▇▇▇▇▇▇▇▇▇▇, maintained at premises controlled by

Apple Inc., contain evidence, fruits, and instrumentalities of crime, all as specified in Attachments

A and B hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agencies, within 10 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachments A and B hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachments A and B. The Government is required to serve a copy of

this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and

Order may be served via electronic transmission or any other means through which the Provider

is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is

reason to believe that notification of the existence of this warrant will result in destruction of or

tampering with evidence, and/or tamping with potential witnesses, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

*Oct. 21, 2019*          *10:42 a.m.*

Date Issued          Time Issued

HONORABLE J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

2

12.13.2017

## iCloud Search Warrant Attachment A

### I.   Subject Accounts and Execution of Warrant

This warrant is directed to Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud accounts with Apple IDs                   ,

██████████████████████, Maintained at Premises Controlled by Apple, Inc. (the "Subject Accounts"). The Provider is directed to produce the information described below associated with the Subject Accounts for the following time periods through the date of this Warrant. With respect to the Subject Accounts, this application is limited to all content created, sent, or received after May 1, 2019.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.   Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts:

a. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

b.  *Device information and settings.*  All information about the devices associated with the Subject Accounts, including but not limited to the Integrated Circuit Card ID ("ICCID") number, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), the serial number, customer device settings, and repair history.

c.  *Transactional records.*  All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

d.  *Purchase records.*  All purchase records associated with the Subject Accounts, including records reflecting app purchases from the App Store and/or iTunes Store.

e.  *Address book information.*  All address book, contact list, or similar information associated with the Subject Accounts.

f.  *Call history and voicemails.*  All call histories, logs for FaceTime calls, audio voicemails, and visual voicemails associated with the Subject Accounts.

g.  *Text message content.*  All text messages (including iMessages, Short Message Service ("SMS") messages, and Multimedia Messaging Service ("MMS") messages) sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each text message, and the date and time at which each text message was sent).

h.  *Email content.*  All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

12.13.2017

i.   *Photos and videos.*  All photographs or videos associated with the Subject Accounts, including any photographs or videos found on any iCloud Photo Library, My Photo Stream, or iCloud Photo Sharing service linked to the Subject Accounts.  All associated metadata with any photograph or video including the time and date of creation, the author or creator, the means of its creation, and the GPS location information for where a photo or video was taken.

j.   *Documents.*   All documents stored in or otherwise associated with the Subject Accounts, including all documents in iCloud Drive, and iWork Apps.

k.   *Search and web histories.* All search history, web history, bookmarks, and iCloud Tabs.

l.   *Third-party application data.*  All records, messages, and data relating to third-party applications, including WhatsApp and other third-party messaging applications, stored in or otherwise associated with the Subject Accounts.

m.  *Location data*.  All location data associated with the Subject Accounts.

n.   *Customer correspondence.*  All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

o.   *iOS Device Backups.*  All device backups, and the contents of those backups, including but not limited to messages, web history, and preferences.

## III.   Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. §

3

30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); 18 U.S.C § 1956 (international promotional money laundering); and 18 U.S.C. § 1343 (wire fraud), including the following:

a. Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

b. Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c. Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d. Evidence relating to the funding of bank accounts held in the name of GEP.

e. Evidence relating to political contributions made by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

f. Evidence relating to the source of the funds used to make any political contributions by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g. Evidence relating to the sources of the funds deposited into bank accounts held by Fruman, Igor Fruman's brother ( Correia, or Parnas, or on which those individuals are listed as a signatory.

4

h. Evidence of other bank accounts or entities related to GEP, Parnas, Igor Fruman,
and                    including emails reflecting registration of other accounts
potentially containing relevant evidence.

i. Evidence relating to communications with or regarding political candidates,
campaigns, political action committees, political consultants, or political contributions.

j. Evidence relating to communications with                                    or
Andrey Muraviev.

k. Evidence relating to contributions made in the name "

l. Evidence relating to contributions to any federal, state, or local candidate, or any
political action committee, including but not limited to                    PAC,
      PAC,                        PAC, the                Fund,            for Congress,
            for Congress, the            Fund,        or

m. Evidence of intent to make unlawful political contributions or violate the campaign
finance laws.

n. Evidence related to any false statements made or caused to be made to the Federal
Election Commission.

o. Evidence of knowledge of the campaign finance laws, including but not limited to
knowledge of the prohibition of making contributions in the name of another person, and
knowledge of the prohibition on contributions by foreign nationals.

p. Evidence relating to the May 9, 2018 letter from Congressman            to
Secretary of State            regarding U.S. Ambassador                including
correspondence attaching or concerning the letter.

