service iCloud Drive, which can be used to store documents to the iCloud. Additionally, iWork Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.

xi. *Web history, search history, and bookmarks.* Apple maintains search and web browsing activity from Safari, Apple's proprietary web browser, as well as bookmarks used to save particular website addresses. iCloud account subscribers may also use iCloud Tabs, which enables iCloud to be used to synchronize webpages opened in Safari web browsers on multiple devices, and iCloud Keychain, which enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

xii. *Third-party application data.* Records and data associated with third-party apps may also be stored on iCloud. For example, the iOS app WhatsApp, an encrypted instant messaging and calling service, can be configured to regularly backup a user's instant messages on iCloud.

xiii. *Location data.* Apple maintains recent location data, collected periodically, from mobile devices. For example, Apple collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. The Apple application Find My iPhone, which allows owners of Apple devices to remotely identify and track the location of devices, allows for location reporting, which allows Apple to periodically store and use a device's most recent location data in connection with an iCloud account.

xiv. *Customer correspondence.* Apple also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's iCloud account.

xv. *iOS Device Backups.* Apple allows iPhone users to back up the contents of their devices, including messages, web history, and preferences, to an iCloud account.

**D. Jurisdiction and Authority to Issue Warrant**

8. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

9. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

10. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

**II. Prior Applications**

11. On or about January 18, 2019, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, and [REDACTED] [REDACTED], among others.

12. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for Subject Account-1 through Subject Account-3, along with an iCloud account belonging to [redacted].[2]

13. On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a search warrant for the January 18 Warrant returns.[3]

14. On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a search warrant for the May 16 Warrant returns.

## III. Probable Cause Regarding the Subject Offenses

15. The FBI and the USAO-SDNY are investigating, among other things discussed herein, schemes involving Lev Parnas, Igor Fruman, David Correia, Andrey Kukushkin and others to make political contributions to candidates and political action committees ("PACs") in order to

---

[2] Based on my review of the iCloud account returns obtained pursuant to the May 16 Warrant, which is still ongoing, I understand that Parnas stored relevant text messages (including iMessages sent from an iPhone) and photos, among other materials, on Subject Account-1; that Parnas stored relevant text messages (including iMessages sent from an iPhone), WhatsApp messages, and photos on Subject Account-2, and that Fruman stored relevant documents on Subject Account-3.

[3] On August 14, 2019, the USAO and FBI sought a warrant from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, to conduct an expanded search of the January 18 Warrant returns. Judge Pitman reviewed and approved the application, and both the affiant and Judge Pitman signed the affidavit in support of the application for a warrant, which was assigned docket number 19 Mag. 7595. However, at present, the Government is unable to locate a copy of the search warrant, which, to the extent it was presented to Judge Pitman, was not retained. Accordingly, on October 17, 2019, the USAO presented the signed copy of the 19 Mag. 7595 application to Judge Oetken, who, that same day, issued a new warrant authorizing the seizure of the same materials sought in the August 14 application. Moreover, no material identified herein was seized pursuant to the August 14 application. All of the material discussed herein that is attributed to the January 18 Warrant was seized and identified pursuant to that original judicial authorization.

gain access to politicians and influence policy, in violation of certain of the Subject Offenses. First, there is probable cause to believe that Parnas made illegal "straw donations," funded by third parties, in violation of the federal campaign finance laws, which prohibit persons from making contributions in the name of another person, and caused false forms to be submitted to the FEC. *See* 18 U.S.C. § 1001, 1519 and 2, 52 U.S.C. § 30122. Some of those contributions were made in the name of Global Energy Producers LLC ("GEP"), a purported liquefied natural gas ("LNG") import-export business that had been incorporated by Igor Fruman and Parnas around the time the contributions were made.[4] The rest of the contributions were made in the names of Igor Fruman and Parnas, although, as discussed below, Igor Fruman paid for Parnas's contributions. Second, in 2018, it appears that Parnas, Igor Fruman, Correia, Andrey Muraviev, and Kukushkin conspired to attempt to acquire cannabis licenses in multiple states by, among other things, donating to politicians in those states. Members of the group hired lobbyists, Correia identified the specific contributions the group should make in order to obtain licenses, and Muraviev – a Russian national with no legal status in the United States – wired $1 million from overseas to the United States, some of which was used to make contributions to politicians in Nevada and elsewhere, in violation of the federal campaign finance law that prohibits foreign nationals from directly or indirectly making political contributions. *See* 52 U.S.C. § 30121. In addition, this conduct violates the money laundering and wire fraud laws, in that the defendants deprived campaigns and candidates of information regarding the true source of the funds for those donations (that, is a foreign

[4] Two of the contributions funded by Fruman and effectuated by Parnas were made in the name of GEP, which, as described below, appears to be a corporation created at or shortly before the time the contributions were made for the principal purpose of obscuring the true donor's identity. The FEC has interpreted the so-called straw donor prohibition as not only applying to individuals, but also to the creation and use of closely held corporations or corporate LLCs for the purpose of concealing the true source of the funds.

national), which affected their allocution or use of assets and exposed the candidates and campaigns to the risk of economic harm in the form of fines by federal and state election commissions tasked with enforcing the campaign finance laws, *see* 18 U.S.C. §§ 1343, 1956; 52 U.S.C. § 30121.

16. The FBI and USAO are also investigating whether Fruman and Parnas, at the request of a foreign government, entity, or person, undertook actions to cause the removal of the United States Ambassador to the Ukraine. The Foreign Agents Registration Act ("FARA") criminalize acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities, including engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-2. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. 18 U.S.C. § 951. As described below, there is probable cause to believe that Fruman and Parnas lobbied for the removal of the then-Ambassador to the Ukraine, [REDACTED], at the direction and request of at least one Ukrainian government official, and that they did so without registering under FARA. *See* 22 U.S.C. §§ 612 (setting forth the requirements of the registration statement), 618 (providing criminal liability for any willful violations of the statute).

17. As set forth below, based on my review of emails obtained pursuant to the January 18 Warrant, materials obtained pursuant to the May 16 Warrant, FEC records, financial records, and

public sources, it appears that Parnas and Fruman used electronic devices to among other things, communicate regarding the illegal campaign finance donation schemes, create documents and store financial and incorporation records related to GEP matters, make campaign contributions, and communicate with co-conspirators and others regarding their efforts to seek the removal of the U.S. Ambassador to Ukraine at the request of a foreign government official. Accordingly, there is probable cause to believe that the Subject Accounts contain evidence of the Subject Offenses.

Straw Donations to the [REDACTED] Fund in 2016

18. Based on my review of public sources and financial records, I have learned that Parnas is a businessman and entrepreneur who lives in south Florida. According to a sworn affidavit that Parnas filed with the FEC, discussed below, he has worked in a number of industries including as a real estate broker, stockbroker, and most recently as the founder of Fraud Guarantee, which "provides risk management tools for investors to prevent losses from fraudulent activities." Based on my review of communications obtained pursuant to the January 18 Warrant and the May 16 Warrant and records from financial institutions, I have learned that, from time to time, including in 2016 and 2018, Parnas has had trouble paying creditors on time and as of 2018, appeared to have struggled financially. Parnas's business partner in Fraud Guarantee is Correia, who, based on my review of the same materials, also appears to have experienced financial troubles.

