events. On January 4, 2017, Parnas emailed          a copy of          passport, with the subject line "Inaugural." On January 11, 2017, Parnas asked          for invitation letters, apparently to the Inauguration, for          ,          (a Ukrainian entrepreneur and former government official), and          (the former Prosecutor General).   On January 14, 2017, a representative of the inaugural committee emailed Parnas to confirm that tickets had been set aside for Parnas, Fruman,          , and          . It appears that          attended at least some inaugural events with Parnas, and while          may have been invited, he did not attend.

        d. Following the presidential inauguration, Parnas acted again as an intermediary between          and the Ukrainian government. On February 10, 2017,          emailed Parnas a copy of a contract for services between the "Government of Ukraine" and          , which appeared to be separate from          work for          (which was already subject to a paid retainer and signed contract). On February 14, 2017,          sent Parnas a copy of a letter from          to President          in which          apologized for not being able to travel to meet          , but looked forward to meeting him in New York to "discuss the issues of importance to Ukraine in its relations with the United States." Parnas then forwarded a copy of the letter to          However,          terminated his work on behalf of these Ukrainian clients shortly thereafter: on February 19, 2017, Parnas forwarded          a copy of an article in the          entitled "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates."          , the managing partner of          Washington office, wrote back "Not good." On March 14, 2017,          emailed Parnas in reference to          "representation of the [British law firm]," and wrote that because they have not "received any direction" in the three months they have been under contract,          was terminating the agreement. Parnas replied, "Got it. I will let them know." Based on my review of Department of Justice filings related to FARA, I have

learned that neither ████ nor Parnas registered under FARA in connection with any work performed in 2017 for ████ the British law firm, or the government of Ukraine.

44. Based on my review of materials obtained pursuant to the May 16 Warrant and public reporting, it appears that at least two events—both of which were subsequently referenced by

████ ,[17] the Ukrainian Prosecutor-General, in his communications with Parnas regarding ████ removal in the spring of 2019—appear to have provided motives for ████ or others allied with then-President ████ to seek ████ 's removal in the spring of 2018. Specifically, I have learned the following:

a. According to public reporting, on April 4, 2018, Ukraine's National Anti-Corruption Bureau ("NABU") released an audio recording of ████ the head of the Special Anti-Corruption Office ("SAPO") implicating ████ in corruption. According to public reporting, NABU receives funding from the U.S. and European Union aid programs, and has worked with U.S. law enforcement to share information in the past. In the recordings, ████ tipped off corruption targets that they were going to be searched, and pressured anti-corruption prosecutors and judges. As discussed below, ████ referenced this episode the following year, when she called for ████ removal. Based on subsequent messages

---

[17] Based on my review of public reporting and participation in the investigation, I have learned that ████ appointed ████ as Prosecutor-General in May 12, 2016, after the former Prosecutor-General, ████ was removed from his office by parliament. According to public reporting, ████ has no legal training and is an ally of ████ . Based on my review of the May 16 Warrant returns, I have learned that according to a message between Parnas and ████ dated May 2, 2019, Parnas referred to ████ as "the head of the Ukrainian ████ party." According to public reporting, in 2014, ████ was elected the leader of the Bloc of ████ political party. In August 2015, the Ukrainian Democratic Alliance for Reform merged with the Bloc of ████ party, and ████ became its leader. ████ is currently the mayor of Kiev, and was a former professional boxer who hired Rudolph Giuliani in 2008 as a campaign consultant. In September 2019, ████ was fired by ████ , the newly-elected president of Ukraine.

12.13.2017



between ▮ and Parnas which are discussed below, in which ▮ arranges for ▮ to be interviewed by a journalist as part of their efforts to remove ▮ it appears that ▮ and ▮ are aligned, or at the very least, are aligned in their opposition to NABU and ▮.

    b. According to public reporting, in early 2018 ▮ led an investigation into corruption within the State Migration Service ("SMS"), which led to the arrests of NABU agents. ▮ used this episode to attack the head of NABU (▮ as incompetent, and introduced an anti-NABU piece of legislation. However, ▮ announced that ▮ arrests had thwarted a joint FBI-NABU investigation into the SMS allowing Iranians to obtain Ukrainian passports. According to public reporting, ▮ and officials from the European Union used this incident (the thwarted investigation) to stop lawmakers from passing the anti-NABU legislation introduced by ▮ subsequently sent documents related to this incident to Parnas in the spring of 2019, as their efforts to remove ▮ intensified, and his messages evinced a belief that ▮ and ▮ were aligned against ▮

    c. According to an interview with ▮ published in the ▮ on October 1, 2019, ▮ frequently clashed with Ambassador ▮ beginning in as early as 2016. Specifically, ▮ stated that in his first meeting with ▮ in 2016, ▮ snapped at ▮ that "no one is going to dictate to me who is going to be investigated," with respect to ▮ investigations into anti-corruption activists, and that ▮ left the meeting. According to the ▮ article, as ▮ stepped up her criticism of Ukraine's failure to root out corruption, ▮ "personal animus toward ▮ grew," and he became convinced that "he needed to go around her and find a direct path to a more receptive audience: Mr. Trump's inner circle."

50

12.13.2017

45. Based on my participation in the investigation to date, it appears that the initial request to remove       originated in the spring of 2018. Based on my review of border crossing records, it appears that Parnas was in the United States in early 2018. Fruman, however, traveled to Ukraine in March, April, and May 2018.[18]   Around that same time period, Parnas and Fruman started attending political fundraising events and making contributions to congressional candidates and political action committees (including in the name of GEP) with the apparent purpose of enhancing their influence in       circles, as discussed above.

46. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound access to seek       's removal. Specifically, I have learned the following:

a. During an April 20, 2018 roundtable at       sponsored by the       PAC, Parnas met then-Congressman       (R-TX), and subsequently scheduled a meeting with       for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with       Fruman was in Ukraine at the time, and so Parnas sent him two photographs of the meeting: one depicted Parnas pointing at a map of Ukraine and Eastern Europe while       looked on, and the other photo depicted       posing with Parnas.

---

[18] While the exact nature of Fruman's trips—and who he met with—is unknown, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that at least some of those trips were geared towards various business ventures. Based on my participation in the investigation, I have learned that Fruman appears to be an investor in a bar and restaurant in Ukraine, and previously invested in a milk company in Ukraine. Around this time, in the spring of 2018, based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Fruman began exchanging messages with Parnas regarding energy companies in Ukraine and Poland.

51

b. It appears that in that first meeting, Parnas discussed with          the United States Ambassador to Ukraine,                              , and advocated for her removal from that position. In a letter dated that same day—May 9, 2018-          wrote to Secretary of State

          :

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine.  As you likely know,          is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador          has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms.          as U.S. Ambassador to Ukraine immediately.  I kindly ask you to consider terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of          staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and noted, "Please don't distribute, this is only for your records." Parnas had multiple other meetings with          in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for          reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to          who was running for reelection in November 2018, which were funded by Fruman (and reimbursed later with funds from Muraviev, a Russian national, as discussed above).

d. Parnas's efforts to remove          continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President          of Ukraine. Later that month,          staff arranged a call with the State Department regarding Ambassador          Prior to that meeting,          chief of staff asked Parnas if there was anything else he wanted to discuss before she spoke to the State

52

12.13.2017

Department. Despite ▓▓▓ letter and subsequent efforts, Ambassador ▓▓▓ was not removed from her posting at that time.

47. After lobbying ▓▓▓ to remove ▓▓▓ did not on its own succeed, it appears that Parnas soon enlisted Rudolph Giuliani[19] in his efforts to remove ▓▓▓ Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

a. Parnas appeared to have met Giuliani at one of the ▓▓▓ fundraising events Parnas attended in the spring of 2018. In September 2018, Parnas retained Giuliani, through his consulting firm ▓▓▓ LLC, ostensibly to act as a consultant and spokesman for Parnas's fledgling insurance business, Fraud Guarantee. As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid. However, based on my participation in the investigation and my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that Giuliani's work for Parnas involved, in large part, assisting in the efforts to remove Ambassador ▓▓▓.

48. It appears that Giuliani's assistance on the Ambassador issue began in earnest in December 2018. Based on my review of public reporting and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

---

[19] Based on my review of the January 18 Warrant, I have learned that while Giuliani is an attorney, the parties' contract includes a detailed description of the scope of work to be performed by ▓▓▓ none of which was legal in nature. To the contrary, the terms of the contract expressly state that ▓▓▓ is being retained "as a consultant" and describes a series of non-legal tasks to be completed in that capacity. Based on my participation in the investigation, aside from his statement that Fruman and Parnas were his "clients," described below, it does not appear that Giuliani was ever representing Fruman or Parnas as an attorney at any point.

12.13.2017

a. On December 7, 2018, Parnas forwarded Giuliani a copy of the May 9, 2018

▮ letter.

b. In January 2019, Giuliani and Parnas met with ▮ at ▮ in
New York. A memorandum regarding the meeting, which appears to have been subsequently
provided to the State Department by Giuliani,[20] indicates that they discussed Ambassador
▮, who ▮ asserted "protects" the "ineffective" Specialized Anticorruption
Prosecutor's Office in Ukraine – an apparent reference to NABU and ▮ – and who
▮ claimed asked him to close three cases, including a case against the member of Ukraine's
Parliament who was involved in the disclosure of ▮-related information. According to the
memorandum, ▮ also reported that he had re-initiated an investigation his predecessor,
▮, had opened into ▮ in which ▮, a board member, was implicated.

c. Around the same time, also according to a memorandum which appears to have
been provided to the State Department by Giuliani, Parnas and Giuliani participated in a phone
interview of ▮ (the former Prosecutor General), who provided information about his ▮

---

[20] Based on my participation in the investigation, I have learned that according to a U.S.
Department of State Office of Inspector General investigation, in late March or early April 2019,
Secretary of State ▮ received a package that had to do with "Ukraine issues." The
package had a return label of "The White House," although it bore no official seal, and contained
notes from interviews between Parnas, Fruman, and Giuliani, among others, with ▮ and
▮ dated January 23, 2019, regarding ▮ ▮ and ▮ The documents
were separated into folders that bore the insignia of the Trump Hotel. The notes from the meeting
with ▮ include his allegation about the "do not prosecute list," discussed below, and his
explanation that the heads of SAPO and NABU "do not like each other" and that the head of
NABU favored ▮ over Trump, and that ▮ spends money on "good public
relations" for NABU. The package then contained ▮ March 20, 2019 articles (discussed
below) featuring his interview with ▮ along with documents that appeared to be
▮ notes and emails regarding the articles. On October 2, 2019, Giuliani confirmed to
▮ that the package originated with him, and that he gave the documents to the White House,
which then passed them to ▮. Giuliani claimed that ▮ told him that ▮ would
refer the documents for an investigation.

investigation and claimed that President ▊▊▊▊ had put an end to the investigation at the request of then-Vice-President ▊▊▊▊.

49. Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that on February 11, 2019, Parnas and Giuliani again met with ▊▊▊▊ this time in Warsaw, Poland. Based on my review of materials obtained from the May 16 Warrant, I have learned that in February 2019, ▊▊▊▊, an attorney and the spouse of former Washington D.C. United States Attorney ▊▊▊▊, appears to have become involved in the effort to remove Ambassador ▊▊▊▊. On multiple occasions, she asked Parnas if Giuliani had completed drafting a retainer agreement, noting in one instance that "[o]ur hands are pretty tied about doing much until we have it in place as we need it for FARA." Texts messages suggest that Giuliani was preparing a retainer agreement, and Parnas stated in one message that the retainer should be between ▊▊▊▊ and the Ministry of Justice of Ukraine (Attn: ▊▊▊▊).

50. Based on my review of materials obtained from the May 16 Warrant, I have learned that on or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between '▊▊▊▊ as the General Prosecutor of Ukraine," and ▊▊▊▊ and ▊▊▊▊[21] The retainer amount was $200,000 for services by Giuliani, ▊▊▊▊ and ▊▊▊▊ in recovering "sums of money in various financial institutions outside Ukraine." It is not clear what this phrase refers to, and may simply have been an effort to legitimize, or give the

---

[21] Based on my review of materials obtained pursuant to the May 16 Warrant, it is not clear whether Parnas or Giuliani forwarded a copy of the February 2019 draft retainer agreement to ▊▊▊▊ Around that time, ▊▊▊▊ repeatedly asked Parnas what the status of the retainer agreement was, and asked him to forward her a copy. Parnas responded that he was trying but it was not going through, although it is not clear whether Parnas ultimately succeeded in forwarding the draft retainer to ▊▊▊▊

12.13.2017

appearance of legitimacy to, what were in truth their efforts to remove the U.S. ambassador to Ukraine. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement." On February 20, 2019, Parnas asked Giuliani to send wire instructions and a "signed copy by you██████ and██ so they can execute and wire funds." Later that day, Parnas confirmed that he "received signed retainer," however, we have not obtained a copy of the signed retainer. As discussed below, drafts of three long-form retainer agreements between██████ & ██████ and (i)██████ (ii)██████,[22] and (iii)██████ and██ separately – all of which were signed by██████ – were subsequently circulated in April 2019. Based on my review of Department of Justice records related to FARA filings, I have learned that none of Parnas, Fruman, Giuliani,██████ or██████ registered under FARA at any point in 2018 or 2019.

51. Based on my review of materials obtained from the May 16 Warrant, I have learned that after Giuliani received payments from Parnas, Giuliani appeared to have privately lobbied high-level officials—including, apparently, Secretary of State██████ and President Trump—for the removal of Ambassador██████. On February 11, 2019, the same day that Giuliani and Parnas met with██████ asked Parnas and Giuliani in a text message "Is there absolute commitment for HER to be gone this week?" Giuliani replied, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you.██████ is now aware of it. Talked to him on Friday." On February 14, 2019,██████ asked Parnas if he had heard from Giuliani, and Parnas said he had, and encouraged██████ to "nudge [Giuliani] about the Mrs. A.," which appears to be a

_____

[22] Based on my review of publicly available material, I have learned that██████ worked under██████ at that time as the deputy head of International Legal Cooperation. According to an article published on October 5, 2019 in the██████,██████ asked██████ to remove██████ at a meeting in 2016 due to██ s corruption.

reference to Ambassador [        ]  On February 16, 2019, Parnas texted [        ] that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." It appears Parnas was in Ukraine at the time. [        ] responded, "That's for Rudy to get tonight." The next day, [        ] asked Parnas if Giuliani "meet with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to President Trump. Later that day, [        ] asked "Was he successful re Amb?" to which Parnas replied "this week."

52. Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that shortly after Giuliani's lobbying efforts, Parnas traveled to Ukraine in late February and met with [        ] On February 21, 2019, Giuliani texted Parnas, "How is it going????" to which Parnas replied, "Meeting with [        ] now everything good." Three days later, Giuliani again asked how things were going, and Parnas explained that he was "meeting with [        ] in 2 hours he has some paperwork to give us I'll call you after the meeting." It is currently unclear whether these meetings between Parnas and [        ] regarded [        ] desire to have the Ambassador removed; Giuliani's desire for information about [        ] and [        ] or both; or another topic. Nonetheless, as reflected in text messages below, it does appear that Parnas's efforts to have Ambassador [        ] removed were done at the request of [        ]

53. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that following Parnas's meeting with [        ] in February 2019, and given that Giuliani's lobbying efforts appeared to have failed, Parnas, [        ] Giuliani, and [        ] worked with a journalist, [        ] at [        ] to mount an aggressive public media campaign to remove [        ] Their media campaign began within days of [        ]



57

12.13.2017

complaining to Parnas about actions that ▮▮▮▮▮▮▮ had taken in Ukraine against an ally of ▮▮▮▮▮▮▮ Specifically, I have learned the following:

54. According to articles published on March 6, 2019, ▮▮▮▮▮▮▮ gave a speech in which she called for ▮▮▮▮▮▮▮ removal from SAPO. As discussed above, NABU had previously called for the removal of ▮▮▮▮▮▮▮ (who, according to public reporting, was an ally of ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ ), and claimed that ▮▮▮▮▮▮▮ had leaked information about corruption cases to corruption targets; yet a year later, ▮▮▮▮▮▮▮ was still in his position. ▮▮▮▮▮▮▮ also criticized the Ukrainian court system, which she described as riddled with compromised judges.

55. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that ▮▮▮▮▮▮▮ immediately complained about ▮▮▮▮▮▮▮ statements to Parnas. Specifically, on March 5, 2019 (which appears to be the day of ▮▮▮▮▮▮▮ speech, which was not reported until the following day), ▮▮▮▮▮▮▮ texted Parnas "Ambassador openly called to fire head of the SAPO," which was a reference to ▮▮▮▮▮▮▮ Parnas asked ▮▮▮▮▮▮▮ to call him, and ▮▮▮▮▮▮▮ reported that the Ambassador had also criticized Ukrainian Supreme Court judges.

56. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that in response to ▮▮▮▮▮▮▮ complaint, on March 8, 2019, Parnas sent ▮▮▮▮▮▮▮ a photograph of ▮▮▮▮▮▮▮ letter, and she replied by sending the contact information for ▮▮▮▮▮▮▮ a reporter at ▮▮▮▮▮▮▮ . That same day, according to text messages, it appears that Parnas, ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ met with ▮▮▮▮▮▮▮ about Ambassador ▮▮▮▮▮▮▮ and the next day Parnas sent ▮▮▮▮▮▮▮ information about the Ambassador. Specifically, I have learned the following:

a.      wrote Parnas again on March 8, 2019, and referred to a statement made in which she called for     s removal; Parnas replied "we are all in the loop," and wrote to confirm that they were setting up an interview with     and a journalist (     as discussed below).     then sent Parnas the contact info for     and     wrote: "     is waiting I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and     discussed setting up an interview between    , but     told Parnas that     could not answer questions about "the Ambassador,     in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time,     was running for re-election, which he would ultimately lose.

b.      appeared to grow impatient with Parnas's failure to secure     removal. On March 11, 2019,     asked Parnas when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On March 13, 2019,     wrote Parnas "I am fucking sick of everything. I did not get the visit. My First did not get shit. I am ready to screw your opponents. But you want even more. We – everything. You – later. This is not fair." Based on my participation in the investigation, this appears to be a reference to     and others' willingness to share information about     and     and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador     and meeting with the Attorney General. On March 14, 2019, Parnas responded "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or    



     c. Parnas,       and       continued to work together to publicize     's allegations through       A few days later, on March 12, 2019, Parnas received from    a written narrative and answers to questions posed by     about      Vice-President       and       Parnas forwarded      answers to      Around that time, Parnas also spoke to      and conveyed additional information back to        indicated that he needed President      and      "on the record about the ambassador and      and so Parnas set up an interview between      and     

     d. Based on my review of public reporting, I have learned that on March 20, 2019, a portion of      video interview with      and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in       In his interview,      claimed he would open an investigation into whether the director of NABU,      attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee       In a second video interview published on March 20, 2019, by      in       told      that Ambassador      had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017.    reported that      was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman      wrote a "private letter asking Secretary of State    to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump."      also posted a copy of the letter. The article quoted      as describing      allegations as untrue and an "absurd attempt" to discredit NABU.

     57. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas continued working to publicize      s allegations against

60



and texted links to ▮▮▮▮▮ articles to many of his contacts. Specifically, I have learned the following:

a. On March 20, 2019, Parnas sent ▮▮▮▮▮ the development director of ▮▮▮▮▮ PAC (to whom Parnas had previously donated in the name of GEP) links to both of ▮▮▮▮▮ articles in ▮▮▮▮▮ along with links to tweets by ▮▮▮▮▮ and ▮▮▮▮▮. Parnas instructed ▮▮▮▮▮ "have ▮ retweet it," an apparent reference to ▮▮▮▮▮. ▮▮▮▮▮ confirmed "sent." As discussed below, ▮▮▮▮▮ retweeted a related article several days later. However, President Trump retweeted one of the links that Parnas sent to ▮▮▮▮▮ that same day, on March 20, 2019: an article entitled "As Russia Collusion fades, Ukrainian plot to help ▮▮▮▮▮ emerges." ▮▮▮▮▮ then sent a copy of President Trump's tweet to Parnas.

b. Parnas frequently updated ▮▮▮▮▮ on the success of their March 20, 2019 press blitz. Parnas promptly sent a screenshot of President Trump's tweet to ▮▮▮▮▮. In an apparent effort to garner more information for ▮▮▮▮▮ Parnas asked ▮▮▮▮▮ to send him "the names of the people that she said," which appears to be a reference to ▮▮▮▮▮ claimed "do not prosecute list." ▮▮▮▮▮ sent Parnas three names (" ▮▮▮▮▮ MP, ▮▮▮▮▮ MP, ▮▮▮▮▮ ngo") and described them all as "loud NABU activist[s]." As discussed above, based on public reporting, it appears that ▮▮▮▮▮ may have clashed with ▮▮▮▮▮ regarding NABU in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for ▮▮▮▮▮ to claim that ▮▮▮▮▮ had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated ▮▮▮▮▮ and told him that "Today you become a world-class political figure. Glory to the Ukraine !!!" ▮▮▮▮▮ then asked Parnas if it was "true, that the Ambassador chick and ▮▮▮▮▮ [sic] were called to Washington," which appears to be a reference

61

to ▮▮▮▮ and ▮▮▮ the head of NABU, to which Parnas replied, "I will call later. We'll talk."

    c. Parnas then reported to ▮▮▮ that President Trump had re-tweeted a story about ▮▮▮. ▮▮▮ responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that ▮▮▮ s reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

    d. The day after ▮▮▮ published the ▮▮▮ interview, on March 21, 2019, Parnas complained to ▮▮▮ and ▮▮▮ that the top news story in Ukraine was the reporting regarding Ambassador ▮▮▮, which prompted the Ambassador to put out a statement saying that ▮▮▮ was a "prime example of corruption." ▮▮▮ was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," ▮▮▮ continued, "they are saying in the State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call ▮▮▮ and had "good news." Then, in an apparent effort to quell the negative press ▮▮▮ was receiving and further publicize their allegations against ▮▮▮, Parnas offered to ▮▮▮ and ▮▮▮ "You want me to go on ▮▮▮ and talk about it? I would not mention any names if I did that. I would just say a client approached me six months back with allegations that FBI and US Ambassador in Ukraine were playing favorites. And reference ▮▮▮ getting free pass and alleged ties to 'high level ▮▮▮ administration officials'. Maybe mention allegations about setting up ▮▮▮. The media could connect the dots from there." Based on