5

q.  Communications with individuals associated with the government or a political party in the Ukraine, including                            , or               .

r.  Communications regarding             specifically or the position of U.S. Ambassador to Ukraine generally.

s.  Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani,             Parnas, or Fruman.

t.  Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

u.  Passwords or other information needed to access user's online accounts.

v.  Evidence of the intent of Parnas, Igor Fruman,           , David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani,            and            , as it relates to the Subject Offenses under investigation.

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------

In the Matter of a Warrant for All
Content and Other Information
Associated with the iCloud Account
with Apple IDs          ,
          , and          ,
Maintained at Premises Controlled by
Apple, Inc., USAO Reference No.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

19MAG 9829

---------------------------------------------------

## Agent Affidavit in Support of Application for a Search Warrant
### for Stored Electronic Communications

STATE OF NEW YORK )
                  ) ss.
COUNTY OF NEW YORK )

          being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence.

2. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of cellphones in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions,

statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## B. The Provider, the Subject Accounts and the Subject Offenses

3. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the iCloud Accounts assigned identification numbers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Subject Accounts"), maintained and controlled by Apple Inc. ("Apple" or the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

4. Based on my review of records obtained from Apple, I have learned the following:

a. The Apple iCloud account assigned identification number ▮▮▮▮▮ ("Subject Account-1") is registered to Lev Parnas, using the e-mail address ▮▮▮▮▮▮▮.[1] The Apple iCloud account assigned identification number ▮▮▮▮▮ ("Subject Account-2") is also registered to Parnas, using the email address ▮▮▮▮▮▮▮▮▮▮.

b. The Apple iCloud account assigned identification number ▮▮▮▮▮ ("Subject Account-3") is registered to Igor Fruman, using telephone number ▮▮▮▮▮ (the "Fruman Number") and email address ▮▮▮▮▮▮▮.

5. On October 9, 2019, a grand jury sitting in the United States Attorney's Office for the Southern District of New York returned an indictment charging (i) Lev Parnas and Igor Fruman with conspiring to make unlawful straw donations, making and willfully causing false statements

---

[1] Subject Account-1 was also registered with the telephone number ▮▮▮▮▮, which based on my review of telephone records, is subscribed to Parnas's wife, ▮▮▮▮▮. However, because his email is associated with Subject Account-1, and for the reasons discussed below, it appears that Lev Parnas is the user of Subject Account-1.

2

to be made to the FEC, and fabricating documents to impede, obstruct, and influence the proper administration of a matter within the FEC's jurisdiction, in violation of 52 U.S.C. §§ 30122 and 18 U.S.C. §§ 371, 1001, 2, and 1519; and (ii) charging Lev Parnas, Igor Fruman, David Correia and Andrey Kukushkin with conspiring to make unlawful foreign contributions in violation of 52 U.S.C. § 30121 and 18 U.S.C. § 371.  A copy of the indictment is attached hereto.

6.   As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. § 30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); 18 U.S.C § 1956 (international promotional money laundering); and 18 U.S.C. § 1343 (wire fraud) (together, the "Subject Offenses").

**C. Services and Records of the Provider**

7.   Based on my training, experience, and participation in this investigation, as well as my review of publicly-available information, I have learned the following about Apple:

a.   Apple designs, manufactures, and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications.  Apple's products and services include Mac, iPhone, iPad, iPod, Apple TV, a portfolio of consumer and professional software applications, the iOS and Mac OS operating systems, iCloud, and a variety of accessory, service and support offerings.  Apple provides email

services to its users through email addresses at the domain names mac.com, me.com, and icloud.com. Apple also sells and delivers digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store.