19. Based on my review of the returns of the January 18 Warrant, FEC records, financial records, and public sources, there is probable cause to believe that Parnas and Correia made unlawful straw donations to the [REDACTED] Fund in 2016 at the suggestion of [REDACTED] [REDACTED] a businessman who had previously contributed to the [REDACTED] Fund, using funds provided by [REDACTED]. Specifically, I have learned, among other things, the following:

a. On or about October 3, 2016, Correia emailed [REDACTED] copying Parnas: "It was a great pleasure meeting the other evening . . . I look forward to moving on the Trump dinner and helping to make it a massive success. I already shared with Lev the donation amounts and we will get back to you with details of any/all interested donors." Correia also sent [REDACTED] "some information about our group [REDACTED] . . . and a few properties that [REDACTED] owns." Based on my review of this and other emails, it appears that [REDACTED] solicited Parnas and Correia to attend a fundraising dinner for Trump, and that in response Correia shared information about investing in [REDACTED] a private equity group with which Parnas and Correia were affiliated.

b. On or about October 11, 2016, [REDACTED] sent Parnas and Correia a registration link for a [REDACTED] Fund event being held the following day in Hillsboro Beach, Florida. In the subject line to the email, [REDACTED] wrote: "URGENT register before 4:30 today all the names that will be attending tomorrow."

c. On or about October 14, 2016, Correia emailed [REDACTED] that Parnas had said he and [REDACTED] had "connected and worked things out" and that Correia was "happy to have you as part of the team!" In a subsequent email copying Parnas, Correia asked [REDACTED] to return a "scanned copy of the agreement once you sign it" and to let Correia "know when the wire is sent so we can confirm receipt on our end." Later that day, [REDACTED] replied that he was "happy to be part of the team" and "looking forward for more ventures in the future." [REDACTED] wrote "[a]ttached please find the sign agreement and shortly ill wire the money to the account." However, [REDACTED] did not actually attach an agreement, and based on my review of the emails obtained pursuant to the January 18 Warrant, I have not identified any such agreement between [REDACTED] and Parnas or Correia.

d. Based on my review of bank records, I have learned that on or about October 14, 2016, a bank account in the name of [REDACTED] LLC, on which Parnas was a signer, received a wire transfer from [REDACTED] in the amount of $300,000. The reference line on the wire stated "purchase 3 pct Fraud Guarantee LLC," which I understand to be a reference to a purported purchase of three percent of Parnas's business, Fraud Guarantee LLC. Prior to receiving the wire transfer from [REDACTED] the balance of the [REDACTED] account was negative $801.82.

e. On or about October 14, 2016, $100,000 was transferred from a bank account in the name of [REDACTED] LLC at [REDACTED] (the "[REDACTED] Account") to an account in Lev and [REDACTED] names at [REDACTED]. On the same date, $25,000 was wired from the account in Parnas's name to an account in the name of [REDACTED] which is the name of David Correia's wife.

f. On or about October 24, 2016, Parnas contributed $50,000 to the [REDACTED] Fund. On the same day, a $5,000 contribution was made in the name of [REDACTED] to the [REDACTED] PAC. Based on my review of financial records, it appears that both of the contributions were funded with money from the $300,000 payment by [REDACTED]

20. Based on my review of public records, I have learned that [REDACTED] who is a lawful permanent resident, contributed $15,000 to the [REDACTED] Fund on October 14, 2016, and another $15,000 on or about October 24, 2016. Based on my review of public sources and the [REDACTED] Fund's contributor form, I have learned that contributions to [REDACTED] Fund were "allocated sequentially according to the following formula: $2,700 . . . to [[REDACTED] for President] primary account; $2,700 . . . to [[REDACTED] for President] general account; $33,900 . . . to [the [REDACTED] National Committee's] operating account; $101,700 . . . to [the

National Committee's] headquarters account; $101,700 . . . to [the National Committee's] legal proceedings account; $101,700 . . . to [the National Committee's] convention account." The form also indicated that "the allocation formula may change if any contribution would exceed applicable contribution limits." Thus, because contributed a total of $30,000 after the primary was over, his contribution was allocated as a $2,700 contribution to the Trump Campaign (the maximum) and $27,300 to the National Committee's operating account. Accordingly, it appears that was legally barred from having his funds allocated in the manner that the $50,000 from Parnas and $5,000 from Correia were allocated to the Fund. In other words, it appears that because the contributions were made in the names of Parnas and Correia, funded two additional maximum contributions to for President.

21. Based on my review of bank records for the Account, I have learned that, in addition to the donations to the Fund, between October 14, 2016, and December 5, 2016, Parnas spent nearly all of the remaining money transferred from on what appeared to be personal expenditures. In addition to the $100,000 transfer to his personal account, discussed above, Parnas spent the remainder of the money on luxury personal items, including a private jet rental company, hotels and restaurants, luxury clothing stores, and cash transfers to his personal accounts. By December 5, 2016, the balance in the Account was less than $7,000. Thus, based on my review of the bank records, it does not appear that any of the funds were used for a business purpose. Moreover, based on my review of the emails obtained pursuant to the January 18 Warrant, I have not found evidence that ever asked for a return of his "investment" in Fraud Guarantee, even though

[REDACTED] did ask for a return of his investment in a separate company, [REDACTED] (which investment actually appears to have been made using different funds).

22. Based on the foregoing, it appears that the contributions to the [REDACTED] Fund were solicited and funded by [REDACTED], but were made in the names of Parnas and [REDACTED] in violation of certain of the Subject Offenses, including 52 U.S.C. § 30122 (unlawful straw donations), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC). Specifically, [REDACTED] solicited Correia's and Parnas's attendance at a [REDACTED] Fund event. [REDACTED] wired Parnas $300,000, but while [REDACTED] had discussed an investment in Correia's business Fraud Guarantee, the money was wired to a different entity, [REDACTED] and the only documented investment [REDACTED] seems to have made was a $100,000 investment, using separate funds, in [REDACTED] The funds [REDACTED] sent to Parnas through [REDACTED] by contrast, do not appear to have been used in connection with Fraud Guarantee's business, or for a business purpose. Instead, as discussed above, Parnas used $55,000 of those funds to fund his and Correia's donations to the [REDACTED] Fund, and spent the remainder of the funds over the following two months on luxury and personal expenses for Parnas. In addition, [REDACTED] did not ask for his "investment" to be returned, although he was comfortable doing so with respect to his [REDACTED] investment, which indicates that [REDACTED] did not actually believe that his $300,000 wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the [REDACTED] Fund were made in violation of federal law and as part of the Subject Offenses.