12.13.2017

my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant, Parnas's reference to his "client" appears to refer to          .

      e.  Based on my review of public reporting, I have learned that          article soon received substantially increased press attention. On March 23, 2019, on the

on          ,          aired a segment highlighting that former-Congressman          sent Secretary of State          "an urgent letter" in May 2018, asking that Ambassador          be removed from her position, and published a copy of that letter.          was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman

      She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that Trump had decided, at least at that point, to fire          appears to be the "good news" that Parnas reported back to          two days prior.

      f.  In an apparent reference to          interview, Parnas happily wrote to          "I love you and your husband you are the best," and "Tell he was awesome my hero."          responded, "We can be really great if we have a retainer signed." Parnas agreed, and          asked if the "Wicket Witch" was gone, which appears to be a reference to          .

      g.  On March 23, 2019, Correia texted Parnas: "          must be pretty happy!! And grateful?!," Based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I believe that Correia's statement appears to be a reference to the possibility that



Congressman [redacted] would replace [redacted].23 Correia then wrote, "This is insane! Finally the facts come out, [redacted] etc., and, looks like she's finally fired . . . This is even better than if it happened before." Parnas replied, "Just the beginning."

h. Around this time, [redacted] and Giuliani began frequently posting messages related to Ukraine, [redacted], [redacted], and the 2016 election on Twitter, apparently in an effort to further magnify the press attention their claims against [redacted] would receive.

i. On March 24, 2019, [redacted] retweeted an article summarizing [redacted] reporting in the [redacted], entitled "Calls Grow to Remove [redacted] U.S. Ambassador to Ukraine."

j. Although Parnas, Giuliani, and [redacted] appeared to be pleased with the press response in the U.S., the press response in Ukraine appeared to be unfavorable to [redacted] On March 26, 2019, [redacted] sent Parnas pictures of documents that allegedly contained information about [redacted] and noted, "I hope this is enough." He then complained to Parnas that despite the information he was gathering about [redacted] the Ambassador had not been fired. In particular, he wrote the "[redacted] is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the

---

[23] Based on my review of the materials obtained pursuant to the January 18 and May 16 Warrants, it appears that Parnas and Correia had discussed replacing [redacted] with [redacted] at least as early as January 2019. On January 7, 2019, Correia sent Parnas a document entitled "Discussion List," which had a section labeled "Ukraine," which referenced their efforts to remove [redacted]. Specifically, Correia noted that the "former Inspector General," which appears to be a reference to [redacted], was waiting on a visa, and that they would "need help if denied." The existing inspector general, which appears to be a reference to [redacted] was "coming January 10-15th." With respect to "Ambassador to Ukraine," Correia wrote "Replace with [redacted] and noted that they "[s]hould be receiving very important info by both [[redacted] and [redacted] including information regarding "payoffs and bribes," an "Anti-Trump" room in the embassy, and "Telling current President (and others) that Trump will be impeached." Correia also noted that "We will be returning January 20th, or thereabouts," which appeared to be a reference to Parnas returning to Ukraine.

conversation. My case on [a Ukrainian public figure who allegedly helped ███ is proceeding along in force. Testimony about ███ [likely ███ monetary transfer is available. And only you are unable to bring down a single, stupid woman ☹." Parnas wrote back, "She is not a simple, stupid woman. Believe me. But she is not going anywhere."

k. On March 29, 2019, Parnas wrote to ███ "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." ███ then told Parnas that he had additional documents related to ███ and when Parnas asked ███ to send them to him, ███ replied that he would "pass it along with the new Ambassador ☺."

l. Over the next several days, Parnas continued to feed information to ███ who asked Parnas to "eyeball" articles for "accuracy," and continued to publish articles in ███. On March 27, 2019, Parnas told Giuliani that "███ just canceled on [ ███ which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on March 30, 2019, Giuliani confirmed that he would be appearing on ███ that morning, to which Parnas responded, "Great." Parnas sent some of ███ articles to Giuliani, among many other contacts.

m. However, when ███ still had not been removed, ███ continued his complaints about ███ to Parnas. On March 29, 2019, ███ told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding ███. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On April 2, 2019, ███ bragged, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week."

65

On April 9, 2019,          provided the names of "Advisors and public speakers of the presidential candidate"          who was running against          , and their alleged connections to          (to whom          referred by her nickname, "          "), and wrote that the candidate for Prosecutor-General—who would replace          in the event          was elected—was a "Favorite activist of          ."

58. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas,          and Giuliani made efforts to formalize the relationship with          in April 2019. On April 13, 2019, Giuliani sent Parnas a retainer agreement between          and          and          and his deputy. The agreement indicated that          was retaining          LLP to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."[24]  The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain activities on behalf of foreign political parties or entities." Per the agreement,          would to pay a $125,000 retainer and $25,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that          subsequently signed a copy of the retainer agreement.

---

[24] Based on my participation in the investigation, I believe that "embezzlement of funds" may be a reference to an allegation that          misappropriated money from Ukraine or          "Interference in the 2016 U.S. election" may be a reference to the allegation that there was a plot to turn up information about then-candidate Trump and individuals working with him, including          .

59. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that between April 11 and 23, 2019, Parnas worked with          to arrange additional interviews with Ukrainian government officials, and provided the questions that          would ask one official. Specifically, I have learned, among other things, the following:

a.          ran multiple articles during that period. However,          walked back some of his claims and told          on April 17, 2019, that Ambassador          had never requested a "do not prosecute" list, and it was instead he who had requested that list. In addition, on April 21, 2019,          won the Ukrainian presidential runoff against          . Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and public reporting, I believe that          may have walked back his comments due to the negative press attention his unfounded allegations had garnered, or in an effort to maintain credibility with the incoming          administration, so that he would not be removed by any incoming administration.

b. On April 23, 2019, Parnas asked Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on May 4, 2019, Giuliani joked, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day,          told Parnas that "People here are talking that there will be a very high level coming from you to the inauguration," to which Parnas replied "You do understand Who is dealing with this." Two days

67

later, on May 6, 2019, according to public reporting, the State Department confirmed that
Ambassador            would leave her post on May 20, 2019.[25]

60. Based on my review of public reporting, I have learned that after
removal, Giuliani and Parnas both gave multiple press interviews in which they admitted to
meeting with         and       , among other things. Specifically, I have learned, among other
things, the following:

a. On May 9, 2019, Giuliani publicly confirmed that he had met with            on
multiple occasions, and stated his intention to travel to Ukraine to meet with newly-elected
President        to push him to press ahead with two investigations he hoped would benefit
President Trump: (i) the origin of the Special Counsel's investigation into Russian interference in
the 2016 election; and (ii)          involvement in         According to the
     Giuliani was to be accompanied by Parnas and        However, on May 15, 2019,
Giuliani announced that his trip to Ukraine was cancelled.

b. On July 22, 2019, articles were published by            and the
                    regarding Parnas and Fruman's campaign for the
removal of        . Parnas and        were interviewed for the articles. Parnas said that
he and Fruman were not "acting at the behest of anyone." Parnas also said that he and Fruman

---

[25] Based on my review of materials obtained pursuant to the May 16 Warrant, I have
learned that Parnas explicitly discussed FARA with at least two individuals, separate from
          in the spring of 2019. *First*, on March 5, 2019, Parnas texted with          , and
          sent Parnas a FARA registration for a different individual, and Parnas confirmed "Got
it." Notably, that FARA registration was completed on behalf of two embassies (the Embassy of
            ) and on behalf of a foreign individual. *Second*, in April 2019, Parnas texted
with           , a naturalized Ukrainian-American who resides in Brooklyn, Israel, and
Ukraine, regarding        and        On April 24, 2019, Parnas asked      to send him
the "fara registration," and        responded with a FARA registration completed by a public
relations firm on behalf of

12.13.2017

were not paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along."         claimed that "he raised the issue of         in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because         own letter to Secretary         noted that others had brought the issue of         to his attention.

c. On July 25, 2019, President Trump spoke to Ukrainian President         According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to         who was still in place at that time following         election but subsequently removed from office, or possibly         , the former prosecutor.

d. As noted above, Parnas, Fruman, Giuliani, and         have never registered with the FARA unit of the Department of Justice. The firm of         LLP previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine.

61. Accordingly, there is further reason to believe that the efforts by Parnas, Fruman, Correia,         and Giuliani to lobby for the removal of Ambassador         may have been done at the direction or request of Ukrainian officials, particularly         in violation of certain of the Subject Offenses. While Parnas has characterized his discussions with Congressman         regarding the Ambassador as "passing information along," it appears likely that that information originated from Ukrainian sources. In particular, Parnas and Fruman appear

69

to have close relationships with Ukrainian government officials, including ███████, who appears to have solicited Parnas's help in removing the Ambassador. Parnas and Fruman arranged for meetings and telephone calls between Giuliani and ███████ in early 2019 regarding, among other things, derogatory information about the Ambassador. Parnas and others then facilitated the publication of ███████ s derogatory information about the Ambassador in the media in March 2019, which, in conjunction with the ███████ letter being made public, ultimately led to her removal. Giuliani also privately lobbied Secretary of State ███████ and the President for ███████ removal, after he had met with ███████ in New York in January 2019. Giuliani drafted retainer agreements between ███████ and ███████ specifically, and played a key part in the group's media campaign to remove ███████ by appearing on television, tweeting information related to Ukraine, and giving media interviews. Giuliani did so while continuing to lobby executive branch officials and the State Department (including by compiling a package of materials that included the anti-███████ media articles the group had planted) for ███████ removal. ███████ and ███████ also appear to have been involved in the publicity campaign to remove the Ambassador, and connected Parnas to ███████, whose articles spurred the media campaign.

## A. Probable Cause Regarding the Subject Accounts

62. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications about political contributions, communications about and records of movement of money and bank transactions relating to GEP and other entities operated by Fruman and Parnas, evidence of a scheme to disguise the true source of political contributions to candidates, campaigns, and political action committees, and communications

70

related to Parnas's and Fruman's efforts to remove the U.S. Ambassador to the Ukraine, which may have been at the request or direction of a foreign government or individual. In particular:

a. As set forth above, there is probable cause to believe that Parnas and Fruman are the users of the Subject Accounts, and that they have used the Subject Accounts, or iPhones registered to the Subject Accounts, to communicate with each other by email, text, and WhatsApp messages in furtherance of the Subject Offenses. Moreover, based on my review of Subject Account-1 through -3, each account contained evidence relevant to the Subject Offenses. Parnas stored relevant text messages and photos, among other materials, on Subject Account-1; Parnas stored relevant text messages, WhatsApp messages, and photos on Subject Account-2, and Fruman stored relevant documents on Subject Account-3. Based on my training and experience and my review of publicly-available information provided by Apple, described above, I have learned that iCloud automatically backs up an iPhone on a daily basis, unless the backup feature is disabled. Accordingly, there is probable cause to believe that the Subject Accounts contain records that are or previously were on the iPhones assigned to Parnas and Fruman.