     b. The iPhone is a line of smartphones designed and marketed by Apple. It runs Apple's iOS mobile operating system. The iPhone has wireless internet capabilities and can connect to many cellular networks around the world. The iPhone can shoot video, send and receive email, browse the Internet, send text messages, provide navigation services via Global Positioning Satellite location technology, record notes, do mathematical calculations, and receive visual and audio voicemail. Apple's text and video messaging application programs are, respectively, iMessage, which enables users of Apple devices to exchange instant messages containing text, photos, videos, locations, and contacts, and FaceTime, which enables those users to conduct video calls. Other functions such as video games, reference works, social networking – including Facebook and Twitter – can be enabled by downloading application programs ("apps" or, singular, "app"). Apple operates an App Store, which offers numerous apps by Apple and third parties.

     c. Apple's devices, including iPhones, can be backed up to iCloud, a file hosting, storage, and sharing service provided by Apple. Apple provides users with gigabytes of free electronic storage space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may be used to store iOS device backups, which by default happens automatically for a user of an iCloud account. iCloud accounts may also be used to store or backup data associated with the use of iCloud-connected services including email (iCloud mail), images and video (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud

accounts are accessed using an "Apple ID," which is typically created during the setup of an Apple device or through the registration of an iCloud account. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism. Because iCloud accounts are typically linked to iPhones, iCloud accounts are generally registered with a telephone number belonging to an iPhone.

      d. Apple maintains the following records and information with respect to iCloud accounts:

            i. *Subscriber and billing.* When a user registers an Apple device with an iCloud account, Apple collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and email addresses. Apple also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for some subscribers, Apple maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

            ii. *Device information and settings.* Apple maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers for the device, such as the Integrated Circuit Card ID ("ICCID") number, which is the serial number on the device's SIM card, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's device is captured when iTunes is used on that device to play content associated with an Apple ID. Information about a user's device settings may be captured and stored on the iCloud. Apple also retains records related to communications

12.13.2017

between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

      iii.    *IP records.* Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForget pages on Apple's website.

      iv.    *Purchase records.* Apple maintains records reflecting a user's app purchases from App Store and iTunes Store.

      v.    *Address book.* Apple allows subscribers to maintain the equivalent of an address book on the iPhones, comprising telephone numbers, email addresses, and other contact information. That information may be backed up to a user's iCloud account.

      vi.    *Call history and voicemails.* Apple maintains records reflecting telephone call history and logs for FaceTime calls. That information may be backed up to a user's iCloud account. Apple also allows iCloud subscribers to automatically backup audio and visual voicemails to a subscriber's iCloud account.

      vii.    *Text message contents.* In general, text messages, Short Message Service ("SMS") messages, Multimedia Messaging Service ("MMS") messages, and iMessages sent to or from a subscriber's account are backed up to the iCloud unless and until the subscriber deletes the messages. If the subscriber does not delete messages, they can remain on the iCloud indefinitely. Even if the subscriber deletes messages off of an electronic device, they may continue to be available on the iCloud for a certain period of time.

      viii.    *Email contents.* In general, an iCloud account subscriber may elect to store and maintain email content on an iCloud account. When a subscriber makes such an election, any email (which can include attachments such as documents, images, and videos) sent to or from a

subscriber's account, or stored in draft form in the account, is maintained on Apple's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on Apple's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Apple's servers for a certain period of time. Additionally, to the extent a subscriber maintains an iCloud Mail account, iCloud enables a user to access Apple-provided email accounts, and email stored in those accounts are maintained by Apple.

ix. *Photos and videos.* In general, an iCloud account subscriber may elect to store and maintain photographs and videos on an iCloud account. When a subscriber makes such an election, any photograph or video stored in the account is maintained on Apple's servers unless and until the subscriber deletes the photograph or video. If the subscriber does not delete the photograph or video, it can remain on Apple's servers indefinitely. Even if the subscriber deletes a photograph or video, it may continue to be available on Apple's servers for a certain period of time. Additionally, to the extent a subscriber uses iCloud Photo Library and My Photo Stream, which can be used to store and manage images and videos, or iCloud Photo Sharing, which allows users to share images and videos with other Apple subscribers, photographs and videos stored in those platforms are also maintained in a subscriber's iCloud account. Apple also retains the metadata – or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data – for photos and videos that are stored on a iCloud account. This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

x. *Documents.* An iCloud account subscriber may elect to store and maintain documents on an iCloud account by saving documents on an iPhone to the iCloud or by using the

12.13.2017