Straw Donations to Campaigns and PACs in 2018

23. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting [redacted] candidates, with a principal focus on the 2018 midterm elections. For instance, Parnas was invited to participate in exclusive events hosted by [redacted] (a 501(c)(4) nonprofit entity organized by senior staff members from the Trump Campaign to promote President Trump's policy agenda), [redacted] PAC (which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-[redacted] administration"), and [redacted] PAC (which had a stated purpose of working to keep [redacted] in control of Congress). Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. Parnas and Igor Fruman attended some of those events together. In order to attend these events, however, Parnas and Igor Fruman were required to, and did, make sizeable political contributions including to [redacted] PAC and [redacted] PAC. The investigation has revealed that while Igor Fruman financed all of these contributions, some of them were reported in Parnas's name, or in the name of GEP, as described below, a LNG import-export business incorporated by Parnas and Igor Fruman around the time the contributions were made, seemingly in order to obscure the source of the funds and/or evade contribution limitations.

24. Specifically, based on my review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following regarding contributions made by Igor Fruman, Parnas, and GEP:

a. In early February 2018, Parnas was invited to attend the 2018 [redacted] National Committee Spring Retreat at the [redacted] resort in Palm Beach, Florida, scheduled for March 3 through 5, 2018. President Trump was scheduled to be the keynote speaker. Parnas and Igor

Fruman both appear to have attended the event and met President Trump. Fruman subsequently stated to a Russian-language newspaper, which has been translated into English, the following regarding the [redacted] event: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in [redacted] was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the [redacted] victory in the mid-term elections to Congress in November 2018."

b. On or about February 23, 2018, [redacted] the director of development for the [redacted] PAC and [redacted] PAC, invited Parnas to attend a [redacted] dinner in New York on or about March 12, 2018, with Vice-President [redacted] and Majority Leader [redacted] In order to attend the event, Parnas was required to make a minimum contribution of $125,000 to [redacted] PAC, with $50,000 contributed before the event. Parnas and Fruman attended the event and on or about March 19, 2018, Fruman made a $50,000 contribution to the PAC in the name "[redacted] That contribution was transferred to multiple committees, including as a maximum $33,900 contribution to the [redacted]

c. Over the next two months, Parnas and Igor Fruman attended multiple [redacted] events at the invitation of [redacted] For instance, on or about March 26, 2018, [redacted] invited Parnas and Fruman to attend a dinner at [redacted] and on or about March 29, 2018, Parnas, Fruman, [redacted] dined at the resort. The next day, [redacted] emailed Parnas a link to an [redacted] advertisement and the PAC's donor form. Fruman, Parnas, and Parnas's son appear to have attended another [redacted] event on or about April 11, 2018. On or about April 20, 2018, Fruman attended at [redacted] roundtable event at [redacted] at which President Trump was present, as was Representative [redacted] a congressman from

Texas, and other congressional Representatives. On or about April 23, 2018, [redacted] sent Parnas the donor form again as well as some more information on [redacted]

d. On or April 30, 2018, Igor Fruman and Parnas appear to have attended a dinner at the Trump International Hotel in Washington, D.C., that was affiliated with [redacted] The next day, on or about May 1, 2018, [redacted] sent Parnas the contribution form. Parnas responded, "Got it will text you when I send it." On or about May 6, 2018, [redacted], Parnas's assistant, emailed [redacted] for wiring instructions for [redacted] and [redacted] [redacted]

e. On or about May 17, 2018, Parnas, with [redacted] assistance, made a $325,000 contribution, in the name of GEP, to [redacted] PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor, will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."

f. On or about May 31, 2018, [redacted] emailed [redacted] and asked whether "Lev could complete the last $75k to [redacted] which was a reference to the fact that Parnas committed to contribute $125,000 to [redacted] to attend the March 12, 2018 dinner in New York, but Fruman had only paid $50,000. On or about June 12, 2018, Igor Fruman made another $50,000 contribution to [redacted] PAC, and on June 29, 2018, Parnas made an $11,000 contribution to the [redacted] PAC.



g. As noted above, on or about April 20, 2018, Parnas met Representative [redacted] at [redacted] On or about April 22, 2018, [redacted] contacted Representative [redacted] staff to request a meeting on behalf of Parnas; a dinner was scheduled for April 26, 2018, but then canceled. Parnas met Representative [redacted] at his office in Washington, D.C., on or about May 9, 2018. On or about June 6, 2018, Parnas met with Representative [redacted] again at his office. On June 7, 2018, [redacted] wrote [redacted] staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman [redacted]]." [redacted] later explained that she had an "initial list of donors" who would make a donation of $21,000 on one credit card. [redacted] staff explained the applicable campaign finance regulations and said she was unsure if "we can do that entire amount on one credit card but I can find out." Parnas appears to have again met Representative [redacted] on June 14, 2018. On June 25, 2018, Parnas and Igor Fruman each made $2,700 contributions to Representative [redacted] who was running for reelection in November 2018. They listed GEP as their employer.

25. Based on my review of financial records, it appears that the contributions to [redacted] PAC and Representative [redacted] that were made in Parnas's name were, in fact, funded by Igor Fruman, in violation of certain of the Subject Offenses. Additionally, it appears that the contribution to [redacted] PAC, which was made in the name of GEP, was actually funded not by GEP, but rather through a private loan from third parties to Igor Fruman and his brother, [redacted] having nothing to do with GEP, in violation of certain of the Subject Offenses. Specifically, from my review of financial records and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a. On or about on May 15, 2018, Igor and [redacted] obtained a $3 million commercial loan from [redacted] a businessman in Florida, and [redacted] an

attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identified [REDACTED] as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, [REDACTED] lent the money to [REDACTED] [REDACTED] (which is owned by Igor and [REDACTED] and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by [REDACTED].

b. On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and [REDACTED] [REDACTED] was transferred from [REDACTED] to a bank account in the name of [REDACTED] [REDACTED] (the "[REDACTED] Account"), on which Parnas was a signer (but neither Igor nor [REDACTED] was). Prior to receiving that transfer, the [REDACTED] Account generally had a low balance and minimal account activity. For instance, in January 2018, the [REDACTED] [REDACTED] Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the [REDACTED] Account two days prior, on or about May 17, 2018, Parnas, with [REDACTED] assistance, wired $325,000 to [REDACTED] PAC. As described above, Parnas told [REDACTED] to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c. On or about May 22, 2018, $100,000 was transferred from the [REDACTED] Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the [REDACTED] loan to [REDACTED] and Igor Fruman. The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the [REDACTED] PAC in Parnas's name.

d. Additionally, Parnas's June 25, 2018 contribution to Representative [redacted] was paid for using an [redacted] account held in the name of [redacted] (registered signer, [redacted] using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to [redacted] PAC and Representative [redacted]

e. On or about May 3, 2018, [redacted] assisted Parnas with making a $15,000 donation in GEP's name to [redacted] PAC. However, this donation does not appear to have come from GEP. Rather, [redacted] used an [redacted] card held in Igor Fruman's name, which drew on an account held in the name of "[redacted] - [redacted] – which appears to be a credit card account associated with Igor and [redacted] business – to make the donation.

26. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to [redacted] PAC was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

a. GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with [redacted] as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC in any public filing until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[5]

27. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, on or about June 25, 2019, Igor Fruman made a $2,700 contribution to Representative [REDACTED] – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that [REDACTED] is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the [REDACTED] contribution form stated that contributions by individuals would be given in priority order to: [REDACTED] [REDACTED] Committee (up to $5,000), [REDACTED] for Congress (up to $2,700), the [REDACTED] (up

[5] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and [REDACTED] [REDACTED] and asked for Parnas' approval. Corriea also emailed copies to [REDACTED] on the same date. According to the NDA, GEP and [REDACTED] wished to "explore a business possibility," and was signed by Fruman but not by [REDACTED] Based on my review of publicly available materials, it appears that [REDACTED] may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business with [REDACTED] or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.

to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor Fruman contributed $50,000 in March 2018 to [REDACTED] (as discussed below, in the name "[REDACTED] his funds were used to make maximum contributions to the [REDACTED] and [REDACTED] Committee. When Parnas subsequently contributed $11,000 in June 2018 to [REDACTED] those funds were used to make maximum contributions to [REDACTED] Committee and [REDACTED] for Congress, as well as a $3,300 contribution to [REDACTED] Thus, it appears that by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum contributions to [REDACTED] Committee and exceeded the contribution limit to the [REDACTED]

28. Based on my review of public sources and emails obtained pursuant to the January 18 Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up initially for the primary purpose of making a contribution. Specifically:

a. On or about July 17, 2018, the [REDACTED] asked for comment on a story relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant wrote to Parnas and Correia, "This is what happens when you become visible. The buzzards descend." Parnas responded, "That's why we need to stay under the radar and have the best lawyers."

b. On or about July 23, 2018, [REDACTED] published an article about LLC donations to [REDACTED] which mentioned the contribution by GEP. The following day, on or about July 24, 2018, a reporter for [REDACTED] emailed Parnas about GEP. Parnas did not respond, and on or about July 25, 2018, [REDACTED] published an article suggesting that GEP was a

mere shell company used to make a contribution to the PAC. On the same day, the Campaign Legal Center filed a complaint with the FEC about the contribution.

c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from [redacted] and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to [redacted] was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the [redacted] loan to [redacted].

d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the [redacted] FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the [redacted] PAC contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to [redacted] for Congress "was made with a business credit card . . . which [he] reimbursed." These statements to the FEC, and GEP's response to the

FEC, appear to be false, in violation of certain of the Subject Offenses. As set forth above, the [REDACTED] PAC contribution was made with funds from a third party private loan to an entity run by Igor and [REDACTED] that were moved through multiple bank accounts – none belonging to GEP – before being paid to [REDACTED] PAC by the [REDACTED] Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and [REDACTED] the analyst found no evidence of reimbursement by Parnas to [REDACTED] or [REDACTED] for the contributions to Congressman [REDACTED]

e. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.

29. Based on my review of financial records for a bank account held in the name of [REDACTED] [REDACTED] at [REDACTED] for which [REDACTED] is an authorized signatory (the "[REDACTED]



"), I have learned that on September 19, 2018 – the day after the Account received a wire transfer from Andrey Muraviev in the amount of $500,000, as discussed below – the Account was used to pay the bill in the amount of $494,415.21. That bill included Igor Fruman's donations to the Fund, PAC, for Congress, and Parnas' and Igor Fruman's donations to among other donations.

30. Based on the foregoing, it appears that the contributions to PAC and Representative were funded by Igor Fruman, but were made in the name of Parnas in violation of certain of the Subject Offenses. In addition, it appears that the contributions made in the name of GEP to PAC and PAC were unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation of certain of the Subject Offenses.

Unlawful Contributions by Fruman in a False Name

31. It appears that Fruman made multiple contributions, using another person's name and identity, in the name " and listed an incorrect employer in order to disguise the true donor of the contributed funds and potentially conceal assets from others, including creditors. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a. On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution to PAC. The contribution was reported to the FEC as coming from



[redacted]" with his employer as "[redacted] Corp." The funds from that contribution were distributed to the [redacted] Committee PAC, and [redacted] House candidates.[6]

b. On or about April 27, 2018, Fruman made a $100,000 contribution to the [redacted] PAC. The contribution was reported to the FEC as coming from "[redacted] with his employer as [redacted]." The funds were distributed to the [redacted] and the [redacted] National Committee.

c. On or about June 12, 2018, Fruman made a $50,000 contribution to [redacted] PAC. The contribution was reported to the FEC as coming from "[redacted] with his employer as "[redacted] Corp." The funds were distributed to various [redacted] House candidates.

32. Based on my review of public sources, it appears that there is another individual – who did not make the contribution – but who is named [redacted] and works for [redacted]. Accordingly, it appears that Fruman may have made contributions in a variation of his name, or in another person's name, to avoid contribution limits, in violation of certain of the Subject Offenses.

<u>Donations Funded by Muraviev</u>

[6] Based on my participation in the investigation, including my review of FEC records, financial records, and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that the pattern of donations indicate that Parnas and Fruman were creditor-conscious in deciding which donations to make in their true names. Almost all of the large contributions they arranged were not made in their true names. Instead, such large donations were typically made either in the name of GEP or in the name "[redacted]." As a result, a search of the FEC database in 2018 would have shown that Fruman's only five-digit contribution was $15,000 to the [redacted] Fund, and Parnas's only five-digit contribution was $11,000 to [redacted] In 2018, contributing in the name of GEP or [redacted]" would have had the effect of disguising the fact that Fruman and Parnas were behind large contributions.

33. Parnas and Igor Fruman made additional contributions to state and federal candidates in 2018 that were in fact funded by Andrey Muraviev, a Russian national. Specifically, between September and October 2018, Muraviev wired Parnas and Fruman $1 million with the understanding and expectation that those funds would be used to make donations to candidates and campaigns in specific states in order to assist in their efforts at obtaining cannabis licenses for a planned business venture. Parnas, Fruman, Correia, and another business partner, Andrey Kukushkin, worked with Muraviev to ensure that his money was used to make political donations that the group believed would be beneficial to their cannabis business interests, without reporting the true source of the funds, or that they were taking these actions in coordination with Muraviev, a foreign principal.

34. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in the summer of 2018, Kukushkin, a U.S. citizen who resides in California, worked with Correia and eventually Parnas and Fruman about engaging in a cannabis business that was ultimately funded by Kukushkin's partner, Muraviev. Specifically, I have learned the following:

a. In or about July 2018, Correia began discussing a cannabis business in San Francisco with Kukushkin. In an email sent on or about July 22, 2018, Kukushkin complained to Correia about a number of local regulatory issues associated with his cannabis business, and over the next few days Correia and Kukushkin discussed collaborating on a cannabis business in the future. On August 10, 2018, Correia and Kukushkin met in San Diego, California, and appear to have discussed a potential cannabis venture.

b. On or about August 21, 2018, Correia relayed information regarding the business opportunity with Kukushkin to Parnas, writing in an email:

> Great opportunity with these guys since big Andre is funding. However, it is obvious I'm going to have to spend more time on this