b. Based on my training and experience, iPhones like those linked to the Subject Accounts, which have been used to communicate with others in furtherance of the Subject Offenses often contain records of that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over messaging applications. Individuals engaged in criminal activity often store such records in order to, among other things, keep track of co-conspirator's contact information, keep a record of

requests for payments or of payments made, and follow-up on requests for payments, contributions, or other aspects of the schemes. Based on my training and experience, I also know that once records are backed up to an iCloud, they can exist there for months or even years after they were created, even if a user replaces an iPhone or removes files from an iPhone device. Indeed, I have learned from publicly-available information from Apple that, depending on a user's settings, even if a user removes files from an iPhone, that user would need to log into their iCloud account and manually delete those same files in order for them to be removed from the iCloud account. Accordingly, there is reason to believe that records will be found in the Subject Accounts that date back years.

63. <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received after May 1, 2019, which is the ending date for content obtained pursuant to the prior May 16 Warrant.

**B.   Evidence, Fruits and Instrumentalities**

64. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant. In particular, I believe the Subject Accounts are likely to contain the following information:

a.   Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

b.   Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c.  Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d.  Evidence relating to the funding of bank accounts held in the name of GEP.

e.  Evidence relating to political contributions made by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

f.  Evidence relating to the source of the funds used to make any political contributions by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g.  Evidence relating to the sources of the funds deposited into bank accounts held by Fruman, Igor Fruman's brother (                    Correia, or Parnas, or on which those individuals are listed as a signatory.

h.  Evidence of other bank accounts or entities related to GEP, Parnas, Igor Fruman,
            and                    including emails reflecting registration of other accounts potentially containing relevant evidence.

i.  Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

j.  Evidence relating to communications with                              or Andrey Muraviev.

k.  Evidence relating to contributions made in the name "

l.  Evidence relating to contributions to any federal, state, or local candidate, or any political action committee, including but not limited to                PAC,

73

12.13.2017



PAC, ▮▮▮▮ PAC, the ▮▮▮▮ Fund, ▮▮▮▮ for Congress, ▮▮▮▮ for Congress, the ▮▮▮▮ Fund, ▮▮▮▮, or ▮▮▮▮

m.  Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

n.  Evidence related to any false statements made or caused to be made to the Federal Election Commission.

o.  Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

p.  Evidence relating to the May 9, 2018 letter from Congressman ▮▮▮▮ to Secretary of State ▮▮▮▮ regarding U.S. Ambassador ▮▮▮▮ including correspondence attaching or concerning the letter.

q.  Communications with individuals associated with the government or a political party in the Ukraine, including ▮▮▮▮, or ▮▮▮▮.

r.  Communications regarding ▮▮▮▮ specifically or the position of U.S. Ambassador to Ukraine generally.

s.  Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani, ▮▮▮▮ Parnas, or Fruman.

t.  Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

u.  Passwords or other information needed to access user's online accounts.

74

12.13.2017

v. Evidence of the intent of Parnas, Igor Fruman, ████████, David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani, ████, ████ and ████ ████ as it relates to the Subject Offenses under investigation.

## IV.   Review of the Information Obtained Pursuant to the Warrant

65. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 10 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachments A and B to the proposed warrant.

66. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all records within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as

searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## V.    Request for Non-Disclosure and Sealing Order

67.  While there has been public reporting about some of the contributions made by GEP, the existence of a criminal investigation, as well as the scope and focus of this criminal investigation are not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation and/or to the scope and focus of the investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  Specifically, from my experience investigating public corruption offenses, I know that individuals who participate in campaign finance offenses may communicate about known government investigations and tailor their stories to be consistent, and tamper with or hide potential evidence.  Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering and/or obstruction of justice.  In addition, the investigation relates to financial transactions involving foreign bank accounts, and premature disclosure of the focus of this investigation could lead to efforts to hide or conceal foreign funds or transactions.  Lastly, if the subjects of this investigation were alerted to the existence of a criminal investigation, it may prompt them to delete electronic records, including in e-mail accounts or other electronic media not presently known to the government.  Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the

12.13.2017

warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

68. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## VI.   Conclusion

69. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Sworn to before me this
21 day of October, 2019

HONORABLE J. PAUL OETKEN
United States District Judge
Southern District of New York

77

12.13.2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All Content and
Other Information Associated with the iCloud
Accounts with Apple IDs
[          ], and [          ], Maintained at
Premises Controlled by Apple, Inc. USAO
Reference No. [          ]

**19MAG 9829**

### SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Apple Inc. ("Provider")

United States Attorney's Office for the Southern District of New York and the Federal
Bureau of Investigation (collectively, the "Investigative Agencies")

**1. Warrant.** Upon an affidavit of Special Agent [          ] of the Federal Bureau

of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C.