> than originally planned. These guys are not smart-businessman and the one issue I'm dealing with, which began last night, is literally retarded. I think Andrey Kukushkin is a really good guy, but needs a lot of handholding on some very easy issues. This creates a great opportunity for us!....because they need this help, but, I'm not sure how to find enough time along with everything else we/I am doing if we're not getting paid some sort of consulting fee or salaries in the meantime. Let's discuss. We are going to make it happen no matter what, just trying to figure out the best structure.

c. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, and my participation in the investigation, I believe that Correia's reference to "big Andre" is to Andrey Muraviev, a business partner of Kukushkin's who would be "funding" the venture.

d. On or about September 7, 2018, Parnas, Fruman, and Kukushkin attended a fundraiser in Las Vegas for [REDACTED], who was at that time the attorney general of Nevada, and a candidate for government in the state's November 2018 election. According to a subsequent email, the event was attended by Vice President [REDACTED], and a minimum $10,000 donation was required for attendance. In a subsequent email, [REDACTED] promised, on behalf of the group, to "send [a] donation out in the next couple of days."

e. Parnas, Fruman, Muraviev, Kukushkin, and [REDACTED] began communicating via WhatsApp in the days following the September 7, 2018, [REDACTED] event regarding their scheme to use Muraviev's money to make political donations that they believed would benefit their cannabis business. Specifically, on or about September 9, 2018, Parnas created a WhatsApp text

---

7 Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that beginning in approximately September 2016, David Correia and Lev Parnas began discussing a cannabis and medical marijuana business with prospective partners, including [REDACTED]. Based on my review of law enforcement records, I am aware that [REDACTED] was born in Russia and is an American citizen. In May 2017, Correia, Parnas, [REDACTED] and others met in Miami and discussed a plan to acquire a medical marijuana license in Florida and elsewhere. However, based on my review of email correspondence, it appears that this business venture did not come to fruition in 2017.

chain between himself, "Andrey Muravyev", Igor Fruman, Andrey Kukushkin, and [REDACTED] (the "Text Chain").[8] Parnas wrote: "[REDACTED], Andrey, Igor, Kukhnya. Brothers, I just wanted to introduce you to each other, and [REDACTED], if you can, get in touch with Andrey and Kuynya." [REDACTED] responded by providing the [REDACTED] Number, and wrote, "Who should I call and at what number?" Parnas then told him to call Andrey, which appears to be a reference to Muraviev, and noted that Parnas would "send you his number and contact info momentarily."

f. In the same Text Chain, on or about September 10, 2018, Igor Fruman sent the account details for the [REDACTED] Account, along with a photograph of [REDACTED] [REDACTED] tax identification number.

g. On or about September 12, 2018, Correia emailed Parnas a document entitled "Cannabis Schedule and budget," which listed a number of intended political donations across five states. The header of the document read "Schedule and Contribution Budget Cannabis Multi-State License Strategy." The document described an effort to "schedule trips to meet with" politicians and candidates in California, Nevada, Florida, New York, and New Jersey – all states with legalized medical or recreational cannabis – and make political donations in the multi-hundred thousand dollars to support those politicians. With respect to Nevada, the document noted that trips would be scheduled to meet with "[REDACTED] [sic] (AG/next Governor), [REDACTED] [REDACTED] (LV Mayor), Clark County Officials and other relevant associates/agencies in Las Vegas, Reno and Lake Tahoe areas" and that the campaign contribution budget would be $250,000. With respect to Florida, the document noted that trips would be scheduled to meet with

---

[8] The Text Chain is in English and Russian, the latter of which I do not speak. I have reviewed preliminary English-language translations of the Russian-language text messages in the Text Chain, and my summaries of those Russian-language text messages herein are based on those draft translations.

"Rep. [redacted] (next Gov)" among others, and that the campaign contribution budget would be between $250,000 and $500,000. In total, the document projected between $1.3 and $2 million in political contributions. The document also included a "funding schedule," which noted that $500,000 was "due by 9/12," an additional $500,000 was due by October 1, 2018, and that "remaining funds TBD." For the reasons set forth below, I believe that this funding was to come from Muraviev.

h. On or about September 12, 2018, Correia forwarded the "Cannabis Schedule and Budget" document to Parnas by WhatsApp message, and Parnas replied "Perfect send to Igor." Later that day, Correia wrote "Praying for a good response from Andrey," likely referring to Muraviev. Correia subsequently wrote Parnas to ask for an in-person meeting, and noted that "I would love to be updated on things that we can't discuss over the phone."

i. Following their meeting in Las Vegas in September 2018, Kukushkin and Correia worked on behalf of the group to take steps to formalize their business arrangement. Specifically, on or about September 14, 2018, Correia emailed Kukushkin documents relating to the incorporation of a new entity. On or about September 15, 2018, in a conversation about how to structure the new company, "NewCo," Kukushkin wrote "I believe whats left was for Igor and Lev to establish who is going to be shareholder(s) of the NewCo and could we all use LLC's as our proxy's in it. I am just trying to establish core structure and how transparent should Andrey be exposed for the benefits of NewCo Transparency, his Russian roots and current political paranoia about it." Based on my review of emails pursuant to the January 18 Warrant and my participation in the investigation, I believe that Kukushkin was responding to the corporate documents Correia had sent the day prior, and was noting the importance of concealing Muraviev's involvement in the corporation due to "his Russian roots and current political paranoia about it."

j. On or about October 1, 2018, Correia forwarded a document entitled "[redacted] Bylaws" to Kukushkin, and asked him to "take a look." On October 2, 2018, Kukushkin executed the "[redacted]" bylaws in an email confirmation to Correia. The by-laws provided that "[redacted]" would be incorporated in Nevada and that Kukushkin would be the president and treasurer, while Correia would be the secretary. Correia then forwarded the executed by-laws to Fruman and Parnas. Based on my participation in the investigation and my review of emails obtained pursuant to the January 18 Warrant, I believe that the "[redacted] Bylaws" reflected the new corporation that Kukushkin and Correia (who were the only listed parties on the corporate documents) formed to represent the business venture between Kukushkin, Correia, Parnas, Fruman, and Muraviev.

k. In late September 2018, Parnas and Correia spoke about their plans with respect to Muraviev's money. Specifically, on or about September 30, 2019, Parnas and Correia spoke about the fact that Kukushkin was going to send signed corporate documents so Correia could open a bank account, and Correia updated Parnas regarding travel that Kukushkin wanted [redacted] to book on his behalf. Correia closed by noting that "Then....Andrey M can wire the $500k...." Parnas replied and directed Correia not to use their credit cards to book Kukushkin's flight. Correia sent Parnas a proposed draft text message for Kukushkin, that read:

> Hey there buddy. I understand completely. However the new bank and the next $500k is different. The original funding was for charitable donations for political donations, prior to a company being opened. Our agreement was for $1M for 'startup' moneys. However, the next $500,000 is for the "operationa[l]" budget, which would include general company expenses, such as your travel. Therefore our bank account needs to be open tomorrow and a new wire for the remain[ing] $500k needs to be sent to accommodate such expenses."