§ 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal

Procedure 41, the Court hereby finds there is probable cause to believe the iCloud Accounts with

Apple IDs [          ], maintained at premises controlled by

Apple Inc., contain evidence, fruits, and instrumentalities of crime, all as specified in Attachments

A and B hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agencies, within 10 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachments A and B hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachments A and B. The Government is required to serve a copy of

this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and

Order may be served via electronic transmission or any other means through which the Provider

is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is

reason to believe that notification of the existence of this warrant will result in destruction of or

tampering with evidence, and/or tamping with potential witnesses, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

*Oct. 21, 2019*          *10:42 a.m.*

Date Issued          Time Issued

HONORABLE J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

2

## iCloud Search Warrant Attachment A

### I.    Subject Accounts and Execution of Warrant

This warrant is directed to Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud accounts with Apple IDs ▓▓▓▓▓▓▓▓,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Maintained at Premises Controlled by Apple, Inc. (the "Subject Accounts"). The Provider is directed to produce the information described below associated with the Subject Accounts for the following time periods through the date of this Warrant. With respect to the Subject Accounts, this application is limited to all content created, sent, or received after May 1, 2019.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.    Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts:

a. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

b.   *Device information and settings.*  All information about the devices associated with the Subject Accounts, including but not limited to the Integrated Circuit Card ID ("ICCID") number, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), the serial number, customer device settings, and repair history.

c.   *Transactional records.*  All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

d.   *Purchase records.*  All purchase records associated with the Subject Accounts, including records reflecting app purchases from the App Store and/or iTunes Store.

e.   *Address book information.*  All address book, contact list, or similar information associated with the Subject Accounts.

f.   *Call history and voicemails.*  All call histories, logs for FaceTime calls, audio voicemails, and visual voicemails associated with the Subject Accounts.

g.   *Text message content.*  All text messages (including iMessages, Short Message Service ("SMS") messages, and Multimedia Messaging Service ("MMS") messages) sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each text message, and the date and time at which each text message was sent).

h.   *Email content.*  All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

12.13.2017

     i.   *Photos and videos.*  All photographs or videos associated with the Subject Accounts, including any photographs or videos found on any iCloud Photo Library, My Photo Stream, or iCloud Photo Sharing service linked to the Subject Accounts.  All associated metadata with any photograph or video including the time and date of creation, the author or creator, the means of its creation, and the GPS location information for where a photo or video was taken.

     j.   *Documents.*   All documents stored in or otherwise associated with the Subject Accounts, including all documents in iCloud Drive, and iWork Apps.

     k.   *Search and web histories.* All search history, web history, bookmarks, and iCloud Tabs.

     l.   *Third-party application data.*  All records, messages, and data relating to third-party applications, including WhatsApp and other third-party messaging applications, stored in or otherwise associated with the Subject Accounts.

     m. *Location data*.  All location data associated with the Subject Accounts.

     n.   *Customer correspondence.*  All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

     o.   *iOS Device Backups.*  All device backups, and the contents of those backups, including but not limited to messages, web history, and preferences.

## III.    Review of Information by the Government

     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 52 U.S.C. § 30122 (unlawful straw donations), 52 U.S.C. §

12.13.2017

30121 (unlawful contribution by a foreign national), 18 U.S.C. § 371 (conspiracy to commit the same), 18 U.S.C. § 2 (aiding and abetting the same), 18 U.S.C. § 1001 (false statement to the Federal Election Commission ("FEC")), and 18 U.S.C. § 1001 and 2 (willfully causing a false statement to be made to the FEC), 18 U.S.C. § 1519 (fabrication of documents); 22 U.S.C. §§ 612 and 618 (failure to register as a foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government); 18 U.S.C § 1956 (international promotional money laundering); and 18 U.S.C. § 1343 (wire fraud), including the following:

a.  Evidence relating to the creation, incorporation, or operation of Global Energy Producers ("GEP"), or other shell corporations used to make political contributions.

b.  Evidence relating to the ownership of GEP, including any evidence relating to attempts to conceal the ownership of GEP.

c.  Evidence necessary to establish the extent to which GEP is operating as an actual business, including as an oil, gas, or energy business.

d.  Evidence relating to the funding of bank accounts held in the name of GEP.

e.  Evidence relating to political contributions made by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

f.  Evidence relating to the source of the funds used to make any political contributions by Fruman, Parnas, their family members, GEP, and its affiliates, employees, or representatives, or other entities controlled by Fruman and Parnas.

g.  Evidence relating to the sources of the funds deposited into bank accounts held by Fruman, Igor Fruman's brother ( Correia, or Parnas, or on which those individuals are listed as a signatory.

4

h. Evidence of other bank accounts or entities related to GEP, Parnas, Igor Fruman, ▮ and ▮ including emails reflecting registration of other accounts potentially containing relevant evidence.

i. Evidence relating to communications with or regarding political candidates, campaigns, political action committees, political consultants, or political contributions.

j. Evidence relating to communications with ▮ or Andrey Muraviev.

k. Evidence relating to contributions made in the name "▮

l. Evidence relating to contributions to any federal, state, or local candidate, or any political action committee, including but not limited to ▮ PAC, ▮ PAC, ▮ PAC, the ▮ Fund, ▮ for Congress, ▮ for Congress, the ▮ Fund, ▮ or ▮

m. Evidence of intent to make unlawful political contributions or violate the campaign finance laws.

n. Evidence related to any false statements made or caused to be made to the Federal Election Commission.

o. Evidence of knowledge of the campaign finance laws, including but not limited to knowledge of the prohibition of making contributions in the name of another person, and knowledge of the prohibition on contributions by foreign nationals.

p. Evidence relating to the May 9, 2018 letter from Congressman ▮ to Secretary of State ▮ regarding U.S. Ambassador ▮ including correspondence attaching or concerning the letter.

5

12.13.2017

q. Communications with individuals associated with the government or a political party in the Ukraine, including              , or        .

r. Communications regarding      specifically or the position of U.S. Ambassador to Ukraine generally.

s. Evidence, including travel records, related to meetings with Ukrainian government officials involving Rudolph Giuliani,     Parnas, or Fruman.

t. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

u. Passwords or other information needed to access user's online accounts.

v. Evidence of the intent of Parnas, Igor Fruman,    , David Correia, Andrey Kukushkin, Andrey Muraviev, Giuliani,    and    , as it relates to the Subject Offenses under investigation.