Parnas responded, "Sounds good but confirm with Igor before you send it."[9]

35. Based on my review of financial records, I have learned the following about the manner in which the funds from Muraviev were laundered through the [redacted] Account which, as described above, was provided by Igor Fruman to the group on the Text Chain:

a. [redacted] is an authorized signatory. On or about September 18, 2018, the [redacted] account received a $500,000 wire transfer from an account held in the name of [redacted] Ltd. at [redacted] a Swiss bank, with the note "payment as per the loan agreement d."[10] Based on my review of financial records and public sources, I have learned that a similarly-named entity based in Russia is associated with Andrey Muraviev, a Russian national.

b. The day before the $500,000 transfer from [redacted] Ltd., the account balance of the [redacted] Account was $1,662.61.

c. The following day, on or about September 19, 2018, approximately $494,415 of the funds in the [redacted] Account – most if not all of which came from [redacted] – were used to pay an [redacted] bill for a credit card in the name of [redacted] As discussed infra, based on my review of records from [redacted], I have learned that the [redacted] credit card account was used to pay for a June 12, 2018 $50,000 contribution

---

[9] Based on my review of public sources, I have learned that September 2018 was the deadline in Nevada for certain retail marijuana licenses. Nonetheless, it appears from my review of materials obtained pursuant to the May 16 Warrant that Parnas, Igor Fruman, Correia, Kukushkin, and Muraviev contemplated that their contributions and donations would aid them in changing Nevada's rules or getting them preferential access to new licenses.

[10] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that [redacted] entered into a loan agreement with [redacted] for the amount of $500,000, which was set to be repaid by December 31, 2018. Based on my review of available bank records for the [redacted] account through May 2019, it does not appear that this "loan" was ever repaid.

to [REDACTED] PAC in the name of "[REDACTED] referenced above, as well as a $15,000 contribution to the [REDACTED] Fund, and a $5,400 contribution to [REDACTED] for Congress, all of which were also made in Igor Fruman's name. As discussed below, [REDACTED] was listed on the group's contribution chart. Muraviev thus appears to have funded each of these donations. The remainder of the [REDACTED] expenses paid by Muraviev's funding were for travel and other personal expenses. Thus, it appears that while Parnas and Fruman did use a portion of Muraviev's money to, as agreed, fund political donations and pay for travel that may be related to their venture, at least some portion of the funds appear to have been used for purposes other than what was discussed with Muraviev and Kukushkin.

36. Based on my review of emails pursuant to the January 18 Warrant, I have learned that in early October 2018, Correia circulated several documents to Parnas and Igor Fruman that appeared to be more detailed versions of his prior "Cannabis Schedule and budget" described above, which set forth the precise candidates and campaigns that Muraviev's funds would be donated to. Specifically, I have learned the following:

a. On October 8, 2018, Correia emailed Parnas and Igor Fruman a document entitled "State Campaign Contributions." In the cover email, Correia noted that the document was a draft, and that he would put it into a "final format" once "we go over these things." Correia also told Parnas and Fruman that they needed to discuss "which donations have been made" and "which are only committed." Specifically, I have learned the following with respect to the draft document:

i. The document contained a table of intended campaign contributions to support state and local candidates in New Jersey totaling $102,500; New York totaling $160,000; Florida totaling $390,000; Nevada totaling $225,000; California totaling $120,000; and Colorado totaling

$110,000. The total sum of intended contributions was approximately $1.1 million, to support 25 separate candidates, who were both [REDACTED] and [REDACTED].

ii. With respect to Nevada, the chart listed intended donations of $150,000 to support [REDACTED] and $75,000 to support [REDACTED] a candidate for state attorney general. With respect to Florida, the chart listed an intended donation of $250,000 to support [REDACTED], with a note that it had been made or promised on October 3, 2018.

iii. Later on October 8, 2018, Correia sent a "final draft" of the same document to Parnas and Igor Fruman. Correia wrote "Gents, please see attached. If all good. Please forward on …." The document was entitled the "[REDACTED] Contribution List" and the document's header read "[REDACTED] State Campaign Contributions." Specifically, the document reflected the following donations and commitments:

| *Candidate* | *Office* | *Noted Commitment or Payment* | *Amount* |
|---|---|---|---|
| [REDACTED] | US. Senator (New Jersey) | Committed | $45,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Paid | $50,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Committed | $15,000 |
| [REDACTED] | U.S. Rep. (New Jersey) | Committed | $20,000 |
| [REDACTED] | U.S. Senate Candidate (New Jersey) | Committed | $15,000 |
| [REDACTED] | U.S. Rep. Candidate (New Jersey) | Committed | $15,000 |
| [REDACTED] | New Jersey Attorney General | Paid | $50,000 |
| [REDACTED] | U.S. Senator (New York) | Paid | $35,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $20,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $50,000 |
| [REDACTED] | U.S. Rep. (New York) | Committed | $15,000 |
| [REDACTED] | New York Attorney General Candidate | Committed | $40,000 |
| [REDACTED] | New York Attorney General Candidate | Paid | $30,000 |

[11] Based on my review of public reporting, I have learned that [REDACTED] was at that time the attorney general of Rhode Island. Similarly, while [REDACTED] is listed as a candidate, he was in office at that time.

| [redacted] | | | |
|---|---|---|---|
| | New York Governor | Paid | $125,000 |
| | U.S. Rep. (Florida) | Paid | $15,000 |
| | Florida Attorney General Candidate | Committed | $75,000 |
| | Florida Governor Candidate | Committed | $250,000 |
| | U.S. Rep. (Florida) | Committed | $50,000 |
| | U.S. Senate Candidate (Florida) | Paid | $100,000 |
| | Nevada Governor Candidate | Committed | $200,000 |
| | Nevada Attorney General Candidate | Committed | $50,000 |
| | U.S. Senator (Nevada) | Paid | $40,000 |
| | California Attorney General Candidate | Committed | $40,000 |
| | California Governor Candidate | Committed | $80,000 |
| | U.S. Rep. (California) | Paid | $125,000 |
| | U.S. Rep. (Texas) | Paid | $150,000 |
| | PAC | Committed | $250,000 |

iv. In total, the chart reflected that $720,000 contributions had been paid, and that $1,230,000 in commitments were outstanding, for a total projected amount of campaign contributions of $1,950,000. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and participation in the investigation, I believe that the "[redacted] Contribution List" was a more detailed accounting of the campaign contributions that Parnas, Igor Fruman, and Correia intended to make, including with Muraviev's funds. "[redacted]" is the name of the corporation that Correia and Kukushkin formed following their meeting in Las Vegas with Parnas, Igor Fruman, and Muraviev. Moreover, from my review of material obtained pursuant to the May 16 Warrant, I have learned that on or about October 9, 2018, Igor Fruman sent the "[redacted] Contribution List" that Correia had prepared to Muraviev and Kukushkin via WhatsApp.

37. After receiving the [redacted] Contribution list, Muraviev sent an additional $500,000 to Parnas and Igor Fruman (at [redacted] Account) in October 2018. Specifically, based on my review of financial records, I have learned the following:

a. On or about October 16, 2018, the [redacted] Account received a $500,000 transfer from [redacted] from an account at the [redacted] [redacted]. Based on my review of public sources, it appears that [redacted] has the same registered director, secretary, and address as [redacted] Cyprus. The day before the transfer, the account balance of the [redacted] Account was $5,982.16. The same day that the [redacted] [redacted] Account received the wire transfer from [redacted], those funds were used to pay a $79,054 [redacted] credit card bill at [redacted], and nearly all of the remaining money was wired out to accounts controlled by Parnas and Igor Fruman.

b. Based on my review of records from [redacted], I have learned that the [redacted] [redacted] credit card account was used to pay for two donations on November 1, 2018, which were made in Igor Fruman's name: $10,000 to [redacted] for Nevada, and $10,000 to [redacted] – Candidate for Nevada Attorney General, which are discussed below. Thus, Muraviev's money appears to have funded these donations, both of which were on the [redacted] Contribution List.

c. Based on my review of financial records, it appears that most of Muraviev's funds from the second wire transfer were not used for legitimate cannabis-related business expenses, but were instead used for personal expenses, other payments to consultants, and the donations to [redacted] and [redacted] In addition, based on my review of emails obtained pursuant to the January 18 Warrant, I believe that this is the second transfer contemplated by Correia's "Cannabis Schedule

and budget" described above, which was circulated within days of the group's Las Vegas meeting, and contemplated that funding in the amount of $500,000 would be due on October 1, 2018.

38. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and public reporting, I have learned the following about the political activities and conversations of Parnas, Fruman, Kukushkin, Muraviev, and Correia after Muraviev made the second $500,000 wire transfer in October 2018:

a. On or about October 19, 2018, [redacted] emailed [redacted] at the [redacted] National Committee, to confirm that Parnas, Igor Fruman, and Kukushkin would attend an October 20, 2018 campaign rally that featured [redacted] and President Trump. [redacted] wrote that, with respect to making a donation, "think the only problem we might run into is that our FEC lawyer has advised us not to make any contributions until this matter is resolved. But I will double check with both our lawyers and Lev to see how we should proceed." Based on my participation in the investigation, I believe that [redacted] was referring to the FEC complaint filed against Fruman and Parnas, discussed above, related to the $325,000 donation from GEP to [redacted]

b. On or about October 20, 2018, Kukushkin, Parnas, and Igor Fruman attended the campaign rally for [redacted] in Nevada.[12] Kukushkin, Parnas, and Fruman sent 10 photographs of themselves to Muraviev. The photographs depict, among other things, Kukushkin posing with [redacted] a candidate for Nevada state attorney general; and Kukushkin with Parnas and Igor Fruman.

---

[12] Based on my review of the Text Chain, it appears that [redacted] left the Text Chain on or about October 19, 2018, and thus did not receive any messages sent after that date.

c. On or about October 22, 2018, a member of [redacted] staff emailed Parnas, and noted that "[redacted] asked [that] I reach out and send you his W9. I have also attached his contribution form." [redacted] emailed [redacted] staff member the next day because "Lev asked me to get in touch with you regarding donations," and subsequently coordinated the donation with the staff member over the next week. [redacted] confirmed that the donation had been made on November 1, 2018, in the amount of $10,000, in response to which [redacted] campaign staff asked if the donation was "just" the $10,000. Based on my review of emails obtained pursuant to the January 18 Warrant, including the "[redacted] Contribution List," I believe that Parnas may have committed to donate $50,000 to [redacted] but only donated $10,000, which, as noted above, was funded by Muraviev.

39. Based on my review of the Text Chain, I have learned the following:

a. Following the October 20, 2018 rally, Kukushkin learned that their efforts to obtain retail licenses in Nevada were failing, including because the group had missed the September 20, 2018 application deadline,[13] and he advocated taking additional steps to "change the rules" in order to benefit their business interests, which he noted would need the Governor's approval. As noted above, the group had donated to [redacted] a Nevada gubernatorial candidate.

b. Starting on or about October 30, 2018, it appears that Parnas, Igor Fruman, Kukushkin, and Muraviev had a disagreement with respect to the next steps for their business venture. Parnas complained in a text message that "It['s] very disturbing after all our talks and

---

[13] Based on my review of Nevada law and information published by Nevada's Marijuana Enforcement Division, I have learned that Nevada law permits the Nevada Department of Taxation (the "DOT") to allocate recreational retail marijuana licenses. The DOT only accepts applications for recreational retail licenses during limited time periods. On July 5, 2018, the DOT announced that it would accept applications during September 7, 2018, and September 20, 2018, for a limited number of recreational retail licenses. The DOT has not held a subsequent application period since that time, and has not announced whether any additional licensing periods will open.

meetings that we are still nowhere in our understandings," and proposed "to stop this partnership and meet to discuss how we can move forward."

c. Muraviev responded in Russian. Based on my review of a draft translation of Muraviev's response, I have learned that Muraviev stated that "In Las Vegas we agreed on principals of our cooperation and share in future enterprise, as well as a movement strategy. It was decided that I will provide $1 million for our future enterprise (500 Nevada, California and 500 New York, New Jersey). As of today, I fulfilled all my obligations completely! Then we're supposed to work on obtaining licenses at these states. If our company is registered, then we have to move to the part two, filing the applications. Yesterday Igor told me that 2 more millions needed for other states. It was not in our agreement! And if conditions change, then I have no objections against termination of our partnership. I plan to be at the USA after November 15, ready for meetings." Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Muraveiv's reference to "$1 million for our future enterprise" referred to his payment of $1 million to fund donations to politicians in five states, as set forth in Correia's "Cannabis Schedule and budget" described above. In addition, because by this time Muraviev had already transferred $1 million to Parnas and Igor Fruman, he confirmed that "I fulfilled all my obligations completely!" However, the revised version of Correia's donation document, the [redacted] Contribution" list, added additional states and donations which totaled more than $2 million. This change appears to have been conveyed to Muraviev by Igor Fruman ("Yesterday Igor told me 2 more millions needed"), which led Muraviev to dispute that the additional amount for the other states was "not in our agreement."

d. In response, Parnas wrote, "I don't want to discuss everything over text when we met in vegas I agree I also thought we are [on] the same page and yes you sent what discussed for

part one the 2 mm that Igor spoke with you was a suggestion not a deal changer. We did very thing we are supposed to do with part 1 but we never started part 2 – office and personal to do the work. Now as far as deal changing it is your partner that told me a different deal than we discussed I wanted to send this text when I was in vegas but Igor talked me into waiting til he spoke with you."

e. Kukushin replied to the Text Chain that, "I believe we all have a clarity from day 1 and precise course of action. We have performed everything that we have agreed upon on our end. The Nevada company has been formed, the operating agreement signed and bank account opened. *Money transferred by Andrey M to Global Energy was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing.* I haven't changed any rules of our engagement and was present at all the scheduled meetings with officials in Nevada." (emphasis added). Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Kukushkin was referring to the fact that they had formed ███, signed an operating agreement, and opened a bank account as they had agreed. Kukushkin's reference to Muraviev's money being intended to "support the very specific people & states (per Igor's table)" was a reference to the specific donations intended in the five states set forth in Correia's "Cannabis Schedule and budget" described above, which Correia forwarded to Parnas, which appears to have ultimately been provided to Igor Fruman and/or Kukushkin and Muraviev.

f. On or about October 31, 2018, Igor Fruman wrote, "Just a reminder what they told in Las Vegas in Kunya's presence: They give us right and possibility to become as ███ and ███ for this town and state!!!!!!!!" Based on my participation in the investigation, I believe that Igor Fruman was referring to what "they," possibly Nevada politicians or candidates, told

Fruman and Kukushkin in Las Vegas, namely that they could be as rich as [REDACTED] and [REDACTED], wealthy casino magnates from Las Vegas.

g. Later on October 31, 2018, Muraviev replied in Russian (which has since been translated): "Good morning, everybody! If the question is opening of the office in Vegas, then I suggest taking careful, business-like approach to it. Particularly, we need to define goals, get the employees and give them clear-cut tasks. In my opinion, organizing office and spending 100K a month, as Igor suggests, is not practical at the current stage of company development. I just don't see goals [y]et! If we need an office in NY, then we have to understand what for. . . . After receiving first licenses, we can organize central business office. That's how it usually works! And it seems that we agreed on it."

h. A few days later, Parnas and Kukushkin had a further disagreement about an intended donation to [REDACTED] As noted above, while a $10,000 donation had already been made, the group had planned to donate more to [REDACTED]. On or about November 4, 2018, Parnas wrote, "Kunya make sure you get [REDACTED] the 12,500 !!! I was very embarrassed just now they said they never received the check from [REDACTED]. I don't understand?"[14]

i. Kukushkin replied, "Excuse me ?! *Leva, the money where wired to Global Energy in order to cover all the donations whatsoever.* What does it have to do with [REDACTED]? You are the ones issuing them the checks NOT me or Andrey. You should be embarrassed bringing it up after all." (emphasis added). Parnas wrote back, "Are you fuckin crazy What are you talking about you when to meet him and the VP and pledged 12,500 from [REDACTED]. I don't want to play these games You are going to get everybody in trouble." Kukushkin replied, "From us – not [REDACTED] [REDACTED]

[14] From my involvement in this investigation, I have learned that "[REDACTED]" is the name of one of Kukushkin's cannabis businesses, which is based in San Francisco.

doesn't do any business in Vegas." Based on my training, experience, and participation in this investigation, I believe that this dispute centered around whether the money that Muraviev had already wired was intended to cover this donation to [redacted]

j. Parnas wrote, " Your fuckin sick [y]ou don't remember what you say to people[, t]his is the governor and attorney general[, h]e came up to me and asked about the group he met oasis and why they still don't send a check[.] I'm not going to argue with you[, y]ou can talk to Igor." Kukushkin clarified, "We were supposed to tell him that the check(s) from Global are indeed the donations from us." Parnas wrote back, "This is crazy and stupid shit I'm done." Kukushkin replied, "You supposed to tell them, not me!"

40. Based on my review of public sources, I am aware that federal and state election commissions have the authority to subject campaigns to fines and financial penalties if they violate the campaign finance laws by accepting foreign-funded donations. This is true specifically with respect to Nevada state law. Thus, had the [redacted] and [redacted] campaigns in particular been aware of information that the defendants hid from them (that Muraviev was the true source of the donations) then it appears that they would not have accepted those donations. Thus, the defendants exposed the campaigns to which they donated to the risk of economic harm by hiding information regarding the ultimate source of funds.

41. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas, Fruman, and Correia ceased their business relationship with Kukushkin and Muraviev in or about November 2018. Specifically, in a memorandum drafted by Correia to Parnas dated November 17, 2018, Correia outlined problems with respect to the proposed cannabis business with Kukushkin, including that Kukushkin's existing cannabis ventures were poorly managed. In

addition, based on my review of bank records, it does not appear that Parnas or Fruman ever returned or repaid Muraviev his $1 million.

Contributions to Representative [REDACTED] and Unregistered Activities as Foreign Agents

42. In 2018 and 2019, Parnas, and possibly others, appear to have worked to remove the U.S. Ambassador to Ukraine, [REDACTED], at the direction and request of a Ukrainian government official, in violation of certain of the Subject Offenses.

43. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned that going back to at least 2016, Parnas and Fruman had close relationships with Ukrainian government officials, to include [REDACTED] [REDACTED] (then-Head of the State Fiscal Service of Ukraine),[15] [REDACTED] (then-General Prosecutor of Ukraine), and [REDACTED] (then-President of Ukraine). Parnas also appears to have acted as an intermediary on their behalf in the United States. Specifically, I have learned the following with respect to Parnas's activities in 2016 and 2017 related to Ukrainian officials:

a. In December 2016, Fruman flew with [REDACTED] from Munich to Miami, and arranged a dinner for [REDACTED] Fruman, Parnas, Correia, and others at [REDACTED] on December 15, 2016, apparently to pitch [REDACTED] on investing in [REDACTED] a fund associated with Correia. Based on my review of financial records, I have learned that [REDACTED] subsequently wired $500,000 (from "[REDACTED]," which based on my review of publicly available corporate records, appears to be a U.K. company that was dissolved in 2018) to an account Parnas controlled on January 11, 2017 (unrelated to [REDACTED] the fund that Correia pitched). Based on my

---

[15] Based on my review of public reporting and participation in the investigation, I have learned that the State Fiscal Service of Ukraine is a governmental agency that combines the powers of tax authorities, customs, and financial police, and is responsible for, among other things, implementing state tax and customs policy.

review of emails obtained pursuant to the January 18 Warrant, I have learned that [redacted] transferred the funds to Parnas pursuant to a promissory note, signed only by Parnas, which described the funds as a loan.[16]

b. Several weeks later, Parnas began communicating with [redacted], a Florida-based lobbyist, in order to have [redacted] represent [redacted] personal interests in the United States. Between December 2016 and January 2017, Parnas served as an intermediary between [redacted] and [redacted] and received a referral fee from [redacted] after [redacted] was retained. However, it appears that [redacted] and Parnas took efforts to hide the fact that [redacted] was the ultimate client: in an early draft of a retainer agreement circulated in early January 2017, the client was listed as a British law firm "acting in the interests of [redacted] [redacted] a citizen of Ukraine." However, after [redacted] told Parnas that he needed to run the contract by the Senate Foreign Relations staff, subsequent drafts (and the final signed version) omitted any reference to [redacted] and described the client simply as the British law firm. Email correspondence makes clear that [redacted] was the ultimate client: Parnas sent the contract (which he received from [redacted] to [redacted] for his final signature, although a woman signed the contract as an "authorized representative," and Parnas directed [redacted] to pay [redacted] $100,000, which [redacted] appears to have done. The contract memorialized an agreement for [redacted] to "consult with the Client and advocate on its behalf" on any issues "before the Federal government of the United States" in exchange for $100,000 per month, plus costs.

c. Parnas also solicited [redacted] help in ensuring that [redacted] and other Ukrainian officials were invited to the U.S. presidential inauguration, and had access to tickets to inaugural

---

[16] Based on my review of bank account records, it appears that Parnas used these funds for largely personal expenses, and does not appear to have repaid [redacted]